## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. _____

TODD STANAFORD, on behalf of himself
and all others similarly situated,

                Plaintiff,

vs.

ROBERT DONALD BRUCE GENOVESE,
TIFFENI ALIECE GRAVES, MARNIE
MARKIN, GEOFFREY BROWNE, BG
CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC. AND LIBERTY
SILVER CORPORATION,

                Defendants.

**<u>DEMAND FOR JURY TRIAL</u>**

## <u>CLASS ACTION COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff, Todd Stanaford ("Plaintiff"), by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the public documents and announcements issued by Liberty Silver Corporation, ("Liberty Silver" or the "Company"), filings with the Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, and other information readily obtainable on the Internet.

1

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of purchasers of the common stock of Liberty Silver (the "Class") during the period April 1, 2008 through October 5, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       This Complaint alleges a massive and systemic financial fraud that was effected by the Defendants against the Class via a clear "pump and dump" scheme.   In the course of this scheme, the Defendants promoted Liberty Silver in newsletters and reports published and disseminated over the internet.

3.       Defendants' made materially false or misleading statements regarding predictions in those reports, or caused them to be made. Following the Defendants' promotional efforts (the "pump"), Genovese, directly or indirectly, sold Liberty Silver to the investing public at an increased price (the "dump"), pocketing unlawful profits amounting to tens of millions of dollars. Genovese attempted to conceal his involvement in the fraudulent pump and dump scheme - and their receipt of illicit income from the fraud - by using nominee entities and operating offshore brokerage and bank accounts in Canada, the Turks and Caicos Islands, and elsewhere.

## PARTIES

4.       Plaintiff purchased shares of Liberty Silver common stock, as set forth in the accompanying certification, which is incorporated by reference herein, and has been damaged thereby.  Plaintiff is a resident of the state of Texas.

5.       Defendant Robert Donald Bruce Genovese, ("Genovese"), is an investment capitalist, entrepreneur, and stock promoter.  Upon information and belief, although he is a Canadian citizen, Genovese resides in Florida.

2

6.      Defendant BG Capital Group LTD ("BG Capital"), is an investment management company incorporated in the Bahamas, with offices in the United States, Bahamas, and Barbados.  BG Capital has its corporate office in Nassau, Bahamas, and its management office in Plantation, Florida.  BG Capital is wholly owned and controlled by Genovese.

7.      Defendant Liberty Silver is a company incorporated in Nevada and headquartered in Canada, with all its pertinent assets located in Nevada.  Liberty Silver did extensive business with Genovese when he was in Florida including actions furthering the fraud connected with Genovese.

8.      Defendant Look Back Investments, Inc., is a shell investment company incorporated in Panama, headquartered in Panama City, Panama, and wholly owned and controlled by Genovese.

9.      Defendant Tiffeni Aliece Graves, former next door neighbor and personal friend of Marnie and Matthew Markin, purchased 250,000 pre-split shares of Liberty Silver stock at $.05 cents per share on April 1, 2008, the same day that Marnie Markin bought 250,000 shares. Upon information and belief, Graves made these purchases as part of Defendants' pump and dump scheme, instigated by Genovese.  Upon information and belief, Graves resides in and is a citizen of California.

10.     Defendant Marnie Markin is the wife of Matthew Markin (CEO of American Lithium Minerals) and the sister in-law of Marco Markin (CEO of BG Capital and Neptune Society).  Marnie Markin bought 250,000 pre-split shares of Liberty Silver stock at $.05 cents per share on April 1, 2008. Upon information and belief, Marnie Markin made these purchases as part of Defendants' pump and dump scheme, instigated by Genovese. Upon information and belief, Marnie Markin resides in and is a citizen of Florida.

11.     Defendant Geoffrey Browne, ("Browne") is the Chairman of the Board of Directors, and CEO, of Liberty Silver.  Browne approved the financings and decisions of Liberty Silver, with full knowledge of Genovese's previous history of securities fraud, or was willfully reckless in not knowing.  Upon information and belief, Browne resides in and is a citizen of Canada.

12.     Defendants Genovese, Graves, Markin, and Brown are collectively referred to herein as the "Individual Defendants."

13.     The Individual Defendants, because of their positions with Liberty Silver, and/or their positions of influence, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. By reason of their influence,  management positions, and/or their ability to make public statements in the name of Liberty Silver, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Liberty Silver to engage in the conduct complained of herein.

## JURISDICTION AND VENUE

14.     The claims alleged herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and the rules and regulations of the SEC promulgated thereunder.

15.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, §22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. §1331.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, §22(a) of the Securities Act, 15 U.S.C. §77v, and §28 U.S.C. §1391(b), as a substantial part of the acts events or omissions giving rise to the claims pleaded herein occurred in this

District and defendants named herein maintain their residence or principal places of business in this District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the Toronto Stock Exchange and Over the Counter Bulletin Board.

## BACKGROUND INFORMATION

18.     Genovese is believed to have used a pump and dump pattern of stock manipulations in Liberty Silver as well as in numerous other schemes, including but not limited to, schemes involving the following companies:  Clearly Canadian Brands (CCBEF), Neptune Society (NPTI), Envoy Communications (ECGI), Spectrum Sciences & Software (SPSC), American Lithium Minerals, Inc. (AMLM), and others.  This information should have been known, or was known, by Defendants Browne, Markin, Graves, and Liberty Silver.

