**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 9:13-cv-80923-KLR**

TODD STANAFORD a/k/a JERALD TODD
STANAFORD, on behalf of himself and all
others similarly situated,

                    Plaintiff,

         vs.

ROBERT DONALD BRUCE GENOVESE,
WILLIAM TAFURI, GEOFFREY BROWNE,
BG CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC., OUTLOOK
INVESTMENTS, INC., AND LIBERTY
SILVER CORPORATION,                                **DEMAND FOR JURY TRIAL**

                    Defendants.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION..................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................2

III.    PARTIES ................................................................................................................3

IV.     BACKGROUND INFORMATION .........................................................................4

        A.      Clearly Canadian ........................................................................................5

        B.      Neptune Society .........................................................................................6

        C.      Envoy Communications..............................................................................8

        D.      Spectrum Sciences & Software ..................................................................8

        E.      American Lithium.......................................................................................11

V.      DEFENDANTS' LIBERTY SILVER SCHEME ....................................................13

        A.      Genovese Utilized John Thomas Financial to Create Artificial Demand For
                Liberty Silver Shares .................................................................................17

        B.      False and Misleading Statements and The Continued Market Manipulation
                Scheme ......................................................................................................30

VI.     TRUTH IS REVEALED .........................................................................................49

VII.    CLASS ACTION ALLEGATIONS .........................................................................64

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ........................................................66

IX.     LOSS CAUSATION/ECONOMIC LOSS ...............................................................68

X.      NO SAFE HARBOR................................................................................................69

Plaintiffs Todd Stanaford a/k/a Jerald Todd Stanaford ("Stanaford") and Philip Hobley ("Hobley") (collectively "Plaintiffs"), by their undersigned attorneys, allege the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the public documents and announcements issued by Liberty Silver Corporation ("Liberty Silver" or the "Company"), filings with the Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, a detailed anonymous letter to the SEC regarding Robert Donald Bruce Genovese's various activities and the companies he has invested in and the stocks he has traded, other information readily obtainable on the internet, interviews of confidential witnesses, and documents from confidential witnesses.

## I.   <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of purchasers of the common stock of Liberty Silver (the "Class") during the period February 10, 2010 through October 5, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      This Complaint alleges a massive and systemic financial fraud and market manipulation scheme that was affected by the Defendants against the Class *via*, among other things, a clear "pump and dump" scheme.   The SEC has issued warnings to investors about pump and dump schemes and has described the pattern of such schemes as follows:

> First, there's the glowing press release about a company, usually on its financial health or some new product or innovation.  Then, newsletters that purport to offer unbiased recommendations may suddenly tout the company as the latest "hot" stock.  Messages in chat rooms and bulletin board postings may urge you to buy the stock quickly or to sell before the price goes down. Or you may even hear the company mentioned by a radio or TV analyst.

Unsuspecting investors then purchase the stock in droves, pumping up the price. But when the fraudsters behind the scheme sell their shares at the peak and stop hyping the stock, the price plummets, and innocent investors lose their money.

3.      Defendants' scheme follows this pattern to the letter.  Prior to and during the Class Period, Defendant Robert Donald Bruce Genovese ("Genovese") purchased millions of shares of Liberty Silver stock.  During the Class Period, Defendants were able to pump up the price of Liberty Silver stock by disseminating materially false and misleading promotional reports and newsletters that touted the Company's newly acquired Hi Ho properties and its silver reserves. Defendants were further able to manipulate the movement and price of Liberty Silver stock by engaging the services of a corrupt brokerage firm (that has since been shut down by financial regulators) to aggressively push the Company's stock onto its unwitting investor clients.

4.      Following the Defendants' promotional efforts (the "pump"), Defendant Genovese, directly or indirectly, sold millions of shares of Liberty Silver stock to the investing public at artificially inflated prices (the "dump"), pocketing unlawful profits amounting to millions of dollars. Genovese attempted to conceal his involvement in the fraudulent pump and dump scheme – and his receipt of illicit income from the fraud and market manipulation scheme – by using nominee entities and operating offshore brokerage and bank accounts in Canada, the Turks and Caicos Islands, and elsewhere.

## II.    <u>JURISDICTION AND VENUE</u>

5.      The claims alleged herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

7.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and §28 U.S.C. §1391(b), as a substantial part of the acts events or omissions giving rise to

2

the claims pleaded herein occurred in this District and Defendants named herein maintain their residence or principal places of business in this District.

8.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the Over the Counter Bulletin Board ("OTCBB").

III.    **PARTIES**

9.      Plaintiff Stanaford purchased shares of Liberty Silver common stock, as set forth in the certification filed with Plaintiff's original Complaint filed September 11, 2013 (Dkt No. 1), which is incorporated by reference herein, and has been damaged thereby.

10.     Plaintiff Hobley purchased shares of Liberty Silver common stock and has been damaged thereby, as set forth in the attached investor certification.

11.     Defendant Robert Donald Bruce Genovese, ("Genovese"), or as he is referred to "Bobby Genovese" or sometimes "Bobby G," is an investment entrepreneur and stock promoter. Recently, Genovese has been revealed to be a serial orchestrator of numerous pump and dump stock schemes, which have defrauded investors out of tens of millions of dollars.  Upon information and belief, although he is a Canadian citizen, Genovese resides in Florida.

12.     Defendant BG Capital Group LTD ("BG Capital") is an investment management company incorporated in the Bahamas, with offices in the United States, Bahamas, and Barbados. BG Capital has its corporate office in Nassau, Bahamas, and its management office in Plantation, Florida.  BG Capital is wholly owned and controlled by Genovese.

13.     Defendant Look Back Investments, Inc. ("Look Back Investments") is a shell investment company incorporated in Panama, headquartered in Panama City, Panama, and wholly owned and controlled by Genovese.

14.     Defendant Outlook Investments, Inc. ("Outlook Investments") is a shell investment company wholly owned and controlled by Genovese.

15.     Defendant Liberty Silver is a Nevada corporation headquartered in Canada, with all its pertinent assets located in Nevada.  Liberty Silver did extensive business with Genovese when he was in Florida, including actions in furtherance of the fraud and market manipulation scheme connected with Genovese.

16.     Defendant William Tafuri ("Tafuri") served as President, Chief Operating Officer ("COO") and a director of Liberty Silver during the Class Period and upon information and belief, is a resident of the State of Utah.

17.     Defendant Geoffrey Browne, ("Browne") is the Chairman of the Board of Directors and is the Chief Executive Officer ("CEO") of Liberty Silver.  Browne approved the financings, filings, press releases, and decisions of Liberty Silver, with full knowledge of Genovese's previous history of securities fraud, or was willfully reckless in not knowing.  Upon information and belief, Browne resides in and is a citizen of Canada.

18.     Defendants Genovese, Tafuri, and Browne are collectively referred to herein as the "Individual Defendants."

## IV.    BACKGROUND INFORMATION

19.     Genovese is believed to have used a pump and dump pattern of manipulations of Liberty Silver stock, as well as numerous other companies' stock, including but not limited to, schemes involving the following companies:   Clearly Canadian Brands (CCBEF) ("Clearly Canadian"), Neptune Society (NPTI), Envoy Communications (ECGI), Spectrum Sciences & Software (SPSC) ("Spectrum Sciences"), American Lithium Minerals, Inc. (AMLM) ("American Lithium"), and others.  This information should have been known, or was known, by Defendants Browne, Tafuri and Liberty Silver. Genovese is a penny stock promoter and is notorious for

operating on the fringes of the financial markets, making tens of millions of dollars by touting and manipulating penny stocks.  He uses television programs, newsletters, false and misleading press releases, emails, and rogue broker dealers to pump up stocks, urging the public to invest in these stocks at artificially inflated prices, driving the stock prices higher; Genovese then dumps large blocks of the stock, which he has acquired at extremely low prices, at the artificially inflated prices created by the schemes, profiting millions of dollars in the process.  When Genovese dumps his large blocks of stock, the stock price plummets—leaving the general investing public with huge losses.

### A. <u>Clearly Canadian</u>

20.     Clearly Canadian, a once prosperous boutique beverage company based in Vancouver, Canada, ran into financial difficulties around 2001, culminating in delisting by the Toronto Stock Exchange in February of 2005.  In March 2005, Defendant BG Capital, an entity wholly owned by Genovese, announced that it would invest $1,000,000 in a short-term financing facility that eventually led towards control of the company. Two months later in May, Clearly Canadian completed a 1:10 reverse stock split and listed on the OTCBB under the symbol CCBEF.  Immediately following this, Genovese used a reality TV show to promote Clearly Canadian, while at the same time appointing his cronies to positions of power in the company and purchasing large blocks of Clearly Canadian stock.  When the stock price became artificially inflated by Genovese's manipulation, Genovese and his nominees dumped their stock—leaving the company in worse financial condition than when he took control.  On March 17, 2010, Clearly Canadian filed for bankruptcy and was delisted.

21.     Below is a graph of the stock for Clearly Canadian from the time BG Capital took control. The rising and falling pattern of the stock is caused by Genovese buying and selling large blocks of stock to drive up the price.  Genovese would sell blocks of stock between various shell

corporations he owned and controlled to create the illusion of volume and demand.  At the same time, Genovese would promote the stock through various mediums such as newsletters, emails, press releases, and reports.  When the time was right, Genovese would dump his shares for huge profits while cratering the market (see graph below):



### B.    Neptune Society

22.    On January 20, 1999, an OTCBB shell company named Lari Corp. announced that it would acquire the then private Neptune Society based in California.  Lari Corp. was incorporated in Florida sometime in 1998 with 125,000 shares issued at par value.  On August 26, 1998, Lari Corp. was listed on the OTCBB under the symbol LREE.  On January 19, 1999 (one day before the announcement that Lari Corp. would acquire Neptune Society), Lari Corp. sold 250,000 shares at $.80 cents per share raising $200,000. Each share purchased in the January financing included the right to buy four more shares at the same price in the future.  A large portion of these stocks were purchased, directly or indirectly, by Genovese through offshore companies under his control, and by his nominees.  On April 7, 1999, shares that participated in the January 19, 1999 financing exercised their right to buy, resulting in the issuance of an additional 1,000,000 shares of the now

called Neptune Society (Lari Corp. took on the Neptune Society name following its acquisition) at $.80 cents per share.

23.     The original 250,000 shares were purchased by twenty-four investors, including Genovese, BG Capital, and other offshore companies tied to, and believed to be owned and controlled by, Genovese.  The 1,000,000 shares were exercised by nine offshore companies. Indeed, the other fifteen investors quickly sold their shares to the nine offshore companies controlled by Genovese.  Three of those companies were Crystal Overseas Trading, Inc., Private Investment Company, Ltd., and Seloz Gestion & Finance SA, all offshore companies affiliated with Genovese and used by Genovese to facilitate his stock schemes.

24.     Shares of Neptune Society on the OTCBB traded at a split adjusted share price of between $20 in 1998, to as high as $60 in 2000. In that time over 1,770,000 shares of Neptune Society traded hands, allowing the offshore owners of the 1,250,000 shares purchased for $.80 per share to liquidate their shares, resulting in up to $40 million in profits. The rising and falling of the Neptune Society stock price in the graph below shows Genovese buying and selling stock with his various entities, driving the price up, then dumping the stock, causing the value to drastically drop in December 2000:



25.     After the stock lost 95% of its value, with Genovese making huge profits and the general investing public experiencing huge losses, Genovese purchased the remaining shares, taking the company private.

### C.     Envoy Communications

26.     Envoy Communications was a stock heavily touted by Genovese, using BG Capital along with emails and press releases, while his brother Geoffrey was the CEO of the company. After raising over $50 million in financings by making bold promises to consolidate the media industry, Envoy Communications ended up like all the other companies associated with Genovese, delivering over 90% losses to its investors while Genovese's brother, Geoffrey, extracted millions of dollars in compensation, both from a $375,000 salary and over 1,500,000 shares exercised through stock options. Note the rising and falling pattern of the below stock, as well as the massive increase in volume due to Genovese dumping his large blocks of stock, followed by a deep decrease in value, similar to all companies associated with Genovese, including Liberty Silver:



### D.     Spectrum Sciences & Software

27.     Spectrum Sciences began with the incorporation of a shell company named, Silva Bay International Inc. ("Silva Bay") in Delaware in 1998. In a process that is nearly identical to

the Neptune Society transaction, Silva Bay listed on the Pink Sheets under the symbol SIVY in the year 2000. On April 2, 2003, Silva Bay acquired a company named Spectrum Sciences for 2,500,000 shares of Silva Bay and changed its name to Spectrum Sciences & Software Inc., and its trading symbol to SPSC.

28.     According to Part I – Item 4 of Form 10 filed with the SEC on June 10, 2003, Spectrum Sciences had 18,844,000 shares outstanding, which included 2,500,000 shares issued to Donald Myrick.  Donald Myrick is the founder of Spectrum Sciences.   In other words, there were 16,344,000 shares of the Silva Bay shell, which could be sold as part of the free trading float.

29.     3,700,000 shares were held by three offshore companies based in the Bahamas, Turks & Caicos, and Switzerland, respectively Crystal Overseas Trading, Inc., Private Investment Company, Ltd., and Seloz Gestion & Finance SA, all offshore companies controlled by Genovese that exercised the $.80 rights in Neptune Society in 1999, while the stock price was $50. The connection to Genovese does not end there.  An SEC filing in 2004 shows these offshore companies as having entered into an agreement with BG Capital to sell BG Capital owned shares of Neptune Society as part of that private transaction.  Crystal Overseas Trading and Martin Christen (the Turks & Caicos based director of Private Investment Company, Ltd.) can both be linked back to Swiss Overseas Finance Company, another company that exercised those $.80 warrants in Neptune Society in 1999. Spectrum Sciences would subsequently be a target of an informal SEC inquiry, a negative New York Times article, and litigation directed at Genovese and BG Capital.

30.     Genovese's participation is found in a Stock Option Plan he formally entered into with Spectrum Sciences on March 11, 2004.  In the agreement, Genovese would be given the right

to buy shares of Spectrum Sciences at $1.65 per share indefinitely, and using a Form S-8 (which is meant for only working executives of a company as opposed to stock promoters) these shares would be immediately free trading. In addition, Genovese was paid exorbitant cash consulting fees, approximately $2,000,000 dollars, by Spectrum Sciences.  Spectrum Sciences' Form 10-Q for the period ending March 31, 2004 filed May 24, 2002, revealed that Genovese exercised all of his options. The Form 10-Q stated in relevant part: "Between January 1, 2004 and May 21, 2004, Mr. Genovese has exercised 21,178,300 options."

31.    A Form 13D filed on August 3, 2004 by BG Capital revealed that Genovese sold all of those shares as quickly as he received them:

> During March and April 2004, the Reporting Persons [Genovese] exercised Options relating to 20,078,300 shares of Common Stock, using Genovese's personal funds, BG Capital's working capital and/or cancellation of indebtedness owed to Genovese and his affiliates as consideration for the exercise price due therefore. The Reporting Persons [Genovese] have sold substantially all of such shares of Common Stock [Spectrum Sciences].

