UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TODD STANAFORD a/k/a JERALD TODD
STANAFORD, on behalf of himself and all
others similarly situated,

                Plaintiffs,

    vs.

ROBERT DONALD BRUCE GENOVESE,
WILLIAM TAFURI, GEOFFREY BROWNE,
BG CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC., OUTLOOK
INVESTMENTS, INC., AND LIBERTY
SILVER CORPORATION,

                Defendants.

Case No. 9:13-cv-80923 (KLR)


**LIBERTY SILVER DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

     A.     The Genovese Defendants' Alleged Pump and Dump Scheme ............................4

     B.     Allegations Concerning the Liberty Silver Defendants ...........................................6

ARGUMENT ....................................................................................................................13

I.     The Reform Act Substantially Heightened Pleading Standards in Securities Fraud
Class Actions....................................................................................................................13

II.    Plaintiffs' Claims Should be Dismissed Because Section 10(b) and Rule 10b-5
Apply Only to Domestic Securities Transactions .........................................................14

III.   Plaintiffs Fail to Allege Particularized Facts Showing that the Liberty Silver
Defendants Made False or Misleading Statements of Material Fact ................................16

     A.     The Allegedly Misleading Liberty Silver Press Releases are Not Properly
Alleged to be False or Misleading and are Not Material ......................................17

            (1)     July 16, 2012 Liberty Silver Press Release....................................18

            (2)     August 8, 2012 Liberty Silver Press Release Announcing
Hi Ho Acquisition .........................................................................19

            (3)     August 21, 2012 Liberty Silver Press Release Extending
Sennen Takeover Offer ................................................................21

     B.     Plaintiffs Do Not Sufficiently Allege Falsity or Scienter with Respect to
Liberty Silver's Financial Disclosures.................................................................23

     C.     The Liberty Silver Defendants are Not Responsible for the Alleged
Misstatements of the Genovese Defendants ........................................................26

            *(1)*     *The Liberty Silver Defendants Had No Duty to Correct the
Statements Made by or on Behalf of the Genovese Defendants*................27

IV.   Plaintiffs Do Not Plead Sufficient Facts to Show that the Liberty Silver
Defendants Made any Allegedly False or Misleading Statement with a Strong
Inference of Scienter .....................................................................................................30

     A.     The Claims Against Mr. Browne Must Be Dismissed Because They
Contain No Particularized Allegations to Demonstrate Fraud.............................33

V.    Plaintiffs Cannot Plead a Causal Connection between the Alleged Misstatements
and the Claimed Loss....................................................................................................34

VI.   Plaintiffs' Section 20(a) Claim Against the Liberty Silver Defendants Fails to
State a Claim ................................................................................................................35

CONCLUSION....................................................................................................................36

i

## TABLE OF AUTHORITIES

CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60, (2d Cir. 2012)................................................................................16

*Amalgamated Bank v. Coca-Cola Co.*,
  No. 5-cv-1226, 2006 WL 2818973 (N.D. Ga. Sept. 26, 2006)...............................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................14, 33

*Basic v. Levinson*,
  485 U.S. 224 (1988)........................................................................................24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................13, 26

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
  116 F.3d 1364 (11th Cir. 1997), *reh'g denied*, 116 F.3d 1495 (11th Cir. 1997)................3, 14

*Brown v. Enstar Grp., Inc.*,
  84 F.3d 393 (11th Cir. 1996) ...........................................................................35

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) ...................................................................31, 34

*Cheney v. Cyberguard Corp.*,
  No. 98-cv-6879, 2000 WL 1140306 (S.D. Fla. July 31, 2000) ...........................3, 6

*City of Pontiac Policemen's and Firemen's Ret.t Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. May 6, 2014) ..................................................................15

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................................34

*EEOC v. Arabian American Oil Co.*,
  499 U.S. 244 (1991)........................................................................................14

*Elkind v. Liggett & Myers, Inc.*,
  635 F.2d 156 (2d Cir. 1980)............................................................................27

*Fidel v. Rampell*,
  No. 02-cv-61258, 2005 WL 5587454 (S.D. Fla. Mar. 29, 2005) ...........................37

*FindWhat Investor Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ...............................................................24, 28, 33

*First Global Corp v. Mansiana Ocean Residences, LLC,*
No. 9-cv-21092, 2010 WL 2163756 (S.D. Fla. May 27, 2010)................................................12

*Garfield v. NDC Health Corp.,*
466 F.3d 1255 (11th Cir. 2006) ..........................................................................14, 18, 22, 35

*Harris v. Ivax Corp.,*
182 F.3d 799 (11th Cir. 1999) ..................................................................................18, 20, 21

*Hart v. Internet Wire, Inc.,*
145 F. Supp. 2d 360 (S.D.N.Y. 2001).............................................................................31

*In re BP p.l.c. Sec. Litig.,*
843 F. Supp. 2d 712 (S.D. Tex. 2012) ...........................................................................16

*In re Columbia Labs., Inc. Sec. Litig.,*
144 F. Supp. 2d 1362 (S.D. Fla. 2001) ..............................................................17, 20, 21, 23

*In re Med/Waste, Inc. Sec. Litig.,*
No. 99-cv-1684, 2000 WL 34241099 (S.D. Fla. Aug. 30, 2000) ................................19, 22, 25

*In re Mirant Corp. Sec. Litig.,*
No. 1:02-CV-1467, 2009 WL 48188 (N.D. Ga. Jan. 7, 2009)..................................................37

*In re Recoton Corp. Securities Litigation,*
358 F. Supp. 2d 1130 (M.D. Fla. 2005).............................................................................29

*In re Saf T Lok, Inc. Sec. Litig.,*
No. 02-cv-80252 (KLR), 2003 WL 22383607 (S.D. Fla. July 3, 2003)............................13, 35

*In re Sawtek, Inc. Sec. Litig.,*
No. 03-cv-00294, 2005 WL 2465041 (M.D. Fla. Oct. 6, 2005)..............................................37

*In re Smart Technologies, Inc. Shareholder Litigation,*
295 F.R.D. 50 (S.D.N.Y. 2013) ........................................................................................15, 16

*In re Smith Gardner Sec. Litig.,*
214 F. Supp. 2d 1291 (S.D. Fla. 2002) ....................................................................19, 22, 25

*In re Sunterra Corp. Sec. Litig.,*
199 F. Supp. 2d 1308 (M.D. Fla. 2002).........................................................................12, 31

*In re Technical Chems. Sec. Litig.,*
No. 98-7334, 2000 WL 1222025 (S.D. Fla. July 3, 2000).........................................19, 22, 25

*In re UBS Secs. Litig.,*
No. 07 Civ. 11225, 2011 WL 4059356 (S.D.N.Y. Sept. 13, 2011).........................................16

iii

*Instituto de Prevision Militar v. Merrill Lynch & Co.*,
 No. 05-cv-22721, 2007 WL 2900318 (S.D. Fla. Sept. 28, 2007) ............................................27

*Janus Capital Group, Inc. v. First Derivative Trader*,
 131 S. Ct. 2296 (2011) ....................................................................................................2, 26, 27

*La Grasta v. First Union Sec. Inc.*,
 358 F.3d 840 (11th Cir. 2004) ...............................................................................................12

*Lahtinen v. Liberty Int'l. Fin. Servs., Inc.*,
 No. 13-61766-CIV, 2014 WL 351999 (S.D. Fla. Jan. 31, 2014) .............................................26

*Laperriere v. Vesta Ins. Grp., Inc.*,
 526 F.3d 715 (11th Cir. 2008) ...............................................................................................35

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005) ..................................................................................................29

*Merck & Co. v. Reynolds*,
 559 U.S. 633 (2010) ...............................................................................................................36

*Meyer v. Greene*,
 710 F.3d 1189 (11th Cir. 2013) .......................................................................................13, 24

*Miller v. Dyadic Int'l., Inc.*,
 No. 07-cv-80948, 2008 WL 5070279 (S.D. Fla. Nov. 25, 2008) ....................................6, 7, 8

*Mizzaro v. Home Depot, Inc.*,
 544 F.3d 1230 (11th Cir. 2008) ....................................................................................... passim

*Morrison v. National Australia Bank Ltd.*,
 561 U.S. 247 (2010) .......................................................................................................1, 14, 15

*Oxford Asset Mgmt., Ltd., v. Jaharis*,
 297 F.3d 1182 (11th Cir. 2002) ..........................................................................................6, 12

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enterprises, Inc.*,
 No. 10-Civ-61261, 2011 WL 4591541 (S.D. Fla. Sept. 30, 2011) .......................22, 32, 34, 35

*Public Pension Fund Grp. v. KV Pharmaceutical Co.*,
 679 F.3d 972 (8th Cir. 2012) ..................................................................................................29

*Rudolph v. Arthur Anderson & Co.*,
 800 F.2d 1040 (11th Cir. 1986) ..............................................................................................27

*S.E.C. v. Lucent Technologies, Inc.*,
 610 F. Supp. 2d 342 (D. N.J. 2009) .......................................................................................29

*Schultz v. Applica, Inc.*,
    488 F. Supp. 2d 1219 (S.D. Fla. 2007) .................................................................17

*SEC v. Merchant Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) ...........................................................................28

*SEC v. Monterosso*,
    756 F.3d 1326 (11th Cir. 2014) .........................................................................27

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,
    No. 06-CIV-80652 (KLR), 2007 WL 7124464 (S.D. Fla. Feb. 12, 2007) .............................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................31

*Tello v. Dean Witter Reynolds, Inc.*,
    494 F.3d 956 (11th Cir. 2007) .....................................................................14, 33

*Theoharous v. Fong*,
    256 F.3d 1219 (11th Cir. 2001) .........................................................................36

*Thompson v. RelationServe Media, Inc.*,
    610 F.3d 628 (11th Cir. 2010) .................................................................... passim

*Ziemba v. Cascade Int'l., Inc.*,
    256 F.3d 1194 (11th Cir. 2001) .....................................................................27, 28

*Zisholtz v. Suntrust Banks, Inc.*,
    No. 01:08-CV-1287, 2009 WL 3132907 (N.D. Ga. Sept. 24, 2009)................................29, 30

## STATUTES

15 U.S.C.
    §78u-4(b)(1) ...................................................................................................14

    §78u-5(c)(1)(B)(ii)(II)........................................................................................17

    § 78u–5(c)(*i*)(1)(C) ...........................................................................................20

    § 78u–5(c)(*i*)(1)(D) ...........................................................................................20

§ 10 (b) of the Securities Exchange Act of 1934 .................................................... passim

## OTHER AUTHORITIES

17 C.F.R. § 240 10b-5(a) .......................................................................................29

17 C.F.R. § 240 10b-5(c) .......................................................................................29

Federal Rule of Civil Procedure 9(b) ........................................................................ passim

Federal Rules of Civil Procedure 12(b)(6) ..................................................... 1, 3, 13, 15

Rule 10b-5 ............................................................................................................... passim

Canadian *Standards of Disclosure for Mineral Projects*, National Instrument 43-101 ................. 8

Defendants Liberty Silver Corporation ("Liberty Silver" or "the Company"), Geoffrey

Browne, and William Tafuri (collectively the "Liberty Silver Defendants") respectfully submit

this memorandum of law in support of their motion, pursuant to Federal Rules of Civil Procedure

9(b) and 12(b)(6), and the Private Securities Litigation Reform Act ("PSLRA"), to dismiss the

Third Amended Consolidated Class Action Complaint (the "Complaint").

