# Exhibit J

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K/A

[ X ] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the Fiscal Year Ended June 30, 2010

[] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

# LIBERTY SILVER CORP.

(Exact name of registrant as specified in its charter)

| Nevada | 333-150028 | 32-0196442 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**675 Sierra Rose Drive, Suite 112
Reno, NV 89511**
(Address of principal executive offices)
Registrant's telephone number, including area code: **775-622-0327**

Securities registered under Section 12(b) of the Exchange Act:    None
Securities registered under Section 12(g) of the Exchange Act:    None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act [] Yes [X] No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the [ ]Yes [X] No

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. [X] Yes [ ] No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Not Applicable.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and smaller reporting company" in Rule 12b-2 of the Exchange Act.

1

Large accelerated filer [ ]                                                              Accelerated filer [ ]
Non-accelerated filer [ ]  (Do not check if a smaller reporting company)    Smaller reporting company [ X ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). [ ] Yes  [X ] No

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of the last business day of the registrant's most recently completed second fiscal quarter $0.00.

As of October 1, 2010, the Company had 69,733,334 shares issued and outstanding.

2

**EXPLANATORY NOTE:**

Liberty Silver Corp. is filing this Amendment No. 1 on Form 10-K/A (this "Amendment") to its annual report on Form 10-K, which was filed with the Securities and Exchange Commission on October 13, 2010 (the "Original Filing") to: i) revise disclosures under Item 1 - Economic Geology; ii) to include a small scale map under Item 2; and iii) update the information contained in Item 9A Controls and Procedures; specifically, to include information required by Item 307 of Regulation S-K regarding Liberty Silver Corp.'s disclosure controls and procedures.

Pursuant to the rules of the SEC, Item 15 of Part IV of the Original Filing has been amended to contain currently-dated certifications from our principal executive officer and principal financial officer, as required by Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. The certifications of our principal executive officer and our principal financial officer are attached to this form 10-K/A as Exhibits 31.1, 31.2, 32.1 and 32.2.

Except as described above, no other changes have been made to the Original Filing. Except as described above, this Amendment No. 1 on Form 10-K/A does not reflect events occurring after the filing of the Original Filing or modify or update those disclosures, including any exhibits to the Original Filing affected by subsequent events. Information not affected by the changes described above is unchanged and reflects the disclosures made at the time of the Original Filing.  Accordingly, this Amendment No. 1 on Form 10-K/A should be read in conjunction with our filings made with the Securities and Exchange Commission subsequent to the filing of the Original Filing, including any amendments to those filings.

PART I

**ITEM 1.        BUSINESS**

**Corporate History**

Liberty Silver Corp. ( "We", "Us", the "Company", or the "Registrant") was incorporated on February 20, 2007 under the laws of the state of Nevada under the name Lincoln Mining Corp. We were incorporated for the purpose of engaging in mineral exploration activities, and on May 24, 2007, purchased the Zone Lode mining claim located in Elko County, Nevada, for a purchase price of $10,000.  Our objective was to conduct mineral exploration activities on the Zone Lode claim to assess whether it contained economic reserves of copper, gold, silver, molybdenum or zinc.  We were not able to determine whether this property contained reserves that were economically recoverable and have ceased our attempts at developing this property.

As disclosed on a Form 8-K filed by the Company on April 5, 2010, on March 29, 2010, the Company entered into an Exploration Earn-In Agreement relating to the Trinity Silver property located in Pershing County, Nevada (the "Property"); a copy of the Agreement was filed as an exhibit to the Form 8-K filed by the Company on April 5, 2010 and is hereby incorporated by reference.

The Property consists of a total of approximately 5,800 acres, including 5,040 acres of fee land and 59 unpatented mining claims.  Under the Agreement, the Registrant may earn-in a 70% undivided interest in the Property during a 6-year period in consideration of (1) a signing payment of $25,000, which has been made, (2) an expenditure of a cumulative total of $5,000,000 in exploration and development expenses on the Property by March 29, 2016, including a minimum of $500,000 which must be expended within one year from the effective date of the Agreement, and (3) completion of a bankable feasibility study on the Property on or before the 7th anniversary date of the Agreement.  Our business operations are currently

on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet site that will contain copies of the reports we file electronically. The address for the SEC Internet site is http://www.sec.gov.

