# Exhibit O

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C.

**FORM 8-K**

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Event: October 15, 2012

# LIBERTY SILVER CORP.

(Exact name of registrant as specified in its charter)

| **Nevada** | **333-150028** | **32-0196442** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**181 Bay Street, Suite 2330**
**Brookfield Place, P.O. Box 848**
**Toronto, Ontario, Canada, M5J 2T3**
(Address of Principal Executive Office)

Registrant's telephone number, including area code: **888-749-4916**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ]     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ]     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ]     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ]     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

- 1 -

# Exhibit O

**ITEM 1.01 ENTRY INTO MATERIAL DEFINITIVE AGREEMENT**

On October 15, 2012, Liberty Silver Corp., a Nevada corporation (the "Company") entered a Purchase Agreement (the "Purchase Agreement") with Primus Resources, L.C., a Wyoming limited liability company, and James A. Freeman (collectively "Seller") to acquire unpatented mining claims, Nevada BLM Serial No. 799907, 799908, 799909, 799910, and 799911 covering approximately 100 acres of property located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada (the "Hi Ho Properties").

**ITEM 2.01 COMPLETION OF ACQUISITION OR DISPOSITION OF ASSETS**

On October 15, 2012, the Company closed the transaction contemplated by the Purchase Agreement and acquired the Hi Ho Properties from the Seller. The Hi Ho Properties are the only acreage not controlled by the Company or its joint venture partner Renaissance Gold Inc. on the Trinity land package. Under the terms of the Purchase Agreement, the Company provided cash consideration of US$250,000 and issued 2,583,333 restricted shares of common stock of the Company to Seller at a deemed value of US $1,860,000 (US $0.72 per share). In addition the Seller was granted a 2% net smelter royalty on future production from the Hi Ho Properties pursuant to the terms of a Deed With Reservation of Royalty Hi Ho Silver Claims (the "Deed"), attached to the Purchase Agreement as Exhibit B.

In conjunction with the entry into the Purchase Agreement, the Company entered into a Registration Rights Agreement (the "Registration Rights Agreement") with Seller, pursuant to which the Company has agreed to file a registration statement on Form S-1 with the United States Securities and Exchange Commission which registers the common stock issued to the Seller pursuant to the Purchase Agreement.   Pursuant to the Registration Rights Agreement the Company will pay Seller additional consideration as follows:

- if the registration statement is declared effective by the United States Securities and Exchange Commission in respect of the 2,583,333 shares by March 1, 2013, the Company will issue an additional 277,778 common shares to Seller, thereby increasing the total aggregate number of shares issued to  2,861,111 at a deemed value of US$2,060,000 (US $0.72 per share); or

- if the registration statement is not declared effective by the United States Securities and Exchange Commission in respect of the 2,583,333 shares by March 1, 2013, the Company will pay Seller US$200,000. As well, if the five-day weighted average trading price of the Company's common shares on the Toronto Stock Exchange as of March 1, 2013 (the "Market Price") exceeds US$0.72 per share, the Company will issue an additional number of the Company's common shares to Seller equal to (a) 277,778 less (b) US$200,000 divided by the Market Price.

The foregoing descriptions of the Purchase Agreement and Deed, and Registration Rights Agreement are qualified in their entirety by the contents of the respective agreements, which are attached as Exhibits to this Current Report.

- 2 -

**ITEM 3.02 UNREGISTERED SALES OF EQUITY SECURITIES.**

In conjunction with the closing under the Purchase Agreement, on October 15, 2012, as partial consideration for the acquisition of the Hi Ho Properties, the Company issued 2,583,333 restricted shares of common stock of the Company to the Seller at a deemed value of US $1,860,000 (US $0.72 per share). For the above share issuance the shares were not registered under the Securities Act of 1933 in reliance upon the exemption from registration provided in Section 4(2) of the Securities Act of 1933 and Rule 506 of Regulation D promulgated thereunder. No underwriters were used, nor were any brokerage commissions paid in connection with the above share issuances.

**ITEM 8.01 OTHER EVENTS**

The Company issued the press release, filed as Exhibit 99.1 herewith, on October 16, 2012.

**ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS**

10.15    Purchase Agreement Hi Ho Silver Mining Claims dated October 15, 2012.

10.16    Registration Rights Agreement dated October 15, 2012

99.1    Press Release of the Company dated October 16, 2012

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

LIBERTY SILVER CORP.


By:  /s/ Manish Z. Kshatriya
        Executive VP & CFO

Date: October 16, 2012

- 3 -

**Purchase Agreement**
**Hi Ho Silver Mining Claims**

This Purchase Agreement Hi Ho Silver Mining Claims ("Agreement") is made and entered into by and among Primus Resources, L.C., a Wyoming limited liability company, and James A. Freeman (collectively "Seller"), and Liberty Silver Corp., a Nevada corporation ("Buyer").

**Recitals**

A.      Seller owns certain unpatented mining claims situated in Pershing County, Nevada which are described in Exhibit A attached to and by this reference incorporated in this Agreement (collectively the "Property").

B.      Buyer desires to purchase from Seller and Seller desires to sell to Buyer the Property subject to this Agreement on the terms and conditions described below.

Now, therefore, in consideration of their mutual covenants and promises, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

**1.      Definitions.**

**1.1**      "Agreement" means this Purchase Agreement, including all amendments and modifications, and all schedules and exhibits (each individually an "Exhibit" and collectively the "Exhibits") attached to and by this reference incorporated in this Agreement.

**1.2**      "Buyer" means Liberty Silver Corp., a Nevada corporation, and its successors and assigns.

**1.3**      "Closing" means the delivery of documents and other items to be delivered by the parties, the exchange of consideration, and the consummation of the transactions contemplated under this Agreement as described in Section 6.

**1.4**      "Closing Date" means the date on which the Closing shall occur.

**1.5**      "Deed" means the conveyance with reservation of mineral production royalty to be executed and delivered by Seller on the Closing.  The Deed shall be in the form of Exhibit B attached to and incorporated by reference in this Agreement.  At Buyer's request, the Deed shall convey title to the Property to Renaissance Exploration, Inc, a Nevada corporation, with which Buyer is party to the Exploration Earn-In Agreement dated March 29, 2010

**1.6**      "Property" means the unpatented mining claims (collectively the "claims") described in Exhibit A and all appurtenances and other rights and interests which appertain to the unpatented mining claims, including copies of all geologic data concerning the Property which Seller presently possesses.  Seller makes no representations or warranties concerning the data and Buyer agrees that it may rely on and use the data at its own risk.

**1.7**      "Registration Rights Agreement" means the registration rights agreement to be executed and delivered by the parties on the Closing which, amongst other matters,

1

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

provides for the issuance of up to an additional 277,778 shares of common stock of Buyer to Sellers which is part of the purchase price.  The Registration Rights Agreement shall be in the form of Exhibit D attached to and incorporated by reference in this Agreement.

**1.8**  "Seller" means collectively Primus Resources, L.C., a Wyoming limited liability company, and James A. Freeman, and their successors and assigns.

## 2.    Purchase and Sale.

**2.1**  **Sale of Property**.  Subject to all the terms and conditions of this Agreement and for the consideration described in this Agreement, Seller agrees to sell to Buyer and Buyer agrees to buy the Property, subject to Seller's reservation of a nonexecutive, nonparticipating and nonworking mineral production royalty (the "Royalty") of two percent (2%) of the net smelter returns from the production of minerals from the Property.

**2.2**  **Purchase Price**.  The total purchase price for the Property shall consist of (a) a cash payment in the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) United States currency; (b) 2,583,333 duly issued, fully paid and nonassessable shares of the common stock of Liberty Silver Corp. (collectively the "Shares); (c) the Royalty; (d) Buyer's payment to Seller of the sum of Seven Hundred Dollars ($700.00) as reimbursement for Seller's payment of the federal annual mining claim maintenance fees for the claims for the annual assessment year 2012 to 2013; (e) the Registration Rights Agreement including the cash payment and the additional shares of common stock of Buyer which may be paid to Seller pursuant to the terms and conditions thereof; and (f) Buyer's payment to Seller of Seller's reasonable costs and expenses associated with the transactions contemplated under this Agreement, such amount to be approved by Buyer, acting reasonably, in advance of the Closing.  The purchase price shall be delivered and paid on the Closing.

**2.3**  **Advance Payment.**  On the parties' execution of this Agreement, Buyer shall pay to Primus Resources, L.C. an advance payment of Thirty Thousand Dollars ($30,000.00) (the "Deposit") which shall be for the account of Primus Resources, L.C. alone and not for the account of James A. Freeman.  On the Closing, the Deposit shall be credited to the account of Buyer against the amount payable by Buyer to Primus Resources, L.C.  If the Closing does not occur for the reason that Seller is not able to satisfy all of the conditions for Closing, Primus Resources, L.C. shall repay the Deposit to Buyer.  If the Closing does not occur for the reason that Buyer is not able to satisfy the conditions of Closing, the Deposit shall be non-refundable and Seller shall own the Deposit free and clear of any claim, right or title of Buyer.

**2.4**  **Allocation of Purchase Price.**  The purchase price shall allocated seventy-five percent (75%) to Primus Resources, L.C. and twenty-five percent (25%) to James A. Freeman.

**2.5**  **Shares.** The Shares shall be subject to the requirements of applicable Canadian, United States, provincial and state laws and regulations and the rules of each exchange or trading association on which the Shares are listed for trading or are traded.  Seller acknowledges that, in addition to the legends required under United States securities laws, the Shares will bear legends restricting trading for a period of six (6) months from the dates of issuance.  Seller confirms and Buyer acknowledges that Buyer is obligated to file with the United States Securities and Exchange Commission a registration statement in respect of resale of the Shares in the United States in and accordance with the terms of the

2

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

Registration Rights Agreement. Each Seller has completed and executed or will complete and execute a Certification of U.S. Purchaser in form acceptable to Buyer.

