# Exhibit T

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

[ X ] **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the Fiscal Year Ended June 30, 2012

[] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

# LIBERTY SILVER CORP.

(Exact name of registrant as specified in its charter)

| **Nevada** | **333-150028** | **32-0196442** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**181 Bay Street, Suite 2330**
**Toronto, Ontario, Canada, M5J 2T3**
(Address of principal executive offices)
Registrant's telephone number, including area code: **888-749-4916**

Securities registered under Section 12(b) of the Exchange Act:        None
Securities registered under Section 12(g) of the Exchange Act:        None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act [] Yes [X ] No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the [ ]Yes [X ] No

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. [X] Yes [ ] No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). [X] Yes [ ] No.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [  ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer [ ]                                                    Accelerated filer [ ]
Non-accelerated filer [ ]  (Do not check if a smaller reporting company)      Smaller reporting company [ X ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). [ ] Yes  [X ] No

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of the last business day of the registrant's most recently completed second fiscal quarter $58,408,817.

As of September 28, 2012, the Company had 80,710,834 shares issued and outstanding.

2

PART I

**ITEM 1.       BUSINESS**

**The Corporation**

Liberty Silver Corp. ("Liberty Silver", the "Company", or the "Registrant") was incorporated on February 20, 2007 under the laws of the state of Nevada under the name Lincoln Mining Corp.  Pursuant to a Certificate of Amendment dated February 11, 2010, the Company changed its name to Liberty Silver Corp.  The Company's registered office is located at 1802 N. Carson Street, Suite 212, Carson City Nevada 89701, and its head office is located at 181 Bay Street, Suite 2330, P.O. Box 848, Toronto, Ontario, Canada, M5J 2T3, and the telephone number is 888-749-4916.

**Current Operations**

<u>Overview</u>

The Company was incorporated for the purpose of engaging in mineral exploration activities, and on May 24, 2007, purchased the Zone Lode mining claim located in Elko County, Nevada, for a purchase price of $10,000.  The objective was to conduct mineral exploration activities on the Zone Lode claim to assess whether it contained economic reserves of copper, gold, silver, molybdenum or zinc.  The Company was not able to determine whether this property contained reserves that were economically recoverable and as a result, ceased to explore this property.  The Company's current business operations are focused on exploring and developing the Trinity Silver property located in Pershing County, Nevada (the "Trinity Project").

The Company acquired its interest in the Trinity Project through an Exploration Earn-In Agreement (the "Earn-In Agreement"), discussed below in Item 2 - Properties.  On March 29, 2010, the Company entered into the Earn-In Agreement relating to the Trinity Project with AuEx, Inc., a Nevada company providing the Company with a right to earn a 70% undivided interest in rights of AuEx, Inc. in the Trinity Project (the "70% Interest"); as discussed below, the 70% Interest is subject to the rights and obligations of AuEx, Inc. and its successors and assigns under a Minerals Lease and Sublease between AuEx, Inc. and Newmont Mining USA Limited.  AuEx, Inc. is beneficially owned by another Nevada company AuEx Ventures, Inc. AuEx, Inc. held an exclusive interest in the Trinity Project by way of a Minerals Lease and Sublease with Newmont Mining USA Limited, a Delaware corporation who owns or leases the various unpatented mining claims and portions of private land comprising the Trinity Project; the Minerals Lease and Sublease is discussed below. As part of a restructuring transaction by AuEx Ventures, Inc., another Nevada company Renaissance Gold Inc. ("Renaissance") was spun out, and on July 1, 2010 AuEx, Inc. assigned all of its interest in the Trinity Project and the Earn-In Agreement to Renaissance, who currently holds a 100% leasehold interest in the Trinity Project pursuant to the Minerals Lease and Sublease.  The Company's rights in the Trinity Project are derived from and based upon the rights of Renaissance through the Minerals Lease and Sublease.  The Minerals Lease and Sublease grants to Newmont, a right of first offer on any transfer of AuEx, Inc.'s interests in the Trinity Project to any non-affiliate of AuEx, Inc., and also gives Newmont a right to either enter into a joint venture agreement covering the Trinity Project and any other real property interests that AuEx, Inc. holds or acquires within the Trinity Project, or receive a royalty on all mineral production from such properties.

The Trinity Project consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.  Under the Earn-In Agreement, the Company may earn-in the 70% Interest in the rights of Renaissance in the Trinity Project during a 6-year period in consideration of (1) a signing

3

payment of $25,000, (2) an expenditure of a cumulative total of $5,000,000 in exploration and development expenses on the Trinity Project by March 29, 2016, including a minimum of $500,000 which must be expended within one year from the effective date of the Agreement, and (3) completion of a bankable feasibility study on the Trinity Project on or before the 7th anniversary date of the Agreement.   Item (1) has been completed by the Company, and the Company is current with item (2).

The Company's business operations are currently focused on efforts to develop the Trinity Project. The Company foresees future operations at the Trinity Project consisting of (i) an effort to expand the known resource through drilling, (ii) permitting for operation, if deemed economically viable, (iii) metallurgical studies aimed at enhancing the recovery of the silver and by-product lead and zinc, and (iv) engineering design related to potential construction of a new mine. Exploration of the property will be conducted simultaneously with the mine development in order to locate additional resources.

Products

The Company's anticipated product will be precious and base metal-bearing concentrates and/or precious metal bullion produced from ores from mineral deposits which it hopes to discover and exploit through exploration and acquisition.   The Company anticipates such products will be silver, lead and zinc.

Trinity Project Location

The Trinity Project is located along the west flank of the Trinity Range in Pershing County, Nevada, about 25 miles by road northwest of Lovelock, NV, the county seat. The Trinity Project consists of approximately 10,600 acres, which includes 248 unpatented lode mining claims and portions of nine sections of private land.  The specific location of the Trinity Project is discussed in more detail the Item 2 entitled "Properties" herein.

Infrastructure

The Trinity Project is situated in western Nevada, a locale that is host to many metal mines, mining equipment companies, drilling companies, mining and metallurgical consulting expertise, and experienced mining personnel.  Its location is accessible by all-weather road through an area of very sparse population.

Government Regulation and Approval

The following permits will be necessary to put the Trinity Project into production.

| Permit/notification | Agency |
|---|---|
| - Mine registry | Nevada Division of Minerals |
| - Mine Opening notification | State Inspector of Mines |
| - Solid Waste Landfill | Nevada Bureau of Waste Management |
| - Hazardous Waste Management Permit | Nevada Bureau of Waste Management |
| - General Storm Water Permit | Nevada Bureau of Pollution Control |
| - Hazardous material Permit | State Fire Marshal |
| - Fire and Life Safety | State Fire Marshal |
| - Explosives Permit | Bureau of Alcohol, Tobacco, Firearms |
| - Notification of Commencement of Operations | Mine Safety and Health Administration |
| - Radio License | Federal Communications Commission |

4

<u>Environmental Regulations</u>

Current exploration activities and any future mining operations, if any, are subject to extensive laws and regulations governing the protection of the environment, waste disposal, worker safety, mine construction, and protection of endangered and protected species. The Company has incurred, and expects to incur in the future, significant expenditures to comply with such laws and regulations. Future changes in applicable laws, regulations and permits or changes in their enforcement or regulatory interpretation could have an adverse impact on the Company's financial condition or results of operations. In the event of a mineral discovery, and if management decides to proceed with production, the costs and delays associated with compliance with these laws and regulations could stop the Company from proceeding with a project or the operation or further improvement of a mine or increase the costs of improvement or production.

The Company expects the following environmental permits will be necessary for any anticipated operations:

- Permit for Reclamation
- Water Pollution Control Permit
- Air Quality Operating Permit
- Industrial Artificial pond permit
- Water Rights

The Company anticipates that it will begin soliciting bids for the programs necessary to obtain these permits in due course. The cost, timing, and work schedules are not yet available.

<u>Competition</u>

The Company competes with other mining and exploration companies in connection with the acquisition of mining claims and leases on silver and other precious metals prospects and in connection with the recruitment and retention of qualified employees. Many of these companies are much larger than Liberty Silver, have greater financial resources and have been in the mining business for much longer. As such, these competitors may be in a better position through size, finances and experience to acquire suitable exploration properties. Liberty Silver may not be able to compete against these companies in acquiring new properties and/or qualified people to work on the current Trinity Project, or any other properties that may be acquired in the future.

Given the size of the world market for precious metals such as silver and gold relative to the number of individual producers and consumers, management believes that no single company has sufficient market influence to significantly affect the price or supply of precious metals such as silver and gold in the world market.

<u>Employees</u>

The Company currently has six full-time employees, Geoff Browne, the Chief Executive Officer and Chairman of the Board of Directors, Manish Z. Kshatriya, the Chief Financial Officer and Executive Vice President, William Tafuri, the President and Chief Operating Officer, H. Richard Klatt, the Vice President of Exploration, and two additional employees.

**Reports to Security Holders**

The Company files reports with the SEC under section 15d of the Securities Exchange Act of 1934. The reports will be filed electronically. You may read copies of any materials filed with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet site that will contain copies of the reports that are filed electronically. The address for the SEC Internet site is http://www.sec.gov.

## ITEM 1A.    RISK FACTORS

Not Applicable.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not Applicable.

## ITEM 2.       PROPERTIES.

### Office Space

The Registrant has a lease agreement for office space at 181 Bay Street, Suite 2330, Toronto, Ontario, Canada, M5J 2T3. The telephone number is: 647-749-4916. The monthly base rent is CDN $4,007 (approximately US $4,000). The term of the lease is for fifty-four months and terminates on April 28, 2016.

The Registrant has a lease agreement for a field office at 808 Packer Way, Sparks, NV 89431. The phone number there is: 775-352-9375. The monthly base rent is USD $ 2,477.25 plus Common Area Reimbursement of USD $ 370 and Property Tax of USD $250. The term of the lease is for twelve months and terminates on January 31, 2013.

### Trinity Project

### Trinity Project Location

The Trinity Project is situated approximately 25 road miles north-northwest of Lovelock, Nevada, in Pershing County, Nevada, on the northwest flank of the Trinity Range, in the Trinity mining district. The latitude-longitude coordinates of the mine site are $40^o$ 23' 47" N, $118^o$ 36' 38" W; the mine is located SE ¼, Section 9, Township 29 North, Range 30 East, MDB&M.

The Trinity Project includes public and leased/subleased fee land consisting of the following:

(1)     248 unpatented lode mining claims, the Seka 1-6, 8-16, 61-64, 73-76, 95-112, TS 1-18 claims, Elm1-183, and XXX 1-6 totaling approximately 5000 acres, located in sections 2, 4, 10, 16, and 21, Township 29 North, Range 30 East, and section 26, 28, 34 and 35, Township 30 North, Range 30 East MDB&M. The claims are located on public land open to mineral entry, currently valid, and subject to Bureau of Land Management regulations.

(2)     Approximately 4,396 acres of fee land leased by Newmont Mining Corp. from Southern Pacific Land Co., and its successors, and from Santa Fe Pacific Minerals Corporation, and its successors located in sections 3, 5, 11, and 17, Township 29 North, Range 30 East, and sections 27, 33, and 35, Township 30

6

North, Range 30 East MDB&M.

(3)      Approximately 1,280 acres of fee land owned by Newmont Mining Corp. located in sections 9 and 15, Township 29 North, Range 30 East, MDB&M.

The Company's joint venture area of interest is currently sections 2-5, 8-11, 14-17, Township 29 North, Range 30 East, MDB&M, and sections, 26-28, 32-35, Township 30 North, Range 30 East, MDB&M. The Company's rights, which apply to all of the above properties include exploration, development, and production of valuable minerals except geothermal, hydrocarbons, and sand/gravel, and also include the authority to apply for all necessary permits, licenses and other approvals from the United States of America, the State of Nevada or any other governmental or other entity having regulatory authority over any part of the Trinity Project.

The following Maps identify the location of the Trinity Silver Mine located in Pershing County Nevada:

7





MAP* SHOWING LOCATION OF THE TRINITY SILVER
OPEN PIT MINE, PERSHING COUNTY, NEVADA

Trinity Silver mine

Scale

*Nevada State road map base, 1998

H.R. Klatt
3-17-11

9

**Trinity Project Agreements**

The Company acquired its interest in the Trinity Project through an Exploration Earn-In Agreement, discussed below.  On March 29, 2010, the Company entered into the Earn-In Agreement relating to the Trinity Project with AuEx, Inc., a Nevada company beneficially owned by another Nevada company AuEx Ventures, Inc. AuEx, Inc. held an exclusive interest in the Trinity Project by way of a Minerals Lease and Sublease with Newmont Mining USA Limited, a Delaware corporation who owns or leases the various unpatented mining claims and portions of private land comprising the Trinity Project; the Minerals Lease and Sublease is discussed below. As part of a restructuring transaction by AuEx Ventures, Inc., another Nevada company Renaissance Gold Inc. ("Renaissance") was spun out, and on July 1, 2010 AuEx, Inc. assigned all of its interest in the Trinity Project and the Earn-In Agreement to Renaissance, who currently holds a 100% leasehold interest in the Trinity Project pursuant to the Minerals Lease and Sublease.  The Company's rights in the Trinity Project are derived from and based upon the rights of Renaissance through the Minerals Lease and Sublease.

**Lease and Sublease Agreement**

Renaissance's rights in the Trinity Project are derived through a Minerals Lease and Sublease dated July 29, 2005 (the "Lease") by and between Newmont Mining USA Limited, a Delaware corporation ("Newmont") and AuEx, Inc., a Nevada corporation.

Consideration

The Lease was granted to Renaissance for the following consideration:

    a) Renaissance agreed to pay Newmont a claim fee reimbursement of $10,955 concurrently with the execution of the Lease  (this amount was paid);
    b) Renaissance is required to expend a total of $2,000,000 in ascertaining the existence, location, quantity, quality or commercial value of a deposit of minerals within the Trinity Project on or before the seventh anniversary of the Lease;
    c) Prior to the commencement of any commercial production, Renaissance shall supply Newmont with a feasibility study with respect to the Trinity Project.

Joint Venture / Royalty

The Lease gives Newmont a right to either enter into a joint venture with Renaissance covering the Trinity Project and any other real property interests that Renaissance holds or acquires within the Trinity Project, or receive a royalty on all mineral production from such properties.

*Joint Venture:*  The Lease contemplates the following schedule with respect to Newmont's rights to enter into a joint venture with Renaissance:

    a)  Before Renaissance spends $5 million and provides a feasibility study, Newmont can elect at any time to enter into a joint venture in which event Newmont would be required to pay all future joint venture expenses up to 250% of the expenditures made by Renaissance as of the date of Newmont's election to enter into the joint venture.
    b) Upon Renaissance spending $5 million, but before the feasibility study, Renaissance shall deliver written notice to Newmont containing a summary of the expenditures made by Renaissance on the Trinity Project.  Newmont may thereafter elect to enter into a joint venture by notifying Renaissance in writing of such election within 60 days of Newmont's receipt of Renaissance's initial notice.  Under the joint venture, Newmont would be required to pay all

10

future joint venture expenses up to 250% of the expenditures made by Renaissance as of the date of Newmont's election to enter into the joint venture.

c) After Renaissance spending $5 million, but before the feasibility study, at any time after the expiration of the 60 day period identified in section b above, Newmont can elect to enter into a joint venture in which event Newmont would be required to pay Renaissance 50% of the expenditures made in the Trinity Project up to the date of Newmont's election to participate in a joint venture, and all future joint venture expenses up to 200% of such expenditures.

d) At any time within 60 days after Renaissance's delivery of feasibility study, Newmont can elect to enter into a joint venture at which time Newmont would be required to pay Renaissance 200% of expenditures made by Renaissance as of the date of Newmont's election to enter into the joint venture. Additionally, Renaissance can elect to have Newmont finance Renaissance's share of the joint venture expenses until the Trinity Project is put into commercial production. Following the commencement of commercial production, Newmont shall be entitled to recover such paid expenses with interest at the London Interbank Offering Rate. If Newmont fails to elect to participate in the Joint Venture within 60 days following the delivery of the feasibility study, Newmont's right to participate in a joint venture shall terminate.

Should Newmont elect to participate in a joint venture with Renaissance, pursuant to the Lease, Newmont will serve as the manager of the joint venture and own 51% of the joint venture with an option to acquire an additional 14% for additional payments to Renaissance (for a total participating interest of 65%).