Genovese is a penny stock promoter and is notorious for operating on the fringes of the financial markets, making millions of dollars by touting penny stocks.  He uses television shows, newsletters, false and misleading releases, and emails to pump up a stock, urging the public to invest in these stocks at artificially inflated rates driving the stock price higher; Genovese can then dump large blocks of stock at the artificially inflated prices, profiting millions of dollars in the process.  When Genovese dumps his large blocks of stock, the stock price plummets leaving the general investing public with huge losses.

## Clearly Canadian

19.     Clearly Canadian, a once prosperous boutique beverage company based in Vancouver, ran into financial difficulties around 2001 culminating in a Toronto Stock Exchange delisting in February of 2005.  In March of 2005, Defendant BG Capital announced

that it would invest $1,000,000 in a short-term financing facility that eventually led towards control of the company. Two months later in May, the company completed a 1:10 reverse stock split and listed on the OTCBB under the symbol CCBEF.  Immediately following this, Genovese used a reality TV show to promote Clearly Canadian, while at the same time appointing his cronies in positions of power in the company and purchasing large blocks of stock.  When the stock price became artificially inflated, Genovese and his nominees dumped their stock leaving the company in worse financial condition than when he took control.  On March 17, 2010, Clearly Canadian filed for bankruptcy and was delisted.

20.     Below is a graph of the stock for Clearly Canadian from the time BG Capital took control. The rising and falling pattern of the stock is caused by Genovese buying and selling large blocks of stock to drive up the price.  Genovese would sell blocks of stock between various shell corporations he owned and controlled to create the illusion of volume and demand.  At the same time, Genovese would promote the stock through various mediums such as newsletters, emails, press releases, and reports.  When the time was right, Genovese would dump his shares for huge profits while cratering the market.



**Neptune Society**

21.     On January 20, 1999, an OTCBB shell named Lari Corp. announced that it would acquire the then private "Neptune Society" based in California.  Lari Corp. was incorporated in Florida sometime in 1998 with 125,000 shares issued at par value.  On August 26, 1998, Lari Corp. was listed on the OTCBB under the symbol LREE.  On January 19, 1999 (one day before the announcement that Lari Corp. would acquire Neptune Society), Lari Corp. sold 250,000 shares at .80 cents per share raising $200,000. Each share purchased in January included the right to buy four more shares at the same price in the future.  A large portion of these stocks were purchased, directly or indirectly, by Genovese through offshore companies under his control, and by his nominees.  On April 7, 1999, shares that participated in the January 19, 1999, financing exercised their right to buy resulting in the issuance of an additional 1,000,000 shares of the now called Neptune Society (Lari Corp. took on the Neptune Society name following its acquisition) at $.80 cents per share.

22.     The original 250,000 shares were purchased by twenty-four investors, including Genovese, BG Capital, and other offshore companies tied to, and most likely owned and controlled by, Genovese.  The 1,000,000 shares were exercised by nine offshore companies. This means that the other fifteen investors immediately sold their shares to the nine offshore companies controlled by Genovese.  Three of those companies were Crystal Overseas Trading, Inc., Private Investment Company, Ltd., and Seloz Gestion & Finance SA, all offshore companies affiliated with Genovese and used by Genovese to facilitate his stock schemes.

23.     Shares of Neptune Society on the OTCBB traded at a split adjusted share price of between $20 in 1998, to as high as $60 in 2000. In that time over 1,770,000 shares of Neptune Society traded hands allowing the offshore owners of the 1,250,000 shares purchased for $.80 to liquidate their shares resulting in up to $40 million in profits. The rising and falling of the NPTI stock price in the graph below shows Genovese buying and selling stock with his various

entities, driving the price up, then dumping the stock, causing the value to drastically drop in December 2000.



24.     After the stock lost 95% of its value, with Genovese making a huge profit and the general investing public experiencing huge losses, Genovese purchased the remaining shares, taking the company private.  In other words, Genovese had his cake and ate it too.

**Envoy Communications**

25.     Envoy Communications was a stock heavily touted by Bobby Genovese, using BG Capital along with emails and press releases, while his brother Geoffrey was the CEO of the company. After raising over $50 million in financings by making bold promises to consolidate the media industry, Envoy Communications ended up like all the other companies associated with Genovese, delivering over 90% losses to its investors while Genovese's brother Geoff extracted millions of dollars in compensation, both from a $375,000 salary and over 1,500,000 shares in stock options. Note the rising and falling pattern of the stock below, as well as the massive increase in volume due to Genovese dumping his large blocks of stock, then a deep decrease in value, similar to all other companies associated with Bobby Genovese, including Liberty Silver:



**Spectrum Sciences & Software**

26.    Spectrum Sciences & Software ("SPSC") began with the incorporation of a shell company named, Silva Bay International Inc. ("Silva Bay") in Delaware in 1998. In a process that is nearly identical to the Neptune Society transaction, Silva Bay listed on the Pink Sheets under the symbol SIVY in the year 2000. On April 2, 2003, Silva Bay acquired a company named Spectrum Sciences for 2,500,000 shares of Silva Bay and changed its name to Spectrum Sciences & Software Inc., and its trading symbol to SPSC.

27.    According to Part I – Item 4 of Form 10 filed with the SEC on June 10, 2003, SPSC had 18,844,000 shares outstanding which included 2,500,000 shares issued to Donald Myrick.  Donald Myrick is the founder of SPSC.   In other words, there were 16,344,000 shares of the Silva Bay shell which could be sold as part of the free trading float.