32.    From January 1, 2004 to May 21, 2004 (the period in which Genovese exercised 21,000,000 options), Spectrum Sciences traded 220,030,000 shares.  That was enough volume for Genovese to liquidate the 21,000,000 options as well as the 16,344,000 shares that were purchased by Genovese for almost nothing. Note the high volume of trades illustrated by the graph:



| Date | Closing Price | Volume | BG Trading Volume | BG Avg. Price | BG % of Total Volume |
|------|---------------|--------|-------------------|---------------|----------------------|
| 9/22/2004 | $1.18 | 455,000 | 164,950 | $1.18 | 36% |
| 9/24/2004 | $1.20 | 235,000 | 126,260 | $1.20 | 54% |
| 9/30/2004 | $1.26 | 298,000 | 137,000 | $1.25 | 46% |

33.     The above graph shows the trading activities of BG Capital in its attempt to raise the price of the stock by purchasing and selling massive blocks of stock in rapid succession.  These are only the trading records of BG Capital, not those of all the offshore companies that Genovese controlled, and which have been traced back as owning millions of additional shares.  Three days out of eight, BG Capital was responsible for more than half of the entire volume of trading for Spectrum Sciences.  This shows that Genovese was buying and selling, in massive quantities, to surge the share price up.  In addition to these manipulative trades, Genovese employed emails, false reports, newsletters, TV shows, and false websites to hype up stocks, driving the price up until he could dump his shares and make huge profits.

34.     In 2004, investors of Spectrum Sciences filed a lawsuit against Genovese and BG Capital for violations of insider trading laws.  After repeatedly ignoring the court's rulings, including refusing to show up for depositions numerous times, failing to produce discovery, and being uncooperative, the court granted a motion to compel against Genovese and BG Capital.  Instead of producing discovery or appearing for deposition, less than a week after the motion to compel was granted, Genovese agreed to a settlement of $3.25 million to resolve the claims.

**E.     American Lithium**

35.     American Lithium started as Nugget Resources, a shell company with 5,500,000 free trading shares sold at $.01 per share as documented in a Form S-1 filing dated March 22, 2006.  As is customary for OTCBB scams, to lower the already low average cost of the free trading shares, Nugget Resources completed a 4 for 1 forward stock split on March 19, 2009.  According to various SEC filings and as discussed by, *inter alia*, Carol Remond of *Dow Jones Newswire* in

11

her piece entitled, "American Lithium and the Mysterious Stock Promoter," Genovese, directly or indirectly, purchased all 5,500,000 shares; therefore after the split, Genovese had and/or controlled 22,000,000 shares, purchased for less than a penny per share.

36.     On the date of the stock split, March 19, 2009, Nugget Resources changed its name to American Lithium Minerals, Inc. and its trading symbol to AMLM. Prior to the name change and split, Matthew Markin was appointed as President and CEO of American Lithium.  Matthew Markin is the brother of Marco Markin, the CEO of Neptune Society (a company now wholly owned and controlled by Genovese), and an associate/nominee of Genovese. Matthew Markin also shows up in SEC filings for Neptune Society in 2003 as having provided consulting services for the company.

37.     A press release by American Lithium dated September 2, 2009, disclosed that Stephen Cook was appointed as Vice President of Investor Relations for the company. Upon information and belief, Cook was appointed as VP of Investor Relations merely as an instrument for Genovese to use in hyping the stock of American Lithium.  As a cohort in Genovese's schemes, Cook is the man who leads Genovese's multimedia promotional blitz to artificially inflate the stock.

38.     Starting in June of 2009, American Lithium stock began to rise aggressively from $.20 per share to as high as $3.00.  On information and belief, this drastic per share rise was due to false or misleading reports issued by Genovese and his associates (Cook and Markin), combined with massive and frequent trading between Genovese controlled shell entities, as well as largely exaggerated promotional materials.  The sheer volume and frequency of the trades provided Genovese with plenty of time and volume to liquidate the entire 22,000,000 shares of undisclosed float for millions of dollars in profit.  *See* graph below:



39.     In confirmation, on August 26, 2011 BG Capital emerged in an American Lithium Form 8-K filing as having financed American Lithium, formally linking Genovese to yet another worthless OTCBB stock that currently trades for $.02 cents per share.

40.     Upon information and belief, every public company that has been promoted or associated with Genovese has resulted in investor losses of between 90-100%.   Defendants Browne, Tafuri, and Liberty Silver knowingly or extremely recklessly allowed Genovese and his associates to employ the same type of scheme employed by Genovese in connection with these public companies to defraud Liberty Silver's investors.

## V.     DEFENDANTS' LIBERTY SILVER SCHEME

41.     Liberty Silver states on its website that it is engaged in the exploration and development of mineral properties in North America. Specifically, the Company describes itself as an "advanced exploration play in Nevada with potential opportunity to quickly become a low cost, open pit operation."   The Company has an option on the Trinity Silver Project, an undeveloped silver prospect near Lovelock, Nevada.

42.     Liberty Silver has entered into a joint venture with Renaissance Gold, Inc. ("Renaissance Gold"), whose chairman is Haywood Capital Markets' chairman John Tognetti. Under the terms of the Joint Venture Agreement, Liberty Silver must spend $5 million to earn 70% ownership of the Trinity silver project from Renaissance.

43.     On April 1, 2008, Lincoln Mining (soon to be Liberty Silver) filed a Form S-1 with the SEC registering 2,420,000 shares at $.05 per share, raising a total of $121,000.  One of the investors who had the ability to buy 250,000 pre-split shares at only $.05 in that offering was Marnie Markin.  Marnie Markin is the wife of Matthew Markin (CEO of American Lithium) and the sister in-law of Marco Markin (CEO of BG Capital and Neptune Society).  Marnie Markin is believed to have purchased the shares on behalf of Genovese and/or BG Capital.

44.     Another investor who purchased 250,000 shares at $.05 a share was Tiffeni Aliece Graves ("Graves").  In California, Graves was the next door neighbor of Marnie and Matthew Markin and is also believed to have purchased stock on behalf of Genovese and/or BG Capital.

45.     At the time Marnie Markin and Graves purchased these large blocks of stock, Lincoln Mining had no employees, no cash, no property, and no assets.

46.     Liberty Silver was incorporated on February 20, 2007 under the laws of the state of Nevada under the name Lincoln Mining Corp.  Pursuant to a Certificate of Amendment dated February 11, 2010, the Company changed its name to Liberty Silver Corp.

47.     The Class Period begins on February 10, 2010.  On February 10, 2010, the Company's board of directors authorized a 20-for-1 forward stock split of Lincoln Mining/Liberty Silver's currently issued and outstanding common stock.

48.     On March 15, 2010, the 20-for-1 forward stock split became effective, turning the 2,420,000 pre-split shares into 48,400,000.  Through covert purchases, such as those by Marnie

Markin and Graves, Genovese directly or indirectly acquired a substantial portion, if not the majority, of the Company's shares from the March 15, 2010 stock split. At the very least, based on the 500,000 shares purchased by Marnie Markin and Graves alone, Genovese was the indirect owner of 10,000,000 shares of Liberty Silver stock (or more than 20% of all shares then outstanding) on March 15, 2010 following the forward stock split.[1]

49.     Exactly ten days later, on March 25, 2010, shares of Liberty Silver began trading on heavy volume in a pattern that mimics all of Genovese's past OTCBB companies. *See* Graph below. Note the familiar rising and falling pattern:



---

[1] This is bolstered by insider trading records that Genovese filed with regulators on December 27, 2012 (after the close of the Class Period), which show that Outlook Investment, Inc. (an entity wholly owned by Genovese) held an opening balance of over 7.15 million shares of Liberty Silver stock as of November 15, 2011 (the earliest the records filed by Genovese dated back). These filings further reveal that BG Capital (another entity wholly owned by Genovese) held an opening balance of approximately 170,000 shares of Liberty Silver stock as of November 15, 2011.

50.     On November 11, 2011, Liberty Silver announced a $3.25 million non-brokered financing from a Panamanian Company named "Look Back Investments."  Under the terms of the financing, Look Back Investments received 6,500,000 shares as well as the option to buy 6,500,000 more at $0.65 per share.  In an exhibit to a Form 8-K filed with the SEC on November 10, 2011, in connection with the financing, Liberty Silver disclosed that Look Back Investments is wholly owned and controlled by Genovese.  Thus, as he had done with American Lithium, Genovese positioned himself as financer of Liberty Silver, which provided him with a means to further control and manipulate the Company.

51.     In a Liberty Silver press release issued on December 21, 2011, the Company announced that it had "closed a U.S. $4.6 million non-brokered private placement funding (the "Funding") to support the continued exploration and development of its Trinity silver project in Nevada, and for general corporate and working capital purposes."  The press release later described that the Funding consisted of the sale of 9,127,500 shares of common stock with the option to buy 9,127,500 more shares at $0.65 per share.  Liberty Silver's Form 10-K, filed on September 28, 2012 confirms that the $4.6 million Funding was, in fact, a combination of the $3.25 million from Look Back Investments in addition to $1,313,750 raised through the sale of 2,627,500 shares of stock and the option to buy 2,627,500 more at $0.65 per share.  Upon information and belief, most or all of the additional stock and warrant purchases came from Genovese-owned entities, including Outlook Investments, Inc. and/or other Genovese proxies.[2]

---

[2] Based on insider trading records that Genovese filed with the System for Electronic Disclosure ("SEDI") on December 27, 2012 (after the close of the Class Period), 2,000,000 shares of Liberty Silver stock were purportedly purchased by Outlook Investments, Inc. (an entity controlled by Genovese) on December 16, 2011, though strangely (or perhaps coincidentally) no unit price was listed for the purchase.

52.     In the December 21, 2011 press release, Defendant Tafuri, President and COO of Liberty Silver, stated:

> We are very pleased with the progress on the Trinity property. Our 43-101 Report indicates a property of merit that contains a defined silver resource, which could be expanded through further drilling. Our team has identified and confirmed multiple silver and gold targets not discussed in the 43-101 Report. With the funding in place, we expect to initiate additional geochemical and geophysical surveys in conjunction with an aggressive drilling campaign targeting both high priority exploration targets, and the extensions from the original pit. Given our geographical location, the quality of historical data, and our geological interpretations, we anticipate the planned programs could expand the current resources and help to define the potential for a profitable mine.

53.     On December 22, 2011, using the $3.25 million financing from Genovese through Look Back Investments, Liberty Silver was able to meet requirements for listing on the Toronto Stock Exchange (the "TSX").   Once Liberty Silver was listed on the TSX, the Company's outstanding shares were treated differently in that they were no longer looked at by brokers and banks as red flagged OTCBB shares (red flagged because a company with 48,400,000 undisclosed shares should not have been allowed on the exchange), but were viewed as the more prestigious TSX shares.  By obtaining a listing on the TSX, Liberty Silver appeared to the public as a reputable mining company.

### A.     Genovese Utilized John Thomas Financial to Create Artificial Demand For Liberty Silver Shares

54.     At numerous times throughout the pump and dump scheme perpetrated by Genovese, Genovese flew his private jet to New York to visit with Anastasio "Tommy" Belesis, the founder of the New York City-based financial services company John Thomas Financial ("JTF").  During the course of the scheme Genovese provided a $2 million "loan" to Belesis *via*

ATB Holdings, an entity owned by Belesis.[3]  According to information obtained by CW 6, an investment banker at JTF from 2011 through 2013, the loan was never repaid.  As a result of Genovese's visits, JTF brokers were instructed to heavily sell Liberty Silver shares to its clients, to the clients' detriment and to the detriment of the investing public.  After the price of Liberty Silver stock was sufficiently inflated, JTF executed Genovese's sale of 6.6 million shares of Liberty Silver stock *for proceeds of more than $8.64 million*.

55.     Confidential witness ("CW") 1 was a compliance officer at JTF, from January 2010 through June 2013.  In CW 1's role at JTF, CW 1 was responsible for implementing and overseeing compliance practices and procedures within and beyond the realm of money laundering.  CW 1 reviewed JTF's trades on a daily basis and also had access to and reviewed JTF emails for compliance purposes, including accessing customer complaints.  CW 1 explained that JTF's relationship with Genovese began around the summer of 2012 when a meeting between Genovese and Belesis was arranged by Abraham "Avi" Mirman, the head of investment banking at JTF.[4] CW 1 explained that he/she was aware of communications between Mirman, Belesis, and

---

[3] Belesis's self-interested practices have prompted the Financial Industry Regulatory Authority, Inc. ("FINRA") to discipline Belesis for his actions in connection with investor fraud.  Indeed, Belesis's conduct at JTF is the subject of a recent action against Belesis brought by FINRA, in which Belesis and JTF are charged with blocking numerous customer orders to sell shares of American West Resources stock at a time when JTF was selling 855,000 of its own shares for more than $1 million in proceeds during a 600% spike in stock price.  FINRA has charged that of fifteen sell orders that JTF received in one day, only one was actually executed, due to actions taken by Belesis to prevent the execution of customer sell orders so that JTF could execute its own proprietary sell orders.  The SEC and the FBI have also investigated Belesis for possible fraudulent conduct.

[4] FINRA disclosures indicate that Mirman has been the subject of two regulatory events, five customer disputes, and one terminated license. Mirman was found liable for misrepresentations, breaches of fiduciary duty, and fraud in many of the disclosure events. Additionally, South Carolina and Georgia denied Mirman's applications for broker registration due to his disciplinary history.

Genovese because as part of CW 1's role, he/she reviewed emails between these individuals. According to CW 1, Mirman introduced Belesis to Genovese through email, and approximately one week later, Mirman and Belesis traveled in Genovese's private jet to meet with Genovese in person. CW 1 said that shortly after the trip, shares of Liberty Silver were deposited by Defendants BG Capital and Look Back Investments, Inc. into an account at JTF. CW 1 was aware that BG Capital and Look Back Investments were owned and controlled by Genovese, because CW 1 had reviewed Genovese's signatures on paperwork required for the stock deposits.

56.     CW 1 explained that while Liberty Silver was publicly traded on the TSX when the JTF account was opened, the shares had to be deposited into the JTF account in the form of US over-the-counter (OTC) physical certificates. CW 1 was responsible for approving "most physical certificates," and said "it's usually my discretion [whether to open an account for the sale of physical certificates], and I don't usually like taking physical certificates." This was because, physical certificates raise "so many questions," including problems in assessing whether the seller of the certificates is affiliated with the issuer of the certificates, explained CW 1. Despite CW 1's concerns, Belesis had a "keen interest in getting the certificates into the company [*i.e.,* JTF], and [he] would not accept 'no' as an answer." Rather, "it was basically jammed down our throats," CW 1 said. CW 1 recalled that numerous employees at JTF stated that Belesis received payments from Genovese totaling "two and half million" dollars in return for directing JTF brokers to buy Liberty Silver stock on behalf of their clients. Indeed, the SEC has stripped Belesis of his broker's license due to evidence showing that Belesis accepted payments in exchange for artificially pumping securities.[5]

---

[5] A cease-and-desist order entered by the SEC in December 2013 charged that Belesis placed customers in two hedge funds while JTF helped to fraudulently elevate investors' interests in those funds. In addition, the SEC's order stated that Belesis had influenced the funds' manager and

57.     CW 1 further explained that Genovese visited JTF's office in New York to give a presentation on Liberty Silver to the firm's brokers about a week after the Genovese owned and controlled Liberty Silver shares were deposited into JTF's account. This was one of at least two trips that Genovese made to JTF, according to CW 1. The presentation was held in the JTF Board Room and was attended by CW 1, Belesis, Castellano and "all [of] the brokers."  CW 1 recalled that during the presentation a JTF employee asked Genovese if Genovese had a controlling interest in Liberty Silver stock, to which Genovese replied that he did not. ***JTF's Compliance Department later determined that Genovese was in fact a "control person" of Liberty Silver.***  This resulted in JTF having to refile regulatory records pertaining to the Liberty Silver shares, in order to disclose this interest, CW 1 said.  Belesis directed JTF brokers to sell Liberty Silver to JTF's clients until trading was ultimately halted by the SEC, according to CW 1.  JTF accounted for roughly "80 to 90 percent of the [trading] volume" in Liberty Silver on certain days, CW 1 explained.