## PRELIMINARY STATEMENT

This is a putative securities class action arising out of an alleged pump-and-dump scheme

led by Robert Genovese involving the stock of Liberty Silver, a Canadian-headquartered mining

company.  The securities fraud that Plaintiffs allege is simple.  Defendant Genovese (1) bought a

lot of Liberty Silver stock through a series of covert, offshore purchases, (2) pumped up the price

of the stock by disseminating false information about the company and by engaging in

manipulative trading practices with John Thomas Financial, and then (3) sold millions of shares

of Liberty Silver stock, making an unlawful profit and causing the share price to plummet.

(Compl. ¶¶ 2-4)

Based on Plaintiff's own theory of the fraud, the only plausible view is that the Liberty

Silver Defendants were victims; not willing or reckless participants in any unlawful conduct.

Plaintiffs' efforts to draw the Liberty Silver Defendants into the alleged scheme are unavailing.

After two failed complaints, Plaintiffs are still unable to sufficiently allege that the Liberty Silver

Defendants violated the securities laws.  As set forth below, the Complaint has a number of

fundamental, fatal flaws.

First, Plaintiffs' claims under Section 10(b) and Rule 10b-5 should be dismissed because

the Complaint does not allege a "domestic transaction[]," as required by *Morrison v. National*

*Australia Bank Ltd.*, 561 U.S. 247 (2010).  As the Complaint recognizes, Liberty Silver's stock is

1

listed on the Toronto Stock Exchange.  Plaintiffs do not allege that any of their purchases were made in the United States and therefore fail to state a claim.  In addition, the purported class ("all those who purchased or acquired Liberty Silver common stock") cannot be sustained because it includes, by definition, those who engaged in foreign transactions.

Second, Plaintiffs fail to allege that the statements made by Liberty Silver were ***material*** or ***false when made***.  The Complaint pleads no facts showing that the press releases issued by Liberty Silver in 2012 concerning the proposed Sennen transaction and the acquisition of the Hi Ho Silver property were false.  The allegation that the Company fraudulently concealed a private placement transaction with Genovese as a related party transaction also fails.  It is undisputed that the Company did disclose that transaction, issuing a Form 8-K that attached the subscription agreement that specifically named "Robert Genovese."  To the extent that Genovese had additional holdings in Liberty Silver, Plaintiffs make no particularized allegations that the Liberty Silver Defendants knew of such holdings.  Indeed, the Complaint itself alleges that Genovese made "covert" purchases and did not disclose the full extent of his beneficial ownership of Liberty Silver's shares until ***December 27, 2012***, months after Liberty Silver's challenged SEC filings.

Third, Plaintiffs attempt to hold the Liberty Silver Defendants liable for the allegedly misleading media campaign that was solicited, managed, and approved by Genovese.  The Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Trader*[1] makes clear, however, that defendants are liable [for] the statements only if they had "ultimate control" over the statements.  The Complaint makes no such allegation.

---

[1] 131 S. Ct. 2296 (2011).

Fourth, the Complaint fails to provide particularized allegations of scienter. Plaintiffs do not sufficiently allege that the Liberty Silver Defendants intentionally or recklessly participated in the alleged Genovese scheme. There are no plausible allegations to explain why any Liberty Silver Defendant would participate in the alleged scheme that operated to the detriment of the Company. Certainly, there is no allegation that any Liberty Silver Defendants sold stock during the class period.

Ultimately, the Complaint's core theory of liability—that the Company knew but failed to warn investors of Genovese's pump-and-dump scheme—is as implausible as it is unsupported by specific factual allegations. Indeed, Plaintiffs would have this Court conclude that the Liberty Silver Defendants aided and abetted a scheme to pump the stock despite the fact that ***not a single Liberty Silver Defendant sold any shares during the class period***. This theory defies reason. The more plausible inference from the Complaint's factual allegations is that the Liberty Silver Defendants were deceived by the Genovese Defendants. Indeed, Plaintiffs' claim that the Liberty Silver Defendants were reckless in not knowing of Genovese's fraud is rebutted by Plaintiffs' own allegations that Genovese concealed his activities through secret accounts and offshore entities in Canada, the Turks and Caicos Islands, and elsewhere.

## STATEMENT OF FACTS[2]

Plaintiff Stanaford filed an initial complaint on September 11, 2013, a Second Amended Complaint on March 24, 2014, and, along with Philip Hobley, filed the Third Amended Complaint on August 4, 2014. At its core, the Complaint alleges that Defendant Genovese

---

[2] The factual background is taken from (i) the Complaint; and (ii) documents incorporated by reference in the Complaint. *See Cheney v. Cyberguard Corp.*, No. 98-cv-6879, 2000 WL 1140306, at *3 (S.D. Fla. July 31, 2000) ("Where the plaintiff has referred to certain documents in the complaint that are central to the plaintiff's claim, the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require the conversion of the motion into a motion for summary judgment." (internal quotations omitted) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997), *reh'g denied*, 116 F.3d 1495 (11th Cir. 1997)).

orchestrated a pump and dump scheme to manipulate Liberty Silver stock by "buying and selling massive blocks of Liberty Silver stock, fabricat[ing] newletters, and false and misleading reports, using nominees and offshore companies to purchase stock on his behalf, all so that Genovese could make huge profits while leaving investors in financial ruin." (Compl. ¶¶ 4, 127)  The Complaint alleges that the Liberty Silver Defendants were either reckless in their failure to detect and prevent Genovese's scheme, or "permitted" the scheme to occur. (Compl. ¶ 138)  As discussed below, these allegations cannot survive the strict pleading requirements of federal securities laws.

### A.     The Genovese Defendants' Alleged Pump and Dump Scheme

Defendant Robert Genovese, a Canadian citizen residing in Florida, is an investment entrepreneur and stock promoter.  (Compl. ¶ 11)  Genovese owns and controls Defendant BG Capital Group LTD, an investment management company incorporated in the Bahamas, Defendant Look Back Investments Inc., a shell company incorporated in Panama, and Defendant Outlook Investments, Inc., another shell investment company (collectively with Genovese, the "Genovese Defendants"). (Compl. ¶¶ 12-14)  The Complaint asserts that "Genovese is a penny stock promoter and is notorious for operating on the fringes of the financial markets, making tens of millions of dollars by touting and manipulating penny stocks" including "Clearly Canadian Brands, Neptune Society, Envoy Communications, Spectrum Sciences & Software, American Lithium Minerals and others." (Compl. ¶ 19)  The Complaint alleges that Genovese "used a pump and dump pattern of manipulations of Liberty Silver stock . . .." (Compl. ¶¶ 4,19)

To perpetrate the alleged scheme, the Complaint alleges that on or about November 11, 2011, Genovese, through Look Back, paid $3.25 million for 6,500,000 shares of Liberty Silver stock in a private placement.  (Compl. ¶  50)  The Complaint does not allege that the Liberty

Silver Defendants had knowledge of Genovese's ownership or control of any shares other than those purchased in the November 2011 private placement.  The Genovese Defendants then allegedly manipulated Liberty Silver's stock price in August and September 2012 by making a series of false and misleading statements about the Company in promotional publications paid for by Genovese (Compl. ¶¶ 98, 103, 104, 105.)  The Complaint does not allege that the Liberty Silver Defendants authorized or approved the alleged misrepresentations made by the Genovese Defendants.

Genovese allegedly used unscrupulous brokers at John Thomas Financial, a financial services firm in New York City, to aggressively promote and sell Liberty Silver stock using boiler room tactics. (Compl. ¶¶ 54-70, 74-80, 82-83)  John Thomas Financial was founded by Anastasio Belesis, who has been disciplined by the U.S. Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, Inc. and stripped of his broker's license for fraud. (Compl. ¶¶ 54, 56)  Genovese allegedly paid Belesis $2 million dollars for his role in the scheme.  (Compl. ¶¶ 54, 69)  There is no allegation that Genovese made any such payment to any of the Liberty Silver Defendants.  After Genovese's media campaign had inflated Liberty Silver's stock price, Genovese directed John Thomas Financial to sell 6.6 million of his Liberty Silver shares, earning him proceeds of more than $8.64 million. (Compl. ¶¶ 54, 66, 74, 82)

There is no allegation that the Liberty Silver Defendants knew of the $2 million payment to Belesis or the boiler room tactics being used by to further the alleged scheme.  On the contrary, Defendants Tafuri and Browne and other representatives of Liberty Silver are only

alleged to have met with brokers from John Thomas Financial to pursue potential private placement opportunities.[3] (Compl. ¶¶ 67, 68, 73, 81).

On Friday, October 5, 2012, the SEC halted trading in Liberty Silver stock. (Compl. ¶ 117)  On October 12, 2012, the Ontario Securities Commission followed suit and halted trading in Liberty Silver stock. (Compl. ¶ 119)

### B.    Allegations Concerning the Liberty Silver Defendants

Headquartered in Canada, Liberty Silver is a mining company focused on exploring and developing mineral properties in North America.[4] (Compl. ¶¶ 15, 41)  Geoffrey Browne is a Director and the Chief Executive Officer of Liberty Silver and previously served as Chairman of the Board of Directors during the relevant time period. (Compl. ¶ 17)  Liberty Silver engaged Browne on October 18, 2010 to serve as Chief Executive Officer and a member of the Board of Directors.[5]  He previously worked as a senior executive in the financial services industry for over thirty years in Canada, the United States, and the United Kingdom.[6]

---

[3] *See* Declaration of Michelle Reed in support of Liberty Silver Defendants Motion to Dismiss the Third Amended Complaint ("Reed Decl."), Ex. M, Liberty Silver Form 10K for the Fiscal Year Ended June 30, 2012, filed on September 28, 2012, at 20 (disclosing that "[i]n order to continue to meet its fiscal obligations beyond the next twelve months, management has plans to pursue various financing alternatives, including, but not limited to, merger and acquisition activity, raising capital through the capital markets and debt financing.").

[4] *See* Reed Decl., Ex. A, Liberty Silver Press Release, "Liberty Silver Closes U.S. $4.6 Million Non-Broker Private Placement Funding," Dec. 21, 2011.  (*See* Compl. ¶ 51)

[5] *See* Reed Decl., Ex. B, Liberty Silver Form 8-K filed on Oct. 19, 2010.  The Court may consider Liberty Silver's October 19, 2010 Form 8-K, and other Liberty Silver Form 8-Ks referenced in this motion to dismiss, because on a motion to dismiss a securities fraud action, a court may consider "the contents of public disclosure documents which are required to be filed with the SEC, and are so actually filed even if the documents are not attached to the complaint but are attached to the motion to dismiss." *Miller v. Dyadic Int'l., Inc.*, No. 07-cv-80948, 2008 WL 5070279, at *8 (S.D. Fla. Nov. 25, 2008) (quoting *Oxford Asset Mgmt., Ltd., v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)); *see also Cheney*, 2000 WL 1140306, at *3.  The language referenced in the Form 8-K is offered for the contents of the statements made, but not for the truth of the matter asserted. *See Jaharis*, 297 F.3d at 1188 (affirming district court's consideration of defendant's prospectus and 10-Q for the relevant period to resolve motion to dismiss where court considered the documents for their contents, "not to prove the truth of the matters asserted").