**ITEM 1A.    RISK FACTORS**

AN INVESTMENT IN OUR COMMON STOCK IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. YOU SHOULD CAREFULLY CONSIDER THE FOLLOWING RISK FACTORS IN EVALUATING OUR BUSINESS BEFORE PURCHASING ANY OF OUR SHARES OF COMMON STOCK. NO PURCHASE OF OUR COMMON STOCK SHOULD BE MADE BY ANY PERSON WHO IS NOT IN A POSITION TO LOSE THE ENTIRE AMOUNT OF HIS INVESTMENT. THE ORDER OF THE FOLLOWING RISK FACTORS IS PRESENTED ARBITRARILY. YOU SHOULD NOT CONCLUDE THE SIGNIFICANCE OF A RISK FACTOR BECAUSE OF THE ORDER OF PRESENTATION. OUR BUSINESS AND OPERATIONS COULD BE SERIOUSLY HARMED AS A RESULT OF THESE RISKS.

**Risks Related to Our Business**

*Our property is in the exploration and development stage. There is substantial risk that no commercially exploitable minerals will be found and that funds we expend on exploration and development will be lost.  If we do not discover any mineral resource in a commercially exploitable quantity, our business could fail.*

Exploration for minerals is a speculative venture involving substantial risk.  New mineral exploration companies encounter difficulties, and there is a high rate of failure of such enterprises.  The expenditures we may make in the exploration of the mineral concessions may not result in the discovery of commercial quantities of ore. The likelihood of success must be considered in light of the problems, expenses, difficulties, complications and delays encountered in connection with the exploration of the mineral properties that we plan to undertake. These potential problems include, but are not limited to, unanticipated problems relating to exploration, additional costs and expenses that may exceed current estimates, unusual or unexpected mineral formations, and other geological conditions.  If we find mineral reserves which we decide to extract, of which there is no guarantee, we may face additional problems, expenses, difficulties and complications which make mining the ore unprofitable. If we encounter any or all of these unanticipated problems, we may be unable to successfully put our Property into production.

*Because we may never earn revenues from our operations, our business may fail and cause investors to lose their entire investment in our company.*

We have no history of revenues from operations. We have yet to generate positive earnings and there can be no assurance that we will ever operate profitably. Our company has a limited operating history and is in the exploration and development stage. The success of our company is significantly dependent on the uncertain events of the discovery and exploitation of mineral reserves on our properties or selling the rights to exploit those mineral reserves. If our business plan is not successful and we are not able to operate profitably, then our stock may become worthless and investors may lose all of their investment in our company. Prior to completion of our exploration stage, we anticipate that we will incur increased operating expenses without realizing any revenues. We therefore expect to incur significant losses into the foreseeable future. We recognize that if we are unable to generate significant revenues from the exploration of our mineral claims in the future, we will not be able to earn profits or continue operations. There is no history upon which to base any assumption as to the likelihood that we will prove successful, and we can provide no assurance that we will generate any revenues or ever achieve profitability. If we are unsuccessful in addressing these

risks, our business will fail and investors may lose all of their investment in our company.

***Mineral operations are subject to applicable law and government regulation. Even if we discover a mineral resource in a commercially exploitable quantity, these laws and regulations could restrict or prohibit the exploitation of that mineral resource. If we cannot exploit any mineral resource that we might discover on our properties, our business may fail.***

Both mineral exploration and extraction require permits from various federal, state, and local governmental authorities and are governed by laws and regulations, including those with respect to prospecting, mine development, mineral production, transport, export, taxation, labor standards, occupational health, waste disposal, toxic substances, land use, environmental protection, mine safety and other matters. There can be no assurance that we will be able to obtain or maintain any of the permits required for the continued exploration of our mineral properties or for the construction and operation of a mine on our properties at economically viable costs. If we cannot accomplish these objectives, our business could fail.  We believe that we are in compliance with all material laws and regulations that currently apply to our activities but there can be no assurance that we can continue to remain in compliance. Current laws and regulations could be amended and we might not be able to comply with them, as amended. Further, there can be no assurance that we will be able to obtain or maintain all permits necessary for our future operations, or that we will be able to obtain them on reasonable terms. To the extent such approvals are required and are not obtained, we may be delayed or prohibited from proceeding with planned exploration or development of our mineral properties.