**3.     Closing.**

**3.1         Closing Date**. The Closing shall be on the later of October 15, 2012, or acceptance by the Toronto Stock Exchange (the "Exchange") of the transactions contemplated by this Agreement, provided that the Closing shall not be later than October 15, 2012. _

**3.2         Closing Costs**. The expenses of the Closing shall be paid in the following manner:

**3.2.1         **Buyer shall pay all filing fees, recording fees and real property transfer taxes, if any, for the recording of the instruments necessary to convey title to Buyer under this Agreement.

**3.2.2         **Any other expenses or closing costs in connection with this transaction shall be paid by the party which incurs them, except the costs incurred by Seller which Buyer shall reimburse in accordance with Section 2.2(e).

**4.     Seller's Covenants and Representations.** Seller represents to Buyer as of the Effective Date and as of the Closing Date and covenants, as follows:

**4.1         Authority**. Seller has full power, legal right and authority to enter into this Agreement and the instruments which Seller is obligated to execute and deliver in accordance with the terms of this Agreement and to do all such acts and things as are required to be done, observed or performed by Seller in accordance with this Agreement.

**4.2         Valid Authorization of this Agreement**. Seller has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the instruments which Seller is obligated to execute and deliver in accordance with this Agreement and to observe and perform the provisions of this Agreement and any such instrument to which Seller is a party in accordance with its terms.

**4.3         Validity of Agreement and Non-Conflict**. Except as described in this Section, none of the authorization, creation, execution, delivery of this Agreement or any of the instruments which Seller is obligated to execute and deliver in accordance with this Agreement requires Seller to obtain any approval or consent of any governmental agency or authority having jurisdiction of Seller, nor is Seller in conflict with or contravention of, as applicable, the provisions of any material indenture, instrument, agreement or undertaking to which Seller is a party or by which Seller or any of its respective properties or assets are bound, including, without limitation, the Property. This Agreement and each instrument executed and delivered by Seller constitutes a valid and legally binding obligation of Seller and, when executed and delivered, of the instruments which Seller is obligated to execute and deliver in accordance with this Agreement will constitute valid and legally binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except to the extent that the enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws or events relating to or affecting creditors' rights generally.

3

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

**4.4        Title.**  Concerning the unpatented mining claims which constitute the Property, Seller represents that:  (a) the claims were properly located in accordance with applicable federal and state laws and regulations;  (b) all federal annual mining claim maintenance and rental fees for the claims have been paid properly;  (c) the claims are in good standing in the mining claim records of the Bureau of Land Management and, subject to the paramount title of the United States, Seller has beneficial and record title to the claims and the right to convey the claims to Buyer; and  (d) the claims are free and clear of all liens, claims, encumbrances and royalties created by, through or under Seller, except under this Agreement.

The parties acknowledge the following regarding the Hi Ho Silver unpatented mining claims (collectively the "Hi Ho Silver Claims") which comprise the property: (a) the Claims were located on November 7 and 8, 1998, on public lands of the United States which were open for mineral entry; (b) the Hi Ho Silver Claims are located on public lands portions of which were within the boundaries of the Black Boy 1 to Black Boy 5 unpatented mining claims (the "Black Boy Claims") which were located on September 1, 1975, and which the Bureau of Land Management declared forfeited and void on September 1, 1998; (c) the Black Boy Claims were senior to the Seka unpatented mining claims (the "Seka Claims") which were located in April and May 1982; (d) when the Black Boy Claims were forfeited on September 1, 1998, the public lands within their boundaries, including the portions of any overlaps of the Black Boy Claims and the Seka Claims, became open for the location of unpatented mining claims, including the Hi Ho Silver Claims; (e) portions of the southern ends of the Hi Ho Silver 9, 10 and 11 Claims may overlap onto portions of the Seka 9, 10, 11 and 12 Claims which are outside of the boundaries of the Black Boy Claims and which were not open for the location of unpatented mining claims when the Black Boy Claims were forfeited on September 1, 1998 (the "Overlap Area"); (f) Buyer located the Elm 19 – 26, 28, 30, 32, 34, 36 – 41 unpatented mining claims (the "Elm Claims") in September 2010 which Buyer represents and warrants do not overlap the Hi Ho Silver Claims; (g) Seller acknowledges that Buyer is not obligated to pay to Seller the Royalty for the production of minerals from the Overlap Area; (h) promptly after signing of this Agreement, the parties jointly shall locate, identify and, if necessary, re-erect the monuments of location and corner monuments for the Hi Ho Silver Claims and the Seka Claims using GPS equipment with an accuracy of one meter or less; and (i) before the commencement of mining on the Hi Ho Silver Claims Buyer will conduct a survey of the Hi Ho Silver Claims and the adjoining Seka Claims to determine the boundaries of the Hi Ho Silver Claims and the Seka Claims and the Overlap Area and any area which is open for location resulting from gaps in the locations of the unpatented mining claims.  Buyer shall notify Seller before conducting the survey in order that Seller's representatives may observe the conduct of the survey.  When the survey is completed, Seller and Buyer shall execute an addendum to the Deed which includes the survey as part of the description of the Property.

**4.5        Seller Not a Foreign Person.**  Seller is not a "foreign person" as defined under Section 1445(f) of the Internal Revenue Code of 1954, as amended.

**4.6        Securities Law Matters.**  Securities law matters regarding Seller are as stated in Exhibit C attached to and by this reference incorporated in this Agreement.

**4.7        Further Assurances.**  Seller shall execute and deliver all documents and instruments reasonably requested by Buyer to consummate the transactions contemplated under this Agreement.

4

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

**4.7     Survival of Representations.**  Seller's representations shall survive the Closing and recording of the instruments which Seller is obligated to execute and deliver in accordance with this Agreement.

**5.     Buyer's Covenants and Representations.**  To induce Seller to enter this Agreement, Buyer represents to Seller as of the Effective Date and as of the Closing Date, and covenants as follows:

**5.1          Authority**.  Buyer has full power, legal right and authority to enter into this Agreement and the instruments which Buyer is obligated to execute and deliver in accordance with the terms of this Agreement and to do all such acts and things as are required to be done, observed or performed by Buyer in accordance with this Agreement.

**5.2          Valid Authorization of this Agreement**.  Buyer has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the instruments which it is obligated to execute and deliver in accordance with this Agreement and to observe and perform the provisions of this Agreement and any such instrument to which it is a party in accordance with its terms.

**5.3          Liability for Property.**  Buyer acknowledges that Buyer has had an opportunity to inspect the Property and that it accepts the condition of and title to the property "as is", subject to Seller's representations in Section 4.4.  On and after the Closing, Buyer shall assume all liability for the condition of the property and the reclamation of disturbances on the property which Buyer creates on the Property.  Buyer shall conduct all activities on the Property and reclaim all disturbances in accordance with the applicable laws and regulations.  Buyer shall defend, indemnify and hold harmless Seller from and against any and all claims arising from or relating to Buyer's activities on, possession and use of the Property before or after the Closing.

**6.     Closing Procedure.**  The Closing shall be conducted at Seller's office in Reno, Nevada or such other place as the parties agree.  On the Closing the parties shall complete the following actions:

**6.1     Delivery of Purchase Price.**  On the Closing, Buyer shall deliver to Primus Resources, L.C. by wire transfer to an account which Primus Resources, L.C. designates the sum of (a) One hundred fifty-seven Thousand Five Hundred Dollars ($157,500.00) as part of the cash payment; (b) Seven Hundred Dollars ($700.00) as reimbursement for the federal annual mining claim maintenance fees; and (c) the amount of costs and expenses incurred by Primus Resources, L.C. as provided in Section 2.2(e).  Buyer shall also deliver to James A. Freeman certified funds drawn on a United States bank the amount of Sixty-two Thousand Five Hundred Dollars ($62,500.00).  Seller shall deliver certificates in the name of Primus Resources, L.C. for the aggregate 1,937,500 Shares in increments to be designated by Primus Resources, L.C., but not more than six separate certificates and to James A Freeman a certificate in the name of James A. Freeman for 645,833 Shares.

**6.2     Delivery of Conveyance and Data.**  Seller shall execute and deliver the Deed and an Internal Revenue Code Section 1445 certificate simultaneously on Buyer's delivery of Buyer's check for the Purchase Price.  Buyer shall execute the Deed.

**6.3     Declaration of Value.**  The parties shall sign a declaration of value which shall be delivered to Buyer.

5

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

**6.4     Recording.**  Promptly after the Closing, Buyer shall file and record the Deed with the Bureau of Land Management and the Pershing County Recorder and shall deliver conformed copies to Seller.

**7.     Termination.**

**7.1          Termination by Seller**.  If Buyer is unable to comply with its obligations under this Agreement on or before the Closing Date, Buyer shall do so as soon thereafter as it is able to do so, however, in no event shall the Closing occur more than ten (10) business days after the latest date described in Section 3.1.  If Buyer does not perform Buyer's obligations under this Agreement, Seller may terminate this Agreement by delivering notice to Buyer of Seller's intention to terminate this Agreement.  The termination shall be effective five (5) days after Seller's delivery of notice of termination.  On termination, Seller shall have no obligation whatever to perform any obligations under this Agreement or to sell or otherwise transfer title to the Property to Buyer.

**7.2          Termination by Buyer**.  If Seller is unable to comply with Seller's obligations under this Agreement on or before the Closing Date, Buyer shall do so as soon thereafter as Seller is able to do so, however, in no event shall the Closing occur more than ten (10) business days after the latest date described in Section 3.1.  If Seller does not perform its obligations under this Agreement, Buyer may terminate this Agreement by delivering notice to Seller of Buyer's intention to terminate this Agreement.  The termination shall be effective five (5) days after Buyer's delivery of notice of termination.  On termination, Buyer shall have no obligation whatever to perform any obligations under this Agreement or to purchase the Property.