*Royalty:* In the event Newmont does not elect to participate in a joint venture, then Newmont shall have the right to receive a royalty on all mineral production from the Trinity Project. Pursuant to the Lease, if Newmont elects to not participate in the joint venture, then Renaissance shall pay to Newmont $1 million and the Lease shall terminate and Newmont shall transfer title to all property comprising the Trinity Project to Renaissance, and thereafter receive a royalty payment of up to 5% of the net smelter returns generated from the properties comprising the Trinity Project. The Company is current in respect of the consideration requirements of the Earn-In Agreement.

<u>Buyout Option</u>

The Lease provides Renaissance with a buyout option pursuant to which Renaissance holds the right to purchase Newmont's rights in the Trinity Project through the payment of $1 million to Newmont. In the event Renaissance elects the buyout option, Newmont would transfer title to the Trinity Project to Renaissance through quitclaim deed while retaining certain rights in the Trinity Project; such rights may include some form of joint venture or a royalty interest.

**Ownership Interest – Earn-In Agreement**

As noted above, the rights to the Trinity Project are held 100% by Renaissance, pursuant to an assignment of such rights from AuEx, Inc. The Company entered into the Earn-In Agreement providing the Company with a right to earn a 70% undivided interest in rights of Renaissance in the Trinity Project (the "70% Interest"), as set out below. The following is intended to be a summary of some of the material terms of the Earn-In Agreement, and is subject to, and qualified in its entirety, by the full text of the Earn-In Agreement

<u>Consideration</u>

The exclusive right to acquire the 70% Interest in the rights of Renaissance in the Trinity Project was granted to the Company for the following consideration:

11

a) The Company agreed to pay $25,000 upon execution of the Earn-In Agreement (this amount was paid);

b) In order to obtain the 70% Interest in the Trinity Project, the Company is required to (i) produce a bankable feasibility study by March 29, 2017 and (ii) to expend a minimum of $5,000,000 in exploration on the Trinity Project as follows: $500,000 in the first year; $1,000,000 in the second year; $1,000,000 in the third year; $1,000,000 in the fourth year; $1,000,000 in the fifth year; and $500,000 in the sixth year.

Any excess expenditure in any year shall be carried forward and applied to the subsequent year's expenditure requirement, and the Company may accelerate the expenditures at its discretion. If the Company elects not to meet the minimum expenditure obligation during any year but wishes to maintain the Earn-In Agreement in full force and effect, or if it is subsequently determined that the minimum amount was not expended in any given year, the Company shall pay the amount of any deficiency to Renaissance. The Company is current in respect of the consideration requirements of the Earn-In Agreement.

Work Program

The Company shall be the operator and shall have full control over the content of work programs and annual expenditure amounts during the earn-in period, including having the authority to apply for all necessary permits, licenses and other approvals from the U.S., the State of Nevada or any other governmental or other entity having regulatory authority over any part of the Trinity Project.

Joint Venture

Upon the Company having acquired the 70% Interest in the Trinity Project by satisfying the minimum expenditure amounts and producing a bankable feasibility study, the Company and Renaissance shall enter into a formal joint venture agreement, and the Company will be the operator of the joint venture.

At such time as the Company earns the 70% Interest in the Trinity Project, the parties will thereafter participate in expenditures on the Trinity Project in accordance with their respective interests therein, or have their interest diluted in accordance with a straight-line dilution formula, as set forth in the joint venture agreement.

If through dilution the interest of a party is reduced to less than 10%, then that party's participating interest shall automatically be converted to a 3% net smelter returns royalty interest. Should third party claims be acquired with royalties within the area of interest, the 3% royalty described above would be reduced by the amount of such royalty but not below 1%. This reduction does not apply to the royalty described under the heading "Royalty upon Termination of Interest" below.

Royalty upon Termination of Interest

If the Company elects to terminate its right to earn interest in the Trinity Project prior to completing a bankable feasibility study by March 29, 2017, but has expended at least $3,000,000, the Company shall be entitled to a 4% net smelter return royalty capped at twice its expenditure on the Trinity Project.

Termination

The Company may in its sole discretion terminate the Earn-In Agreement at any time by giving not less than 30 days prior written notice to that effect to Renaissance. Upon expiry of the 30-day notice period, the Earn-In Agreement will be of no further force and effect. Upon such termination, the Company shall have no further obligation to incur expenses on or for the benefit of the Trinity Project and shall have no further

obligations or liabilities to Renaissance under the Earn-In Agreement or with respect to the Trinity Project (including without limitation liability for lost profits or consequential damages as a result of an election by the Company to terminate the agreement), other than (a) as set forth below, and (b) to reclaim (in accordance with applicable law) any disturbances of the Trinity Project made by the Company.

At any time the Company may, at its option, terminate its interest in some but less than all of the claims comprising the Trinity Project by written notice to Renaissance, provided that if such notice (or notice of termination of the Earn-In Agreement in its entirety) is received by Renaissance after June 30th of any year, the Company shall remain obligated to pay the claim maintenance fees (and make all filings and recordings required in connection therewith) for those claims to which such termination applies for the upcoming assessment year. To the extent the Company terminates its interest in some but less than all of the claims, the Earn-In Agreement shall remain in full force and effect with respect to the remaining claims.

In the event the Company is in default in the observance or performance of any of the Company's covenants, agreements or obligations under the Earn-In Agreement, Renaissance may give written notice of such alleged default specifying the details of same. The Company shall have 30 days following receipt of said notice within which to remedy any such default described therein, or to diligently commence action in good faith to remedy such default. If the Company does not cure or diligently commence to cure such default by the end of the applicable 30-day period, then Renaissance shall have the right to terminate the Earn-In Agreement by providing 30 days advance written notice to the Company.

<u>Confidentiality</u>

All data and information coming into possession of Renaissance or the Company by virtue of the Earn-In Agreement with respect to the business or operations of the other party, or the Trinity Project generally, shall be kept confidential and shall not be disclosed to any person not a party hereto without the prior written consent of the other party, except: (a) as required by law, rule, regulation or policy of any stock exchange or securities commission having jurisdiction over a party; (b) as may be required by a party in the prosecution or defense of a lawsuit or other legal or administrative proceedings; (c) as required by a financial institution in connection with a request for financing relating to development or mining activities; or (d) as may be required in connection with a proposed conveyance to a third party of an interest in the Trinity Project or the Earn-In Agreement, provided such third party agrees in writing in a manner enforceable by the other party to abide by all of the applicable confidentiality provisions of the Earn-In Agreement with respect to such data and information.

To the extent either party intends to disclose data or information via press release or other similar format as may be required, the disclosing party shall provide the other party with not less than five business days notice of the text of the proposed disclosure, and the other party shall have the right to comment on the same.

**Trinity Project Technical Report**

In the process of compiling and synthesizing information on the Trinity Project, on February 15, 2011, the Company completed an independently verified mineral resource estimate on the Trinity Project (the "Trinity Project Technical Report"); the report was publicly released by the Company on March 2, 2011. The Technical Report for the Trinity mine project was prepared in accordance with the Canadian Securities Administrators' National Instrument 43-101 ("NI 43-101") by Mine Development Associates of Reno, Nevada. The Trinity Project Technical Report may be viewed under the Company's profile on the Securities and Exchange Commission's website at www.SEC.gov.

13

**Mining history**

The following disclosure regarding the mining history of the Trinity Project has been derived from information contained in the Trinity Project Technical Report.

The Trinity Project lies in the Trinity mining district, which had limited production of silver, lead, zinc, and gold from 1864 through 1942, primarily from the east side of the Trinity Range. In the vicinity of the Trinity project, which is located on the west side of the range, there was historic prospecting with unrecorded but presumed minor silver production.

Minor exploration activity took place in the vicinity of the Trinity project in the 1950s, and in the 1960s Phelps Dodge Corporation completed trenching, IP surveying, and limited drilling in the area.

U. S. Borax and Chemical Corp. ("Borax") became interested in what is now the Trinity project in 1982 on the basis of reconnaissance geochemical sampling that indicated the presence of anomalous lead and silver in the Willow Canyon area. By 1984, Borax had acquired a property position and had entered into a joint venture with Southern Pacific Land Company (later Santa Fe Pacific Mining, Inc. ("SFPM") and still later Newmont Mining Corp. ("Newmont")), in which Borax was the operator. From 1982 to 1986, Borax and its joint-venture partner explored the property and developed the Trinity mine. Borax operated the open pit heap-leaching mine, through a mining contractor, on behalf of the joint venture from September 3, 1987 to August 29, 1988, with leaching continuing into 1989. During this period, the mine produced about five million ounces of silver from about 1.1 million tons of oxidized ore grading six ounces of silver per ton. Borax drilled and conducted extensive metallurgical testing on the sulfide mineralization, but metal prices at the time were too low to support mining of this material.

In 1984-1985, 1987-1989, and 1990, SFPM conducted exploration and drilling on their property in the vicinity of the joint-venture lands. In 1991, SFPM acquired sole interest in the joint-venture lands, including Borax's claims, and conducted further exploration through 1992. SFPM's 1990-1992 exploration work concentrated on down-dip and lateral extensions of mineralization underlying the oxide pit and the sulfide mineralization, as well as extensions of mineralization outside the immediate mine area.

There was no exploration on the Trinity property from 1993 to 2005. In August 2005, Renaissance leased the property from Newmont, who had acquired SFPM's Nevada holdings. Under an earn-in agreement with Piedmont Mining Company, Renaissance explored the property from September 2005 through July 2009, including limited drilling in 2006 and 2007 that encountered high-grade silver values below and adjacent to the open pit.

Liberty Silver entered into an Earn-In Agreement with Renaissance in March, 2010. To date, Liberty Silver has conducted extensive data compilation and has completed a magnetotelluric geophysical survey of the project. The database of technical data for the property, developed since 1982, includes the results of soil and rock surveys, geophysical surveys, geologic mapping, lithology logging and multi-element analyses for about 400 drill holes, and metallurgical work, as well as data derived from the previous production of heap-leach silver.

**Geology and Mineralization of Trinity Project**

The following disclosure regarding the Geology and Mineralization of the Trinity Project has been derived from information contained in the Trinity Project Technical Report.

The Trinity Project lies on the western flank of the Trinity Range, one of the generally north-trending ranges formed during Tertiary extension of the Basin and Range Province.

14

Within the Trinity Range, the basement rocks are comprised of the Middle Triassic to Early Jurassic near-shore deltaic deposits of the Auld Lang Syne Group, which are represented by phyllite, argillite, quartzite, and dirty limestone at the Trinity project. The best-represented pre-Cenozoic deformation in this portion of the Trinity Range is the Jurassic and Cretaceous Nevadan Orogeny, which resulted in low-grade regional metamorphism, variably directed folding, and thrust faulting. A Cretaceous intrusive episode culminated the Nevadan Orogeny and is exemplified by a Cretaceous granodiorite stock just northeast of the Trinity project.

Tertiary volcanic and sedimentary rocks and Quaternary sediments are abundant in the Trinity project area. There is a thin Tertiary rhyolite sequence along the central north-south axis of the property that includes the resource area. These volcanic rocks overlie the Mesozoic phyllite and argillite, exposed to the east, but are separated by an argillite breccia that is closely associated with faulting. The rhyolite includes interbedded rhyolitic flows, welded tuffs, air-fall tuffs, epiclastic tuffs, and lacustrine deposits. Several rhyolite domes, dikes, and sills have also been identified on the property, some of which may be related to mineralization. Early Tertiary north- to northwest-trending faults are present in the Trinity project area, as are younger north- to northeast-trending normal faults. Late Tertiary and/or Quaternary bench and channel gravel deposits and Quaternary alluvium and outwash unconformably overlie the rhyolites and cover the western part of the property.

Rhyolite porphyry, aphanitic rhyolite, and volcaniclastic rocks are the principal host rocks for mineralization in the Trinity mine area. Silicification and quartz-adularia-sericite alteration are associated with the mineralization. Tertiary rhyolitic tuffs and flows were extensively altered and form a halo extending 1.6 miles beyond the main mineralized area. This alteration affected the Auld Lang Syne Group only locally along faults and breccia zones.

Mineralization at the Trinity project is controlled by a northeast-trending zone of normal faults. Silver, lead, and zinc mineralization occurs in fractures and bedding planes in Tertiary rhyolite in the hanging-wall block of the fault zone. Although mineralization continues downward into the underlying Triassic rocks, it is more tightly constrained to fractures that host higher-grade vein mineralization. The original Trinity silver deposit can generally be divided into two parts: a sulfide zone below the current pit and to the northeast, and an overlying oxide zone. Borax's mining in the late 1980s focused on a portion of the oxide zone.

Mineralization occurs as oxidized and unoxidized sulfides in veinlets, as fracture-controlled mineralization, and as disseminations within the host rocks, including breccia matrix. Sulfide mineralization consists mainly of pyrite, sphalerite, galena, marcasite, and minor arsenopyrite with various silver minerals, including tetrahedrite-freibergite, pyrargyrite, minor argentite, and rare native silver, with traces of gold, pyrrhotite, stannite, and chalcopyrite. Low-grade lead and zinc have the potential to add value as byproducts.

**Index of Geologic Terms**

| TERM | DEFINITION |
| --- | --- |
| Adularia | A variety of transparent or translucent orthoclase. |
| Air-fall tuffs | Ash exploded out of a volcano, which falls through the air and settles in beds, called **tuffs** when consolidated. |
| Alluvium | Loose, unconsolidated (not cemented together into a solid rock) soil or sediments |
| Aphanitic | Igneous rock in which the grain or crystalline structure is too fine to be seen by the unaided eye |
| Argillite | A fine-grained sedimentary rock composed predominantly of indurated muds and oozes. |

| | |
|---|---|
| Argillization | The replacement or alteration of feldspars to form clay minerals. |
| Arsenopyrite | The most prevalent mineral containing the element arsenic. |
| Breccia | A rock composed of broken fragments of minerals or rock cemented together by a fine-grained matrix, which can be either similar to or different from the composition of the fragments. |
| Cenozoic | The current and most recent geological era and covers the period from 65.5 million years ago to the present |
| Chalcopyrite | A major ore mineral containing copper, iron, and sulfur. |
| Cretaceous | A geologic period from 145 to 65 million years ago. |
| Deltaic | Pertaining to, or like a delta. |
| Dikes | A type of sheet intrusion referring to any geologic body that cuts discordantly across rock structures. |
| Domes | A roughly circular mound-shaped protrusion resulting from the slow extrusion of viscous lava from a volcano. |
| Epiclastic | Formed at the surface of the earth by consolidation of fragments of preexisting rocks. |
| Freibergite | A complex sulfosalt mineral of silver, copper, iron, antimony, arsenic, and sulfur. |
| Galena | The natural mineral form of lead sulfide. |
| Grandiorite | A visibly crystalline plutonic rock composed chiefly of sodic plagioclase, alkali feldspar, quartz, and subordinate dark-colored minerals. |
| Hydrothermal | Relating to or produced by hot water, especially water heated underground by the Earth's internal heat. |
| Jurassic | The geologic period that extends from about 200 to 145 million years ago. |
| Lacustrine | Of or relating to lakes. |
| Metal Sulfides | A group of minerals containing both metals and sulfur. |
| Mesozoic | A geologic era that extends from 251 to 65 million years ago |
| Mineral | A mineral is a naturally occurring solid chemical substance having characteristic chemical composition, highly ordered atomic structure, and specific |
| Mineralization | The act or process of mineralizing. |
| Miocene | A geological epoch that extends from about 23.8 to 5.3 million years ago. |
| Nevadan Orogeny | A major mountain building event that took place along the western edge of ancient North America between the mid to late Jurassic. |
| Ore | Mineralized material that can be mined and processed at a positive cash flow. |
| Orthoclase | A variety of feldspar, essentially potassium aluminum silicate, which forms igneous rock. |
| Oxidized | A process whereby the sulfur in a mineral has been removed and replaced by oxygen. |
| Phyllite, | A type of foliated metamorphic rock primarily composed of quartz, muscovite mica, and chlorite |
| Pliocene | The geologic epoch that extends from about 5.3 million to 1.8 million years ago. |
| Porphyry | A variety of igneous rock consisting of large-grained crystals suspended in a fine grained matrix |
| Pyrargyrite | A sulfosalt mineral consisting of silver, arsenic, and sulfur. |
| Pyrite | A very common sulfide mineral consisting of iron and sulfur found in a wide variety of geological occurrences.  Commonly known as "Fools Gold" |
| Pyrrhotite | An unusual iron sulfide mineral with a variable iron content. |
| Quartzite | A hard metamorphic rock which was originally sandstone |
| Rhyolite | A fine-grained volcanic rock, similar to granite in composition |
| Sercitization | A hydrothermal or metamorphic process involving the introduction of, alteration to, or replacement by white, fine-grained potassium mica. |
| Silicification | A hydrothermal or metamorphic process involving the introduction of, alteration to, or replacement by silica. |
| Sills | A tabular sheet intrusion that has intruded between older layers of sedimentary rock, beds of volcanic lava or tuff. |
| Sphalerite | A mineral containing zinc and sulfur. |
| Stannite | A mineral containing copper, iron, tin, and sulfur. |
| Sulfides | Sulfide minerals are a class of minerals containing sulfur with sulfide ($S^{2-}$) as the major anion. |
| Tetrahedrite | A sulfosalt mineral containing  copper, antimony, and sulfur. |
| Triassic | A geologic period that extends from about 251 to 200 million years ago. |
| Volcanic | A rock formed from magma erupted from a volcano. |

16

| Volcaniclastic | Volcanic material which been transported and reworked through mechanical action, such as by wind or water. |
| Welded tuffs | Rock composed of compacted volcanic ejected materials. |

## Subsequent Event

On August 8, 2012, Liberty Silver entered into a conditional letter agreement with Primus Resources, L.C. to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada (the "Hi Ho Properties"). The Hi Ho Properties are the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. on the Trinity land package. Under the terms of the Agreement, Liberty Silver will provide cash consideration of US$150,000 and issue 3,000,000 common shares of Liberty Silver stock to Primus. In addition, Primus will be granted a 2% net smelter royalty ("NSR") on future production from the Hi Ho Properties. The total consideration for the acquisition of the Hi Ho Properties will be applied to Liberty Silver's expenditure commitment under its Earn-In Agreement with Renaissance, upon acceptance by Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Properties payment, Liberty Silver will have contributed in excess of 85% of its required US$5 million expenditure commitment to earn its 70% interest in the project. Pursuant to the terms of its Earn-In Agreement with Renaissance, the Company has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study in the following year.