28.    3,700,000 shares were held by three offshore companies based in the Bahamas, Turks & Caicos, and Switzerland, respectively Crystal Overseas Trading, Inc., Private Investment Company, Ltd., and Seloz Gestion & Finance SA, all offshore companies controlled by Genovese that exercised the $.80 cent rights on Neptune Society in 1999, while the stock

price was $50 dollars. The connection to Genovese does not end there.  An SEC filing in 2004 shows those offshore companies as having entered into an agreement with BG Capital to sell BG Capital shares of Neptune Society as part of that private transaction.  Crystal Overseas Trading and Martin Christen, who is the Turks & Caicos based director of Private Investment Company, Ltd., can both be linked back to Swiss Overseas Finance Company, another company that exercised those $.80 cent warrants on Neptune in 1999. The reason these shares are so important is that SPSC would subsequently be a target of an informal SEC inquiry, a negative New York Times article, and litigation directed at Genovese and BG Capital.

29.     Genovese's participation is found in a Stock Option Plan he formally entered into with SPSC on March 11, 2004.  In the Agreement, Genovese would be given the right to buy shares of SPSC at $1.65 per share indefinitely, and using a Form S-8 (which is meant for only working executives of a company as opposed to stock promoters) these shares would be immediately free trading. In addition Genovese was paid exorbitant cash consulting fees, approximately $2,000,000 dollars, by SPSC.  The Form 10-Q for the period ending March 31, 2004, revealed that Genovese exercised all of his options: The Form 10-Q filed on May 24, 2004, stated in relevant part "Between January 1, 2004 and May 21, 2004, Mr. Genovese has exercised 21,178,300 options."

30.     A Form 13D filed on August 3, 2004 by BG Capital, revealed that Genovese sold all of those shares as quickly as he received them:

> During March and April 2004, the Reporting Persons (Genovese) exercised Options relating to 20,078,300 shares of Common Stock, using Genovese's personal funds, BG Capital's working capital and/or cancellation of indebtedness owed to Genovese and his affiliates as consideration for the exercise price due therefore, The Reporting Persons (Genovese) have sold substantially all of such shares of Common Stock (SPSC stock).

31.     From January 1, 2004 to May 21, 2004 (the period where Genovese exercised 21,000,000 options), SPSC traded 220,030,000 shares.  That was enough volume to liquidate the 21,000,000 options but also the 16,344,000 shares that were purchased, upon information and belief, by Genovese for almost nothing. Note the high volume of trades illustrated by the graph:



| Date | Closing Price | Volume | BG Trading Volume | BG Avg. Price | BG % of Total Volume |
|------|---------------|--------|-------------------|---------------|----------------------|
| 9/22/2004 | $1.18 | 455,000 | 164,950 | $1.18 | 36% |
| 9/24/2004 | $1.20 | 235,000 | 126,260 | $1.20 | 54% |
| 9/30/2004 | $1.26 | 298,000 | 137,000 | $1.25 | 46% |

32.     The above graph shows the trading records of BG Capital in its attempt to raise the price of the stock by purchasing and selling massive blocks of stock in rapid succession. These are only the records of BG Capital, not those of all the offshore companies that Genovese controlled, and which have been traced back as owning millions of additional shares.  Three days out of eight, BG Capital was responsible for more than half of the entire volume of trading for SPSC.  This shows that Genovese was buying and selling, in massive quantities, to surge the price up.  In addition to these manipulative trades, Genovese employed emails, false reports,

newsletters, TV shows, and false websites to hype up a stock, driving the price up until he could dump his shares and make a huge profit.

33.     In 2004, investors of SPSC filed a lawsuit against Genovese and BG Capital for violations of insider trading.  After repeatedly ignoring the court's rulings, including refusing to show up for depositions numerous times, failing to produce discovery, and being uncooperative, the court granted a motion to compel against Genovese and BG Capital.  Instead of producing discovery or appearing for deposition, Genovese agreed to a settlement for $3.25 million less than a week after the motion to compel was granted.

**<u>American Lithium Minerals</u>**

34.     American Lithium Minerals started as Nugget Resources a shell company with 5,500,000 free trading shares sold at $.01 per share as documented in an S-1 filing dated March 22, 2006.  As is customary for OTCBB scams, to lower the already low average cost of the free trading shares, Nugget Resources completed a 4 for 1 forward split on March 19, 2009.  Upon information and belief, Genovese, directly or indirectly, purchased all 5,500,000 shares, therefore after the split Genovese had and/or controlled 22,000,000 shares, purchased for less than a penny per share.

35.     On the date of the stock split, March 19, 2009, Nugget Resources changed its name to American Lithium Minerals, Inc. and its trading symbol to AMLM. Prior to the name change and split, Matthew Markin was appointed as President and CEO of the company. Matthew Markin is the brother of Marco Markin, the CEO of Neptune Society (a company now wholly owned and controlled by Genovese), and an associate/nominee of Genovese. Matthew Markin also shows up in filings for Neptune Society in 2003 as having provided consulting services for the company.

36.     A press release from American Lithium Minerals dated September 2, 2009, disclosed that Stephen Cook was appointed as Vice President of Investor Relations. Upon information and belief, Cook was appointed as VP of Investor Relations merely as an instrument for Genovese to use in hyping the stock of American Lithium Minerals. In each of Genovese's schemes, Cook is the man who leads Genovese's multimedia promotional blitz to artificially inflate the stock.