58.     According to CW 1, Liberty Silver was not the subject of any pre-deal due diligence by JTF.  This was different from JTF's standard protocol. "Usually [we] look into the stock – where it's coming from," CW 1 said. For Liberty Silver, "there was none of that done."  Rather, the "certificates were basically railroaded in by Belesis with no concerns about the orientation of where the certificates came from or anything like that." As CW 1 put it, Belesis was "very hands on" with the Liberty Silver matter.

---

advisor and explained that the manager George Jarkesy, Jr. "kept an appreciative Belesis apprised of his efforts" to negotiate fees for JTF, thus depriving the funds "of a material amount of money that went instead to placement fees, loans to small companies that then used the money to pay fees to JTF and for unearned bridge loan fees JTF received for performing little or no services."  SEC Cease-and-Desist Order at 13.  The order explained that on one occasion, "after Belesis complained that Jarkesy was not securing sufficient fees for JTF in February 2009, Jarkesy responded that 'we will always try to get you as much as possible, Everytime [sic] without exception!'"  *Id.*

59.     CW 1 and JTF's Chief Compliance Officer, Joseph Castellano, were very concerned that due diligence had not been conducted on Liberty Silver. The revelation that Genovese was in fact a controlling person of Liberty Silver, along with Look Back Investments and BG Capital being based in Panama and the Bahamas respectively, bolstered these concerns, CW 1 explained. Due to their significant concerns, CW 1 and Castellano prepared and signed a letter to state that, for the above reasons, they were "very uncomfortable with the stock."  The letter was prepared for internal JTF use and was designed to shield the compliance officers from potential liability relating to JTF's dealings in Liberty Silver.

60.     CW 2 worked at JTF from February 2008 through June 2013, most recently as a regional managing director.  CW 2 was present at a meeting, believed to be the meeting attended by CW 1,  in which Genovese and Mirman gave a sales pitch to JTF's brokers on Liberty Silver. According to CW 2, the meeting took place in JTF's board room during the early fall of 2012 and was attended by CW 2, Belesis, and all of JTF's brokers.  Mirman introduced Genovese to JTF during the meeting.  CW 2 said it was a "110% fact" that Mirman introduced Genovese to JTF and Belesis. Mirman told brokers that Genovese was a friend and client of Mirman's for "over 10 years," according to CW 2.  As CW 2 explained, Mirman was so close to Genovese that he regularly told JTF brokers stories about his nights out on the town with Genovese.  CW 2 recalled that Genovese touted Liberty Silver and the Trinity Silver Project after he was introduced to the firm by Mirman. Mirman, either before, during, or after Genovese's presentation, directed all of JTF's brokers to buy Liberty Silver for their clients, according to CW 2.

61.     Mirman, as CW 2 recalled, assured brokers that Liberty Silver was a good long-term investment. CW 2 said Mirman told JTF brokers that he (*i.e.,* Mirman) conducted all of the due diligence necessary for JTF to comfortably pitch the Liberty Silver stock to its clients. The

compliance department did not have a significant, if any, role in the due diligence for Liberty Silver, according to CW 2.  As CW 2 explained, Mirman told JTF brokers that he was available to speak with any of their clients about Liberty Silver.

62.    CW 2 said he/she and CW 2's former colleagues (in the aftermath of the Liberty Silver trading halt) found out that Genovese regularly cons investors by artificially inflating the value of companies under his control, adding that Genovese has been involved in "so many deals like [Liberty Silver]."   Genovese knows how to "scam" and should be "investigated and prosecuted," CW 2 said.

63.    Liberty Silver was not the first investment prospect brought into the firm by Mirman to see regulatory scrutiny, according to CW 2.  Before Liberty Silver, CW 2 said, Mirman opened accounts for Grandparents.com and an oil and gas company, the name of which CW 2 could not recall.  CW 2 saw this as a red flag and thus did not purchase any Liberty Silver shares for CW 2's clients. Mirman pitched Grandparents.com and the oil and gas company similarly to Liberty Silver, and encouraged JTF brokers to purchase shares in these companies, according to CW 2.[6]  CW 2 approximated that Mirman pitched Grandparents.com in November 2011 and the oil and gas company in 2012.

64.    CW 3 worked as an analyst at JTF from January 2012 to May 2012.  As part of CW 3's responsibilities, he/she would cold-call prospective clients to schedule follow-up calls between them and JTF brokers.  CW 3 said that JTF's clients were typically C-level executives with "deep

---

[6] As reported in an article entitled "John Thomas Financial Being Probed by Brokerage Industry, SEC and FBI," published by the *New York Post* on February 7, 2013:

> The FBI has also been poking around JTF's dealings with Grandparents.com, which hired JTF last year to help it with a stock deal. The agents have asked whether JTF brokers told prospective buyers of the stock that media personality Regis Philbin had ties to the penny-stock company, sources said.

pockets." CW 3 described JTF's corporate culture as "very hostile," and CW 3 explained that brokers often antagonized clients, going as far as to question their manhood in cases in which clients were hesitant to invest more money into stocks that JTF was "rallying" at the time. CW 3 said that JTF's clients were receptive to this type of sales pitch because of "ignorance." CW 3 explained that after clients invested significantly into the stock, the price of the stock would often decline rapidly.

65. The testimony of the confidential witnesses is bolstered by sworn declarations from JTF brokers. Renos Gordos, Rodney Laveau, Anthony Mauiolo, Darren Himmelstein, and Keith Williams are former JTF brokers who were sued by JTF for alleged breaches of employment agreements. As part of their motion to dismiss the action against them, these brokers filed declarations discussing, *inter alia*, the practices of JTF. *See John Thomas Financial Inc. v. Renos ("Ray") Gordos, et al.,* No. 650057/2013, filed in the Supreme Court of the State of New York, County of New York.[7] In these declarations, the brokers discussed JTF's involvement in "pump and dump" schemes, including the following discussion:

> While I am not a securities regulator, what I witnessed at JTF cannot be allowable conduct of broker-dealers or members of FINRA or the SEC. Truth be told, Mr. Thomas Belesis, the founder and CEO of JTF, runs a boiler room operation like a tyrant. He tells registered representatives to essentially ignore their client's investment objectives and tries to push securities on clients that are far from appropriate. He also belittles hollers and screams at registered representatives throughout the day and asks them to do things that are wholly inappropriate. By way of example, he admonished brokers and screams at them to actually not read private placement memoranda; even though they are required to understand the security they are selling. Instead, he screams at the reps to "just sell" the deals and, if you are not doing sufficient business, "kill yourselves." He repeatedly threatens to terminate brokers that question him or any of his deals. He single handedly creates an environment of extreme intimidation and hostility.

---

[7] JTF voluntarily dismissed its action against the brokers in February 2013.

Upon information and belief, JTF through, Mr. Thomas Belesis and other principals, has promoters' present securities and companies to the registered representatives in order to have those brokers sell the securities to increase the price of the share of the stock, while, at the same time, has those promoters selling into that same market. ***One such example of this "pump and dump" scheme occurred with Liberty Silver Corp., a company that JTF was recommending to its clients.*** Upon information and belief, JTF also recommended and traded bulletin board stocks, without proper paperwork, in violation of both FINRA and SEC rules. ***While I will not use this forum to explain the inappropriate conduct by Belesis, I will state that those violations are so egregious that I had to leave for fear of being a part of what could be considered a criminal enterprise.***

I had hoped and expected that, by departing JTF, I would no longer have to be subject to Mr. Belesis.  I was wrong.  Now he has made it a personal vendetta to attempt to ruin me, my partner and the three brokers that work for me.  He is trying to inappropriately harm my career and chase me out of the business.

*Id.* (emphasis added).[8]

66.     Defendant Genovese used Belesis and JTF to artificially inflate stock prices by having Belesis direct the JTF "boiler room" to buy and sell large quantities of stock in companies owned by Genovese, including Liberty Silver.  After the stock prices were artificially inflated, Genovese directed Belesis to heavily sell the stocks, with Genovese making a large profit while the investing public sustained huge losses.

67.     CW 6 was an investment banker at JTF from 2011 through 2013.  CW 6 explained that in mid-August 2012, CW 6 and a JTF executive flew to Defendant Genovese's house in Canada to meet with Genovese.  During that meeting, CW 6 explained that Genovese pitched them on Liberty Silver as a stock that JTF might be interested in presenting to its clients.  CW 6 explained that shortly thereafter, CW 6 and another JTF employee met with Defendant Genovese and Defendant Tafuri, President and Chief Operating Officer of Liberty Silver, in Nevada.

---

[8] Plaintiffs reached out to each of these brokers who either did not respond or refused to provide comment or information.

According to CW 6, as part of the trip, CW 6 and the other JTF employee went to dinner with Genovese and some of Liberty Silver's management, including Tafuri. CW 6 explained that during the August 2012 trip, Genovese discussed his private investments in Liberty Silver. Based on those discussions, CW 6 said that Tafuri was fully aware of Genovese's private investments in the Company, including the $3.25 million investment *via* Look Back Investments, Inc. According to CW 6, Genovese's investment was applied towards Liberty Silver's Trinity project and the Company's obligation to Renaissance Gold.

68.    CW 6 explained that Genovese and Tafuri came to New York and met with JTF brokers in August 2012 and in September 2012, at which time they pitched Liberty Silver. According to CW 6, between August and October 2012, Genovese made at least three visits to JTF and met with JTF brokers. CW 6 recalled that Defendant Tafuri was present for two of those meetings with JTF. CW 6 further explained that in September/October 2012 Defendant Browne, Chairman and CEO of Liberty Silver, participated in at least one conference call with JTF.

69.    During one of Genovese's visits to JTF in September 2012, CW 6 learned of a "*quid pro quo* agreement" between Genovese and Belesis. CW 6 explained that as part of the agreement, Genovese intended to sell a large amount of Liberty Silver stock through trades conducted by JTF and Genovese promised Belesis that he would invest half of whatever he received from those sales into ATB Holdings, a company owned by Belesis. CW 6 said that he/she advised Belesis not to take part in the *quid pro quo* arrangement. However, during or immediately following Genovese's visit, JTF initiated opening a trading account for Genovese, CW 6 explained. CW 6 further explained that BG Capital (Genovese's company) provided a $2 million loan in ATB Holding Company LLC in September 2012, an entity owned by Belesis. CW 6 said that to his/her knowledge, the $2 million loan was never repaid. In fact, documents provided by CW 6 include

an email from Marco Markin (BG Capital's CEO) suggesting that the loan was never intended to be repaid: "As per our discussion, you will find the revised agreements attached.  The agreements should now reflect the original agreement.  ***The next step would be to forgive the agreements and simply write an 'I owe you on the back of a napkin'*** (HAHA)."

70.     CW 6 said that by late August or early September 2012 and continuing through October 2012, JTF was actively encouraging its clients to buy Liberty Silver stock.   CW 6 confirmed that what happened with Liberty Silver stock was a "pump and dump" and he/she described it as being "forced down people's throats."

71.     CW 6 said that in September 2012, CW 6 attended a conference and dinner in Canada that was hosted by Genovese and that was designed to promote Liberty Silver.  CW 6 said that people from Liberty Silver management, including Defendant Tafuri, was present at the conference and dinner.  In addition to Tafuri, CW 6 also remembered Defendant Browne being present at the conference and dinner.  According to CW 6, almost everyone at the conference and dinner, "probably 70 to 80 percent," were news people/promoters who were being pitched to promote Liberty Silver stock.  CW 6 estimated that there were probably 20 to 30 people that attended the conference and dinner and that 20 of those people were newsletter writers or promoters.  CW 6 recalled that one such promoter in attendance at the conference and dinner was James West, author of the Midas Letter.

72.     According to CW 6, "every single promotion [of Liberty Silver] was put in place by Bobby [Genovese]."  CW 6 received emails from Genovese about the different promotions that were being issued about Liberty Silver.  CW 6 explained that Genovese was involved in preparing promotions that were issued by people claiming to be third parties and that Genovese approved promotional reports regarding Liberty Silver before they were issued.  Indeed, emails provided by

CW 6 show Genovese corresponding with and directing numerous newsletter writers and bloggers to post favorable news about Liberty Silver.

73.    CW 6 explained that Liberty Silver's management, including Tafuri and Browne, were trying to promote Liberty Silver as part of a capital raise that Liberty Silver was seeking. According to CW 6, Liberty Silver was trying to set up a private placement of its stock to investors by October or November of 2012 in order to raise money for the Company.

74.    CW 6 confirmed that the 6.6 million shares of Liberty Silver stock sold by Genovese on September 20, 2012 was executed by JTF on Genovese's order.   CW 6 said that the 6.6 million shares were sold directly to JTF clients.   CW 6 further explained, and provided documents to support, that by September 19, 2012, Genovese had requested that JTF sell an additional 6.5 million shares of Liberty Silver stock during that month of September 2012. According to CW 6, the shares were to be sold to clients and/or prospective clients of JTF.  CW 6 said that the second block of 6.5 million shares was never sold because JTF's clearinghouse, Sterne Agee & Leech, would or could not clear the trade.

75.    CW 6 recalled that Genovese initially informed JTF that he was not a control person of Liberty Silver but explained that JTF later learned that Genovese was such a control person based on his ownership of large amounts of Liberty Silver common stock.

76.    CW 6 said that in mid-October after Liberty Silver stock had been halted, CW 6 along with other JTF employees met with Genovese.   At that time, CW 6 explained, Genovese showed CW 6 a list of Liberty Silver shareholders and said, "these are all mine," implying that he owned a large percentage of Liberty Silver stock through other shareholders.   CW 6 confirmed that Genovese was buying up large amounts of Liberty Silver stock and was manipulating the stock during the Class Period.  CW 6 estimated that Genovese probably "sourced" 80 to 90 percent of

the Liberty Silver float, which CW 6 explained to mean that Genovese either personally owned or was responsible for having brought people into ownership of about 80 to 90 percent of Liberty Silver's freely tradable stock during the Class Period.

77.    CW 7 was an executive officer of JTF since its inception and continuing throughout the Class Period.  CW 7 explained that JTF began speaking to Genovese about Liberty Silver in August 2012.  CW 7 explained that in mid-August 2012, CW 7 and another JTF employee who worked in JTF's investment banking department flew to Genovese's house in Canada to meet with Genovese.  During that meeting, CW 7 said, Genovese pitched them on Liberty Silver as a stock that JTF should sell to its clients.

78.    Like CW 6, CW 7 explained that in late August 2012, Defendants Genovese and Tafuri came to JTF's office in New York and made a presentation to JTF's brokers about Liberty Silver stock.  CW 7 said that following the visit from Genovese and Tafuri, JTF brokers began pitching Liberty Silver stock to their clients and began executing trades in Liberty Silver stock on behalf of their clients, from which JTF brokers received a commission.  CW 7 described this as JTF "building a position in Liberty Silver."  Trading documents supplied by CW 7 suggest that, in addition to selling 6.6 million shares for Genovese, JTF traded more than 5.6 million shares of Liberty Silver stock in the open market on behalf of JTF's clients during September and October 2012.

79.    CW 7 said that following the August 2012 meeting, Genovese made additional visits to JTF in September and October 2012, during which Genovese would talk to brokers about Liberty Silver.