[6] *See* Reed Decl., Ex. C, Liberty Silver Press Release, "Liberty Silver Announces Offer for Sennen Resources," July 16, 2012.  (*See* Compl. ¶ 90)

William Tafuri is the former President and Chief Operating Officer of Liberty Silver. (Compl. ¶ 16)  Tafuri served as a member of the Liberty Silver Board of Directors[7] from April 2010 to December 2012.[8] (Compl. ¶ 16)  Tafuri also previously served as the Company's Vice President of Exploration.[9]  Prior to joining Liberty Silver, Tafuri worked for mining companies for over thirty-five years in North and South America, Russia, and Central Asia.[10]

At all times during the Class Period, Liberty Silver was a separate and distinct legal entity from the Genovese Defendants and had its own independent board of directors. (*See* note 5, *supra*.)  The Complaint pleads no facts to support the conclusory allegations that the Liberty Silver Defendants were aware that Genovese held a controlling stake of Liberty Silver's shares. (Compl. ¶¶ 59, 75, 80, 85, 107, 116)  To the contrary, the Complaint asserts that during the Class Period, Genovese was nothing more than a large shareholder who invested $3.25 million in the Company in exchange for 6.5 million shares (Compl. ¶ 50, 109, 138); the extent of Genovese's true holdings in Liberty Silver, alleged in the Complaint to be 8.6 million shares, only came to light **after** the trading suspension occurred and **after** the class period.[11] (Compl. ¶ 51 n. 2, 111, 115 fn. 15, 120)

Liberty Silver's flagship project is the Trinity Silver project, located in Pershing County, Nevada.[12]  Pursuant to an earn-in agreement with Renaissance Gold Inc., Liberty Silver is to

---

[7] During the relevant time period, between February 10, 2010 and October 5, 2012, in addition to Defendants Browne and Tafuri, the members of Liberty Silver's Board of Directors included Terry Fields, John Pulos, W. Tom Hodgson, Paul Haggis, Timothy Unwin, John Barrington, George Kent, Dick Klatt, and Manish Kshatriya. Terry Fields resigned from the Board on May 6, 2010.  The Genovese Defendants are not alleged to have any connection to or affiliation with these Directors. *See* Reed Decl., Ex. M, Liberty Silver Form 10K for the Fiscal Year Ended June 30, 2012, filed on September 28, 2012, at 49-50; Ex. N, Liberty Silver Form 8-K filed on May 11, 2010. Although these filings are not cited by Plaintiff, the Court may properly consider the content of the public disclosures.  *See Miller*, 2008 WL 5070279 at *8.

[8] *See* Reed Decl., Ex. D, Liberty Silver Form 8-K filed on Apr. 26, 2010.

[9] *See* Reed Decl., Ex. D.

[10] *See* Reed Decl., Ex. D.

[11] Plaintiff makes no allegation that Genovese filed a Schedule 13D during the class period.

[12] *See* Reed Decl., Ex. A.

spend $5 million to develop the 10,476 acre Trinity project in return for a 70% interest in the property. [13] (Compl. ¶ 42)  Liberty Silver repeatedly warned investors of the Company's risks. The Company warned:

- Our property is in the exploration and development stage. There is substantial risk that no commercially exploitable minerals will be found. . . If we do not discover any mineral resources in a commercially exploitable quantity, our business could fail.[14]

- Because we may never earn revenues from our operations, our business may fail and cause investors to lose their entire investment in our company. [15]

- The Company's common stock is currently approved for trading on the OTC Bulletin Board, but the Company cannot ensure that a liquid trading market for its shares will be sustained. [16]

On February 28, 2011, Liberty Silver announced the completion of an independently verified mineral resource estimate technical report on the Trinity Silver project in compliance with Rule 43-101, a Canadian national instrument setting forth the Standards of Disclosure for Mineral Projects. [17]  Liberty Silver disclosed the results of the resource estimate, which "confirm[ed] that [the Trinity project] is a viable, commercial project . . . substantiated by the wealth of data from previous mining operations, exploration drilling and geophysics programs, which also indicate substantial potential for expanding the resource outside the identified deposit

---

[13] *See* Reed Decl., Ex. E, Liberty Silver Press Release, "Liberty Silver Expands Trinity Land Package with Acquisition of Hi Ho Silver Property," Aug. 8, 2012. (*See* Compl. ¶ 93)

[14] *See* Reed Decl., Ex. J, Liberty Silver Form 10K/A for the Fiscal Year Ended June 30, 2010, filed on Apr. 15, 2011, at 7-10.  Although the Form 10K/A is not cited by Plaintiff, the Court may properly consider the content of the public disclosure.  *See Miller*, 2008 WL 5070279, at *8.

[15] *See* Reed Decl., Ex. J.

[16] *See* Reed Decl., Ex. J.

[17] *See* Reed Decl., Ex. F, Liberty Silver Press Release, "Liberty Silver Completes Silver Resource Estimate at the Trinity Mine Project," Feb. 28, 2011 (detailing 43-101 report).  Although Plaintiff does not cite the February 28, 2011 press release, it is incorporated by reference in the Complaint ¶¶ 52, 120, 122, which cite to the 43-101 Report. *See Miller*, 2008 WL 5070279, at *8.

area."[18] Although pleased with the results of the inferred resource estimate, Liberty Silver

cautioned that the results were preliminary and geologically speculative, stating:

> Mineral resources that are not mineral reserves do not have
> demonstrated economic viability. Mineral resource estimates do
> not account for mineability, selectivity, mining loss and dilution.
> The assessment in the 43-101 report is preliminary in nature,
> includes inferred mineral resources that are considered too
> speculative geologically to have economic considerations applied
> to them that would enable them to be categorized as mineral
> reserves and there is no certainty that these inferred mineral
> resources will be converted to the measured and indicated
> categories through further drilling, or into mineral reserves, once
> economic considerations are applied.
>
> Due to the uncertainty that may be attached to Inferred Mineral
> Resources, it cannot be assumed that all or any part of an Inferred
> Mineral Resource will be upgraded to an Indicated or Measured
> Mineral Resource as a result of continued exploration. Confidence
> in the estimate is insufficient to allow the meaningful application
> of technical and economic parameters or to enable an evaluation of
> economic viability worthy of public disclosure. Inferred Mineral
> Resources must be excluded from estimates forming the basis of
> feasibility or other economic studies.

In November 10, 2011, the Company entered into an agreement with Look Back whereby

Look Back invested $3.25 million and obtained a subscription at $0.50/share (i.e., 6.5 million

shares) and option for additional warrants. In a public filing with the SEC made the same day,

the Company disclosed the Subscription Agreement, Escrow Agreement, and Registration Rights

Agreement in a Form 8-K with the SEC.[19] The Subscription Agreement and the Registration

Rights Agreement identified the authorized signatory as Genovese and showed the source of the

escrow funds as BG Capital Group. The Company disclosed the transaction with Look Back in

the Form 8-K and all subsequent Form 10-Qs and 10-Ks filed with the commission.[20]

---

[18] *See* Reed Decl., Ex. F.
[19] Reed Decl., Ex. U, Form 8-K filed by Liberty Silver on November 10, 2011.
[20] Reed Decl., Exs. S-T.

On December 19, 2011, Liberty Silver received approval from the Toronto Stock Exchange ("TSX") to list its common stock for trading on the TSX under the symbol "LSL."[21] Liberty Silver common stock began trading on the TSX on December 22, 2011. (Compl. ¶ 53)

In July 2012, Liberty Silver announced a proposed takeover of Sennen, a junior mineral exploration company. (Compl. ¶ 90)  The takeover would provide Sennen shareholders with "more liquid Liberty Silver common shares, which trade on the TSX main board" as opposed to the TSX Venture Exchange, where Sennen's shares were trading.[22]  Additionally, the takeover would offer Sennen shareholders the security of a management team with a significant personal stake in the company, as Liberty Silver's "board and management collectively own[ed] approximately 30% of Liberty's outstanding shares, while Sennen's board and management appear to collectively hold less than 8% of their company's equity."[23] (Compl. ¶93)  The Complaint claims, without any specific supporting allegations, that the proposed takeover was a sham, overestimating the value of Liberty Silver shares offered in exchange for the tender. (Compl. ¶¶ 90-92)

On August 8, 2012, Liberty Silver entered into a binding agreement with Primus Resources, L.C. ("Primus Resources") to acquire the Hi Ho Property, approximately 100 acres of property adjacent to the Trinity Silver mine in exchange for $150,000 in cash and 3,000,000 common shares of Liberty Silver.[24] (Compl. ¶ 93)  The Complaint alleges that Liberty Silver overpaid for the Hi Ho Property.  (Compl. ¶ 94)  The Hi Ho Property held important strategic value for Liberty Silver because "[h]istoric data combined with current modeling indicat[ed] that

---

[21] *See* Reed Decl., Ex. G, Form 8-K Filed by Liberty Silver on Dec. 19, 2011. (Compl. ¶ 53).

[22] *See* Reed Decl., Ex. C, Liberty Silver Press Release, "Liberty Silver Announces Offer for Sennen Resources," July 16, 2012.  (Compl. ¶ 90)

[23] *See* Reed Decl., Ex. C.

[24] *See* Reed Decl., Ex. E, Liberty Silver Press Release, "Liberty Silver Expands Trinity Land Package with Acquisition of Hi Ho Silver Property," Aug. 8, 2012.  Note-the final terms of the deal differed slightly from the figures referenced in the Complaint. *See*, Reed Decl., Ex. O, Form 8-K Filed by Liberty Silver on Oct. 16, 2012.

the Trinity deposit extends into the Hi Ho Properties, significantly increasing our current

resource potential and the projected economics for bringing Trinity back into production."[25]  Jim

Marin, the President of Primus Resources, discussed the transaction:

> We are extremely pleased to reach an agreement that will result in our mineral claims being included with Liberty Silver's land package at the Trinity Silver property.  We have closely monitored their progress to date on the property and we agree with their approach for its development, which we feel has enormous upside potential.  Their on the ground mining team is very strong and has a great understanding of the existing resource and the multiple drilling targets independent of the resource zone . . .[26]

As a result of the Hi Ho Property acquisition, Liberty Silver satisfied over 85% of the required

$5 million in expenditures on the Trinity Silver property under its earn-in agreement with

Renaissance Gold.[27]

On August 9, 2012, Liberty Silver issued an open letter to Sennen's shareholders to

provide reassurance that "[w]hile Sennen has repeatedly portrayed [the] offer as hostile, [Liberty

Silver's] first preference remains to conclude a friendly transaction that will benefit the

shareholders of both Sennen and Liberty Silver."[28]  On August 21, 2012, Liberty Silver extended

its takeover offer for Sennen Resources until September 10, 2012.[29]  In the press release, Browne

reiterated Liberty Silver's contention that "tendering to [the] offer represents the best value for

Sennen shareholders rather than maintaining Sennen's *status quo*."[30]  Browne also updated the

Sennen shareholders on the benefit of Liberty Silver's recent Hi Ho Property acquisition, which

---

[25] *See* Reed Decl., Ex. E.