***Our success is dependent on retaining key personnel and on hiring and retaining additional personnel.  If we fail to retain our key personnel, we may have to cease operations.***

Our ability to continue to explore and develop our mineral concessions, if warranted, is, in large part, dependent upon our ability to attract and maintain qualified key personnel. There is competition for such personnel, and there can be no assurance that we will be able to attract and retain them. We may not be able to find qualified geologists and mining engineers on a timely basis or at all to pursue our business plan.  Furthermore, if we are able to find qualified employees, the cost to hire them may be too great because there may be other companies that pay at a higher rate than we are able to pay.  Our progress now and in the future will depend on the efforts of key management figures, such as William Tafuri, our President and Chief Operating Officer, and on our ability to hire additional key personnel as needed in the future to continue to explore and develop our mineral concessions and pursue our business plan.  The loss of current key personnel or our inability to hire additional key personnel in the future could have a material adverse effect on our business and could require us to cease operations or to cause our business to fail.

***As we undertake exploration of our mineral claims, we will be subject to compliance with government regulation that may increase the anticipated cost of our exploration program.***

There are several governmental regulations that materially restrict mineral exploration. We will be subject to the federal regulations (environmental, Bureau of Land Management) and the laws of the State of Nevada as we carry out our exploration program. We may be required to obtain additional work permits, post bonds and perform remediation work for any physical disturbance to the land in order to comply with these laws. While our planned exploration program budgets for regulatory compliance, there is a risk that new regulations could increase our costs of doing business and prevent us from carrying out our exploration program.

***We will need additional financing to execute our business plan, which additional financing may not be available on reasonable terms or at all.***

Our current working capital is not sufficient to fund our planned operations and exploration activities for the next year. Our operating budget for the next twelve months is currently approximately $1.65 million, and our currently available working capital is only approximately $1,000,000. Accordingly, we will require additional working capital to sustain our planned business operations and to carry out our planned exploration activities. We do not currently have any commitments to provide such funds, and there is no assurance that we will be able to obtain the required financing when needed to sustain our operations. In addition, if we do discover mineral resources in commercially exploitable quantities on our current property, or on any other property we may acquire in the future, we will be required to expend substantial sums of money to establish the extent of the resource, develop processes to extract it and develop extraction and processing facilities and infrastructure. Although we may derive substantial benefits from the discovery of a major deposit, if we cannot raise the necessary capital to exploit such a deposit, our business may fail.

*Mineral exploration and development is subject to extraordinary operating risks. We do not currently insure against these risks. In the event of a cave-in or similar occurrence, our liability may exceed our resources, which would have an adverse impact on our company.*

Mineral exploration, development and production involve many risks. Our operations will be subject to all the hazards and risks inherent in the exploration for mineral resources and, if we discover a mineral resource in commercially exploitable quantity, our operations could be subject to all of the hazards and risks inherent in the development and production of resources, including liability for pollution, cave-ins or similar hazards against which we cannot insure or against which we may elect not to insure. Any such event could result in work stoppages and damage to property, including damage to the environment. As we do not have any current exploration, development or production activities, we do not currently maintain insurance coverage against these operating hazards. The payment of any liabilities that arise from any such occurrence would have a material adverse impact on our company.

*Silver prices are highly volatile. If a profitable market does not exist, we may have to cease operations.*

Silver prices have been highly volatile, and are affected by numerous international economic and political factors over which we have no control. Our company's long-term success is highly dependent upon the price of silver, as the economic feasibility of any ore body discovered on our current property, or on other properties we may acquire in the future, would, in large part, be determined by the prevailing market price of silver. If a profitable market does not exist, we may have to cease operations.

*The silver exploration and mining industry is highly competitive.*

The silver industry is highly competitive, and we are required to compete with other corporations that may have greater resources than ours. Such corporations could outbid us for potential projects or produce minerals at lower costs which would have a negative effect on our operations.

**Risks Relating to the Common Stock**

*The Company's common stock is currently approved for trading on the OTC Bulletin Board, but the Company cannot ensure that a liquid trading market for its shares will be sustained.*

The Company's common stock is currently approved for quotation on the OTC Bulletin Board under the symbol LBSV.OB. The Company cannot ensure that any level of trading activity will be sustained or that, if sustained, that it constitutes a liquid trading market which allows persons who purchase the Company's

9

common stock to promptly liquidate their investment at any time. Persons who purchase the Company's common stock may have difficulty liquidating their investment because of the lack of a market or the difficulty in maintaining a market for such shares.