**8.     Notices**.  Any notices required or authorized to be given by this Agreement shall be in written form.  Any notices required or authorized to be given by this Agreement may be sent by commercial courier service or mailed by registered or certified delivery, postage prepaid and return receipt requested, addressed to the proper party at the following address or such address as the party shall have designated to the other parties in accordance with this paragraph.  Any notice required or authorized to be given by this Agreement shall be deemed to have been sufficiently given or served in written form if mailed as provided herein, personally delivered to the proper party, or sent by facsimile, telex, telegraph, telecopier or other means of electronic transmission, and actually received by such party.  Such notice shall be effective on the date of receipt by the addressee party. A party shall promptly notify the other parties of a change of address.

If to Primus:               Primus Resources, L.C.
                            310 – 2120 Carey Avenue
                            Cheyenne, Wyoming 82001
                            Facsimile: 530-873-6823


If to James A. Freeman:     James A. Freeman
                            653 Vassar Street
                            Reno, Nevada 89502
                            Facsimile: 530-873-6823


If to Buyer:                Liberty Silver Corp.
                            Attention: Chief Executive Officer
                            Suite 2330 – 181 Bay Street
                            Toronto, Ontario M5J 2T3

6

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

Facsimile: 888-749-6314

**9.      Patriot Act.**   Each party represents and warrants that it is not on the Specially Designated National & Blocked Persons List of the Office of Foreign Assets Control of the United States Treasury Department and is not otherwise blocked or banned by any foreign assets office rule or any other law or regulation, including the USA Patriot Act or Executive Order 13224.

**10.      Binding Effect of Obligations**.   This Agreement shall be binding upon and inure to the benefit of the respective parties, and their personal representatives, successors and assigns.

**11.      Acknowledgement – Personal Information**.   Seller acknowledges and consents to:

     **11.1**   The disclosure to the Exchange and all other regulatory authorities of all personal information of the undersigned obtained by Buyer, except that the tax identification numbers of Primus Resources, L.C. and James A. Freeman shall be disclosed only to the United States Internal Revenue Service.

     **11.2**   The collection, use and disclosure of such personal information by the Exchange and all other regulatory authorities in accordance with their requirements.

**12.      Regulatory Approval**.   This Agreement and the transactions contemplated under this Agreement are subject to receipt of all necessary regulatory approvals, including acceptance of the Exchange.   Liberty Silver Corp. will diligently and promptly make all necessary filings with the Exchange and all pertinent regulatory authorities in relation to this Agreement as soon as practicable following the Effective Date.

**13.      Whole Agreement**.   The parties agree that the whole agreement between them is written in this Agreement and its exhibits. There are no terms or conditions, express or implied, other than in this Agreement.  This Agreement may be amended or modified only by an instrument in writing, signed by the parties with the same formality as this Agreement.

**14.      Governing Law**.   This Agreement shall be construed and enforced in accordance with the laws of the State of Nevada.

**15.      Multiple Counterparts**.   This Agreement may be executed in any number of counterparts and delivered by facsimile or other electronic means, each of which shall be deemed to be an original, but all of which shall constitute the same Agreement.

**16.      Severability**.   If any part, term or provision of this Agreement is held by the courts to be illegal or in conflict with any law of the United States or any state, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Agreement did not contain the particular part, term or provision held to be invalid.

**17.      Interpretation.**   A provision of this Agreement must not be construed to the disadvantage of a party merely because that party was responsible for the preparation of the Agreement or the inclusion of the provision in the Agreement.

7

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

The parties have executed this Agreement effective October 15, 2012 (the "Effective Date").

Primus Resources, L.C.

By /s/James A. Marin
James A. Marin, W.O.P. U.C.C. 1-207, Manager

/s/James A. Freeman
James A. Freeman

Liberty Silver Corp.

By /s/Geoff Browne
Name: Geoff Browne
Title: Chief Executive Officer

8

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

STATE OF NEVADA                         )
                                        ss.
COUNTY OF WASHOE                        )


      This Purchase Agreement Hi Ho Silver Mining Claims was acknowledged before me on October ___, 2012, by James N. Marin, W.O.P. U.C.C. 1-207.


_____
Notary Public


STATE OF NEVADA                         )
                                        ss.
COUNTY OF WASHOE                        )


      This Purchase Agreement Hi Ho Silver Mining Claims was acknowledged before me on October ___, 2012, by James A. Freeman.


_____
Notary Public


_____)
                                        ss.
_____)


      This Purchase Agreement Hi Ho Silver Mining Claims was acknowledged before me on October ___, 2012, by _____ as the _____ of Liberty Silver Corp.


_____
Notary Public


9

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

**EXHIBIT A**
**Description of Property**
**Pershing County, Nevada**

**Description of Unpatented Mining Claims**

| CLAIM NAME | NEVADA BLM SERIAL NO. |
|---|---|
| Hi Ho Silver No. 3 | 799907 |
| Hi Ho Silver No. 5 | 799908 |
| Hi Ho Silver No. 9 | 799909 |
| Hi Ho Silver No.10 | 799910 |
| Hi Ho Silver No.11 | 799911 |

10

74691.000 Purchase Agreement Hi Ho Silver Claims 101412

**EXHIBIT B**
**Form of Deed**

Assessor's Parcel No.  n/a unpatented mining claims

Recorded at the request of
and when recorded return to:
Primus Resources, L.C.
c/o Thomas P. Erwin
Erwin & Thompson LLP
One East Liberty Street, Suite 424
Reno, Nevada 89501

The undersigned affirms that this document does not
contain the personal information of any person.

**Deed With Reservation of Royalty**
**Hi Ho Silver Claims**

This Deed With Reservation of Royalty Hi Ho Silver Claims ("Deed") is made by Primus Resources, L.C., a Wyoming limited liability company, and James A. Freeman (collectively "Owner"), as grantors, to Renaissance Exploration, Inc., a  Nevada corporation ("Renaissance"), as grantee.

**Recitals**

**1.**    Owner and Liberty Silver Corp., a Nevada corporation, are parties to the Mining Lease and Option to Purchase Agreement Hi Ho Silver Claims dated October 15, 2012 (the "Agreement"), concerning the Hi Ho Silver unpatented mining claims situated in Pershing County, Nevada, more particularly described in Exhibit A attached to and by this reference incorporated in this Deed  (collectively the "Royalty Property"), in accordance with which Owner agreed to sell to Liberty Silver Corp. all of Owner's right, title and interest in and to the Royalty Property, subject to Owner's reservation of the production royalty (the "Royalty") and other obligations described in this Deed.

**2.**    Liberty Silver Corp. and Renaissance are parties to the Exploration Earn-In Agreement dated March 29, 2010, in accordance with which acquisitions by Liberty Silver Corp. of properties in the area of interest described in the Exploration Earn-In Agreement must, at the election of Renaissance, be acquired in the name of Renaissance.  Renaissance has elected to cause title to the Royalty Property to be acquired in the name of Renaissance.

**3.**    Owner and Liberty Silver Corp. have closed the purchase and sale of the Royalty Property in accordance with the Agreement.

11

**DO NOT MARK, PRINT, SIGN OR TYPE OUTSIDE THE LINED MARGIN**

In consideration of the parties' rights and obligations under the Agreement, the parties agree as follows:

**3.1     Deed.**  Owner conveys and transfers to Renaissance, and its assigns and successors forever, all of Owner's right, title and interest in the Royalty Property, except and subject to Owner's reserved Royalty and the parties' rights and obligations under this Deed.

**3.2     Royalty.**  Owner grants, reserves and retains to itself, and Owner's assigns and successors forever, and Renaissance agrees and covenants to pay to Owner, and Owner's assigns and successors, a production royalty based on the Net Smelter Returns from the production or sale of Minerals from any lands within the exterior boundaries of the Royalty Property.  The Royalty percentage rate shall be two percent (2%).

**2.1     Burden on Royalty Property.**  Renaissance's agreement and covenant to pay the Royalty and the minimum payments are covenants coupled with an interest in the Royalty Property and shall burden and run with the Royalty Property, including any and all amendments, conversions to a lease or other form of tenure, relocations or patent of all or any of the unpatented mining claims which comprise all or part of the Royalty Property.  On the amendment, conversion to a lease or other form of tenure, relocation or patenting of any of the unpatented mining claims which comprise all or part of the Royalty Property, the parties agree and covenant to execute, deliver and record in the office of the recorder in which all or any part of the Royalty Property is situated an instrument by which Renaissance grants to Owner the Royalty and subjects the newly located unpatented mining claims and any amended, converted or relocated unpatented mining claims and the patented claims, as applicable, to all of the burdens, conditions, obligations and terms of this Deed.

**2.2     Payment of Royalty.**  Renaissance shall calculate, pay and report the Royalty in accordance with the provisions of Exhibit 1.

**2.3     Production Records.**  Renaissance shall keep true and accurate accounts, books and records of all of its activities, operations and production of minerals on the Royalty Property.

**2.4     Delivery of Payments.**  Renaissance shall deliver the payments under this Deed as to an undivided seventy-five percent (75%) to Primus Resources, L.C. by wire transfer to an account designated by Primus Resources, L.C. and as to an undivided twenty-five percent (25%) to James A. Freeman by check, certified funds, drawn on a United States bank.

**3.3     Compliance with Laws, Reclamation, Environmental Obligations and Indemnities**.

12

**DO NOT MARK, PRINT, SIGN OR TYPE OUTSIDE THE LINED MARGIN**

      **3.1**    **Compliance with Laws.**  Renaissance shall at all times comply with all applicable federal, state and local laws, regulations and ordinances relating to Renaissance's activities and operations on or relating to the Royalty Property.

      **3.2**    **Reclamation, Environmental Obligations and Indemnities**. Renaissance shall perform all reclamation required under federal, state and local laws, regulations and ordinances relating to Renaissance's activities or operations on or relating to the Royalty Property.  Renaissance shall defend, indemnify and hold harmless Owner from and against any and all actions, claims, costs, damages, expenses (including attorney's fees and legal costs), liabilities and responsibilities arising from or relating to Renaissance's activities or operations on or relating to the Royalty Property, including those under laws, regulations and ordinances intended to protect or preserve the environment or to reclaim the Royalty Property.  Renaissance's obligations under this Section shall survive the abandonment, surrender or transfer of the Royalty Property.