## ITEM 3.        LEGAL PROCEEDINGS.

Neither the Company nor its property is the subject of any pending legal proceedings, and no such proceeding is known to be contemplated by any governmental authority. The Company is not aware of any legal proceedings in which any director, officer or affiliate of the Company, any owner of record or beneficially of more than 5% of any class of our voting securities, or any associate of any such director, officer, affiliate or security holder of the Company, is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries.

## ITEM 4.        MINE SAFETY DISCLOSURES.

The recently enacted Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Act") requires the operators of mines to include in each periodic report filed with the Securities and Exchange Commission certain specified disclosures regarding the Company's history of mine safety. The Company is currently in the exploration phase and does not operate mines at any of its properties, and as such is not subject to disclosure requirements regarding mine safety that were imposed by the Act.

## PART II

## ITEM 5.        MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

## Market Information.

The Company's common stock is quoted on the Toronto Stock Exchange under the Symbol "LSL", and on the OTC Bulletin Board under the Symbol "LBSV.OB".

The quotations set forth below reflect inter-dealer prices, without retail mark-up, markdown or commission and may not represent actual transactions.

The high and low closing prices of our common stock on the Toronto Stock Exchange and the OTC Bulletin Board for the periods indicated below are as follows:

| | TSX | | | OTCBB | |
| PERIOD | HIGH BID CAD$ | LOW BID CAD$ | HIGH BID US$ | LOW BID US$ |
|---|---|---|---|---|
| April 1, 2012 through June 30, 2012 | $ 0.95 | $ 0.41 | $ 0.85 | $ 0.47 |
| January 1, 2012 through March 31, 2012 | $ 1.04 | $ 0.75 | $ 1.03 | $ 0.60 |
| October 1, 2011 through December 31, 2011 (1) | $ 1.09 | $ 0.72 | $ 1.11 | $ 0.50 |
| July 1, 2011 through September 30, 2011 | $ N/A | $ N/A | $ 0.80 | $ 0.47 |
| April 1, 2011 through June 30, 2011 | $ N/A | $ N/A | $ 0.64 | $ 0.30 |
| January 1, 2011 through March 31, 2011 | N/A | N/A | $ 0.63 | $ 0.19 |
| October 1, 2010 through December 31, 2010 | N/A | N/A | $ 0.64 | $ 0.17 |
| July 1, 2010 through September 30, 2010 | N/A | N/A | $ 0.61 | $ 0.30 |

(1)  Common stock commenced trading on the TSX on December 22, 2011.

As of September 25, 2012, there were 80,710,834 shares of common stock issued and outstanding held by approximately 29 registered stockholders of record of the Company's common stock.

There have been no cash dividends declared or paid on the shares of common stock, and management does not anticipate payment of dividends in the foreseeable future.

**ITEM 6.      SELECTED FINANCIAL DATA.**

Not Applicable.

**ITEM 7.      MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION.**

**SPECIAL NOTE OF CAUTION REGARDING FORWARD-LOOKING STATEMENTS**

CERTAIN STATEMENTS IN THIS REPORT, INCLUDING STATEMENTS IN THE FOLLOWING DISCUSSION, ARE WHAT ARE KNOWN AS "FORWARD LOOKING STATEMENTS", WHICH ARE BASICALLY STATEMENTS ABOUT THE FUTURE. FOR THAT REASON, THESE STATEMENTS INVOLVE RISK AND UNCERTAINTY SINCE NO ONE CAN ACCURATELY PREDICT THE FUTURE. WORDS SUCH AS "PLANS," "INTENDS," "WILL," "HOPES," "SEEKS," "ANTICIPATES," "EXPECTS "AND THE LIKE OFTEN IDENTIFY SUCH FORWARD LOOKING STATEMENTS, BUT ARE NOT THE ONLY INDICATION THAT A STATEMENT IS A FORWARD LOOKING STATEMENT. SUCH FORWARD LOOKING STATEMENTS INCLUDE STATEMENTS CONCERNING OUR PLANS AND OBJECTIVES WITH RESPECT TO THE PRESENT AND FUTURE OPERATIONS OF THE COMPANY, AND STATEMENTS WHICH EXPRESS OR IMPLY THAT SUCH PRESENT AND FUTURE OPERATIONS WILL OR MAY PRODUCE REVENUES, INCOME OR PROFITS. NUMEROUS FACTORS AND FUTURE EVENTS COULD CAUSE THE COMPANY TO CHANGE SUCH PLANS AND OBJECTIVES OR FAIL TO SUCCESSFULLY IMPLEMENT SUCH PLANS OR ACHIEVE SUCH OBJECTIVES, OR CAUSE SUCH PRESENT AND FUTURE OPERATIONS TO FAIL TO PRODUCE REVENUES, INCOME OR PROFITS. THEREFORE, THE READER IS ADVISED THAT THE FOLLOWING DISCUSSION SHOULD BE CONSIDERED IN LIGHT OF THE DISCUSSION OF RISKS AND OTHER FACTORS CONTAINED

IN THIS REPORT ON FORM 10-K AND IN THE COMPANY'S OTHER FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION. NO STATEMENTS CONTAINED IN THE FOLLOWING DISCUSSION SHOULD BE CONSTRUED AS A GUARANTEE OR ASSURANCE OF FUTURE PERFORMANCE OR FUTURE RESULTS.

**Background and Overview**

The Company was incorporated for the purpose of engaging in mineral exploration activities.  On March 29, 2010, the Company entered into an Exploration Earn-In Agreement relating to the Trinity Project located in Pershing County, Nevada and now intends to engage in efforts to develop the Trinity Project.  The plan of operation for the fiscal year ending June 30, 2013 is to conduct mineral exploration activities and production planning at the Trinity Silver property. Operations at the Trinity Project will consist of (i) an effort to expand the known resource through drilling, (ii) permitting for operation, if deemed economically viable, (iii) metallurgical studies aimed at enhancing the recovery of the silver and by-product lead and zinc, and (iv) engineering design related to potential construction of a new mine. Exploration of the property will be conducted simultaneously with the mine development in order to locate additional resources.

**Results of Operations**

The following discussion and analysis provides information that we believe is relevant to an assessment and understanding of our results of operation and financial condition for the fiscal year ended June 30, 2012 as compared to the fiscal year ended June 30, 2011.  Unless otherwise stated, all figures herein are expressed in U.S. dollars.

***Comparison of the fiscal years ended June 30, 2012 and 2011***

Revenue

During the fiscal years ended June 30, 2012 and June 30, 2011, the Company generated no revenue.

Expenses

During the fiscal year ended June 30, 2012, the Company reported total operating expenses of $5,681,977 as compared to $1,463,758 during the fiscal year ended fiscal year ended June 30, 2012, an increase of $4,218,219 or approximately 288%.  The increase in operating expenses is primarily due to increases in stock compensation, financing cost associated with valuation of warrants, exploration, legal and accounting expense and operation and administration.   The increases in these expenses are primarily attributable to the Company's effort to finance, explore and develop the Trinity Silver property located in Pershing County, Nevada.

Comprehensive Loss

The Company had a comprehensive loss of $5,689,256 for the fiscal year ended June 30, 2012, as compared to a comprehensive loss of $1,464,253 for the fiscal year ended June 30, 2012, a change of $4,225,003 or approximately 289%.  The change in comprehensive loss was primarily due to an increase in operating expenses, which was minimally offset by the gain from foreign exchange during the fiscal year ended June 30, 2012.

**Liquidity and Capital Resources**

Management currently believes that the Company has sufficient working capital needed to meet its current fiscal obligations.  In order to continue to meet its fiscal obligations beyond the next twelve months, management has plans to pursue various financing alternatives including, but not limited to, merger and acquisition activity, raising capital through the capital markets and debt financing.

On November 10, 2011, the Company entered into a Subscription Agreement (the "Subscription Agreement") with Look Back Investments, Inc. ("Investor"), pursuant to which an investor acquired Subscription Receipts ("Subscription Receipts") for U.S. $0.50 per Subscription Receipt for gross proceeds of U.S. $3,250,000; the gross proceeds of U.S. $3,250,000 (the "Escrow Proceeds") were held in escrow pursuant to the terms of the Subscription Receipt.  Each Subscription Receipt entitled the investor to receive one unit (a "Unit") from the Company without payment of any additional consideration upon conditional approval by the Toronto Stock Exchange for the listing of the common shares of the Company.  Each Unit consists of one share of common stock of the Company and one common stock purchase warrant (a "Warrant"); each Warrant is exercisable at a price of US $0.65 per share at any time until 5:00 p.m. (Toronto time) on December 31, 2013.  On December 19, 2011, each Subscription Receipt was automatically converted for no additional consideration, into one Unit of the Company as a result of the Company's receipt of notice that its common stock was accepted for trading on the Toronto Stock Exchange under the trading symbol, "LSL", effective as of December 22, 2011.  On December 19, 2011, the Escrow Proceeds were delivered to the Company from the escrow agent.  As a result of the foregoing private placement transaction, the Company currently has the necessary working capital needed to meet its current budget.

Additionally, on December 19, 2011, the Company completed a private placement offering, pursuant to which the Company raised a total of US $1,313,750 through the sale of 2,627,500 Units at a purchase price of US $0.50 per Unit; there were no underwriting discounts or commissions paid.  Each Unit consisted of one share of common stock of the Company and one common stock purchase warrant (a "Warrant").  Each whole Warrant entitles the holder to acquire one share of common stock at a price of US $0.65 for a period of two years following the date of the closing of the financing.

*Current Assets and Total Assets*

As of June 30, 2012, the Company audited balance sheet reflects that the Company had: i) total current assets of $1,796,779, as compared to total current assets of $27,017 at June 30, 2011, an increase of $1,769,762, or approximately 6,511%; and ii) total assets of $1,956,416, as compared to total assets of $124,528 at June 30, 2011, an increase of 1,831,888 or approximately 1,471%.  The increase in total current assets and total assets was primarily attributable to the proceeds raised from the Company's issuance of common stock.

*Total Current Liabilities and Liabilities*

As of June 30, 2012, the audited balance sheets reflect that the Company had total current liabilities and total liabilities of $167,948, as compared to total current liabilities and total liabilities of $578,320 at June 30, 2011, a decrease of $410,372 or approximately 71%. This decrease was due to a decrease in accrued liabilities and related party payable, partially offset by an increase in accounts payable

*Cash Flow*

During the fiscal year ended June 30, 2012 cash was primarily used to fund operations. We had a net increase in cash used in operating activities during the fiscal year ended June 30, 2012 as compared to June

30, 2011.  See below for additional discussion and analysis of cash flow.

| | For the years ended June 30, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | $ | $ |
| Net cash provided by (used in) operating activities | (3,155,094) | (785,254) |
| Net cash used in investing activities | (66,340) | (72,511) |
| Net cash provided by financing activities | 4,899,625 | 150,000 |
| Net Change in Cash | 1,678,191 | (707,765) |

During the year ended June 30, 2012, net cash used in operating activities was $3,155,094, compared to net cash used in operating activities of $785,254 during the year ended June 30, 2011.  The increase in net cash used in operating activities is primarily due to an increase in: exploration expense; operation and administration expense; and, legal and accounting expense.  The increase in these expenses was partially offset by a small decrease in consulting expense.

During the year ended June 30, 2012, net cash used in investing activities was $66,340, comprised of $34,732 paid for the purchase of furniture and equipment and $31,608 paid to acquire mining interests.  During the year ended June 30, 2011, net cash used in investing activities was $72,511, all of which was paid to acquire mining interests.

During the year ended June 30, 2012, net cash provided by financing activities was $4,899,625.  The net amount was comprised of $5,252,388 from the proceeds of the issuance of common stock, partially offset by $202,763 of costs associated with the issuance of the common stock, and $150,000 used to repay related party notes.  During the year ended June 30, 2011, net cash provided by financing activities was $150,000, which represented proceeds from related party notes.

**Subsequent Events**

On August 8, 2012, Liberty Silver entered into a conditional letter agreement with Primus Resources, L.C. to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada (the "Hi Ho Properties"). The Hi Ho Properties are the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. on the Trinity land package. Under the terms of the Agreement, Liberty Silver will provide cash consideration of US$150,000 and issue 3,000,000 common shares of Liberty Silver stock to Primus. In addition, Primus will be granted a 2% net smelter royalty ("NSR") on future production from the Hi Ho Properties. The total consideration for the acquisition of the Hi Ho Properties will be applied to Liberty Silver's expenditure commitment under its Earn-In Agreement with Renaissance, upon acceptance by Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Properties payment, Liberty Silver will have contributed in excess of 85% of its required US$5 million expenditure commitment to earn its 70% interest in the project. Pursuant to the terms of its Earn-In Agreement with Renaissance, the Company has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study in the following year.

As disclosed on Form CB filed with the Securities and Exchange Commission on July 17, 2012, on July 16, 2012 Liberty Silver commenced an offer (the "Offer") to purchase all of the issued and outstanding common shares of Sennen Resources Ltd. ("Sennen"). The Offer was open for acceptance by

21

Sennen shareholders until 11:59 P.M. on Monday September 10, 2012. The Offer was not accepted by the requisite number of Sennen shareholders, therefore the Offer was terminated on September 11, 2012 at 12:00 A.M.

**Off-Balance Sheet Arrangements**

The Company has no off-balance sheet arrangements and has not entered into any transaction involving unconsolidated limited purpose entities.