37.     Starting in June of 2009, American Lithium Minerals stock began to rise aggressively from $.20 cents a share to as high as $3.00. This drastic rise was due to false or misleading reports issued by Genovese and his associates (Cook and Markin), combined with massive and frequent trading between Genovese controlled shell entities, as well as largely exaggerated promotional materials. The sheer volume and frequency of the trades provided Genovese with plenty of time and volume to liquidate the entire 22,000,000 shares of undisclosed float for millions of dollars in profit. *See,* graph below:



38.     In confirmation, on August 26, 2011 BG Capital emerged in an 8-K filing as having financed American Lithium Minerals, formally linking Genovese to yet another worthless OTCBB stock that currently trades for $.02 cents per share.

39.     Every single public company that has been promoted or associated with Genovese has resulted in investor losses of between 90-100%.   Browne and Liberty Silver allowed Genovese and his minions to employ the same scheme to defraud the Company's investors.

## FACTS OF THE CASE

40.     Liberty Silver states on its website that it is engaged in the exploration and development of mineral properties in North America. Specifically, the Company describes itself as an "advanced exploration play in Nevada with potential opportunity to quickly become a low cost, open pit operation."   The Company has an option on the Trinity Silver Project, an undeveloped silver prospect near Lovelock, Nevada.

41.     Liberty Silver has entered into a joint venture with Renaissance Gold, whose chairman is Haywood Capital Markets chairman John Tognetti. Under the terms of the Joint Venture Agreement, Liberty Silver must spend $5 million to earn 70% ownership of the Trinity silver project from Renaissance.

42.     On April 1, 2008, Lincoln Mining (soon to be Liberty Silver) filed an S-1 with the SEC registering 2,420,000 shares at $.05 per share raising a total of $121,000.   One of the investors who was able to buy 250,000 pre-split shares at only $.05 cents in that offering was Marnie Markin.   Marnie Markin is the wife of Matthew Markin (CEO of American Lithium Minerals) and the sister in-law of Marco Markin (CEO of BG Capital and Neptune Society). Marnie Markin is just another instrument of Genovese to purchase stock on his behalf.

43.     Another investor who purchased 250,000 shares at $.05 a share was Tiffeni Aliece Graves.  Graves was the next door neighbor of Marnie and Matthew Markin in California and is also believed to have purchased stock on behalf of Genovese.

44.     At the time Marnie Markin and Tiffeni Aliece Graves purchased these large blocks of stocks, Lincoln Mining had no employees, no cash, no property, and no assets.  In other words, there was no reason for Marnie Markin and Tiffeni Aliece Graves to purchase 500,000 shares of Liberty Silver except to participate in Genovese's next scam.

45.     On March 15, 2010, Lincoln Mining conducted a 20 for 1 forward stock split turning those 2,420,000 pre-split shares into 48,400,000. That same day, March 15, 2010, it changed its name to Liberty Silver Corp. Exactly ten days later, on March 25, 2010, shares of Liberty Silver began trading on heavy volume in a pattern that mimics all of Genovese's past OTCBB companies. *See* Graph below. Note the familiar rising and falling pattern:



46.     On November 11, 2011, Liberty Silver announced a $3.25 million non-brokered financing with a Panamanian Company named "Look Back Investments."  Under the terms of the financing Look Back Investments received 6,500,000 shares as well as the option to buy 6,500,000 more at $.65 cents per share.  In an exhibit to the Form 8-K for the financing dated November 10, 2011, Liberty Silver disclosed that Look Back Investments is wholly owned and controlled by Genovese.

47.     As of the November 11, 2011 financing of $3.25 million through the Genovese company Look Back Investments, shares of Liberty Silver had already traded no less than $33 million on volume of 55 million shares. In other words an owner (Genovese) of the undisclosed 48,400,000 shares could have liquidated, and upon information and belief did liquidate tens of millions of dollars worth of shares, making $3,250,000 a small amount to reinvest.  Upon information and belief, Genovese directly or indirectly owned most, if not all, of the shares from the March 15, 2010, stock split.

48.     In a Liberty Silver press release on December 21, 2011, Bill Tafuri, President and COO of Liberty Silver stated:

> We are very pleased with the progress on the Trinity property. Our 43-101 Report indicates a property of merit that contains a defined silver resource, which could be expanded through further drilling. Our team has identified and confirmed multiple silver and gold targets not discussed in the 43-101 Report. With the funding in place, we expect to initiate additional geochemical and geophysical surveys in conjunction with an aggressive drilling campaign targeting both high priority exploration targets, and the extensions from the original pit. Given our geographical location, the quality of historical data, and our geological interpretations, we anticipate the planned programs could expand the current resources and help to define the potential for a profitable mine.

49.     On December 22, 2011, using the $3.25 million financing from Genovese through Look Back Investments, Liberty Silver was able to meet requirements for listing on the Toronto Stock Exchange (the "TSX"), even though Liberty Silver had 48,400,000 undisclosed free

trading shares purchased for $.0025 per share, which violated the rules of the TSX.  In addition, Liberty Silver somehow bypassed the advanced stage mineral development requirements of the TSX.  The false reports issued by Genovese and his accomplices mislead the TSX to believe that the value of Liberty Silver was far greater than it actually was.  Regardless of these deficiencies Liberty Silver obtained a listing on the TSX.  Once Liberty Silver was listed on the TSX, the 48,400,000 shares were treated differently as they were no longer looked at by brokers and banks as red flagged OTCBB shares (red flagged because a company with 48,400,000 undisclosed shares should not have been allowed on the exchange) - but the more prestigious TSX shares. More importantly, by obtaining a listing on the TSX, Liberty Silver appeared to the public as another reputable mining company instead of the pump and dump vessel that it was.