80.    According to CW 7, Genovese informed JTF management and brokers that he was not a control person of Liberty Silver.  CW 7 explained that JTF later learned that Genovese was

in fact a control person at Liberty Silver based on his ownership interests and thereby qualified as "a 13D filer."[9]

81.    CW 7 explained that Liberty Silver was seeking a private placement to be completed before the end of 2012 and was therefore looking to promote Liberty Silver.  CW 7 said that Liberty Silver was looking to raise $10 million in the private placement so that the Company could monetize its mines.

82.    CW 7 said that the September 20, 2012 sale of 6.6 million shares of Genovese's Liberty Silver stock was executed by JTF.  CW 7 explained that the shares were sold to JTF clients.

83.    Like CW 6, CW 7 further explained, and provided documents to support, that by late-September 2012, Genovese intended for JTF to sell an additional 6.5 million shares of Liberty Silver stock during that month of September 2012.  CW 7 explained, and information supplied by CW 7 confirmed, that the 6.5 million shares were to come from Look Back Investments, Inc. (Genovese's company).  According to CW 7, JTF had clients lined up who JTF believed would purchase the 6.5 million shares from Genovese's intended second block trade.  CW 7 said that the second block trade of 6.5 million shares was not executed because JTF's clearinghouse, Sterne Agee & Leech was having difficulties clearing the trade, and the SEC halted trading before the trade could be cleared.  CW 7 further explained that at the time the SEC halted trading, the SEC also issued subpoenas to JTF and to Sterne Agee & Leech.  CW 7 said that because of those subpoenas, the clearinghouse would not clear additional trades in Liberty Silver.

84.    CW 4 is and has been an executive officer of Renaissance Gold since its inception. Renaissance Gold maintains rights to the Trinity Silver Project and in 2010 entered into an earn-

---

[9] Schedule 13D is an SEC form that must be filed with the SEC by anyone who acquires beneficial ownership of more than 5% of any class of securities in a publicly traded company.

in agreement with Liberty Silver, pursuant to which Liberty Silver is to develop the Trinity Property in return for a 70% interest in the Trinity Project. CW 4 works at Renaissance Gold's headquarters in Reno, Nevada, and regularly interfaces with Liberty Silver executives to discuss their Joint Venture.

85.     CW 4 said that he/she was shocked in 2012 when CW 4 learned that Liberty Silver's market capitalization was so high, especially given that Liberty Silver was required to spend all of the funds needed to develop the project.[10] According to CW 4, during the time of the Joint Venture, Defendant Genovese owned "a bunch of stock" in Liberty Silver and said he/she believed Genovese had a controlling stake in Liberty Silver. CW 4 said that Genovese promoted the Company by making what CW 4 viewed as false statements. For example, CW 4 recalled that Genovese on multiple occasions made public statements that the project would gross one hundred million ounces of silver. CW 4 recalled that a couple years ago, Genovese pitched CW 4 on promoting Renaissance Gold, to which CW 4 responded, "You're the last guy I need in my camp."

**B.      False and Misleading Statements and The Continued Market Manipulation Scheme**

86.     On February 14, 2012, Liberty Silver filed its Form 10-Q for the quarterly period ended December 31, 2011. The Form 10-Q was signed and certified by Defendant Browne. The Form 10-Q failed to disclose the private placement by Genovese *via* Look Back Investments announced in November 2011. The omission violated SEC Regulation S-X, Rule 4-08(k)(1) and Accounting Standards Codification ("ASC") 850, *Related Party Disclosures.*

---

[10] CW 4 explained that Liberty Silver's interest in the Trinity Project is conditioned on completing a bankable feasibility study on the project, and if the Company is unable to create the study, 100% of the interest in the Trinity Project is returned to Renaissance Gold.

87.     ASC 850-10-50-1 provides that financial statements shall include disclosures of material related party transactions.  SEC Regulation S-X, Rule 4-08(k)(1) requires that related party transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows.[11]  ASC 850-10-20 defines "Related Parties" as,

---

[11] Generally accepted accounting principles ("GAAP") and SEC regulations provide that a public company and its management must disclose related party transactions in financial statements filed with the SEC.  ASC provides guidance on, and requirements for, the disclosure of transactions with related parties.

ASC 850-10-50-1 provides that financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business.  The disclosures shall include, *inter alia*:

    a.      The nature of the relationship(s) involved.

    b.      A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

    c.      The dollar amounts of the transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

    d.      Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

For SEC Registrants, such as Liberty, SEC Regulation S-X, Rule 4-08(k)(1) sets forth the following additional requirements with respect to financial statements required to be filed with the SEC:

    (k)      Related party transactions which affect the financial statements.

        (1)      Related party transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows.

Related party transactions can appear in a variety of circumstances, including: purchases and sales of merchandise and services (merchantable assets); purchases and sales of productive (capital) assets; indebtedness and guarantees; investments in the securities of the enterprise or affiliated entities; leases; off-balance sheet financing; use of company assets and personnel; compensation arrangements, including stock options and employee pension trusts; asset transfers; and investments in other entities, including special purpose entities (SPEs).

among other things, "Principal owners of the entity and members of their immediate families." ASC 850-10-20 defines "Principal Owners" as "Owners of record or known beneficial owners of more than 10 percent of the voting interests of the entity."

88.     At the time of Look Back Investments' private placement in Liberty Silver, according to the trading records reported to SEDI on December 27, 2012, Genovese's entities BG Capital and Outlook Investments owned over 7.3 million shares of Liberty Silver common stock, which was above 10% beneficial ownership interest threshold for disclosure under ASC 850-10. Accordingly, Liberty Silver's Form 10-Q filed on February 14, 2012, violated SEC Regulation S-X and was materially false or misleading.[12]

89.     From January 2012 to July 2012, Liberty Silver's stock trading volumes averaged about 42,000 shares per day.  However, after Genovese and the other Defendants accelerated their prototypical Genovese fraudulent and manipulative scheme, volume drastically increased.   In September and early October 2012, trading volumes averaged roughly 236,000 shares per day.

90.     In an effort to leverage more shares, legitimize Liberty Silver, and drive the stock price higher, Defendants announced an offer to buy a more cash rich company.  On July 16, 2012, Liberty Silver announced that it would make a tender offer for Sennen Resources ("Sennen"), a reputable TSX listed company with nearly $14 million in cash.  ***The proposed takeover would pay Sennen investors with Liberty Silver stock in a ratio that would value Sennen Resources at its cash value ($14 million) and Liberty Silver at a completely unfounded, ridiculous, and artificial valuation of $48,000,000.***  In the press release, Defendant Browne (Liberty Silver's CEO and

---

[12] Information about transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance. ASC 850-10-05-10. Relevant information is omitted if the disclosures required by ASC 850 are not made. *Id.*

Chairman) gushed that, "Liberty Silver is well-placed to take advantage of these opportunities using our mitigated-risk approach to project evaluation and development. We are confident that the combination of Sennen's cash resources and Liberty Silver's skilled management team and proven risk-mitigation strategy will enable us to advance our promising Trinity Silver project in Nevada and to identify other low-risk projects."

91.     The next day, July 17, 2012, the Company issued a press release announcing that Defendant Browne would appear on the Business News Network (BNN) to discuss Liberty Silver's proposed acquisition.  Defendant Browne appeared on BNN that evening to draw further attention to the Company's purported business prospects.

92.     Ian Rozier, CEO and President of Sennen, opposed the merger and in a directors' circular issued by Sennen's board, Sennen executives highlighted various red flags about Liberty Silver. In particular, Rozier publicly stated that ***"Liberty's Offer is an insult to the intelligence of Sennen Shareholders who understand that this is a clear case of the management and promoters of an OTC shell company with very little money and questionable assets trying to back their ludicrously overvalued paper into an established company with tangible assets-in this case Sennen and its treasury."*** He further publicly highlighted that ***Liberty Silver's stock was actually valued between $0.005 and $0.07 per share instead of the $.20 per share Liberty Silver claimed.*** Unsurprisingly, Sennen's investors expressed uniform opposition to the proposed merger.

93.     On August 8, 2012, Liberty Silver announced its expanded properties in a press release entitled "Liberty Silver Expands Trinity Land Package with Acquisition of Hi Ho Silver Property."  In the press release, Defendant Browne, Chairman and CEO of Liberty Silver, stated: ***"The Hi Ho Properties are an important addition to our future development plans at Trinity. Historic data, combined with current modeling indicates that the Trinity deposit extends into***

*the Hi Ho Properties, significantly increasing our current resource potential and the projected economics for bringing Trinity back into production."* (Emphasis added).

94.     CW 4 (the executive officer of Renaissance Gold) explained that Liberty Silver purchased the Hi Ho properties at an extremely high price of $2 million, which CW 4 described as a "ransom price."  According to CW 4, Renaissance Gold had previously expressed interest in the Hi Ho properties but could not agree to a price because in CW 4's view, the owners were "very unreasonable with the price" and effectively held the claims "hostage."

95.     Despite the receipt of overwhelmingly negative feedback from Sennen shareholders, on August 9, 2012, Liberty Silver issued an open letter, in the form of a press release, to Sennen shareholders in an attempt to re-build its reputation in response to Sennen's announced opposition to the proposed merger.  Moreover, on August 21, 2012, Liberty Silver announced that it was extending its offer to acquire Sennen until September 10, 2012.  In the press release, Defendant Browne again touted the value that the purported acquisition would add, stating: "The combination of Sennen's cash resources and Liberty Silver's skilled management team and prudent risk-mitigation strategy will enable us to advance the Trinity Silver project, as well as identify other low-risk opportunities to the benefit of shareholders of both our companies." Defendant Browne also used the opportunity as a platform to again discuss the new Hi Ho properties: "*With the recent acquisition of the Hi Ho properties, we have met yet another milestone.  As promised, we have added significant upside to our established resource, moved very close to fulfilling our earn-in requirements, and further de-risked the project. We are now planning the best path towards re-starting production.*" (Emphasis added).  This extended offer, in light of Sennen's repeated and emphatic lack of interest in the proposed acquisition, was nothing more than another attempt to artificially pump up the price of Liberty Silver stock.

34

96.    In response, Sennen's CEO Ian Rozier again emphatically announced Sennen's opposition.  In an August 25, 2012 press release, Rozier stated that "the offer had always been a hostile, derogatory and insulting one, which was utterly inadequate for shareholders . . . shareholders were justifiably outraged by what they considered to be continual harassment by Liberty."  In the press release, Rozier was further quoted as saying that "Sennen has zero interest in doing any business whatsoever with Liberty Silver."  Unsurprisingly, Sennen's shareholders voted to oppose the acquisition.

97.    Not to be deterred by the unfavorable response to the Company's proposed acquisition of Sennen, Defendants, in textbook pump and dump fashion, shifted their focus to promoting new opportunities, namely its newly acquired Hi Ho properties, which Defendants used as the basis for unsubstantiated and exaggerated resource estimates.

98.    On August 28, 2012, BG Capital, a wholly owned entity of Genovese, announced it had taken a position in Liberty Silver and stressed the potential of Liberty Silver and its Trinity Silver Project:

**BG Capital Group Taps into Liberty Silver Corp. Amidst Forecast of "Silver Rush"**

PLANTATION, Fla., Aug. 28, 2012 /PRNewswire-iReach/ -- BG Capital Group, a venture capital and private equity firm with offices in South Florida, has announced an interest and investment in Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV), an advanced stage junior silver mining company with potential resources of 120m silver equivalent ounces.

"***We are confident that this newly discovered deposit located in the United States will yield a substantial supply of silver***," said Bobby Genovese, CEO of BG Capital Group.  "We anticipate a growing increase in the value of silver and prospect of this project given the limited supply in areas that can be safely mined."

The revival of this US supply source is good news for investors - and the national economy - as this project has the potential to not only provide a safe location to produce – but it is also expected to create more jobs.  Today, silver production

35

comes primarily from other countries that face challenges including violence and localized uprisings that have put mining to halts.

Liberty currently oversees approximately 24 million inferred ounces of silver equivalent resources located 23 miles from the renowned Coeur Rochester silver mine, known as the "Trinity" project, with an opportunity to become a low-cost, large-scale operation given the existing open pit mine on the property that produced 5m silver ounces in the late 1980s.

***Historical drilling and production data, recent surveys and drilling results, as well as BG Capital's independent research reveals the property has potential resources of approximately 120m silver equivalent ounces between the Trinity property and the adjacent Hi Ho silver property of which Liberty recently entered into a mineral rights agreement with.***

Liberty Silver Corp is an advanced stage junior mining company focused on developing its flagship property - the Trinity Silver Project - comprised of 10,600 acres including 5,700 acres of fee land and 240 unpatented mining claims.  The Trinity property, previously mined and operated by US Borax, produced 5 million ounces of silver from 1.1 million tons of ore from its open pit oxide resource from 1987 to 1989; mining ceased when sulfide mineralization was encountered in the bottom of the pit and metal prices were too low to support mining the sulfide resource.

The Trinity Silver Project is located 25 miles northwest of Lovelock, Nevada (Pershing County) and shares its geographical location with major gold and silver producers including one of the largest silver mines in the United States, the Coeur Rochester silver mine, which produced 125 million ounces of silver from 1986 to 2010 and has an estimated 120 million silver ounces in reserves. The Company holds the right to earn a 70% interest in the Trinity Project from Renaissance Gold (TSXV: REN).

(Emphasis added).

99.     According to CW 4 (the executive officer at Renaissance Gold), Liberty Silver was responsible for quality assurance and quality control over the 2012 inferred resource estimates. CW 4 explained that the inferred resource estimates announced by Liberty Silver and Renaissance Gold in 2012 were twice the amount in value than was estimated in 2011 as a result of the newly acquired Hi Ho claims.  CW 4 said that this increase raised concern from the Ontario Securities Commission ("OSC").  As CW 4 recalled, the OSC ordered the 2012 estimates to be retracted

because no modern ore samples had been analyzed to support the estimates.  CW 4 explained that estimates of the Hi Ho property resources were entirely based on ore samples that had been collected from a predecessor company during its 1980s drilling program.

100.     CW 5 is a geologist who contracted with Liberty Silver in 2012 and 2013 to consult the Company on the Trinity Silver Project in Pershing, Nevada. CW 5, as a certified professional geologist, oversaw quality assurance regarding the 2012 drilling program.  CW 5 was the Qualified Person responsible for the accuracy of technical data in certain press releases by the Company in accordance with the Canadian Standards of Disclosure for Mineral Projects (National Instrument 43-101).  CW 5, along with another consultant geologist for Liberty Silver analyzed drill samples to verify the geological nature of the mineral deposit.

101.     According to CW 5, while the Hi Ho Property was adjacent to the Trinity Project property, resources can only be determined through the analysis of a deposit's geology as well as mineralogy.  As CW 5 explained, "we have drill hole information [at the Hi Ho Property], but we don't have enough to say much about it yet."  According to CW 5, no drill samples were collected from the Hi Ho Property in 2012.

102.     CW 5 recalled that CW 5 was invited by an executive of Liberty Silver to attend a meeting at SRK Consulting, a consulting geologist firm utilized by Liberty Silver, around summer to fall 2012.  CW 5 believed either Liberty Silver Vice President of Exploration Dick Klatt or President and Chief Operating Officer Defendant Tafuri extended CW 5 the invitation. CW 5 said he/she could not attend the meeting because of a prior engagement.  CW 5 recalled that meeting was a "type of client show," and CW 5 believed that Defendant Genovese attended the meeting.