[26] *See* Reed Decl., Ex. E.

[27] *See* Reed Decl., Ex. E.

[28] *See* Reed Decl., Ex. H, Liberty Silver Open Letter to Shareholders of Sennen Resources, Aug. 9, 2012. The Court may consider Liberty Silver's August 9, 2012 Open letter because Plaintiff references the Open Letter in the Complaint and relies on its contents in asserting his claims. (*See* Compl. ¶ 95)

[29] *See* Reed Decl., Ex. I, Liberty Silver Press Release, "Liberty Silver Extends Offer for Sennen Resources," Aug. 21, 2012.  (*See* Compl. ¶ 95)

[30] *See* Reed Decl., Ex. I.

positioned Liberty Silver "very close to fulfilling [its] earn-in requirements and further de-risked the project."[31]  Sennen's shareholders ultimately rejected the takeover offer on September 14, 2012, with no price reaction in Liberty Silver's stock.[32]  (Compl. ¶ 96)

In September and October 2012, the market for Liberty Stock became unusually volatile, with high volumes and increasing price.  (Compl. ¶¶ 117-119)  On October 5, 2012, the SEC halted trading in Liberty Silver shares due to "questions concerning publicly available information about Liberty Silver, the control of its stock, its market price, and trading in the stock."[33] (Compl. ¶ 117)  When trading in Liberty Silver shares resumed, the price of a Liberty Silver common share declined from a closing price of $1.55 on October 5, 2012 to $0.15 on October 19, ultimately recovering to $1.29 by the end of the month.[34] (Compl. ¶ 118)  Neither Browne nor Tafuri sold any shares during the relevant period, between February 2010 and October 2012.[35]  Browne and Tafuri suffered personal losses in their Liberty Silver holdings as a result of the decline in the price of Liberty Silver's stock.

On October 19, 2012, Liberty Silver issued a press release to clarify that Liberty Silver had not purchased any promotional advertisements or reports about the Company and to advise

---

[31] *See* Reed Decl., Ex. I.

[32] *See* Reed Decl., Ex. K, Liberty Silver Press Release, "Expiry of Liberty Silver Offer for Sennen Resources," September 15, 2012. The Court may consider the Sept. 15, 2012 press release because Liberty Silver's failed takeover bid for Sennen is central to the Complaint and is not undisputed (*See* ¶¶ 90-92, 95-97, 116, 121). *See Jaharis*, 297 F.3d at 1188 (affirming district court's consideration of press releases in analyzing motion to dismiss securities fraud claims); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1316 n.5 (M.D. Fla. 2002) (considering press releases pertinent to the complaint where contents were not in dispute); *First Global Corp v. Mansiana Ocean Residences, LLC*, No. 9-cv-21092, 2010 WL 2163756, *3 n.3 (S.D. Fla. May 27, 2010) (taking judicial notice of "the existence of the press release's message").

[33] *See* Reed Decl., Ex. L, U.S. Securities & Exchange Commission, Order of Suspension of Trading, Oct. 5, 2012.

[34] *See* Reed Decl., Ex. P, Chart of Liberty Silver Common Shares Prices Between February 5, 2010 and October 31, 2012.  Although not cited by the Complaint, the Court may take judicial notice of Liberty Silver's stock prices during the class action. *See La Grasta v. First Union Sec. Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) (taking judicial notice of the stock price throughout the securities fraud class action period although plaintiff's complaint only referenced the stock price on certain dates during the period).

[35] The Complaint does not allege that Browne and Tafuri sold any shares during the relevant time period of the alleged "pump & dump scheme."  Consistent with this, Liberty Silver's SEC Filings do not contain any Form 4s reporting sales by Browne and Tafuri during the relevant time period.

that Liberty Silver did not have any contractual or other relationship with Genovese, who was quoted in several promotional articles discussing Liberty Silver that were published between February 2010 and October 2012 and which are the subject of Plaintiffs' Complaint.[36] (Compl. ¶ 120)  Subsequently, on October 29, 2012, Liberty Silver issued a press release cautioning "the investment community" to derive all information about the Company solely from the Company's website and its public filings with the SEC and the Ontario Securities Commission.[37]

## ARGUMENT

To state a claim under Section 10 (b) of the Securities Exchange Act of 1934 and Rule 10b-5, Plaintiffs must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'"[38]  The Complaint fails to meet these requirements.

**I.    The Reform Act Substantially Heightened Pleading Standards in Securities Fraud Class Actions**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face" and that "raise a right to relief above the speculative level."[39]  When assessing a complaint, pleadings that "are no

---

[36] *See* Reed Decl., Ex. R, Form 8-K filed by Liberty Silver on Oct. 22, 2012.

[37] *See* Reed Decl., Ex. Q, Form 8-K filed by Liberty Silver on Oct. 29, 2012.

[38] *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008) (dismissing securities fraud claims for failure to adequately plead scienter); *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013) (affirming dismissal of class action securities fraud complaint raising §§ 10(b), 20(a) and Rule 10b-5 claims for failure to state a claim); *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, No. 06-CIV-80652 (KLR), 2007 WL 7124464,  at *5 (S.D. Fla. Feb. 12, 2007) (dismissing securities fraud claim with prejudice for failure to allege misrepresentation or omission in connection with the purchase or sale of securities); *In re Saf T Lok, Inc. Sec. Litig.*, No. 02-cv-80252 (KLR), 2003 WL 22383607, at *5 (S.D. Fla. July 3, 2003)  (dismissing securities fraud claims against accounting firm and individual defendants for failure to sufficiently allege scienter).

[39] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

more than conclusions are not entitled to the assumption of truth."[40]  Further, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and ***common sense***."[41]

To sufficiently allege securities fraud, Plaintiffs must clear two additional hurdles: Federal Rule of Civil Procedure 9(b) and the particularity requirements of the PSLRA.[42]  To satisfy Rule 9(b), a complaint must set forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) the same, and (3) the content of such statements and the manner in which they misled the Plaintiffs, and (4) what the defendants obtained as a consequence of the fraud."[43]

The PSLRA heightens pleading standards for 10(b) and Rule 10b-5 claims even further, requiring Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which the belief is formed."[44]

## II.  Plaintiffs' Claims Should be Dismissed Because Section 10(b) and Rule 10b-5 Apply Only to Domestic Securities Transactions

The laws of the United States do not generally apply in foreign jurisdictions, unless Congress expressly indicates extraterritorial application.[45]  In *Morrison v. National Australia*

---

[40] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[41] *Id.* (emphasis added).

[42] *Mizzaro*, 544 F.3d at 1237.

[43] *Id.* (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).

[44] *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (quoting 15 U.S.C. § 78u-4(b)(1); *Brooks v. Blue Cross and Blue Shield of Fla.*, 116 F.3d 1364, 1371 (11th Cir. 1997).

[45] *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).

*Bank Ltd*., 561 U.S. 247 (2010),[46] the Supreme Court considered whether a company with foreign-listed shares that were cross listed on the New York Stock Exchange was subject to liability under Section 10(b).  The Court held that neither Section 10(b) nor Rule 10b-5 were extraterritorial.[47]

Since *Morrison*, courts of appeals have uniformly treated cross-listed foreign securities as beyond the reach of the Securities Exchange Act of 1934.  For example, in *City of Pontiac*, the Second Circuit held that domestic plaintiffs who place orders in the United States to trade securities on foreign exchanges may not sue under Section 10(b) and Rule 10b-5.[48]  Plaintiffs in that case brought a securities fraud class action against UBS and several officers and directors in connection with purchases of UBS shares that were listed on foreign exchanges and the NYSE. One plaintiff, a domestic investor, placed a buy order in the United States that was executed on a Swiss exchange.  The Second Circuit affirmed dismissal of the complaint pursuant to Rule 12(b)(6) for failure to plead the existence of a "domestic transaction" despite the placement of a buy order in the United States, holding that the claims were "based on purchases of foreign shares on foreign exchanges."[49]

In this case, as the Complaint recognizes, Liberty Silver's shares were listed on the TSX and the Over The Counter Bulletin Board ("OTCBB").  Plaintiffs fail to allege, however, that they purchased any of their shares in a "domestic transaction," *i.e.*, on the OTCBB, and therefore they fail to state a claim under Section 10(b).

In addition, the Complaint's class allegations are fundamentally flawed because the purported class is not limited to domestic transactions.  This case closely parallels *In re Smart*

---

[46] 561 U.S. 247 (2010).

[47] *Id*. at 261-62.

[48] *City of Pontiac Policemen's and Firemen's Ret.t Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. May 6, 2014).

[49] *Id*. at 182.

*Technologies, Inc. Shareholder Litigation*,[50] which rejected class claims for investors who purchased shares on an exchange in Canada:

> [T]o the extent that putative class members purchased, incurred "irrevocable liability," or obtained "title" to securities, *see Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012), in Canada—or anywhere else outside the United States—they do not have a viable cause of action under the Securities Act, and may not be included in the class certified here.
>
> The fact that SMART cross-listed its shares on the NASDAQ and TMX does not change the conclusion because the "purchase[ ]" or "acqui [sition]" of shares on the TMX occurred extraterritorially. *See In re UBS Secs. Litig.*, No. 07 Civ. 11225, 2011 WL 4059356, at *5–6 (S.D.N.Y. Sept. 13, 2011).[51]

Plaintiffs broadly define the class as "purchasers of the common stock of Liberty Silver (the 'Class') during the period February 10, 2010 through October 5, 2012."[52] Plaintiffs do not distinguish between the shares traded on the OTCBB and shares traded on the TSX thus ignoring what is now black letter law: shares purchased and sold on foreign exchanges are not regulated by Section 10(b) and Rule 10b-5. "Post *Morrison*, the only relevant inquiry is *where the transaction occurred, i.e.,* whether it was a 'domestic transaction.'"[53] Accordingly, the Complaint must be dismissed.

## III. Plaintiffs Fail to Allege Particularized Facts Showing that the Liberty Silver Defendants Made False or Misleading Statements of Material Fact

The Complaint identifies nine purportedly materially false or misleading communications.[54] Five are statements made by Liberty Silver, including three press releases and two financial disclosures.[55] The remaining four challenged statements were made by or on

---

[50] 295 F.R.D. 50 (S.D.N.Y. 2013).

[51] *Id*. at 57 & n.11.

[52] Compl. ¶ 1.

[53] *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 796 (S.D. Tex. 2012) (citing *Morrison*, 130 S. Ct. at 2884).

[54] Compl. ¶¶ 86, 90, 93, 95, 98, 103, 104, 105, 106.