*Potential future sales under Rule 144 may depress the market price for the common stock.*

In general, under Rule 144, a person who has satisfied a minimum holding period of between 6 months and one-year and any other applicable requirements of Rule 144, may thereafter sell such shares publicly. The possible future sale of our shares by the Company's existing shareholders, pursuant to and in accordance with the provisions of Rule 144, may have a depressive effect on the price of our common stock in the over-the-counter market.

*The Company's common stock is currently deemed a "penny stock", which may make it more difficult for investors to sell their shares.*

The Company's common stock is currently subject to the "penny stock" rules adopted under section 15(g) of the Exchange Act. The penny stock rules apply generally to companies whose common stock is not listed on a national securities exchange and trades at less than $5.00 per share. These rules require, among other things, that brokers who trade penny stock to persons other than "established customers" complete certain documentation, make suitability inquiries of investors and provide investors with certain information concerning trading in the security, including a risk disclosure document and quote information under certain circumstances. Many brokers have decided not to trade penny stocks because of the requirements of the penny stock rules and, as a result, the number of broker-dealers willing to act as market makers in such securities is limited. As long as the Company's shares continue to remain subject to the penny stock rules, it could have an adverse effect on the market for the Company's shares, and investors could find it more difficult to dispose of the Company's shares.

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

Not Applicable.

**ITEM 2.     PROPERTIES.**

Property location

The Registrant leases office space at 675 Sierra Rose Drive, Suite 112, Reno, Nevada 89511. It's telephone number is: 775-622-0327.

The Trinity silver mine is situated approximately 25 road miles north-northwest of Lovelock, Nevada, in Pershing County, Nevada, on the northwest flank of the Trinity Range, in the Trinity mining district. It is located about 25 mi northwest of the Rochester silver mine, one of the largest silver mines in the United States. The latitude-longitude coordinates of the mine site are $40^{o}$ 23' 47" N, $118^{o}$ 36' 38" W; it is situated in sections 3, 4, 5, 9, 10, 11, 15, 16, and 17, Township 29 North, Range 30 East, MDB&M and sections 27, 33, and 35, Township 30 North, Range 30 East, MDB&M.

Land; Land Status; Property Rights; Licensing

The Trinity silver mine property includes located public and leased/subleased fee land consisting of the following:

**SIGNATURES**

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.


By: /s/ John Pulos
      John Pulos, Chief Financial Officer

Date:  April 14, 2011

In accordance with Section 13 or 15(d) of the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

By: /s/ Geoff Browne
      Geoff Browne, Director

Date:  April 14, 2011


By: /s/ Bill Tafuri
      Bill Tafuri, Director

Date:  April 14, 2011

By: /s/ John Pulos
      John Pulos, Director

Date:  April 14, 2011


By: /s/ John Barrington
      John Barrington, Director

Date:  April 14, 2011

By: /s/ Tom Hodgson
      Tom Hodgson, Director

Date:  April 14, 2011

Exhibit 31.1

**CERTIFICATION**

I, Geoff Browne, certify that:

1. I have reviewed this amended annual report on Form 10-K/A of Liberty Silver Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a+15(e) and 15d+15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a+15(f) and 15d+15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 14, 2011     /s/ Geoff Browne
                        Principal Executive Officer

<u>Exhibit 31.2</u>

## CERTIFICATION

I, John Pulos, certify that:

1. I have reviewed this amended annual report on Form 10-K/A of Liberty Silver Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a+15(e) and 15d+15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a+15(f) and 15d+15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: Date: April 14, 2011     <u>/s/ John Pulos</u>
                               <u>Chief Financial Officer</u>

Exhibit 32.1

**Certification of the Principal Executive Officer
Pursuant to 18 U.S.C. Section 1350,
As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the amended annual report of Liberty Silver Corp. (the "Company") on Form 10-K/A for the fiscal year ended June 30, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Geoff Browne, the Chief Executive Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Geoff Browne
Chief Executive Officer

Date: Date: April 14, 2011

<u>Exhibit 32.2</u>

**Certification of the Principal Accounting Officer**
**Pursuant to 18 U.S.C. Section 1350,**
**As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the amended annual report of Liberty Silver Corp. (the "Company") on Form 10-K/A for the fiscal year ended June 30, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), John Pulos, the Chief Financial Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

<u>/s/ John Pulos</u>
Chief Financial Officer

Date: Date: April 14, 2011