      **3.4**    **Tailings and Residues.**  All tailings, residues, waste rock, spoiled leach materials and other materials (collectively "Materials") resulting from Renaissance's operations and activities on the Royalty Property shall be Renaissance's sole property, but shall remain subject to the Royalty if they are processed or reprocessed and Renaissance receives revenues from such processing or reprocessing.  If Materials are processed or reprocessed, the Royalty payable shall be determined by using the best engineering, metallurgical and technical practices and standards then available.

      **3.5**    **Title Maintenance.**

      **5.1**    **Title Maintenance and Taxes.**  Renaissance shall maintain title to the Royalty Property, including without limitation, paying when due all taxes on or with respect to the Royalty Property and doing all things and making all payments necessary or appropriate to maintain the right, title and interest of Renaissance and Owner, respectively, in the Royalty Property and under this Deed. Renaissance shall deliver to Owner proof of Renaissance's compliance with this Section not less than thirty (30) days before the applicable deadline.

      **5.2**    **Property Maintenance.**  Renaissance shall perform all required assessment work on, pay all mining claim maintenance fees and make such filings and recordings as are necessary to maintain title to the Royalty Property in accordance with applicable federal and state laws and regulations.  Renaissance shall deliver to Owner proof of Renaissance's compliance with this Section not less than thirty (30) days before the applicable deadline.

      **5.3**    **Abandonment**.  If Renaissance intends to abandon or surrender any of

13

**DO NOT MARK, PRINT, SIGN OR TYPE OUTSIDE THE LINED MARGIN**

the unpatented mining claims which are part of the Royalty Property (the "Abandonment Property"), Renaissance shall first give notice of such intention to Owner at least ninety (90) days in advance of the proposed date of abandonment or surrender.  At any time before the date of Renaissance's proposed abandonment or surrender of the Royalty Property Owner may deliver notice to Renaissance that Owner desires Renaissance to convey the Abandonment Property to Owner.  In such case, within thirty (30) business days after Renaissance's receipt of Owner's notice, Renaissance shall convey the Abandonment Property to Owner free and clear of any claims, encumbrances or liens created by, through or under Renaissance.  If Owner does not timely request reconveyance of the Abandonment Property, Owner's right to do so shall be irrevocably terminated.

**3.6** **General Provisions**.

**6.1** **Conflict.**  If a conflict arises between the provisions of this Deed and the provisions of the Agreement, the provisions of the Agreement shall prevail.

**6.2** **Entire Agreement**.  This Deed and the Agreement constitute the entire agreement between the parties.

**6.3** **Additional Documents.**  The parties shall from time to time execute all such further instruments and documents and do all such further actions as may be necessary to effectuate the purposes of this Deed.

**6.4** **Binding Effect.**  All of the covenants, conditions, and terms of this Deed shall bind and inure to the benefit of the parties and their successors and assigns.

**6.5** **No Partnership.**  Nothing in this Deed shall be construed to create, expressly or by implication, a joint venture, mining partnership or other partnership relationship between the parties.

**6.6** **Governing Law**.  This Deed is to be governed by and construed under the laws of the State of Nevada.

**6.7** **Time of Essence**.  Time is of the essence in this Deed.

**6.8** **Notices.**  Any notices required or authorized to be given by this Deed shall be in writing and shall be sent either by commercial courier, facsimile, or by certified U.S. mail, postage prepaid and return receipt requested, addressed to the proper party at the address stated below or such address as the party shall have designated to the other parties in accordance with this Section.  Such notice shall be effective on the date of receipt by the addressee party, except that any facsimiles received after 5:00 p.m. of the addressee's local

14

**DO NOT MARK, PRINT, SIGN OR TYPE OUTSIDE THE LINED MARGIN**

time shall be deemed delivered the next day.  A party shall promptly notify the other parties of a change of address.

|  |  |
|---|---|
| If to Primus: | Primus Resources, L.C.<br>310 – 2120 Carey Avenue<br>Cheyenne, Wyoming 82001<br>Facsimile: 530-873-6823 |
| If to James A. Freeman: | James A. Freeman<br>653 Vassar Street<br>Reno, Nevada 89502 |
| If to Renaissance: | Renaissance Exploration, Inc.<br>4750 Longley Lane<br>Reno, Nevada 89502<br>Facsimile: (775) 337-1542 |

This Deed is effective October ___, 2012.

Primus Resources, L.C.

By /s/James N. Marin
James N. Marin, W.O.C. U.C.C. 1-207, Manager

/s/ James A. Freeman
James A. Freeman

Renaissance Exploration, Inc.

By /s/Richard L. Bedell, Jr.
Richard L. Bedell, Jr., President

15

**DO NOT MARK, PRINT, SIGN OR TYPE OUTSIDE THE LINED MARGIN**

STATE OF NEVADA,        )

                          ss.

COUNTY OF WASHOE.    )


       This Deed With Reservation of Royalty Hi Ho Silver Claims was acknowledged before me on October ___, 2012, by James N. Marin, W.O.C. U.C.C. 1-207, as Manager of Primus Resources, L.C.

_____
Notary Public



STATE OF NEVADA,        )

                       : ss.

COUNTY OF WASHOE.    )

       This Deed With Reservation of Royalty Hi Ho Silver Claims was acknowledged before me on October ___, 2012, by James A. Freeman.


_____
Notary Public



STATE OF NEVADA,        )

                       : ss.

COUNTY OF WASHOE.    )


This Deed With Reservation of Royalty Hi Ho Silver Claims was acknowledged before me on October ___, 2012, by Richard L. Bedell, Jr. as President of Renaissance Exploration, Inc.


_____
Notary Public



16

**DO NOT MARK, PRINT, SIGN OR TYPE OUTSIDE THE LINED MARGIN**

**Exhibit 1**
**Net Smelter Returns**

Payor:  Renaissance Exploration, Inc.

Recipient:  Primus Resources, L.C. as to an undivided seventy-five percent (75%) and James   A. Freeman as to an undivided twenty-five percent (25%).

**1.     Definitions.**  The terms defined in the instrument to which this Exhibit is attached and made part of shall have the same meanings in this Exhibit.  The following definitions shall apply to this Exhibit.

    **1.1**     "Gold Production" means the quantity of refined gold outturned to Payor's account by an independent third party refinery for gold produced from the Property during the month on either a provisional or final settlement basis.

    **1.2**     "Gross Value" shall be determined on a month basis and have the following meanings with respect to the following Minerals:

        **1.2.1**     Gold

            (a)     If Payor sells gold concentrates, dore or ore, then Gross Value shall be the value of the gold contained in the gold concentrates, dore and ore determined by utilizing:  (1) the mine weights and assays for such gold concentrates, dore and ore; (2) a reasonable recovery rate for the refined gold recoverable from such gold concentrates, dore and ore (which shall be adjusted annually to reflect the actual recovery rate of refined metal from such gold concentrates, dore and ore); and (3) the Monthly Average Gold Price for the month in which the gold concentrates, dore and ore were sold.

            (b)     If Payor produces refined gold (meeting the specifications of the London Bullion Market Association, and if the London Bullion Market Association no longer prescribes specifications, the specifications of such other association generally accepted and recognized in the mining industry) from Minerals, and if Section 1.2.1(a) above is not applicable, then for purposes of determining Gross Value, the refined gold shall be deemed to have been sold at the Monthly Average Gold Price for the month in which it was refined.  The Gross Value shall be determined by multiplying Gold Production during the month by the Monthly Average Gold Price.

        **1.2.2**     Silver.

            (a)      If Payor sells silver concentrates, dore or ore, then Gross Value shall be the value of the silver contained in the silver concentrates, dore and ore determined by utilizing:  (1) the mine weights and assays for such silver concentrates, dore and ore; (2) a reasonable recovery rate for the refined silver recoverable from such silver concentrates, dore and ore (which shall be adjusted annually to reflect the actual recovery rate of refined metal from such silver concentrates, dore and ore); and (3) the Monthly Average Silver Price for the month in which the silver concentrates, dore and ore were sold.

            (b)     If Payor produces refined silver (meeting the specifications for refined silver subject to the New York Silver Price published by Handy & Harmon, and if Handy & Harmon no longer publishes such specifications, the specifications of such other association or entity generally accepted and recognized in the mining industry) from Minerals, and if Section

17

1.2.2(a) above is not applicable, the refined silver shall be deemed to have been sold at the Monthly Average Silver Price for the month in which it was refined.  The Gross Value shall be determined by multiplying Silver Production during the month by the Monthly Average Silver Price.

  **1.2.3** All Other Minerals.

    (a) If Payor sells any concentrates, dore or ore of Minerals other than gold or silver, then Gross Value shall be the value of such Minerals determined by utilizing:  (1) the mine weights and assays for such Minerals; (2) a reasonable recovery rate for the Minerals (which shall be adjusted annually to reflect the actual recovery rate of recovered or refined metal or  product from such Minerals); and (3) the monthly average price for the Minerals or product of the Minerals for the month in which the concentrates, dore or ore was sold.  The monthly average price shall be determined by reference to the market for such Minerals or product which is recognized in the mining industry as authoritative and reflective of the market for such Minerals or product.

    (b) If Payor produces refined or processed metals from Minerals other than refined gold or refined silver, and if Section 1.2.3(a) above is not applicable, then Gross Value shall be equal to the amount of the proceeds received by Payor during the month from the sale of such refined or processed metals. Payor shall have the right to sell such refined or processed metals to an affiliated party, provided that such sales shall be considered, solely for purposes of determining Gross Value, to have been sold at prices and on terms no less favorable than those that would be obtained from an unaffiliated third party in similar quantities and under similar circumstances.

  **1.3** "Minerals" means gold, silver, platinum, antimony, mercury, copper, lead, zinc, and all other mineral elements and mineral compounds, but not geothermal resources, which are contemplated to exist on the Property or which are after the Effective Date discovered on the Property and which can be extracted, mined or processed by any method presently known or developed or invented after the Effective Date.