**ITEM 7A.        QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not Applicable.

**ITEM 8.        FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

The financial statements of the Company required by Article 8 of Regulation S-X are attached to this report

**LIBERTY SILVER CORP.**
**AUDITED FINANCIAL STATEMENTS**
**FOR THE FISCAL YEARS ENDED JUNE 30, 2012 and 2011**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 23 |
| Balance Sheets | 24 |
| Statements of Operations And Comprehensive Income | 25 |
| Statements of Stockholders Equity | 26-28 |
| Statements of Cash Flows | 29-30 |
| Notes to Consolidated Financial Statements | 31-47 |

**Morrill & Associates, LLC**
Certified Public Accountants
1448 North 2000 West, Suite 3
Clinton, Utah 84015
801-820-6233 Phone; 801-820-6628 Fax

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders
Liberty Silver Corp. (An Exploration Stage Company)
Manahattan, CA

We have audited the accompanying balance sheets of Liberty Silver Corp. (an exploration stage company) as of June 30, 2012 and 2011 and the related statements of operations, stockholders' equity (deficit) and cash flows for the years ended June 30, 2012 and 2011 and from inception on February 20, 2007 through June 30, 2012. These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting.  Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting.  Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Liberty Silver Corp. (an exploration stage company) as of June 30, 2012 and 2011 and the results of its operations and cash flows for the years ended June 30, 2012 and 2011 and from inception on February 20, 2007 through June 30, 2012 in conformity with generally accepted accounting principles in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.  The Company has suffered recurring losses and has no operations, which raise substantial doubt about its ability to continue as a going concern.  Management's plans in regard to these matters are described in Note 9. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.


*/s/ Morrill & Associates*


Morrill & Associates
Clinton, Utah 84015
September 25, 2012

23

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Balance Sheets**

ASSETS

| | | June 30, 2012 | | June 30, 2011 |
|---|---|---|---|---|
| Current Assets | | | | |
| Cash and cash equivalents | $ | 1,694,914 | $ | 16,723 |
| Accounts receivable | | - | | - |
| Deposit | | 10,906 | | - |
| Other | | 34,335 | | - |
| Prepaid | | 56,624 | | 10,294 |
| Total current assets | | 1,796,779 | | 27,017 |
| Property and Equipment | | | | |
| Furniture and office equipment | | 34,732 | | - |
| Accumulated depreciation | | (4,214) | | - |
| Mining interests | | 129,119 | | 97,511 |
| Total property and equipment | | 159,637 | | 97,511 |
| Total assets | $ | 1,956,416 | $ | 124,528 |

LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)

| | | June 30, 2012 | | June 30, 2011 |
|---|---|---|---|---|
| Current Liabilities | | | | |
| Accounts payable | $ | 96,323 | $ | 60,924 |
| Accrued liabilities | | 71,625 | | 367,396 |
| Related party payable | | - | | 150,000 |
| Total current liabilities | | 167,948 | | 578,320 |
| Total liabilities | | 167,948 | | 578,320 |
| | | | | |
| Commitments and contingencies (note 7) | | - | | - |
| | | | | |
| Stockholders' Equity (Deficit) | | | | |
| Capital stock, $.001 par value, | | | | |
| 200,000,000 shares authorized; | | | | |
| 80,710,834 and 69,733,334 shares issued and outstanding, | | | | |
| respectively | | 80,711 | | 69,734 |
| Additional paid-in-capital | | 9,937,509 | | 1,814,207 |
| Issue costs | | (202,763) | | - |
| Deficit accumulated during the exploration stage | | (8,026,989) | | (2,337,733) |
| | | | | |
| Total stockholders' equity (deficit) | | 1,788,468 | | (453,792) |
| Total liabilities and stockholders' equity (deficit) | $ | 1,956,416 | $ | 124,528 |

The accompanying notes are an integral part of these financial statements.

24

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Operations**

| | For Year Ended June 30, | | Cumulative During the Exploration Stage February 20, 2007 (inception) to June 30, |
| --- | --- | --- | --- |
| | 2012 | 2011 | 2012 |
| Revenue | $                - | $                - | $                    - |
| Operating expenses | | | |
| Financing costs associated with valuation of warrants | 1,826,160 | 40,000 | 2,388,351 |
| Consulting | 416,338 | 582,572 | 1,098,465 |
| Exploration | 1,273,491 | 126,841 | 1,491,433 |
| Operation and administration | 1,311,615 | 288,755 | 1,701,631 |
| Stock compensation | 639,731 | 286,750 | 926,482 |
| Legal and accounting | 214,642 | 138,840 | 401,348 |
| Impairment of mining interests | - | - | 11,800 |
| Total operating expenses | 5,681,977 | 1,463,758 | 8,019,510 |
| Income (loss) from operations | (5,681,977) | (1,463,758) | (8,019,510) |
| Other income (expense) | | | |
| Interest income | - | 882 | 1,220 |
| Interest expense | (169) | (189) | (403) |
| Total other income (expense) | (169) | 693 | 817 |
| Loss before income tax | (5,682,146) | (1,463,065) | (8,018,693) |
| Provision for income taxes | - | - | - |
| Net loss | (5,682,146) | (1,463,065) | (8,018,693) |
| Gain (loss) foreign exchange | (7,110) | (1,188) | (8,296) |
| Comprehensive loss | $ (5,689,256) | $ (1,464,253) | $ (8,026,989) |
| Loss per common share – basic and fully diluted | $ (0.08) | $ (0.02) | |
| Weighted average common shares | 75,705,683 | 69,733,334 | |

The accompanying notes are an integral part of these financial statements.

25

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Stockholders' Equity (Deficit)**
**For the period February 20, 2007 (inception) through June 30, 2012**

| | Common Stock | | Additional Paid in Capital | Issued Cost | Deficit Accumulated During Exploration Stage | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance, February 20, 2007 (inception) | | $ - | $ - | $ - | $ - | $ - |
| *Shares for cash:* | | | | | | |
| Shares issued at $0.001 per share | 80,000,000 | 80,000 | (76,000) | - | - | 4,000 |
| Shares issued at $0.01 per share | 20,000,000 | 20,000 | (10,000) | - | - | 10,000 |
| Shares issued at $0.05 per share | 8,400,000 | 8,400 | 12,600 | - | - | 21,000 |
| Net loss for the period ending June 30, 2007 | - | - | - | - | (1,128) | (1,128) |
| Balance, June 30, 2007 | 108,400,000 | 108,400 | (73,400) | - | (1,128) | 33,872 |
| Net loss for the period ending June 30, 2008 | - | - | - | - | (22,248) | (22,248) |
| Balance, June 30, 2008 | 108,400,000 | 108,400 | (73,400) | - | (23,376) | 11,624 |
| Net loss for the period ending June 30, 2009 | - | - | - | - | (31,522) | (31,522) |
| Balance, June 30, 2009 | 108,400,000 | $ 108,400 | $ (73,400) | $ - | $ (54,898) | $ (19,898) |

The accompanying notes are an integral part of these financial statements.

26

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Stockholders' Equity (Deficit)**
**For the period February 20, 2007 (inception) through June 30, 2012**

| | Common Stock | | Additional Paid in Capital | Issued Cost | Deficit Accumulated During Exploration Stage | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance, June 30, 2009 | 108,400,000 | $ 108,400 | $ (73,400) | $ - | $ (54,898) | $ (19,898) |
| *Shares for cash:* | | | | | | |
| Shares issued at $0.75 per share | 1,333,334 | 1,334 | 998,666 | - | - | 1,000,000 |
| Share cancellation | (40,000,000) | (40,000) | 40,000 | - | - | - |
| Valuation of stock warrants | - | - | 522,191 | - | - | 522,191 |
| Net loss for the period ending June 30, 2010 | - | - | - | - | (818,582) | (818,582) |
| Balance, June 30, 2010 | 69,733,334 | $ 69,734 | $ 1,487,457 | $ - | $ (873,480) | $ 683,711 |
| Valuation of stock options | - | - | 286,750 | - | - | 286,750 |
| Valuation of stock warrants | - | - | 40,000 | - | - | 40,000 |
| Net loss for the period ending June 30, 2011 | - | - | - | - | (1,464,253) | (1,464,253) |

**Liberty Silver Corp.**
**(An Exploration Stage Company)**

The accompanying notes are an integral part of these financial statements.

27

**Statements of Stockholders' Equity (Deficit)**
**For the period February 20, 2007 (inception) through June 30, 2012**

| | Common Stock | | Additional Paid in Capital | Issued Cost | Deficit Accumulated During Exploration Stage | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance, June 30, 2011 | 69,733,334 | 69,734 | 1,814,207 | - | (2,337,733) | (453,792) |
| Valuation of stock options | - | - | 639,731 | - | - | 639,731 |
| Valuation of stock warrants | - | - | 1,826,160 | - | - | 1,826,160 |
| *Shares for cash:* | | | | | | |
| Shares issued at $0.57 per share (1) | 200,000 | 200 | 116,291 | - | - | 116,491 |
| Shares issued at $0.57 per share  (1) | 1,000,000 | 1,000 | 571,148 | - | - | 572,148 |
| Shares issued at $0.50 per share | 6,500,000 | 6,500 | 3,243,500 | - | - | 3,250,000 |
| Shares issued at $0.50 per share | 2,627,500 | 2,627 | 1,311,122 | - | - | 1,313,749 |
| *Shares for non-cash:(2)* | | | | | | |
| Shares issued at $0.64 per share (2) | 650,000 | 650 | 415,350 | - | - | 416,000 |
| Net loss for the period ending June 30, 2012 | - | - | - | (202,763) | (5,689,256) | (5,892,019) |
| Balance, June 30, 2012 | 80,710,834 | 80,711 | 9,937,509 | (202,763) | (8,026,989) | 1,788,468 |

(1) Shares purchase for $0.55 CDN and was converted to $0.57 USD

(2) Shares issued to satisfy contractual obligation pursuant to a registration rights agreement

The accompanying notes are an integral part of these financial statements.

28

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Cash Flows**

| | | | | | | Cumulative During the Exploration Stage February 20, 2007 (inception) to June 30, 2012 |
|---|---|---|---|---|---|---|
| | | For Year Ended June 30, | | | | |
| Cash flows from operating activities | | 2012 | | 2011 | | |
| Comprehensive loss | $ | (5,689,256) | $ | (1,464,253) | $ | (8,026,989) |
| Adjustments to reconcile net (loss) to net cash used in operating activities | | | | | | |
| Valuation of warrants associated with financing | | 1,826,160 | | 40,000 | | 2,388,351 |
| Valuation of stock option issuance | | 639,731 | | 286,750 | | 926,481 |
| Shares issued to settle contractual obligation | | 416,000 | | - | | 416,000 |
| Depreciation expense | | 4,214 | | - | | 4,214 |
| Changes in operating assets and liabilities: | | | | | | |
| (Increase) decrease in prepaid expenses | | (46,330) | | 8,648 | | (56,624) |
| (Increase) decrease in deposit | | (10,906) | | 850 | | (10,906) |
| Increase in other assets | | (34,335) | | - | | (34,335) |
| Increase in accounts payable | | 35,399 | | 54,941 | | 96,323 |
| Increase (decrease) in accrued expenses | | (295,771) | | 287,810 | | 71,625 |
| Net cash used in operating activities | | (3,155,094) | | (785,254) | | (4,225,860) |
| Cash flows from investing activities | | | | | | |
| Cash used for furniture and equipment | | (34,732) | | - | | (34,732) |
| Cash paid for mining interests | | (31,608) | | (72,511) | | (129,119) |
| Net cash used in investing activities | | (66,340) | | (72,511) | | (163,851) |
| Cash flows from financing activities | | | | | | |
| Proceeds from related party note | | - | | 150,000 | | 150,000 |
| Payments on related party note | | (150,000) | | - | | (150,000) |
| Proceeds from issuance of common stock | | 5,252,388 | | - | | 6,287,388 |
| Issue costs | | (202,763) | | - | | (202,763) |
| Net cash provided by financing activities | | 4,899,625 | | 150,000 | | 6,084,625 |
| Increase (decrease) in cash and cash equivalents | | 1,678,191 | | (707,765) | | 1,694,914 |
| Cash and cash equivalents, beginning of period | | 16,723 | | 724,488 | | - |
| Cash and cash equivalents, end of period | $ | 1,694,914 | $ | 16,723 | $ | 1,694,914 |

The accompanying notes are an integral part of these financial statements.

29

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
Statements of Cash Flows (continued)

| | Year ended June 30, 2012 | Year ended June 30, 2011 | Accumulated from February 20, 2007 (inception) through June 30, 2012 |
|---|---|---|---|
| Supplement Disclosures: | | | |
| Cash paid for interest | $ 169 | $ 189 | $ 403 |
| Cash paid for income tax | $ - | $ - | - |

The accompanying notes are an integral part of these financial statements.

30

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

**Note 1 – Nature and Continuance of Operations**

The Company was incorporated in the State of Nevada on February 20, 2007. The Company is considered an exploration stage company since its formation, and the Company has not yet realized any revenues from its planned operations. The Company is primarily focused on the exploration, acquisition and development of mining and mineral properties. Upon the location of commercially minable reserves, the Company plans to prepare for mineral extraction and enter the development stage.

On May 24, 2007, the Company had acquired a mineral property located in Elko County, within the state of Nevada. The Company was not able to determine whether this property contained reserves that were economically recoverable. The Company has ceased their attempts at developing this property.

On February 11, 2010, the Company amended its articles of incorporation. The articles of incorporation were amended for the purposes of (1) changing the name of the registrant to Liberty Silver Corp, and (2) increasing the authorized shares of the Company from 75,000,000 shares of $0.001 par value common stock to 200,000,000 shares of $0.001 par value common stock.

On March 29, 2010, the Company entered into an Exploration Earn-In Agreement (the "Agreement") with AuEx Ventures, Inc., a Nevada corporation.

The Agreement relates to the Trinity Silver property (the "Property") located in Pershing County, Nevada, which consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.

The Company is reviewing other potential acquisitions in the resource and non-resource sectors. While the Company is in the process of completing due diligence reviews of several opportunities, there is no guarantee that we will be able to reach any agreement to acquire such assets.

**Note 2 - Significant Accounting Policies**

The following is a summary of significant account policies used in the preparation of these financial statements.

   **a. Basis of presentation**

The financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America applicable to exploration stage enterprises, and, unless otherwise stated, are expressed in U.S. dollars. The Company's fiscal year end is June 30.

   **b. Cash and cash equivalents**

Cash and cash equivalents include highly liquid investments with original maturities of three months or less.

   **c. Mineral rights, property and acquisition costs**

The Company has been in the exploration stage since its formation on February 20, 2007 and has not yet realized any revenues from its planned operations. It is primarily engaged in the acquisition and exploration

31

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

of mining properties.

The Company capitalizes acquisition and option costs of mineral rights as tangible assets. Upon commencement of commercial production, the mineral rights will be amortized using the unit-of-production method over the life of the mineral rights. If the Company does not continue with exploration after the completion of the feasibility study, the mineral rights will be expensed at that time.

The costs of acquiring mining properties are capitalized upon acquisition. Mine development costs incurred to develop and expand the capacity of mines, or to develop mine areas in advance of production are also capitalized once proven and probable reserves exist and the property is a commercially mineable property. Costs incurred to maintain current exploration or to maintain assets on a standby basis are charged to operations. Costs of abandoned projects are charged to operations upon abandonment. The Company evaluates the carrying value of capitalized mining costs and related property and equipment costs, to determine if these costs are in excess of their recoverable amount whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable. Evaluation of the carrying value of capitalized costs and any related property and equipment costs are based upon expected future cash flows and/or estimated salvage value in accordance with Accounting Standards Codification (ASC) 360-10-35-15, *Impairment or Disposal of Long-Lived Assets*.

### d. Property and equipment

Property and equipment is stated at cost less accumulated depreciation. Depreciation is provided principally on the straight-line method over the estimated useful lives of the assets, which are generally 3 to 39 years. The cost of repairs and maintenance is charged to expense as incurred. Expenditures for property betterments and renewals are capitalized. Upon sale or other disposition of a depreciable asset, cost and accumulated depreciation are removed from the accounts and any gain or loss is reflected in other income (expense).

The Company periodically evaluates whether events and circumstances have occurred that may warrant revision of the estimated useful lives of property and equipment or whether the remaining balance of property and equipment should be evaluated for possible impairment. If events and circumstances warrant evaluation, the Company uses an estimate of the related undiscounted cash flows over the remaining life of the property and equipment in measuring their recoverability. The Company currently owns furniture and office equipment as its depreciable assets.

### e. Impairment of long-lived assets

The Company reviews and evaluates long-lived assets for impairment when events or changes in circumstances indicate the related carrying amounts may not be recoverable. The assets are subject to impairment consideration under ASC 360-10-35-17, *Measurement of an Impairment Loss*, if events or circumstances indicate that their carrying amount might not be recoverable. As of June 30, 2012, exploration progress is on schedule with the Company's exploration and evaluation plan and no events or circumstances have happened to indicate that the related carrying values of the properties may not be recoverable. When the Company determines that an impairment analysis should be done, the analysis will be performed using the rules of FASB ASC 930-360-35, *Asset Impairment*, and 360-10-15-3 through 15-5, *Impairment or Disposal of Long-Lived Assets*.