50.     In a further effort to leverage more shares, legitimize Liberty Silver, and drive the stock price higher, Genovese attempted to buy a more cash rich company.  On July 16, 2012, Liberty Silver announced that it would make a tender offer for Sennen Resources, a reputable TSX listed company with nearly $14 million in cash.  The proposed takeover would pay Sennen Resources investors with Liberty Silver stock in a ratio that would value Sennen Resources at its cash value ($14 million) and Liberty at a completely unfounded, ridiculous, and artificial valuation of $48,000,000.

51.     Ian Rozier, CEO of Sennen Resources, opposed the merger and highlighted various red flags about Liberty Silver. The investors in Sennen voted to oppose the merger. Sennen's opinion of the offer by Liberty Silver was that "the offer had always been a hostile, derogatory and insulting one, which was utterly inadequate for shareholders….shareholders were justifiably outraged by what they considered to be continual harassment by Liberty."

52.     Ian Rozier stated "Liberty's Offer is an insult to the intelligence of Sennen Shareholders who understand that this is a clear case of the management and promoters of an

OTC shell company with very little money and questionable assets trying to back their ludicrously overvalued paper into an established company with tangible assets-in this case Sennen and its treasury." He went on to highlight that Liberty Silver's stock was actually valued between $0.005 and $0.07 per share instead of the $.20 per share Liberty Silver claimed.

53.    From January 2012 to August 2012, Liberty Silver's stock trading volumes averaged about 42,000 shares per day.  However, as soon as Genovese began his familiar fraudulent and manipulative scheme, volumes drastically increased in September and early October, averaging roughly 236,000 shares per day.

54.    In September of 2012, The Midas Letter, a subscriber-driven private investment strategy newsletter, believed to have been paid to falsely report by Genovese, reported the following about Liberty Silver:

> September 27, 2012 – The math is very straightforward with Liberty Silver's Trinity Project: 50 million ounces of silver at $30 per ounce minus cash costs of $15 per ounce equals US$750 million divided by 80 million shares outstanding equals $9.38 a share. Chop that in half for the sake of conservativeness, and you still get a price of $4.68 per common share outstanding.

> * * *

> In the month of September so far, the company has traded over 20 million shares and doubled in value. Silver itself has traded in a similar trajectory, increasing in value by 35% since mid-summer, and outperforming gold smartly. The most respected and experienced traders in precious metals fully expect the ratio of how many ounces of silver it takes to buy one ounce of gold to head towards 16:1 from its current level of over 50:1. That would imply a silver value of $110 per ounce. If Liberty Silver shares continue to trade at such a high beta to the silver futures price, the premium being awarded Liberty Silver could be substantial.

> * * *

> What sets Liberty Silver apart from every other TSX and Venture –listed firm is the caliber of the management and board of directors. And, when it comes to raising money to put a project into production, a team with deep pockets themselves – and more importantly, access to deep institutional pockets – is critical.

Starting with Chairman and CEO Geoffrey Browne, who was the head of private equity at Merrill Lynch Canada and is one of the founders and managing partners of MWI & Partners, a private equity firm. Prior to founding MWI & Partners, Mr. Browne was a senior executive at Canadian Imperial Bank of Commerce and CIBC Wood Gundy Inc. for over 20 years. He has managed more than $1 billion in merger, acquisition and private equity transactions. His experience includes overseeing CIBC's purchase of Wood Gundy and Pelmorex's acquisition of The Weather Network. Mr. Browne is currently a High Beta to Silver and a Fast Track to Production Midas Letter / September 24, 2012 2 director of Insight Sports, and the Alberta Enterprise Corporation, which oversees in excess of $100 million for early stage ventures.

Then there's the president, Bill Tafuri, with 40 years' of diverse mining and exploration experience. He worked major international mining companies including Getty Mining Co, Kennecott Corp., Santa Fe Pacific Gold Corp. and Kinross Gold Corp.

Paul Haggis, a Canadian business icon who is chairman of Canadian Pacific Railway Ltd., C.A. Bancorp Inc., a Canadian merchant bank and alternative asset manager, and Alberta Enterprise Corporation, a venture capital fund overseeing $100 million for early-stage ventures. He was previously, among other positions, president and CEO of OMERS, one of Canada's largest pension funds, and executive vice-president at Manulife Financial. Mr. Haggis was also a director of Canadian Tire Bank until March 2012, chairman of the audit committee at Advantage Energy of Calgary, director and audit committee chair of Prime Restaurants Inc., which was sold to Fairfax Financial Holdings Limited, and a trustee and chair of Royal Ontario Museum's finance committee. He also chairs the Insurance Corporation of British Columbia's investment committee for early-stage ventures. Aye-aye and chair of Royal Ontario Museum's finance committee. He also chairs the Insurance Corporation of British Columbia's investment committee.

But more importantly is the fact that legendary entrepreneur Bobby Genovese, Chairman of BG Capital Group, has become one of the biggest, if not the biggest shareholder of Liberty Silver Corp. I was able to reach Bobby in the Bahamas this morning, where he confirmed rumors that his involvement is indeed factual.