103.     On September 11, 2012, the blog *www.Goldstocktrades.com* posted a report entitled "Why Are the Silver Miners Outperforming?"  Genovese is believed to have paid for the

blog posting[13] and in fact, documents provided by CW 6 show that Gold Stock Trades' editor emailed Genovese about the post and also emailed Genovese about sending blasts of an interview of Defendant Tafuri.  The report touted Liberty Silver by stating:

> We have become interested in a previous silver producing mine right here in Nevada just about to break into all time highs. ***Liberty Silver (LBSV) has recently seen a major increase in accumulation and investment interest. Liberty Silver (LBSV) is permitting and intends to be producing silver at its Trinity Project which was one of the largest silver mines in US history possibly within the next 18-24 months.*** Trinity produced five million ounces of silver between 1987 and 1989 before Rio Tinto closed it down when silver prices went below $5. Now the ballgame has changed as silver may be on its way to test new highs at $50.
>
> The company is now preparing an updated NI 43-101 Resource Estimate and a Preliminary Economic Assessment (PEA). Liberty is beginning permitting as it believes it could move very quickly into restarting production as it already has an existing open pit mine that was once in production. Now silver is breaking above $30 and could move significantly higher over the near term possibly into new all time highs should QE3 be announced later this month. The higher prices has brought a lot of investment interest into this project and makes this project a potential cash cow with huge leverage to the price of silver.
>
> Liberty's Trinity Project is located in the same area as Coeur D'alene flagship Rochester silver mine, near Lovelock, Nevada. The Rochester Silver Mine produced over 125 million ounces of silver ***and still has about 120 million in reserves.*** This is an area of massive silver deposits and Liberty is sitting on a previously producing silver mine with the potential to expand this resource exponentially. With the addition of the recent Hi Ho Property next door, there could potentially be a large amount of silver on the combined property that is located in a very friendly mining jurisdiction in Pershing County, Nevada.

(Emphasis added).

---

[13] The posting is tellingly consistent with the press release issued by BG Capital on August 28, 2012 but contains additional information such as "[Liberty Silver] believes it could move very quickly into restarting production" that appears to have been obtained from an insider.  Moreover, while the report stated that the blogger was "long" in Liberty Silver shares, it did not disclose how many shares he owned and how he came to own them. It is likely the case that the Liberty Silver shares were given as consideration for the promotional post.

104.   On September 27, 2012, The Midas Letter, a subscriber-driven private investment strategy newsletter published by James West, believed to have been paid by Genovese to publish false reports,[14] posted a gushing newsletter about Liberty Silver:

**Liberty Silver Corp: High Beta to Silver and Fast Track to Production**
Friday, September 28, 2012 2:51

September 27, 2012 – *The math is very straightforward with Liberty Silver's Trinity Project: 50 million ounces of silver at $30 per ounce minus cash costs of $15 per ounce equals US$750 million divided by 80 million shares outstanding equals $9.38 a share. Chop that in half for the sake of conservativeness, and you still get a price of $4.68 per common share outstanding. If they don't drill another hole.*

Now this is obviously simplistic, non-43 101 compliant math and in no way should this be relied to come to an investment decision. *But judging by trading in the company's shares, there is a lot of this kind of back-of-the-napkin calculation going on, and investors are apparently arriving at a similar conclusion. A major Wall Street firm is actively accumulating a position after visiting the property earlier this month.* Normally I don't try to chase a stock that gets up a head of steam like this, but after a second, more in-depth look at the company and its project, I decided to jump in.

There's a focused vision among management on one thing and one thing only: going into production.

The 50 million ounces is derived from a look at historical data and over 490 holes of historic drilling by U.S. Borax and Newmont mining. Just 25 kilometers to the south, Coeur d'Alene's Rochester mine has produced over 120 million ounces of silver. *The addition of the Hi Ho Silver properties from Primus Resources adds substantially to the historic non-43-101 resource estimates, and Trinity's first drill program went a long way towards confirming that this historic data is accurate.*

---

[14] Indeed, according to CW 6, James West was present at the conference and dinner hosted by Genovese in Canada in September 2012.  Notably, as part of the report, the only disclosure made by James West regarding possible payment from Liberty Silver was: "I am a shareholder."  Thus, West strategically omitted how many shares he owned and how he came to own them.  It is almost certainly the case that West was given Liberty Silver shares in exchange for pumping the stock and/or received a cash payment for the report.  Following the SEC's halt of trading in Liberty Silver stock, James West has attempted to distance himself from Liberty Silver and immediately removed this newsletter from his website.

*In the month of September so far, the company has traded over 20 million shares and doubled in value.* Silver itself has traded in a similar trajectory, increasing in value by 35% since mid-summer, and outperforming gold smartly.

*The most respected and experienced traders in precious metals fully expect the ratio of how many ounces of silver it takes to buy one ounce of gold to head towards 16:1 from its current level of over 50:1. That would imply a silver value of $110 per ounce.*

If Liberty Silver shares continue to trade at such a high beta to the silver futures price, the premium being awarded Liberty Silver could be substantial. But the expectation of a higher silver price, and the rich nature of the mine, is only half the reason investors are ponying up for Liberty.

The key to understanding what all the excitement is about lies in the board of directors, the members of whom would not be out of place on a Fortune 500's board of directors.

**Management is Financial Firepower**

What sets Liberty Silver apart from every other TSX and Venture –listed firm is the caliber of the management and board of directors. And, when it comes to raising money to put a project into production, a team with deep pockets themselves – and more importantly, access to deep institutional pockets – is critical.

Starting with Chairman and CEO Geoffrey Browne, who was the head of private equity at Merrill Lynch Canada and is one of the founders and managing partners of MWI & Partners, a private equity firm. Prior to founding MWI & Partners, Mr. Browne was a senior executive at Canadian Imperial Bank of Commerce and CIBC Wood Gundy Inc. for over 20 years. He has managed more than $1 billion in merger, acquisition and private equity transactions. His experience includes overseeing CIBC's purchase of Wood Gundy and Pelmorex's acquisition of The Weather Network. Mr. Browne is currently a High Beta to Silver and a Fast Track to Production Midas Letter / September 24, 2012 2 director of Insight Sports, and the Alberta Enterprise Corporation, which oversees in excess of $100 million for early stage ventures.

Then there's the president, Bill Tafuri, with 40 years' of diverse mining and exploration experience. He worked major international mining companies including Getty Mining Co, Kennecott Corp., Santa Fe Pacific Gold Corp. and Kinross Gold Corp.

Paul Haggis, a Canadian business icon who is chairman of Canadian Pacific Railway Ltd., C.A. Bancorp Inc., a Canadian merchant bank and alternative asset manager, and Alberta Enterprise Corporation, a venture capital fund overseeing $100 million for early-stage ventures. He was previously, among other positions, president and CEO of OMERS, one of Canada's largest pension funds, and executive vice-president at Manulife Financial. Mr. Haggis was also a director of Canadian Tire Bank until March 2012, chairman of the audit committee at

Advantage Energy of Calgary, director and audit committee chair of Prime Restaurants Inc., which was sold to Fairfax Financial Holdings Limited, and a trustee and chair of Royal Ontario Museum's finance committee. He also chairs the Insurance Corporation of British Columbia's investment committee for early-stage ventures, aye-aye and chair of Royal Ontario Museum's finance committee. He also chairs the Insurance Corporation of British Columbia's investment committee.

***But more importantly is the fact that legendary entrepreneur Bobby Genovese, Chairman of BG Capital Group, has become one of the biggest, if not the biggest shareholder of Liberty Silver Corp. I was able to reach Bobby in the Bahamas this morning, where he confirmed rumours that his involvement are indeed factual.***

***"BG Capital Group is betting big on silver, and Liberty Silver Corp is our biggest bet," said the charismatic Genovese. "We see a rapid and straightforward path to production, and with SRK Consulting as our technical advisors, we demonstrate our commitment to using only top-tier talent to achieve our aggressive timelines."***

BG Capital Group is a Barbados-based private investment firm with offices throughout North America and with assets totalling well over $200 million and projected revenues of just over $240 million per year from interests across resources, real estate and financial services.

**Trinity Silver Project**

The Trinity Project now consists of 4,200 hectares in Pershing County, Nevada, of the formerly producing Trinity Silver Mine. SRK Consulting has been retained to design the company's path to production, which, as can be seen from the slide below, contemplates a 2 year development cycle. Continuing exploration on the project is expected to add incrementally to the existing known resources, and a conceptual target of 120 million ounces of silver is envisioned.

Trinity Silver is a tertiary-aged, volcanic-hosted, epithermal deposit of sulfide veins and stockworks with widespread illitic alteration. The sulfide mineralogy includes pyrite, galena, sphalerite, arsenopyrite, silver-bearing tetrahedrite, pyrargyrite, and stannite. Mineralization is associated with rhyolites and high tin values of up to 0.05% in 5-ft (2 m) drill intervals make this an interesting possible analogue to the major silver deposits in Bolivia.

The possibility that porphyry copper-style mineralization occurs at depth is suggested by the strength of illitic alteration, in combination with a crude district-wide zonation that includes a central copper-rich zone, an intermediate base metal-rich zone, and a peripheral silver-rich zone. In plan view, only a portion of the concentric zoning pattern has been tested by drilling and a number of vein and porphyry targets exist at depth.

Liberty Silver recently completed the first phase of its 2012 drilling program. Eighteen vertical drill holes were completed to depths of up to 1,500 feet in rhyolite and underlying metasedimentry host rocks by reverse circulation for a total of

20,030 feet. Drilling tested parts of five geographic domains in the vicinity of the southern end the Trinity open pit momentum alert / liberty silver corp — 3 mine and the 43-101 Resource Area.

Sixteen holes intercepted sample intervals greater than 1 opt silver with grades as high as 15 ounces per ton of silver. Sulfide zone samples contain up to 1.7 % lead and 1.6 % zinc. Fast Track to Production The company's commitment to producing cash flow from production for its shareholders is evident in the retention of SRK Consulting Corp, who has produced a "fatal flaw" report that analyzes in depth the roadblocks to production.

The report concludes that there are no major hurdles, and, as evidenced by the graphic above, Trinity could be producing again in as little as 24 months. There are companies out there with bigger deposits, of course, but bigger deposits tend to require larger capital expenditures and take more time to get up and running. Since the Trinity project includes a past-producing mine, and also since its in the mining center of the universe in Nevada, there is advanced infrastructure present that precludes the requirement for investment in roads, power and water, that would encumber projects in more exotic locales.

(Emphasis added).

105.    On the same day, BG Capital issued a press release touting Liberty Silver and

Genovese and emphasizing West's report in the Midas Letter:

**Liberty Silver Doubles in Value and Trades over $20 Million Shares in September**

PLANTATION, Fla.--(BUSINESS WIRE)--Renowned and respected investment advisor and founder of Midas Letter (www.midasletter.com), a subscriber-driven private investment strategy newsletter, James West, has recently reported his overview of the Trinity Silver Project, a Liberty Silver Corp. (TSX: LSL) (OTCBB: LBSV) endeavor.

The Trinity Silver Project is located 25 miles northwest of Lovelock, Nevada (Pershing County) and shares its geographical location with major gold and silver producers including one of the largest silver mines in the United States, the Rochester silver mine owned by Coeur d'Alene Mines Corporation, which produced 125 million ounces of silver from 1986 to 2010 and *has an estimated 120 million silver ounces in reserves*.

As reported by West at www.midasletter.com, "*In the month of September so far, the company has traded over 20 million shares and doubled in value.* Silver itself has traded in a similar trajectory, increasing in value by 35% since mid-summer, and outperforming gold smartly. The most respected and experienced traders in precious metals fully expect the ratio of how many ounces of silver it takes to buy

one ounce of gold to head towards 16:1 from its current level of over 50:1. That would imply a silver value of $110 per ounce.

"If Liberty Silver shares continue to trade at such a high beta to the silver futures price, the premium being awarded Liberty Silver could be substantial," adds West.

Liberty Silver Corp is an advanced stage junior silver mining company focused on developing its flagship property – the Trinity Silver Project – comprised of 10,600 acres including 5,700 acres of fee land and 240 unpatented mining claims. The Trinity property, previously mined and operated by US Borax, produced 5 million ounces of silver from 1.1 million tons of ore from its open pit oxide resource from 1987 to 1989; mining ceased when sulfide mineralization was encountered in the bottom of the pit and metal prices were too low to support mining the sulfide resource.

***Historical drilling and production data, recent surveys and drilling results, as well as independent research reveals the property has potential resources of approximately 120m silver equivalent ounces between the Trinity property and the adjacent Hi Ho silver property of which Liberty recently entered into a mineral rights agreement with.***

West cites Liberty Silver's "caliber of management and board of directors" as a key to the project's success with leadership from Geoffrey Brown, Chairman & CEO, former head of private equity at Merrill Lynch Canada; Bill Tafuri, President, bringing 40 years of diverse mining and exploration experience with such companies as Getty Mining Co., Kennecott Corp. and Santa Fe Pacific Gold Corp.; Paul Haggis, an icon in Canadian business circles as Chairman of Canadian Pacific Railway Ltd, C.A. Bancorp Inc., a Canadian merchant bank and alternative asset manager and Alberta Enterprise Corporation, a venture capital fund overseeing $100 million for early-stage ventures; and the backing of legendary entrepreneur Bobby Genovese, Chairman of BG Capital Group (a venture capital and private equity firm based in Barbados with offices throughout North America with assets of more than $200 million) as one of the biggest shareholders of Liberty Silver Corp.

(Emphasis added).

106.    On September 28, 2012, Liberty Silver filed with the SEC on Form 10-K its financial results for the fiscal year ended June 30, 2012.  The Form 10-K was signed and certified by Defendant Browne pursuant to the Sarbanes-Oxley Act.  The Form 10-K stated, in relevant part:

*The following table sets forth as of September 25, 2012, the name and the number of shares of the Company's common stock,* par value $0.001 per share, *held of record or beneficially <u>by each person who held of record, or was known by the Company to own beneficially, more than 5% of the issued and outstanding shares of common stock,</u>* and the name and shareholdings of each director and of all executive officers and directors as a group.

| Title and Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of class |
|---|---|---|---|
| Common | Geoff Browne [1] | 2,550,000 | 3.2% |
| | 181 Bay Street, Suite 2330 | | |
| | Toronto, Ontario, Canada, M5J2T3 | | |
| Common | Manish Z. Kshatriya [1] | 0 | 0% |
| | 181 Bay Street, Suite 2330 | | |
| | Toronto, Ontario, Canada, M5J2T3 | | |
| Common | William Tafuri [1] | 2,110,000 | 2.6% |
| | 675 Sierra Rose Drive, Suite 112 | | |
| | Reno, NV  89511 | | |
| Common | John Pulos [1] | 10,000,000 | 12.4% |
| | 675 Sierra Rose Drive, Suite 112 | | |
| | Reno, NV  89511 | | |
| Common | John Barrington [1] | 1,000,000 | 1.2% |
| | 181 Bay Street, Suite 2330 | | |
| | Toronto, Ontario, Canada, M5J2T3 | | |
| Common | George Kent [1] | 1,050,000 | 1.3% |
| | 181 Bay Street, Suite 2330 | | |
| | Toronto, Ontario, Canada, M5J2T3 | | |
| Common | Timothy Unwin [1] | 1,050,000 | 1.3% |
| | 181 Bay Street, Suite 2330 | | |
| | Toronto, Ontario, Canada, M5J2T3 | | |

| | | | |
|---|---|---|---|
| Common | Paul Haggis [1] | 1,250,000 | 1.5% |
| | 181 Bay Street, Suite 2330 | | |
| | Toronto, Ontario, Canada, M5J2T3 | | |
| Common | W. Thomas Hodgson [1] | 1,100,000 | 1.4% |
| | 181 Bay Street, Suite 2330 | | |
| | Toronto, Ontario, Canada, M5J2T3 | | |
| Common | H. Richard Klatt [1] | 1,000,000 | 1.2% |
| | 181 Bay Street, Suite 2330 | | |
| | Toronto, Ontario, Canada, M5J2T3 | | |
| Common | All Directors and Executive Officers as a Group (9 in number) | 21,110,000 | 26.1% |

107.    Thus, the table provided in the Form 10-K listed only Liberty Silver's officers and directors while failing to disclose Genovese or his ownership, rendering the statements materially false or misleading.  As of September 28, 2012 (even after Genovese sold 6.6 million shares of Liberty Silver stock), Genovese owned ***more than ten percent*** of Liberty Silver's outstanding shares.  At the time the above statements were made, Defendants knew of Genovese's interest in the Company, including the 6.5 million shares he obtained through Look Back Investments' private placement.