[55] Compl. ¶¶ 98, 103, 104, 105.

behalf of the Genovese Defendants as part of a coordinated media campaign to promote Liberty Silver's stock.  As set forth below, none of these communications can form the basis of a claim against the Liberty Silver Defendants.[56]

### A.  The Allegedly Misleading Liberty Silver Press Releases are Not Properly Alleged to be False or Misleading and are Not Material

Three of the purportedly false or misleading statements attributed to the Liberty Silver Defendants are press releases issued by the Company.[57]  Plaintiffs fail to allege any false or misleading content in these press releases with the required specificity.  Moreover, to the extent Plaintiffs are challenging the forward-looking statements in those press releases, such statements are protected by the PSLRA safe harbor and are not actionable.

The PSLRA exempts certain forward-looking statements from securities fraud liability.[58] The safe harbor protection for forward-looking statements applies "(1) if meaningful cautionary language accompanies or (2) if the plaintiff fails to plead with particularity facts giving rise to a strong inference that the defendant had actual knowledge of the falsity of their statements when made."[59]  The safe harbor protects not only explicitly forward-looking statements, but also "any statement of the assumptions underlying or relating to . . . a statement of the plans and objectives of management for future operations."[60]  Even present-tense statements may fall within the safe

---

[56] Compl. ¶¶ 86, 90, 93, 95, 106.

[57] Compl. ¶¶ 90, 93, 95.

[58] *In re Columbia Labs., Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1367-68 (S.D. Fla. 2001) (recognizing that the PSLRA provides a "statutory safe-harbor" to protect forward-looking statements from securities fraud liability).

[59] *Columbia Labs.*, 144 F. Supp. 2d at 1367-68 (citing 15 U.S.C. § 78u-5(c)(1)(B)(ii)(II)); *Schultz v. Applica, Inc.*, 488 F. Supp. 2d 1219, 1228-29 (S.D. Fla. 2007) (finding that several statements alleged to be materially false or misleading were subject to the PSLRA's safe harbor as forward-looking statements containing meaningful cautionary statements).

[60] *Schultz*, 488 F. Supp. 2d at 1228-29.

harbor's protection because "[f]orward-looking conclusions often rest on both historical observations and assumptions about future events."[61]

### (1)    July 16, 2012 Liberty Silver Press Release

Plaintiffs cite a July 16, 2012 Liberty Silver press release announcing its offer to acquire Sennen, alleging that the offer was a "ploy," a "ludicrously self-promoting offer," and "an attempt to gain legitimacy by piggy-backing on Sennen's credibility."[62]  While the Complaint is long on rhetoric, the only statement from that press release identified is the following:

> Liberty Silver is well-placed to take advantage of the opportunities [presented by the proposed Sennen transaction] using our mitigated-risk approach to project evaluation and development. We are confident that the combination of Sennen's cash resources and Liberty Silver's skilled management team and proven risk-mitigation strategy will enable us to advance our promising Trinity Silver project in Nevada and to identify other low-risk projects.[63]

The Complaint fails to provide any particularized allegations to explain what in this passage is false or misleading. [64]  Plaintiffs appear to challenge the valuations underlying Liberty Silver's takeover offer, noting certain public comments of Ian Rozier, Sennen's CEO and President, stating that "Liberty Silver's stock was actually valued between $0.005 and $0.07 per share instead of the $0.20 per share Liberty Silver claimed."[65] However, even accepted as true, Plaintiffs' allegations merely state what Sennen and Rozier believed Liberty Silver's stock value to be, *after the takeover offer*.  Plaintiffs do not establish any inconsistent contemporaneous statements or objective information available to contradict the financial metrics underlying the takeover offer.  Post-hoc analyses and hindsight critiques are not cognizable methods to establish

---

[61] *Harris v. Ivax Corp.*, 182 F.3d 799, 806-07 (11th Cir. 1999) (holding that an entire statement in a challenged press release constituted a forward-looking statement falling within the PSLRA's safe harbor protection); *Schultz*, 488 F. Supp. 2d at 1228.

[62] Compl. ¶¶ 90, 116.

[63] Compl. ¶ 90.

[64] *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

[65] Compl. ¶ 92.

a materially false or misleading statement.  Rather, to satisfy their obligation under the PSLRA,

Plaintiffs must explain "why the disputed statement was untrue or misleading *when made* . . . by

pointing to inconsistent *contemporaneous* statements or information (such as internal reports)

which were made by or available to the defendants."[66]

> ### (2)   *August 8, 2012 Liberty Silver Press Release Announcing Hi Ho Acquisition*

Plaintiffs also rely on a Liberty Silver press release issued on August 8, 2012 that

announced the acquisition of the Hi Ho property.  The Complaint highlights the following

statement:[67]

> The Hi Ho Properties are an important addition to our future
> development plans at Trinity.  Historic data, combined with current
> modeling indicates that the Trinity deposit extends into the Hi Ho
> Properties, significantly increasing our current resource potential
> and the projected economics for bringing Trinity back into
> production.

Again, the Complaint fails to plead any facts to explain what was allegedly materially

false or misleading about this statement.  Rather, Plaintiffs merely refer to assertions by a

confidential witness, an executive officer of Renaissance Gold, Liberty's joint-venture partner,

suggesting that Liberty Silver paid too high a price for the property.[68]  Post-hoc critique of the

financial terms of the Hi Ho acquisition is insufficient to satisfy Plaintiffs' obligation under the

---

[66] *In re Technical Chems. Sec. Litig.*, No. 98-7334, 2000 WL 1222025, at *9 (S.D. Fla. July 3, 2000) (granting motion to dismiss class action securities fraud complaint raising claims under §§ 10(b), 20(a), and Rule 10b-5) (internal quotations omitted) (emphasis in original); *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1307 (S.D. Fla. 2002) (noting no showing that Defendants knew the statements were false when made); *In re Med/Waste, Inc. Sec. Litig.*, No. 99-cv-1684, 2000 WL 34241099, at *9 (S.D. Fla. Aug. 30, 2000) (dismissing complaint for failure to allege facts suggesting that Defendants knew that company's corporate reports were inaccurate "at the time the statements were issued").

[67] Compl. ¶ 93.

[68] Compl. ¶ 94.

PSLRA to explain why the challenged language was false or misleading *when made* based on inconsistent contemporaneous statements or information.[69]

Moreover, the challenged language in the August 8th press release is forward-looking and falls within the PSLRA's safe harbor.  In particular, Plaintiffs cite to Browne's optimistic statements in the press release, praising the acquisition as "an important addition to [Liberty Silver's] future development plans at Trinity" and stating that "[h]istoric data, combined with current modeling indicates that the Trinity deposit extends into the Hi Ho properties, significantly increasing [Liberty Silver's] resources potential and the projected economics for bringing Trinity back into production."[70]  This language, predicting the Company's "resources potential" and "projected economics" based on underlying assumptions of "historic data" and "current modeling," falls squarely within the PSLRA's safe harbor, which expressly protects statements of future economic performance and underlying assumptions.[71]

The forward-looking statement alleged to be false or misleading comports with the PSLRA safe harbor's requirements by incorporating meaningful cautionary language to alert potential investors of the factors and risks which may impact the Company's ability to achieve the projected favorable results.  Specifically, the press release at issue cautions:

> Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated . . . for many reasons, such as: changes in

---

[69] *Technical Chems.*, 2000 WL 1222025 at *7; *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d at 1307;  *In re Med/Waste, Inc. Sec. Litig.*, 2000 WL 34241099 at *9.

[70] Compl. ¶ 93.

[71] 15 U.S.C. § 78u–5(c)(i)(1)(C), (D); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 804 (11th Cir. 1999) (holding that the statement "[r]eorders are expected to improve as customer inventories are depleted" constituted a forward-looking statement entitled to protection under the PSLRA's safe harbor); *In re Columbia Labs., Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1368 (S.D. Fla. 2001) (holding that statements touting "projected increased profits" were subject to the PSLRA's protection because they were "merely expressing optimism consistent with the PSLRA over the future profitability of their product . . . .").

general economic conditions and conditions in the financial market, changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release and in filings made with Securities Regulators. This is not an exhaustive list of the factors that may affect any of the Company's forward-looking statements.  These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements.[72]

To fall within the protection of the PSLRA, cautionary statements accompanying forward-looking statements must "identify important factors that could cause results to differ materially from those in the forward-looking statement."[73]  The cautionary language included by Liberty Silver is sufficient to warrant PSLRA protection because it clearly warns potential investors that the projected results depend on several factors.[74]

### (3) August 21, 2012 Liberty Silver Press Release Extending Sennen Takeover Offer

Lastly, Plaintiffs refer to a Liberty Silver press release issued on August 9, 2012, announcing an extension of the Sennen takeover offer.  In particular, the Complaint cites the following language for that press release;[75]

With the recent acquisition of the Hi Ho Properties, we have met yet another milestone.  As promised, we have added significant upside to our established resource, moved very close to fulfilling our earn-in requirements, and further de-risked the project.  We are now planning the best path towards re-starting production.

---

[72] Reed Decl., Ex. E.

[73] *Columbia Labs.,* 144 F. Supp. 2d at 1369 (quoting *Harris*, 182 F.3d at 803).

[74] *See, e.g.*, *Columbia Labs.*, 144 F.2d at 1369 ("The Court finds that the language accompanying these forward-looking statements qualify as meaningful cautionary language.  The disputed statements were consistently accompanied by language indicating that the product and projected results depended on the successful completion of UNAIDS study" which put plaintiffs "on notice of the particular risks of their investment.").

[75] Compl. ¶ 95.

Plaintiffs challenge this language as false and misleading, arguing that, "in light of Sennen's repeated and emphatic lack of interest in the proposed acquisition," the offer was "nothing more than another attempt to artificially pump up the price of Liberty Silver stock."[76] A takeover offer does not constitute a fraud simply because it is opposed by the target.  Plaintiffs have failed to specify any materially false or misleading elements of the press release as required by the PSLRA and Rule 9(b).[77]

Plaintiffs also appear to challenge Liberty Silver's August 9, 2012 press release by referring to an August 25, 2012 Sennen press release in which Rozier criticizes Liberty Silver's takeover offer as "a hostile, derogatory, and insulting one, which was utterly inadequate for shareholders."[78]  Again, Sennen's criticism of and subjective reaction to the takeover offer, *after the takeover offer was made*, does not identify any contemporaneous facts to contradict statements made by Liberty Silver in its takeover offer.[79]  The post-hoc critique of the press release fails to sustain Plaintiffs' burden to properly plead a false or misleading statement under the PSLRA.

Moreover, the language in question is forward-looking, stating that the Hi Ho property acquisition added "significant upside" and that Liberty Silver was "now planning the best path towards re-starting production."  Statements about "business prospects" and "management's plans and objectives for future operations" fall squarely within the PSLRA's safe harbor.[80]  This

---

[76] Compl. ¶ 95.

[77] *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

[78] Compl. ¶ 96.

[79] *In re Technical Chems. Sec. Litig.*, No. 98-7334, 2000 WL 1222025, at *7 (S.D. Fla. July 3, 2000) ("The PSLRA places the burden on Plaintiffs to plead specific facts supporting their allegation that a statement was *false or misleading when made*.") (emphasis in original); *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1307 (S.D. Fla. 2002); *In re Med/Waste, Inc. Sec. Litig.*, No. 99-cv-1684, 2000 WL 34241099, at *9 (S.D. Fla. Aug. 30, 2000).