  **1.4** "Monthly Average Gold Price" means the average London Bullion Market Association Afternoon Gold Fix, calculated by dividing the sum of all such prices reported for the month by the number of days for which such prices were reported during that month.  If the London Bullion Market Association Afternoon Gold Fix ceases to be published, all such references shall be replaced with references to prices of gold for immediate sale in another established marked selected by Payor, as such prices are published in Metals Week magazine, and if Metals Week magazine no longer publishes such prices, the prices of such other association or entity generally accepted and recognized in the mining industry.

  **1.5** "Monthly Average Silver Price" means the average New York Silver Price as published daily by Handy & Harmon, calculated by dividing the sum of all such prices reported for the month by the number of days in such month for which such prices were reported.  If the Handy & Harmon quotations cease to be published, all such references shall be replaced with references to prices of silver for immediate sale in another established market selected by Payor as published in Metals Week magazine, and if Metals Week magazine no longer publishes such prices, the prices of such other association or entity generally accepted and recognized in the mining industry.

**1.6**     "Net Smelter Returns" means the Gross Value of all Minerals, less the following costs, charges and expenses paid or incurred by Payor with respect to the refining and smelting of such Minerals:

     **1.6.1**     Charges for smelting and refining (including sampling, assaying and penalty charges), but not any charges or costs of agglomeration, beneficiation, crushing, extraction, milling, mining or other processing; and

     **1.6.2**     Actual costs of transportation (including freight, insurance, security, transaction taxes, handling, port, demurrage, delay and forwarding expenses incurred by reason of or in the course of such transportation) of concentrates or dore metal from the Property to the smelter or refinery, but not any charges or costs of transportation of Minerals or ores from any mine on the Property to an autoclave, concentrator, crusher, heap or other leach process, mill or plant.

**1.7**     "Property" means the real property described in the instrument to which these Net Smelter Returns provisions are attached and made a part.

**1.8**     "Silver Production" means the quantity of refined silver outturned to Payor's account by an independent third-party refinery for silver produced from the Property during the month on either a provisional or final settlement basis.

**2.**     **Payment Procedures.**

**2.1**     **Accrual of Obligation.**  Payor's obligation to pay the Royalty shall accrue and become due and payable upon the sale or shipment from the Property of unrefined metals, dore metal, concentrates, ores or other Minerals or Minerals products or, if refined metals are produced, upon the outturn of refined metals meeting the requirements of the specified published price to Payor's account.

**2.2**     **Futures or Forward Sales, Etc.**  Except as provided in Sections 1.2.1(a), 1.2.2(a) and 1.2.3 (a) (regarding sales of unprocessed gold and silver and sales of Minerals other than gold and silver), Gross Value shall be determined irrespective of any actual arrangements for the sale or other disposition of Minerals by Payor, specifically including but not limited to forward sales, futures trading or commodities options trading, and any other price hedging, price protection, and speculative arrangements that may involve the possible delivery of gold, silver or other metals produced from Minerals.

**2.3**     **Monthly Calculations and Payments.**  Net Smelter Returns royalties shall be determined on a monthly basis. Payor shall pay Recipient each monthly royalty payment on or before the last business day of the month immediately following the month in which the royalty payment obligation accrued. Payor acknowledges that late payment by Payor to Recipient of royalty payments will cause Recipient to incur costs, the exact amount of which will be difficult to ascertain. Accordingly, if any amount due and payable by Payor is not received by Recipient within ten (10) days after such amount is due, then Payor shall pay to Recipient a late charge equal to five percent (5%) of such overdue amount. Recipient's acceptance of such late charge shall not constitute a waiver of Payor' default with respect to such overdue amount, nor prevent Recipient from exercising any of Recipient's other rights and remedies. If any amount payable by Payor remains delinquent for a period in excess of thirty (30) days, Payor shall pay to Recipient, in addition to the late payment, interest from and after the due date at the statutory interest rate.

19

**2.4**     **Statements.**  At the time of payment of the royalty, Payor shall accompany such payment with a statement which shows in detail the quantities and grades of refined gold, silver or other metals or dore, concentrates or ores produced and sold or deemed sold by Payor in the preceding month; the Monthly Average Gold Price and Monthly Average Silver Price, as applicable; costs and other deductions, and other pertinent information in detail to explain the calculation of the payment with respect to such month.  Payment shall be made to the address provided in the agreement or instrument to which this Exhibit is attached for purposes of notices or to such other address as Recipient provides to Payor or by wire transfer to an account which Recipient designates.

**2.5**     **Inventories and Stockpiles.**  Payor shall include in all monthly statements a description of the quantity and quality of any gold or silver dore that has been retained as inventory for more than ninety (90) days.  Recipient shall have thirty (30) days after receipt of the statement to either:  (a) elect that the dore be deemed sold, with Gross Value to be determined as provided in Sections 1.2.1 (a), with respect to gold, and 1.2.2(a), with respect to silver, as of such thirtieth (30th) day utilizing the mine weights and assays for such dore and utilizing a reasonable recovery rate for refined metal and reasonable deemed charges for all deductions which Payor is authorized to take, or (b) elect to wait until such time as the royalty payment otherwise would become payable pursuant to Sections 1.2.1(b) and 1.2.2(b).  Recipient's failure to respond within such time shall be deemed to be an election to use the methods described in Sections 1.2.1(b) and 1.2.2(b).

**2.6**     **Audit.**  Upon reasonable notice and at a reasonable time, Recipient shall have the right to audit and examine the Payor's accounts and records relating to the calculation of the Net Smelter Returns royalty payments for a period of up to one year after delivery of the monthly statement in question.  If such audit determines that there has been a deficiency or an excess in the payment made to Recipient, such deficiency or excess shall be resolved by adjusting the next monthly royalty payment due Recipient.  Recipient shall pay all costs of such audit unless a deficiency of five percent (5%) or more of the royalty payment due for the calendar month in question is determined to exist in which case Payor shall reimburse Recipient for the cost of the audit.  All books and records used by Payor to calculate the royalty payments shall be kept in accordance with generally accepted accounting principles applicable to the mining industry.

**3.**     **Sampling and Commingling.**  Payor shall have the right to commingle Minerals and ores from the Property and materials from other properties, provided, that Payor first informs Recipient, in writing, of Payor's intention to commingle and delivers to Recipient a detailed written description of Payor's commingling plan.  Recipient shall have ninety (90) days during which to review and comment on Payor's proposed commingling plan.  In any and all events, all Minerals and ores shall be measured and sampled by Payor in accordance with sound mining and metallurgical practices for metal and mineral content before commingling of any such Minerals or ores with materials from any other property.  Representative samples of materials from the Property intended to be commingled shall be retained by Payor, and assays of these samples shall be made before commingling to determine the metal content of each ore.  Detailed records shall be kept by Recipient showing measurements, assays of metal content and gross metal content of the materials from the Property are commingled.

20

**Exhibit A**
**Description of Royalty Property**
**Pershing County, Nevada**

**Description of Unpatented Mining Claims**

| CLAIM NAME | NEVADA BLM SERIAL NO. |
|---|---|
| Hi Ho Silver No. 3 | 799907 |
| Hi Ho Silver No. 5 | 799908 |
| Hi Ho Silver No. 9 | 799909 |
| Hi Ho Silver No. 10 | 799910 |
| Hi Ho Silver No. 11 | 799911 |

21

**EXHIBIT C**

**Securities Law Representations & Warrants Made by Seller**

<u>Accredited Investor</u>.  Seller is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

<u>No Government Review</u>.  Seller understands that neither the United States Securities and Exchange Commission ("<u>SEC</u>") nor any securities commission or other governmental authority of any state, country or other jurisdiction has approved the issuance of the Shares or passed upon or endorsed the merits of the Shares or this Agreement, or confirmed the accuracy of, determined the adequacy of, or reviewed this Agreement or the Shares.

<u>Investment Intent</u>.  The Shares are being acquired for Seller's own account for investment purposes only, not as a nominee or agent and not with a view to the resale or distribution of any part thereof, and Seller has no present intention of selling, granting any participation in or otherwise distributing the same.  By executing this Agreement, Seller further represents that Seller does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or any third person with respect to any of the Shares.

<u>Restrictions on Transfer</u>.  Seller understands that the Shares have not been registered under the Securities Act or registered or qualified under any state securities law, and may not be, directly or indirectly, sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and registration or qualification under applicable state securities laws or the availability of an exemption therefrom.  Seller acknowledges that it is able to bear the economic risks of an investment in the Shares for an indefinite period of time.

<u>Investment Experience</u>.  Seller has such knowledge, sophistication and experience in financial, tax and business matters in general, and investments in securities in particular, that it is capable of evaluating the merits and risks of this investment in the Shares, and Seller has made such investigations in connection herewith as it deemed necessary or desirable so as to make an informed investment decision without relying upon Buyer for legal or tax advice related to this investment.

<u>Access to Information</u>.  Seller acknowledges that it has had an opportunity to discuss Buyer's business, management, financial affairs and the terms and conditions of the offering of the Shares with Buyer's management and has had an opportunity to review Buyer's facilities.

<u>Placement and Finder's Fees</u>.  No agent, broker, investment banker, finder, financial advisor or other person acting on behalf of Seller or under its authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the purchase of the Shares, and no person is entitled to any fee or commission or like payment in respect thereof based in any way on agreements, arrangements or understanding made by or on behalf of Seller.

22

<u>Legends</u>.  Seller understands that the Shares will bear the following legend (and appropriate notations thereof will be made in Buyer's stock transfer books), and stop transfer instructions reflecting these restrictions on transfer will be placed with the transfer agent of the Shares:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE.  THE SECURITIES REPRESENTED HEREBY HAVE BEEN TAKEN BY THE REGISTERED OWNER FOR INVESTMENT, AND WITHOUT A VIEW TO RESALE OR DISTRIBUTION THEREOF, AND MAY NOT BE SOLD, TRANSFERRED OR DISPOSED OF WITHOUT AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH TRANSFER OR DISPOSITION DOES NOT VIOLATE THE SECURITIES ACT OF 1933, AS AMENDED, THE RULES AND REGULATIONS THEREUNDER OR OTHER APPLICABLE SECURITIES LAWS.