Various factors could impact the Company's ability to achieve forecasted production schedules.

Additionally, commodity prices, capital expenditure requirements and reclamation costs could differ from the assumptions the Company may use in cash flow models used to assess impairment. The ability to achieve the estimated quantities of recoverable minerals from exploration stage mineral interests involves further risks in addition to those factors applicable to mineral interests where proven and probable reserves have been identified, due to the lower level of confidence that the identified mineralized material can ultimately be mined economically.

Material changes to any of these factors or assumptions discussed above could result in future impairment charges to operations.

**f. Fair Value of Financial instruments**

The Company adopted FASB ASC 820-10-50, "*Fair Value Measurements.* This guidance defines fair value, establishes a three-level valuation hierarchy for disclosures of fair value measurement and enhances disclosure requirements for fair value measures. The three levels are defined as follows:

· Level 1 inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.

· Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

· Level 3 inputs to valuation methodology are unobservable and significant to the fair measurement.

The carrying amounts reported in the balance sheet for the cash and cash equivalents, and current liabilities each qualify as financial instruments and are a reasonable estimate of fair value because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

**g. Environmental expenditures**

The operations of the Company have been, and may in the future, be affected from time to time, in varying degrees, by changes in environmental regulations, including those for future reclamation and site restoration costs. Both the likelihood of new regulations and their overall effect upon the Company vary greatly and are not predictable. The Company's policy is to meet or, if possible, surpass standards set by relevant legislation, by application of technically proven and economically feasible measures.

Environmental expenditures that relate to ongoing environmental and reclamation programs are charged against earnings as incurred or capitalized and amortized depending on their future economic benefits. Estimated future reclamation and site restoration costs, when the ultimate liability is reasonably determinable, are charged against earnings over the estimated remaining life of the related business operation, net of expected recoveries. No costs have been, or may never be recognized by the Company for environmental expenditures.

**h. Income taxes**

33

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

The Financial Accounting Standards Board (FASB) has issued FASB ASC 740-10 (Prior authoritative literature: Financial Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - An Interpretation of FASB Statement No. 109 (FIN 48)). FASB ASC 740-10 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with prior literature FASB Statement No. 109, Accounting for Income Taxes. This standard requires a company to determine whether it is more likely than not that a tax position will be sustained upon examination based upon the technical merits of the position. If the more-likely-than-not threshold is met, a company must measure the tax position to determine the amount to recognize in the financial statements. As a result of the implementation of this standard, the Company performed a review of its material tax positions in accordance with recognition and measurement standards established by FASB ASC 740-10.

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

### i. Basic and diluted net loss per share

The Company computes net loss per share of common stock in accordance with ASC 260, Earnings per Share ("ASC 260"). Under the provisions of ASC 260, basic net income (loss) per share is computed using the weighted average number of common shares outstanding during the period. Diluted net loss per share is computed using the weighted average number of common shares and, if dilutive, potential common shares outstanding during the period. Potential common shares consist of the incremental common shares issuable upon the exercise of stock options and warrants and the conversion of convertible promissory notes. Stock options of 6,950,000 as of June 30, 2012 and warrants in the amount of 10,027,500 as of June 30, 2012 were considered in the calculation but not included due to anti-dilution. The dilutive effect of these instruments is reflected in diluted earnings per share by application of the treasury stock method.

The Company's calculation of basic and diluted loss per share is as follows:

|  |  | For the Years Ended | |
| --- | --- | --- | --- |
|  |  | June 30, 2012 | June 30, 2011 |
| Basic Earnings per share: |  |  |  |
| Income (Loss) (numerator) | $ | (5,689,256) $ | (1,464,253) |
| Shares (denominator) |  | 75,705,683 | 69,733,334 |
| Per Share Amount | $ | (0.08) $ | (0.02) |

34

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

|  | | For the Years Ended | | |
|  |  | June 30, 2012 |  | June 30, 2011 |
| Fully Diluted Earnings per share: | | | | |
| Income (Loss) (numerator) | $ | (5,689,256) | $ | (1,464,253) |
| Shares (denominator) | | 75,705,683 | | 69,733,334 |
| Per Share Amount | $ | (0.08) | $ | (0.02) |

### j. Stock-Based compensation

In December 2004, FASB issued FASB ASC 718 (Prior authoritative literature: SFAS No. 123R, *"Share-Based Payment")*. FASB ASC 718 establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. FASB ASC 718 focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. FASB ASC 718 requires that the compensation cost relating to share-based payment transactions be recognized in the financial statements. That cost will be measured based on the fair value of the equity or liability instruments issued.

### k. Use of estimates and assumptions

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. In these financial statements, assets, liabilities and earnings involve extensive reliance on management's estimates. Actual results could differ from those estimates. The Company's periodic filing with the Securities and Exchange Commission ("SEC") include, where applicable, disclosures of estimates, assumptions, uncertainties, and market that could affect the financial statements and future operations of the Company.

### l. Concentrations of credit risk

The Company's financial instruments that are exposed to concentrations of credit risk primarily consist of its cash and related party payables. The Company places its cash and cash equivalents with financial institutions of high credit worthiness. At times, its cash equivalents with a particular financial institution may exceed any applicable government insurance limits. The Company's management also routinely assesses the financial strength and credit worthiness of any parties to which it extends funds and as such, it believes that any associated credit risk exposures are limited.

### m. Risks and uncertainties

The Company operates in the resource exploration industry that is subject to significant risks and uncertainties, including financial, operational, and other risks associated with operating a resource exploration business, including the potential risk of business failure.

**n. Foreign currency translation**

Comprehensive income is the total of (i) net income plus (ii) all other changes in net assets arising from non-owner sources, which are referred to as other comprehensive income. The Company has presented a single statement of comprehensive income. An analysis of changes in components of accumulated other comprehensive income is presented below the total net income or loss on the income statement.

## Note 3 – New Technical Pronouncements

The Company has reviewed accounting pronouncements issued during the past two years and has assessed the adoption of any that are applicable to the Company. Management has determined that none had a material impact on the financial position, results of operations, or cash flows for the fiscal years ended June 30, 2012 and 2011.

## Note 4 - Mineral Property

Pursuant to a mineral property purchase agreement dated May 24, 2007, the Company acquired a 100% undivided right, title and interest in a mineral claim, located in Section 8 of T35N, R36E Mount Diablo Base Meridian in Elko County, within the state of Nevada for a cash payment of $10,000. The Company must annually renew the lease on the land with the state for $1,800 and has not renewed the lease as of fiscal year end, June 30, 2010. The lease has expired.

Since the Company had not established the commercial feasibility of the mineral claim, the acquisition costs had been capitalized. The Company has not depleted the mineral claims as no proven reserves have been found. The Company was not able to keep the mineral claim in good standing due to lack of funding. The Company allowed the mineral claim to lapse at the end of June 2009. At June 30, 2009, the Company determined that there was little, or no, possibility of the company generating revenues related to the mining interests. This, coupled with the lapse of the mineral claims lease, was determined to be an impairment of the asset. As such, the Company's management determined to fully impair the mining interests, which was a charged to the Company's statements of operations in the amount of $11,800.

On March 29, 2010, the Company entered into an Exploration Earn-In Agreement (the "Agreement") with AuEx Ventures, Inc., a Nevada corporation. The Agreement relates to the Trinity Silver property (the "Property") located in Pershing County, Nevada, which consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.

Under the Agreement, the Company may earn-in a 70% undivided interest in the Property during a 6-year period in consideration of (1) a signing payment of $25,000, which has been made and has been capitalized, (2) an expenditure of a cumulative total of $5,000,000 in exploration and development expenses on the Property by March 29, 2016, and (3) completion of a bankable feasibility study on the Property on or before the 7th anniversary date of the Agreement.

The Company has completed, and continues to pursue, financing opportunities to be in compliance with terms of the Earn-In Agreement. There has been no mining of resources to date.

Subsequent to the fiscal year ended June 30, 2012, as discussed in Note 10 herein, on August 8, 2012, the Company entered into a conditional letter agreement with Primus Resources, L.C. to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada.

**Note 5 - Capital Stock and Warrants**

**Authorized**

The total authorized capital is 200,000,000 common shares with a par value of $0.001 per common share.

**Issued and outstanding**

In April 2007 the Company issued 4,000,000 and 1,000,000 shares of our common stock for cash at $0.001 and $0.01 per share, respectively.

In May 2007 the Company issued 420,000 shares of our common stock for cash at $0.05 per share.

In February 2010, the board of directors authorized a 20-for-1 forward stock split of the Company's currently issued and outstanding common stock. Prior to approval of the forward split the Company had a total of 5,420,000 issued and outstanding shares of $0.001 par value common stock. On the effective date of the forward split, the Company has a total of 108,400,000 issued and outstanding shares of $0.001 par value common stock. The stock split has been retroactively applied to all prior equity transactions.

In May 2010, the Company issued 1,333,334 units ("Units") for cash at US $0.75 per Unit. Each Unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $1.25 per share at any time during the 24 months following the date of closing of the private placement offering.

In May 2010, a director of the Company surrendered 40,000,000 of his common stock to the company.

On July 27, 2011, the Company issued 200,000 units ("Units") for cash at CDN $0.55 (US $0.58) per Unit. Each Unit consisted of one common share and one half of one common share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of CDN$0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.

On August 4, 2011, the Company issued 1,000,000 units ("Units") for cash at CDN $0.55 (US $0.57) per Unit. Each Unit consisted of one common share and one half of one common share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of CDN$0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.

On November 10, 2011, Liberty Silver issued 6,500,000 subscription receipts to an investor (the "Subscription Receipts") pursuant to a private placement at a price of US$ 0.50 per Subscription Receipt for gross proceeds of US $3,250,000; there were no underwriting discounts or commissions paid. On December 19, 2011, each Subscription Receipt was automatically converted for no additional consideration, into one unit of the Company (a "Unit") as a result of the Company's receipt of notice that its common stock was accepted for trading on the Toronto Stock Exchange under the trading symbol, "LSL", effective as of December 22, 2011. Each Unit is comprised of one common share and one common share

purchase one warrant ("Warrant"). Each Warrant is exercisable at a price of US $0.65 per share at any time until 5:00 p.m. (Toronto time) on December 31, 2013.  In conjunction with the issuance of Subscription Receipts, the Company entered into a Registration Rights Agreement (the "Registration Rights Agreement") to which the Company agreed, following the conditional approval by the Toronto Stock Exchange, to file a registration statement on Form S-1 with the Securities and Exchange Commission which registers the common stock and common stock underlying the Warrants acquired by the investor for resale.  If the registration statement did not become effective on or before six months from the date of conditional approval by the Toronto Stock Exchange for the listing of the common stock of the Company, the investor would receive an additional common share for each ten (10) common shares.  On May 31, 2012, the Company issued 650,000 common shares in satisfaction of this contractual obligation, the value for which of $416,000 was determined by the closing market price of $0.64 per share on the date of issuance.

On December 19, 2011, Liberty Silver completed a private placement offering, pursuant to which the Company raised a total of US $1,313,750 through the sale of 2,627,500 units ("Units") at a purchase price of US $0.50 per Unit; there were no underwriting discounts or commissions paid.  Each Unit consists of one common share and one common share purchase warrant (a "Warrant").  Each Warrant entitles the holder to acquire one common share at a price of US $0.65 for a period of two years following the date of the closing of the financing. The Units were not registered under the Securities Act of 1933 (the "Securities Act") in reliance upon the exemptions from registration contained in Section 4(2) and Regulation D thereunder, and Regulation S of the Securities Act.

As of June 30, 2012, the Company had 80,710,834 shares of the common stock issued and outstanding.

### Stock warrants

In May 2010, the Company commenced a private stock offering, whereby it authorized the issuance of 1,333,334 units consisting of one share of its common stock and one common stock purchase warrant for a total raise of $1,000,000. The common stock purchase warrants are exercisable at $1.25 per share and carrying a two-year exercise period. The offering was closed as of May 26, 2010. All 1,333,334 units were issued and $1,000,000 in cash was received.

The amount of warrant expense related to this offering for the year ending June 30, 2010 was $522,191. The expense was calculated using the Black-Scholes pricing model.

In April 2011, the Company borrowed $150,000 from related parties. In conjunction with each $25,000 note, the Company issued a warrant to purchase 50,000 share of the Company's common stock at $0.55 per share for a three-year term, commencing on the date of the note. The total number of warrants for purchase is 300,000 shares.

The amount of warrant expense related to this related party payable for the year ending June 30, 2012 was $370,075 and was $40,000 for the year ending June 30, 2011. The expense was calculated using the Black-Scholes pricing model.

On July 27, 2011, the Company issued 200,000 units ("Units") for cash at CDN $0.55 (US $0.58) per Unit. Each Unit consisted of one common share and one half of one common share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of CDN$0.75 until the date which is 60 months following the

closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.

On August 4, 2011, the Company issued 1,000,000 units ("Units") for cash at CDN $0.55 (US $0.57) per Unit. Each Unit consisted of one common share and one half of one common share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of CDN$0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.

On November 10, 2011, Liberty Silver issued 6,500,000 subscription receipts to an investor (the "Subscription Receipts") pursuant to a private placement at a price of US$ 0.50 per Subscription Receipt for gross proceeds of US $3,250,000; there were no underwriting discounts or commissions paid.  On December 19, 2011, each Subscription Receipt was automatically converted for no additional consideration, into one unit of the Company (a "Unit") as a result of the Company's receipt of notice that its common stock was accepted for trading on the Toronto Stock Exchange under the trading symbol, "LSL", effective as of December 22, 2011.  Each Unit is comprised of one common share and one common share purchase one warrant ("Warrant").  Each Warrant is exercisable at a price of US $0.65 per share at any time until 5:00 p.m. (Toronto time) on December 31, 2013.  In conjunction with the issuance of Subscription Receipts, the Company entered into a Registration Rights Agreement (the "Registration Rights Agreement") with the investor, pursuant to which the Company has agreed, following the conditional approval by the Toronto Stock Exchange, to file a registration statement on Form S-1 with the Securities and Exchange Commission which registers the common stock and common stock underlying the Warrants acquired by the Investor for resale.  If the registration statement does not become effective on or before six months from the date of conditional approval by the Toronto Stock Exchange for the listing of the common stock of the Company, Investor shall receive an additional common share and Warrant for, respectively, each ten (10) common shares.

On December 19, 2011, Liberty Silver completed a private placement offering, pursuant to which the Company raised a total of US $1,313,750 through the sale of 2,627,500 units ("Units") at a purchase price of US $0.50 per Unit; there were no underwriting discounts or commissions paid.  Each Unit consists of one common share and one common share purchase warrant (a "Warrant").  Each Warrant entitles the holder to acquire one common share at a price of US $0.65 for a period of two years following the date of the closing of the financing.  The Units were not registered under the Securities Act of 1933 (the "Securities Act") in reliance upon the exemptions from registration contained in Section 4(2) and Regulation D thereunder, and Regulation S of the Securities Act.

The amount of warrant expense related to these investments for the year ending June 30, 2012 was $1,826,160. The expense was calculated using the Black-Scholes pricing model.