"BG Capital Group is betting big on silver, and Liberty Silver Corp is our biggest bet," said the charismatic Genovese. "We see a rapid and straightforward path to production, and with SRK Consulting as our technical advisors, we demonstrate our commitment to using only top-tier talent to achieve our aggressive timelines."

BG Capital Group is a Barbados-based private investment firm with offices throughout North America and with assets totaling well over $200 million and projected revenues of just over $240 million per year from interests across resources, real estate and financial services.

19

55.     On September 20, 2012, at exactly 11:43:52 AM EST, 6,600,000 shares of Liberty Silver changed hands at $1.31 per share. This block of stock represented over 8% of the shares outstanding and was the single largest trade in the history of the stock.  Sterne Agee & Leech, an asset management company and clearinghouse for John Thomas Financial, purchased the 6,600,000 shares of Liberty Silver, and it was only later discovered that BG Capital, owned and controlled by Genovese, sold those shares.

56.     At numerous times throughout the pump and dump scheme perpetrated by Genovese, Genovese flew his private leer jet to New York, to visit with John Thomas Financial founder Anastasios Belesis ("Belesis".)  Genovese would bring paid celebrities with him (John Elway), to make his fraudulent companies seem more credible, as well as flying Belesis to the Bahamas where, upon information and belief, Belesis accepted $2,500,000 from Genovese to heavily sell John Thomas Financial owned Liberty Silver stock, to the detriment of the investing public, as well as purchase the 6,600,000 shares sold by Genovese on September 20, 2012.

57.     Belesis, using John Thomas Financial, strongly pushed sales for other companies owned by Genovese, such as America West, Neptune Society, and Liberty Silver.  Using his position in John Thomas Financial, Belesis bought and sold large portions of firm ownership in companies owned be Genovese (America West, Neptune Society, and Liberty Silver), while failing to execute client orders to sell the same stock.  Of the fifteen sell orders that John Thomas Financial received in one day, only one was actually executed.  FINRA has made a preliminary decision to discipline Belesis for his actions in connection with Genovese's fraud, and possibly charge Belesis for deception to inflate stock prices. The SEC and the FBI are also investigating Belesis.

58.     Genovese used Belesis and John Thomas Financial to artificially inflate stock prices by having Belesis order the John Thomas Financial "boiler room" to buy and sell large

quantities of stock in companies wholly owned by Genovese.   After the stock prices were artificially inflated, Genovese directed Belesis to heavily sell the stock, with Genovese making a large profit while the investing public sustaining huge losses.     Belesis gave priority to selling the stock owned by Genovese and the stock owned John Thomas Financial, ignoring other clients' demands to sell the same stock, in order for Genovese and Belesis to ensure their own profit.

### TRUTH IS REVEALED

59.     On Friday, October 5, 2012, the SEC Division of Enforcement halted trading on shares of Liberty Silver Corp. for a period of nearly two weeks resulting in the issuer being downgraded to the Grey Market pursuant to rule 15c2-11.  According to the SEC, the reasons for the halt were "a lack of current and accurate information about the company concerning, among other things, the control of its stock, its market price, and trading in the stock."

60.     Only after the SEC halted trading and investigations began did the following information become clear:

- Only after investigation of the purchasers in the April 1, 2008, Offering by Lincoln Mining (later Liberty Silver) is it readily known that Marnie Markin is the wife of Matthew Markin (CEO of American Lithium Minerals) and the sister in-law of Marco Markin (CEO of BG Capital and Neptune Society).  Also, Tiffeni Aliece Graves was Marnie Markin's next door neighbor.

- The Trinity deposit is not economic — its 43-101 includes only inferred ounces, and no feasibility study, prefeasibility study or preliminary economic assessment has been performed on the property. A 43-101 is a national instrument for the *Standards of Disclosure for Mineral Projects* within Canada.  Yet, even on the Liberty Silver website, in tiny print at the bottom, in the disclaimer page it states, "Inferred Mineral Resources must be excluded from estimates forming the basis of feasibility or other economic studies".

- In regard to the ownership of the Trinity project, Liberty Silver has not yet fulfilled the necessary obligations to earn a 70% interest in the Trinity project.  According to an Oct. 16, 2011 Liberty Silver news release, the company has fulfilled only 85% of the required $5 million to earn 70%.

- Genovese employed the use of Midas Letter to pump up Liberty Silver's stock value, doubling the value of the stock in two months.

- On September 20, 2012 BG Capital sold 6,600,000 shares to Sterne, Agee & Leech, at a unit price of $1.31 a share.  BG Capital acquired those shares only two days before from Outlook Investments Inc., another firm controlled by Genovese.

- The September 20, 2012 sale of 6,600,00 shares of Liberty Silver was fraudulently induced by Belesis, using John Thomas Financial, on behalf of Genovese.

- In total, BG Capital and Outlook reduced their Liberty holdings by more than eight million shares between the start of the promotional campaign and the trading halt.

- On October 19, 2012, Liberty Silver issued a press release attempting to distance the Company from Genovese, stating "The Company advises the investment community that it has never provided any form of compensation to a newsletter writer or anyone else for investment research or to recommend investment in the Company's shares. The Company also advises that it has no contractual or other relationship with Mr. Robert Genovese, BG Capital Group or any other company owned or controlled by Genovese (the "Genovese Companies") other than a subscription to a private placement in November 2011".