108.    In addition, by failing to disclose Genovese's beneficial ownership, Defendants Liberty Silver and Browne violated SEC Regulation S-K, Item 403(a) (17 CFR §229.403) which requires disclosure in annual reports filed on SEC Form 10-K of any person who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities.  As of September 28, 2012, Defendant Genovese owned beneficially more than 10% of Liberty Silver's outstanding shares.

45

109.    Defendants Liberty Silver and Browne knew, or were extremely reckless in not knowing, of Genovese's ownership because of Liberty Silver's private placement with Look Back Investments in November 2011 and Browne and Tafuri's interactions with Defendant Genovese. CW 6 said that Tafuri was specifically aware of Genovese's private placement investment in November 2011 that gave Genovese 6.6 million shares and warrants to purchase more.  CW 6 also explained that Tafuri and Browne worked alongside Genovese in promoting Liberty Silver stock through purported third party newsletter writers.  Further both CW 6 and CW 7 explained that Tafuri worked with Genovese in pumping the stock through JTF brokers and even made presentations to JTF brokers.

110.    The September 28, 2012, Form 10-K further stated, in pertinent part:

Effective April 1, 2011, the Company borrowed a total of $150,000 pursuant to the terms and conditions of promissory notes (individually referred to as a "Note" and collectively referred to as the "Notes") entered into with six of the Company's directors.  Each Note was for $25,000 and is required to be repaid by the Company on the earlier of one year, or when the Company raises a minimum of $2,000,000 through equity investments.   The Notes are interest free for the first six months following the date of the Note and then bear interest at a rate of 8% per annum thereafter.   In conjunction with the entry into the Notes, in lieu of the holders charging the Company interest on the outstanding principal of the Notes for the initial six months, the Company issued each holder a warrant entitling the holder to purchase up to a total of 50,000 shares of the Company's common stock at price of $0.55 per share for a period of three (3) years following the date of the Note.  The Notes were repaid through the issuance of shares of common stock in the Company on December 19, 2011.

***Aside from the foregoing, there were no material transactions, or series of similar transactions, during our Company's last fiscal year, or any currently proposed transactions, or series of similar transactions, to which our Company was or is to be a party, in which the amount involved exceeded the lesser of $120,000 or one percent of the average of the small business issuer's total assets at year-end for the last three completed fiscal years and in which any director, executive officer or any security holder who is known to us to own of record or beneficially***

46

> *more than five percent of any class of our common stock, or any member of the immediate family of any of the foregoing persons, had an interest.*

(emphasis added).

111.     Noticeably, the above statements were materially false or misleading based on the omission of the private placement by Genovese *via* Look Back Investments announced in November 2011.  At the time of the Look Back Investments private placement, according to the trading records reported to SEDI on December 27, 2012, Genovese's entities BG Capital and Outlook Investments owned over 7.3 million shares of Liberty Silver common stock, which was well above a five percent ownership interest.  Thus, to render the above statements not materially false or misleading, Defendants were required to disclose the November 2011 private placement as a transaction in which a security holder of more than five percent had an interest.

112.     By failing to disclose the private placement by Genovese *via* Look Back Investments announced in November 2011, Defendants also violated SEC Regulation S-X, Rule 4-08(k)(1) and ASC 850, *Related Party Disclosures.*

113.     In addition, SEC regulations require further disclosures of related party transactions in the non-financial portion of, among others, annual reports filed with the SEC on Form 10-K.  Among other things, Item 404(a) of Regulation S-K (17 CFR §229.404) requires a description of any transaction exceeding $120,000 in which the public company is a party and in which any director, executive officer, member of their immediate families, 5% shareholder or immediate family of a 5% shareholder has a direct or indirect material interest. Item 404(a) requires, among other things, disclosure of the person and the person's relationship to the public company, the nature of the person's interest in the transaction, the amount of the person's interest in the transaction, and any other information regarding the transaction that is material to investors in light of the circumstances of the particular transaction.  By failing to disclose the private

placement by Genovese *via* Look Back Investments announced in November 2011 and the particulars of the transaction, Defendants also violated Item 404(a) of Regulation S-K

114.    On September 20, 2012, at exactly 11:43:52 AM EST, *6,600,000 shares of Liberty Silver changed hands at $1.31 per share*. This block of stock represented over 8% of the shares outstanding and was the single largest trade in the history of the stock.  Sterne Agee & Leech, an asset management company and clearinghouse for JTF, purchased the 6,600,000 shares of Liberty Silver, and *it was only later discovered that BG Capital, owned and controlled by Genovese, sold those shares*.

115.    The statements identified in ¶¶93, 95, 98, 103-105, particularly the portions in bold and italics, are materially false or misleading.  In the statements, Defendants repeatedly emphasized potential silver resources of 120 million ounces and further suggested that this estimate was based on recent samples.  In direct contrast, however, CW 4, the executive officer of Renaissance Gold, explained that the 2012 estimates were entirely based on information obtained from the 1980's and further described Genovese's thinly-hedged assurances of millions in silver resources as false.  CW 5 similarly stated that no drilling samples had been taken from the Hi Ho Property in 2012 and explained that such samples were necessary in order to determine the presence of resources.  Indeed, the Ontario Securities Commission ("OSC") has since questioned the accuracy of the Company's resource estimates.  As explained by Liberty Silver in a February 28, 2013 press release, "[t]he staff of the OSC expressed concerns with the uncertainty related to the mid-1980's historical drilling from the Hi Ho Property acquired in 2012.  It has been determined that additional confirmatory drilling . . . be completed to verify the historical drilling prior to preparing an updated resource estimate."  Moreover, the August 28, 2012 announcement of BG Capital's interest and investment in Liberty Silver (¶98) was materially misleading because

it suggested that Genovese had only recently invested in Liberty Silver and it further failed to disclose that Genovese was then a control person of the Company who held beneficially over 18,000,000 shares of Liberty Silver stock.[15]

116.    Ultimately, statements identified in ¶¶86-108 were materially false or misleading and manipulative because they, *inter alia*: (i) exaggerated the Company's prospects and resources (¶¶93, 97-101); (ii) used ploys such as the announcement of ludicrously self-promoting offers to acquire Sennen Resources in an attempt to gain legitimacy by piggy-backing on Sennen's credibility (¶¶90-92, 95-96); (iii) used BG Capital press releases and the Midas Letter to present seemingly independent reports when in fact the reports were just conduits through which Defendants offered wholly self-serving and largely baseless promotions of Liberty Silver (¶¶98, 103-105); (iv) pointed to the increased trading volume and increased stock price as emergent market responses when they were the results of JTF's unethical sales tactics and/or were sells effectuated by Genovese and his many proxies (¶105); and (iv) suggested that Genovese did not have an interest in the Company greater than five percent of Liberty Silver's common stock (¶¶86, 95, 106-108).  In addition, Defendants manipulated the price of Liberty Silver stock by utilizing the services of JTF to aggressively pressure clients, using unethical tactics, to induce clients to purchase Liberty Silver stock, thereby creating artificial demand and artificial trading activity.

VI.    **TRUTH IS REVEALED**

117.    On Friday, October 5, 2012, the SEC Division of Enforcement halted trading of shares of Liberty Silver for a period of nearly two weeks resulting in the issuer being downgraded to the Grey Market pursuant to Rule 15c2-11.  According to the SEC, the reasons for the halt were

---

[15] Based on the trading records filed with SEDI on December 27, 2012, at the time of the August 28, 2012 press release, BG Capital held 722,501 shares of Liberty Silver stock, Outlook Investments held 10,263,112 shares of Liberty Silver stock, and Look Back Investments held 7,150,000 shares of Liberty Silver stock.

*"a lack of current and accurate information about the company concerning, among other things, the control of its stock, its market price, and trading in the stock."* (emphasis added). The SEC further warned "brokers, dealers, shareholders, and prospective purchasers that they should carefully consider" such lack of current and accurate information about the Company and its control.

118.   When trading of the shares resumed in the Grey Market on October 19, 2012, the price of Liberty Silver stock had declined from its closing price of $1.55 per share on October 5, 2012 (its last trading day) to close at just $0.15 per share on October 19, 2012.

119.   On October 12, 2012, the OSC halted trading in Liberty Silver stock. When trading resumed on October 18, 2012, the stock opened at $0.49 per share and closed at $0.83—a substantial decrease from the stock's $1.58 per share closing price on October 5, 2012 (the day before the SEC's trading halt). Liberty Silver's stock has continued to suffer as a result of Defendants' revealed fraud and was trading at $0.03 per share before the OSC again halted trading in early 2014.

120.   Only after the SEC and OSC halted trading and investigations began did the following information become clear:

- Only after investigation of the purchasers in the April 1, 2008, Offering by Lincoln Mining (later Liberty Silver) is it readily known that Marnie Markin is the wife of Matthew Markin (CEO of American Lithium) and the sister in-law of Marco Markin (CEO of BG Capital and Neptune Society). Also, Tiffeni Aliece Graves was Marnie Markin's next door neighbor.

- The Trinity deposit is not economic — its 43-101 includes only inferred ounces, and no feasibility study, prefeasibility study or preliminary economic assessment has been performed on the property. A 43-101 is a national instrument for the *Standards of Disclosure for Mineral Projects* within Canada. Yet, even on the Liberty Silver website, in tiny print at the bottom, in the disclaimer page it states, "Inferred Mineral Resources must be excluded from estimates forming the basis of feasibility or other economic studies."

- With regard to the ownership of the Trinity project, Liberty Silver has not yet fulfilled the necessary obligations to earn a 70% interest in the Trinity project.  According to an October 16, 2011 Liberty Silver news release, the Company has fulfilled only 85% of the required $5 million to earn 70%.

- Genovese employed the use of the Midas Letter to pump up Liberty Silver's stock value, doubling the value of the stock in two months.

- On September 20, 2012 BG Capital sold 6,600,000 shares to Sterne, Agee & Leech, at a unit price of $1.31 a share.  BG Capital acquired those shares only two days before from Outlook Investments, another firm controlled by Genovese.

- The September 20, 2012 sale of 6,600,000 shares of Liberty Silver was fraudulently induced by Genovese, using JTF.

- In total, BG Capital and Outlook Investments reduced their Liberty holdings by more than eight million shares between the start of the promotional campaign and the trading halt.

- On October 19, 2012, Liberty Silver issued a press release attempting to distance the Company from Genovese, stating "The Company advises the investment community that it has never provided any form of compensation to a newsletter writer or anyone else for investment research or to recommend investment in the Company's shares. The Company also advises that it has no contractual or other relationship with Mr. Robert Genovese, BG Capital Group or any other company owned or controlled by Genovese (the "Genovese Companies") other than a subscription to a private placement in November 2011."

- Between BG Capital, Outlook Investments, and Look Back Investments, Genovese's reported Liberty Silver holdings amounted to approximately 8.6 million shares, or more than 10% of the total shares then outstanding (and this was after the 6.6 million shares sold by BG Capital).

- In December 2012, Genovese filed a document with Canadian regulators that shows he made more than 250 transactions involving Liberty Silver shares since late 2011.

121.    On October 12, 2012, the Financial Post posted an article on the Liberty Silver situation, which stated in relevant part:

**Junior Miner Liberty Silver Under Double Scrutiny**

A trading halt and regulatory investigation into a Canadian junior miner has raised questions about the company's ownership structure and cast a cloud over its board members, which include some high-profile Canadian businessmen.

When the U.S. Securities and Exchange Commission halted Liberty Silver Corp. on Oct. 5, it had "questions concerning publicly available information about Liberty Silver, the control of its stock, its market price, and trading in the stock."

*The concerns were understandable. Despite having only $1.7-million in cash (as of June 30) and a very early-stage silver project, Toronto-based Liberty boasted a market value of $124-million. The value of its shares, listed on the Toronto Stock Exchange, more than doubled in just five weeks before the halt on very high volumes.*

The halt came shortly after another junior company, Vancouver-based Sennen Resources Ltd., expressed major concerns about Liberty's share structure and economic prospects after Liberty tried to acquire it. The bid failed.

Now Liberty is under even more pressure as the Ontario Securities Commission makes inquiries about the company. Liberty is also the subject of an anonymous investigative report sent to regulators and media that accuses Bobby Genovese, a well-known Canadian stock promoter, of holding undisclosed control over millions of shares.

It all adds up to trouble for chief executive Geoff Browne, who has some hard work ahead of him to lift the halt and earn investor confidence.

"We all have very important reputations to maintain and I'll tell you that everything is above board," he said in an interview.

Mr. Browne, who is also chairman, is a former senior executive at CIBC World Markets. Also on the board is Paul Haggis, who was hand-picked by Bill Ackman to be chairman of Canadian Pacific Railway Ltd. Mr. Haggis also chairs Alberta Enterprise Corp., a province-backed venture capital fund that includes Mr. Browne on its board.

Thomas Hodgson, a former chief executive of Magna Entertainment Corp. who has held a number of senior roles in Frank Stronach's Magna empire, is on the Liberty board as well.

It is unusual for a tiny junior mining company to have such high-profile board members, and the SEC investigation is a potential blow to their reputations. Mr. Browne bolstered the board after he became CEO in 2010.

Liberty was a little-known company trading on the U.S. over-the-counter market until late 2011, when it received approval to list on the TSX. Industry observers are now surprised that it bypassed the Venture Exchange, given that its Nevada-based Trinity silver project is at a very early stage and only has an inferred resource estimate. *The estimate relies on historic drilling data, and the consultants that did a technical report on the project expressed concern about the vast majority of the resources in the estimate.*

In July, Liberty entered the limelight with its hostile all-stock bid for Sennen, a move that was plotted by Byron Capital Markets. Given its low capital position, Liberty wanted to seize Sennen's $13.5-million cash pile and use it for the Trinity project. Mr. Browne went on a PR offensive, issuing many press releases and appearing on BNN.

But Sennen fought back. It conducted an in-depth investigation of Liberty and found some causes for concern. Most notably, it reported that Liberty issued more than 68 million shares at fractions of a penny each, an astronomical number of near-worthless shares for a TSX-listed company. Sennen estimated that Liberty's real value is between 0.5¢ and 7¢ a share (the stock was worth 70¢ at that point and would jump to $1.58). Its shareholders agreed and rejected the bid.

"It is quite apparent that Liberty's management show the same contempt for the regulators as they do for Sennen shareholders," Sennen CEO Ian Rozier said, after Liberty waited four days past the expiry of its bid to report that it was finished.