[80] *See, e.g.*, *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enterprises, Inc.*, No. 10-Civ-61261, 2011 WL 4591541, at *15 (S.D. Fla. Sept. 30, 2011) (holding that statements involving defendants' "business prospects and expected financial results" were subject to the PSLRA's safe-harbor provisions); *Amalgamated Bank v. Coca-Cola Co.*, No. 5-cv-1226,

forward-looking language is accompanied by the requisite meaningful cautionary language, advising potential investors of the factors which may impact the Company's ability to achieve the anticipated favorable results.[81]  Shielded from potential liability as a forward-looking statement, this statement is not actionable as the predicate for a securities fraud claim.

### B.  Plaintiffs Do Not Sufficiently Allege Falsity or Scienter with Respect to Liberty Silver's Financial Disclosures.

Plaintiffs allege that the Liberty Silver Defendants made material omissions in two financial disclosures: a Form 10-Q dated February 14, 2012 and a Form 10-K dated September 28, 2012.  In both instances, Plaintiffs claim that Liberty Silver failed to disclose the Company's November 2011 private placement transaction with Look Back and Genovese as a related party transaction.  Plaintiffs further allege that the Form 10-K was misleading for failure to identify Genovese as a 5% or more beneficial owner.[82]

Plaintiffs' allegation of a fraudulent, material omission has a fatal flaw: Liberty Silver ***did disclose the relationship between Look Back, Genovese, and BG Capital in connection with the November 2011 private placement of Liberty Silver shares***.  In a Form 8-K, dated November 10, 2011, the Company attached the Subscription Agreement, Escrow Agreement, and Registration Rights Agreement with the SEC.[83]  The Subscription Agreement and the Registration Rights Agreement specifically identify the authorized signatory as "Robert

---

2006 WL 2818973, at *5 (N.D. Ga. Sept. 26, 2006) (holding that defendant's "optimistic characterizations of its work force, its strategy, its health, and its execution," fell within PSLRA's safe harbor, including statement that defendant was "confident" it would meet certain "realistic and achievable" financial targets); *In re Columbia Labs., Inc. Sec. Litig.*, 144 F. Supp. 2d at 1368-69 (holding that allegedly misleading statements were protected by the PSLRA's safe harbor because they "reflect Defendants' optimism and expectations about a future event" and "future profitability").

[81] *See, supra*, Section I (B)(2)(b).

[82] Compl. ¶¶ 86-88, 106-13.

[83] Reed Decl., Ex. U, Form 8-K filed by Liberty Silver on November 10, 2011.

Genovese" and indicate that the escrow funds would be coming from BG Capital Group.[84]  The Company's September 28, 2012 Form 10-K further disclosed the Look Back transaction, noting the $3.25 million investment, subscription at $0.50/share (i.e., 6.5 million shares), and option for additional warrants.[85]

Investors were thus fully informed about the exact number of shares that Look Back purchased and that the underlying purchaser was Genovese.[86]  Certainly, there can be no plausible allegation that the Liberty Silver Defendants acted intentionally or in a severely reckless manner by failing to disclose Genovese's involvement in the Look Back private placement transaction in the February 2012 Form 10-Q and the September 2012 Form 10-K when it is undisputed that the Company disclosed the material information in previous public filings with the SEC.

Plaintiffs make no specific allegation that the Liberty Silver Defendants knew that Genovese, BG Capital, or Outlook Investments held Company stock beyond the shares purchased in the November 2011 private placement.[87]  Other than saying generally that "Defendants knew of Genovese's interest in the Company," Plaintiffs nowhere specifically allege that the Liberty Silver Defendants knew of any other BG Capital or Outlook Investments holdings.  Plaintiffs' only particularized allegations were that the Liberty Silver Defendants knew

---

[84] Reed Decl. Ex. U (Subscription Agreement, Definition 1(c)).

[85] Reed Decl., Ex. U.

[86] *See Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (explaining the premise of the fraud-on-the-market theory, stating that "the market price of shares traded on well-developed markets reflects *all publicly available information*, and, hence, any material misrepresentations") (emphasis added) (quoting *Basic v. Levinson*, 485 U.S. 224, 246 (1988); *see also FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1309-10 (11th Cir. 2011) ("Because millions of shares chang[e] hands daily, and a critical mass of market makers study the available information and influence the stock price through trades and recommendations, an efficient capital market rapidly and efficiently digests *all available information* and translates that information into the processed form of a market price.") (internal quotation marks and citation omitted, and emphasis added).

[87] *See* Compl. ¶¶ 107, 109 (alleging specifically only that they knew about the Look Back Investments shares).

about the Look Back shares purchased in the private placements and that transaction was disclosed.[88]

Moreover, Plaintiffs' suggestion that Liberty Silver was reckless in not knowing about the BG Capital or Outlook Investment holdings is rebutted by the judicially noticeable facts.  Liberty Silver did its due diligence and as Plaintiffs allege, Genovese simply was not forthcoming. Annex B to the Registration Rights Agreement provides a Selling Security Holder Notice and Questionnaire that specifically asks whether the seller (*i.e.*, Look Back and/or Genovese) beneficially owns any additional securities.[89]  Genovese never made any such disclosure in response to the questionnaire or in the form of an SEC Form 13(d) filing.

Finally, there is no allegation that the Liberty Silver Defendants knew Genovese was a 5% or greater shareholder as of September 28, 2012.  Plaintiffs' only specific allegations are that the Liberty Silver Defendants knew of the Look Back shares and warrants, but Plaintiffs themselves allege that Genovese disposed of 6.6 million shares on September 20, 2012.[90] Plaintiffs' retrospective argument predicated on Genovese's disclosure of his Liberty Silver stock ownership on *December 27, 2012*, over a year after the private placement with Look Back, fails to satisfy the PSLRA's pleadings standards, which require plausible allegations that the challenged statements were false or misleading ***when made.***[91]  As the Complaint makes clear, Genovese hid the true extent of his beneficial ownership of Liberty Silver stock by acquiring the shares through several offshore investment vehicles, and only disclosed his ownership on

---

[88] Reed Decl., Ex. U, Form 8-K filed by Liberty Silver on November 10, 2011.

[89] Reed Decl., Ex. U (*see* Questions 3 and 5).

[90] Compl. ¶ 120.

[91] *In re Technical Chems. Sec. Litig.*, 2000 WL 1222025 at *7; *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d at 1307;  *In re Med/Waste, Inc. Sec. Litig.*, 2000 WL 34241099 at *9.

December 27, 2012, months after he had profited from manipulating the Company's stock price.[92]

### C.  The Liberty Silver Defendants are Not Responsible for the Alleged Misstatements of the Genovese Defendants

Plaintiffs attempt to hold the Liberty Silver Defendants liable for four allegedly false or misleading statements made by or at the direction of the Genovese Defendants.[93]  Without alleging that the Liberty Silver Defendants authorized or approved any of those statements, Plaintiffs nevertheless summarily attribute responsibility to the Liberty Silver Defendants. Plaintiffs argue that Browne and Tafuri, by virtue of their leadership positions within Liberty Silver, "were either culpably reckless, or were willing participants in Genovese's malicious scam involving Liberty Silver."[94]  This legal conclusion should not be accepted by the Court as true.[95]

Moreover, as the Supreme Court explained in *Janus Capital Grp., Inc. v. First Derivative Trader*, to be liable under Section 10(b) and Rule 10b-5(b) for a false or misleading statement, the defendant must have had "ultimate authority" over the statements at issue.  Without "ultimate control" over the statement, "including its content and whether and how to communicate it . . . a person or entity can merely suggest what to say, not 'make' a statement in its own right."[96]  Here, Plaintiffs do not allege any specific facts to support the notion that the Liberty Silver Defendants had ultimate control of the allegedly false or misleading statements made by or on behalf of the Genovese Defendants.  Plaintiffs' sole attempt to tie the Liberty Silver Defendants to the

---

[92] Compl. ¶¶ 4, 48 n.1, 50 n.2, 57, 59, 75, 80, 88.

[93] Compl. ¶¶ 86, 90, 93, 95, 106.

[94] Compl. ¶ 127.

[95] *See Lahtinen v. Liberty Int'l. Fin. Servs., Inc.*, No. 13-61766-CIV, 2014 WL 351999, at *3 (S.D. Fla. Jan. 31, 2014) (when evaluating a motion to dismiss, "[a] court should first ask whether the pleading properly asserts well-pleaded factual allegations or instead merely asserts legal conclusions that are not entitled to the assumption of truth.") (internal quotation marks omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[96] *Janus*, 131 S. Ct. at 2302 (holding that defendant, a mutual fund investment advisor, could not be liable under Section 10(b) for false statements made by a mutual fund in its prospectuses).

statements made by or on behalf of the Genovese Defendants is a cursory allegation that Browne
and Tafuri held leadership roles in Liberty Silver.  This allegation, even if accepted as true,
unquestionably fails to establish that Liberty Silver, Browne and Tafuri held "ultimate authority"
over the statements issued by or on behalf of the Genovese Defendants. [97]

> **(1)     *The Liberty Silver Defendants Had No Duty to Correct the Statements
> Made by or on Behalf of the Genovese Defendants***

Unable to attribute any material misstatement or omission to the Liberty Silver
Defendants, Plaintiffs attempt to argue that Liberty Silver had a duty to "warn its investors about
Genovese's fraudulent history" and to "countermand any of Genovese's ridiculous claims
regarding the Company or its future prospects."[98]  A duty to disclose only arises in two instances:
(1) "where a defendant's failure to speak would render the defendant's own prior speech
misleading or deceptive"; and (2) "where the law imposes special obligations, as for accountants,
brokers, or other experts, depending on the circumstances of the case."[99]  Neither is present here.
A corporation has no duty to correct statements made about it by a third party unless "the
officials of the company have, by their activity, made an implied representation that the
information they have reviewed is true or at least in accordance with the company's views."[100]

As discussed above, Plaintiffs fail to allege that the Liberty Silver Defendants approved
the statements made by or on behalf of the Genovese Defendants or made any implied

---

[97] 131 S. Ct. 2296, 2302 (2011). The Court's decision in *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014)
does not change this result.  The Complaint contains no allegations that the Liberty Silver Defendants drafted or
materially contributed to the reports of the third-party stock promoters or otherwise took actions to participate in a
fraudulent scheme.  Attendance at a dinner or conference is not sufficient to allege a fraudulent scheme by the
Liberty Silver Defendants and the stock promoters.

[98] Compl. ¶ 127.

[99] *Ziemba v. Cascade Int'l., Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001) (quoting *Rudolph v. Arthur Anderson & Co.*,
800 F.2d 1040, 1043 (11th Cir. 1986).