23

**EXHIBIT D**
**Form of Registration Rights Agreement**
[see attached]

24

**REGISTRATION RIGHTS AGREEMENT**

This Registration Rights Agreement (this "Agreement") is made and entered into as of October 15, 2012, by and among Liberty Silver Corp., a Nevada corporation (the "Company"), and the investors signatory hereto (each an "Investor" and collectively, the "Investors").

This Agreement is made pursuant to the Purchase Agreement, dated as of October 15, 2012 among the Company, the Investors and certain other parties (the "Purchase Agreement").

The Company and the Investors hereby agree as follows:

1.   **Definitions.**

   **Capitalized terms used and not otherwise defined herein that are defined in the Purchase Agreement shall have the meanings given such terms in the Purchase Agreement.** As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

   "Commission" means the Securities and Exchange Commission.

   "Effective Date" means the date that a Registration Statement is first declared effective by the Commission.

   "Effectiveness Date" means with respect to the Registration Statement required to be filed under Section 2(a), the earlier of: (i) March 1, 2013; and, (ii) the fifth Trading Day following the date on which the Company is notified by the Commission that the Registration Statement will not be reviewed or is no longer subject to further review and comments.

   "Effectiveness Period" means the period commencing on the Effective Date and terminating on the date the Registration Statement ceases to be effective in accordance with clause 2(a)(i) or (ii) of this Agreement.

   "Exchange Act" means the Securities Exchange Act of 1934, as amended.

   "Filing Date" means with respect to the Registration Statement required to be filed under Section 2(a), the thirtieth day following the Closing Date.

   "Holder" or "Holders" means the holder or holders, as the case may be, from time to time of Registrable Securities.

   "Market Price" means the per share weighted average trading price at which the Common Stock has traded on the Toronto Stock Exchange during the period of 5 consecutive Trading Days ending on the second Trading Day before such date (or, if the shares are not quoted on the Toronto Stock Exchange, then on such stock exchange on which the Common Stock is listed as may be selected for that purpose by the directors, or, if the shares are not listed on any stock exchange, then in the over-the-counter market) as reported by the Toronto Stock Exchange (or such other stock exchange or as quoted by the most commonly quoted or carried source of quotations for shares traded in the over-the-counter market).

"Person" means an individual, a corporation, a partnership, a syndicate, a trustee or any unincorporated organization and words importing persons are intended to have a similarly extended meaning;

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Prospectus" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"Registrable Securities" means: (i) all of the shares of Common Stock issued or issuable to the Investors pursuant to the Purchase Agreement; (ii) all shares of Common Stock issued to the Investors pursuant to Sections 2(c) and 2(d) of this Agreement; and (iii) all shares of Common Stock issuable upon exercise of the Warrants, together with any securities issued or issuable upon any stock split, dividend or other distribution, recapitalization or similar event, or any conversion price adjustment with respect to any of the securities referenced above.

"Registration Statement" means the registration statement required to be filed in accordance with Section 2(a) and any additional registration statement(s) required to be filed under Section 2(b), including (in each case) the Prospectus, amendments and supplements to such registration statements or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statements.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 415" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 424" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Securities Act" means the Securities Act of 1933, as amended.

"Shares" means the shares of Common Stock issued or issuable to the Investors pursuant to the Purchase Agreement.

"<u>Trading Day</u>" means (i) a day on which the Common Stock is traded or quoted on a Trading Market (other than the OTC Bulletin Board), or (ii) if the Common Stock is not listed on a Trading Market (other than the OTC Bulletin Board), a day on which the Common Stock is traded in the over the counter market, as reported by the OTC Bulletin Board, or (iii) if the Common Stock is not quoted on any Trading Market, a day on which the Common Stock is quoted in the over the counter market as reported by the Pink OTC Markets Inc. (or any similar organization or agency succeeding to its functions of reporting prices); provided, that in the event that the Common Stock is not listed or quoted as set forth in (i), (ii) and (iii) hereof, then Trading Day shall mean a Business Day.

"<u>Trading Market</u>" means whichever of the Toronto Stock Exchange, or OTC Bulletin Board on which the Common Stock is listed or quoted for trading on the date in question.

"<u>Warrants</u>" shall mean the Warrants issued or issuable to the Investors pursuant to the Purchase Agreement.

**2. Registration.**

(a) On or prior to the Filing Date, the Company shall prepare and file with the Commission a Registration Statement covering the resale of all Registrable Securities to be made on a continuous basis pursuant to Rule 415, on Form S-1 (except if the Company is eligible at such time to register for resale the Registrable Securities on Form S-3, in which case such registration shall be on Form S-3), and shall contain (unless otherwise directed by the Holders) substantially the "<u>Plan of Distribution</u>" attached hereto as <u>Annex A</u>. The Company shall cause the Registration Statement to be declared effective under the Securities Act as soon as possible but, in any event, no later than the Effectiveness Date, and shall use its reasonable best efforts to keep the Registration Statement continuously effective under the Securities Act until the date which is the earlier of (i) the first date as of which all of the Registrable Securities have been publicly sold thereunder by the Holders, or (ii) (A) the first date as of which all of the Registrable Securities may be sold by the Holders pursuant to Rule 144 without application of the requirements imposed by such Rule upon sales by affiliates, as determined by the Company and evidenced by a written opinion of its counsel to that effect delivered to each of the Holders who then hold Registrable Securities that have not been publicly sold, addressed and acceptable to the Company's transfer agent and the affected Holders, and (B) any "distribution compliance period" and "offering restrictions" (as such terms are defined in Regulation S under the Securities Act) applicable to the Registrable Securities at their time of issue shall have ceased to apply thereto (the date described in this clause 2(a)(ii), the "Termination Date").

(b) Notwithstanding any other provision of this Agreement, if the Registration Statement is not filed on or before the Filing Date, or if the Registration Statement is not declared effective by the Commission on or before the Effectiveness Date, the Company shall not be relieved of its obligation to prepare and file the Registration Statement or to cause the Registration Statement to be declared effective by the Commission, on the earliest possible date thereafter provided, however, that the requirements of this Section 2(b) shall terminate on the Termination Date.

(c) If a Registration Statement is declared effective by the Commission on or prior to March 1, 2013, then, in addition to any other rights available to the Holders under the Purchase Agreement or under applicable law, the Company shall issue to the Holders, for no additional consideration and without any further action required by the Holder, an additional 277,778 shares of Common Stock to be allocated on a pro rata basis. The certificates representing such shares shall be delivered to the Holders as soon as reasonably practicable and in any event no later than five (5) business days following March 1, 2013. In connection with the foregoing, the Company shall execute and deliver to its transfer agent all required treasury orders. In addition, the Company shall file an amended

Registration Statement to qualify these shares.

(d) If a Registration Statement is not declared effective by the Commission on or prior to March 1, 2013, then, in addition to any other rights available to the Holders under the Purchase Agreement or under applicable law:

|     |     |     |
| --- | --- | --- |
| (i) | | the Company shall pay to the Holder, for no additional consideration and without any further action required by the Holder, a total of U.S. $200,000 to be paid on a pro rata basis; and |
| (ii) | | if the Market Price of the Common Stock calculated as at March 1, 2012, is more than U.S. $0.72 per share, the Company shall issue to the Holders, for no additional consideration and without any further action required by the Holder, an additional number of shares of Common Stock to be allocated on a pro rata basis as follows and calculated as follows: |

additional shares of Common Stock  =    277,778 less [U.S.$200,000 / Market Price calculated as at March 1, 2012]

The certificates representing such shares shall be delivered to the Holders as soon as reasonably practicable and in any event no later than five (5) business days following March 1, 2013.  In connection with the foregoing, the Company shall execute and deliver to its transfer agent all required treasury orders.  In addition, the Company shall file an amended Registration Statement to qualify these shares.

(e) The Company shall not be required to include the Registrable Securities of a Holder in a Registration Statement and shall not be required to pay any liquidated or other damages under Sections 2(c) and 2(d) hereof to any Holder who fails to furnish to the Company a fully completed Selling Holder Questionnaire at least five Trading Days prior to the Filing Date (subject to the requirements set forth in Section 3(a)).

**3.   Registration Procedures.**

In connection with the Company's registration obligations hereunder, the Company and, as applicable, Holders shall do the following:

(a)  Not less than five Trading Dys prior to the filing of the Registration Statement or any related Prospectus or any amendment or supplement thereto (including any document that would be incorporated or deemed to be incorporated therein by reference), the Company shall, (i) furnish to each Holder copies of all such documents proposed to be filed, which documents (other than those incorporated or deemed to be incorporated by reference) will be subject to the review of such Holders, and (ii) cause its officers and directors, counsel and independent certified public accountants to respond to such inquiries of the Holders as shall be necessary, in the reasonable opinion of respective counsel to conduct a reasonable investigation within the meaning of the Securities Act. Each Holder agrees to furnish to the Company a completed questionnaire in the form attached to this Agreement as Annex B (a "Selling Shareholder Questionnaire") not less than five Trading Days prior to the Filing Date.

(b) (i) The Company shall prepare and file with the Commission such amendments, including post-effective amendments, to the Registration Statement and the Prospectus used in connection

therewith as may be necessary to keep such Registration Statement continuously effective as to the applicable Registrable Securities for its Effectiveness Period and prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities; (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus amendment or supplement, and as so amended or supplemented to be filed pursuant to Rule 424; (iii) respond as promptly as reasonably possible to any comments received from the Commission with respect to the Registration Statement or any amendment thereto and, as promptly as reasonably possible provide the Holders true and complete copies of all correspondence from and to the Commission relating to the Selling Holder Sections (other than to the extent the Company believes that such disclosure would result in the disclosure to the Holders of material and non-public information concerning the Company); and (iv) comply in all material respects with the provisions of the Securities Act and the Exchange Act, and the rules and regulations of the Commission thereunder, with respect to the Registration Statement and the disposition of all Registrable Securities covered by the Registration Statement.