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

The fair value of warrants was established at the date of grant using the Black-Scholes valuation model with the following underlying assumptions:

1)  Risk free interest rate:
    2012:   0.24% - 1.51%
    2011:   1.31%

2)  Dividend yield:
    2012 & 2011:   0%

3)  Volatility:
    2012:   102.90% - 113.77%
    2011:   200%

4)  Weighted average remaining life:
    2012:   1.63 years
    2011:   2.75 years

The following table summarizes information about warrants as of June 30, 2012:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, July 1, 2009 | - | $ | - |
| Warrants granted | 1,333,334 | | 1.25 |
| Warrants expired | - | | - |
| Outstanding, June 30, 2010 | 1,333,334 | $ | 1.25 |
| Exercisable, June 30, 2010 | 1,333,334 | $ | 1.25 |

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, July 1, 2010 | 1,333,334 | | 1.25 |
| Warrants granted | 300,000 | | 0.55 |
| Warrants exercised | - | | - |
| Outstanding, June 30, 2011 | 1,633,334 | $ | 1.12 |
| Exercisable, June 30, 2011 | 1,633,334 | $ | 1.12 |
| Outstanding, July 1, 2011 | 1,633,334 | | 1.12 |
| Warrants granted | 9,727,500 | | 0.66 |
| Warrants exercised | - | | - |
| Warrants expired | 1,333,334 | | 1.25 |
| Outstanding, June 30, 2012 | 10,027,500 | $ | 0.65 |
| Exercisable, June 30, 2012 | 10,027,500 | $ | 0.65 |

40

The following table summarizes information about stock warrants granted to employees, advisors, investors and board members at June 30, 2012:

| | Warrants Outstanding | | | | Warrants Exercisable | |
|---|---|---|---|---|---|---|
| Range of Exercise Prices | | Number Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Number of Warrants | Weighted Average Exercise Price |
| $ 0.55 | | 300,000 | $ 0.55 | | 1.75 | 300,000 | $ 0.55 |
| $ 0.75 (1) | | 600,000 | $ 0.75 (1) | 4.08 | 600,000 | $ 0.75 (1) |
| $ 0.65 | | 9,127,500 | $ 0.65 | 1.47 | 9,127,500 | $ 0.65 |

(1) Figure expressed in $CDN

As of June 30, 2012, the aggregate weighted-average intrinsic value of the warrants outstanding and exercisable was $1,604,400. The weighted-average grant-date fair value of warrants outstanding as of June 30, 2012 was $0.65.

### Stock options

In October 2010, the Company granted to Geoff Browne, Chief Executive Officer, 3,000,000 stock options of the Company's common stock to be purchased at $0.75 per share for a 5 year term, all of which are vested. In addition, the Company granted the directors, Paul Haggis, Timothy Unwin, John Barrington, and George Kent, each 300,000 stock options, for a total of 1,200,000, to purchase the Company's common stock at $0.75 per share for a 5 year term, all of which are vested.

In December 2010, the Company granted director W. Thomas Hodgson 300,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term, all of which are vested.

In April 2011, the Company granted consultant Kevin O'Connor 100,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term, all of which are vested.

In April 2011, the Company granted director and employee John Barrington 500,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term, all of which have vested.

In April 2011, the Company granted director and officer Bill Tafuri 800,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term. Pursuant to the terms of the option agreement, entered into between Mr. Tafuri and the Company, a total of 266,664 options vested

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

immediately upon the grant of the options; the remaining 533,336 options vest over a two year period. The vesting of the remaining 533,336 options may be accelerated in the event the Company achieves certain milestones with respect to its mining operations.

In April 2011, the Company granted employee Dick Klatt 600,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term. Pursuant to the terms of the option agreement, entered into between Mr. Klatt and the Company, a total of 200,000 options vested immediately upon the grant of the options; the remaining 400,000 options vest over a two year period. The vesting of the remaining 400,000 options may be accelerated in the event the Company achieves certain milestones with respect to its mining operations.

In January 2012, the Company granted non-qualified stock options of 450,000 shares at an exercise price of $1.00 per share for a 5 year term to Manish Z. Kshatriya, Chief financial Officer and Executive Vice President. Pursuant to the terms of the option agreement, entered into between Mr. Kshatriya and the Company, a total of 150,000 options vest six months from the grant date, 150,000 options will vest 18 months following the grant date, and the remaining 150,000 options vest 30 months following the grant date of the options.

The amount of stock option compensation expense for the year ending June 30, 2011 was $639,731. The expense was calculated using the Black-Scholes pricing model.

The fair value of stock options was established at the date of grant using the Black-Scholes valuation model with the following underlying assumptions:

1) Risk free interest rate:
   2012:   0.79% - 2.09%
   2011:   1.14% - 2.09%

2) Dividend yield:
   2012 & 2011:   0%

3) Volatility:
   2012:   95.11% - 164.27%
   2011:   127.32% - 164.27%

4) Weighted average remaining life:
   2012:   3.59 years
   2011:   4.52 years

The following table summarizes information about options as of June 30, 2012:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, July 1, 2010 | - | $ | - |
|     Options granted | 6,500,000 | | .75 |
|     Options expired | - | | - |

42

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

| | | | |
|---|---:|---|---:|
| Options cancelled | - | | - |
| Outstanding, June 30, 2011 | 6,500,000 | $ | - |
| Exercisable, June 30, 2011 | 6,500,000 | $ | - |
| | | | |
| Outstanding, July 1, 2011 | 6,500,000 | $ | .75 |
| Options granted | 450,000 | | 1.00 |
| Options expired | - | | - |
| Options cancelled | - | | - |
| Outstanding, June 30, 2012 | 6,950,000 | $ | 0.88 |
| Exercisable, June 30, 2012 | 6,500,000 | $ | 0.75 |

The following table summarizes information about stock warrants granted to employees, advisors, investors and board members at June 30, 2012:

| | Stock Options Outstanding | | | | Stock Options Exercisable | |
|---|---|---|---|---|---|---|
| Range of Exercise Prices | | Number Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Number of Options | Weighted Average Exercise Price |
| $ 0.75 | | 6,500,000 | $ 0.75 | 3.52 | 6,500,000 | $ 0.75 |
| $ 1.00 | | 450,000 | $ 1.00 | 4.55 | 450,000 | $ 1.00 |

As of June 30, 2012, the aggregate intrinsic value of the stock options outstanding and exercisable was $0. The weighted-average grant-date fair value of stock options granted for the year ended June 30, 2012 was $0.88.

## Note 6 – Related Party Payable

Effective April 1, 2011, the Company borrowed a total of $150,000 pursuant to the terms and conditions of promissory notes (individually referred to as a "Note" and collectively referred to as the "Notes") entered into with six of the Company's directors. Each Note was for $25,000 and was required to be repaid by the Company on the earlier of one year, or when the Company raised a minimum of $2,000,000 through equity investments. The Notes were interest free for the first six months following the date of the Note and then bore interest at a rate of 8% per annum thereafter. In conjunction with the entry into the Notes, in lieu of the holders charging the Company interest on the outstanding principal of the Notes for the initial six months, the Company issued each holder a warrant entitling the holder to purchase up to a total of 50,000 shares of the Company's common stock at a price of $0.55 per share for a period of three (3) years following the date of the Note. The Notes were repaid during the year at the time of the Company's equity financing during the year.

## Note 7 – Commitments and Contingencies

43

Effective November 1, 2011, the Company entered into a sub-lease agreement for the lease of premises in Toronto, Ontario, Canada, for a term of 54 months.  The Company has its head office at these premises, which is approximately 1,400 square feet.  The annual base rent commitment for the Toronto head office space is CAD $48,094.

Effective February 8, 2012, the Company entered into a lease agreement for the lease of premises in Sparks, Nevada, USA, for a term of 12 months.  The Company has its field office at these premises, which is approximately 5,500 square feet.  The annual base rent commitment for the Sparks field office space is USD $27,972.

As at June 30, 2012, the Company had a commitment, for the above noted leases, of USD $196,123 remaining.

The following table outlines the remaining lease commitment at the end of the next five fiscal years based on the leases that are currently entered into by the Company:

| Year | Total Lease Commitment |
| --- | --- |
| 2012 | $196,123 |
| 2013 | $132,900 |
| 2014 | $85,994 |
| 2015 | $39,088 |
| 2016 and thereafter | $0 |

Additionally, in the normal course of operations, certain contingencies may arise relating to legal actions undertaken against the Company. In the opinion of management, the outcome of such potential legal actions will not have a material adverse effect on the Company's results of operations, liquidity, or its financial position.


**Note 8 - Income Taxes**

The Financial Accounting Standards Board (FASB) has issued FASB ASC 740-10 (Prior authoritative literature: Financial Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - An Interpretation of FASB Statement No. 109 (FIN 48)).  FASB ASC 740-10 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with prior literature FASB Statement No. 109, Accounting for Income Taxes.  This standard requires a company to determine whether it is more likely than not that a tax position will be sustained upon examination based upon the technical merits of the position.  If the more-likely-than-not threshold is met, a company must measure the tax position to determine the amount to recognize in the financial statements.  As a result of the implementation of this standard, the Company performed a review of its material tax positions in accordance with recognition and measurement standards established by FASB ASC 740-10.

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carry forwards and deferred tax liabilities are recognized for taxable temporary differences.  Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis.  Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the

44

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

deferred tax assets will not be realized.  Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

As of June 30, 2012, the Company had no accrued interest and penalties related to uncertain tax positions. The income tax provision differs from the amount of income tax determined by applying the U.S. federal and state income tax rates of 34% to pretax income from continuing operations for the years ended June 30, 2012 and 2011 due to the following:

Deferred tax assets and the valuation account are as follows:

| | | For the Years Ended June 30, | | |
|---|---|---|---|---|
| | | **2012** | | **2011** |
| Deferred tax asset: | | | | |
| Net operating loss carry forward | $ | 2,729,176 | $ | 794,829 |
| Valuation allowance | | (2,729,176) | | (794,829) |
| Total | $ | - | $ | - |

The components of income tax expense are as follows:

| | | For the Years Ended June 30, | | |
|---|---|---|---|---|
| | | 2012 | | 2011 |
| Current Federal tax | $ | - | $ | - |
| Current State tax | | - | | - |
| Change in NOL benefit | | 1,934,347 | | 497,846 |
| Change in valuation allowance | | (1,934,347) | | (497,846) |
| Total | $ | - | $ | - |

The potential income tax benefit of these losses has been offset by a full valuation allowance.

As of June 30, 2012 and 2011, the Company has an unused net operating loss carry-forward balance of $2,729,176 and $794,829 that is available to offset future taxable income. This unused net operating loss carry-forward balance begins to expire in 2029.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | | Years Ended June 30, | |
|---|---|---|---|
| | | **2012** | **2011** |
| Beginning balance | $ | -$ | - |
| Additions based on tax positions related to current year | | - | - |

Liberty Silver Corp
Notes to the Financial Statement
June 30, 2012 and 2011

| | | | |
|---|---|---|---|
| Additions for tax positions of prior years | | - | - |
| Reductions for tax positions of prior years | | - | - |
| Reductions in benefit due to income tax expense | | - | - |
| Ending balance | $ | - | $ - |

At June 30, 2012 and 2011, the Company had no unrecognized tax benefits that, if recognized, would affect the effective tax rate.

The Company did not have any tax positions for which it is reasonably possible that the total amount of unrecognized tax benefits will significantly increase or decrease within the next 12 months.

As of June 30, 2012 and 2011, the Company had no accrued interest or penalties related to uncertain tax positions.

The tax years that remain subject to examination by major taxing jurisdictions are those for the years ended June 30, 2012, 2011, 2010 and 2009.

## Note 9 – Going Concern

These financial statements have been prepared on a going concern basis. The Company has incurred losses since inception resulting in an accumulated deficit of $8,026,990 and further losses are anticipated in the development of its business. This raises substantial doubt about the Company's ability to continue as a going concern. Its ability to continue as a going concern is dependent upon the ability of the Company to generate profitable operations in the future and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due.

Management has plans to pursue various financing alternatives including, but not limited to, merger and acquisition activity, raising capital through the capital markets and debt financing. These financial statements do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts of and classification of liabilities that might be necessary in the event the Company cannot continue in existence.

The ability of the Company to emerge from the exploration stage is dependent upon, among other things, obtaining additional financing to continue operations, explore and develop the mineral properties and the discovery, development, and sale of reserves.

These factors, among others raise substantial doubt about the Company's ability to continue as a going concern. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

## Note 10 – Subsequent events

On August 8, 2012, Liberty Silver entered into a conditional letter agreement with Primus Resources, L.C. to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada (the "Hi Ho Properties"). The Hi Ho Properties are the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. on the Trinity land package.

Liberty Silver Corp.
Notes to the Financial Statement
June 30, 2012 and 2011

Under the terms of the Agreement, Liberty Silver will provide cash consideration of US$150,000 and issue 3,000,000 common shares of Liberty Silver stock to Primus. In addition, Primus will be granted a 2% net smelter royalty ("NSR") on future production from the Hi Ho Properties. The total consideration for the acquisition of the Hi Ho Properties will be applied to Liberty Silver's expenditure commitment under its Earn-In Agreement with Renaissance, upon acceptance by Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Properties payment, Liberty Silver will have contributed in excess of 85% of its required US$5 million expenditure commitment to earn its 70% interest in the project. Pursuant to the terms of its Earn-In Agreement with Renaissance, the Company has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study in the following year.

As disclosed on Form CB filed with the Securities and Exchange Commission on July 17, 2012, on July 16, 2012 Liberty Silver commenced an offer (the "Offer") to purchase all of the issued and outstanding common shares of Sennen Resources Ltd. ("Sennen"). The Offer was open for acceptance by Sennen shareholders until 11:59 P.M. on Monday September 10, 2012. The Offer was not accepted by the requisite number of Sennen shareholders, therefore the Offer was terminated on September 11, 2012 at 12:00 A.M.

Liberty Silver Corp has evaluated subsequent events for the period ended June 30, 2012 through the date the financial statements were issued, and concluded, aside from the foregoing, that there were no other events or transactions occurring during this period that required recognition or disclosure in its financial statements.

47

**ITEM 9.      CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

As disclosed on Form 8-K filed with the SEC on February 4, 2011, the Company changed its accountants. The Company has had no disagreements with its accountants, which would be required to be disclosed pursuant to Item 304 of Regulation S-K.

**ITEM 9A.   CONTROLS AND PROCEDURES.**

**Disclosure Controls and Procedures**

The Securities and Exchange Commission defines the term "disclosure controls and procedures" to mean a company's controls and other procedures of an issuer that are designed to ensure that information required to be disclosed in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.  The Company maintains such a system of controls and procedures in an effort to ensure that all information which it is required to disclose in the reports it files under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified under the SEC's rules and forms and that information required to be disclosed is accumulated and communicated to principal executive and principal financial officers to allow timely decisions regarding disclosure.

As of the end of the period covered by this report, The Company carried out an evaluation, under the supervision and with the participation of the chief executive officer and the chief financial officer, of the effectiveness of the design and operation of disclosure controls and procedures.  Based on this evaluation, the chief executive officer and chief financial officer concluded that disclosure controls and procedures are designed to provide reasonable assurance of achieving the objectives of alerting them on a timely basis to material information required to be included in periodic SEC reports and of ensuring that such information is recorded, processed, summarized and reported within the time periods specified.  The Company's chief executive officer and chief financial officer also concluded that disclosure controls and procedures were effective as of the end of the period covered by this report to provide reasonable assurance of the achievement of these objectives.

**Internal Control Over Financial Reporting**

The management of the Company is responsible for the preparation of the financial statements and related financial information appearing in this Annual Report on Form 10-K. The financial statements and notes have been prepared in conformity with accounting principles generally accepted in the United States of America. The management of the Company also is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. A company's internal control over financial reporting is defined as a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting

principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Management, including the Chief Executive Officer and Chief Financial Officer, does not expect that the Company's disclosure controls and internal controls will prevent all error and all fraud. Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable, not absolute, assurance that the objectives of the control system are met and may not prevent or detect misstatements. Further, over time, control may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate.

With the participation of the Chief Executive Officer and Chief Financial Officer, the Company's management evaluated the effectiveness of the Company's internal control over financial reporting as of June 30, 2012 based upon the framework in Internal Control –Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, management has concluded that, as of June 30, 2012, the Company's internal control over financial reporting was effective.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report is not subject to attestation by the Company's registered public accounting firm.

There was no change in the Company's internal control over financial reporting during the last fiscal quarter, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B.    OTHER INFORMATION.**

None.