- Between BG Capital, Outlook Investments Inc., and Look Back Investments Inc., Genovese's reported Liberty Silver holdings amounted to approximately 8.6 million shares, or more than 10% of the total.

- In December, 2012, Genovese filed a document with Canadian regulators that shows he made more than 250 transactions involving Liberty Silver shares since late 2011.

61.     In summary, Genovese employed the use of buying and selling massive blocks of Liberty Silver stock, fabricated newsletters, false and misleading reports, paid celebrity endorsements, deceitful offerings to other companies, using nominees and offshore companies to purchase stock on his behalf, and appointing officers/directors who are easily controlled by Genovese, all so that Genovese could make huge profits while leaving the company and investors in financial ruin.  Genovese would assert control over Liberty Silver using his handpicked nominees and executives, and Genovese controlled companies.

62.     Aiding Genovese in this fraudulent and malevolent scheme were Marnie Markin and Tiffeni Aleice Graves (who purchased Liberty Silver stock on Genovese's behalf), the numerous offshore shell companies wholly owned and/or controlled by Genovese, Stephen Cook (Genovese's hype man, Cook provides false information to pump up the stock, and adds another

level of control that Genovese exerts on each company), and Browne, who as Chairman of the Board and CEO of Liberty Silver, was either culpably reckless, or was a willing participant in Genovese's malicious scam involving Liberty Silver, and Belesis (who used John Thomas Financial to push Genovese owned companies on the investing public, with full knowledge of the fraudulent scheme).  At no time did Browne or Liberty Silver warn its investors about Genovese's fraudulent history, nor did they countermand any of Genovese's ridiculous claims regarding the Company or its future prospects.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired Liberty Silver common stock from April 1, 2008, through and including October 5, 2012. This action also alleges claims on behalf of members of the Class that purchased or otherwise acquired Liberty Silver common stock during the Class Period. Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

64.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable. Throughout the Class Period, Liberty Silver securities were actively traded on the TSX and OTCBB. Although the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class who traded the Liberty Silver's common stock during the Class Period.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendants violated federal securities laws based upon the facts alleged herein;

b.      Whether Defendants omitted or misrepresented material facts about Liberty Silver, its business and its management;

c.      Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management;

d.      Whether the Defendants caused Liberty Silver to issue false and misleading financial statements during the Class Period;

e.      Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

f.      Whether the prices of Liberty Silver securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.      Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

66.     Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal securities laws as complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

68.     A class action is superior to alternative methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

69.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.     the omissions and misrepresentations were material;

c.     Liberty Silver securities are traded in an efficient market;

d.     the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.     the Company traded on the TSX and OTCBB, and was covered by multiple analysts;

f.     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.     Plaintiff and members of the Class purchased, acquired and/or sold Liberty Silver securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

70.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## ADDITIONAL SCIENTER ALLEGATIONS

71.     The Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of Liberty Silver, including the Individual Defendants. The Defendants were motivated to materially misrepresent the true nature of the Liberty Silver's business, operations, ownership, and financial affairs to the public and regulators in order to keep Liberty Silver's share price artificially high.

72.     Further, Genovese has effected the pump and dump scheme upon numerous previous companies, even continuing in his actions in other companies after the halt of Liberty Silver trading.  He has deliberately used nefarious, fraudulent, and manipulative means to further his own goals at the expense of the investors in the companies he has scammed.  He willfully and intentionally manipulated stock prices using emails, newsletters, and other mediums, to drive the price of Liberty Silver stock up while at the same time dumping his own stock on unknowing investors.

73.     Browne was the Chairman of the Board for Liberty Silver, as well as the CEO of the Company.  Through any investigation whatsoever into the nature of Genovese's involvement in previous companies, Browne could, and should have been able to prevent the fraudulent acts from taking place.  Instead Browne acted in his own best interest, violating his fiduciary duty and the federal securities laws, by allowing Genovese to use Liberty Silver as a vessel for his fraud. Browne failed miserably in executing his duties by standing idly and recklessly by while Genovese and his associates mislead investors into purchasing Liberty Silver stock at artificially inflated prices.  As Chairman of the Board and CEO, Browne could not have been unaware that

26

Genovese was behind the November 11, 2011 financing, as well as Genovese's ownership, directly and indirectly, in Liberty Silver. Also, Browne was issued 3,000,000 stock options to be purchased at $.75 cents a share, which was below the market price, so his motivation to keep the stock price artificially inflated was personal financial gain.

## LOSS CAUSATION / ECONOMIC LOSS

74.     During the Class Period, as detailed herein, the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Liberty Silver's common stock price, and operated as a fraud or deceit on acquirers of Liberty Silver's common stock. As detailed above, when the truth about Liberty Silver's financial situation, and ownership or control, was revealed, Liberty Silver's common stock declined as the prior artificial inflation came out of its common stock price. That decline in Liberty Silver's common stock price was a direct result of the nature and extent of the fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Liberty Silver-specific facts unrelated to the fraudulent conduct. The economic loss, i.e., damages, suffered by the Plaintiff and other Class members was a direct result of the fraudulent scheme to artificially inflate Liberty Silver's common stock price and the subsequent significant decline in the value of the Liberty Silver's common stock when the prior misrepresentations and other fraudulent conduct were revealed.