While Mr. Rozier made some sharp critiques of Liberty, the more serious ones were made in an anonymous report sent to regulators and media, including the Financial Post. ***It suggested that Mr. Genovese holds undisclosed control over tens of millions of shares. It also linked him to numerous other OTC Bulletin Board companies with questionable disclosure practices.***

Mr. Genovese is best known to Canadian investors for taking over Clearly Canadian, a once-successful beverage company that collapsed. He also appeared in a short-lived reality TV show called Bobby G: Adventure Capitalist. His website describes him as a "self-styled entrepreneur" who is armed with "high powered marketing savvy and a penchant for picking winners."

***On Aug. 28, his firm BG Capital Group issued a press release saying it was investing in Liberty Silver and that the Trinity project has potential resources of 120 million ounces. The stock was also promoted by newsletter writers around this time and ran up dramatically until the SEC halt.*** The stock traded for about 30 minutes on the TSX after the SEC halt, during which it plunged 39%.

Mr. Genovese did not respond to a request for comment.

Mr. Browne said he was not aware of how many Liberty Silver shares are under Mr. Genovese's control. He suggested that Liberty's marketing efforts over the summer may be responsible for the run-up in the stock.

As Liberty waits for the SEC to provide more guidance around its halt, its balance sheet remains stressed. Liberty's cash pile has likely declined since June 30 (when it was $1.7-million) because of expenses related to its Sennen bid and the fact that ***salaries for its top four executives amount to $476,000 per year***, according to a filing.

(Emphasis added).

122.    Another article posted by Financial Post entitled, "Regulators Fall Short On Probe of Liberty Silver Trading Halt," questioned the reliability of Liberty Silver's purported resources. Specifically, the article explained that a 43-101 technical report, a 111 page document filed by the Company stated on page 87: "The Trinity resources are classified entirely as Inferred due to: (1) the simplistic sectional modeling method; (2) suspect USBRC AA data that dominate the data used in the resource modeling; (3) lack of backup data that could be used to verify the historic conventional rotary, RC, and core drill hole data; and (4) limited amount of density data."   The article further explained that the report on page 75 states that "Inferred mineral resources must be excluded from estimates forming the basis of feasibility or other economic studies."

123.    On December 28, 2012, the Financial Post reported on the profits Genovese and Genovese controlled entities had taken during the run-up of Liberty Silver's stock price and prior to the halt in trading of Liberty Silver shares:

**Bobby Genovese Profited Ahead of Liberty Silver Halt, Filing Reveals:**

Penny-stock promoter Bobby Genovese cashed in a big profit on shares of Liberty Silver Corp. before they were halted by regulators in October, a filing shows.

*Late Thursday, Mr. Genovese filed a document with regulators that show he has made more than 250 transactions involving Liberty Silver shares since late 2011 (shortly before it listed on the Toronto Stock Exchange).* The regulatory filing can now be viewed on SEDI (or at Inca Kola News, which first noted it).

*Liberty was a little-known junior miner until August, when Mr. Genovese (better known as "Bobby G") and a group of newsletter writers began a heavy promotional campaign around the stock. Over the next five weeks, the shares soared from 70¢ to a high of $1.58.* The move alarmed regulators on both sides of the border, who suspended trading on Oct. 5.

*Mr. Genovese was steadily accumulating shares both before and during the promotional campaign. But after the campaign started, he sold large quantities at elevated prices.*

*The most eye-opening trade occurred on Sept. 20, when his firm, BG Capital Group Ltd., sold 6.6 million shares at a unit price of US$1.31, far above the price where most of them were purchased. In the two days prior to that sale, BG took*

*control of 6.6 million shares that appeared to come from Outlook Investments Inc., a separate firm under Mr. Genovese's control.*

In total, BG and Outlook reduced their Liberty holdings by more than eight million shares between the start of the promotional campaign and the trading halt.

A spokesman for Liberty Silver said the miner was just made aware of Mr. Genovese's filing and plans to review it. The company had no other immediate comment.

*Between BG, Outlook and another entity called Lookback Investments Inc., Mr. Genovese's reported Liberty holdings amount to approximately 8.6 million shares, or more than 10% of the total.*

Before listing on the TSX, Liberty Silver issued almost 70 million shares for fractions of a penny each, and there have been anonymous allegations that Mr. Genovese has undisclosed control over tens of millions of them.

*It is not clear why Mr. Genovese waited so long to make the transactions public. Some of them are more than a year old.*

While the TSX lifted its trading halt after two weeks, Liberty shares have been removed from trading on the OTC Bulletin Board, and can only be bought and sold on the grey market in the United States. The stock fell below 50¢ shortly after the halt ended.

124.    And on October 7, 2013 the Financial Post published an article entitled "Liberty

Silver borrowing from 'Bobby G:'"

With its finances on the brink of collapse, management at Liberty Silver Corp. have elected to take money from the last person they wanted to do business with.

The Toronto-based junior miner announced it is borrowing US$1-million from BG Capital, a firm controlled by penny stock promoter and former reality television star Bobby Genovese (better known as "Bobby G").

It is a sharp reversal of strategy for Liberty's board and management, which have been trying to distance themselves from Mr. Genovese ever since a stock trading scandal in 2012.

Last October, regulators in both Canada and the United States halted Liberty shares for two weeks after they soared to astronomical highs in a very short time. The move happened right after Liberty was heavily promoted by Mr. Genovese and a group of newsletter writers. It was later revealed that companies tied to Mr. Genovese sold more than eight million Liberty shares between the start of the promotional campaign and the trading halt, netting a large profit.

At last December's annual meeting, Liberty's board and senior management maintained that they wanted nothing to do with Mr. Genovese as they tried to focus on the Trinity silver project in Nevada.

"We are keeping ourselves very separate and apart from Mr. Genovese. So he has no influence on our company and is not a part of our financing plans," chairman Tim Unwin told the Financial Post at the meeting.

They have elected to do this deal with him because they had no other choice if they wanted to keep the lights on.

In an interview on Monday, Mr. Unwin said the company has been in contact with "several" potential long-term funders, but needed to raise some money right away to stay afloat while those talks continue. Mr. Genovese offered this short-term facility and Liberty saw no option but to take it.

"That's the real world and that's what we have to do," he said, adding that it should keep the company going for the next 18 months. He also said regulators know about the transaction.

Liberty's latest set of financial statements confirm that it is in dire financial position. Its cash position was down to $23,925 at the end of June, while accounts payable totaled $867,952. The loan from BG Capital includes an immediate advance of US$50,000 that is badly needed.

According to Liberty's press release, BG Capital and its related parties own 8,609,853 Liberty shares, or 10.3% of the total. There have been anonymous allegations that Mr. Genovese holds undisclosed control over far more shares as well. When Liberty shares were temporarily halted last year, the company had a market value of $124-million. It is worth $4.2-million today.

125.    Finally, on June 22, 2014 the Ocala Star Banner published an article on Genovese,

Liberty Silver and this lawsuit:

Bobby Genovese compares Ocala to an undervalued stock when describing his business ventures in Marion County, which include Silver Springs, the Ocala Entertainment Complex and the BG Equestrian Resort.

Friendly and engaging over the phone, Genovese even sounds like he's hawking shares when he discusses his part-time home.

"Marion County over the next three to five to seven years is going to explode to upside," he said. "It's a no-brainer."

56

"Bobby G," as he's known, has only had a local footprint for the past two years or so. But the 52-year-old Toronto native, who mostly lives in the Bahamas, has been making a name for himself in international business circles for decades.

He built his venture capital empire on a strategy of buying low and selling high in the rough-and-tumble world of penny stocks.

Critics say his dealings in that world made him rich while ruining others. Genovese says he plays fair and accepts his wins and his losses.

A class-action lawsuit pending in South Florida accuses Genovese and his associates of "pumping and dumping" — artificially inflating the price of stocks through large-scale buying and selling, along with the planting of deceptive reports in the media, then selling en masse and leaving behind investors with shares plummeting in value.

Genovese vehemently denies any charges of illegal or unethical business dealings. He calls the "pumper and dumper" label "ridiculous."

"If that were correct, there would be charges," Genovese said by phone during a business trip in British Columbia on Thursday. "It would be stock manipulation. It would be fraud. But when the regulators and everyone else looked at the trading and everything else, there was nothing done illegally, any more than you or anyone else buying and selling a stock. Period."

***

The class-action suit, filed in September by a Liberty Silver investor who says he was swindled, argues otherwise. The suit names as defendants Genovese, three other people and four firms to which he is linked: BG Capital Group Ltd., Look Back Investments Inc., Outlook Investments Inc. and Liberty Silver Corp. itself.

Liberty Silver is a mining company that once had little to its name other than a Nevada mining option. Most industry watchers thought the land had been mined out during the 1980s.

According to the lawsuit, and other legal filings, the financially struggling mining company in late 2011 received a $3.25 million cash infusion from Genovese's Panama-based Look Back Investments Inc.

In exchange, Look Back received millions of Liberty Silver's penny stocks and options to buy millions more at fixed prices. The loan allowed Liberty Silver to be listed on the Toronto Stock Exchange.

About that time, Genovese heavily promoted Liberty Silver through another one of his companies: BG Capital, an investment firm.

Soon after, Liberty Silver's stock sales, which had been mostly dormant, soared.

Stock sale records, and the lawsuit, show millions of shares changing hands. The flurry of activity attracted the attention of other investors.

Those investors did not know that much of that trading — millions of shares worth — was done between BG Capital and Look Back, both owned by Genovese, according to the lawsuit.

The trading became so heated that Liberty Silver's market value rose to more than $150 million, though the company wasn't earning a dime from mining silver.

In October 2012, the U.S. Securities and Exchange Commission halted trading, saying it was unclear who owned the stock. Canadian regulators followed suit and halted trading in their country.

But by then BG Capital and Look Back had sold millions of Liberty Silver shares at prices far exceeding the fixed low prices at which they originally bought.

Two weeks later, regulators again allowed trading of the stock. By then the stock's value had plunged.

Two years after the events depicted in the lawsuit, Genovese points out he is now buying more Liberty Silver stock, but at prices far lower than when he sold them. He said he currently owns nearly 35 percent of the company.

In legal documents responding to the lawsuit, Liberty management says it knew nothing of the alleged pump-and-dump scheme, and didn't know about various Genovese companies buying and selling its stock.

"I trade the stock in the company no different than I do General Electric, Wells Fargo or any other company I'm in," Genovese said. "I trade to make a living. I don't trade to lose money, so if I'm faulted for that, then you're right 1,000 percent; I do have critics.

"The SEC halted it, pending a review, which they've done," he said. "It's now been two years. As of yet, nobody has been found to have done anything wrong. The Toronto Stock Exchange also halted the stock. They did what they call a two-week forensic review of everything, to find out nobody had done anything wrong."

But Liberty Silver is not the only controversial venture linked to Genovese.

In a 2004 federal lawsuit, he was accused of manipulating stocks in Spectrum Sciences & Software Holdings, a Fort Walton Beach company now out of business.

The lawsuit was eventually settled, with Genovese paying $3.25 million.

According to that suit, the small military contractor received a badly needed loan from BG Capital in exchange for giving Genovese the option of buying more than 20 million shares of Spectrum stock fixed at $1.65 and $1.95 per share.

In addition, Spectrum made Genovese a consultant to the company and gave him an expense account, according to the lawsuit and SEC filings.

About that time the company's founder resigned, complaining that Genovese was effectively running the company.

That was also when a media blitz about Spectrum began, including news that the company was winning numerous military contracts. The Wall Street Digest newsletter touted the company, predicting its stock could soar 1,000 percent.

What most people didn't know, unless they read the newsletter's fine print, was that a company named Endeavor Capital Group had shelled out nearly $1 million to this and other newsletters to build public "awareness of Spectrum." It turns out Genovese owned Endeavor, according to SEC records.

Spectrum stock prices rose to nearly $4 per share. Genovese sold his shares nearly as soon as he bought them, making tens of millions of dollars in profit, filings show.

By May 2004, Spectrum announced it had cut ties with Genovese as a consultant. The company had received notice that the SEC was investigating Spectrum and its relationship with Genovese and his investment companies.

Genovese said he did nothing wrong by touting a company he had faith in.

"Was I involved with Spectrum? One thousand percent," he said during the interview last week.

 "When I left Spectrum the stock was trading north of $2 a share and it had more than $30 million in cash in the company from the exercise of the options," he said. "Thirty million. Subsequently, five years after I have left the company, the company is now bankrupt. Is that my fault? No."

***

There are a string of companies on which critics say Genovese left his mark before moving along.

In 2005, after investing $1 million in Clearly Canadian, a struggling Canadian flavored-water company, the company made him chairman and CEO.

Genovese set out to tout the company and persuade the public that the once-popular beverage maker was back on the road to profitability. He also boasted about the company on a short-lived reality TV program, "Bobby G: Adventure Capitalist," shown on the video-on-demand channel Mojo HD.

Clearly Canadian stock climbed to $4.55 per share after previously being de-listed on both the Toronto Stock Exchange and the NASDAQ when stock value fell below $1 per share.

When the stock hit its high, Genovese dumped his shares, according to an account included in the Liberty Silver lawsuit.

Genovese is similarly linked to American Lithium Minerals, in which the company benefited from promotional newsletter campaigns. The source of the funding to discuss or list the company is unclear, but newsletters reported they had been paid to cover American Lithium.

The company's stock rose from pennies a share to about $3 per share and then plummeted to a few cents again, but not before Genovese could unload his stocks, according to the Liberty Silver lawsuit.

Genovese said that while he buys and sells stocks and aims to make a profit, some companies in his portfolio have failed.

"My goal is to build companies," he said during the interview. "I've had some phenomenal winners and, like a Clearly Canadian, the most important lesson I learned in that was don't compete with Coke and Pepsi. Did I lose? I lost $6.5 million personally on Clearly Canadian.

"When I left Spectrum the stock was trading north of $2 a share and it had more than $30 million in cash in the company from the exercise of the options," he said. "Thirty million. Subsequently, five years after I have left the company, the company is now bankrupt. Is that my fault? No."

***

"Other companies, like a Neptune or Tamarac or some of the other companies I've been associated with, have been phenomenal successes," he said. "But I think if you'd take my batting rate, I'd say 85 to 90 percent works and, absolutely, there's 10 percent that are beyond your control."

"What can you do?" he said.

***

Genovese is now a wealthy man by any account. He owns nearly a dozen luxury properties, a Learjet and a yacht. He's been on the covers of magazines.

In interviews he says the collection of toys are vast, but they are only a means for him and his young son and daughter to better enjoy life and each other.

Not bad for a high school dropout.

"I was not that scholastically inclined," Genovese said. "My parents were divorced. My mother was divorced three times. (We were) just sort of average middle Canadians," he said.

"The one thing I had going for me were horses," he said. "So I ended up leaving school after grade eight, grade nine and teaching riding and then quickly realized the people that had all the money were the ones who actually owned the horses. Us working in the barn? Not so much.

"I just thought, 'I gotta get on the other side of the horse.' "Leaving the barn and stalls behind, Genovese moved to Vancouver and started selling stocks. After that, he struck out on his own.

"I created a merchant bank called BG Capital, which was basically all my own money," he said.

"I was able to put together a deal to buy North America's largest cremation company because I thought no matter what happens, people are going to continue to die," Genovese recalled. "I thought it was a no-brainer. How is everybody missing this?"

The company was the California-based Neptune Society.

In the class-action lawsuit against him, the plaintiffs allege Genovese bought shares in Lari Corp. through a series of shell companies, with options to buy more shares at a fixed price. Lari Corp. would go on to buy Neptune. Stocks were bought and sold between the same group of investors, all tied to Genovese, pushing the stock price up, according to the lawsuit.