[100] *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980) (*superseded by statute on other grounds*)
(collecting cases) (affirming determination that no securities fraud was committed for failure to correct statements
made about the company in analyst reports and projections); *see also Instituto de Prevision Militar v. Merrill Lynch
& Co.*,  No. 05-cv-22721, 2007 WL 2900318, at *4 (S.D. Fla. Sept. 28, 2007) (holding that even where a company
affirmatively allows its name to be used in name and logo to be used, no duty to correct misrepresentations arises).

representation that the statements were true.  In fact, the Company expressly told investors not to rely on them.[101]  Accordingly, Plaintiffs' assertion that the Liberty Silver Defendants had a duty to "countermand" allegedly false or misleading statements made by or on behalf of Genovese, with which they had no involvement, lacks merit.[102]  The law has never required publicly traded companies to police all investment blogs, chatrooms, privately distributed newsletters, and the like.  The Supreme Court, in *Janus* explicitly rejected any such duty.  Finally, as soon as the Liberty Silver Defendants determined that the stock may have been manipulated, the Company issued a press release reminding investors to rely only on SEC filings and disclaiming any relationship with Genovese.[103]

> ### (2)   Plaintiffs Fail to Plausibly Allege that the Liberty Silver Defendants are Accountable for Genovese's Alleged Fraudulent Conduct Under a Theory of Scheme Liability

Although the bulk of Plaintiffs' Complaint addresses alleged misstatements or omissions made by the Genovese Defendants and the Liberty Silver Defendants, Plaintiffs appear to raise claims against the Liberty Silver Defendants under Rule 10b-5(a) and 10b-5(c) as well.  The sole reference to these provisions appears in a single paragraph of the Complaint which parrots the language of these provisions and lacks any corresponding factual allegations.  Plaintiffs' unsubstantiated reference to Rule 10b-5's scheme liability provisions in the context of a Complaint concentrated entirely on alleged misstatements or omissions, fails to state a claim.

---

[101]  *See* Reed Decl., Ex. Q, Form 8-K filed by Liberty Silver on Oct. 29, 2012.

[102]  *Ziemba*, 256 F.3d at 1206; *see also FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1298-99 (11th Cir. 2011) (holding that a duty to disclose arises where a subject is voluntarily raised and a disclosure is necessary to prevent the statement from being misleading); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007) (holding that defendant made a material omission by failing to disclose his "very recent personal bankruptcy (in 2000) [which] resulted from the failure of this business of which he was CEO" despite having touted his business experience).

[103]  Reed Decl., Ex. B.

Rule 10b-5(a) prohibits "any device, scheme or artifice to defraud."[104]  Similarly, Rule 10b-5(b) prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."[105]  Consistent with misstatement and omission claims under Rule 10b-5(b), scheme liability claims are subject to the same heightened pleading standards under Fed. R. Civ. P. 9(b).[106]  Securities fraud cases predicated on misstatements or omissions are not actionable as scheme liability claims under Rule 10b-5(a) and (c).[107]

Plaintiffs' allegations against the Liberty Silver Defendants focus entirely on alleged misstatements or omissions in press releases and SEC filings and the Liberty Silver Defendants' alleged failure to detect or warn investors about Genovese's "ridiculous claims".[108]  Accordingly, where "[t]he only scheme liability allegations . . . which arguably are *not* merely conclusory are those which incorporate allegations  . . . regarding the misrepresentations or omissions," Plaintiffs have failed to plausibly allege claims under Rule 10b-5(a) and (c) against the Liberty Silver Defendants.[109]

---

[104] 17 C.F.R. §240 10b-5(a).

[105] 17 C.F.R. §240 10b-5(c).

[106] *Zisholtz v. Suntrust Banks, Inc.*, No. 01:08-CV-1287, 2009 WL 3132907, *6 (N.D. Ga. Sept. 24, 2009) (dismissing Rule 10b-5(a) and (c) claims finding that "Plaintiffs allegations about manipulative auction practices do not meet the heightened pleading requirements applicable to securities fraud cases.").

[107] *See Public Pension Fund Grp. v. KV Pharmaceutical Co.,* 679 F.3d 972, 987 (8th Cir. 2012) (affirming dismissal of Rule 10b-5(a) and (c) claims where "[t]he only scheme liability allegations in the investors' complaint which arguably are *not* merely conclusory are those which incorporate the allegations regarding the misrepresentations or omissions"); *Lentell v. Merrill Lynch & Co.,*  396 F.3d 161, 177-78 (2d Cir. 2005) (holding that where the "sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made a market manipulation claim under Rule 10b-5(a) and (c)"); *S.E.C. v. Lucent Technologies, Inc.*, 610 F. Supp. 2d 342, 361 (D. N.J. 2009) (dismissing the SEC's Rule 10b-5(a) and (c) claims against all defendants where the "alleged deception" was "nothing more than a reiteration of the misrepresentations and omissions" underlying plaintiffs' 10b-5(b) claim.) (internal quotations and citation omitted); *In re Recoton Corp. Securities Litigation*, 358 F. Supp. 2d 1130, 1137 & n. 4 (M.D. Fla. 2005) (holding that plaintiffs allegation of liability under Rule 10b-5(a) and (c) failed to state a claim where "[p]laintiffs base their claims on alleged misrepresentations and omissions and make no attempt to cast the claims in terms of market manipulation Pursuant to Rule 10b-5(a) and (c).").

[108] Compl. ¶¶ 17, 86-88, 90-96, 106-113, 115, 116, 127.

[109] *Public Pension Fund Group v. KV Pharmaceutical Co.*, 679 F.3d 972, 987 (8th Cir. 2012)

Moreover, the Complaint's conclusory references to deceptive conduct fail to satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b).  Although Plaintiffs, relying on confidential witnesses, suggest that the Liberty Silver Defendants had communications with John Thomas Financial, Plaintiffs allege that these communications related to the Company's efforts to secure a "private placement so that the Company could monetize its mines."[110]  Plaintiffs do not contend that the Liberty Silver Defendants joined in Genovese's alleged deceptive scheme of "buying and selling massive blocks of Liberty Silver stock . . . using nominees and offshore companies to purchase stock on his behalf, all so that Genovese could make huge profits while leaving investors in financial ruin."[111]  Indeed, Plaintiffs make no allegation that any of the Liberty Silver Defendants bought or sold a single Liberty Silver share during the Class Period. Accordingly, absent any particularized allegation that the Liberty Silver Defendants utilized deceptive acts or engaged in a scheme to defraud, Plaintiffs 10b-5(a) and (c) claims lack merit.[112]

## IV. Plaintiffs Do Not Plead Sufficient Facts to Show that the Liberty Silver Defendants Made any Allegedly False or Misleading Statement with a Strong Inference of Scienter

To plead scienter as required for claims under Section 10(b) and Rule 10b-5, a plaintiff must "plead with particularity, facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements."[113]  The Eleventh Circuit has expressly rejected the idea that "allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish

---

[110] Compl. ¶¶ 73, 81, 136.

[111] Compl. ¶126.

[112] *See*, *Zisholtz v. Suntrust Banks, Inc.*, No. 01:08-CV-1287, 2009 WL 3132907, *6 (N.D. Ga. Sept. 24, 2009) (dismissing plaintiffs' Rule 10b-5(a) and (c) claims for failure to satisfy Fed. R. Civ. P. 9 (b)).

[113] *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010) (internal quotation marks and citation omitted).

scienter."[114]  Rather, "a securities fraud a plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner."[115]

Severe recklessness consists of "highly unreasonable omissions or misrepresentations" which represent "an extreme departure from the standards of ordinary care" and "present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it."[116]  Factual allegations will only give rise to a strong inference of scienter where the allegations are "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[117]

Plaintiffs' allegations concerning the Liberty Silver Defendants' mental states fall far short of the PSLRA's heightened pleading standard.  First, Plaintiffs levy the conclusory assertion that Browne and Tafuri "were either culpably reckless or were willing participants in Genovese's malicious scam"[118] because, through their roles as Chairman of the Board and Chief Executive Officer, and President and Chief Operating Officer respectively, they could have discovered the scheme "[t]hrough any investigation whatsoever into the nature of Genovese's involvement with Liberty Silver . . . and previous companies."[119]  Attempts to establish scienter simply by alleging that the Browne and Tafuri "must have known" certain facts because of their roles as corporate executives "does not pass muster under the PSLRA."[120]

---

[114] *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir. 1999).

[115] *Id.* at 1287.

[116] *Id.* at 1282 n.18.

[117] *Mizzaro, v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

[118] Compl. ¶ 127.

[119] Compl. ¶ 138.

[120] *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1324 (M.D. Fla. 2002) (holding that an allegation that defendant "must have known" of certain information because he held the CEO position "does not pass muster under the PSLRA"); *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001) (holding that applicable law "unambiguously foreclose[s] plaintiffs' efforts to impose 10b-5 liability on defendants for failing to recognize" what

Moreover, Plaintiffs' allegations that Browne and Tafuri were "willing participants"[121] in Genovese's scam and "worked alongside Genovese in promoting Liberty Silver stock" in order to "entice potential investors to participate in a private placement before the end of 2012 to allow the Company to fund its mining activities"[122] are unsupported by any particularized factual allegations and are insufficient to establish scienter in satisfaction of the PSLRA.  Allegations of fraudulent intent predicated on general financial incentives are insufficient to establish scienter.[123]

Nor have Plaintiffs alleged that Browne or Tafuri sold any of their Liberty Silver shares to create a plausible inference that they shared Genovese's motive.[124]  Rather, Plaintiffs allege that Genovese was the mastermind and beneficiary of the scheme, asserting that he bought and sold "massive blocks of Liberty Silver stock, fabricated newsletters and false and misleading reports . . . all so that [he] could make huge profits while leaving investors in financial ruin."[125] He further alleges that Genovese hid his illicit fraud "by using nominee entities and operating offshore brokerage and bank accounts in Canada, the Turks and Caicos Islands, and elsewhere."[126]  Certainly the Liberty Silver Defendants cannot be considered severely reckless

---

"plaintiffs, in hindsight, see as red flags" because allegations that defendants "should have known" that statements were false or misleading are insufficient to plead recklessness under 10b-5).

[121] Compl. ¶ 127.

[122] Comp. ¶ 136.

[123] *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enterprises, Inc.*, No. 10-Civ-61261, 2011 WL 4591541 (S.D. Fla. Sept. 30, 2011) (holding that "financial incentive to present [defendant's] business prospects in a positive light . . . does not establish a strong inference of actual fraud"); *see also, Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634-35 (11th Cir. 2010) (holding that the alleged motive of intent "to mislead the public regarding the company's worth" is insufficient to establish scienter).

[124] *See Phila. Fin. Mgmt.*, 2011 WL 4591541 (S.D. Fla. Sept. 30, 2011) (finding that plaintiffs failed to adequately plead scienter where "Plaintiffs do not allege that [defendant] attempted to sell any part of [his] interest while he was allegedly concealing the downturn in foreclosure rentals."); *see also, Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (holding that the omission of any allegations of suspicious stock transactions by management weighs against inferring scienter).

[125] Compl. ¶ 126.

[126] Compl. ¶ 4.

when, by Plaintiffs' own allegation, Genovese's actions were actively and intentionally hidden from sight.