(c) The Company shall notify the Holders as promptly as reasonably possible (and, in the case of (i)(A) below, not less than three Trading Days prior to such filing) and (if requested by any such Person) confirm such notice in writing no later than one Trading Day following the day (i)(A) when a Prospectus or any Prospectus supplement or post-effective amendment to a Registration Statement is proposed to be filed; (B) when the Commission notifies the Company whether there will be a "review" of such Registration Statement and whenever the Commission comments in writing on such Registration Statement (the Company shall provide true and complete copies of all correspondence to and from the Commission regarding the Registration Statement to each of the Holders that pertain to the Selling Holder Sections applicable to such Holder, other than to the extent the Company believes that such disclosure would result in the disclosure to the Holders of material and non-public information concerning the Company); and (C) with respect to the Registration Statement or any post-effective amendment, when the same has become effective; (ii) of any request by the Commission or any other Federal or state governmental authority for amendments or supplements to a Registration Statement or Prospectus or for additional information; (iii) of the issuance by the Commission of any stop order suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; and (v) of the occurrence of any event or passage of time that makes the financial statements included in a Registration Statement ineligible for inclusion therein or any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to such Registration Statement, Prospectus or other documents so that in such Registration Statement or the Prospectus, as the case may be, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(d) The Company will use its reasonable best efforts to avoid the issuance of, or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment.

(e) Upon request by a Holder, the Company will promptly deliver to such Holder, without charge, as many copies of the Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Persons may reasonably request. The Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of

the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(f) Prior to any public offering of Registrable Securities, the Company will use its reasonable best efforts (i) to register or qualify or cooperate with the selling Holders in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or Blue Sky laws of the applicable jurisdictions that are required for the Holders to offer and sell the Registrable Securities and are requested by the Holders in writing, (ii) to keep each such registration or qualification (or exemption therefrom) effective during the Effectiveness Period, and (iii) to do any and all other acts or things necessary or advisable to enable the disposition in such jurisdictions of the Registrable Securities covered by the Registration Statements; provided, however, that in no event will the Company be required, in order to satisfy its obligations under this paragraph, to qualify to do business generally in any jurisdiction where it is not so qualified on the date the applicable Registration Statement is filed.

(g) The Company will cooperate with the Holders to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to the Registration Statements, which certificates shall be free of all restrictive legends, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holders may request.

(h) The Company shall, upon the occurrence of any event contemplated by Section 3(c)(v), as promptly as reasonably possible, prepare a supplement or amendment, including a post-effective amendment, to the affected Registration Statements or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(i) The Company shall provide a transfer agent and registrar for all Registrable Securities registered pursuant to such Registration Statement and a CUSIP number for all such Registrable Securities, in each case not later than the Effective Date.

(j) The Company shall cause all Registrable Securities that are required by this Agreement to be registered by a Registration Statement to be listed on each Trading Market or other securities exchange on which securities of the same class issued by the Company are then listed or if such securities are not listed, then on such Trading Market or other securities exchange on which any other securities of the Company are then traded, and enter into such customary agreements including a listing application and indemnification agreement in customary form (provided that the applicable listing requirements are satisfied).

### 4.   Registration Expenses.

All fees and expenses incident to the performance of or compliance with this Agreement by the Company shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market or other securities exchange on which the Common Stock is then listed for trading, and (B) in compliance with applicable state securities or Blue Sky laws), (ii) printing expenses (including, without limitation, expenses of printing

certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) Securities Act liability insurance, if the Company desires such insurance, and (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company shall be responsible for all of its internal expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on any Trading Market or other securities exchange as required hereunder.

**5.  Indemnification.**

(a) <u>Indemnification by the Company</u>. The Company shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Holder, the officers, directors, agents, investment advisors, partners, members, shareholders and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (1) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or (2) in the case of an occurrence of an event of the type specified in Section 3(c)(ii)-(v), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of an Advice (as hereinafter defined) or an amended or supplemented Prospectus, but only if and to the extent that following the receipt of the Advice or the amended or supplemented Prospectus the misstatement or omission giving rise to such Loss would have been corrected.

(b) <u>Indemnification by Holders</u>. Each Holder shall, severally, and not jointly or jointly and severally, indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising solely out of or based solely upon: (x) such Holder's failure to comply with the prospectus delivery requirements of the Securities Act or (y) any untrue statement of a material fact contained in any Registration Statement, any Prospectus, any form of prospectus, or in any amendment or supplement thereto, or arising out of or based upon any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading to the extent, but only to the extent that, (1) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or (2) in the case of an occurrence of an event of the type specified in Section 3(c)(ii)-(v), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the

Prospectus is outdated or defective and prior to the receipt by such Holder of an Advice or an amended or supplemented Prospectus, but only if and to the extent that following the receipt of the Advice or the amended or supplemented Prospectus the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(c) <u>Conduct of Indemnification Proceedings</u>. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "Indemnified Party"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "Indemnifying Party") in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have proximately and materially adversely prejudiced the Indemnifying Party. An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding. All fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten Trading Days of written notice thereof to the Indemnifying Party (regardless of whether it is ultimately determined that an Indemnified Party is not entitled to indemnification hereunder; provided, that the Indemnifying Party may require such Indemnified Party to undertake to reimburse all such fees and expenses to the extent it is finally judicially determined that such Indemnified Party is not entitled to indemnification hereunder).

(d) <u>Contribution</u>. If a claim for indemnification under Section 5(a) or 5(b) is unavailable to an Indemnified Party (by reason of public policy or otherwise), then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement

of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in Section 5(c), any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section was available to such party in accordance with its terms.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 5(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.

The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

**6.   Miscellaneous.**

(a) <u>Remedies</u>. In the event of a breach by the Company or by a Holder, of any of their obligations under this Agreement, each Holder or the Company, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company and each Holder agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

(b) <u>Piggyback on Registrations</u>. The Company (including such other security holders as the Company may so determine) reserves the right to include securities of the Company in a Registration Statement other than the Registrable Securities, and the Company may, from the date of this Agreement until the expiration of the Registration Period, enter into any agreement providing for such right to any of its security holders.

(c) <u>Compliance</u>. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Registrable Securities pursuant to the Registration Statement.

(d) <u>Discontinued Disposition</u>. Each Holder agrees by its acquisition of such Registrable Securities that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in Section 3(c), such Holder will forthwith discontinue disposition of such Registrable Securities under the Registration Statement until such Holder's receipt of the copies of the supplemented Prospectus and/or amended Registration Statement or until it is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

10

(e) <u>Reserved</u>.

(f) <u>Amendments and Waivers</u>. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and the Holders of no less than a majority of the then outstanding or issuable Registrable Securities. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of at least a majority of the Registrable Securities to which such waiver or consent relates, provided, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence.

(g) <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be delivered as set forth in the Purchase Agreement.

(h) <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of each Holder. The Company may not assign its rights or obligations hereunder without the prior written consent of each Holder (which consent shall not be unreasonably withheld). Any Investor may assign any or all of its rights under this Agreement to any Person to whom such investor assigns or transfers any Shares, provided such transferee agrees in writing to be bound, with respect to the transferred Shares, by the provisions hereof that apply to the "Investors".

(i) <u>Execution and Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and, all of which taken together shall constitute one and the same Agreement. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were the original thereof.

(j) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be determined in accordance with with the provisions of the Purchase Agreement.

(n) <u>Cumulative Remedies</u>. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(o) <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(p) <u>Headings</u>. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(q) <u>Independent Nature of Investors' Obligations and Rights</u>. The obligations of each Investor under this Agreement are several, and not joint or jointly and several, with the obligations of any other Investor, and no Investor shall be responsible in any way for the performance of the obligations of any other Investor under this Agreement. Nothing contained herein or in any Transaction Document, and no action taken by any Investor pursuant thereto, shall be deemed to constitute the Investors as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Investors are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement or any other Transaction Document. Each Investor acknowledges that no other Investor will be acting as agent of such Investor in enforcing its rights under this Agreement. Each Investor shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement, and it shall not be necessary for any other Investor to be joined as an additional party in any Proceeding for such purpose. The Company acknowledges that each of the Investors has been provided with the same Registration Rights Agreement for the purpose of closing a transaction with multiple Investors and not because it was required or requested to do so by any Investor.

12

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**LIBERTY SILVER CORP.**

By:/s/ Geoffrey Browne
    Name: Geoffrey Browne
    Title: Chief Executive Officer

[SIGNATURE PAGE OF HOLDERS FOLLOWS]

13

[SIGNATURE PAGE OF HOLDERS TO LIBERTY SILVER CORP. RRA]

Name of Holder:                                    Primus Resources, L.C.
*Signature of Authorized Signatory of Holder:*/s/James A. Marin
Name of Authorized Signatory:              James A. Marin
Title of Authorized Signatory:                Manager


Name of Holder:                                    James A. Freeman
*Signature of Authorized Signatory of Holder:*/s/James A. Freeman
Name of Authorized Signatory:              James A. Freeman


[SIGNATURE PAGES CONTINUE]

<u>Plan of Distribution</u>

Each Selling Stockholder (the "<u>Selling Stockholders</u>") of the common stock ("<u>Common Stock</u>") of Liberty Silver Corp., a Nevada corporation (the "<u>Company</u>") and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on the Trading Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A Selling Stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the Selling Stockholders to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise; or

- any other method permitted pursuant to applicable law.

The Selling Stockholders may also sell shares under Rule 144 under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), if available, rather than under this prospectus.

Broker-dealers engaged by the Selling Stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this Prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with NASDR Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with NASDR IM-2440.