**PART III**

**ITEM 10.     DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE.**

<u>**Directors and Executive Officers**</u>

The following table sets forth the our directors, executive officers, promoters and control persons, their ages, and all offices and positions held within the Company as of June 30, 2012.  Directors are elected for a period of one year and thereafter serve until their successor is duly elected by the stockholders and qualified.  Officers and other employees serve at the will of the board of directors.

| Name | Age | Present Position With the Company | Since |
|---|---|---|---|
| R. Geoffrey Browne | 58 | Chief Executive Officer, Chairman | October 2010 |
| Manish Z. Kshatriya | 39 | Chief Financial Officer, Executive VP | January 2012 |
| Bill Tafuri | 71 | President, Chief Operating Officer, Director | October 2010 |
| John Pulos | 46 | Director | February 2007 |
| John Barrington | 67 | Director | October 2010 |
| George Kent | 82 | Director | October 2010 |
| Paul Haggis | 60 | Director | October 2010 |

49

| Tim Unwin   | 69 | Director                        | October 2010  |
| Tom Hodgson | 59 | Director                        | December 2010 |
| Dick Klatt  | 76 | Vice President of Exploration   | October 2010  |

**Biographical Information**

*Geoff Browne*. Mr. Browne currently serves as our Chief Executive Officer and a Director of the Company. Mr. Browne has over 30 years of experience in the financial services industry in Canada, the U.S. and London, England. In addition to his work with the Company, since July 1996 Mr. Browne has served as the Managing Partner of MWI & Partners, a private equity firm located in Ontario, Canada. As the managing partner of MWI & Partners, Mr. Browne is responsible for making investments for the company. Prior to founding MWI & Partners, Inc., from September 1976 to June 1996 Mr. Browne was a senior executive with Canadian Imperial Bank of Commerce and CIBC Wood Gundy Inc. The last position he held at CIBC was Chief of Staff for CIBC World Markets. Mr. Browne is active on numerous other corporate and not-for-profit Boards, and is one of three independent members of the Investment Review Committee of UBS Global Asset Management (Canada) Co. Mr. Browne is holds a B.A. in economics from the University of Western Ontario.

*Manish Z. Kshatriya*. Mr. Kshatriya has over 14 years of progressive experience in corporate finance, accounting, taxation and auditing obtained in public accounting practice and industry. From January 2006 until October 2011, Mr. Kshatriya worked for Augen Capital Corp., a Toronto based, Canadian listed mining merchant bank where he served as both the Director of Finance, and most recently the Chief Financial Officer. As the Director of Finance and Chief Financial Officer, Mr. Kshatriya was responsible for the management and oversight of all financial matters for Augen Capital Corp. Mr. Kshatriya is a Chartered Accountant and a member of the Institute of Chartered Accountants of Ontario. He is also a Certified Public Accountant in the United States and a member of the Colorado State Board of Accountancy.

*William Tafuri*. Mr. Tafuri currently serves as our President, Chief Operating Officer, and as a Director of the Company. Mr. Tafuri has a Ph.D. in geology and over 35 years of diverse mining and exploration experience in precious and base metals. Mr. Tafuri has worked for a number of major international mining companies and has held management positions in both domestic and foreign locations for Getty Mining Co., Santa Fe Pacific Gold Corp., and Kinross Gold Corp. He has extensive consulting experience, both domestic and foreign. He has extensive exploration and mine development experience in the USA, Central Asia, and Russia. From March 2010 to the present Mr. Tafuri has been the President and COO of the Company. As March of 2010 Mr. Tafuri was responsible for managing the operations of the Company. From January 2007 to December 2009, Mr. Tafuri was the President of Yellowcake Mining Company, which was located in Vancouver, B.C., Canada, and was in the business of mining. As of January 2007, Mr. Tafuri was responsible for the acquisition and exploration of uranium properties in Wyoming and Colorado. From June 2004 to November 2006 Mr. Tafuri was the Vice President of Centrasia Mining Company, which was located in Vancouver, B.C., Canada and was in the business of mining. As of June 2004, Mr. Tafuri was responsible for the acquisition and exploration of mining properties in Central Asia. Mr. Tafuri received his B.S. and M.S. degrees in geology at the University of Nevada-Reno and his Ph.D. in geology at the University of Utah.

*John Pulos*. Mr. Pulos currently serves as a member of the Board of Directors. Mr. Pulos has been involved in the real estate market for the past 20 years with a focus on development, investment and obtaining land entitlements throughout the United States and Canada as well as investing in many private and public companies. From February 2007 to present Mr. Pulos has been a director and officer of Liberty Silver. In May 2010 Mr. Pulos became CFO and Vice President of Liberty Silver and duties included all filings, accounts payable and help in running the day-to-day operations of Liberty. In January 2012, Mr.

Pulos stepped down as CFO and Vice President but remains on the Board of Directors. Mr. Pulos obtained his Bachelor of Arts in Political Science from the University of Washington and a Masters of Science in Real Estate Finance at New York University.

*Paul Haggis* Mr. Haggis currently serves as a Director of the Company. In addition to his work as a Director of the Company, from March 2008 to the present, Mr. Haggis has served as the Chairman of the Alberta Enterprise Corporation, a venture capital fund that focuses on first stage ventures. As the Chairman of the Alberta Enterprise Corporation, Mr. Haggis is responsible for overseeing management and approving, with the board, fund investments and company policy. Additionally, currently Mr. Haggis is also an active director of Canadian Tire Bank, Chair of the Audit Committee of Advantage Energy of Calgary, Chairman of CA Bancorp, Toronto, and is an Honorary Trustee and of the Royal Ontario Museum. In Addition Paul has overseen and is actively engaged in the investment program at ICBC as advisor the Investment Committee. He was Chair of the Investment Committee of the Board until December 31st 2011. From Sept 2003 until May 2007, Mr. Haggis served as the President and CEO of OMERS, one of Canada's largest pension plans. As the President and CEO, Mr. Haggis was responsible for overseeing all of the business operations of OMERS. During Mr. Haggis' leadership, OMERS assets grew to more than $48 Billion dollars in assets with value added of 2.6 billion dollars.

*Timothy Unwin*. Mr. Unwin currently serves as a Director of the Company. In addition to his work for the Company, Mr. Unwin is also the Chairman of the board of Evoke Neurosciences Inc., a private U.S based company specializing in neurological testing and reporting, and from December 2008 to the present, Mr. Unwin has been a partner emeritus at Blake, Cassels & Graydon LLP in Toronto. Additionally, from February 2009 to the present, Mr. Unwin has served as a director and member of the Audit Committee of C.A. Bancorp Inc. From March 2004 until his retirement as an active partner in December 2008, Mr. Unwin worked as the managing partner of the New York Office of Blake, Cassels & Graydon LLP. As the managing partner, Mr. Unwin oversaw the management of the law firm and worked as a corporate and securities lawyer. Prior to working as the managing partner of the New York Office of Blake, Cassels & Graydon LLP, Mr. Unwin was also the office managing partner at Blake's office in London, England. Mr. Unwin is a graduate of the director's education program at the Institute of Corporate Directors at the Rotman School of Management, University of Toronto and is an institute certified director (ICD.D).

*John Barrington*. Mr. Barrington currently serves as a consultant to the Company and as a Director of the Company. From January 1, 2007 to December 31, 2012, Mr. Barrington was the President & CEO of Uxmal Communications Ltd., which is located in Toronto, Canada and is a holding company in the communications, media and marketing business. As January 2007 Mr. Barrington was responsible for strategy and executive functions at Uxmal Communications Ltd. Additionally, prior to his work for Uxmal Communications Ltd., Mr. Barrington worked in the mining industry at such projects as the Opimiska Mine in Chapais Que and the Lorraine mine in Belleterre Que. Mr. Barrington also worked at TransCanada Pipelines and the Ontario Ministry of Transportation and Communications, where he was head of the Financial Planning Unit. Subsequently Mr. Barrington was one of the founders of the Uxmal Communications partnership, and among many other investments and acquisitions in Canada and the U.S. bought, turned around and later sold Comac, which at the time was Canada's third largest consumer magazine company. Mr. Barrington holds a bachelor of engineering science degree from the University of Western Ontario.

*George Kent*. Mr. Kent currently serves as a Director of the Company. As a Professional Engineer in geology he has been engaged in worldwide exploration, mining, financing and education for decades, having spent eight years with Watts Griffis and McOuat Limited and significant periods of time employed with major and minor public companies, Noranda, Dresser Industries, Conwest Exploration, nine years as a full professor at the University of Toronto in Geo-Engineering and Arts and Science faculties, and five years as Exploration Geologist and finally as Officer in Charge with the United Nations of an all mineral

survey over 120,000 sq kms in Ethiopia.  In addition to his work for the Company, from October, 2011 to the present, Mr. Kent has served as the President of George R. Kent & Associates Ltd since 1980 which firm is engaged in geological and mining consulting across Canada in Ecuador, Bolivia, India, and in some other countries, assisting in public company formation, directorships Santa Maria Mines Ltd and Canadax Mines Ltd 1980 - 1985. He was a founder, CEO, and director of Duration Mines Limited from 1980 - 1985; of Glimmer Resources Inc. from 1986 - 2004 both successful mining, oil and gas producing companies. He was a co-founder (2001) and still serves as Vice President Corporate Development, CFO, and director of Taranis Resources Inc. Mr. Kent belongs to four investment groups, is a member of the Geological Discussion Group, and is a Life Member of the Canadian Institute of Mining and Metallurgy and of the Prospectors and Developers Association. He is very active in mining circles.

*W. Thomas Hodgson.* In addition to serving as a director of the Company, Mr. Hodgson is also Executive Chairman of Lithium Americas Corp., a TSX-listed mineral exploration company, and Senior Partner and Chairman of Greenbrook Capital Partners Inc., a financial advisory firm, and until May 2011, acted as a consultant and advisor to the Chairman Magna International Inc., one of the world's largest automotive companies, having a particular specialization in sourcing venture investment opportunities for the company. Mr. Hodgson has over twenty years' experience in capital markets research, corporate advisory matters and consulting.  He is currently a director of Helix Biopharma Corp. and Lithium Americas Corp., has been a board member of MI Developments Inc., and was Director, President and Chief Executive Officer of Magna Entertainment Corp. from March 2005 to March 2006.  From November 2002 to March 2005, Mr. Hodgson was President of Strategic Analysis Corporation.  Prior to that, Mr. Hodgson held senior positions with Canadian financial institutions and U.K. companies, including Canadian Imperial Bank of Commerce, Canada Permanent Trust Co. Central Guaranty Trust, where he served as President and Chief Executive Officer, Marathon Asset Management Inc., where he served as President, and GlobalNetFinancial.com, where he served as Chief Operating Officer and then as President and Chief Executive Officer.  Mr. Hodgson holds an MBA from Queen's University, Kingston, Ontario.

*H. Richard 'Dick' Klatt.* Mr. Klatt currently serves as vice president of exploration for the Company. Mr. Klatt has over 40 years of diverse mining and exploration experience in precious and base metals. He has worked for a number of major mining companies.  From 2007 through 2009 he served as contract exploration manager of Yellowcake Mining, Inc., Las Vegas Nevada, during which time he organized and oversaw exploration drilling for uranium in the Uravan mineral belt, Colorado.  From 2006 through 2007 he worked as a consulting minerals exploration geologist during which time he: (i) completed an economic geology review of the La Sal uranium district for Superior Uranium, Moab, Utah; (ii) completed extensive lithology-logging for base and precious metals for a drill program at the south rim of the Bingham copper mine, Utah, for Grand Central Silver Mines, Carrollton, Texas; (iii) directed a 2,100 feet diamond drilling program for gold and cobalt in the Belt-Percell basin, eastern Idaho, for Salmon River Resources, Vancouver, British Columbia, Canada; (iv) completed a 6,000 feet diamond drilling program for zinc in western Utah for Franconia Minerals Corp., Spokane, Washington; and (v) Directed a 6,000 m rotary drilling program for uranium in western Colorado for U.S. Energy, Riverton, Wyoming. From 2004 through 2005, he worked as a consulting minerals exploration geologist for Kennecott Exploration Company located in Salt Lake City, Utah.  During this time he also oversaw initial development drilling for vein-hosted base metals in the Zacatecas district, Zacatecas, Mexico, for Capstone Gold, Vancouver, British Columbia, Canada.  Mr. Klatt received his B.S. degree in geology at the University of Illinois, Urbana, Illinois.

**Family Relationships**

There are no family relationships between any of the current directors or officers of the Company.

**Involvement in Certain Legal Proceedings**

To the best of its knowledge, the Company's directors and executive officers were not involved in any legal proceedings during the last ten years as described in Item 401(f) of Regulation S-K.

**Directorships**

None of the Company's executive officers or directors is a director of any company with a class of equity securities registered pursuant to Section 12 of the Securities exchange Act of 1934 (the "Exchange Act") or subject to the requirements of the Exchange Act or any company registered as an investment company under the Investment Company Act of 1940.

**Code of Ethics**

Our board of directors has adopted a code of ethics that will apply to its principal executive officer, principal financial officer and principal accounting officer or controller and to persons performing similar functions. The code of ethics is designed to deter wrongdoing and to promote honest and ethical conduct, full, fair, accurate, timely and understandable disclosure, compliance with applicable laws, rules and regulations, prompt internal reporting of violations of the code and accountability for adherence to the code.  We will provide a copy of our code of ethics, without charge, to any person upon receipt of written request for such delivered to our corporate headquarters.  All such requests should be sent care of Liberty Silver Corp, Attn: Corporate Secretary, 181 Bay Street, Suite 2330, Toronto, Ontario, Canada, M5J 2T3.  The Company's Code of Business Conduct and Ethics has also posted on our website at, www.libertysilvercorp.com.

53

## ITEM 11.    EXECUTIVE COMPENSATION.

### Summary Compensation Table

The following table sets forth, for the years indicated, all compensation paid, distributed or accrued for services, including salary and bonus amounts, rendered in all capacities by the Company's principal executive officer , chief financial officer and all other executive officers; the information contained below represents compensation paid to the Company's officers for their work related to the Company.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Award(s) ($) | Option Award(s) ($) | Non-Equity Incentive Plan Compensation (#) | Non-qualified Deferred Compensation Earnings ($) | All other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Geoff Browne CEO | 2012 | 200,004 | -- | -- | -- | -- | -- | -- | 200,004 |
| | 2011 | 166,673 | -- | -- | 1,468,451   (2) | -- | -- | -- | 1,635,124 |
| Bill Tafuri, President, COO | 2012 | 120,000 | -- | -- | -- | -- | -- | -- | 120,000 |
| | 2011 | 120,000 | -- | -- | 292,251   (2) | -- | -- | -- | 412,251 |
| | 2010 | 30,000 | -- | -- | -- | -- | -- | -- | 30,000 |
| Manish Z. Kshatriya CFO | 2012 | 60,357 | -- | -- | 296,133   (2) | -- | -- | -- | 356,490 |
| Dick Klatt (1) | 2012 | 96,000 | -- | -- | -- | -- | -- | -- | 96,000 |
| | 2011 | 93,600 | -- | -- | 219,188   (2) | -- | -- | -- | 312,788 |
| | 2010 | 20,000 | -- | -- | -- | -- | -- | -- | 20,000 |
| John Pulos CFO (3) | 2011 | -- | -- | -- | -- | -- | -- | -- | -- |
| | 2010 | -- | -- | -- | -- | -- | -- | -- | -- |

(1) Dick Klatt serves as the vice president of exploration of the Company.
(2) Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a description please refer to Note 6 in the Notes to the Financial Statements herein.
(3) John Pulos resigned as the Chief Financial Officer of the Company on January 16, 2012.

### Grant of Plan Based Awards

The following table provides a summary of equity awards granted to the Company's executive officers during the fiscal year ended June 30, 2012.

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stocks or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | |
| Geoff Browne | October 18, 2010 | -- | -- | -- | -- | -- | -- | -- | 3,000,000 | .75 | 1,468,451(1) |
| William Tafuri | April 19, 2011 | -- | -- | -- | -- | -- | -- | -- | 800,000 | .75 | 292,251(1) |
| Manish Kshatriya | January 16, 2012 | -- | -- | -- | -- | -- | -- | -- | 450,000 | 1.00 | 296,133 (1) |

54

| Dick Klatt | April 19, 2011 | -- | -- | -- | -- | -- | -- | -- | 600,000 | .75 | 219,188(1) |
| John Pulos | | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |

(1) Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a discussion please refer to Note 4 in the Notes to the Financial Statements herein.

## Outstanding Stock Options Awards At Fiscal Year End

The following table provides a summary of equity awards outstanding at June 30, 2012, for each of our named executive officers.

| | Option Awards | | | | | Stock Awards | | | |
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
|---|---|---|---|---|---|---|---|---|---|
| Geoff Browne | 3,000,000 | -- | -- | .75 | October 18, 2015 | -- | -- | -- | -- |
| William Tafuri | 266,664 | 533,336 | -- | .75 | April 19, 2016 | -- | -- | -- | -- |
| Dick Klatt | 200,000 | 400,000 | -- | .75 | April 19, 2016 | -- | -- | -- | -- |
| Manish Kshatriya | 150,00 | 300,00 | -- | 1.00 | July 16, 2019 | -- | -- | -- | -- |

There were no options or other derivative securities exercised in fiscal 2012 by our named executive officers. In addition, there were no shares acquired by our named executive officers upon the vesting of restricted stock.