75.     At all times relevant, Defendants' materially false and misleading statements or omissions or manipulative devices alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading because they failed to disclose a true and accurate picture of Liberty Silver's business, operations and financial condition, as alleged herein. Throughout the Class Period,

Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Liberty Silver's common stock price to be artificially inflated. Plaintiff and other Class members purchased Liberty Silver's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## NO SAFE HARBOR

76.    The statutory safe harbor under the Private Securities Litigation Reform Act of which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pled in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Liberty Silver who knew that those statements were false, misleading or omitted necessary information when they were made.

## COUNT I

### (Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

79.     Pursuant to the above plan, scheme, conspiracy, course of conduct, and manipulation, each of these Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Liberty Silver's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Liberty Silver's finances and business prospects.

80.     By virtue of their positions at Liberty Silver, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, these defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to these defendants. Such acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

29

81.     Information showing that these defendants acted knowingly or with reckless disregard for the truth is within these defendants' knowledge and control. As the officers, owners and/or directors of Liberty Silver, Defendants had knowledge of the details of Liberty Silver's internal affairs.

82.     Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Liberty Silver. As officers and/or directors of a publicly-held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Liberty Silver's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Liberty Silver's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Liberty Silver's business and financial condition which were concealed by these defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Liberty Silver's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by these defendants, and were damaged thereby.

83.     During the Class Period, Liberty Silver's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which these defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Liberty Silver's securities at prices artificially inflated by these defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired such securities, or would not have purchased or otherwise

acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Liberty Silver's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of the Liberty Silver's securities declined upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

84.     By reason of the foregoing, Defendants knowingly or recklessly, directly or indirectly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of Liberty Silver common stock during the Class Period.

85.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Liberty Silver's securities during the Class Period, upon the disclosure that Liberty Silver had been disseminating materially false and misleading information to the investing public, and had been manipulating the price of Liberty Silver stock.

<u>**COUNT II**</u>

<u>**(Violations of Section 20(a) of the Exchange Act Against Defendants)**</u>

86.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.     During the Class Period, Defendants participated in the operation and management of Liberty Silver, and conducted and participated, directly and indirectly, in the conduct of Liberty Silver's business affairs. Because of their senior positions, they knew the

adverse non-public information about Liberty Silver's business prospects and financial condition.

88.     As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to Liberty Silver's business prospects, financial condition, and results of operations, and to correct promptly any public statements issued by Liberty Silver which had become materially false or misleading.

89.     Because of their positions of control and authority as senior officers, the Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning Liberty Silver's operations. Throughout the Class Period, the Defendants exercised their power and authority to cause the Liberty Silver to engage in the wrongful acts complained of herein. Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Liberty Silver securities.

90.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Liberty Silver.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

A.     Determining this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

32

C.      Awarding Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  September 11, 2013                    Respectfully submitted,

                                                             S/Gary S. Menzer
                                                        Gary S. Menzer (Florida Bar No. 60386)
                                                        gmenzer@menzerhill.com
                                                        **MENZER & HILL, PA**
                                                        2200 NW Corporate Blvd., Suite 406
                                                        Boca Raton, FL 33431
                                                        Telephone:  (561) 327-7207
                                                        Facsimile:  (561) 431-4611

                                                        William B. Federman
                                                        wbf@federmanlaw.com
                                                        **FEDERMAN & SHERWOOD**
                                                        10205 North Pennsylvania Ave.
                                                        Oklahoma City, OK 73120
                                                        Telephone:  (405) 235-1560
                                                        Facsimile: (405) 239-2112

                                                        *Attorneys for Plaintiff*

Plaintiffs Certification of Investment of
Liberty Silver Corp. [OTC: LBSV]

I, _Jerald T. Stanaford_, hereby certify that the following information is true and correct to the best of my knowledge, information and belief:

1. I have reviewed the Complaint in this action and authorize the filing of this Certification as an exhibit to the Complaint, or any substantively similar complaint or amended complaint to be filed in the future. I retain the law office of Federman & Sherwood, and any other counsel with whom Federman & Sherwood deems appropriate to associate with, to pursue this action on my behalf on a contingency fee basis.

2. If chosen, I am willing to serve as a representative party on behalf of the class (the "Class"), either individually or as part of a group on behalf of the Class as defined in the Complaint, including providing testimony at deposition or trial (if necessary). I am also willing to participate on an executive committee of shareholders.

3. I have made the following transaction(s) during the Class Period in Liberty Silver Corp. securities (which are the subject of this action) as follows:

| # SHARES PURCHASED | DATE OF PURCHASE | PRICE PAID PER SHARE | CLASS OF STOCK (e.g. COMMON) | IF SOLD # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SELLING PRICE |
|---|---|---|---|---|---|---|
| 88,000 | 9,25,12 | 1.45 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(continue list on blank piece of paper, if necessary)

4. I did not purchase these securities at the direction of my attorney or in order to participate in a lawsuit under the Securities Act of 1933 or the Securities Exchange Act of 1934.

5. During the 3-year period preceding the date of this Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

6. I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court, except for such reasonable costs and expenses directly relating to my service as a representative of the Class and as ordered and approved by the Court.

Signed under penalty of perjury, under the laws of the United States of America, this _9_ day of _September_ 2013.

| | |
|---|---|
| Investor Signature | Home Address |
| Jerald Stanaford | |
| Print Name | City          State          Zip |
| Home Telephone Number | E-Mail Address |
| Cell Telephone Number | Secondary Email Address (if any) |

**Return this completed form by e-mail or fax to:**
K. Lynn Nunn @ FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
(405) 235-1560/Fax (405) 239-2112
Email: kln@federmanlaw.com
Website: www.federmanlaw.com