The investors then sold their shares just before the stock values fell. Genovese later bought the much-devalued stock and took the company private, the lawsuit said.

The lawsuit, however, is seeking damages only for the Liberty Silver stock manipulation allegations.

Genovese told the Star-Banner the Neptune purchase "led into construction, which led into marketing, which led into water sports, which led into branding. There are probably 18, 19 companies now under the BG Capital umbrella. We own no less than 50 percent. What we look for are guys that know what they're doing, and I basically act as the bank and help them grow their businesses.

"The more successful they are, the more successful we are," he said.

Now, more of his attention is on Marion County.

***

What brought him here? Genovese said he was looking for a place where his kids could grow up as he did in northern Ontario, getting outdoors, riding horses and "knowing what it's like to do manual labor."

He said he came across the legendary Padua Stables property only to wonder, "When you acquire it, what do you do with it?"

So, instead, he settled on the former Foxtrotter farm, with such attractions as a water slide, rock climbing wall and a small animal menagerie.

Sounding like much the doting dad, he notes his son is highly ranked in the state as an age-group tennis player and his daughter is a budding equestrian.

"Every weekend I'm at a horse show or a tennis tournament," he said.

In late 2013, Genovese purchased a 50 percent stake in What's Up Media, a Marion County-based magazine and production company that hosts and promotes concerts and special events here. It also publishes What's Up Ocala magazine.

Genovese said he then created a partnership with What's Up Media owner Joel Wiessner in the latter's Silver Springs Management Co. That company manages Silver Springs State Park in a three-year deal with the Florida Department of Environmental Protection.

He also convinced FDEP to hold off on tearing down Silver Springs' neighbor, Wild Waters, allowing him to try and make a go of the aging water park.

As for the Ocala Entertainment Complex, Genovese thinks it will fill a niche too long unexploited.

"I think the biggest need for Ocala right now — and I'm so surprised we don't have it — there is no event place," Genovese said. "Other than the Hilton hotel, where do people go to have large-scale events? There is no conference center or

62

convention room. There's nothing like that. My plan is to clean up the Ocala Entertainment Complex and turn it into a place where people can have every kind of different function they want to have there," he said.

Originally, he said he intended to turn the OEC into an upscale country and western club.

Instead, he met with Anthony Perera, owner of Cowboys Saloon on Pine Avenue, and bought a half-stake in the business.

In keeping with his equine roots, Genovese pledges to be a booster of the Florida Horse Park and aims to "bring the horses back to Marion County" with his BG Equine Resort.

Genovese's vision for Marion County is simple: He said he sees "incredible opportunities" where others have "lost faith."

"I am putting millions and millions and millions of dollars into Marion County because I think it's only going to get better and better and better," he said.

126. In summary, Genovese employed the use of buying and selling massive blocks of Liberty Silver stock, fabricated newsletters, and false and misleading reports, using nominees and offshore companies to purchase stock on his behalf, all so that Genovese could make huge profits while leaving investors in financial ruin.

127. Aiding Genovese in this fraudulent and malevolent scheme were Marnie Markin and Graves (who are believed to have purchased Liberty Silver stock on Genovese's behalf), the numerous offshore shell companies wholly owned and/or controlled by Genovese, and JTF who aggressively pushed Liberty Silver on to the investing public at the same time JTF was selling huge amounts of Genovese's Liberty Silver shares.  Defendant Browne, who was Chairman of the Board and CEO of Liberty Silver, and Defendant Tafuri who was President, Chief Operating Officer, and a director of Liberty Silver, were either culpably reckless, or were willing participants in Genovese's malicious scam involving Liberty Silver.  At no time did Browne, Tafuri, or Liberty Silver warn its investors about Genovese's fraudulent history, nor did they countermand any of

Genovese's ridiculous claims regarding the Company or its future prospects.  In fact, these Defendants put out materially false and misleading statements of their own regarding Liberty Silver's resource potential and knowingly or recklessly failed to disclose Genovese's substantial holdings in the Company.

### VII.    CLASS ACTION ALLEGATIONS

128.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired Liberty Silver common stock from February 10, 2010 through and including October 5, 2012. Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

129.    The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable. Throughout the Class Period, Liberty Silver securities were actively traded on the TSX and OTCBB. Although the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members of the Class who traded Liberty Silver common stock during the Class Period.

130.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendants violated federal securities laws based upon the facts alleged herein;

b.      Whether Defendants omitted or misrepresented material facts about Liberty Silver, its business and its management;

c.      Whether Defendants acted knowingly or recklessly in manipulating the market for Liberty Silver securities;

d.      Whether the prices of Liberty Silver securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

e.      Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

131.    Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal securities laws as complained of herein.

132.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

133.    A class action is superior to alternative methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

134.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine and/or *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) in that:

a.    Defendants manipulated Liberty Silver stock prices;

b.    Liberty Silver securities are traded in an efficient market;

c.    the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

d.    the Company traded on the TSX and OTCBB, and was covered by multiple analysts;

e.    the manipulation alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

f.    Plaintiffs and members of the Class purchased, acquired and/or sold Liberty Silver securities between the time the Defendants failed to disclose or misrepresented material facts and otherwise engaged in market manipulation and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts or the market manipulation scheme.

135.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

136.    The Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of Liberty Silver,

including Defendants. The Defendants were motivated to materially misrepresent and manipulate the true nature of the Liberty Silver's business, operations, ownership, and financial affairs to the public and regulators in order to keep Liberty Silver's share price artificially high.  Defendant Genovese's motivation derived from his intent to sell at least 13.1 million shares of Liberty Silver stock once the price was artificially high.  Defendants Liberty Silver, Tafuri, and Browne's motivation derived from their desire to entice potential investors to participate in a private placement before the end of 2012 to allow the Company to fund its mining activities.  As explained by CW 7, the Company needed capital to monetize the mines.  A large market capitalization and an influx of positive trading in the Company's stock would have substantially furthered Liberty Silver in its fund-raising efforts.

137.    Further, Genovese has effected pump and dump schemes upon numerous other companies previously, even continuing in his actions in other companies after the halt of Liberty Silver trading.  He has deliberately used nefarious, fraudulent, and manipulative means to further his own goals at the expense of the investors in the companies whose stock he has manipulated. He willfully and intentionally manipulated Liberty Silver's stock prices using emails, newsletters, and other mediums, to drive the price of Liberty Silver stock up while at the same time dumping his own stock on unknowing investors.

138.    Browne was the Chairman of the Board and CEO of Liberty Silver.  Tafuri was President, Chief Operating Officer, and a director of the Company.  Through any investigation whatsoever into the nature of Genovese's involvement with Liberty Silver (including his financing of Liberty Silver in November 11, 2011) and previous companies, Browne and Tafuri could, and should have been able to prevent the fraudulent and manipulative acts from taking place.  Browne and Tafuri, either knowingly or recklessly, permitted Genovese and his associates to mislead

investors into purchasing Liberty Silver stock at artificially inflated prices.  As Chairman of the Board and CEO, Browne, and as President and Chief Operating Officer, Tafuri, could not have been unaware that Genovese was behind the November 11, 2011 financing, as well as Genovese's ownership, directly and indirectly, of Liberty Silver.  Indeed, as previously discussed, both CW 4 (an executive officer at Renaissance Gold) and CW 5 (a geological consultant for Liberty Silver) were aware of Genovese's significant stock ownership of and/or involvement with the Company. CW 6 similarly confirmed that Tafuri was specifically aware of Genovese's private placement investment in November 2011 that gave Genovese 6.6 million shares and warrants to purchase more.  CW 6 also explained that Tafuri and Browne worked alongside Genovese in promoting Liberty Silver stock through purported third party newsletter writers.  Further both CW 6 and CW 7 explained that Tafuri worked with Genovese in pumping the stock through JTF brokers and even made presentations to JTF brokers.

## IX.    LOSS CAUSATION / ECONOMIC LOSS

139.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Liberty Silver's common stock price, which operated as a fraud and deceit on purchasers of Liberty Silver common stock. When the truth about Liberty Silver's financial situation, and ownership or control, was revealed, Liberty Silver's common stock significantly declined as the prior artificial inflation came out of its common stock price.  The halted trading and the decline in Liberty Silver's common stock price (discussed *supra*) was a direct result of the nature and extent of the fraud and manipulative acts finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Liberty

Silver-specific facts unrelated to the fraudulent and manipulative conduct. The economic loss, *i.e.*, damages, suffered by the Plaintiffs and other Class members was a direct result of the fraudulent and manipulative scheme to artificially inflate Liberty Silver's common stock price and the subsequent significant decline in the value of Liberty Silver's common stock when the prior misrepresentations and other fraudulent and manipulative conduct were revealed.

140.   At all times relevant, Defendants' materially false and misleading statements, omissions or manipulative machinations alleged herein directly or proximately caused the damages suffered by the Plaintiffs and other Class members. Those statements were materially false and misleading because they failed to disclose a true and accurate picture of Liberty Silver's business, operations, financial condition and the value of its stock, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, and/or engaged in manipulative activities causing Liberty Silver's common stock price to be artificially inflated. Plaintiffs and other Class members purchased Liberty Silver's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## X.   <u>NO SAFE HARBOR</u>

141.   The statutory safe harbor under the Private Securities Litigation Reform Act which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Liberty Silver who knew that those statements were false, misleading or omitted necessary information when they were made.

## COUNT I

### (Violations of Section 10(b) and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants)

142.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

143.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

144.    Pursuant to the above plan, scheme, conspiracy, course of conduct, and manipulation, each of these Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts, the media that were designed to influence the market for Liberty Silver's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Liberty Silver's finances and business prospects and manipulated the price of Liberty Silver's stock.

145.     By virtue of their positions at Liberty Silver, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, these defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to these Defendants. Such acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

146.     Information showing that these Defendants acted knowingly or with reckless disregard for the truth is within these defendants' knowledge and control. As the officers, owners, promoters and/or directors of Liberty Silver, Defendants had knowledge of the details of Liberty Silver's affairs.

147.     Defendants are liable both directly and indirectly for the wrongs complained of herein. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, and market manipulation, the market price of Liberty Silver's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Liberty Silver's business and financial condition which were concealed by these defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Liberty Silver's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by these Defendants, and were damaged thereby.

148.    During the Class Period, Liberty Silver's securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which these defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Liberty Silver's securities at prices artificially inflated by these defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired such securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Liberty Silver's securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Liberty Silver's securities declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

149.    By reason of the foregoing, Defendants knowingly or recklessly, directly or indirectly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class in connection with their purchases of Liberty Silver common stock during the Class Period.

150.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Liberty Silver's securities during the Class Period, upon the disclosure that Defendants had been disseminating materially false and misleading information to the investing public, and had been manipulating the price of Liberty Silver stock.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against Defendants Browne, Tafuri, and Genovese)

151.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152.    During the Class Period, Defendants Browne and Tafuri participated in the operation and management of Liberty Silver, and conducted and participated, directly and indirectly, in the conduct of Liberty Silver's business affairs.  Because of Browne and Tafuri's senior positions, they knew the adverse non-public information about Liberty Silver's business prospects.  Defendants Browne and Tafuri further knew of, and participated in, schemes to artificially inflate the value of Liberty Silver stock.  Defendant Genovese participated in the management of BG Capital and Look Back Investments.  Genovese concocted and directed a market manipulation scheme, directed the scheme as it related to JTF purposely pushing the near valueless Liberty Silver stock on its clients for the purpose of driving up its price, and directed so-called "third parties" to issue glowing articles about Liberty Silver that were actually prepared by Genovese.

153.    As officers, directors, and/or major owners of the publicly owned company Liberty Silver, Defendants Browne, Tafuri, and Genovese had a duty to disseminate accurate and truthful information with respect to Liberty Silver's business prospects, financial condition, and results of operations, and to correct promptly any public statements issued by Liberty Silver which had become materially false or misleading and to refrain from manipulating the public markets for Liberty Silver stock.

154.    Because of their positions of control and authority as senior officers, and/or major owners, Defendants Browne, Tafuri, and Genovese were able to, and did, control the contents of

73

the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning Liberty Silver's operations.  Throughout the Class Period, these Defendants exercised their power and authority to cause Liberty Silver and/or BG Capital or Look Back Investments to engage in the wrongful acts complained of herein. Defendants therefore, were "controlling persons" of the Company and/or Look Back Investments and BG Capital within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Liberty Silver securities.

155.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Liberty Silver.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, prays for judgment as follows:

A.     Determining this action to be a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

C.     Awarding Plaintiffs the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

74

Dated:  August 4, 2014

Respectfully submitted,

/s/ Gary S. Menzer
Gary S. Menzer (Florida Bar No. 60386)
gmenzer@menzerhill.com
**MENZER & HILL, PA**
7280 W. Palmetto Park, Suite 301-N
Boca Raton, FL 33433
Telephone:  (561) 327-7207
Facsimile:  (561) 431-4611

*Liaison Counsel for Plaintiffs*


William B. Federman
wbf@federmanlaw.com
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Facsimile: (405) 239-2112

*Lead Counsel for Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Third Amended Consolidated Class Action Complaint was served by the CM/ECF Filing System on August 4, 2014, on all counsel or parties of record.


/s/ Gary S. Menzer
Gary S. Menzer

Plaintiffs Certification of Investment of
Liberty Silver Corp. [OTC: LBSV]

I, *PHILIP HOBLEY*_____, hereby certify that the following information is true and correct to the best of my knowledge, information and belief:

1.   I have reviewed the Complaint in this action and authorize the filing of this Certification as an exhibit to the Complaint, or any substantively similar complaint or amended complaint to be filed in the future.  I retain the law office of Federman & Sherwood, and any other counsel with whom Federman & Sherwood deems appropriate to associate with, to pursue this action on my behalf on a contingency fee basis.

2.   If chosen, I am willing to serve as a representative party on behalf of the class (the "Class"), either individually or as part of a group on behalf of the Class as defined in the Complaint, including providing testimony at deposition or trial (if necessary).  I am also willing to participate on an executive committee of shareholders.

3.   I have made the following transaction(s) during the Class Period in Liberty Silver Corp. securities (which are the subject of this action) as follows:

| # SHARES PURCHASED | DATE OF PURCHASE | PRICE PAID PER SHARE | CLASS OF STOCK (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SELLING PRICE |
|---|---|---|---|---|---|---|
| 85 575 | OCTOBER 03 2012 | $1.40 | COMMON | NOT SOLD | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(continue list on blank piece of paper, if necessary)

4.   I did not purchase these securities at the direction of my attorney or in order to participate in a lawsuit under the Securities Act of 1933 or the Securities Exchange Act of 1934.

5.   During the 3-year period preceding the date of this Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

6.   I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court, except for such reasonable costs and expenses directly relating to my service as a representative of the Class and as ordered and approved by the Court.

Signed under penalty of perjury, under the laws of the United States of America, this _11_ day of _NOVEMBER_, 2013.

| | |
|---|---|
| _P.H. Hobley_ | |
| Investor Signature | Home Address |
| *PHILIP HOBLEY* | |
| Print Name | City            State            Zip |
| | |
| Home Telephone Number | E-Mail Address |
| | |
| Cell Telephone Number | Secondary Email Address (if any) |

**Return this completed form by e-mail or fax to:**
K. Lynn Nunn @ FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
(405) 235-1560/Fax (405) 239-2112
Email: kln@federmanlaw.com
Website: www.federmanlaw.com