Rule 9(b) requires that Plaintiffs allege "what the defendants obtained as a consequence of the fraud"—here, Plaintiffs have alleged no benefit to Browne, Tafuri, or Liberty Silver.[127] The Liberty Silver Defendants did not sell a single share of stock during the alleged pump. Rather, the longtime officers of Liberty Silver were left cleaning up collateral damage from the alleged dump, with the stock trading suspension and subsequent market turmoil. The common sense analysis required by *Iqbal* demands dismissal for failure to plead scienter.[128]

### A. The Claims against Mr. Browne Must be Dismissed because They Contain No Particularized Allegations to Demonstrate Fraud

Plaintiffs' allegations against Mr. Browne are simple: "Browne was the Chairman of the Board and CEO of Liberty Silver."[129]  By virtue of his position, Plaintiffs claim that he should have done an investigation and "should have been able to prevent the fraudulent and manipulative acts from taking place."[130]  The only particularized allegations are that Browne once attended a conference and a dinner where Genovese was in attendance.[131]  None of these allegations amount to intentional or reckless fraud.

Plaintiffs also fail to identify any cognizable motive for the alleged fraud against Mr. Browne.  Their claims that Mr. Browne defrauded shareholders to permit Liberty Silver to successfully complete a private placement have all been squarely and repeatedly rejected by the Eleventh Circuit as inadequate to plead scienter.[132]   What is pertinent, however, is the fact that

---

[127] *Mizzaro*, 544 F.3d at 1237 (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).

[128] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[129] Compl. ¶ 138.

[130] Compl. ¶ 138.

[131] Compl. ¶ 71.

[132] *See FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1309-10 (11th Cir. 2011) (affirming determination that alleged motive "to meet Wall Street's revenue expectations" was insufficient to establish scienter); *Thompson v.*

Mr. Browne never sold a single share of Liberty Silver stock during the alleged class period—a scenario numerous courts have recognized indicates the absence of fraudulent intent.[133]

## V.   Plaintiffs Cannot Plead a Causal Connection between the Alleged Misstatements and the Claimed Loss

Under Section 10(b), liability is precluded if the plaintiff fails to plead the causal connection between the alleged misrepresentation and the loss.[134]   Here, the misstatements allegedly made by Liberty Silver are not connected to any loss.  The July 16, 2012 and August 21, 2012 press releases regarding the tender offer for Sennen Resources are not tied to any loss—Plaintiffs do not allege that Liberty Silver's stock price declined when the tender offer expired.[135]

The alleged omissions in Liberty Silver's February 12, 2012 10-Q and September 28, 2012 10-K could not have caused any losses where the allegedly omitted information was predicated upon Genovese's failures to disclose the extent of his beneficial ownership of Liberty Silver shares.

The only remaining statement is the August 8, 2012 press release regarding the Hi Ho acquisition.[136]   Plaintiffs do not connect this statement with any corrective disclosure.  Indeed, Plaintiffs' Complaint alleges that the stock decline occurred for other reasons, including

---

*RelationServe Media, Inc.*, 610 F.3d 628, 688-89 (11th Cir. 2010) ("It stands to reason, of course, that a company's offices and directors have a motive to commit securities fraud.  But that could be said of any public company's officers and directors, which is why the precedent of this circuit squarely forecloses any argument that stand-alone allegations of 'motive and opportunity' will satisfy the PSLRA's standard." (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285-86 (11th Cir. 1999)).

[133] *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 688-89 (11th Cir. 2010) (finding scienter allegations to be conclusory where "Jacoby never alleged that any officer or director defendant sold Media stock during the class period, or did anything else that would support the motive and opportunity theory."); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (holding that the omission of any allegations of suspicious stock transactions by management weighs against inferring scienter); *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enterprises, Inc.*, No. 10-Civ-61261, 2011 WL 4591541, at *17 (S.D. Fla. Sept. 30, 2011) (finding that plaintiffs failed to adequately plead scienter where "Plaintiffs do not allege that [defendant] attempted to sell any part of [his] interest while he was allegedly concealing the downturn in foreclosure rentals.").

[134] *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

[135] Reed Decl., Ex. K.

[136] Compl. ¶ 93.

Genovese's alleged market manipulation.[137]  These claims should be dismissed because Liberty Silver's alleged misstatements could not have caused Plaintiffs' losses.

## VI.    Plaintiffs' Section 20(a) Claim Against the Liberty Silver Defendants Fails to State a Claim

Absent any particularized allegations to assert that the Liberty Silver Defendants were even aware of Genovese's alleged fraudulent conduct, Plaintiffs' attempt to hold Browne and Tafuri liable for Genovese's "malicious scam"[138] as controls persons under Section 20(a) of the 1934 Securities Exchange Act lacks merit.

Section 20(a) "is not a freestanding claim, but rather a means of imposing liability" on an entity or individual who controls "the person who actually commits a securities law violation."[139] A primary violation of the securities laws is an essential element of a § 20(a) derivative claim.[140] Accordingly, where plaintiff has failed to sufficiently plead a primary violation of the securities laws, the derivative controlling person liability claim under § 20(a) must also fail.[141]  To state a claim under § 20(a), a plaintiff must allege: (1) a primary violation of the securities laws; (2) that the defendant had the power to control the general business affairs of the primary violator; and (3) that the defendant had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability.[142]

---

[137] Compl. ¶¶ 139-140.

[138] Compl. ¶ 127.

[139] *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010) (quoting *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008).

[140] *Id.* at 635-36 (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)).

[141] *Id.* at 636; *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enterprises, Inc.*, No. 10-cv-61261, 2011 WL 4591541 (S.D. Fla. Sept. 30, 2011) (dismissing Section 20(a) claims for failure to adequately plead a primary securities fraud claim under Section 10(b) and Rule 10b-5); *In re Saf T Lok, Inc. Sec. Litig.*, No. 02-cv-80252 (KLR), 2003 WL 22383607, at *6 (S.D. Fla. July 3, 2003) ("Because Plaintiffs have failed to adequately plead a section 10(b) violation, the section 20(a) controlling person claim necessarily fails and will be dismissed.").

[142] *Phila. Fin. Mgmt.,* 2011 WL 4591541, at *10, *17 n.18; *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996).

Under this standard, Plaintiffs' claim of controlling person liability against Browne and Tafuri under Section 20(a) is patently insufficient. Plaintiffs contend that Browne and Tafuri may be held liable as controlling persons because they "participated in the operation and management of Liberty Silver, and participated, directly and indirectly, in the conduct of Liberty Silver's business affairs" and because they "knew of, and participated in, schemes to artificially inflate the value of Liberty Silver stock."[143] However, for the reasons discussed above, Plaintiffs have failed to allege that Liberty Silver committed a primary violation of Section 10 (b) and Rule 10b-5. Moreover, Plaintiffs admit that Genovese was the primary fraud violator[144] and have failed to allege *any* control by the Liberty Silver Defendants over the Genovese Defendants. Accordingly, even if all of Plaintiffs' allegations are accepted as true, Plaintiffs have simply failed to allege even a speculative claim that Browne and Tafuri had the power to control the general business affairs and the specific corporate policies of Genovese and his affiliated entities.[145]

## CONCLUSION

For the foregoing reasons, the Liberty Silver Defendants respectfully request that this Court dismiss Plaintiffs' claims against them with prejudice. Dismissal with prejudice is warranted where, as here, leave to amend would be futile given Plaintiffs' failure to satisfy the

---

[143] Compl. ¶ 152.

[144] Compl. ¶ 126 ("In summary, Genovese employed the use of buying and selling massive blocks of Liberty Silver stock, fabricated newsletters, and false and misleading reports, using nominees and offshore companies to purchase stock on his behalf, all so that Genovese could make huge profits while leaving investors in financial ruin."; ¶ 152 ("Genovese concocted and directed the market manipulation scheme").

[145] *See, e.g. Theoharous v. Fong*, 256 F.3d 1219, 1227-28 (11th Cir. 2001) *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) (dismissing 20(a) claim because plaintiffs did not plead facts "to establish that [defendant] had the power to control the general business affairs of [the Company], nor that [defendant] had the power to control or influence the 'specific corporate policy which resulted in' the alleged misconduct."); *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 691-92 (11th Cir. 2010) (holding that plaintiffs "§20(a) control-person claims are frivolous beyond doubt" where, "some of the defendants never even worked for [the alleged primary violator]; therefore, absent extraordinary facts not alleged here, they could not conceivably have had the power to control either [the primary violator's] "general affairs" or to direct specific "corporate policy" resulting in the primary liability").

requisite pleading standards despite several amendments[146] and leave to amend "would frustrate

the purpose of the PSLRA by prolonging a non-meritorious securities fraud action" against the

Liberty Silver Defendants.[147]

Dated: October 6, 2014                    Respectfully submitted,

                                  The PGD LAW FIRM LLC

                                        */s/ Patrick Dempsey*

                                  Patrick Dempsey
                                  Florida Bar No. 27676
                                  THE PGD LAW FIRM LLC
                                  Southeast Financial Center, Suite 2790
                                  200 South Biscayne Boulevard
                                  Miami, Florida 33131
                                  Telephone: (305) 549-8601
                                  Facsimile: (305) 440-4051
                                  Email:  dempsey@pgdlawfirm.com

                                  *Counsel for Liberty Silver, Geoffrey Browne,*
                                  *and William Tafuri*

PETRILLO KLEIN & BOXER               AKIN GUMP STRAUSS HAUER & FELD

      */s/ Guy Petrillo*                     */s/ Michelle A. Reed*
Guy Petrillo   (pro hac vice)             Michelle A. Reed (pro hac vice)
655 Third Avenue, 22nd Floor          1700 Pacific Avenue, Suite 4100
New York, New York                 Dallas, Texas 75201-4624
Telephone: (212) 370-0331          Telephone: (214) 969-2800
Facsimile: (212) 370-0391           Facsimile: (214) 969-4343
Email: gpetrillo@pkbllp.com         Email: mreed@akingump.com

*Counsel for William Tafuri*

---

[146] *Fidel v. Rampell*, No. 02-cv-61258, 2005 WL 5587454, at *8 (S.D. Fla. Mar. 29, 2005) (dismissing securities fraud complaint with prejudice where, "[b]ased on Plaintiffs repeated amendments to the Complaint without success, the Court finds that any future amendments to the Complaint would be futile"); *In re Sawtek, Inc. Sec. Litig.*, No. 03-cv-00294, 2005 WL 2465041, at *13-14 (M.D. Fla. Oct. 6, 2005) (dismissing securities class action with prejudice where leave to amend would be futile "in light of the Court's determination that the allegedly false and misleading statements are protected by the [PSLRA's] safe harbor").

[147] *In re Mirant Corp. Sec. Litig.*, No. 1:02-CV-1467, 2009 WL 48188, at *27 (N.D. Ga. Jan. 7, 2009) (dismissing securities class action lawsuit with prejudice).

Robert H. Hotz, Jr. (pro hac vice)
Jennifer C. Hildebrand (pro hac vice)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1028
Facsimile: (212) 872-1002
Email: rhotz@akingump.com
Email: jhildebrand@akingump.com

*Counsel for Liberty Silver and Geoffrey Browne*