In connection with the sale of the Common Stock or interests therein, the Selling Stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The Selling Stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The Selling Stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more

15

derivative securities which require the delivery to such broker-dealer or other financial institution of shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

The Selling Stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Each Selling Stockholder has informed the Company that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock. In no event shall any broker-dealer receive fees, commissions and markups which, in the aggregate, would exceed eight percent (8%).

The Company is required to pay certain fees and expenses incurred by the Company incident to the registration of the shares. The Company has agreed to indemnify the Selling Stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

Because Selling Stockholders may be deemed to be "underwriters" within the meaning of the Securities Act, they will be subject to the prospectus delivery requirements of the Securities Act. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Securities Act may be sold under Rule 144 rather than under this prospectus. Each Selling Stockholder has advised us that they have not entered into any written or oral agreements, understandings or arrangements with any underwriter or broker-dealer regarding the sale of the resale shares. There is no underwriter or coordinating broker acting in connection with the proposed sale of the resale shares by the Selling Stockholders.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the shares may be resold by the Selling Stockholders without registration and without regard to any volume limitations by reason of Rule 144(e) under the Securities Act or any other rule of similar effect or (ii) all of the shares have been sold pursuant to the prospectus or Rule 144 under the Securities Act or any other rule of similar effect. The resale shares will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale shares may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

Under applicable rules and regulations under the Exchange Act, any person engaged in the distribution of the resale shares may not simultaneously engage in market making activities with respect to the Common Stock for the applicable restricted period, as defined in Regulation M, prior to the commencement of the distribution. In addition, the Selling Stockholders will be subject to applicable provisions of the Exchange Act and the rules and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of shares of the Common Stock by the Selling Stockholders or any other person. We will make copies of this prospectus available to the Selling Stockholders and have informed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale.

**Annex B**

### LIBERTY SILVER CORP.

#### Selling Security Holder Notice and Questionnaire

The undersigned beneficial owner of common stock, par value $0.001 per share (the "Common Stock"), of Liberty Silver Corp., a Nevada corporation (the "Company"), (the "Registrable Securities") understands that the Company has filed or intends to file with the Securities and Exchange Commission (the "Commission") a registration statement on Form S-3 (the "Registration Statement") for the registration and resale under Rule 415 of the Securities Act of 1933, as amended (the "Securities Act"), of the Registrable Securities, in accordance with the terms of the Registration Rights Agreement, dated as of _____ ___, 2012 (the "Registration Rights Agreement"), among the Company and the Purchasers named therein. A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below. All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Registration Rights Agreement.

Certain legal consequences arise from being named as a selling security holder in the Registration Statement and the related prospectus. Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling security holder in the Registration Statement and the related prospectus.

### NOTICE

The undersigned beneficial owner (the "Selling Security Holder") of Registrable Securities hereby elects to include the Registrable Securities owned by it and listed below in Item 3 (unless otherwise specified under such Item 3) in the Registration Statement.

17

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate:

**QUESTIONNAIRE**

**1.**　　　　**Name.**

　　　(a)　　Full Legal Name of Selling Security Holder

_____

　　　(b)　　Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Securities Listed in Item 3 below are held:

_____

　　　(c)　　Full Legal Name of Natural Control Person (which means a natural person who directly or indirectly alone or with others has power to vote or dispose of the securities covered by the questionnaire):

_____

**2. Address for Notices to Selling Security Holder:**

_____
_____
_____

Telephone:
Fax:
Contact Person:

**3. Beneficial Ownership of Registrable Securities:**

　　　(a)　　Type and Principal Amount of Registrable Securities beneficially owned:

_____
_____
_____

**4. Broker-Dealer Status:**

    (a)    Are you a broker-dealer?

                        Yes      No

    (b)    If "yes" to Section 4(a), did you receive your Registrable Securities as compensation for investment banking services to the Company.

                        Yes      No

Note:    If no, the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

    (c)    Are you an affiliate of a broker-dealer?

                        Yes      No

    (d)    If you are an affiliate of a broker-dealer, do you certify that you bought the Registrable Securities in the ordinary course of business, and at the time of the purchase of the Registrable Securities to be resold, you had no agreements or understandings, directly or indirectly, with any person to distribute the Registrable Securities?

                        Yes      No

Note:    If no, the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

**5. Beneficial Ownership of Other Securities of the Company Owned by the Selling Security Holder.**

*Except as set forth below in this Item 5, the undersigned is not the beneficial or registered owner of any securities of the Company other than the Registrable Securities listed above in Item 3.*

    (a)    Type and Amount of Other Securities beneficially owned by the Selling Securityholder:

_____

_____

19

**6. Relationships with the Company:**

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (owners of 5% of more of the equity securities of the undersigned) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

State any exceptions here:

_____

_____

      The undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Registration Statement remains effective.

      By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items 1 through 6 and the inclusion of such information in the Registration Statement and the related prospectus and any amendments or supplements thereto.  The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Registration Statement and the related prospectus.

      IN WITNESS WHEREOF the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated:                        Beneficial Owner:

                             By:

                                Name:
                                Title:

**PLEASE FAX A COPY OF THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE, AND RETURN THE ORIGINAL BY OVERNIGHT MAIL, TO:**



## LIBERTY SILVER CLOSES ACQUISITION OF HI HO PROPERTY TO EXPAND TRINITY LAND PACKAGE

Toronto, ON — October 16, 2012: Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("Liberty Silver" or the "Company") is pleased to announce that it has completed its transaction with Primus Resources, L.C. and a second property owner (collectively, "Primus") to acquire approximately 100 acres located adjacent to the former Trinity Mine on the Company's Trinity property in Nevada (the "Hi Ho Property"). The Hi Ho Property was the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. ("Renaissance") on the Trinity land package.

"We are extremely pleased to have completed the transaction with Primus and appreciate their continued confidence," stated Geoff Browne, Chairman and CEO of Liberty.

The Hi Ho Property completes the land package controlled by Liberty Silver and Renaissance. The joint venture comprises over 10,500 acres of contiguous land in an historic Nevada mining district, which includes the Trinity Mine and several other exploration targets. US Borax operated the Trinity Mine from 1988 to 1989, where it produced over 5 million ounces of silver. Operations at the mine were suspended when silver prices declined to less than $5/oz in the late 1980's. Based upon the drilling results available to the Company from the US Borax drill programs on the Hi Ho Property, it is expected that the inclusion of the Hi Ho Property has the potential to substantially increase the estimated silver resource in the Trinity Mine pit area (please see the Company's December 2011 NI 43 101 resource estimate). The Company is also currently evaluating the internal data in conjunction with its recent drilling and geophysical data to determine future drilling targets. The data will be used to update the Company's current NI 43-101 report and will be utilized as part of the previously announced scoping study, which is being completed in connection with the Company's proposal to put the Trinity Mine back into production.

Richard Bedell, President and CEO of Renaissance comments, "The addition of the Hi Ho Property completes the Trinity land package and significantly increases the size of the potential resource given its close proximity to the existing pit and the historic drilling and assay data that Liberty has analyzed. We are extremely pleased with the progress that Liberty has made on the exploration and development of Trinity. Their approach has been professional, and we are very comfortable with their entire team and the assessment of the property's potential. Trinity is one of the marquee properties in our portfolio and we remain very confident in Liberty's ability to advance the project.  We are fully supportive of Liberty Silver's management and its technical team."

In closing the Hi Ho Property transaction, Liberty Silver paid cash consideration of US$250,000 plus transaction expenses, issued 2,583,333 Liberty Silver common shares (the "Liberty Silver Shares") to Primus at a deemed value of US$1,860,000 (US$0.72 per share), and also granted

Primus a 2% net smelter royalty on future production from the Hi Ho Property. In addition, pursuant to a registration rights agreement between Liberty Silver and Primus, Liberty Silver will pay Primus additional consideration as follows:

- if a registration statement is declared effective by the United States Securities Exchange Commission in respect of the Liberty Silver Shares by March 1, 2013, Liberty Silver will issue an additional 277,778 Liberty Silver common shares to Primus, thereby increasing the total aggregate number of shares issued to 2,861,111 shares at a deemed value of US$2,060,000 (US$0.72 per share); or

- if a registration statement is not declared effective by the United States Securities Exchange Commission in respect of the Liberty Silver Shares by March 1, 2013, Liberty Silver will pay Primus US$200,000. As well, if the five-day weighted average trading price of Liberty Silver's common shares on the Toronto Stock Exchange as of March 1, 2013 (the "Market Price") exceeds US$0.72 per share, Liberty Silver will issue an additional number of Liberty Silver common shares to Primus equal to (a) 277,778 less (b) US$200,000 divided by the Market Price.

"We have closely monitored the progress that Liberty Silver has made since they began operations at Trinity last year," stated Jim Marin of Primus. "They have a strong on the ground team, excellent board and management, supported by first class engineering and permitting consultants. We are very excited to be part of the project and look forward to their future success."

"Liberty Silver is very pleased to have the vendors as significant shareholders and appreciate their recognition of the future potential of the combined properties," added Mr. Browne.

The total consideration for the acquisition of the Hi Ho Property is being applied to Liberty Silver's expenditure commitment under its earn-in agreement with Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Property payment, Liberty Silver has contributed in excess of 85% of its required US$5,000,000 expenditure commitment to earn a 70% interest in the Trinity project. Pursuant to the terms of its earn-in agreement with Renaissance, Liberty Silver has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study the following year.

"We continue to achieve each milestone set forth by our team," concluded Mr. Browne. "This acquisition not only has the potential to increase our current resource and the potential economics to bring the Trinity Mine back into production, but also moves us very close to meeting our earn-in requirements. Although the past week has been challenging for the Company, the board and management of Liberty Silver remain fully committed to its future. Importantly and as previously stated, investors are reminded that they should only rely on official statements and releases issued by the Company for information regarding its activities."

About Liberty Silver Corp.

Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America. Liberty Silver is led by a skilled, experienced management team and board of directors with significant experience managing exploration, development and mining projects. Liberty Silver is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and acquiring new properties that have the potential to increase their resource base. The Trinity silver project, located in Pershing County, Nevada, is Liberty Silver's flagship project.