## Long-Term Incentive Plans

We do not have any long-term incentive plans, pension plans, or similar compensatory plans for our directors or executive officers.

## Change of Control Agreements

We are not party to any change of control agreements with any of our directors or executive officers.

## Employment Agreement; Employment Arrangement

Geoff Browne currently serves as the Chief Executive Officer and Executive Vice President of the Company. Pursuant to an agreement dated October 18, 2010, (the "Agreement") Mr. Browne is paid an annual salary of $200,000, as well as an annual discretionary performance bonus for his services rendered as the Chief Executive Officer; the amount of the performance bonus is at the discretion of the Company's Board of Directors. In conjunction with the entry into the Agreement, the Company granted Mr. Browne stock options to acquire up to 3,000,000 shares of restricted common stock of the Company at a price of

$.75 per share.

Manish Z. Kshatriya currently serves as the Chief Financial Officer of the Company.  Pursuant to an arrangement with the Company, in consideration of his services to the Company, Mr. Kshatriya's is paid $2,500 per week.  Additionally, in January of 2012 he was granted stock options to purchase up to a total of 450,000 shares the Company's common stock at an exercise price of $1.00 per share.  The options are subject to the following vesting schedule: (i) 150,000 options vest six months after January 16, 2012; (ii) 150,000 options vest one and a half years after January 16, 2012; and (iii) 150,000 options vest two and one half years after January 16, 2012.

Bill Tafuri currently serves as the Chief Operating Officer of the Company. Pursuant to an arrangement with the Company, in consideration of Mr. Tafuri's services to the Company, Mr. Tafuri is paid $120,000 annually.  Additionally, in April 2011, Mr. Tafuri was granted stock options to purchase 800,000 shares of the Company's common stock at $0.75 per share for a 5-year term.  Pursuant to the terms of the option agreement, entered into between Mr. Tafuri and the Company, a total of 266,664 options vested immediately upon the grant of the options; the remaining 533,336 options vest over a two-year period.  The vesting of the remaining 533,336 options may be accelerated in the event the Company achieves certain milestones with respect to its mining operations.

Dick Klatt currently serves as the Vice President of Exploration of the Company. Pursuant to an arrangement with the Company, in consideration of Mr. Klatt's services to the Company, Mr. Klatt is paid $96,000 annually.  Additionally, in April 2011, Mr. Klatt was granted stock options to purchase 600,000 shares of the Company's common stock at $0.75 per share for a 5-year term.  Pursuant to the terms of the option agreement, entered into between Mr. Klatt and the Company, a total of 200,000 options vested immediately upon the grant of the options; the remaining 400,000 options vest over a two-year period.  The vesting of the remaining 400,000 options may be accelerated in the event the Company achieves certain milestones with respect to its mining operations

## Equity Compensation Plan Information

As disclosed on Form 8-K filed with the Securities and Exchange Commission on May 3, 2011, on April 19, 2011, subject to shareholder approval, the Board of Directors of the Company approved the adoption of the Liberty Silver Corp. Incentive Share Plan (the "Plan") under which common shares of the Company's common stock have been reserved for purposes of possible future issuance of incentive stock options, non-qualified stock options, and stock grants to employees, directors and certain key individuals.  Under the Plan, the maximum number of common shares reserved for issuance shall not exceed 10% of the common shares of the Company outstanding from time to time.  The purpose of the Plan shall be to advance the interests of the Company by encouraging equity participation in the Company through the acquisition of common shares of the Company.  In order to maintain flexibility in the award of stock benefits, the Plan constitutes a single plan, but is composed of two parts.  The first part is the Share Option Plan which provides grants of both incentive stock options under Section 422A of the Internal Revenue Code of 1986, as amended, and nonqualified stock options.  The second part is the Share Bonus Plan which provides grants of shares of Company common stock. The foregoing description of the Plan is qualified in its entirety by reference to the Liberty Silver Corp. Incentive Share Plan which was filed as Exhibit 10.9 to Form 8-K filed with the Securities and Exchange Commission on May 3, 2011 and is hereby incorporated by reference.

## Director Compensation

The general policy of the Board is that compensation for independent directors should be equity-based

compensation. Additionally, the Company reimburses directors for reasonable expenses incurred during the course of their performance. There are no long-term incentive or medical reimbursement plans. The Company does not pay directors, who are part of management, for Board service in addition to their regular employee compensation. The Board, through its compensation committee, determines the amount of director compensation. The following table provides a summary of compensation paid to directors during the fiscal year ended June 30, 2012.

| Director | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) (1) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Geoff Browne (3) | -- | -- | -- | -- | -- | -- | -- |
| William Tafuri (3) | -- | -- | -- | -- | -- | -- | -- |
| John Pulos (3) | -- | -- | -- | -- | -- | -- | -- |
| John Barrington | 120,000(2) | --- | --- | --- | --- | --- | 120,000 |
| George Kent | --- | --- | --- | --- | --- | --- | --- |
| Timothy Unwin | --- | --- | --- | --- | --- | -- | --- |
| Paul Haggis | -- | --- | --- | --- | --- | --- | --- |
| W. Thomas Hodgson | -- | --- | --- | --- | --- | --- | --- |

(1)    Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a discussion please refer to Note 6 in the Notes to the Financial Statements herein.

(2)    This figure represents fees paid to John Barrington for consulting services rendered to the Company, not in his capacity as a director.

(3)    Refer to the summary compensation table in Item 11 executive compensation.

**ITEM 12.     SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

<u>**Equity Compensation Plan**</u>

The following table gives information about our Equity Compensation Plan as of June 30, 2012:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants | Weighted average exercise price of outstanding options, warrants | Number of securities remaining available for future issuances under equity compensation plans (excluding securities reflected in column) (a) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | - | - | - |
| Equity compensation plans not approved by security holders | 6,950,000 | $0.88 | 1,121,083 |
| Total | 6,950,000 | $0.88 | 1,121,083 |

<u>**Security Ownership of Certain Beneficial Owners**</u>

The following table sets forth as of September 25, 2012, the name and the number of shares of the Company's common stock, par value $0.001 per share, held of record or beneficially by each person who held of record, or was known by the Company to own beneficially, more than 5% of the issued and outstanding shares of common stock, and the name and shareholdings of each director and of all executive officers and directors as a group.

| Title and Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of class |
|---|---|---|---|
| Common | Geoff Browne [1] <br> 181 Bay Street, Suite 2330 <br> Toronto, Ontario, Canada, M5J2T3 | 2,550,000 | 3.2% |
| Common | Manish Z. Kshatriya [1] <br> 181 Bay Street, Suite 2330 <br> Toronto, Ontario, Canada, M5J2T3 | 0 | 0% |
| Common | William Tafuri [1] <br> 675 Sierra Rose Drive, Suite 112 <br> Reno, NV  89511 | 2,110,000 | 2.6% |

| | | | |
|---|---|---|---|
| Common | John Pulos [1]<br>675 Sierra Rose Drive, Suite 112<br>Reno, NV 89511 | 10,000,000 | 12.4% |
| Common | John Barrington [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,000,000 | 1.2% |
| Common | George Kent [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,050,000 | 1.3% |
| Common | Timothy Unwin [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,050,000 | 1.3% |
| Common | Paul Haggis [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,250,000 | 1.5% |
| Common | W. Thomas Hodgson [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,100,000 | 1.4% |
| Common | H. Richard Klatt [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,000,000 | 1.2% |
| Common | All Directors and Executive Officers as a<br>Group (9 in number) | 21,110,000 | 26.1% |

(1) Director or Officer of Company

## ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

### Certain Relationships and Related Transactions

Effective April 1, 2011, the Company borrowed a total of $150,000 pursuant to the terms and conditions of promissory notes (individually referred to as a "Note" and collectively referred to as the "Notes") entered into with six of the Company's directors.  Each Note was for $25,000 and is required to be repaid by the Company on the earlier of one year, or when the Company raises a minimum of $2,000,000 through equity investments.   The Notes are interest free for the first six months following the date of the Note and then bear interest at a rate of 8% per annum thereafter.   In conjunction with the entry into the Notes, in lieu of the holders charging the Company interest on the outstanding principal of the Notes for the initial six months, the Company issued each holder a warrant entitling the holder to purchase up to a total of 50,000 shares of the Company's common stock at price of $0.55 per share for a period of three (3) years following the date of the Note.  The Notes were repaid through the issuance of shares of common stock in the Company on December 19, 2011.

Aside from the foregoing, there were no material transactions, or series of similar transactions, during our Company's last fiscal year, or any currently proposed transactions, or series of similar transactions, to which our Company was or is to be a party, in which the amount involved exceeded the lesser of $120,000 or one percent of the average of the small business issuer's total assets at year-end for the last three completed fiscal years and in which any director, executive officer or any security holder who is known to us to own of record or beneficially more than five percent of any class of our common stock, or any member of the immediate family of any of the foregoing persons, had an interest.

**Director Independence**

The Company's common stock is currently traded on the OTCBB, and as such, is not subject to the rules of any national securities exchange which requires that a majority of a listed company's directors and specified committees of its board of directors meet independence standards prescribed by such rules. For the purpose of preparing the disclosures in this Form 10-K with respect to director independence, the Company has used the definition of "independent director" within the meaning of National Instrument 52-110 – Audit Committees adopted by the Canadian Securities Administration and as set forth in the Marketplace Rules of the NASDAQ, which defines an "independent director" generally as being a person, other than an executive officer or employee of the company or any other individual having a relationship which, in the opinion of the company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

Consistent with these standards, the Company's board of directors has determined that W. Thomas Hodgson, Timothy Unwin, Paul Haggis, and George Kent are "independent".

## ITEM 14.      PRINCIPAL ACCOUNTING FEES AND SERVICES

**Audit Fees**

(1)      Morrill & Associates served as the Company's independent registered public accounting firm for the years ended June 30, 2012 and 2011, and is expected to serve in that capacity for the current year. Principal accounting fees for professional services rendered for the Company by Morrill & Associates for the year ended June 30, 2012 and 2011, are summarized as follows:

|  | 2012 | | 2011 | |
|---|---|---|---|---|
| Audit | $ | 15,000 | $ | 23,000 |
| Audit related | $ | 0 | $ | 0 |
| Tax | $ | 0 | $ | 0 |
| All other | $ | 0 | $ | 0 |
| Total | $ | 15,000 | $ | 23,000 |

**Audit Related Fees**

(2)      Morrill & Associates did not bill the Company any amounts for assurance and related services that were related to its audit or review of the Company's financial statements during the fiscal years ended 2012 and 2011.

**Tax Fees**

(3)      The aggregate fees billed by Morrill & Associates for tax compliance, advice and planning were $0.00 for the fiscal years ended June 30, 2012 and 2011.

**All Other Fees**

 (4)      Morrill & Associates did not bill the Company for any products and services other than the foregoing during the fiscal years ended 2012 and 2011.

**Audit Committee's Pre-approval Policies and Procedures**

(5)    At the Company's regularly scheduled and special meetings, the audit committee considers and pre-approves any audit and non-audit services to be performed by the Company's independent registered public accounting firm. The audit committee has the authority to grant pre-approvals of non-audit services.

**PART IV**

**ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

**(a)(1)(2) Financial Statements and Financial Statement Schedule.**

The financial statements and financial statement schedules identified in Item 8 are filed as part of this annual report.

**(a)(3) Exhibits.**

The exhibits required by this item are set forth on the Exhibit Index below.

| | |
|---|---|
| 3.1 | Articles of Incorporation (incorporated by reference from exhibit to Form S-1 filed with the Securities and Exchange Commission on April 1, 2008). |
| 3.1 | Articles of Amendment (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on February 12, 2008). |
| 3.2 | Bylaws (incorporated by reference from exhibit to Form S-1 filed with the Securities and Exchange Commission on April 1, 2008). |
| 3.2 | Amended Bylaws (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 25, 2010). |
| 10.1 | Mineral Property Purchase Agreement corporation (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on April 1, 2008). |
| 10.2 | Exploration Earn-In Agreement dated March 29, 2010, by and between Liberty Silver Corp, a Nevada corporation, and AuEx Ventures, Inc., a Nevada corporation (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on April 5, 2010). |
| 10.3 | Employment Agreement and accompanying Stock Option Agreement dated October 18, 2010, by and between Liberty Silver Corp. and Geoff Browne (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 19, 2010). |
| 10.4 | Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and Paul Haggis (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010). |
| 10.5 | Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and Timothy Unwin (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010). |

10.6   Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and John Barrington (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.7   Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and George Kent (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.8   Stock Option Agreement dated December 6, 2010 by and between Liberty Silver Corp. and W. Thomas Hodgson (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on December 6, 2010).

10.9   Liberty Silver Corp. Incentive Share Plan (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 3, 2011).

10.10   Liberty Silver Corp. Incentive Stock Option Agreement dated April 19, 2011 between Liberty Silver Corp. and Bill Tafuri (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 5, 2011).

10.11   Liberty Silver Corp. Non-Qualified Stock Option Agreement dated April 19, 2011 between Liberty Silver Corp. and John Barrington (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 5, 2011).

10.12   Subscription Agreement dated November 10, 2011(incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on November 10, 2011).

10.13   Subscription Receipt and Escrow Agreement dated November 10, 2011(incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on November 10, 2011).

10.14   Registration Rights Agreement dated November 10, 2011(incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on November 10, 2011).

31.1   Certifications pursuant to Rule 13a-14(a) or 15d-14(a) under the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

31.2   Certifications pursuant to Rule 13a-14(a) or 15d-14(a) under the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

32.1   Certifications pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

32.2   Certifications pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

101   SCH XBRL Schema Document.*

101   INS XBRL Instance Document*

101   CAL XBRL Taxonomy Extension Calculation Linkbase Document.*

101   LAB XBRL Taxonomy Extension Label Linkbase Document.*

101   PRE XBRL Taxonomy Extension Presentation Linkbase Document.*

101   DEF XBRL Taxonomy Extension Definition Linkbase Document.*

* Filed Herewith

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

By: /s/ Manish Z. Kshatriya
      Manish Z. Kshatriya, Chief Financial Officer

Date:  September 28, 2012

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

By: /s/ R. Geoffrey Browne
      R. Geoffrey Browne, Director

Date:  September 28, 2012

By: /s/ Thomas Hodgson
      Thomas Hodgson, Director

Date:  September 28, 2012

By: /s/ Timothy Unwin
      Timothy Unwin, Director

Date:  September 28, 2012

By: /s/ Paul Haggis
      Paul Haggis, Director

Date:  September 28, 2012

By: /s/ John Pulos
      John Pulos, Director

Date:  September 28, 2012

64

Exhibit 31.1

## CERTIFICATION

I, R. Geoffrey Browne, certify that:

1.      I have reviewed this annual report on Form 10-K of Liberty Silver Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a+15(e) and 15d+15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a+15(f) and 15d+15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 28, 2012      /s/ R. Geoffrey Browne
                              Chief Executive Officer

Exhibit 32.1

**Certification of the Principal Executive Officer**
**Pursuant to 18 U.S.C. Section 1350,**
**As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the annual report of Liberty Silver Corp. (the "Company") on Form 10-K for the fiscal year ended June 30, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), R. Geoffrey Browne, the Chief Executive Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ R. Geoffrey Browne
Chief Executive Officer
 Date: Date: September 28, 2012

Exhibit 31.2

## CERTIFICATION

I, Manish Z. Kshatriya, certify that:

1.      I have reviewed this annual report on Form 10-K of Liberty Silver Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a+15(e) and 15d+15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a+15(f) and 15d+15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date: September 28, 2012     /s/ Manish Z. Kshatriya
                             Chief Financial Officer

<u>Exhibit 32.2</u>

**Certification of the Principal Accounting Officer**
**Pursuant to 18 U.S.C. Section 1350,**
**As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the annual report of Liberty Silver Corp. (the "Company") on Form 10-Q for the fiscal year ended June 30, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Manish Z. Kshatriya, the Chief Financial Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ Manish Z. Kshatriya
Chief Financial Officer

Date: Date: September 28, 2012