# Exhibit U

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C.  20549

_____

### FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

_____

Date of Report (Date of earliest event reported): November 10, 2011

# LIBERTY SILVER CORP.
(Exact name of registrant as specified in its charter)

| Nevada | 333-150028 | 32-0196442 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**181 Bay Street, Suite 2330**
**Toronto ,Ontario, Canada, M5J 3T3**
(Address of Principal Executive Office)

Registrant's telephone number, including area code: **416-369-3978**

_____

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 DFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4 (c) under the Exchange Act (17 CFR 240.13e-4(c))

**ITEM 1.01 - ENTRY INTO MATERIAL DEFINITIVE AGREEMENT**

On November 10, 2011, Liberty Silver Corp., a Nevada corporation (the "Company") entered into a Subscription Agreement (the "Subscription Agreement") with Look Back Investments, Inc. ("Investor"), pursuant to which Investor acquired Subscription Receipts ("Subscription Receipts") for U.S. $0.50 per Subscription Receipt for gross proceeds of U.S. $3,250,000; the gross proceeds of U.S. $3,250,000 (the "Escrow Proceeds") are being held in escrow pursuant to the terms of the Subscription Receipt. Each Subscription Receipt entitles the Investor to receive one unit (a "Unit") from the Company without payment of any additional consideration upon conditional approval by the Toronto Stock Exchange for the listing of the common shares of the Company (the "Escrow Release Condition"). Each Unit consists of one share of common stock of the Company and one common stock purchase warrant (a "Warrant"). Each whole Warrant entitles the holder to acquire one share of common stock at a price of U.S. $0.65 for a period of two years following the date of listing with the Toronto Stock Exchange.

If the Escrow Release Condition is not satisfied on or before 5:00 p.m. (Toronto time) on December 31, 2011, the Subscription Receipts will immediately become null and void and of no further force and effect and within five (5) business days thereafter the Escrow Proceeds will be returned to Investor by the escrow agent, Capital Transfer Agency, Inc.

In conjunction with the entry into the Subscription Agreement, the Company entered into a Registration Rights Agreement (the "Registration Rights Agreement") with Investor, pursuant to which the Company has agreed, immediately following the conditional approval by the Toronto Stock Exchange, to file a registration statement on Form S-1 with the Securities and Exchange Commission which registers the common stock and common stock underlying the Warrants acquired by the Investor for resale. If the registration statement does not become effective on or before six months from the date of conditional approval by the Toronto Stock Exchange for the listing of the common stock of the Company, Investor shall receive an additional common share and Warrant for, respectively, each ten (10) common shares and each ten (10) Warrants held by the Investor.

The foregoing descriptions of the Subscription Agreement, Subscription Receipt, and Registration Rights Agreement are qualified in their entirety by the contents of the respective agreements which are attached as Exhibits to this Current Report.

**ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS**

10.12     Subscription Agreement dated November 10, 2011

10.13     Subscription Receipt and Escrow Agreement dated November 10, 2011

10.14     Registration Rights Agreement dated November 10, 2011

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

LIBERTY SILVER CORP.

By:  /s/ Geoff Browne
     Chief Executive Officer

Date: November 10, 2011

3

TO SUBSCRIBE, EACH SUBSCRIBER MUST RETURN THE FOLLOWING (as applicable to the Subscriber):

a.    Duly completed and executed Subscription Agreement (complete cover page);
b.    Terms and Conditions of Subscription for Subscription Receipts of Liberty Silver Corp.;
c.    Duly completed and executed Schedule "B" – Exemption Form;
d.    Duly completed and executed Schedule "C" – Accredited Investor Certificate, if applicable;
e.    Duly completed and executed Schedule "D" – Certificate of U.S. Accredited Investor, if applicable;
f.    Duly completed and executed Schedule "E" – Additional, Representations, Warranties and Covenants of Subscriber Resident Outside of Canada and the United States, if applicable; and
g.    Subscription Funds by certified cheque, bank draft, money order or wire transfer (see Schedule "F" for instructions).

## SUBSCRIPTION AGREEMENT

TO:        **LIBERTY SILVER CORP. (the "Company")**

The undersigned (hereinafter referred to as the "**Subscriber**") hereby irrevocably subscribes for and agrees to purchase the number of subscription receipts of the Company (the "**Subscription Receipts**") set forth below, for the aggregate consideration set forth below (the "**Subscription Price**"), representing a subscription price of US$0.50 per Subscription Receipt. The gross proceeds (less the BG Subscriber Expense, as herein defined) shall be paid to the Escrow Agent (as herein defined) against issuance of the certificates representing the Subscription Receipts. Upon satisfaction of the Escrow Release Condition (as herein defined), each Subscription Receipt shall be automatically exchanged without any further action by the holder and for no additional consideration for one unit of the Company (each, a "**Unit**"). Each Unit shall consist of one common share in the capital of the Company (each, a "**Common Share**"), one Common Share purchase warrant (each whole warrant, a "**Warrant**"), and one right to acquire Common Shares in certain circumstances (each, a "**Right**"). Each Warrant shall entitle the holder thereof to acquire one Common Share (a "**Warrant Share**") at a price of U.S.$0.65 per Warrant Share at any time until 5:00 p.m. (Toronto time) on the date which is the earlier of 24 months following the date the Company's Common Shares are listed on Toronto Stock Exchange (the "**Exchange**") and 30 months following the date of the closing of the Offering. Each Right shall entitle the holder thereof to acquire, for no additional consideration, one-tenth (1/10) of a Common Share (each whole such Common Share, a "**Right Share**") in the event that the Registration (as herein defined) of the Securities (as herein defined) has not occurred in accordance with the terms of the Registration Rights Agreement (as herein defined). The Subscriber agrees to be bound by the terms and conditions set forth in the attached "Terms and Conditions of Subscription for Subscription Receipts of Liberty Silver Corp." including without limitation the terms, conditions, representations and warranties set forth thereunder or set out in any applicable Schedules attached thereto (the "**Terms**"), which Terms and attachments thereto together with this page form this subscription agreement (the "**Subscription Agreement**").

| **THE SUBSCRIBER: SUBSCRIBED:** | **SUBSCRIPTION RECEIPTS** |
|---|---|
| Print name of Subscriber: <br> Look Back Investments, Inc. | Number of Subscription Receipts:  6,500,000 <br> Aggregate consideration:   $3,250,000 |
| Signature of individual Subscriber: | |
| Signature of authorized signatory, if Subscriber not an individual: | **DISCLOSED PRINCIPAL (if purchasing as agent or trustee for a disclosed principal):** |
| Print name of authorized signatory, if applicable: <br> Robert Genovese | Name of disclosed principal: |
| Subscriber's address: <br> Calle Euaeblo A. Morales <br> Suite a-A #5 <br> El Cangrejo, Panama City, Panama | Address of disclosed principal: |
| Subscriber's email address: | Telephone number of disclosed principal: |

Form A

| Subscriber's telephone number: | |
|---|---|

**REGISTRATION INSTRUCTIONS (if other than in name of Subscriber):**

**CERTIFICATE DELIVERY INSTRUCTIONS (if other than to Subscriber's address):**

| Name: |
|---|
| Account reference, if applicable: |
| Address: |

| Name: |
|---|
| Account reference, if applicable: |
| Address: |

**DELIVERY:** This Subscription Agreement should be delivered to the Company at the following address:

> **LIBERTY SILVER CORP.**
> c/o Peterson Law Professional Corporation
> 390 Bay Street, Suite 806
> Toronto, ON M5H 2Y2

**ACCEPTANCE:** The Company hereby accepts the above subscription on the Terms contained in this Subscription Agreement.

**Liberty Silver Corp.**

Dated:  November 10, 2011

Per:    /s/ Geoffrey Browne____
        Authorized Signatory

**TERMS AND CONDITIONS OF**
**SUBSCRIPTION FOR SUBSCRIPTION RECEIPTS OF**
**LIBERTY SILVER CORP.**

1.  **Definitions** - In this Subscription Agreement:

    (a)    *"Action"* has the meaning ascribed to such term in section 10(x) hereof;

    (b)    *"Anti-Money Laundering Laws"* has the meaning ascribed to such term in section 10(x) hereof;

    (c)    *"BG Subscriber"* means BG Capital Group Ltd.;

    (d)    *"BG Subscriber's Expenses"* means the reasonable professional fees incurred by BG Subscriber in connection with its subscription for Subscription Receipts which shall not exceed CDN$25,000 plus applicable taxes and reasonable disbursements;

    (e)    *"Closing Date"* means November 9, 2011 or such earlier or later date as the Company shall determine;

    (f)    *"Closing Time"* means 9:00 a.m. (Toronto time) or such earlier or later time on the Closing Date as the Company shall determine;

    (g)    *"Common Shares"* mean the shares of common stock in the capital of the Company partially comprising each Unit;

    (h)    *"Disclosed Beneficial Purchaser"* has the meaning ascribed to such term in section 11(f) hereof;

    (i)    *"Disclosure Documents"* means all reports, schedules, forms, statements and other documents required to be filed by the Company with the Securities and Exchange Commission under the Securities laws, including the exhibits thereto and documents incorporated by reference therein, which are publicly available or otherwise posted by the Company on EDGAR during the 24 months preceding the date hereof;;

    (j)    *"Environmental Laws"* has the meaning ascribed to such term in section 10(q)(i) hereof;

    (k)    *"Escrow Agent"* means Capital Transfer Agency Inc.;

    (l)    *"Escrow Release Condition"* has the meaning ascribed to such term in section 9(a) hereof;

    (m)    *"Escrowed Funds"* has the meaning ascribed to such term in section 9(a) hereof;

    (n)    *"Escrowed Proceeds"* has the meaning ascribed to such term in section 9(a) hereof;

    (o)    *"Exchange"* has the meaning ascribed to such term on the face page hereof;

2

(p)     "*Exchange Confirmation*" has the meaning ascribed to such term in section 9(a) hereof;

(q)     "*Licenses*" has the meaning ascribed to such term in section 10(r) hereof;

(r)     "*Listing*" has the meaning ascribed to such term in section 8 hereof;

(s)     "*Mining Rights*" has the meaning ascribed to such term in section 10(o) hereof;

(t)     "*NI 45-106*" means National Instrument 45-106 - Prospectus and Registration Exemptions, a Canadian securities regulatory policy applicable to the Company;

(u)     "*Offering*" means the offering of Subscription Receipts;

(v)     "*Registration*" means the registration of the Securities in accordance with the U.S. Securities Act, as set out in the Registration Rights Agreement;

(w)     "*Registration Rights Agreement*" means the Registration Rights Agreement, in the form set out in Schedule "G" hereto, to be entered into by the Company and each Subscriber on or before the Closing Date;

(x)     "*Release Deadline*" has the meaning ascribed to such term in section 9(b) hereof;

(y)     "*Right*" means the right, partially comprising each Unit, for the holder to receive, for no additional consideration, one-tenth (1/10) of a Right Share in the event that the Registration has not occurred in accordance with the terms of the Registration Rights Agreement;

(z)     "*Right Shares*" mean Common Shares issuable upon conversion of the Rights in accordance with the terms of the Registration Rights Agreement;

(aa)    "**SEC**" means the United States Securities and Exchange Commission;

(bb)    "*Securities*" has the meaning ascribed to such term in section 11(a);

(cc)    "*Securities Laws*" has the meaning ascribed to such term in section 10(c) hereof;

(dd)    "*SRA Agreement*" has the meaning ascribed to such term in section 3 hereof;

(ee)    "*Subscribers*" means the subscribers of Subscription Receipts pursuant to their executed and accepted Subscription Agreements;

(ff)    "*Subscription Receipt Certificate*" has the meaning ascribed to such term in section 3 hereof;

(gg)    "*Taxes*" has the meaning ascribed to such term in section 10(ff) hereof;

(hh)    "*Terms*" has the meaning ascribed to such term on the face page hereof;

(ii)    "*U.S. Person*" has the meaning set out in Regulation S under the U.S. Securities Act;

(jj)    "*U.S. Securities Act*" means the United States Securities Act of 1933, as amended;

3

(kk)    "**U.S. Exchange Act**" means the United States Securities and Exchange Act of 1934, as amended;

(ll)    "*Units*" mean the unit of securities of the Company into which the Subscription Receipts will be automatically exchanged in the event the Escrow Release Condition is satisfied by the Release Deadline, each such unit to be comprised of one (1) Common Share, one (1) Warrant, and one (1) Right;

(mm)    "*Warrant Shares*" has the meaning ascribed to such term on the face page hereof; and

(nn)    "*Warrants*" has the meaning ascribed to such term on the face page hereof.

2.    **Deliveries by Subscriber** - In connection with its subscription under this Subscription Agreement, the Subscriber agrees to deliver to the Company at the address shown on the face page hereof:

(a)    this Subscription Agreement duly completed and executed;

(b)    a certified cheque, bank draft or money order payable to the Escrow Agent, in trust, Attention: Lisa Cripps, for the Subscription Price set out on the face page hereof, less the BG Subscriber's Expense, if the Subscriber is the BG Subscriber, or to wire transfer such Subscription Price, less the BG Subscriber's Expense, if the Subscriber is the BG Subscriber, to the Escrow Agent as set forth in the attached Schedule "F";

(c)    the attached Schedule "B" - Exemption Form, duly initialled and signed by or on behalf of the Subscriber;

(d)    if applicable, the attached Schedule "C" - Accredited Investor Certificate, duly initialled and signed by or on behalf of the Subscriber;

(e)    if applicable, the attached Schedule "D" - Certificate of U.S. Accredited Investor, duly initialled and signed by or on behalf of the Subscriber;

(f)    if applicable, the attached Schedule "E" - Additional, Representations, Warranties and Covenants of Subscriber Resident Outside of Canada and the United States; and

(g)    such other documents as may be reasonably requested by the Company.

3.    **Subscription for the Subscription Receipts** – The Subscriber hereby confirms its irrevocable subscription for and offer to purchase the Subscription Receipts from the Company, on and subject to the Terms set out in this Subscription Agreement, for the Subscription Price which is payable in the manner set out in section 2. The certificate representing the Subscription Receipts will be registered in accordance with the registration instructions set forth on the face page of this Subscription Agreement. The Subscription Receipts shall be duly and validly created and issued pursuant to the terms of the certificate representing the Subscription Receipts (the "**Subscription Receipt Certificate**") and the terms of a subscription receipt and escrow agreement (the "**SRA Agreement**") to be entered into on or before the Closing Date. The Subscription Receipt Certificate representing the Subscription Receipts will, among other things, include provisions for the appropriate adjustment in number and price upon the occurrence of certain events, including any subdivision, consolidation, or reclassification of the Company's common shares.

4

4.  **Acceptance and Rejection of Subscription by the Company** – The Subscriber acknowledges and agrees that the Company reserves the right, in its absolute discretion, to reject this subscription for Subscription Receipts, in whole or in part, at any time prior to the Closing Time. Upon the Company's acceptance of this subscription, this Subscription Agreement will constitute an agreement for the purchase by the Subscriber from the Company, and for the Company to issue and sell to the Subscriber, the number of Subscription Receipts set forth on the first page hereof at the Subscription Price and on the Terms set forth herein. The Company shall be entitled to rely on delivery of a facsimile copy of completed and executed Subscription Agreements, and acceptance by the Company of such facsimile subscriptions shall be legally effective to create a valid and binding agreement between the Subscriber and the Company in accordance with the terms hereof. If this subscription is rejected in whole, any cheques or other forms of payment delivered to the Escrow Agent or the Company representing the Subscription Price will be promptly returned to the Subscriber without interest or deduction. If this subscription is accepted only in part, a cheque representing any refund of the Subscription Price for that portion of the subscription for the Subscription Receipts which is not accepted will be promptly delivered to the Subscriber or to the Subscriber's legal counsel for delivery to the Subscribers without interest or deduction.

5.  **Closing** – If the Subscriber's subscription is accepted by the Company, the purchase and sale of the Subscription Receipts shall be completed at the Closing Time on the Closing Date.

6.  **Issuance of Subscription Receipt Certificates** – Upon this subscription being accepted by the Company, the Company shall, subject to the receipt of the deliveries to be made by the Subscriber pursuant to section 2 hereof and Terms set out in this Subscription Agreement, issue to the Subscriber certificates evidencing the Subscriber's ownership of the Subscription Receipts acquired by the Subscriber pursuant to the subscription for Subscription Receipts.

7.  **Acknowledgment of Offering** – The Subscriber acknowledges that the Subscription Receipts subscribed for hereunder form part of a larger issuance and sale of 6,500,000 Subscription Receipts for aggregate gross proceeds of up to $3,250,000. The Subscriber acknowledges it is intended that the minimum dollar amount of Subscription Receipts will be $3,000,000.

8.  **Acknowledgment of Transaction** – The Subscriber acknowledges that the Company is proceeding with a proposed listing of its Common Shares on the Exchange (the "**Listing**"). The completion and approval of the Listing by the Exchange is subject to the satisfaction of a number of conditions, including, but not limited to, the completion of the Offering and other customary listing conditions.

9.  **Escrow Conditions**

    (a)  Upon completion of the offer, issue and sale by the Company of the Subscription Receipts, the gross proceeds from the Offering less the BG Subscriber's Expense (the "**Escrowed Proceeds**") will be held by the Escrow Agent (or such other escrow agent as may be acceptable to the Company and the BG Subscriber), in its capacity as escrow agent thereunder and invested in an interest bearing account (the Escrowed Proceeds, together with all interest and other income earned thereon, are referred to herein as the "**Escrowed Funds**") pursuant to the SRA Agreement. The Escrowed Funds shall be released to the Company (or as it may direct), upon the receipt of written confirmation from the Exchange (the "**Exchange Confirmation**") that all conditions precedent to the Listing have been satisfied (the "**Escrow Release Condition**"). As a condition precedent to the release of the Escrowed Funds to the Company, the Chief Executive Officer and Chief Financial Officer of the Company shall certify to the Escrow Agent that the Escrow Release Condition has been satisfied, and a copy of such certification shall be provided to the BG Subscriber together with a copy of the Exchange Confirmation.

(b)     In the event that the Escrow Release Condition is not satisfied at or before 5:00 p.m. (EST) on December 31, 2011 (the "**Release Deadline**"), then the Subscription Receipts shall expire automatically and be of no further force and effect and the Escrowed Funds shall be returned to the Subscribers *pro rata*. To the extent the Escrowed Proceeds are not sufficient to refund the Subscribers the full amount paid for the Subscription Receipts, the Company shall be liable and responsible to repay the deficiency to the Subscribers, *pro rata*.

(c)     The Subscription Receipts shall be created and issued pursuant to the SRA Agreement and the specific attributes of the Subscription Receipts shall be as set forth thereunder. The Company shall provide a copy of the SRA Agreement to the Subscriber upon request by the Subscriber.

(d)     The Subscriber, on its own behalf and on behalf of each beneficial purchaser, if any, for whom it is contracting under this Subscription Agreement, acknowledges and agrees that the rights of the holders of the Subscription Receipts (including, without limitation, the date of the Release Deadline) may be modified under the SRA Agreement pursuant to an extraordinary resolution approved either: (i) by holders of Subscription Receipts representing at least 66⅔% of the outstanding Subscription Receipts that attend or are represented by proxy at a duly convened meeting of holders of Subscription Receipts; or (ii) by written consent of holders of Subscription Receipts representing at least 66⅔% of the outstanding Subscription Receipts.

10.     **Representations, Warranties and Covenants of the Company** − The Company represents, warrants and covenants to the Subscriber, and acknowledges that the Subscriber is relying upon such representations, warranties and covenants in purchasing the Subscription Receipts, that:

(a)     the Company has been duly incorporated and is validly existing under the laws of the State of Nevada, has all requisite corporate power and authority and is duly qualified to carry on its business as now conducted and to own, lease or operate its properties and assets and no steps or proceedings have been taken by the Company or to the knowledge of the Company by any person, voluntary or otherwise, requiring or authorizing its dissolution or winding-up and the Company has all requisite corporate power and authority to enter into each of this Subscription Agreement, the SRA Agreement and the Registration Rights Agreement and to carry out its obligations hereunder and thereunder;

(b)     the Company has no subsidiaries;

(c)     the Company is a reporting issuer under the securities laws of the United States and is not in default of any requirement of such securities laws (the "**Securities Laws**");

(d)     each of the execution and delivery of this Subscription Agreement, the SRA Agreement and the Registration Rights Agreement and the performance by the Company of its obligations hereunder or thereunder, including the issuance of the Subscription Receipts and underlying Common Shares, Warrants, Rights and Warrant Shares, do not and will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, (whether after notice or lapse of time or both): (A) any statute, rule or regulation in effect at the date hereof applicable to the Company including, without limitation, the Securities Laws; (B) the constating documents, by-laws or resolutions of the Company which are in effect at the date hereof; (C) any mortgage, note, indenture, contract, agreement, instrument, lease or other document to which the Company is a party or by which it is bound; or (D) any judgment, decree or order binding the Company or the property or assets of the Company;

(e)     the Company is in compliance with the timely and continuous disclosure obligations under the Securities Laws and, without limiting the generality of the foregoing, there has not occurred any material adverse change, financial or otherwise, in the assets, liabilities (contingent or

6

otherwise), business, financial condition, capital or prospects of the Company since June 30, 2011, which has not been publicly disclosed on a non-confidential basis and all the statements set forth in the Disclosure Documents are true, correct, and complete in all material respects and do not contain any material misrepresentation as of the date of such statements;

(f)      except as disclosed in the Disclosure Documents or as contemplated herein, the Company has not approved, entered into any binding agreement in respect of, or has any knowledge of:

(i)      the purchase of any material property or assets or any interest therein or the sale, transfer or other disposition of any material property or assets or any interest therein currently owned, directly or indirectly, by the Company whether by asset sale, transfer of shares or otherwise;

(ii)      the change of control (by sale or transfer of shares or sale of all or substantially all of the property and assets of the Company or otherwise) of the Company; or

(iii)      a proposed or planned disposition of shares by any shareholder who owns, directly or indirectly, 10% or more of the outstanding shares of the Company;

(g)      the audited consolidated comparative financial statements of the Company as at and for the years ended June 30, 2011 and 2010, respectively have been prepared in accordance with United States generally accepted accounting principles, and present fairly in all material respects the financial position and condition of the Company, as at the dates thereof and for the periods indicated and reflect all assets, liabilities or obligations (absolute, accrued, contingent or otherwise) of the Company and the results of its operations and the changes in its financial position for the periods then ended;

(h)      no holder of outstanding shares in the capital of the Company is entitled to any pre-emptive or any similar rights to subscribe for any Common Shares or other securities of the Company and other than as disclosed in section 10(aa) hereof, no rights, warrants or options to acquire, or instruments convertible into or exchangeable for, any shares in the capital of the Company are outstanding;

(i)      no legal or governmental proceedings are pending to which the Company is a party or to which its property is subject that would result in any material adverse change in the operation, business, condition or prospects of the Company and, to the knowledge of the Company, no such proceedings have been threatened against or are contemplated with respect to the Company or with respect to its properties;

(j)      the Company is not violation in of its constating documents or in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any material contract, indenture, trust deed, mortgage, loan agreement, note, option, lease or other agreement or instrument to which it is a party or by which it or its property may be bound;

(k)      to the knowledge of the Company, no counterparty to any material obligation, agreement, covenant or condition contained in any material contract or other material instrument to which the Company is a party is in default in the performance or observance thereof, except where such default in performance would not have a material adverse effect on the Company;

(l)      any and all of the agreements and other documents and instruments pursuant to which the Company holds its property and assets (including any interest in, or right to earn an interest in, any property) are valid and subsisting agreements, documents or instruments in full force and effect, enforceable against the Company in accordance with the terms thereof, the Company is not in default of any of the material provisions of any such agreements, documents or

instruments nor has any such default been alleged and such properties and assets are in good standing, in all material respects, under the applicable statutes and regulations of the jurisdictions in which they are situated, all leases, licences and claims pursuant to which the Company derives its interests in such property and assets are in good standing and there has been no material default under any such lease, licence or claim.  None of the properties (or any interest in, or right to earn an interest in, any property) of the Company is subject to any right of first refusal or purchase or acquisition right which is not disclosed in the Disclosure Documents;

(m)   to the knowledge of the Company, there is no agreement in force or effect which in any manner affects or will affect the voting or control of any of the securities of the Company, and there are no shareholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's shareholders;

(n)   the Company is the absolute legal and beneficial owner of, and has good and marketable title to, all of its material properties or assets as described in the Disclosure Documents, and except as disclosed in the Disclosure Documents, free of all mortgages, liens, charges, pledges, security interests, encumbrances, claims or demands whatsoever and no other property rights are necessary for the conduct of the business of the Company, as currently conducted or contemplated to be conducted by the Company, the Company does not know of any claim or the basis for any claim that might or could adversely affect the right thereof to use, transfer or otherwise exploit such property rights and, except as disclosed in the Disclosure Documents, the Company has no responsibility or obligation to pay any commission, royalty, licence fee or similar payment to any person with respect to the property rights thereof;

(o)   the Company holds either freehold title, mining leases, mining concessions, mining claims or participating interests or other conventional property or proprietary interests or rights, recognized in the jurisdiction in which a particular property is located (collectively, the "**Mining Rights**"), in respect of the ore bodies and minerals located in material properties in which the Company has an interest as set out in Schedule "H" hereto and as described in all material respects in the Disclosure Documents, under valid, subsisting and enforceable documents or recognized and enforceable agreements or instruments, sufficient to permit the Company to explore the minerals relating thereto, and all material property, options, leases or claims in which the Company has an interest or right have been validly located and recorded in accordance with all applicable laws and are valid and subsisting. The Company has all necessary surface rights, access rights and other necessary rights and interests relating to material properties in which the Company has an interest granting the Company, as applicable, the right and ability to explore for minerals, ore and metals for development purposes as are appropriate in view of the rights and interest therein of the Company, with only such exceptions as do not materially interfere with the use made by the Company of the rights or interest so held, and each of the proprietary interests or rights and each of the documents, agreements and instruments and obligations relating thereto referred to above is currently in good standing in the name of the Company. The Mining Rights in respect of the Company's material properties as disclosed in Schedule "H" hereto and in the Disclosure Documents constitute a description of all material Mining Rights held by the Company;

(p)   the Company has conducted and is conducting its business in material compliance with all applicable laws and regulations of each jurisdiction in which it carries on business (including, without limitation, all applicable federal, state, provincial, municipal and local environmental anti-pollution and licensing laws, regulations and other lawful requirements of any governmental or regulatory body) and has not received a notice of non-compliance, or knows of, or has reasonable grounds to know of, any facts that could give rise to a notice of non-compliance with any such laws or regulations which would have a material adverse effect on the Company;

8

(q)      except to the extent that any violation or other matter referred to in this subsection does not have a material adverse effect on the Company:

(i)      the Company is not currently in violation of any applicable federal, state, provincial, municipal or local laws, regulations, orders, governmental decrees or ordinances with respect to environmental, health or safety matters (collectively, the "**Environmental Laws**");

(ii)     to the knowledge of the Company, the Company has operated its business at all times and has received, handled, used, stored, treated, shipped and disposed of all contaminants without violation of Environmental Laws;

(iii)    there have been no material spills, releases, deposits or discharges of hazardous or toxic substances, contaminants or wastes into the earth, air or into any body of water or any municipal or other sewer or drain water systems by the Company that have not been remedied;

(iv)     as a result of its operations, no orders, rulings, directions or notices have been issued and remain outstanding or to the knowledge of the Company are pending or threatened against the Company under or pursuant to any Environmental Laws;

(v)      the Company has no knowledge of, and has not received any notice of, any claim, judicial or administrative proceeding, pending or threatened against it which may materially adversely affect the Company as a whole relating to or alleging any material violation of Environmental Laws by the Company and the Company is not aware of any facts which could give rise to any such claim or judicial or administrative proceeding and the Company, to the knowledge of the Company, is not the subject of any investigation, evaluation, audit or review by any governmental authority to determine whether any material violation of Environmental Laws by it has occurred or is occurring or whether any remedial action is needed;

(vi)     to the knowledge of the Company, the Company has not failed to report to the proper governmental authority the occurrence of any event which is required to be so reported by any Environmental Law; and

(vii)    the Company holds all licences, permits and approvals required under any Environmental Laws in connection with the operation of its business as currently conducted and the ownership and use of its assets, all such licences, permits and approvals are in full force and effect, and the Company has not received any notification pursuant to any Environmental Laws that any material work, repairs, constructions or capital expenditures are required to be made by it as a condition of continued compliance with any Environmental Laws, or any licence, permit or approval issued pursuant thereto, or that any license, permit or approval referred to above is about to be reviewed, made subject to material limitations or conditions, revoked, withdrawn or terminated;

(r)      the Company holds all requisite licences, registrations, qualifications, permits, consents and other approvals, including in respect of any Mining Rights (collectively, the "**Licenses**"), necessary for carrying on its business as currently carried on and proposed to be carried on and all such Licenses are valid and subsisting and in good standing in all material respects except where the failure to hold such licences would not have a material adverse effect on the Company, and the Company has not received any notice of proceedings relating to the revocation, adverse modification or cancellation of or any intention to revoke, adversely modify or cancel any of the Licenses;

(s)      the Company is the holder in good standing of all of its material licences free and clear of any encumbrances which would have a material adverse effect on the Company, and the Company has no knowledge of any claim of adverse ownership in respect thereof;

(t)      at the Closing Time, each of this Subscription Agreement, the SRA Agreement and the Subscription Receipt Certificate, the Registration Rights Agreement, and, at the applicable times, the certificates representing the Warrants and the Rights shall have been duly authorized and executed and delivered by the Company and upon such execution and delivery by the Company and the other parties thereto each shall constitute a valid and binding obligation of the Company and each shall be enforceable against the Company in accordance with its terms, except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws relating to or affecting the rights of creditors generally and except as limited by the application of equitable principles when equitable remedies are sought, and by the fact that rights to indemnity, contribution and waiver, and the ability to sever unenforceable terms, may be limited by applicable law;

(u)      Pacific Stock Transfer Company, at its principal office in the City of Las Vegas, Nevada, has been duly appointed as registrar and transfer agent in respect of the Common Shares;

(v)      Capital Transfer Agency Inc., at its principal office in the City of Toronto, Ontario, has been duly appointed agent in respect of the Subscription Receipts;

(w)      no order, ruling or determination having the effect of suspending the sale or ceasing the trading in any securities of the Company has been issued by any regulatory authority and is continuing in effect and no proceedings for that purpose have been instituted or, to the knowledge of the Company, are pending, contemplated or threatened by any regulatory authority;

(x)      there are no material actions, suits, proceedings or inquiries pending or, to the knowledge of the Company, threatened against or affecting the Company at law or in equity or before or by any federal, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality (collectively, an "**Action**") which: i) would adversely impede or prevent the consummation of the transactions contemplated by this Subscription Agreement or challenge the legality, validity or enforceability of this Subscription Agreement; or ii) could, if there were an unfavourable decision, have a material adverse effect. Neither the Company, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under applicable Securities Laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by any securities commission or other regulatory authorities involving the Company or any current or former director or officer of the Company. No securities commission nor any other regulatory authority has issued any order, ruling or determination having the effect of ceasing the trading or suspending the sale of the Subscription Receipts, Common Shares or any other securities of the Company and no Action has been instituted or is pending or, to the knowledge of the Company, is threatened by any securities commission or other regulatory authority;

(y)      there are no actions, suits, judgments, investigations, inquiries or proceedings of any kind whatsoever outstanding (whether or not purportedly on behalf of the Company), pending or, to the knowledge of the Company, threatened against or affecting the Company or any of its directors or officers, at law or in equity or before or by any commission, board, bureau or agency of any kind whatsoever and, to the knowledge of the Company, there is no basis therefor and the Company is not subject to any judgment, order, writ, injunction, decree, award, rule, policy or regulation of any governmental authority which, either separately or in the aggregate, may affect,

10

is material to or will materially affect the Company or would adversely affect the ability of the Company to perform its obligations under this Subscription Agreement;

(z) the Company is not aware of any licensing or legislation, regulation, by-law or other lawful requirement of any governmental authority having lawful jurisdiction over the Company presently in force or, to its knowledge, proposed to be brought into force that the Company anticipates it will be unable to comply with or which could reasonably be expected to have a material adverse effect on the Company;

(aa) as of October 31, 2011, the authorized capital of the Company consists of 200,000,000 Common Shares, of which 70,933,334 Common Shares are issued and outstanding as fully paid and non-assessable. The Company also has 2,233,334 warrants to subscribe for an equal number of Common Shares and 6,500,000 stock options outstanding to subscribe for an equal number of Common Shares as of October 31, 2011;

(bb) the Company is subject to the reporting requirements of section 13(a) or 15(d) of the U.S. Exchange Act, has filed with the SEC all reports required to be filed pursuant to the U.S. Exchange Act, and such reports at the time they were filed with the SEC materially complied as to form with the requirements of the U.S. Exchange Act;

(cc) the Company shall use commercially reasonable efforts to file with the SEC all reports required to be filed pursuant to the U.S. Exchange Act on such date as each such report is required to be filed, until such time as the Common Shares and Warrant Shares may be resold pursuant to an effective registration statement filed with the SEC or pursuant to Rule 144 under the U.S. Securities Act without regard to Rule 144(i);

(dd) upon request to do so, the Company shall use commercially reasonable efforts and shall take all steps to qualify the Securities for electronic deposit;

(ee) none of the directors, officers or employees of the Company or any associate or affiliate of any of the foregoing had or has any material interest, direct or indirect, in any material transaction or any proposed material transaction with the Company which materially affects, is material to or will materially affect the Company;

(ff) the Company owns or has the right to use under license, sub-license or otherwise all material intellectual property used by the Company in its business, including copyrights, industrial design, trademarks, trade secrets, knowhow and proprietary rights, free and clear of all encumbrances;

(gg) the Company is in compliance with all laws respecting employment and employment practices, terms and conditions of employment, pay equity and wages, except where non-compliance with such laws could not reasonably be expected to have a material adverse effect on the Company and has not and is not engaged in any unfair labour practice;

(hh) there has not been in the last two years and there is not currently any labour disruption or conflict which could reasonably be expected to have a material adverse effect on the Company;

(ii) all taxes (including income tax, capital tax, payroll taxes, employer health tax, workers' compensation payments, property taxes, customs and land transfer taxes), duties, royalties, levies, imposts, assessments, deductions, charges or withholdings and all liabilities with respect thereto including any penalty and interest payable with respect thereto (collectively, "**Taxes**") due and payable by the Company have been paid except for where the failure to pay such taxes would not constitute an adverse material fact of the Company or result in an adverse material change to the Company. All tax returns, declarations, remittances and filings required to be filed by the Company have been filed with all appropriate governmental authorities and all such

11

returns, declarations, remittances and filings are complete and accurate and no material fact or facts have been omitted therefrom which would make any of them misleading except where the failure to file such documents would not constitute an adverse material fact of the Company or result in an adverse material change to the Company. To the knowledge of the Company, no examination of any tax return of the Company is currently in progress and there are no issues or disputes outstanding with any governmental authority respecting any Taxes that have been paid, or may be payable, by the Company except where such examinations, issues or disputes would not constitute an adverse material fact of the Company or result in an adverse material change to the Company;

(jj)     the Company has established on its books and records reserves that are adequate for the payment of all Taxes not yet due and payable and there are no liens for Taxes on the assets of the Company and, to the knowledge of the Company, there are no audits pending of the tax returns of the Company (whether federal, state, provincial, local or foreign) and there are no claims which have been or may be asserted relating to any such tax returns, which audits and claims, if determined adversely, would result in the assertion by any governmental agency of any deficiency that would result in a material adverse effect on the Company;

(kk)     except as disclosed in the Disclosure Documents, there are no material liabilities of the Company whether direct, indirect, absolute, contingent or otherwise and the Company has not made any loans to or guaranteed the obligations of any person;

(ll)     except as disclosed in the Disclosure Documents, the Company is not indebted to any person in any material respect;

(mm)     there are no documents required to be filed under the Securities Laws in connection with the Offering that will not have been filed as required, subject only to satisfaction of all applicable post-closing filings and/or requirements;

(nn)     the minute books of the Company made available to counsel for the Underwriters in connection with its due diligence investigation of the Company for the periods from the date of incorporation to the date of examination thereof are all of the minute books of the Company and contain the constating documents of the Company from the date of incorporation and copies of all proceedings (or certified copies thereof) of the shareholders, the boards of directors and all committees of the boards of directors of the Company and there have been no other meetings, resolutions or proceedings of the shareholders, board of directors or any committees of the boards of directors of the Company not reflected in such minute books and other records, other than those which are not material in the context of the Company as of the date hereof;

(oo)     all information which has been prepared by the Company relating to the Company and its business, property and liabilities and made available to the Underwriters, including all financial and operational information provided to the Underwriters was, as of the date of such information and is as of the date hereof, true and correct in all material respects, taken as a whole, and no fact or facts have been omitted therefrom which would make such information materially misleading;

(pp)     the operations of the Company are and have been conducted at all times in compliance with the anti-money laundering statutes of all jurisdictions to which they are subject, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Anti-Money Laundering Laws**") and no Action by or before any governmental authority or any arbitrator involving the Company with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened;

(qq)    the creation, sale and issuance of the Subscription Receipts, and the delivery of the Subscription Receipt Certificates representing them, will have been approved by all requisite corporate action on or before the Closing Date and, upon issue and delivery at the Closing Time, the Subscription Receipts will be validly issued and the Subscription Receipt Certificates will be validly delivered;

(rr)    upon the automatic exchange of the Subscription Receipts into Units in accordance with the terms of the Subscription Receipt Certificate or the SRA Agreement, as applicable, the issuance of the Common Shares, and the creation and issuance of the Warrants and Rights, and the delivery of the certificates representing the Common Shares, Warrants and Rights, will have been approved by all requisite corporate action on or before such automatic exchange and, upon issue and delivery, the Common Shares will be validly issued as fully paid and non-assessable, the Warrant and the Rights will be validly issued, and the certificates representing the Common Shares, Warrants and Rights will be validly delivered;

(ss)    upon valid exercise of the Warrants in accordance with the terms thereof, and in accordance with the terms of the Subscription Receipt Certificate or the SRA Agreement, as applicable, the issuance of the Warrant Shares and the delivery of the certificates representing the Warrant Shares will have been approved by all requisite corporate action on or before the automatic exchange of the Subscription Receipts and, upon issue and delivery, the Warrant Shares will be validly issued as fully paid and non-assessable, and the certificates representing the Warrant Shares will be validly delivered;

(tt)    upon valid exercise of the Rights in accordance with the terms of the Registration Rights Agreement, the issuance of the Right Shares and the delivery of the certificates representing the Right Shares will have been approved by all requisite corporate action on or before the exercise of the Rights and, upon issue and delivery, the Right Shares will be validly issued as fully paid and non-assessable, and the certificates representing the Right Shares will be validly delivered;

(uu)    the representations and warranties of the Company stated or referred to in this Subscription Agreement shall be true and correct both as of the execution of this Subscription Agreement by the Subscriber and as of the Closing Time on the Closing Date, as if repeated at such time, and shall survive the completion of the issuance of the Subscription Receipts;

(vv)    upon satisfaction of the Escrow Release Condition, the net proceeds of the Offering will be used by the Company to fund the exploration of the Mining Rights with respect to the Trinity Silver Mine Property identified in Schedule "H" and for general working capital purposes; and

(ww)    the Company will, and covenants and agrees to, use its best efforts to perform its obligations under the Registration Rights Agreement and to effect the Registration in accordance with the terms set out in the Registration Rights Agreement.

11.    **Representations, Warranties and Covenants of the Subscriber** – The Subscriber (on its own behalf and, if applicable, on behalf of each person on whose behalf the Subscriber is contracting) represents, warrants and covenants to the Company (and acknowledges that the Company and its counsel are relying thereon) that both at the date hereof and at the Closing Time (as defined below):

(a)    it has been independently advised as to restrictions with respect to trading in the Subscription Receipts and the Common Shares, Warrants and Rights issuable upon exchange of the Subscription Receipts (collectively, the "**Securities**") imposed by applicable securities laws, confirms that no representation (written or oral) has been made to it by or on behalf of the Company with respect thereto other than as set forth herein, acknowledges that it is aware of the

characteristics of the Securities, the risks relating to an investment therein and of the fact that it may not be able to resell the Securities except in accordance with limited exemptions under applicable securities laws and regulatory policy until expiry of the applicable restricted period and compliance with the other requirements of applicable law; and it agrees that:

(i)    any certificates representing the Securities are to bear the following legend:

"UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY BEFORE [INSERT: THE DATE THAT IS FOUR MONTHS AND A DAY AFTER THE CLOSING DATE]";

and

(ii)    any certificates representing the Common Shares issuable upon conversion of the Subscription Receipts are to also bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE LISTED ON THE TORONTO STOCK EXCHANGE ("TSX"); HOWEVER, THE SAID SECURITIES CANNOT BE TRADED THROUGH THE FACILITIES OF TSX SINCE THEY ARE NOT FREELY TRANSFERABLE, AND CONSEQUENTLY ANY CERTIFICATE REPRESENTING SUCH SECURITIES IS NOT "GOOD DELIVERY" IN SETTLEMENT OF TRANSACTIONS ON TSX.";

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THE HOLDER HEREOF, BY PURCHASING THE SECURITIES REPRESENTED HEREBY, AGREES FOR THE BENEFIT OF LIBERTY SILVER CORP. AND ITS SUCCESSORS (THE "CORPORATION") THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE CORPORATION, (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN COMPLIANCE WITH LOCAL LAWS AND REGULATIONS, (C) WITHIN THE UNITED STATES, PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF APPLICABLE AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (D) WITHIN THE UNITED STATES, IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE STATE LAWS AND REGULATIONS GOVERNING THE OFFER AND SALE OF SECURITIES, AND IN THE CASE OF TRANSFERS PURSUANT TO (C) OR (D) ABOVE, THE HOLDER HEREOF HAS, PRIOR TO SUCH TRANSFER, FURNISHED TO THE CORPORATION AND THE CORPORATION'S TRANSFER AGENT AN OPINION OF COUNSEL OF RECOGNIZED STANDING IN FORM AND SUBSTANCE SATISFACTORY TO THE CORPORATION."

and the Subscriber further acknowledges that: (i) it has been advised to consult its own legal counsel in its jurisdiction of residence for full particulars of the resale restrictions applicable to it; and (ii) in the event that the Company is required by applicable securities legislation to provide written notice containing the legend set out at section 11(a)(i) to the beneficial purchaser of the Subscription Receipts, notice shall be deemed to have been given and received on the date on which it was delivered to the address of such beneficial purchaser provided on the face page hereof; and

(b)     it has not received or been provided with, nor has it requested, nor does it have any need to receive, any offering memorandum, any prospectus, sales or advertising literature, or any other document (other than an annual report, annual information form, interim report, information circular or any other continuous disclosure document, the content of which is prescribed by statute or regulation) describing or purporting to describe the present or proposed business and affairs of the Company which has been prepared for delivery to, and review by, prospective purchasers in order to assist them in making an investment decision in respect of the Subscription Receipts; and

(c)     it has not become aware of any advertisement in printed media of general and regular paid circulation (or other printed public media), radio, television or telecommunications or other form of advertisement (including electronic display and the internet) with respect to the distribution of the Securities; and

(d)     it understands that the Subscription Receipts are being offered for sale only on a "private placement" basis and that the sale and delivery of the Subscription Receipts is conditional upon such sale being exempt from the requirements as to the filing of a prospectus or delivery of an offering memorandum or upon the issuance of such orders, consents or approvals as may be required to permit such sale without the requirement of filing a prospectus or delivering an offering memorandum and, as a consequence (i) the Subscriber is restricted from using most of the civil remedies available under securities legislation, (ii) the Subscriber may not receive information that would otherwise be required to be provided to it under applicable securities legislation, and (iii) the Company is relieved from certain obligations that would otherwise apply under applicable securities legislation; and

(e)     unless it is purchasing under section 11(f) or (g), it is purchasing the Subscription Receipts as principal for its own account, not for the benefit of any other person, for investment only and not with a view to the resale or distribution of all or any of the Securities, it is resident in the jurisdiction set out as the "Subscriber's Residential Address" on the face page hereof; and

(f)     if it is not purchasing as principal or pursuant to section 11(g), it is duly authorized to enter into this Subscription Agreement and to execute and deliver all documentation in connection with the purchase on behalf of each beneficial purchaser, each of whom is purchasing as principal for its own account, not for the benefit of any other person, and not with a view to the resale or distribution of all or any of the Securities, it acknowledges that the Company may be required by law to disclose to certain regulatory authorities the identity of each beneficial purchaser of Subscription Receipts (the "**Disclosed Beneficial Purchaser**") for whom it may be acting, and it and each beneficial purchaser is resident in the jurisdiction set out as the "Subscriber's Residential Address"; and

(g)     it, and each person on whose behalf the Subscriber is contracting, is a resident of a jurisdiction outside of both Canada and the United States, it has concurrently executed and delivered a Representation Letter in the form attached to this Subscription Agreement as Schedule "E" and will provide such evidence of compliance with all matters described in such Representation Letter as the Company or its counsel may request; and

(h)     it acknowledges that:

(i)      no securities commission or similar regulatory authority has reviewed or passed on the merits of the Securities; and

(ii)     there is no government or other insurance covering the Securities; and

(iii)    there are risks associated with the purchase of the Subscription Receipts; and

(iv)    there are restrictions on the Subscriber's ability to resell the Securities and it is the responsibility of the Subscriber to find out what those restrictions are and to comply with them before selling the Securities; and

(v)     there is no market for the Securities and there is no assurance that a market will develop in the future and that no verbal or written representation has been made by or on behalf of the Company with respect thereto; and

(vi)    the Company has advised the Subscriber that the Company is relying on an exemption from the requirements to provide the Subscriber with a prospectus and to sell securities through a person or company registered to sell securities under the *Securities Act* (Ontario) and other applicable securities laws and, as a consequence of acquiring securities pursuant to this exemption, certain protections, rights and remedies provided by the *Securities Act* (Ontario) and other applicable securities laws, including statutory rights of rescission or damages, will not be available to the Subscriber; and

(vii)   the certificates representing the Securities will be endorsed with a legend stating that such securities will be subject to restrictions on resale in accordance with applicable securities legislation; and

(i)     the Subscription Receipts have not been offered to the Subscriber (or any person on whose behalf the Subscriber is contracting) in the United States, and any person making the order to purchase the Subscription Receipts and executing and delivering this Subscription Agreement was not in the United States when the order was placed and this Subscription Agreement was executed and delivered, unless such person is a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States signing on behalf of a discretionary account or similar account (other than an estate or trust) held for the benefit or account of a Disclosed Beneficial Purchaser which is a not in the United States or a U.S. Person; and

(j)     it is not a U.S. Person (as defined in Regulation S under the U.S. Securities Act, which definition includes, but is not limited to, an individual resident in the United States, an estate or trust of which any executor or administrator or trustee, respectively, is a U.S. Person and any partnership or corporation organized or incorporated under the laws of the United States) and is not purchasing and will not purchase the Subscription Receipts on behalf of, or for the account or benefit of, a person in the United States or a U.S. Person or for resale in the United States; and

(k)     it is aware that the Securities are not currently registered under the U.S. Securities Act or the securities laws of any state and that these securities may not be offered or sold in the United States without registration under the U.S. Securities Act or compliance with requirements of an exemption from registration and the applicable laws of all applicable states and acknowledges that while the Company has covenanted and agreed to file a registration statement under the U.S. Securities Act in respect of the Securities, there is no certainty as to timing or to whether the registration status will become effective; and

(l)     it undertakes and agrees that it will not offer or sell any of the Securities in the United States unless such securities are registered under the U.S. Securities Act and the securities laws of all applicable states of the United States or an exemption from such registration requirements is available, and further that it will not resell the Securities, except in accordance with the provisions of applicable securities legislation, regulations, rules, policies and orders and stock exchange rules; and

(m)     it has not purchased the Subscription Receipts as a result of any form of directed selling efforts in the United States, as such term is defined in Regulation S under the U.S. Securities Act; and

16

(n)     it understands and acknowledges that the Company (i) is under no obligation to be or to remain a "foreign issuer", as such term is defined in the U.S. Securities Act, (ii) may not, at the time the Subscriber sells the Securities or at any other time, be a foreign issuer and that it is not currently a foreign issuer, and (iii) may engage in one or more transactions that could cause the Company not to be a foreign issuer; and

(o)     if it is not an individual, it pre-existed the offering of the Subscription Receipts and has a bona fide business purpose other than the investment in the Subscription Receipts and was not created, formed or established solely or primarily to acquire securities, or to permit purchases of securities without a prospectus, in reliance on an exemption from the prospectus requirements of applicable securities legislation; and

(p)     if it is a corporation, partnership, trust, unincorporated association or other entity, it has the legal capacity to enter into and be bound by this Subscription Agreement and further certifies that all necessary approvals of directors, trustees, fiduciaries, shareholders, partners, stakeholders, holders of voting securities or otherwise have been given and obtained; and

(q)     if it is an individual, it is of the full age of majority and is legally competent to execute this Subscription Agreement and take all action pursuant hereto; and

(r)     the entering into of this Subscription Agreement and the transactions contemplated hereby will not result in a violation of any of the terms or provisions of any law applicable to the Subscriber (or any person on whose behalf the Subscriber is contracting), or if the Subscriber (or any person on whose behalf the Subscriber is contracting) is not a natural person, any of such person's constating documents, or any agreement to which such person is a party or by which it is bound; and

(s)     this Subscription Agreement has been duly and validly authorized, executed and delivered by and constitutes a legal, valid, binding and enforceable obligation of the Subscriber; and

(t)     in the case of a subscription by it for Subscription Receipts acting as agent for a principal, it is duly authorized to execute and deliver this Subscription Agreement and all other necessary documentation in connection with such subscription on behalf of such principal and this Subscription Agreement has been duly authorized, executed and delivered by or on behalf of, and constitutes a legal, valid and binding agreement of, such principal; and

(u)     it has such knowledge and experience in financial and business affairs as to be capable of evaluating the merits and risks of its investment in the Subscription Receipts and is able to, and agrees to, bear the economic risk of loss of its investment or, where it is not purchasing as principal, each beneficial purchaser is able to, and agrees to, bear the economic risk of loss of its investment; and

(v)     it has relied solely upon publicly available information relating to the Company and not upon any verbal or written representation as to fact or otherwise made by or on behalf of the Company; and

(w)     it acknowledges that the Company's counsel is acting as counsel to the Company and not as counsel to the Subscriber (or any person on whose behalf the Subscriber is contracting); and

(x)     if required by applicable securities legislation, regulations, rules, policies or orders or by any securities commission, stock exchange or other regulatory authority, the Subscriber will execute, deliver, file and otherwise assist the Company in filing, such reports, undertakings and other documents with respect to the issue of the Securities including, without limitation: (A) this Subscription Agreement; (B) if the Subscriber, or if applicable, the Disclosed Beneficial

17

Purchaser, is an accredited investor, a Representation Letter in the form attached as Exhibit 1 hereto; and (C) if the Subscriber, or if applicable, the Disclosed Beneficial Purchaser, is resident outside of Canada, a Representation Letter in the form attached as Exhibit 2 hereto; and

(y) it acknowledges that the acquisition of the Common Shares issuable upon conversion of the Subscription Receipts purchased hereunder by the Subscriber (or any person on whose behalf the Subscriber is contracting) may result in the Subscriber (or any such person) becoming a "control person" in respect of the Company, as defined under applicable securities laws, and that it has been advised to consult its own legal counsel, both in its jurisdiction of residence and in Canada, for full particulars of the resale restrictions applicable to it; and

(z) no person has made to the Subscriber (or any person on whose behalf the Subscriber is contracting) any written or oral representations (i) that any person will resell or repurchase the Securities (except in accordance with the articles of the Company or the SRA Agreement), or (ii) that any person will refund the purchase price of the Subscription Receipts, or (iii) as to the future price or value of the Securities, or (iv) as to any of the Securities being listed on any stock exchange; and

(aa) the Subscription Price which will be advanced by the Subscriber to the Company hereunder will not represent proceeds of crime for the purposes of the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) (the "**PCMLA**") and the Subscriber acknowledges that the Company may in the future be required by law to disclose the Subscriber's name and other information relating to this Subscription Agreement and the Subscriber's subscription hereunder, on a confidential basis, pursuant to the PCMLA; and to the best of its knowledge (i) none of the subscription funds to be provided by the Subscriber (A) have been or will be derived from or related to any activity that is deemed criminal under the laws of Canada, the United States of America, or any other jurisdiction, or (B) are being tendered on behalf of a person or entity who has not been identified to the Subscriber, and (ii) it shall promptly notify the Company if the Subscriber discovers that any of such representations ceases to be true, and to provide the Company with appropriate information in connection therewith; and

(bb) the Subscriber (including any person on whose behalf the Subscriber is contracting) has been encouraged to obtain independent legal, income tax and investment advice with respect to this subscription for the Subscription Receipts and accordingly, has had the opportunity to acquire an understanding of the meanings of all terms contained herein relevant to the Subscriber (and each person on whose behalf the Subscriber is contracting) for purposes of giving representations, warranties and covenants under this Subscription Agreement; and

(cc) the Subscriber has such knowledge of financial and business affairs or has received such advice as to be capable of evaluating the merits and risks of the Subscriber's investment in the Subscription Receipts and the Subscriber is able to bear the economic risk of the loss of the Subscriber's investment in the Subscription Receipts; and

(dd) the Subscriber will execute, deliver, file and otherwise assist the Company in filing such reports, undertakings and other documents with respect to the issue of the Common Shares, Warrants and/or Warrant Shares as may be required by applicable securities legislation, regulations, rules, policies and orders of securities commissions, stock exchanges or other regulatory authorities applicable to the Company; and

(ee) the Subscriber agrees to be bound by any escrow and pooling agreements that may be required by any securities commission or stock exchange or other regulatory authority having jurisdiction; and

18

(ff)   the representations and warranties of the Subscriber stated or referred to in this Subscription Agreement shall be true and correct both as of the execution of this Subscription Agreement by the Subscriber and as of the Closing Time on the Closing Date, as if repeated at such time, and shall survive the completion of the issuance of the Subscription Receipts.

12.   **Collection of Personal Information** - The Subscriber, on the Subscriber's own behalf and, if applicable, on behalf of each beneficial purchaser for whom the Subscriber is contracting hereunder, acknowledges and consents to the fact that the Company is collecting the personal information (as that term is defined under applicable private legislation, including, without imitation, the *Personal Information Protection and Electronic Documents Act* (Canada) and any other applicable similar, replacement or supplemental provincial or federal legislation or laws in effect from time to time) of the Subscriber or that of each beneficial purchaser for whom the Subscriber is contracting hereunder, for the purpose of completing this Subscription Agreement.

13.   **Consent to Use and Disclosure** - The Subscriber and, if applicable, on behalf of each beneficial purchaser for whom the Subscriber is contracting hereunder, acknowledges and consents to the company retaining such personal information for as long as permitted or required by law or business practices. The Subscriber, on its own behalf and, if applicable, on behalf of each beneficial purchaser for whom the Subscriber is contracting hereunder, further acknowledges and consents to the fact that the Company may be required by applicable securities legislation or the rules and policies of any stock exchange or the rules of the Investment Industry Regulatory Organization of Canada to provide regulatory authorities with any personal information provided by the Subscriber in this Subscription Agreement. The Subscriber represents and warrants that the Subscriber has the authority to provide the consents and acknowledgements set out in this paragraph on behalf of each beneficial purchaser for whom the Subscriber is contracting hereunder. In addition to the foregoing, the Subscriber agrees and acknowledges that the Company may use and disclose the personal information of the Subscriber or that of each beneficial purchaser for whom the Subscriber is contracting hereunder, as follows:

(a)   for internal use with respect to managing the relationships between and contractual obligations of the Company and the Subscriber or any beneficial purchaser for whom the Subscriber is contracting hereunder;

(b)   for use and disclosure for income tax related purposes, including without limitation, where required by law, disclosure to the Canada Revenue Agency;

(c)   disclosure to securities regulatory authorities with jurisdiction with respect to reports of trade and similar regulatory filings;

(d)   disclosure to a governmental or other authority to which the disclosure is required by court order or subpoena compelling such disclosure and where there is no reasonable alternative to such disclosure;

(e)   disclosure to professional advisers of the company in connection with the performance of their professional services; and

(f)   for use and disclosure as otherwise required or permitted by law.

14.   **Ontario Authorization** - The Subscriber and, if applicable, on behalf of each beneficial purchaser for which the Subscriber is contracting hereunder, acknowledges that the Company may be required to file with the Ontario Securities Commission information pertaining to the Subscriber and each such beneficial purchaser relating to the purchase of the Subscription Receipts, that this information is being collected indirectly by the Ontario Securities Commission under the authority granted to it in applicable securities legislation, that this information is being

19

collected for the purposes of the administration and enforcement of the securities legislation of Ontario, and that the title, business address and business telephone number of the public official in Ontario who can answer questions about the Ontario Securities Commission's indirect collection of the information is as follows:

Ontario Securities Commission
Suite 1903, Box 5520 Queen Street West
Toronto, Ontario  M5H 3S8
Telephone: (416) 593-3682
Facsimile: (416) 593-8252
Public official contact regarding indirect collection of information:
Administrative Assistant to the Director of Corporate Finance
Telephone (416) 593-8086

and the Subscriber hereby authorizes the indirect collection of such information by the Ontario Securities Commission.

15. **Facsimiles and Counterparts** - The Company shall be entitled to rely on a facsimile or other electronically communicated copy of an executed Subscription Agreement and acceptance by the Company of such agreement shall be legally effective to create a valid and binding agreement between the Subscriber and the Company in accordance with the Terms hereof. In addition, this Subscription Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same document.

16. b) **Reliance by Company and Indemnity** - The representations, warranties and covenants of the Subscriber herein (including all schedules and certificates attached hereto) are made with the intent that they be relied upon in determining the suitability of a purchaser of Subscription Receipts and the Subscriber agrees to indemnify and hold harmless the Company and its directors, officers, employees, and advisers from and against any and all loss, liability, claim, damage and expense whatsoever including, but not limited to, any fees, costs and expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation, administrative proceeding or investigation commenced or threatened or any claim whatsoever arising out of or based upon any representation or warranty of the Subscriber contained herein or in any document furnished by the Subscriber to the Company in connection herewith being untrue in any material respect or any breach or failure by the Subscriber to comply with any covenant or agreement made by the Subscriber herein or in any document furnished by the Subscriber to the Company in connection herewith. The Subscriber undertakes to immediately notify the Company at its registered and records office, 675 Sierra Rose Drive, Ste. 112, Reno, Nevada, 89511, Attention: Geoffrey Browne, of any change in any statement or other information relating to the Subscriber set forth herein which takes place prior to the Closing Time on the Closing Date.

(b) **Reliance by Subscriber and Indemnity** - The representations, warranties and covenants of the Company herein (including all schedules and certificates attached hereto) are made with the intent that they be relied upon in determining the suitability of the investment of the Subscription Receipts by the Subscriber, and the Company agrees to indemnify and hold harmless the Subscriber from and against any and all loss, liability, claim, damage and expense whatsoever including, but not limited to, any fees, costs and expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation, administrative proceeding or investigation commenced or threatened or any claim whatsoever arising out of or based upon any representation or warranty of the Company contained herein or in any document furnished by the Company to the

20

Subscriber in connection herewith being untrue in any material respect or any breach or failure by the Subscriber to comply with any covenant or agreement made by the Company herein or in any document furnished by the Company to the Subscriber in connection herewith.

17. **Closing Conditions** – The obligations of the Subscriber to purchase the Subscription Receipts, to complete the transactions contemplated in this Subscription Agreement and to deliver executed Subscription Agreement and the Subscription Proceeds to the Company is subject to the following conditions for the benefit of the Subscriber, which must be fulfilled at or prior to the Closing Time, unless waived in writing by the Subscriber:

(a) the Company delivering to the Subscriber, at the Closing Time, a certificate dated the Closing Date addressed to the Subscriber and signed by the chief executive officer and chief financial officer of the Company certifying on behalf of the Company, and not in their personal capacities, to the best of their knowledge, information and belief, after due inquiry, that:

(i) no order, ruling or determination having the effect of suspending the sale or ceasing the trading in any securities of the Company (including the Common Shares) has been issued by any regulatory authority and is continuing in effect and no proceedings for that purposes have been instituted or are pending or, to the knowledge of such officers, contemplated or threatened by any regulatory authority;

(ii) the Company has complied with all the covenants and satisfied all the terms and conditions of this Subscription Agreement to be complied with and satisfied by the Company at or prior to the Closing Time;

(iii) the representations and warranties of the Company contained in this Subscription Agreement are true and correct as at the Closing Time, with the same force and effect as if made on and as at the Closing Time after giving effect to the transactions contemplated by this Subscription Agreement; and

(iv) the Company has made and/or obtained, on or prior to the Closing Time, all necessary filings, approvals, consents and acceptances under applicable Securities Laws, and under any applicable agreement or document to which the Company is a party or by which it is bound, required for the execution and delivery of this Subscription Agreement, the offering and sale of the Subscription Receipts (subject to completion of filings with certain regulatory authorities following the Closing Date);

(b) the Company delivering to the Subscriber at the Closing Time a certificate dated the Closing Date addressed to the Subscriber and signed by the Company certifying:

(i) the constating documents of the Company;

(ii) the resolutions of the directors of the Company relevant to the Offering; and

(iii) the incumbency and signatures of signing officers of the Company;

(c) the Subscriber having received from the Company and/or its counsel a certificate of status for the Company, dated the Closing Date or earlier if logistics so dictate;

21

(d)     the Subscriber having received a certificate of the Company's registrar that certifies the number of Common Shares issued and outstanding on the date immediately prior to the Closing Date; and

(e)     the Subscriber shall have received prior to the Closing Date legal opinions from solicitors for the Company dated the Closing Date in a form satisfactory to the Subscriber and its counsel, acting reasonably, with respect to the following matters:

(i)     as to the incorporation and existence of the Company;

(ii)    as to the power and capacity of the Company to own its property and carry on its business as currently conducted and carry out the transactions contemplated by this Subscription Agreement;

(iii)   that all necessary corporate action has been taken by the Company to authorize the execution and delivery of this Subscription Agreement, the SRA Agreement and the Registration Rights Agreement, and to issue the Common Shares, Warrants and Rights issuable on the exchange of the Subscription Receipts;

(iv)    as to the authorized and issued capital of the Company;

(v)     that the Company is not a party to, bound or affected by or subject to any charter or by-law provision which is or would be violated, contravened or breached by the execution, delivery and performance by it of this Subscription Agreement or the performance by it of any of the terms thereof;

(vi)    that this Subscription Agreement, the SRA Agreement and the Registration Rights Agreement has been duly authorized, executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company enforceable against it in accordance with its terms;

(vii)   that the Subscription Receipts, Warrants and Rights have been duly created;

(viii)  that the Common Shares, Warrants and Rights have been authorized and allotted for issuance;

(ix)    that the Warrant Shares issuable on the due exercise of the Warrants and the Rights Shares issuable on the deemed exercise of the Rights have been duly allotted and reserved for issuance, and when issued in accordance with the terms of the certificates representing the Warrants and the Rights, respectively, will be issued as fully paid and non-assessable; and

(x)     matters with respect to title to the Mineral Rights described in Schedule "H".

Each of the foregoing conditions is included for the benefit of the Subscriber and maybe waived by the Subscriber by notice in writing to the Company.

18.   **Governing Law** - This Subscription Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and the Subscriber and the Company both irrevocably attorn to the non-exclusive jurisdiction of the Courts of the Province of Ontario.

19.   **Time** - Time shall be of the essence hereof.

22

20. **Entire Agreement** - This Subscription Agreement represents the entire agreement of the parties hereto relating to the subject matter hereof and there are no representations, warrants, covenants or other agreements relating to the subject matter hereof except as stated or referred to herein.

21. **Subscriber's Costs** - The Subscriber acknowledges and agrees that all costs incurred by the Subscriber (including any fees and disbursements of any counsel retained by the Subscriber) relating to the purchase of the Subscription Receipts by the Subscriber shall be borne by the Subscriber with the exception of the BG Subscriber's Expenses.

22. **Assignment** - No rights or obligations of the Subscriber hereunder may be assigned without the prior written consent of the Company.

23. **Enurement** - The terms and provisions of this Subscription Agreement shall be binding upon and enure to the benefit of the Subscriber and the Company and their respective heirs, executors, administrators, successors and permitted assigns.

24. **Offer Irrevocable** - The Subscriber agrees that this offer is made for valuable consideration and may not be withdrawn, cancelled, terminated or revoked by the Subscriber.

25. **Modifications** - Neither this Subscription Agreement nor any provision hereof shall be modified, changed, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge or termination is sought.

26. **Survival** - The covenants, representations and warranties contained herein shall survive the closing of the transactions contemplated hereby.

27. **Currency** - In this Subscription Agreement, references to "$" or *"Cdn $"* are to United States dollars except where otherwise specified herein.

**TO ASSIST THE COMPANY IN COMPLYING WITH APPLICABLE SECURITIES LAW AND COMPLETING ANY REQUIRED REGULATORY FILINGS, THE SUBSCRIBER HAS COMPLETED THE SUBSCRIPTION AGREEMENT AND THE ATTACHED SCHEDULE "B" - EXEMPTION FORM AND IF APPLICABLE, THE ATTACHED SCHEDULE "C" – ACCREDITED INVESTOR CERTIFICATE, THE ATTACHED SCHEDULE "D" – CERTIFICATE OF U.S. INVESTOR, WHICH FORM PART OF THIS SUBSCRIPTION AGREEMENT AND THE ATTACHED SCHEDULE "E" – ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS FOR SUBSCRIBERS OUTSIDE OF CANADA AND THE UNITED STATES, WHICH FORM PART OF THIS SUBSCRIPTION AGREEMENT.**

**SCHEDULE "A"**

**TERM SHEET**

**LIBERTY SILVER CORP.**

**PRIVATE PLACEMENT OF SUBSCRIPTION RECEIPTS**

| | |
|---|---|
| Issuer: | Liberty Silver Corp. (the "**Company**") |
| Offering: | Private placement (the "**Offering**") of up to 6,500,000 subscription receipts ("**Subscription Receipts**") |
| Offering Size: | Up to US$3,250,000 |
| Issue Price: | $0.50 per Subscription Receipt |
| Subscription Receipts | Each Subscription Receipt will be automatically exchanged without any further action by the holder and for no additional consideration for one unit of the Company (a "**Unit**") upon satisfaction of the Escrow Release Condition on or before the Release Deadline (as defined below). |
| Escrow Release Condition | Upon completion of the Offering, the gross proceeds from the Offering less certain expenses (the "**Escrowed Proceeds**") will be held by the Capital Transfer Agency Inc. (the "**Escrow Agent**"), in an interest bearing account pursuant to a subscription receipt and escrow agreement (the "SRA Agreement") to be entered into on or before the Closing Date (as defined below) between the Company and the Escrow Agent.<br><br>The Escrowed Proceeds plus any interest accrued thereon shall be released to the Company, upon confirmation on or before 5:00 p.m. (Toronto time) on December 31, 2011 (the "**Release Deadline**") that the common shares of the Company ("**Common Shares**") have been accepted for listing on the Toronto Stock Exchange (the "**Escrow Release Condition**"). |
| Units: | Each Unit shall be comprised of one (1) Common Share, one Common Share purchase warrant (a "**Warrant**") and one right to acquire Common Shares (a "**Right**").<br><br>Each whole Warrant will entitle the holder thereof to purchase one Common Share at US$0.65 at any time until 5:00 on the date which is the earlier of (i) 24 months following the date the Common Shares are listed on the Toronto Stock Exchange and (ii) 30 months following the Closing Date.<br><br>Each Right shall entitle the holder thereof to receive, for no additional consideration, one-tenth (1/10) of a Common Share in the event that the registration in accordance with the U.S. Securities Act of the Subscription Receipts, and the Common Shares, Warrants and Rights issuable upon exchange thereof, together with the Common Shares issuable on the exercise of the Warrants or on the exercise of the Rights, has not occurred in accordance with a Registration Rights Agreement to be entered into by the Company and the subscribers. |
| Use of Proceeds: | The net proceeds of the Subscription Receipts will be used for the exploration of the Trinity Silver Mine and for general working capital purposes. |
| Hold Period: | The Subscription Receipts, and the Common Shares, Warrants and Rights issuable upon exchange of the Subscription Receipts, are subject to a hold period expiring on the later of (i) six months after the Closing Date, and (ii) the date on which the Company becomes a reporting issuer. |

| Offering Jurisdictions: | The Subscription Receipts will be offered for sale by way of private placement exemptions available in all provinces of Canada (except Quebec) and in those jurisdictions outside of Canada that are agreed to by the Company and the Agent (including the United States). The Subscription Receipts will be sold to U.S. buyers on a private placement basis pursuant to an exemption from the registration requirements in Rule 144A or Regulation D of the United States Securities Act of 1933, as amended. |
|---|---|
| Concurrent Offering | Concurrent with the Offering, the Company is completing the sale of a minimum of 1,500,000 Units at US$0.50 per Unit for gross proceeds of US$750,000.  The Units shall be issued on the same basis as the Units issued pursuant to the Offering which, for greater certainty, shall include for each Unit, one Common Share, one Warrant and one Right. |
| Closing Date: | Closing of the Offering will occur on or about November 10, 2011 (the "**Closing Date**"). |
| Finders: | This placement is non-brokered. Qualified finders will receive a commission to be determined. |

## SCHEDULE "B"

## EXEMPTION FORM

### *TO BE COMPLETED BY ALL INVESTORS*

> **Please complete this Exemption Form by indicating the category of exempt investor to which the Subscriber belongs and completing and signing page 3 of this Exemption Form. Initial or otherwise mark the box or line to the left of each item. Mark only one of boxes 1, 2, 3 and 4. If box 3 or 4 is marked, mark only one sub-item under box 3 or box 4.**

The Subscriber represents, warrants and covenants to the Company and acknowledges that the Company is relying thereon:

☐    1.    that the Subscriber is purchasing the Subscription Receipts as principal and is an accredited investor resident in Canada **(if this category is initialled, please complete the attached Schedule "C" - Accredited Investor Certificate)**;

☐    2.    that the Subscriber is purchasing the Subscription Receipts as principal and is a U.S. Person **(if this category is initialled, please complete the attached Schedule "D" – Certificate of U.S. Accredited Investor)**;

☐    3.    that the Subscriber is purchasing the Subscription Receipts as principal and is resident outside of Canada and the United States **(if this category is initialled, please complete the attached Schedule "E" – Additional Representations, Warranties and Covenants for Subscribers Outside of Canada and the United States)**;

☐    4.    that the Subscriber is resident other than in Ontario or Saskatchewan, is purchasing the Subscription Receipts as principal and is:

     _____    (a)    a director, executive officer or control person of the Company, or of an affiliate of the Company;

     _____    (b)    a spouse, parent, grandparent, brother, sister or child of a director, executive officer or control person of the Company, or of an affiliate of the Company;

     _____    (c)    a parent, grandparent, brother, sister or child of the spouse of a director, executive officer or control person of the Company, or of an affiliate of the Company;

     _____    (d)    a close personal friend of a director, executive officer or control person of the Company, or of an affiliate of the Company;

     _____    (e)    a close business associate of a director, executive officer or control person of the Company, or of an affiliate of the Company;

- 2 -

_____

(f)     a founder of the Company or a spouse, parent, grandparent, brother, sister, child, close personal friend or close business associate of a founder of the Company;

_____     (g)     a parent, grandparent, brother, sister or child of a spouse of a founder of the Company;

(h)     a person of which a majority of the voting securities are beneficially owned by, or a majority of the directors are, persons described in paragraphs (a) to (g); or

_____

(i)     a trust or estate of which all of the beneficiaries or a majority of the trustees or executors are persons described in paragraphs (a) to (g);

_____

☐     5.     that the Subscriber is resident in Ontario, is purchasing the Subscription Receipts as principal and is:

_____     (a)     a founder of the Company;

_____     (b)     an affiliate of a founder of the Company;

(c)     a spouse, parent, brother, sister, grandparent or child of an executive officer, director or founder of the Company; or

_____

_____     (d)     a person that is a control person of the Company;

The following terms used in this Exemption Form have the following meanings:

"**close business associate**" means an individual who has had sufficient prior business dealings with a director, executive officer, founder or control person of the Company to be in a position to assess their capabilities and trustworthiness;

"**close personal friend**" of a director, executive officer, founder or control person of the Company is an individual who knows the director, executive officer, founder or control person well enough and has known them for a sufficient period of time to be in a position to assess their capabilities and trustworthiness;

"**control person**" means:

(a)     a person who holds a sufficient number of the voting rights attached to all outstanding voting securities of the Company to affect materially the control of the Company, or

(b)     each person in a combination of persons, acting in concert by virtue of an agreement, arrangement, commitment or understanding, which holds in total a sufficient number of the voting rights attached to all outstanding voting securities of the Company to affect materially the control of the Company,

and, if a person or combination of persons holds more than 20% of the voting rights attached to all outstanding voting securities of the Company, the person or combination of persons is deemed, in the absence of evidence to the contrary, to hold a sufficient number of the voting rights to affect materially the control of the Company;

**"executive officer"** means an individual who is:

    (a)    a chair, vice-chair or president;

    (b)    a vice-president in charge of a principal business unit, division or function including sales, finance or production;

    (c)    an officer of the Company or any of its subsidiaries and who performs a policy-making function in respect of the Company; or

    (d)    performing a policy-making function in respect of the Company;

"**founder of the Company**" means a person who

    (a)    acting alone, in conjunction, or in concert with one or more persons, directly or indirectly, takes the initiative in founding, organizing or substantially reorganizing the business of the Company; and

    (b)    is actively involved in the business of the Company.

The undersigned has executed this Exemption Form as of the _____ day of _____, 2011.

If a Corporation, Partnership or Other Entity:    If an Individual:

*Name of Entity*               *Signature*

*Type of Entity*              *Name of Individual*

*Signature of Person Signing*

*Title of Person Signing*

## SCHEDULE "C"

## ACCREDITED INVESTOR CERTIFICATE

*TO BE COMPLETED ONLY BY ACCREDITED INVESTORS*
*WHO ARE RESIDENTS OF CANADA*

---

**If you have marked the "accredited investor" category on the Schedule "B" - Exemption Form and you are a resident of Canada, please complete this Schedule "C" - Accredited Investor Certificate by initialling or otherwise marking the category of accredited investor to which the Subscriber belongs and completing and signing page 3 of this Accredited Investor Certificate.**

---

The Subscriber represents, warrants and covenants to the Company and acknowledges that the Company is relying thereon, that the Subscriber is purchasing the Subscription Receipts as principal and is:

(a)   a Canadian financial institution, or a Schedule III bank;

(b)   the Business Development Bank of Canada incorporated under the *Business Development Bank of Canada Act* (Canada);

(c)   a subsidiary of any person referred to in paragraphs (a) or (b), if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by directors of that subsidiary;

(d)   a person registered under the securities legislation of a jurisdiction of Canada as an adviser or dealer, other than a person registered solely as a limited market dealer under one or both of the *Securities Act* (Ontario) or the *Securities Act* (Newfoundland and Labrador);

(e)   an individual registered or formerly registered under the securities legislation of a jurisdiction of Canada as a representative of a person referred to in paragraph (d);

(f)   the Government of Canada or a jurisdiction of Canada, or any crown Company, agency or wholly owned entity of the Government of Canada or a jurisdiction of Canada;

(g)   a municipality, public board or commission in Canada and a metropolitan community, school board, the Comité de gestion de la taxe scolaire de l'île de Montréal or an intermunicipal management board in Québec;

(h)   any national, federal, state, provincial, territorial or municipal government of or in any foreign jurisdiction, or any agency of that government;

(i)   a pension fund that is regulated by either the Office of the Superintendent of Financial Institutions (Canada) or a pension commission or similar regulatory authority of a jurisdiction of Canada;

- 2 -

(j)     an individual who, either alone or with a spouse, beneficially owns, directly or indirectly, financial assets having an aggregate realizable value that before taxes, but net of any related liabilities, exceeds $1,000,000 (exclusive of the value of the principal residence);

(k)     an individual whose net income before taxes exceeded $200,000 in each of the 2 most recent calendar years or whose net income before taxes combined with that of a spouse exceeded $300,000 in each of the 2 most recent calendar years and who, in either case, reasonably expects to exceed that net income level in the current calendar year;

(l)     an individual who, either alone or with a spouse, has net assets of at least $5,000,000;

(m)    a person, other than an individual or investment fund, that has net assets of at least $5,000,000 as shown on its most recently prepared financial statements;

(n)     an investment fund that distributes or has distributed its securities only to:

    (i)      a person that is or was an accredited investor at the time of the distribution;

    (ii)     a person that acquires or acquired securities in the circumstances referred to in sections 2.10 [*Minimum amount investment*], and 2.19 [*Additional investment in investment funds*] of NI 45-106; or

    (iii)    a person described in paragraph (i) or (ii) that acquires or acquired securities under section 2.18 [*Investment fund reinvestment*] of NI 45-106;

(o)     an investment fund that distributes or has distributed securities under a prospectus in a jurisdiction of Canada for which the regulator or, in Québec, the securities regulatory authority, has issued a receipt;

(p)     a trust company or trust Company registered or authorized to carry on business under the *Trust and Loan Companies Act* (Canada) or under comparable legislation in a jurisdiction of Canada or a foreign jurisdiction, acting on behalf of a fully managed account managed by the trust company or trust Company, as the case may be;

(q)     a person acting on behalf of a fully managed account managed by that person, if that person:

    (i)      is registered or authorized to carry on business as an adviser or the equivalent under the securities legislation of a jurisdiction of Canada or a foreign jurisdiction; and

    (ii)     in Ontario, is purchasing a security that is not a security of an investment fund;

(r)     a registered charity under the *Income Tax Act* (Canada) that, in regard to the trade, has obtained advice from an eligibility adviser or an adviser registered under the securities legislation of the jurisdiction of the registered charity to give advice on the securities being traded;

- 3 -

    (s)    an entity organized in a foreign jurisdiction that is analogous to any of the entities referred to in paragraphs (a) to (d) or paragraph (i) in form and function;

    (t)    a person in respect of which all of the owners of interests, direct, indirect or beneficial, except the voting securities required by law to be owned by directors, are persons that are accredited investors;

    (u)    an investment fund that is advised by a person registered as an adviser or a person that is exempt from registration as an advisor; or

    (v)    a person that is recognized or designated by the securities regulatory authority or, except in Ontario and Québec, the regulator as:

        (i)    an accredited investor; or

        (ii)    an exempt purchaser in Alberta or British Columbia after NI 45-106 comes into force.

As used in this accredited Investor Certificate, the following terms have the following meanings:

"**eligibility adviser**" means a person that is registered as an investment dealer or in an equivalent category of registration under the securities legislation of the Subscriber's jurisdiction and authorized to give advice with respect to the Subscription Receipts;

"**financial assets**" means cash or securities or a contract of insurance, a deposit or an evidence of a deposit that is not a security for the purposes of securities legislation;

"**fully managed account**" means an account of a client for which a person makes the investment decisions if that person has full discretion to trade in securities for the account without requiring the client's express consent to a transaction;

"**investment fund**" means an investment fund as such term is defined in National Instrument 81-106 – Investment Fund Continuous Disclosure;

"**related liabilities**" means  (a) liabilities incurred or assumed for the purpose of financing the acquisition or ownership of financial assets, or (b) liabilities that are secured by financial assets; and

-4-

"**securities legislation**" means securities legislation as such term is defined in National Instrument 14-101 – Definitions.

The undersigned has executed this Accredited Investor Certificate as of the _____ day of _____, 2011.

If a Corporation, Partnership or Other Entity:          If an Individual:


*Name of Entity*                                        *Signature*


*Type of Entity*                                        *Name of Individual*


*Signature of Person Signing*


*Title of Person Signing*

**SCHEDULE "D"**

**CERTIFICATE OF U.S. ACCREDITED INVESTOR**

*TO BE COMPLETED <u>ONLY</u> IF THE SUBSCRIBER IS A U.S. PERSON*

> **If you have marked the "accredited investor" category on the Schedule "B" - Exemption Form and you are not a resident of Canada, and you are a U.S. Person within the meaning set out in Regulation S under the U.S.** *Securities Act of 1933*, **please complete this Schedule "D" - Certificate of U.S. Investor by initialling or otherwise marking the category of U.S. accredited investor to which the Subscriber belongs and completing and signing page 2 of this Certificate of U.S. Accredited Investor.**

**All prospective U.S. purchasers are advised that completion of this Certificate of U.S. Accredited Investor is required in order to purchase the Subscription Receipts. In addition, supplemental information may be required at the Company's discretion in order to confirm the Subscriber's eligibility to invest in the Company as an "accredited investor" as defined in Rule 501(A) of Regulation D promulgated under the U.S. Securities Act of 1933, as amended (the "U.S. Securities Act").**

**In making an investment decision, Subscribers must rely on their own examination of the Company and the terms of the offering including the merits and risks involved. The securities offered have not been recommended by any federal or state securities commission or regulatory authority, nor has any such commission or authority confirmed the accuracy or determined the adequacy of the offering. Any representation to the contrary is a criminal offence.**

**Subscribers should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.**

The undersigned hereby represents and warrants that it is an "accredited investor" as defined in Rule 501(a) of Regulation D of the U.S. Securities Act, by reason of being:

_____  (a)  a natural person whose individual net worth, or joint net worth with his/her spouse, at the time of purchase exceeds U.S.$1,000,000;

_____  (b)  a natural person who had an individual income in excess of U.S.$200,000 in 2007 and 2008 or joint income with his or her spouse in excess of U.S.$300,000 in each of those years and has a reasonable expectation of reaching the same income level in 2011;

_____  (c)  a director or executive officer of the Company;

_____  (d)  a bank as defined in Section 3(a)(2) of the U.S. Securities Act;

_____  (e)  a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the U.S. Securities Act, whether acting in its individual or fiduciary capacity;

_____  (f)  a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934;

_____  (g)  an insurance company as defined in Section 2(13) of the U.S. Securities Act;

_____ (h)  an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act;

_____ (i)  a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958;

_____ (j)  a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, which plan has total assets in excess of U.S.$5,000,000;

_____ (k)  an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is a bank, savings and loan association, insurance company or registered investment advisor;

_____ (l)  an employee benefit plan within the meaning of ERISA which has total assets in excess of U.S.$5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

_____ (m)  a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

_____ (n)  an organization described in Section 50l(c)(3) of the Internal Revenue Code of 1986, as amended, a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

_____ (o)  a trust, with total assets in excess of U.S.$5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of an investment in the securities offered; and

_____ (p)  an entity in which each of the equity owners meets the requirements of one of the above sections.

The undersigned has executed this Certificate of U.S. Accredited Investor as of the _____ day of _____, 2011.

If a Corporation, Partnership or Other Entity:        If an Individual:


*Name of Entity*        *Signature*


*Type of Entity*        *Name of Individual*


*Signature of Person Signing*


*Title of Person Signing*

**SCHEDULE "E"**

**ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS
FOR SUBSCRIBERS OUTSIDE OF CANADA AND THE UNITED STATES**

*TO BE COMPLETED <u>ONLY</u> IF THE SUBSCRIBER IS RESIDENT
OUTSIDE OF CANADA AND THE UNITED STATES*

---

**If you have marked the "resident outside of Canada and the United States" category on the Schedule "B" - Exemption Form, please complete this Schedule "E" – Additional Representations, Warranties and Covenants for Subscribers Outside of Canada and the United States by completing and signing page 2 of this certificate.**

---

The Subscriber, on its own behalf and (if applicable) on behalf of others for whom it is contracting hereunder, further represents, warrants and covenants to and with the Company (and acknowledges that the Company is relying thereon) that it is, and (if applicable) any beneficial purchaser for whom it is contracting hereunder is, a resident of, or otherwise subject to, the securities legislation of a jurisdiction other than Canada or the United States, and:

(a) the Subscriber is, and (if applicable) any other purchaser for whom it is contracting hereunder, is:

(i) a purchaser that is recognized by the securities regulatory authority in the jurisdiction in which it is, and (if applicable) any other purchaser for whom it is contracting hereunder is resident or otherwise subject to the securities laws of such jurisdiction, as an exempt purchaser and is purchasing the Subscription Receipts as principal for its, or (if applicable) each such other purchaser's, own account, and not for the benefit of any other person, for investment only and not with a view to resale or distribution; or

(ii) a purchaser which is purchasing Subscription Receipts pursuant to an exemption from any prospectus or securities registration requirements (particulars of which are enclosed herewith) available to the Company, the Subscriber and any such other purchaser under applicable securities laws of their jurisdiction of residence or to which the Subscriber and any such other purchaser are otherwise subject to, and the Subscriber and any such other purchaser shall deliver to the Company such further particulars of the exemption and their qualification thereunder as the Company may reasonably request;

(b) the purchase of Subscription Receipts by the Subscriber, and (if applicable) each such other purchaser, does not contravene any of the applicable securities laws in such jurisdiction and does not trigger: (i) any obligation to prepare and file a prospectus, an offering memorandum or similar document, or any other ongoing reporting requirements with respect to such purchase or otherwise; or (ii) any registration or other obligation on the part of the Company; and

(c)    the Subscriber, and (if applicable) any other purchaser for whom it is contracting hereunder, will not sell or otherwise dispose of any Common Shares, Warrants or Warrant Shares, Rights or Right Shares except in accordance with applicable Canadian securities laws, and if the Subscriber, or (if applicable) such beneficial purchaser, sells or otherwise disposes of any Common Shares, Warrants or Warrant Shares, Rights or Right Shares to a person other than a resident of Canada, the Subscriber, and (if applicable) such beneficial purchaser, will obtain from such purchaser representations, warranties and covenants in the same form as provided in this Schedule "E" and shall comply with such other requirements as the Company may reasonably require.

**Dated at _____ this _____ day of _____, 2011.**

_____
Name of Subscriber

By: _____
    Signature

_____
    Title

SCHEDULE "F"

**WIRE TRANSFER INSTRUCTIONS**



Melissa Torrecampo
Business Adviser
Commerce Court Banking Center
Court Level, CCW
199 Bay St
Toronto, Ontario, M5L 1G9
Tel: (416) 304-2223
Fax: (416) 362-6518

Incoming Wire Instructions

(U.S. Funds)

| | |
|---|---|
| **Beneficiary Bank/Address :** | **CIBC/CIBC MAIN BRANCH COMMERCE COURT** |

| | |
|---|---|
| **Beneficiary Name/Address :** | **CAPITAL TRANSFER AGENCY INC.**<br>Capital Transfer Agency Inc.<br>105 Adelaide St.W., Suite 1101<br>Toronto, ON M5H 1P9<br>Attention:  Lisa Cripps<br>T: 416.350.5007<br>F: 416.350.5008<br>E: lcripps@capitaltransferagency.com |

| | |
|---|---|
| **Beneficiary Account :** | **0511013** |

| | |
|---|---|
| **Swift Code :** | **CIBC CATT** |

| | |
|---|---|
| **Bank Number :** | **//CC001000002** |

| | |
|---|---|
| **Transit :** | **00002** |

- 2 -

**SCHEDULE "F"**

**FORM OF REGISTRATION RIGHTS AGREEMENT**

SCHEDULE "H"

LIST OF MATERIAL PROPERTIES

TRINITY SILVER MINE PROPERTY

Property location

The Trinity silver mine property is situated approximately 25 road miles north-northwest of Lovelock, Nevada, in Pershing County, Nevada, on the northwest flank of the Trinity Range, in the Trinity mining district. It is located about 25 mi northwest of the Rochester silver mine, one of the largest silver mines in the United States. The latitude-longitude coordinates of the mine site are $40^{o}$ 23' 47" N, $118^{o}$ 36' 38" W; it is situated in sections 2, 3, 4, 5, 9, 10, 11, 15, 16, and 17, Township 29 North, Range 30 East, MDB&M and sections 27, 33, and 35, Township 30 North, Range 30 East, MDB&M.

Land; Land Status; Property Rights; Licensing

The Trinity silver mine property includes located public and leased/subleased fee land consisting of the following:

(1)      240 unpatented lode mining claims, the Seka 1-6, 8-16, 61-64, 73-76, 95-112, TS 1-18, Elm 1-175 and XXX 1-6 claims, totaling approximately 4900 acres, located in sections 2, 4, 10, and 16, Township 29 North, Range 30 East, and section 34 and 35, Township 30 North, Range 30 East. The claims are located on public land open to mineral entry, currently valid, and subject to Bureau of Land Management regulations.

(2)      4,396.44 acres of fee land leased by Newmont Mining Corp. from Southern Pacific Land Co., and its successors, and from Santa Fe Pacific Minerals Corporation, and its successors located in sections 3, 5, 11, and 17, Township 29 North, Range 30 East, and sections 27, 33, and 35, Township 30 North, Range 30 East.

(3)      1280 acres of fee land owned by Newmont Mining Corp. located in sections 9 and 15, Township 29 North, Range 30 East.

The Corporation's joint venture area of interest is currently sections 2-5, 8-11, 14-17, Township 29 North, Range 30 East, MDB&M, and sections, 26-28, 32-35, Township 30 North, Range 30 East, MDB&M. The Corporation's rights, which apply to all of the above properties include exploration, development, and production of valuable minerals except geothermal, hydrocarbons, and sand/gravel, and also include the authority to apply for all necessary permits, licenses and other approvals from the United States of America, the State of Nevada or any other governmental or other entity having regulatory authority over any part of the Trinity silver mine property.

**LIBERTY SILVER CORP.**

**- and -**

**CAPITAL TRANSFER AGENCY INC.**

**SUBSCRIPTION RECEIPT AND ESCROW AGREEMENT**

Providing for the Issuance of
up to 6,500,000 Subscription Receipts

November 10, 2011

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 INTERPRETATION**                                                2
   1.1  Definitions                                 2
   1.2  Words Importing the Singular                 6
   1.3  Interpretation not Affected by Headings      6
   1.4  Day not a Business Day                       6
   1.5  Time of the Essence                          6
   1.6  Governing Law                                7
   1.7  Meaning of "outstanding" for Certain Purposes 7
   1.8  Currency                                     7
**ARTICLE 2 SUBSCRIPTION RECEIPTS**                                         7
   2.1  Appointment of Subscription Receipt and Escrow Agent 7
   2.2  Issue of Subscription Receipts               7
   2.3  Terms of Subscription Receipts               8
   2.4  Issue in Substitution for Lost Subscription Receipts 8
   2.5  Subscription Receiptholder not a Shareholder 9
   2.6  Subscription Receipts to Rank *Pari Passu*   9
   2.7  Signing of Subscription Receipts             9
   2.8  Countersignature by the Subscription Receipt and Escrow Agent 9
   2.9  Legended Certificates                        10
**ARTICLE 3 TRANSFER AND OWNERSHIP OF SUBSCRIPTION RECEIPTS**               12
   3.1  Registration of Subscription Receipts        12
   3.2  Transfer of Subscription Receipts            13
   3.3  Exchange of Subscription Receipts            14
**ARTICLE 4 EXCHANGE OF SUBSCRIPTION RECEIPTS**                             14
   4.1  Exchange of Subscription Receipts            14
   4.2  Delivery of Release Certificate              15
   4.3  Effect of Deemed Exchange of Subscription Receipts 15
   4.4  No Fractional Shares                         15
   4.5  Redemption of Subscription Receipts          16
**ARTICLE 5 NO ADJUSTMENT OF EXCHANGE NUMBER**                             16
   5.1  No Changes in Share Capital Structure        16
**ARTICLE 6 RIGHTS AND COVENANTS**                                         16
   6.1  General Covenants of the Corporation         16
   6.2  Subscription Receipt and Escrow Agent's Remuneration and Expenses 17
   6.3  Performance of Covenants by the Subscription Receipt and Escrow Agent 17
**ARTICLE 7 ESCROWED PROCEEDS**                                            18
   7.1  Initial Escrowed Proceeds and Distribution Amounts 18
   7.2  Qualified Investments                        18
   7.3  Release of Escrowed Proceeds Upon Receipt of Release Certificate 18
   7.4  Release of Escrowed Proceeds on Default      18
   7.5  Direction                                    19
   7.6  Early Termination of any Investment of the Escrowed Proceeds 19
   7.7  Method of Disbursement and Delivery          19

## TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 7.8 | Acknowledgements | 20 |
| 7.9 | Miscellaneous | 20 |
| **ARTICLE 8 ENFORCEMENT** | | **21** |
| 8.1 | Suits by Subscription Receiptholders | 21 |
| 8.2 | Limitation of Liability | 21 |
| **ARTICLE 9 MEETINGS OF SUBSCRIPTION RECEIPTHOLDERS** | | **22** |
| 9.1 | Right to Convene Meetings | 22 |
| 9.2 | Notice | 22 |
| 9.3 | Chairman | 22 |
| 9.4 | Quorum | 22 |
| 9.5 | Power to Adjourn | 23 |
| 9.6 | Show of Hands | 23 |
| 9.7 | Poll | 23 |
| 9.8 | Voting | 23 |
| 9.9 | Regulations | 24 |
| 9.10 | Corporation and Subscription Receipt and Escrow Agent may be Represented | 25 |
| 9.11 | Powers Exercisable by Extraordinary Resolution | 25 |
| 9.12 | Meaning of "Extraordinary Resolution" | 26 |
| 9.13 | Powers Cumulative | 27 |
| 9.14 | Minutes | 27 |
| 9.15 | Instruments in Writing | 27 |
| 9.16 | Binding Effect of Resolutions | 27 |
| 9.17 | Holdings by the Corporation Disregarded | 28 |
| **ARTICLE 10 SUPPLEMENTAL AGREEMENTS AND SUCCESSOR COMPANIES** | | **28** |
| 10.1 | Provision for Supplemental Agreements for Certain Purposes | 28 |
| 10.2 | Successor Entities | 29 |
| **ARTICLE 11 CONCERNING THE SUBSCRIPTION RECEIPT AND ESCROW AGENT** | | **29** |
| 11.1 | Rights and Duties of Subscription Receipt and Escrow Agent | 29 |
| 11.2 | Evidence, Experts and Advisers | 31 |
| 11.3 | Securities, Documents and Monies Held by Subscription Receipt and Escrow Agent | 32 |
| 11.4 | Action by Subscription Receipt and Escrow Agent to Protect Interests | 32 |
| 11.5 | Subscription Receipt and Escrow Agent not Required to Give Security | 32 |
| 11.6 | Protection of Subscription Receipt and Escrow Agent | 33 |
| 11.7 | Replacement of Subscription Receipt and Escrow Agent | 34 |
| 11.8 | Conflict of Interest | 35 |
| 11.9 | Subscription Receipt and Escrow Agent Not to be Appointed Receiver | 35 |
| 11.10 | Authorization to Carry on Business | 35 |
| 11.11 | Privacy | 36 |

- iii -

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| **ARTICLE 12 GENERAL** | | **36** |
| 12.1 | Notice to the Corporation and the Subscription Receipt and Escrow Agent | 36 |
| 12.2 | Notice to the Subscription Receiptholders | 37 |
| 12.3 | Discretion of Directors | 38 |
| 12.4 | Satisfaction and Discharge of Agreement | 38 |
| 12.5 | Provisions of Agreement and Subscription Receipts for the Sole Benefit of Parties and Subscription Receiptholders  38 | |
| 12.6 | Counterparts and Formal Date | 38 |

SCHEDULE "A" - FORM OF SUBSCRIPTION RECEIPT CERTIFICATE
SCHEDULE "B" - FORM OF RELEASE CERTIFICATE
SCHEDULE "C" – FORM OF WARRANT CERTIFICATE

**THIS SUBSCRIPTION RECEIPT AND ESCROW AGREEMENT** made as of November 10, 2011.

AMONG:    **LIBERTY SILVER CORP.**, a company existing under the laws of the State of Nevada

(hereinafter called the "**Corporation**")

AND:    **CAPITAL TRANSFER AGENCY INC.**, a company existing under the laws of Canada;

(hereinafter called the "**Subscription Receipt and Escrow Agent**")

**RECITALS:**

A.    The Corporation proposes to issue and sell up to 6,500,000 Subscription Receipts (as hereinafter defined) of the Corporation (the "**Offering**").

B.    Each Subscription Receipt shall be automatically exchangeable, without any further action by the holder thereof, for one (1) Common Share (as hereinafter defined) upon the Release Event (as hereinafter defined) occurring.

C.    The Corporation has agreed that:

(a)    upon the Closing and until the earlier occurrence of the Release Event and the Release Deadline (as hereinafter defined), the gross proceeds from the sale of the Subscription Receipts, less an amount equal to the BG Capital Expense (as herein defined), shall be held by the Subscription Receipt and Escrow Agent and invested in the manner set forth herein;

(b)    if the Release Event occurs on or before the Release Deadline, the Subscription Receipts will be automatically exchanged, without any further action on the part of the holder thereof and without payment of additional consideration, for one (1) Common Share for each Subscription Receipt held; and

(c)    if the Release Event does not occur on or before the Release Deadline, the Subscription Receipt and Escrow Agent shall deliver to each holder of Subscription Receipts the Subscription Receiptholder's Funds (as hereinafter defined) less applicable withholding taxes, if any.

E.    The foregoing recitals and any statements of fact in this Agreement are and shall be deemed to be made by the Corporation and not by the Subscription Receipt and Escrow Agent.

**NOW THEREFORE, THIS AGREEMENT WITNESSES** that for good and valuable consideration mutually given and received, the receipt and sufficiency of which is hereby mutually acknowledged, it is hereby agreed and declared as follows:

**ARTICLE 1**
**INTERPRETATION**

**1.1**   **Definitions**

In this Agreement, the following terms have the meanings set forth below:

"**Affiliate**" has the meaning ascribed to such term in the Securities Act (Ontario);

"**Business Day**" means a day which is not a Saturday, Sunday or statutory or civic holiday in the City of Toronto, Ontario;

"**Capital Reorganization**" means any reorganization of the Corporation (other than a Securities Reorganization), a reclassification or re-designation of Common Shares outstanding into other securities or a consolidation or merger or amalgamation of the Corporation with or into another entity including a transaction whereby all or substantially all of the Corporation's undertaking and assets become the property of any other entity;

"**Closing**" means the closing on the Closing Date, and in any event before the Release Deadline, of the purchase and sale of the Subscription Receipts;

"**Closing Date**" means November 10, 2011 or such other date as is established by the Corporation, provided that such date is no later than the date of the Release Deadline;

"**Common Share**" means a share of common stock in the capital of the Corporation;

"**Convertible Security**" means a security of the Corporation (other than the Subscription Receipts) convertible into or exchangeable for or otherwise carrying the right to acquire Common Shares;

"**Corporation**" means LIBERTY SILVER CORP., a corporation existing under the laws of Ontario;

"**counsel**" means a barrister, solicitor or attorney (who may be an employee of the Corporation) or a firm of barristers and solicitors or attorneys (who may be counsel to the Corporation), in either case acceptable to the Subscription Receipt and Escrow Agent;

"**Current Market Price**" at any date, means the market price per Common Share as determined by the directors of the Corporation acting reasonably and in good faith;

"**Default**" means the failure of the Release Event to occur on or before the Release Deadline;

"**director**" means a member of the board of directors of the Corporation for the time being, and unless otherwise specified herein, reference to "**action by the board of directors**" means action by the board of directors of the Corporation as a board or, whenever duly empowered, action by a committee of the board;

"**Dividend Paid in the Ordinary Course**" means any dividend paid by the Corporation on the Common Shares (whether in cash, securities, property or other assets), provided that the directors, acting reasonably and in good faith, do not by resolution determine that such dividend is extraordinary or otherwise out of the ordinary course having regard to the Corporation's dividend policy at such time, the value of such dividend, the effect of such dividend on the market value of the Common Shares after giving effect to the payment thereof, the form of payment of such dividend, the financial position of the Corporation and its subsidiaries on a consolidated basis, economic conditions, business practices and such other factors as the directors may in their discretion consider to be relevant;

"**Earnings**" means any income (including interest or gains) actually earned and received on the investment of the Initial Escrowed Proceeds;

"**Escrow Release Condition**" means the receipt of written confirmation from the Toronto Stock Exchange that all conditions precedent to the Listing have been satisfied;

"**Escrowed Proceeds**" at any time means the aggregate of: (i) the Initial Escrowed Proceeds, and (ii) any Earnings derived directly or indirectly from time to time from holding the Initial Escrowed Proceeds less any Losses;

"**Exchange Date**" with respect to any Subscription Receipt means the date of automatic exchange of the Subscription Receipts pursuant to Section 4.1;

"**extraordinary resolution**" has the meaning ascribed thereto in section 9.12;

"**Initial Escrowed Proceeds**" means the gross proceeds from the sale of Subscription Receipts less the reasonable professional fees incurred by BG Capital Group Ltd. in connection with its subscription for Subscription Receipts which shall not exceed CDN$25,000 plus applicable taxes and reasonable disbursements (the "**BG Capital Expense**");

"**Listing**" means the listing and posting for trading of the Common Shares on the TSX;

"**Losses**" means any losses actually suffered from investing the Initial Escrowed Proceeds;

"**Offering**" has the meaning ascribed to such term in the recitals above;

"**person**" means an individual, a corporation, a partnership, a syndicate, a trustee or any unincorporated organization and words importing persons are intended to have a similarly extended meaning;

- 4 -

"**Purchase Price**" means US$0.50 per Subscription Receipt;

"**Regulation S**" means Regulation S under the U.S. Securities Act;

"**Release Certificate**" means a certificate executed by the Corporation addressed to the Subscription Receipt and Escrow Agent confirming that the Escrow Release Condition has been satisfied, in substantially the form attached hereto as Schedule "C";

"**Release Deadline**" means 5:00 p.m. (Toronto time) on December 31, 2011;

"**Release Event**" means the satisfaction of the Escrow Release Condition and the delivery of the Release Certificate to the Subscription Receipt and Escrow Agent providing notice of same;

"**Right**" means the right, partially comprising each Unit, for the holder to receive one-tenth (1/10) of a Right Share in the event that the Registration has not occurred in accordance with the terms of the Rights Agreement;

"**Rights Agreement**" means the Registration Rights Agreement, in the form set out in Schedule "G" to the respective Subscription Agreements of the Subscription Receiptholders, to be entered into by the Company and each Subscriber on or before the Closing Date;

"**Rights Offering**" means the issuance of rights, options or warrants to all or substantially all the holders of the Common Shares pursuant to which those holders are entitled to subscribe for, purchase or otherwise acquire Common Shares or Convertible Securities at a price, or at a conversion price, of less than 95% of the Current Market Price at the record date for such distribution;

"**Right Share**" means the Common Shares issuable upon the conversion of the Rights in accordance with the terms of the Rights Agreement;

"**Securities Laws**" means, as applicable, the securities laws, regulations, rules, rulings and orders of each of the provinces and territories of Canada, the United States and each of its states, as the case may be, and the applicable policy statements issued by the securities regulators in each of the provinces and territories of Canada;

"**Securities Reorganization**" means (i) the issuance to all or substantially all the holders of the Common Shares, by way of a stock distribution, stock dividend or otherwise, payable in Common Shares or Convertible Securities (other than as a Dividend Paid in the Ordinary Course); or (ii) the subdivision by the Corporation of its outstanding Common Shares into a greater number of Common Shares; or (iii) the combination or consolidation by the Corporation of its outstanding Common Shares into a smaller number of Common Shares;

"**shareholder**" means an owner of record of one or more Common Shares;

- 5 -

"**Special Distribution**" means the issuance or distribution to all or substantially all the holders of the Common Shares of (i) securities of any class other than Common Shares, or (ii) rights, options or warrants other than rights, options or warrants exercisable at a price, or at a conversion price, less than 95% of the Current Market Price at the record date for such distribution, or (iii) evidences of indebtedness, or (iv) cash, securities, or any payment of other assets and that issuance or distribution does not constitute a Dividend Paid in the Ordinary Course, a Securities Reorganization or a Rights Offering;

"**Subscription Receipt Certificates**" means the certificates representing the Subscription Receipts substantially in the form attached hereto as Schedule "A" or such other form as may be approved under section 2.2 evidencing Subscription Receipts with such appropriate insertions, deletions, substitutions and variations as may be required or permitted by the terms of this Agreement or as may be required to comply with any law or the rules of any securities exchange or as may be not inconsistent with the terms of this Agreement and as the Corporation may deem necessary or desirable;

"**Subscription Receiptholder's Funds**" means at any time that portion of the Escrowed Proceeds equal to the number of Subscription Receipts held by the Subscription Receiptholder at that time divided by the aggregate number of Subscription Receipts outstanding at that time;

"**Subscription Receiptholders' Request**" means an instrument, signed in one or more counterparts by Subscription Receiptholders holding, in the aggregate, not less than 25% of the aggregate number of all Subscription Receipts then outstanding, requesting the Subscription Receipt and Escrow Agent to take some action (or refrain from taking some action) or proceeding specified therein;

"**Subscription Receiptholders**" or "**holders**" means the holders of Subscription Receipts for the time being entered in the register maintained by the Subscription Receipt and Escrow Agent as a registered holder of a Subscription Receipt;

"**Subscription Receipts**" means the subscription receipts authorized to be created by the Corporation under section 2.2 and issued and countersigned under this Agreement, entitling the holders thereof to acquire Common Shares subject to the terms and conditions of this Agreement and evidenced by Subscription Receipt Certificates;

"**this Subscription Receipt and Escrow Agreement**", "**this Agreement**", "**herein**", "**hereby**" and similar expressions mean or refer to this Subscription Receipt and Escrow Agreement, the schedules attached hereto, and any agreement, deed or instrument supplemental or ancillary hereto or thereto; and the expressions "**Article**", "**section**" or "**subsection**" followed by a number or letter mean and refer to the specified Article, section or subsection of this Agreement;

"**TSX**" means the Toronto Stock Exchange;

"**United States**" means the United States as that term is defined in Regulation S;

"**Units**" mean the unit of securities of the Company into which the Subscription Receipts will be automatically exchanged in the event the Escrow Release Condition is satisfied by the Release Deadline, each such unit to be comprised of one (1) Common Share, one (1) Warrant, and one (1) Right;

"**U.S. Legend**" has the meaning ascribed thereto in section 2.9;

"**U.S. Person**" has the meaning set out in Regulation S under the U.S. Securities Act;

"**U.S. Securities Act**" means the United States Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder;

"**Warrant**" shall mean a common share purchase warrant of the Corporation in the form set forth in Schedule "D" hereto, and each Warrant shall entitle the holder thereof to acquire one Common Share (a "**Warrant Share**") at a price of US$0.65 per Warrant Share at any time until 5:00 p.m. (Toronto time) on the date which is the earlier of 24 months following the date the Corporation's Common Shares are listed on Toronto Stock Exchange and 30 months following the date of this Agreement; and

"**written order of the Corporation**", "**written request of the Corporation**", "**written consent of the Corporation**" and "**certificate of the Corporation**" and any other document required to be signed by the Corporation, means, respectively, a written order, request, consent, certificate or other document signed in the name of the Corporation by any officer or director of the Corporation and may consist of one or more instruments so executed.

## 1.2   Words Importing the Singular

Words importing the singular include the plural and vice versa and words importing the masculine gender include the feminine and neuter genders.

## 1.3   Interpretation not Affected by Headings

The division of this Agreement into Articles, sections, subsections and paragraphs, the provision of a table of contents and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.4   Day not a Business Day

In the event that any day on which any action is required to be taken hereunder is not a Business Day, then the action shall be required to be taken on or before the next succeeding day that is a Business Day.

## 1.5   Time of the Essence

Time shall be of the essence in all respects in this Agreement, the Subscription Receipts and the Subscription Receipt Certificates.

**1.6      Governing Law**

This Agreement and the Subscription Receipt Certificates shall be construed and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein and shall be treated in all respects as Ontario contracts. Each of the parties irrevocably attorns to the jurisdiction of the courts of the Province of Ontario.

**1.7      Meaning of "outstanding" for Certain Purposes**

Every Subscription Receipt Certificate countersigned and delivered by the Subscription Receipt and Escrow Agent hereunder shall be deemed to be outstanding until the earlier of the Exchange Date or the Release Deadline; provided, however, that where a Subscription Receipt Certificate has been issued in substitution for a Subscription Receipt Certificate that has been lost, stolen or destroyed, only the Subscription Receipt Certificate so issued in substitution shall be counted for the purpose of determining the aggregate number of the Subscription Receipts outstanding.

**1.8      Currency**

Unless otherwise stated, all dollar amounts referred to in this Agreement are in United States dollars and all payments required to be made hereunder shall be made in United States dollars.

**ARTICLE 2**
**SUBSCRIPTION RECEIPTS**

**2.1      Appointment of Subscription Receipt and Escrow Agent**

The Corporation hereby appoints the Subscription Receipt and Escrow Agent, and the Subscription Receipt and Escrow Agent hereby accepts the appointment, as Subscription Receipt and Escrow Agent under this Agreement and agrees to perform its duties hereunder upon the terms and conditions herein. Until the earliest of the Closing, the Release Deadline, the termination of the Offering by the Corporation, or in respect of any proposed subscriber to the Offering, the direction of the Corporation to return all or a portion of the gross proceeds of such proposed subscriber, the Subscription Receipt and Escrow Agent shall accept and hold the gross proceeds to the Offering for and on behalf of the proposed subscribers to the Offering and deal with such gross proceeds in the manner set forth in this Agreement.

**2.2      Issue of Subscription Receipts**

The creation by the Corporation of up to 6,500,000 Subscription Receipts and the issuance of such securities by the Corporation at the Purchase Price is hereby authorized. Upon the written order of the Corporation upon Closing, Subscription Receipt Certificates evidencing Subscription Receipts shall be executed by the Corporation and shall be countersigned by or on behalf of the Subscription Receipt and Escrow Agent and delivered by the Subscription Receipt and Escrow Agent to the Corporation in accordance with such written order of the Corporation.  Certificates representing the

- 8 -

Subscription Receipts shall be substantially in the form set out in Schedule "A" hereto. The Subscription Receipts shall be dated as of the Closing Date with such appropriate additions and variations as shall be required and shall bear such distinguishing letters and numbers as the Corporation and Subscription Receipt and Escrow Agent may approve from time to time.

**2.3     Terms of Subscription Receipts**

(1)     Subject to the provisions of Article 4, each of the Subscription Receipts issued and countersigned pursuant to section 2.2 shall evidence the right of the holder thereof to receive from the Corporation, without payment of additional consideration, a Unit, each Unit consisting of one (1) Common Share, one (1) Warrant and one (1) Right.

(2)     Fractional Subscription Receipts shall not be issued or otherwise provided for.

(3)     The Corporation will furnish to the holder of a Subscription Receipt Certificate upon request, and without charge, a copy of this Subscription Receipt and Escrow Agreement.

**2.4     Issue in Substitution for Lost Subscription Receipts**

(1)     In case any of the Subscription Receipt Certificates issued and countersigned pursuant to this Agreement shall become mutilated or be lost, destroyed or stolen, the Corporation, subject to applicable law and to subsection 2.4(2), shall issue and thereupon the Subscription Receipt and Escrow Agent shall countersign and deliver a replacement Subscription Receipt Certificate of like date and tenor and bearing the same legends, if any, as the one mutilated, lost, destroyed or stolen upon surrender of, in place of and upon cancellation of the mutilated Subscription Receipt Certificate or in lieu of and in substitution for such lost, destroyed or stolen Subscription Receipt Certificate, the substituted Subscription Receipt Certificate shall be in a form approved by the Corporation and the Subscription Receipts evidenced by it will entitle the holder to the benefit hereof and will rank equally in accordance with its terms with all other Subscription Receipt Certificates issued or to be issued hereunder.

(2)     The applicant for the issue of a new Subscription Receipt Certificate pursuant to this section shall bear the cost of the issue thereof and in case of loss, destruction or theft shall, as a condition precedent to the issue thereof, furnish to the Corporation and to the Subscription Receipt and Escrow Agent such evidence of ownership and of the loss, destruction or theft of the Subscription Receipt Certificate so lost, destroyed or stolen as shall be satisfactory to the Corporation and to the Subscription Receipt and Escrow Agent in their discretion, and such applicant shall also be required to furnish an indemnity and surety bond in amount and form satisfactory to the Corporation and the Subscription Receipt and Escrow Agent in their discretion and shall pay the reasonable charges of the Corporation and the Subscription Receipt and Escrow Agent in connection therewith.

- 9 -

**2.5     Subscription Receiptholder not a Shareholder**

Nothing in this Agreement or in the holding of a Subscription Receipt evidenced by a Subscription Receipt Certificate or otherwise shall be construed as conferring upon a Subscription Receiptholder any right or interest whatsoever as a shareholder of the Corporation, including but not limited to the right to vote at, to receive notice of, or to attend meetings of shareholders or any other proceedings of the Corporation or the right to receive any dividends.

**2.6     Subscription Receipts to Rank *Pari Passu***

A Subscription Receipt shall rank *pari passu* with all other Subscription Receipts, whatever may be the actual date of issue of the Subscription Receipt Certificates that evidence them.

**2.7     Signing of Subscription Receipts**

The Subscription Receipt Certificates shall be signed by any one director or officer of the Corporation. The signature of any such director or officer may be mechanically reproduced in facsimile, engraved, printed or lithographed and Subscription Receipt Certificates bearing those facsimile signatures shall be binding upon the Corporation as if they had been manually signed by the director or officer.

**2.8     Countersignature by the Subscription Receipt and Escrow Agent**

(1)     No Subscription Receipt Certificate shall be issued or, if issued, shall be valid or entitle the holder to the benefit thereof until it has been countersigned by manual signature by the Subscription Receipt and Escrow Agent in accordance with a written order of the Corporation, substantially in the form approved by the Corporation and the Subscription Receipt and Escrow Agent and the countersignature by the Subscription Receipt and Escrow Agent upon any Subscription Receipt Certificate shall be conclusive evidence as against the Corporation that the Subscription Receipt Certificate so countersigned has been duly issued hereunder and that the holder is entitled to the benefit hereof.

(2)     The countersignature of the Subscription Receipt and Escrow Agent on Subscription Receipt Certificates issued hereunder shall not be construed as a representation or warranty by the Subscription Receipt and Escrow Agent as to the validity of this Agreement or of the Subscription Receipt Certificates (except the due countersigning thereof) and the Subscription Receipt and Escrow Agent shall in no respect be liable or answerable for the use made of the Subscription Receipts or any of them or of the consideration therefor. The countersignature of the Subscription Receipt and Escrow Agent shall constitute a representation and warranty of the Subscription Receipt and Escrow Agent that the Subscription Receipt Certificate has been duly countersigned by the Subscription Receipt and Escrow Agent pursuant to this Agreement.

**2.9     Legended Certificates**

(1)     Each Subscription Receipt Certificate originally issued to a purchaser of Subscription Receipts, each certificate issued in exchange for or in substitution of the Subscription Receipt Certificates, and each certificate representing the Common Shares issued in exchange for the Subscription Receipts shall bear the following legend:

"UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY BEFORE [INSERT: THE DATE THAT IS FOUR MONTHS AND A DAY AFTER THE CLOSING DATE]"

Each certificate representing the Common Shares issued in exchange for the Subscription Receipts shall also bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE LISTED ON THE TORONTO STOCK EXCHANGE ("TSX"); HOWEVER, THE SAID SECURITIES CANNOT BE TRADED THROUGH THE FACILITIES OF TSX SINCE THEY ARE NOT FREELY TRANSFERABLE, AND CONSEQUENTLY ANY CERTIFICATE REPRESENTING SUCH SECURITIES IS NOT "GOOD DELIVERY" IN SETTLEMENT OF TRANSACTIONS ON TSX.";

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THE HOLDER HEREOF, BY PURCHASING THE SECURITIES REPRESENTED HEREBY, AGREES FOR THE BENEFIT OF LIBERTY SILVER CORP. AND ITS SUCCESSORS (THE "CORPORATION") THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE CORPORATION, (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN COMPLIANCE WITH LOCAL LAWS AND REGULATIONS, (C) WITHIN THE UNITED STATES, PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF APPLICABLE AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (D) WITHIN THE UNITED STATES, IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE STATE LAWS AND REGULATIONS GOVERNING THE OFFER AND SALE OF SECURITIES, AND IN THE CASE OF TRANSFERS PURSUANT TO (C) OR (D) ABOVE, THE HOLDER HEREOF HAS, PRIOR TO SUCH TRANSFER, FURNISHED TO THE CORPORATION AND THE CORPORATION'S TRANSFER AGENT AN OPINION OF COUNSEL OF

RECOGNIZED STANDING IN FORM AND SUBSTANCE SATISFACTORY TO THE CORPORATION."

(2)   The Subscription Receipt and Escrow Agent understands and acknowledges that the Subscription Receipts and the Common Shares, Warrants and Rights issuable upon the exchange thereof have not been and will not be registered under the U.S. Securities Act or any state securities laws.

(3)   Until such time as no longer required under the applicable requirements of the U.S. Securities Act or applicable state securities laws, each Subscription Receipt Certificate originally issued to a purchaser of Subscription Receipts that is in the United States, or is purchasing for the account or benefit of a person in the United States, as well as all certificates issued in exchange for or in substitution of any Subscription Receipt Certificate, will bear the following additional legend (the "**U.S. Legend**"):

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THE HOLDER HEREOF, BY PURCHASING THE SECURITIES REPRESENTED HEREBY, AGREES FOR THE BENEFIT OF LIBERTY SILVER CORP. AND ITS SUCCESSORS (THE "CORPORATION") THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE CORPORATION, (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN COMPLIANCE WITH LOCAL LAWS AND REGULATIONS, (C) WITHIN THE UNITED STATES, PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF APPLICABLE AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (D) WITHIN THE UNITED STATES, IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE STATE LAWS AND REGULATIONS GOVERNING THE OFFER AND SALE OF SECURITIES, AND IN THE CASE OF TRANSFERS PURSUANT TO (C) OR (D) ABOVE, THE HOLDER HEREOF HAS, PRIOR TO SUCH TRANSFER, FURNISHED TO THE CORPORATION AN OPINION OF COUNSEL OF RECOGNIZED STANDING IN FORM AND SUBSTANCE SATISFACTORY TO THE CORPORATION.",

and until such time as the same is no longer required under applicable requirements of the U.S. Securities Act or applicable state securities laws, certificates representing the Common Shares issued in exchange for the Subscription Receipts (only to the extent they are derived from Subscription Receipts which bear the U.S. Legend) as well as all certificates issued in exchange therefore or in substitution thereof, shall bear the U.S. Legend.

- 12 -

## ARTICLE 3
## TRANSFER AND OWNERSHIP OF SUBSCRIPTION RECEIPTS

**3.1     Registration of Subscription Receipts**

(1)     The Corporation hereby appoints the Subscription Receipt and Escrow Agent as registrar of the Subscription Receipts. The Corporation may hereafter, with the consent of the Subscription Receipt and Escrow Agent, appoint one or more other additional registrars of the Subscription Receipts.

(2)     The Corporation shall cause a register to be kept by the Subscription Receipt and Escrow Agent and the Subscription Receipt and Escrow Agent agrees to maintain such a register at its principal stock transfer offices in the City of Toronto, Ontario in which shall be entered the names and addresses of the holders of Subscription Receipts and other particulars of the Subscription Receipts held by them and of all transfers of Subscription Receipts, and the Subscription Receipt and Escrow Agent shall be entitled to rely on such register in connection with the transfer or exchange of any Subscription Receipt or Subscription Receipts pursuant to the terms of this Agreement. The Subscription Receipt and Escrow Agent shall also maintain at its principal stock transfer offices in the City of Toronto, Ontario a register of transfers and, if required by the Corporation, branch registers of transfers, in which shall be recorded the particulars of the transfers of Subscription Receipts.

(3)     The registers referred to in this section shall at all reasonable times be open for inspection by the Corporation, by the Subscription Receipt and Escrow Agent and by any Subscription Receiptholder upon receipt by the Subscription Receipt and Escrow Agent of a written request to permit such an inspection during normal business hours.

(4)     Except as required by law, neither the Subscription Receipt and Escrow Agent nor any other registrar nor the Corporation shall be charged with notice of or be bound to see to the execution of any trust, whether express, implied or constructive, in respect of any Subscription Receipt and may transfer any Subscription Receipt on the written direction of the holder thereof, whether named as trustee or otherwise, as though that person were the beneficial owner thereof.

(5)     The Subscription Receipt and Escrow Agent shall, when requested to do so in writing by the Corporation, furnish the Corporation with a list of names and addresses of the Subscription Receiptholders showing the number of Subscription Receipts held by each Subscription Receiptholder and the date and particulars of issue and transfer of each Subscription Receipt.

(6)     The Corporation and the Subscription Receipt and Escrow Agent will deem and treat the registered owner of any Subscription Receipt as the absolute owner thereof for all purposes and neither the Corporation nor the Subscription Receipt

- 13 -

and Escrow Agent shall be affected by any notice or knowledge to the contrary, except where the Corporation or the Subscription Receipt and Escrow Agent is required to take notice by statute or any order of a court of competent jurisdiction.

(7)     No duty shall rest with the Subscription Receipt and Escrow Agent to determine compliance of the transferor or transferee of the Subscription Receipts with applicable Securities Laws. The Subscription Receipt and Escrow Agent shall be entitled to assume that all transfers are legal and proper.

(8)     The provisions of this section 3.1 with respect to the transfer of Subscription Receipts is subject to the provisions of sections 3.2(2) and 3.2(3).

## 3.2     Transfer of Subscription Receipts

(1)     No transfer of Subscription Receipts shall be valid unless made by the Subscription Receiptholder or his executors, administrators or other legal representatives or his or their attorney duly appointed by an instrument in writing in form and execution satisfactory to the Subscription Receipt and Escrow Agent with signatures guaranteed by a Canadian Schedule I chartered bank or eligible guarantor institution with membership in an approved medallion signature guarantee program; or made by the liquidator of, or a trustee in bankruptcy for, a Subscription Receiptholder, in each case upon compliance with such reasonable requirements as the Subscription Receipt and Escrow Agent and the Corporation may prescribe (including, without limitation, a requirement to provide evidence of satisfactory compliance with applicable Securities Laws), and unless recorded on the register of transfers maintained by the Subscription Receipt and Escrow Agent pursuant to subsection 3.1(2), and unless all stamp taxes or governmental or other charges arising by reason of such transfer have been paid.

(2)     If a Subscription Receipt Certificate tendered for transfer bears the U.S. Legend the Subscription Receipt and Escrow Agent shall not register such transfer unless the transferor has provided the Subscription Receipt and Escrow Agent with the Subscription Receipt Certificate and the transfer is made: (i) to the Corporation; (ii) outside the United States in accordance with Rule 904 of Regulation S under the U.S. Securities Act; (iii) within the United States in accordance with Rule 144 or 144A under the U.S. Securities Act, if available, and in compliance with applicable U.S. state securities laws; or (iv) in a transaction that does not require registration under the U.S. Securities Act or any applicable state securities laws; provided that, if a Subscription Receipt is transferred under (iii) or (iv) above, the holder has prior to such sale or transfer, furnished to the Subscription Receipt and Escrow Agent and the Corporation an opinion of counsel or other evidenced exemption, in each case satisfactory to the Corporation.

(3)     The transferee of Subscription Receipts shall, after the transfer form printed on the Subscription Receipt Certificate and any other form of transfer acceptable to the Subscription Receipt and Escrow Agent is duly completed and the Subscription Receipts are delivered to the Subscription Receipt and Escrow Agent

and upon compliance with all other conditions in that regard required by this Agreement or by law, be entitled to have his name entered on the register of holders as the owner of such Subscription Receipts free from all equities or rights of set-off or counterclaim between the Corporation and the transferor or any previous holder of such Subscription Receipts, save in respect of equities of which the Corporation or the transferee is required to take notice by statute or by order of a court of competent jurisdiction. Subscription Receipts registered in the name of the transferee, or as otherwise directed by the transferee, shall be delivered to the transferee, or as otherwise directed by the transferee, within three business days of receipt by the Subscription Receipt and Escrow Agent of a duly completed form of transfer, the Subscription Receipt Certificate, approval of the Corporation in the event that a legend is to be removed and any other duly completed documents or forms required in accordance with this Agreement.

**3.3      Exchange of Subscription Receipts**

(1)      One or more Subscription Receipt Certificates may, upon compliance with the requirements of the Subscription Receipt and Escrow Agent, acting reasonably, be exchanged for one or more Subscription Receipt Certificates of different denomination (s) evidencing in the aggregate an equal number of Subscription Receipts as the number of Subscription Receipts represented by the Subscription Receipt Certificates so exchanged.

(2)      Subscription Receipt Certificates may be exchanged only at the principal transfer office of the Subscription Receipt and Escrow Agent in the City of Toronto, Ontario or at any other place that is designated by the Corporation in writing with the approval of the Subscription Receipt and Escrow Agent. Any Subscription Receipt Certificates tendered for exchange shall be surrendered to the Subscription Receipt and Escrow Agent or to its agent and cancelled.  The Corporation shall sign all Subscription Receipt Certificates necessary to carry out exchanges as aforesaid and those Subscription Receipt Certificates shall be countersigned by or on behalf of the Subscription Receipt and Escrow Agent.

(3)      Subscription Receipt Certificates issued in exchange for Subscription Receipt Certificates in accordance with this section shall bear the legends set forth in subsections 2.9(1), 2.9(2) and 2.9(4), as applicable.

**ARTICLE 4**
**EXCHANGE OF SUBSCRIPTION RECEIPTS**

**4.1      Exchange of Subscription Receipts**

If the Release Event occurs prior to the Release Deadline, upon occurrence of the Release Event:

(1)      the Subscription Receipts shall be deemed to be automatically exchanged, for no additional consideration and without further action on the part of the Subscription

- 15 -

Receiptholders, for Units in accordance with subsection 2.3(1). Each Unit shall be immediately severable into a Common Share, Warrant and Right comprising the Unit; and

(2)    upon issuance of the Units underlying the Subscription Receipts, the Subscription Receipt Certificates representing such Subscription Receipts shall become null and void of no further force or effect.

For greater certainty, Subscription Receipts will not be exchangeable before the occurrence of the Release Event.

## 4.2    Delivery of Release Certificate

Upon the satisfaction of the Escrow Release Condition, the Corporation shall deliver to the Subscription Receipt and Escrow Agent, in accordance with section 12.1, the Release Certificate.

## 4.3    Effect of Deemed Exchange of Subscription Receipts

(1)    Upon the deemed exchange of the Subscription Receipts in accordance with section 4.1, the persons acquiring Common Shares, Warrants and Rights shall forthwith be entered onto the register of holders of Common Shares, Warrants and Rights to be maintained by the Corporation and such Common Shares, Warrants and Rights shall be deemed to have been issued, and the persons to whom such securities are issued shall be deemed to have become the holders of record of Common Shares, Warrants and Rights on the Exchange Date. The register for the Common Shares, Warrants and Rights will include the names and addresses of the persons who hold such securities and the number of Common Shares, Warrants and Rights held by each of them.

(2)    The Corporation will give written notice of the issue of the Common Shares, Warrants and Rights issuable upon deemed exchange of the Subscription Receipts in such detail as may be required, to each securities regulatory agency or government authority in Canada in each jurisdiction in which there is legislation requiring the giving of any such notice.

## 4.4    No Fractional Shares or Warrants

Under no circumstances shall the Corporation be obliged to issue any fractional Common Shares, Warrants or Rights, or any cash or other consideration in lieu thereof, upon the automatic exchange of one or more Subscription Receipts. To the extent that the holder of one or more Subscription Receipts would otherwise have been entitled to receive on the automatic exchange thereof, a fraction of a Common Share, Warrant or Rights, the fraction shall be rounded down to the nearest whole number of Common Shares, Warrants or Rights, as the case may be.

- 16 -

**4.5     Redemption of Subscription Receipts**

If the Release Event does not occur prior to the Release Deadline, the Subscription Receipts shall become null and void as at the Release Deadline and the holder shall be entitled to receive the Subscription Receiptholder's Funds plus any such further funds as may be prescribed by and pursuant to Section 7.4.

**ARTICLE 5**
**NO ADJUSTMENT OF EXCHANGE NUMBER**

**5.1     No Changes in Share Capital Structure**

So long as the Subscription Receipts remain outstanding, the Corporation shall not, prior to the earlier of: (i) the Release Event; and (ii) the Release Deadline, take any action which would result in, or cause any change to, the share capital or capital structure of the Corporation including, but not limited to, a Securities Reorganization, a Rights Offering, a Special Distribution or a Capital Reorganization, or enter into any agreement to do any of the foregoing without the prior consent of the Subscription Receiptholders given by extraordinary resolution.

**ARTICLE 6**
**RIGHTS AND COVENANTS**

**6.1     General Covenants of the Corporation**

The Corporation covenants with the Subscription Receipt and Escrow Agent for the benefit of the Subscription Receipt and Escrow Agent and the Subscription Receiptholders that so long as any Subscription Receipts remain outstanding:

(1)     The Corporation will at all times maintain its existence and will carry on and conduct its business in a prudent manner in accordance with industry standards and good business practice, will keep or cause to be kept proper books of account in accordance with applicable law and will, if and whenever required in writing by the Subscription Receipt and Escrow Agent, file with the Subscription Receipt and Escrow Agent copies of all annual and interim financial statements of the Corporation (including the notes thereto and the auditors' report thereon, if applicable) furnished to its shareholders during the term of this Agreement.

(2)     The Corporation will reserve and keep available a sufficient number of Common Shares for issuance upon the exchange of Subscription Receipts issued by the Corporation and upon the due exercise of the Warrants and the Rights.

(3)     The Corporation will cause the Common Shares, Warrants and Rights to be issued pursuant to the exchange of the Subscription Receipts issued by the Corporation hereunder, in the manner herein provided, to be duly issued in accordance with the Subscription Receipts and the terms hereof, and when so issued such Common Shares shall be fully paid for and non-assessable.

(4)  The Corporation shall cause the holders of the Common Shares, Warrants and Rights to be entered forthwith on the register for the Common Shares, Warrants and Rights, and the Common Shares, Warrants and Rights so acquired shall be deemed to have been issued, and the person or persons to whom such securities are to be issued shall be deemed to have become the holder or holders of record of such Common Shares, Warrants and Rights, on the Exchange Date.

(5)  Generally, the Corporation will perform and carry out all the acts and things to be done by it as provided in this Agreement.

(6)  The Corporation will notify the Subscription Receipt and Escrow Agent and the Subscription Receiptholders of any default under this Agreement.

## 6.2  Subscription Receipt and Escrow Agent's Remuneration and Expenses

The Corporation covenants that it will pay to the Subscription Receipt and Escrow Agent from time to time reasonable remuneration for its services hereunder and will pay or reimburse the Subscription Receipt and Escrow Agent upon its request for all reasonable expenses and disbursements of the Subscription Receipt and Escrow Agent incurred in connection with the performance of its duties hereunder (including the reasonable compensation and the disbursements of counsel and all other advisers, experts, accountants and assistants not regularly in its employ) both before any default hereunder and thereafter until all duties of the Subscription Receipt and Escrow Agent hereunder shall be finally and fully performed, except any such expense or disbursement in connection with or related to or required to be made as a result of the gross negligence, wilful misconduct or bad faith of the Subscription Receipt and Escrow Agent.  Any amount owing hereunder and remaining unpaid after 30 days from the invoice date will bear interest at the then current rate charged by the Subscription Receipt and Escrow Agent against unpaid invoices and shall be payable on demand.

## 6.3  Performance of Covenants by the Subscription Receipt and Escrow Agent

Subject to section 11.7, if the Corporation shall fail to perform any of its covenants contained in this Agreement and the Corporation has not rectified such failure within 10 days after receiving written notice from the Subscription Receipt and Escrow Agent of such failure, the Subscription Receipt and Escrow Agent may notify the Subscription Receiptholders of the failure on the part of the Corporation or may itself perform any of the said covenants capable of being performed by it, but shall be under no obligation to do so or to notify the Subscription Receiptholders. All reasonable sums expended or advanced by the Subscription Receipt and Escrow Agent in so doing shall be repayable as provided in section 6.2. No such performance, expenditure or advance by the Subscription Receipt and Escrow Agent shall be deemed to relieve the Corporation of any default hereunder or of its continuing obligations under the covenants herein contained.

- 18 -

## ARTICLE 7
## ESCROWED PROCEEDS

**7.1      Initial Escrowed Proceeds and Distribution Amounts**

Upon Closing, the Subscription Receipt and Escrow Agent and the Corporation shall acknowledge receipt of the Escrowed Proceeds by the Subscription Receipt and Escrow Agent, and the Subscription Receipt and Escrow Agent shall thereafter hold the Escrowed Proceeds in escrow for and on behalf of the persons who have an interest therein pursuant hereto, shall disburse and deal with the Escrowed Proceeds in the manner contemplated by this Article 7 and at all times shall keep the Escrowed Proceeds in a segregated account, all on the terms and subject to the conditions hereof. Upon Closing, the Corporation shall deliver forthwith to the Subscription Receipt and Escrow Agent such amount as is necessary to satisfy the aggregate shortfall, if any, in the Escrowed Proceeds due to wire transfer charges, deductions and/or fees deducted from the gross proceeds from subscribers to the Offering, by depositing such amount, by wire transfer or bank draft, with the Subscription Receipt and Escrow Agent.

**7.2      Qualified Investments**

(1)      The Subscription Receipt and Escrow Agent shall hold cash balances constituting part or all of the Escrowed Proceeds in a segregated interest bearing account with a Canadian chartered bank, such account to earn a rate of interest then current on similar deposits, but the Subscription Receipt and Escrow Agent shall not be liable to account for any profit to any parties to this Agreement or to any other person or entity other than at a rate, if any, established from time to time by the Subscription Receipt and Escrow Agent.

(2)      The Subscription Receipt and Escrow Agent shall have no liability with respect to loss in the value of investments as permitted to be made under the terms of this Agreement.

**7.3      Release of Escrowed Proceeds Upon Receipt of Release Certificate**

Upon receipt of the Release Certificate on or before the Release Deadline, the Subscription Receipt and Escrow Agent shall liquidate all Escrowed Proceeds in accordance with this Article 7 and deliver (i) the fees and expenses of the Subscription Receipt and Escrow Agent in connection with this Agreement, to the extent not already paid by the Corporation, and (ii) the balance of the Escrowed Proceeds, to the Corporation, all in accordance with the Release Certificate.

**7.4      Release of Escrowed Proceeds on Default**

If the Release Event does not occur on or before the Release Deadline, the Subscription Receipt and Escrow Agent shall deliver to each such holder the Subscription Receiptholder's Funds, less applicable withholding taxes, if any. The Subscription Receiptholder's Funds shall be paid to each Subscription Receiptholder as soon as

practicable, but in any event within five (5) Business Days following the Release Deadline.  If the Escrowed Proceeds are not sufficient to refund to each holder an amount equal to the Purchase Price per Subscription Receipt, the Corporation shall deliver forthwith to the Subscription Receipt and Escrow Agent such amount as is necessary to satisfy the aggregate shortfall, by depositing such amount, by wire transfer or bank draft, with the Subscription Receipt and Escrow Agent, and such funds shall be delivered to the holders of Subscription Receipts on a pro rata basis (such that each Subscription Receiptholder will receive an aggregate amount not less than the Purchase Price per Subscription Receipt).  Payment made in accordance with this Article 7 shall be made in accordance with sections 7.7 and 7.9 hereof. All Subscription Receipt Certificates representing Subscription Receipts in respect of which the Subscription Receiptholder's Funds have been paid to the Subscription Receiptholders shall be deemed to have been cancelled immediately following the Release Deadline (except in respect of the holder's right to receive the Subscription Receiptholder's Funds). All Subscription Receipts represented by Subscription Receipt Certificates which have been deemed to have been cancelled pursuant to this section 7.4 shall be without further force and effect whatsoever.

### 7.5     Direction

In order to permit the Subscription Receipt and Escrow Agent to carry out its obligations under this Article 7, the Corporation hereby specifically authorizes and directs the Subscription Receipt and Escrow Agent to make any stipulated payment or to take any stipulated action in accordance with the provisions of this Agreement.

### 7.6     Early Termination of any Investment of the Escrowed Proceeds

In making any payment pursuant to this Agreement, the Subscription Receipt and Escrow Agent has the authority to liquidate any investments in order to make payments contemplated under this Article and shall not be liable for any loss sustained in the escrow account for early termination of any investment of the Escrowed Proceeds necessary to enable the Subscription Receipt and Escrow Agent to make such payment.

### 7.7     Method of Disbursement and Delivery

(1)     All disbursements of money to holders of Subscription Receipts made in accordance with the provisions of this Article 7 shall be made by wire transfer in accordance with the wire instructions provided by such holders of Subscription Receipts, or in any other manner agreed to by the Corporation and a holder of Subscription Receipts, and in the correct amount.

(2)     All disbursements of money to the Corporation made in accordance with the provisions of this Article 7 shall be made by wire transfer in accordance with the Release Certificate.

(3)     If the Subscription Receipt and Escrow Agent initiates any such wire transfer as required under subsection 7.7(1) or subsection 7.7(2), the Subscription Receipt and Escrow Agent shall have no further obligation or liability for the amount

represented thereby; provided that in the event of the non-receipt of such wire transfer by the intended recipient, the Subscription Receipt and Escrow Agent, upon being furnished with reasonable evidence of such non-receipt reasonably satisfactory to it, shall take all reasonable steps to direct the funds representing the initial wire transfer to the intended recipient.

**7.8     Acknowledgements**

(1)     The Subscription Receipt and Escrow Agent hereby confirms that, on the Closing, wire transfers from the subscribers to the Offering (comprising the Initial Escrowed Proceeds) and funds deposited by the Corporation in accordance with section 7.1, if any, will be held in a segregated account for the benefit of the Corporation and, pending the occurrence of the Release Event or Default, will be held by the Subscription Receipt and Escrow Agent in accordance with section 7.2 hereof.

(2)     The Corporation hereby:

(a)     acknowledges that the funds received by the Subscription Receipt and Escrow Agent pursuant to subsection 7.8(1) represents payment in full of the Purchase Price for the Subscription Receipts to be issued pursuant to the Offering; and

(b)     irrevocably directs the Subscription Receipt and Escrow Agent to retain and hold such funds in accordance with this Agreement, together with any other amounts received as Initial Escrowed Funds in accordance with the terms of this Agreement pending payment of such amounts in accordance with the terms of this Agreement.

**7.9     Miscellaneous**

(1)     The Subscription Receipt and Escrow Agent will disburse monies according to this Agreement only to the extent that monies have been deposited with it.  The Subscription Receipt and Escrow Agent shall not under any circumstances be required to disburse funds in excess of the amounts on deposit with the Subscription Receipt and Escrow Agent at the time of such disbursement.

(2)     In the event that the Subscription Receipt and Escrow Agent shall hold any amount of interest or other distributable amount which is unclaimed or which cannot be paid for any reason other than the gross negligence or wilful misconduct of the Subscription Receipt and Escrow Agent, the Subscription Receipt and Escrow Agent shall be under no obligation to invest or reinvest the same but shall only be obligated to hold the same on behalf of the person or persons entitled thereto in a current or other non-interest bearing account pending payment to the person or persons entitled thereto. The Corporation shall be entitled to any benefit earned by the holding of such amount unclaimed or unpaid interest or such other unclaimed or unpaid distributable amount prior to its

- 21 -

disposition in accordance with this section. The Subscription Receipt and Escrow Agent shall, as and when required by law, and may at any time prior to such required time, pay all or part of such interest or other distributable amount so held to the appropriate provincial governmental official or agency, whose receipt shall be good discharge and release of the Subscription Receipt and Escrow Agent for such amounts.

(3)    The Subscription Receipt and Escrow Agent shall be entitled to act and rely absolutely on the Release Certificate and shall be entitled to release the Escrowed Proceeds upon the receipt of the Release Certificate as provided for in this Agreement.

## ARTICLE 8
## ENFORCEMENT

**8.1    Suits by Subscription Receiptholders**

Subject to section 9.11, all or any of the rights conferred upon a Subscription Receiptholder by the terms of the Subscription Receipts held by such Subscription Receiptholder and/or this Agreement may be enforced by such Subscription Receiptholder by appropriate legal proceedings but without prejudice to the right that is hereby conferred upon the Subscription Receipt and Escrow Agent to proceed in its own name to enforce each and all of the provisions herein contained for the benefit of the holders of the Subscription Receipts from time to time outstanding. The Subscription Receipt and Escrow Agent shall also have the power at any time and from time to time to institute and to maintain such suits and proceedings as it may reasonably be advised shall be necessary or advisable to preserve and protect its interests and the interests of Subscription Receiptholders.

Subject to applicable law, the Subscription Receipt and Escrow Agent and, by acceptance of the Subscription Receipt Certificates and as part of the consideration for the issue of the Subscription Receipts, the Subscription Receiptholders hereby waive and release any right, cause of action or remedy now or hereafter existing in any jurisdiction against any person in its capacity as a director or officer or any past, present or future shareholder, director, officer, employee or agents of the Corporation for the creation and issue of the Subscription Receipts hereunder.

**8.2    Limitation of Liability**

The obligations hereunder (including without limitation under subsection 11.6(5)) are not personally binding upon, nor shall resort hereunder be had to, the private property of any of the past, present or future directors or shareholders of the Corporation or any of the past, present or future officers, employees or agents of the Corporation but only the property of the Corporation (or any successor person) shall be bound in respect hereof.

- 22 -

## ARTICLE 9
## MEETINGS OF SUBSCRIPTION RECEIPTHOLDERS

**9.1    Right to Convene Meetings**

The Subscription Receipt and Escrow Agent may at any time and from time to time and shall on receipt of a written request of the Corporation or of a Subscription Receiptholders' Request and upon being funded and indemnified to its reasonable satisfaction by the Corporation or by the Subscription Receiptholders signing the Subscription Receiptholders' Request against the cost that may be incurred in connection with the calling and holding of the meeting, convene a meeting of the Subscription Receiptholders. In the event of the Subscription Receipt and Escrow Agent failing within 10 days after receipt of the written request of the Corporation or Subscription Receiptholders' Request and funding and indemnity given as aforesaid to give notice convening a meeting, the Corporation or the Subscription Receiptholders, as the case may be, may call and convene such a meeting. Every meeting shall be held in the City of Toronto, Ontario or at such other place as may be approved or determined by the Subscription Receipt and Escrow Agent.

**9.2    Notice**

At least seven (7) days' prior notice of any meeting shall be given to the Subscription Receiptholders in the manner provided by section 12.2 and a copy of the notice shall be delivered to the Subscription Receipt and Escrow Agent (unless the meeting has been called by the Subscription Receipt and Escrow Agent) at the expense of the Corporation and to the Corporation (unless the meeting has been called by the Corporation). Each notice shall state the date, time and place where the meeting is to be held and shall state briefly the general nature of the business to be transacted thereat and it shall not be necessary for the notice to set out the terms of any resolution to be proposed or any of the provisions of this Article 9. The notice convening any such meeting shall be signed by an appropriate officer of the Subscription Receipt and Escrow Agent or the Corporation or by a representative of the Subscription Receiptholders, as the case may be. Any accidental omission in the notice of meeting shall not invalidate any resolution passed at a meeting of Subscription Receiptholders.

**9.3    Chairman**

An individual (who need not be a Subscription Receiptholder) designated in writing by the Subscription Receipt and Escrow Agent shall be chairman of the meeting and if no individual is so designated or if the person so designated is not present within 15 minutes from the time fixed for the holding of the meeting, the Subscription Receiptholders present in person or by proxy shall choose a person present to be chairman.

**9.4    Quorum**

Subject to the provisions of section 9.12, at any meeting of the Subscription Receiptholders a quorum shall consist of Subscription Receiptholders present in person

or by proxy holding at least 10% of the aggregate number of Subscription Receipts then outstanding. If a quorum of the Subscription Receiptholders shall not be present within one-half hour from the time fixed for holding any meeting, the meeting, if summoned by the Subscription Receiptholders or on a Subscription Receiptholders' Request, shall be dissolved; but, subject to section 9.12, in any other case the meeting shall stand adjourned to such day being not less than seven (7) days or more than 35 days later and to such place and time as may be designated by the chairman of the meeting and at least five days' notice shall be given of such adjourned meeting. At the adjourned meeting, the Subscription Receiptholders present in person or by proxy shall form a quorum and may transact the business for which the meeting was originally convened, notwithstanding that they may not hold at least 10% of the aggregate number of Subscription Receipts then outstanding.

**9.5      Power to Adjourn**

The chairman of any meeting at which a quorum of the Subscription Receiptholders is present may, with the consent of the meeting, adjourn the meeting and no notice of the adjournment need be given except such notice, if any, as the meeting may prescribe.

**9.6      Show of Hands**

Every question submitted to a meeting shall be decided in the first place by a majority of the votes given on a show of hands except that votes on an extraordinary resolution shall be given in the manner hereinafter provided. At any meeting, unless a poll is duly demanded as herein provided, a declaration by the chairman that a resolution has been carried or carried unanimously or by a particular majority or lost or not carried by a particular majority shall be conclusive evidence of the fact.

**9.7      Poll**

On every extraordinary resolution and on any other question submitted to a meeting upon which a poll is directed by the chairman or requested by one or more of the Subscription Receiptholders acting in person or by proxy and holding in the aggregate at least 10% of the aggregate number of all the Subscription Receipts then outstanding, a poll shall be taken in such manner as the chairman shall direct. Questions other than those required to be determined by an extraordinary resolution shall be decided by a majority of the votes cast on a poll.  The result of a poll shall be deemed to be a decision of the meeting at which a poll was demanded and shall be binding on all Subscription Receiptholders.

**9.8      Voting**

On a show of hands, every person who is present and entitled to vote, whether as a Subscription Receiptholder or as proxy for one or more absent Subscription Receiptholders or both, shall have one vote. On a poll, each Subscription Receiptholder present in person or represented by proxy duly appointed by instrument in writing shall be entitled to one vote in respect of each Subscription Receipt then held by him. A proxy need not be a Subscription Receiptholder.

**9.9      Regulations**

Subject to the provisions hereof, the Subscription Receipt and Escrow Agent, or the Corporation with the approval of the Subscription Receipt and Escrow Agent may, from time to time, make or vary such regulations as they shall think fit:

(a)      for the issue of voting certificates by any bank, trust company or other depository satisfactory to the Subscription Receipt and Escrow Agent stating that the Subscription Receipts specified therein have been deposited with the depository by a named person and will remain on deposit until after the meeting, which voting certificates shall entitle the persons named therein to be present and vote at the meeting and at any adjournment thereof or to appoint a proxy or proxies to represent them and vote for them at that meeting and at any adjournment thereof in the same manner and with the same effect as though the persons so named in the voting certificates were the actual holders of the Subscription Receipts specified therein;

(b)      for the deposit of voting certificates and/or instruments appointing proxies at such place and time as the Subscription Receipt and Escrow Agent, the Corporation or the Subscription Receiptholders convening the meeting, as the case may be, may in the notice convening the meeting direct;

(c)      for the deposit of voting certificates and/or instruments appointing proxies at some approved place or places other than the place at which the meeting is to be held and enabling particulars of the voting certificates and/or instruments appointing proxies to be sent by mail, telecopier, cable, telex or other means of prepaid, transmitted, recorded communication before the meeting to the Corporation or to the Subscription Receipt and Escrow Agent at the place where the same is to be held and for the voting of proxies so deposited as though the instruments themselves were produced at the meeting;

(d)      for the form of instrument appointing a proxy and the manner in which the form of proxy may be executed; and

(e)      generally for the calling of meetings of Subscription Receiptholders and the conduct of business thereat including setting a record date for Subscription Receiptholders entitled to receive notice of or to vote at such meeting.

Any regulations so made shall be binding and effective and the votes given in accordance therewith shall be valid and shall be counted. Save as the regulations may provide, the only persons who shall be recognized at any meeting as the holders of any Subscription Receipts, or as entitled to vote or, subject to section 9.10, be present at the meeting in respect thereof, shall be persons who are the registered holders of Subscription Receipts or their duly appointed proxies.

**9.10    Corporation and Subscription Receipt and Escrow Agent may be Represented**

The Corporation and the Subscription Receipt and Escrow Agent, by their respective officers, employees, or directors, as applicable, and the counsel to the Corporation and the Subscription Receipt and Escrow Agent may attend any meeting of the Subscription Receiptholders, but shall have no votes as such.

**9.11    Powers Exercisable by Extraordinary Resolution**

In addition to all other powers conferred upon them by any other provisions of this Agreement or by law, the Subscription Receiptholders at a meeting shall have the following powers exercisable from time to time by extraordinary resolution:

(a)    to extend the Release Deadline;

(b)    to agree to any modification, abrogation, alteration, compromise or arrangement of the rights of Subscription Receiptholders and/or the Subscription Receipt and Escrow Agent in its capacity as Subscription Receipt and Escrow Agent hereunder (subject to the Subscription Receipt and Escrow Agent's approval);

(c)    to amend, alter or repeal any extraordinary resolution previously passed;

(d)    to direct or authorize the Subscription Receipt and Escrow Agent (subject to the Subscription Receipt and Escrow Agent being funded and indemnified to its reasonable satisfaction) to enforce any of the covenants on the part of the Corporation contained in this Agreement or the Subscription Receipts or to enforce any of the rights of the Subscription Receiptholders in any manner specified in the extraordinary resolution or to refrain from enforcing any such covenant or right;

(e)    to waive, authorize and direct the Subscription Receipt and Escrow Agent to waive any default on the part of the Corporation in complying with any provisions of this Agreement or the Subscription Receipts, either unconditionally or upon any conditions specified in the extraordinary resolution;

(f)    to restrain any Subscription Receiptholder from taking or instituting any suit, action or proceeding against the Corporation for the enforcement of any of the covenants on the part of the Corporation contained in this Agreement or the Subscription Receipts or to enforce any of the rights of the Subscription Receiptholders;

(g)    to direct any Subscription Receiptholder who, as such, has brought any suit, action or proceeding to stay or discontinue or otherwise deal with the same upon payment of the costs, charges and expenses reasonably and properly incurred by the Subscription Receiptholder in connection therewith;

(h)      to assent to any compromise or arrangement with any creditor or creditors or any class or classes of creditors, whether secured or otherwise, and with the holders of any securities of the Corporation, wherever such assent may be required; and

(i)      from time to time and at any time to remove the Subscription Receipt and Escrow Agent and appoint a successor Subscription Receipt and Escrow Agent.

## 9.12   Meaning of "Extraordinary Resolution"

(1)      The expression "extraordinary resolution" when used in this Agreement means, subject as hereinafter in this section and in sections 9.15 and 9.16 provided, a resolution proposed at a meeting of the Subscription Receiptholders duly convened for that purpose and held in accordance with the provisions of this Article 9 at which there are present in person or by proxy Subscription Receiptholders holding at least 25% of the aggregate number of Subscription Receipts then outstanding and passed by the affirmative votes of Subscription Receiptholders holding not less than two-thirds of the aggregate number of Subscription Receipts represented at the meeting and voted on the poll upon the resolution.

(2)      If, at any meeting called for the purpose of passing an extraordinary resolution, Subscription Receiptholders holding at least 25% of the aggregate number of Subscription Receipts then outstanding are not present in person or by proxy within one-half hour after the time appointed for the meeting, then the meeting, if convened by Subscription Receiptholders or on a Subscription Receiptholders' Request, shall be dissolved; but in any other case it shall stand adjourned to such day, being not less than seven (7) or more than 35 days later and to such place and time as may be appointed by the chairman. Not less than five days' prior notice shall be given of the time and place of the adjourned meeting in the manner provided in section 12.2. The notice shall state that at the adjourned meeting the Subscription Receiptholders present in person or by proxy shall form a quorum but it shall not be necessary to set forth the purposes for which the meeting was originally called or any other particulars. At the adjourned meeting, the Subscription Receiptholders present in person or by proxy shall form a quorum and may transact the business for which the meeting was originally convened or any other particulars and a resolution proposed at the adjourned meeting and passed by the requisite vote as provided in subsection 9.12(1) shall be an extraordinary resolution within the meaning of this Agreement notwithstanding that Subscription Receiptholders holding 25% of the aggregate number of Subscription Receipts then outstanding are not present in person or by proxy at the adjourned meeting.

(3)      Votes on an extraordinary resolution shall always be given on a poll and no demand for a poll on an extraordinary resolution shall be necessary.

**9.13     Powers Cumulative**

It is hereby declared and agreed that any one or more of the powers or any combination of the powers in this Agreement stated to be exercisable by the Subscription Receiptholders by extraordinary resolution or otherwise may be exercised from time to time and the exercise of any one or more of the powers or any combination of the powers from time to time shall not be deemed to exhaust the right of the Subscription Receiptholders to exercise that power or those powers or combination of powers then or any other power or powers or combination of powers thereafter from time to time.

**9.14     Minutes**

Minutes of all resolutions and proceedings at every meeting of Subscription Receiptholders as aforesaid shall be made and duly entered in books to be provided for that purpose by the Subscription Receipt and Escrow Agent at the expense of the Corporation and any minutes as aforesaid, if signed by the chairman of the meeting at which resolutions were passed or proceedings held, or by the chairman of the next succeeding meeting of the Subscription Receiptholders, shall be prima facie evidence of the matters therein stated and, until the contrary is proved, every meeting, in respect of the proceedings of which minutes shall have been made, shall be deemed to have been duly convened and held, and all resolutions passed thereat or proceedings taken, to have been duly passed and taken.

**9.15     Instruments in Writing**

All actions that may be taken and all powers that may be exercised by the Subscription Receiptholders at a meeting held as hereinbefore in this Article 9 provided may also be taken and exercised by Subscription Receiptholders holding two-thirds of the aggregate number of Subscription Receipts then outstanding by an instrument in writing signed in one or more counterparts by Subscription Receiptholders in person or by attorney duly appointed in writing and the expression "extraordinary resolution" when used in this Agreement shall include an instrument so signed.

**9.16     Binding Effect of Resolutions**

Every resolution and every extraordinary resolution passed in accordance with the provisions of this Article 9 at a meeting of Subscription Receiptholders shall be binding upon all the Subscription Receiptholders, whether present at or absent from the meeting, and every instrument in writing signed by Subscription Receiptholders in accordance with section 9.15 shall be binding upon all the Subscription Receiptholders, whether signatories thereto or not, and each and every Subscription Receiptholder and the Subscription Receipt and Escrow Agent (subject to the provisions for its funding and indemnity herein contained) shall be bound to give effect accordingly to every resolution and instrument in writing passed or executed in accordance with these provisions.

**9.17    Holdings by the Corporation Disregarded**

In determining whether Subscription Receiptholders are present at a meeting of Subscription Receiptholders for the purpose of determining a quorum or have concurred in any consent, waiver, extraordinary resolution, Subscription Receiptholders' Request or other action by Subscription Receiptholders under this Agreement, Subscription Receipts owned legally or beneficially by the Corporation or affiliates or in partnership of which the Corporation is directly or indirectly a party, shall be disregarded.  The Corporation shall provide, upon the written request of the Subscription Receipt and Escrow Agent, a certificate as to the registration particulars of any Subscription Receipts held by the Corporation.

**ARTICLE 10**
**SUPPLEMENTAL AGREEMENTS AND SUCCESSOR COMPANIES**

**10.1    Provision for Supplemental Agreements for Certain Purposes**

From time to time the Corporation (if properly authorized by its directors) and the Subscription Receipt and Escrow Agent may, subject to the provisions of this Agreement, and they shall, when so directed hereby, execute and deliver by their proper officers, agreements or instruments supplemental hereto, which thereafter shall form part hereof, for any one or more or all of the following purposes:

(a)    adding to the provisions hereof such additional covenants and enforcement provisions as, in the opinion of counsel, are necessary or advisable, provided that the same are not in the opinion of the Subscription Receipt and Escrow Agent, relying on the advice of counsel, prejudicial to the interests of the Subscription Receiptholders as a group;

(b)    giving effect to any extraordinary resolution passed as provided in Article 9;

(c)    making such provisions not inconsistent with this Agreement as may be necessary or desirable with respect to matters or questions arising hereunder provided that such provisions are not, in the opinion of the Subscription Receipt and Escrow Agent, relying on the advice of counsel, prejudicial to the interests of the Subscription Receiptholders as a group;

(d)    adding to or amending the provisions hereof in respect of the transfer of Subscription Receipts, making provision for the exchange of Subscription Receipts and making any modification in the form of the Subscription Receipt Certificates which does not affect the substance thereof;

(e)    amending any of the provisions of this Agreement or relieving the Corporation from any of the obligations, conditions or restrictions herein contained, provided that no such amendment or relief shall be or become operative or effective if, in the opinion of the Subscription Receipt and

Escrow Agent, relying on the advice of counsel, such amendment or relief impairs or prejudices any of the rights of the Subscription Receiptholders, as a group or of the Subscription Receipt and Escrow Agent, and provided further that the Subscription Receipt and Escrow Agent may in its sole discretion decline to enter into any supplemental agreement which in its opinion may not afford adequate protection to the Subscription Receipt and Escrow Agent when the same shall become operative; and

(f)        for any other purpose not inconsistent with the terms of this Agreement, including the correction or rectification of any ambiguities, defective or inconsistent provisions, errors or omissions herein that do not affect the substances hereof, provided that, in the opinion of the Subscription Receipt and Escrow Agent, relying on the advice of counsel, the rights of the Subscription Receipt and Escrow Agent and the Subscription Receiptholders as a group are in no way prejudiced thereby.

## 10.2    Successor Entities

In the case of the amalgamation, arrangement, consolidation, merger or transfer of the undertaking or assets of the Corporation as an entirety or substantially as an entirety to another person (a "**successor entity**"), the successor entity resulting from the amalgamation, consolidation, merger or transfer (if not the Corporation) shall be bound by the provisions hereof and all obligations for the due and punctual performance and observance of each and every covenant and obligation contained in this Agreement to be performed by the Corporation and the successor entity shall by supplemental agreement satisfactory in form to the Subscription Receipt and Escrow Agent and executed and delivered to the Subscription Receipt and Escrow Agent, expressly assume those obligations.

## ARTICLE 11
## CONCERNING THE SUBSCRIPTION RECEIPT AND ESCROW AGENT

## 11.1    Rights and Duties of Subscription Receipt and Escrow Agent

(1)        In the exercise of the rights and duties prescribed or conferred by the terms of this Agreement, the Subscription Receipt and Escrow Agent shall act honestly and in good faith and shall exercise the degree of care, diligence and skill that a reasonably prudent person would exercise in performing the duties of a Subscription Receipt and Escrow Agent in comparable circumstances. The Subscription Receipt and Escrow Agent accepts the duties and responsibilities under this Agreement, and the Escrowed Proceeds, solely as a custodian, bailee and agent. No trust is intended to be, or is or will be, created hereby and the Subscription Receipt and Escrow Agent shall owe no duties hereunder as a trustee.  No provision of this Agreement shall be construed to relieve the Subscription Receipt and Escrow Agent from, or require any other person to indemnify the Subscription Receipt and Escrow Agent against liability for its own gross negligence, wilful misconduct or bad faith.

- 30 -

(2)     The Subscription Receipt and Escrow Agent shall not be bound to do or take any act, action or proceeding for the enforcement of any of the obligations of the Corporation under this Agreement unless and until it shall have received a Subscription Receiptholder's Request specifying the act, action or proceeding which the Subscription Receipt and Escrow Agent is requested to take. The obligation of the Subscription Receipt and Escrow Agent to commence or continue any act, action or proceeding for the purpose of enforcing any rights of the Subscription Receipt and Escrow Agent or the Subscription Receiptholders hereunder shall be conditional upon the Subscription Receiptholders furnishing, when required by notice in writing by the Subscription Receipt and Escrow Agent, sufficient funds to commence or continue the act, action or proceeding and an indemnity reasonably satisfactory to the Subscription Receipt and Escrow Agent and its counsel to protect and hold harmless the Subscription Receipt and Escrow Agent, its directors, officers, employees and agents against the costs, charges and expenses and liabilities to be incurred thereby and any loss and damage it may suffer by reason thereof. None of the provisions contained in this Agreement shall require the Subscription Receipt and Escrow Agent to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers unless indemnified and funded as aforesaid.

(3)     The Subscription Receipt and Escrow Agent may, before commencing any act, action or proceeding or at any time during the continuance thereof, require the Subscription Receiptholders at whose instance it is acting to deposit with the Subscription Receipt and Escrow Agent the Subscription Receipt Certificates held by them, for which Subscription Receipt Certificates the Subscription Receipt and Escrow Agent shall issue receipts.

(4)     Every provision of this Agreement that, by its terms, relieves the Subscription Receipt and Escrow Agent of liability or entitles it to rely upon any evidence submitted by it, is subject to the provisions of this section 11.1 and section 11.2.

(5)     The Subscription Receipt and Escrow Agent shall not be bound to give any notice or do or take any act, action or proceeding by virtue of the powers conferred on it hereunder unless and until it shall have been required to do so under the terms hereof; nor shall the Subscription Receipt and Escrow Agent be required to take notice of any default hereunder, unless and until notified in writing of such default, which notice shall specifically set out the default desired to be brought to the attention of the Subscription Receipt and Escrow Agent and in the absence of such notice the Subscription Receipt and Escrow Agent may for all purposes of this Agreement conclusively assume that no default has occurred or been made in the performance or observance of the representations, warranties and covenants, agreements or conditions herein contained. Any such notice shall in no way limit any discretion herein given to the Subscription Receipt and Escrow Agent to determine whether or not the Subscription Receipt and Escrow Agent shall take action with respect to any default.

(6)     In this Agreement, whenever confirmations or instructions are required to be given to the Subscription Receipt and Escrow Agent, in order to be valid, such confirmations and instructions shall be in writing.

## 11.2     Evidence, Experts and Advisers

(1)     In addition to the reports, certificates, opinions and other evidence required by this Agreement, the Corporation shall furnish to the Subscription Receipt and Escrow Agent such additional evidence of compliance with any provision hereof and in such form as the Subscription Receipt and Escrow Agent may reasonably require by written notice to the Corporation.

(2)     In the exercise of its rights and duties hereunder, the Subscription Receipt and Escrow Agent may, if it is acting in good faith, act and rely absolutely as to the truth of the statements and the accuracy of the opinions expressed therein, upon statutory declarations, opinions, reports, written requests, consents, or orders of the Corporation, certificates of the Corporation or other evidence furnished to the Subscription Receipt and Escrow Agent pursuant to any provision hereof or pursuant to a request of the Subscription Receipt and Escrow Agent. The Subscription Receipt and Escrow Agent shall be under no responsibility in respect of the validity of this Agreement or the execution and delivery hereof by or on behalf of the Corporation or in respect of the validity or the execution of any Subscription Receipt Certificate by the Corporation and issued hereunder, nor shall it be responsible for any breach by the Corporation of any covenant or condition contained in this Agreement or in any such Subscription Receipt Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any securities to be issued upon the right to acquire provided for in this Agreement and/or in any Subscription Receipt Certificate.

(3)     Proof of the execution of an instrument in writing, including a Subscription Receiptholders' Request, by any Subscription Receiptholder may be made by a certificate of a notary public or other person with similar powers that the person signing such instrument acknowledged to him the execution thereof, or by an affidavit of a witness to such execution or in any other manner which the Subscription Receipt and Escrow Agent may consider adequate and in respect of a corporate Subscription Receiptholder, shall include a certificate of incumbency of such Subscription Receiptholder together with a certified resolution authorizing the person who signs such instrument to sign such instrument.

(4)     The Subscription Receipt and Escrow Agent may act and rely and shall be protected in acting and relying upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, letter, telegram, cablegram or other paper document believed by it to be genuine and to have been signed, sent or presented by or on behalf of the proper party or parties.

(5)    The Subscription Receipt and Escrow Agent may employ or retain such counsel, accountants, engineers, appraisers or other experts or advisers as it may reasonably require for the purpose of determining and discharging its duties hereunder and may pay reasonable remuneration for all services so performed by any of them, without taxation of costs of any counsel and shall not be responsible for any misconduct on the part of any of them who has been selected with reasonable care by the Subscription Receipt and Escrow Agent. Any reasonable remuneration paid by the Subscription Receipt and Escrow Agent shall be paid by the Corporation in accordance with section 6.2.

(6)    The Subscription Receipt and Escrow Agent may, as a condition precedent to any action to be taken by it under this Agreement, require such opinions, statutory declarations, reports, certificates or other evidence as it, acting reasonably, considers necessary or advisable in the circumstances.

(7)    The Subscription Receipt and Escrow Agent may act and rely and shall be protected in acting and relying in good faith on the opinion or advice of or information obtained from counsel or any accountant, engineer, appraiser or other expert or advisor, whether retained or employed by the Corporation or the Subscription Receipt and Escrow Agent with respect to any matter arising in relation to the Agreement.

## 11.3    Securities, Documents and Monies Held by Subscription Receipt and Escrow Agent

Any securities, documents of title, monies or other instruments that may at any time be held by the Subscription Receipt and Escrow Agent on behalf of the Corporation and the Subscription Receiptholders may be placed in the deposit vaults of the Subscription Receipt and Escrow Agent or of any Canadian chartered bank or deposited for safekeeping with any such bank or the Subscription Receipt and Escrow Agent. All interest or other income received by the Subscription Receipt and Escrow Agent in respect of such deposits and investments shall, subject to sections 7.3 and 7.4 belong to the Corporation and shall be paid to the Corporation upon discharge of this Agreement.

## 11.4    Action by Subscription Receipt and Escrow Agent to Protect Interests

Subject to the provisions of this Agreement, the Subscription Receipt and Escrow Agent shall have power to institute and to maintain such actions and proceedings as it may consider necessary or expedient to preserve, protect or enforce its interests or the interests of the Subscription Receiptholders.

## 11.5    Subscription Receipt and Escrow Agent not Required to Give Security

The Subscription Receipt and Escrow Agent shall not be required to give any bond or security in respect of the performance of its duties pursuant to this Agreement or otherwise.

**11.6    Protection of Subscription Receipt and Escrow Agent**

By way of supplement to the provisions of any law for the time being relating to the performance of the duties of the Subscription Receipt and Escrow Agent pursuant to this Agreement, it is expressly declared and agreed as follows:

(1)    The Subscription Receipt and Escrow Agent shall not be liable for or by reason of any representations, statements of fact or recitals in this Agreement or in the Subscription Receipts (except the representation contained in section 11.8 or by virtue of the countersignature of the Subscription Receipt and Escrow Agent on the Subscription Receipts) or be required to verify the same and all such statements of fact or recitals are and shall be deemed to be made by the Corporation (except the representation contained in sections 2.8 or 11.8 of this Agreement).

(2)    Nothing herein contained shall impose any obligation on the Subscription Receipt and Escrow Agent to see to or to require evidence of the registration or filing (or renewal thereof) of this Agreement or any instrument ancillary or supplemental hereto.

(3)    The Subscription Receipt and Escrow Agent shall not be bound to give notice to any person or persons of the execution hereof.

(4)    The Subscription Receipt and Escrow Agent shall not incur any liability or responsibility whatsoever or be in any way responsible for the consequence of any breach on the part of the Corporation of any of the covenants or warranties herein contained or of any acts of any directors, officers, employees, agents or servants of the Corporation.

(5)    Without limiting any protection or indemnity of the Subscription Receipt and Escrow Agent under any other provision hereof, or otherwise at law, the Corporation hereby agrees to indemnify and hold harmless the Subscription Receipt and Escrow Agent and its directors, officers, agents and employees from and against any and all liabilities, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements, including reasonable legal or advisor fees and disbursements, of whatever kind and nature which may at any time be imposed on, incurred by or asserted against the Subscription Receipt and Escrow Agent in connection with the performance of its duties and obligations hereunder, other than such liabilities, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements arising by reason of the gross negligence, fraud or wilful misconduct of the Subscription Receipt and Escrow Agent. This provision shall survive the resignation or removal of the Subscription Receipt and Escrow Agent, or the termination or discharge of this Agreement. The Subscription Receipt and Escrow Agent shall not be under any obligation to prosecute or defend any action or suit in respect of this Agreement which, in the opinion of counsel, may involve it in expense or liability, unless the Corporation shall, so

often as required, furnish the Subscription Receipt and Escrow Agent with satisfactory indemnity and funding against such expense or liability.

**11.7    Replacement of Subscription Receipt and Escrow Agent**

(1)    The Subscription Receipt and Escrow Agent may resign its appointment and be discharged from all further duties and liabilities hereunder by giving to the Corporation not less than 30 days' notice in writing or such shorter notice as the Corporation may accept as sufficient. The Subscription Receiptholders by extraordinary resolution shall have the power at any time to remove the Subscription Receipt and Escrow Agent and to appoint a new subscription receipt and escrow agent. In the event of the Subscription Receipt and Escrow Agent resigning or being removed as aforesaid or being dissolved, becoming bankrupt, going into liquidation or otherwise becoming incapable of acting hereunder, the Corporation shall forthwith appoint a new subscription receipt and escrow agent unless a new subscription receipt and escrow agent has already been appointed by the Subscription Receiptholders; failing that appointment by the Corporation, the retiring Subscription Receipt and Escrow Agent (at the Corporation's expense) or any Subscription Receiptholder may apply to a court of competent jurisdiction, on such notice as the court may direct, for the appointment of a new subscription receipt and escrow agent; but any new subscription receipt and escrow agent so appointed by the Corporation or by the court shall be subject to removal as aforesaid by the Subscription Receiptholders. Any new subscription receipt and escrow agent appointed under any provision of this section shall be a corporation authorized to carry on the business of a trust company or transfer agent in the Province of Ontario. On any such appointment the new subscription receipt and escrow agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as Subscription Receipt and Escrow Agent without any further assurance, conveyance, act or deed; but there shall be immediately executed, at the expense of the Corporation, all such conveyances or other instruments as may, in the opinion of counsel, be necessary or advisable for the purpose of assuring the same to the new Subscription Receipt and Escrow Agent, provided that any resignation or removal of the Subscription Receipt and Escrow Agent and appointment of a successor subscription receipt and escrow agent shall not become effective until the successor subscription receipt and escrow agent shall have executed an appropriate instrument accepting such appointment and, at the request of the Corporation, the predecessor Subscription Receipt and Escrow Agent, upon payment of its outstanding remuneration and expenses, shall execute and deliver to the successor subscription receipt and escrow agent an appropriate instrument transferring to such successor subscription receipt and escrow agent all rights and powers of the Subscription Receipt and Escrow Agent hereunder and all securities, documents of title and other instruments and all monies and properties held by the Subscription Receipt and Escrow Agent hereunder.

- 35 -

(2) Upon the appointment of a successor subscription receipt and escrow agent, the Corporation shall promptly notify the Subscription Receiptholders thereof in the manner provided for in section 12.2.

(3) Any corporation into or with which the Subscription Receipt and Escrow Agent may be merged or consolidated or amalgamated, or any corporation succeeding to the stock transfer business of the Subscription Receipt and Escrow Agent, shall be the successor to the Subscription Receipt and Escrow Agent hereunder without any further act on its part or of any of the parties hereto, provided that such corporation would be eligible for appointment as a new subscription receipt and escrow agent under subsection 11.8(1).

(4) Any Subscription Receipts countersigned but not delivered by a predecessor Subscription Receipt and Escrow Agent may be countersigned by the new or successor subscription receipt and escrow agent in the name of the predecessor or the new or successor subscription receipt and escrow agent.

## 11.8  Conflict of Interest

(1) The Subscription Receipt and Escrow Agent represents to the Corporation that, at the time of the execution and delivery hereof, no material conflict of interest exists which it is aware of in the Subscription Receipt and Escrow Agent's role as a subscription receipt and escrow agent hereunder and agrees that in the event of a material conflict of interest arising which it becomes aware of hereafter it will, within 30 days after ascertaining that it has a material conflict of interest, either eliminate the same or resign as the Subscription Receipt and Escrow Agent hereunder.

(2) Subject to subsection 11.8(1), the Subscription Receipt and Escrow Agent, in its personal or any other capacity, may buy, lend upon and deal in securities of the Corporation, may act as registrar and transfer agent for the Common Shares and generally may contract and enter into financial transactions with the Corporation, all without being liable to account for any profit made thereby.

## 11.9  Subscription Receipt and Escrow Agent Not to be Appointed Receiver

The Subscription Receipt and Escrow Agent and any person related to the Subscription Receipt and Escrow Agent shall not be appointed a receiver or receiver and manager or liquidator of all or any part of the assets or undertaking of the Corporation.

## 11.10  Authorization to Carry on Business

The Subscription Receipt and Escrow Agent represents to the Corporation that it is registered to carry on business in the Province of Ontario.

**11.11  Privacy**

The parties acknowledge that federal and/or provincial legislation that addresses the protection of individual's personal information (collectively, "Privacy Laws") applies to obligations and activities under this Agreement. Despite any other provision of this Agreement, no party will take or direct any action that would contravene, or cause the other to contravene, applicable Privacy Laws. The Corporation will, prior to transferring or causing to be transferred personal information to the Subscription Receipt and Escrow Agent, obtain and retain required consents of the relevant individuals to the collection, use and disclosure of their personal information, or will have determined that such consents either have previously been given upon which the parties can rely or are not required under the Privacy Laws. The Subscription Receipt and Escrow Agent will use commercially reasonable efforts to ensure that its services hereunder comply with Privacy Laws.

**ARTICLE 12**
**GENERAL**

**12.1  Notice to the Corporation and the Subscription Receipt and Escrow Agent**

(1)     Unless herein otherwise expressly provided, any notice to be given hereunder to the Corporation or the Subscription Receipt and Escrow Agent shall be deemed to be validly given if delivered or if sent by registered mail, postage prepaid or if transmitted by telecopier:

(a)     if to the Corporation, to:

LIBERTY SILVER CORP.
390 Bay Street, Suite 806
Toronto, Ontario M5H 2Y2

Attention:     Dennis     (416) 352-5693
Peterson
Facsimile:

(b)     if to the Subscription Receipt and Escrow Agent, to:

Capital Transfer Agency Inc.
105 Adelaide Street West
Suite 1101, Toronto ON M5H 1P9

Attention:     Gary     (416) 350-5008
Cripps
Facsimile:

Each notice shall be personally delivered to the addressee, sent by facsimile transmission to the addressee or sent by registered mail and: (i) a notice that is personally delivered shall, if delivered prior to 5:00 p.m. (recipient's time) on a Business Day, be deemed to be given and received on that day and, in any other case, be deemed to be given and received on the first Business Day following the

day on which it is delivered; (ii) a notice that is sent by facsimile transmission prior to 5:00 p.m. (recipient's time), with confirmation of receipt confirmed, shall be deemed to be given and received on the first Business Day following the day on which it is sent; and (iii) a notice that is sent by registered mail shall be deemed to be given on the fifth Business Day following postmark on the notice.

(2)    The Corporation or the Subscription Receipt and Escrow Agent, as the case may be, may from time to time notify the other in the manner provided in subsection 12.1(1) of a change of address which, from the effective date of such notice and until changed by like notice, shall be the address of the Corporation or the Subscription Receipt and Escrow Agent, as the case may be, for all purposes of this Agreement. A copy of any notice of change of address given pursuant to this subsection 12.1(2) shall be available for inspection at the principal stock transfer offices of the Subscription Receipt and Escrow Agent in the City of Toronto, Ontario by Subscription Receiptholders during normal business hours.

## 12.2    Notice to the Subscription Receiptholders

(1)    Unless herein otherwise expressly provided, any notice to be given hereunder to Subscription Receiptholders shall be deemed to be validly given if the notice is sent by letter mail, postage prepaid, addressed to the holder or delivered by hand or courier (or so mailed to certain holders and so delivered to other holders) at their respective addresses appearing on the register maintained by the Subscription Receipt and Escrow Agent. Any notice so given shall be deemed to have been given on the day of delivery by hand or, if mailed on the fifth Business Day following the postmark on such notice, or if transmitted by telecopier, on the day following transmission.

(2)    If, by reason of strike, lockout or other work stoppage, actual or threatened, involving postal employees, any notice to be given to the Subscription Receiptholders could reasonably be considered unlikely to reach its destination, the notice may be published or distributed once in the Report on Business section of the national edition of The Globe and Mail newspaper or, in the event of a disruption in the circular of that newspaper, once in a daily newspaper in the English language of general circulation in the City of Toronto, Ontario; provided that in the case of a notice convening a meeting of the holders of Subscription Receipts, the Subscription Receipt and Escrow Agent may require such additional publications of that notice, in the same or in other cities or both, as it may deem necessary or appropriate or to comply with any applicable requirement of law or any stock exchange. Any notice so given shall be deemed to have been given on the day on which it has been published in the city or all of the cities in which publication was required (or first published in a city if more than one publication in that city is required). Accidental error or omission in giving notice or accidental failure to mail notice to any Subscription Receiptholder will not invalidate any action or proceeding founded thereon. In determining under any provision hereof, the date when notice of any meeting or other event must be given, the date of

giving notice shall be included and the date of the meeting or other event shall be excluded.

**12.3    Discretion of Directors**

Any matter provided herein to be determined by the directors of the Corporation in their sole discretion and determination so made, absent manifest error, will be conclusive.

**12.4    Satisfaction and Discharge of Agreement**

Following the earliest of:

(1)     the date on which the gross proceeds to the Offering shall have been returned to the proposed subscribers to the Offering pursuant to the terms and conditions of this Agreement;

(2)     the date on which the Common Shares shall have been issued to Subscription Receiptholders to the full extent of the rights attached to all Subscription Receipts theretofore countersigned hereunder, the Escrowed Proceeds shall have been released pursuant to section 7.3 and the monies to be paid hereunder, if any, have been paid; and

(3)     the date on which the Escrowed Proceeds shall have been released pursuant to section 7.4,

this Agreement shall cease to be of further effect. Notwithstanding the foregoing, all indemnities hereunder shall remain in full force and effect and survive the termination and discharge of this Agreement.

**12.5    Provisions of Agreement and Subscription Receipts for the Sole Benefit of Parties and Subscription Receiptholders**

Nothing in this Agreement or in the Subscription Receipts, expressed or implied, shall give or be construed to give to any person other than the parties hereto and the Subscription Receiptholders any legal or equitable right, remedy or claim under this Agreement, or under any covenant or provision therein contained, all such covenants and provisions being for the sole benefit of the parties hereto and the Subscription Receiptholders.

**12.6    Counterparts and Formal Date**

This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts together shall constitute one and the same instrument and notwithstanding their date of execution shall be deemed to bear the date set out at the top of the first page of this Agreement.

**[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]**

- 39 -

IN WITNESS WHEREOF the parties hereto have executed this Agreement under the hands of their proper officers in that behalf.

**LIBERTY SILVER CORP.**

By:    <u>/s/Geoffrey Browne</u>
       Authorized Signing Officer

**CAPITAL TRANSFER AGENCY INC.**

By:    <u>/s/Chris Goodale</u>
       Authorized Signing Officer

By:
       Authorized Signing Officer

**[Signature Page to Subscription Receipt and Escrow Agreement]**

## SCHEDULE "A"

### FORM OF SUBSCRIPTION RECEIPT CERTIFICATE

"UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY BEFORE THE DATE THAT IS 4 MONTHS AND A DAY AFTER THE LATER OF (I) NOVEMBER 10, 2011, AND (II) THE DATE THE ISSUER BECOMES A REPORTING ISSUER IN ANY PROVINCE OR TERRITORY.

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THE HOLDER HEREOF, BY PURCHASING THE SECURITIES REPRESENTED HEREBY, AGREES FOR THE BENEFIT OF LIBERTY SILVER CORP. AND ITS SUCCESSORS (THE "CORPORATION") THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE CORPORATION, (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN COMPLIANCE WITH LOCAL LAWS AND REGULATIONS, (C) WITHIN THE UNITED STATES, PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF APPLICABLE AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (D) WITHIN THE UNITED STATES, IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE STATE LAWS AND REGULATIONS GOVERNING THE OFFER AND SALE OF SECURITIES, AND IN THE CASE OF TRANSFERS PURSUANT TO (C) OR (D) ABOVE, THE HOLDER HEREOF HAS, PRIOR TO SUCH TRANSFER, FURNISHED TO THE CORPORATION AN OPINION OF COUNSEL OF RECOGNIZED STANDING IN FORM AND SUBSTANCE SATISFACTORY TO THE CORPORATION."

A-2

**SUBSCRIPTION RECEIPTS**
**TO ACQUIRE COMMON SHARES OF**
**LIBERTY SILVER CORP.**

Subscription Receipt Certificate No.

Certificate for                     Subscription Receipts.

THIS IS TO CERTIFY THAT, **[Name of Holder]**, the registered holder hereof (the "**holder**"), for value received, is entitled to receive in the manner herein provided and as more specifically set forth in the Subscription Receipt and Escrow Agreement (defined below) and without further payment therefor, one (1) common share (a "**Common Share**") in the capital of Liberty Silver Corp. (the "**Corporation**"), one common share purchase warrant of the Corporation (a "**Warrant**") and one (1) right to be issued for no further consideration 1/10th of one Common Share in certain circumstances (a "**Right**"), for each Subscription Receipt evidenced by this Subscription Receipt Certificate. Each Warrant shall entitle the holder thereof to acquire one Common Share (a "**Warrant Share**") at a price of US$0.65 per Warrant Share at any time until 5:00 p.m. (Toronto time) on the date which is the earlier of 24 months following the date the Corporation's Common Shares are listed on Toronto Stock Exchange and 30 months following the date of the closing of the Offering. Each Right shall entitle the holder thereof to acquire, for no additional consideration, one-tenth (1/10) of a Common Share. Capitalized terms used in this Subscription Receipt Certificate and not otherwise defined herein shall have the meanings ascribed to them in the Subscription Receipt and Escrow Agreement.

The Subscription Receipts represented by this Subscription Receipt Certificate are issued under and pursuant to a subscription receipt and escrow agreement (the "**Subscription Receipt and Escrow Agreement**") made as of November 10, 2011 among the Corporation and Capital Transfer Agency Inc. (the "**Subscription Receipt and Escrow Agent**"). Reference is made to the Subscription Receipt and Escrow Agreement and any instruments supplemental thereto for a full description of the rights of the holders of the Subscription Receipts and the terms and conditions upon which Subscription Receipts are, or are to be, issued, held, transferred and exchanged, all to the same effect as if the provisions of the Subscription Receipt and Escrow Agreement and all instruments supplemental thereto were herein set forth, and to all of which provisions the holder of this Subscription Receipt Certificate by acceptance hereof assents. The Corporation will furnish to the holder of this Subscription Receipt Certificate upon request, and without charge, a copy of the Subscription Receipt and Escrow Agreement.

In the event of any inconsistency between the terms set forth in this Subscription Receipt Certificate and the terms of the Subscription Receipt and Escrow Agreement, the terms of the Subscription Receipt and Escrow Agreement shall govern. All capitalized terms herein not otherwise defined shall have the same meaning as ascribed to such terms in the Subscription Receipt and Escrow Agreement.

Following the occurrence of the Release Event, each Subscription Receipt represented by this Subscription Receipt Certificate shall be automatically exchanged, for no additional consideration and without any further action of the holder, for one (1) Common Share, one (1)

A-3

Warrant and one (1) Right. The Subscription Receipts may not be exchanged prior to the occurrence of the Release Event.

The Release Event means the satisfaction of the Escrow Release Condition and the delivery of the Release Certificate to the Subscription Receipt and Escrow Agent providing notice of same.

In the event that the Release Event does not occur prior to 5:00 p.m. (Toronto Time) on December 31, 2012 (the "**Release Deadline**"), the Subscription Receipt represented hereby shall be null and void and the holder shall be entitled to receive US$0.50 per Subscription Receipt paid together with its pro-rata share of interest earned on the proceeds deposited with the Subscription Receipt and Escrow Agent pursuant to the Subscription Receipt and Escrow Agreement.

The holding of the Subscription Receipts evidenced by this Subscription Receipt Certificate shall not constitute the holder hereof a shareholder of the Corporation or entitle the holder to any right or interest in respect thereof except as herein and in the Subscription Receipt and Escrow Agreement expressly provided.

The Subscription Receipts and the Common Shares issuable upon the conversion of these Subscription Receipts have not been and will not be registered under the United States Securities Act of 1933, as amended, or under the securities laws of any state of the United States.

The Subscription Receipt and Escrow Agreement contains provisions making binding upon all holders of Subscription Receipts outstanding thereunder resolutions passed at meetings of such holders held in accordance with such provisions and instruments in writing signed by Subscription Receiptholders holding a specified percentage of Subscription Receipts outstanding.

The Subscription Receipts evidenced by this Subscription Receipt Certificate may only be transferred in accordance with the terms of the Subscription Receipt and Escrow Agreement and applicable securities laws.

This Subscription Receipt Certificate may be exchanged for one or more Subscription Receipt Certificates of different denomination(s) evidencing in the aggregate an equal number of Subscription Receipts as the number of Subscription Receipts represented by this Subscription Receipt Certificate in accordance with the terms of the Subscription Receipt and Escrow Agreement and applicable securities laws.

This Subscription Receipt Certificate shall not be valid for any purpose whatsoever unless and until it has been signed by the Corporation and countersigned by or on behalf of the Subscription Receipt and Escrow Agent. The countersignature of the Subscription Receipt and Escrow Agent on the Subscription Receipt Certificate issued hereunder shall not be construed as a representation or warranty by the Subscription Receipt and Escrow Agent as to the validity of this Subscription Receipt Certificate (except the due countersigning thereof) and the Subscription Receipt and Escrow Agent shall in no respect be liable or answerable for the use made of the Subscription Receipts or any of them or of the consideration therefor, except as otherwise specified herein.

Time shall be of the essence hereof.

A-4

This Subscription Receipt Certificate is governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein.

A-5

IN WITNESS WHEREOF the Corporation has caused this Subscription Receipt Certificate to be signed by its duly authorized officer as of the 10th day of November, 2011.

**LIBERTY SILVER CORP.**

By: 
          Authorized Signing Officer

Countersigned by:

**CAPITAL TRANSFER AGENCY INC.**

By: 
          Authorized Signing Officer

A-6

## TRANSFER OF SUBSCRIPTION RECEIPTS

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto:

(name)

(address)

the Subscription Receipts registered in the name of the undersigned represented by the within certificate and hereby appoints _____ as its attorney with full power of substitution to transfer the Subscription Receipts on the appropriate register of the Subscription Receipt and Escrow Agent.

DATED this _____ day of _____ 20__.

Signature of Subscription Receiptholder

Guaranteed by:

Authorized Signature Number

NOTE:   The signature to this transfer must correspond with the name as recorded on the Subscription Receipts in every particular without alteration or enlargement or any change whatever. The signature of the person executing this transfer must be guaranteed by an authorized officer of a Canadian Schedule I chartered bank or eligible guarantor institution with membership in an approved medallion signature guarantee program.

**By Hand, Courier or Mail:**

CAPITAL TRANSFER AGENCY INC.
105 Adelaide Street West, Suite 1100
Toronto Ontario, M5H 1P9

<u>SCHEDULE "B"</u>

**RELEASE CERTIFICATE**

**TO:**  Capital Transfer Agency Inc.

**RE:**  Subscription Receipt and Escrow Agreement (the "**Subscription Receipt and Escrow Agreement**") dated •, 2011 among Liberty Silver Corp. and Capital Transfer Agency Inc.

Unless otherwise indicated, capitalized terms shall have the meanings ascribed to them in the Subscription Receipt and Escrow Agreement.

Pursuant to Section 4.2 of the Subscription Receipt and Escrow Agreement, the undersigned hereby certifies that the Escrow Release Condition has been satisfied.  Accordingly, pursuant to Section 7.3 of the Subscription Receipt and Escrow Agreement, the undersigned hereby requests that you:

     (i)     liquidate the Escrowed Proceeds in accordance with Section 7 of the Subscription Receipt and Escrow Agreement;

     (ii)     retain $_____ as payment of your fees and expenses;

     (iii)     deliver the aggregate amount of $_____ (being the balance of the Escrowed Proceeds) to the Corporation, by wire transfer, to the following coordinates:

**[NOTE: LIBERTY SILVER CORP. WIRE INSTRUCTIONS TO BE INSERTED AT TIME OF DELIVERY OF THIS CERTIFICATE.]**

or as it may otherwise direct.

This Release Certificate may be signed in counterparts and delivered by facsimile and shall constitute good and sufficient authority for taking the actions described herein.

DATED this _____ day of _____ 20_____.

**LIBERTY SILVER CORP.**

By:
        CEO

By:
        CFO

## SCHEDULE "C"

### FORM OF WARRANT CERTIFICATE

"UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY BEFORE THE DATE THAT IS 4 MONTHS AND A DAY AFTER THE LATER OF (I) NOVEMBER 10, 2011, AND (II) THE DATE THE ISSUER BECOMES A REPORTING ISSUER IN ANY PROVINCE OR TERRITORY.

***INCLUDE THE BELOW FOR WARRANTS ISSUED IN THE UNITED STATES OR FOR THE ACCOUNT OR BENEFIT OF A PERSON IN THE UNITED STATES:***

THIS WARRANT AND THE SECURITIES DELIVERABLE UPON EXERCISE THEREOF HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES.  THIS WARRANT MAY NOT BE EXERCISED IN THE UNITED STATES OR BY OR ON BEHALF OF, OR FOR THE ACCOUNT OR BENEFIT OF, A U.S. PERSON UNLESS THIS WARRANT AND SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE U.S. SECURITIES ACT AND THE APPLICABLE SECURITIES LEGISLATION OF ANY SUCH STATE OR AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS IS AVAILABLE.  "UNITED STATES" AND "U.S. PERSON" ARE AS DEFINED BY REGULATION S UNDER THE U.S. SECURITIES ACT.

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THE HOLDER HEREOF, BY PURCHASING THE SECURITIES REPRESENTED HEREBY, AGREES FOR THE BENEFIT OF LIBERTY SILVER CORP. AND ITS SUCCESSORS (THE "CORPORATION") THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE CORPORATION, (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN COMPLIANCE WITH LOCAL LAWS AND REGULATIONS, (C) WITHIN THE UNITED STATES, PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF APPLICABLE AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (D) WITHIN THE UNITED STATES, IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE STATE LAWS AND REGULATIONS GOVERNING THE OFFER AND SALE OF SECURITIES, AND IN THE CASE OF TRANSFERS PURSUANT TO (C) OR (D) ABOVE, THE HOLDER HEREOF HAS, PRIOR TO SUCH TRANSFER, FURNISHED TO THE CORPORATION AN OPINION OF COUNSEL OF RECOGNIZED STANDING IN FORM AND SUBSTANCE SATISFACTORY TO THE CORPORATION."

THESE SECURITIES MAY NOT CONSTITUTE "GOOD DELIVERY" IN SETTLEMENT OF TRANSACTIONS ON CANADIAN STOCK EXCHANGES.  IF THE CORPORATION IS

C-2

A "FOREIGN ISSUER" WITHIN THE MEANING OF REGULATION S AT THE TIME OF TRANSFER PURSUANT TO RULE 904 OF REGULATION S, A NEW CERTIFICATE, BEARING NO LEGEND, MAY BE OBTAINED FROM COMPUTERSHARE TRUST COMPANY OF CANADA UPON DELIVERY OF THIS CERTIFICATE AND A DULY EXECUTED DECLARATION, IN A FORM SATISFACTORY TO COMPUTERSHARE TRUST COMPANY OF CANADA AND THE CORPORATION AND, IF SO REQUIRED BY COMPUTERSHARE TRUST COMPANY OF CANADA, AN OPINION OF COUNSEL, TO THE EFFECT THAT THE SALE OF THE SECURITIES REPRESENTED HEREBY IS BEING MADE IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT.

## WARRANT CERTIFICATE

## LIBERTY SILVER CORP.
(incorporated under the laws of State of Nevada)

Warrant Certificate No. ●                                    ● Warrants to Purchase
                                                              Common Shares

This warrant (the "**Warrant**") will be void and of no value unless exercised prior to 5:00 p.m. (Toronto time) on the Expiry Time (as defined below), subject to the Acceleration Provision as hereinafter defined.

THIS IS TO CERTIFY THAT, for value received, <<<<>>>> (the "**Holder**"), is entitled to purchase, at any time and from time to time, up to ● fully paid and non-assessable common shares without par value (the "**Shares**") in the capital of Liberty Silver Corp. (the "**Company**"), upon and subject to the terms and conditions hereinafter referred to. The Holder is entitled to purchase the Shares at and for a price (the "**Exercise Price**") of US$0.65 per Share at any time until 5:00 p.m. (Toronto time) on the date which is the earlier of 24 months following the date the Corporation's Common Shares are listed on Toronto Stock Exchange and May 10, 2014 (the "**Expiry Time**").

Such right to purchase the Shares may only be exercised by the Holder within the time hereinbefore set out by:

> (i)   duly completing, in the manner indicated, and executing the Subscription Form attached hereto; and

> (ii)  surrendering this Warrant to the Company at the offices of Capital Transfer Agency Inc., Suite 1101, 105 Adelaide Street West, Toronto, ON M5H 1P9, together with cash or a certified cheque payable to the order of the Company in the amount of the aggregate exercise price of the Shares subscribed for.

This Warrant and such certified cheque or cash will be deemed to be so surrendered and exercised only upon actual receipt thereof by the Company (the "**Exercise Date**").

Any Shares issued on the exercise of this Warrant will be issued effective on the Exercise Date. Unless otherwise directed, the Company will, within three business days of the Exercise Date, mail or caused to be mailed to the Holder at the address indicated on the Subscription Form attached hereto a certificate or certificates representing such Shares.

The Holder may subscribe for and purchase any lesser number than the whole number of Shares purchasable under this Warrant and, in such event, will be entitled to receive a new Warrant with respect to the remaining balance of the Shares purchasable under this Warrant.

In the event of any alteration of the Shares, including any subdivision, consolidation or reclassification, or in the event of any form of reorganization of the Company, including any amalgamation, merger or arrangement (collectively, a "Reorganization"), an adjustment will be made to the terms of the Warrants such that the Holder, upon exercise of any Warrants following the completion of the Reorganization, will be entitled to receive the same number and kind of securities that it would have been entitled to receive as a result of the Reorganization had it exercised its Warrants immediately prior to the Reorganization.

The Company will not effect any Reorganization which could result in a successor to the Company unless prior to or simultaneously with the consummation thereof, the entity succeeding the Company acknowledges in writing that it is bound by and will comply with the provisions set forth in this Warrant Certificate.

If, in case at any time:

    (a)    the Company pays any dividend payable in stock upon the Shares or makes any distribution to the holders of the Shares;

    (b)    the Company offers for subscription pro rata to the holders of its Shares any additional shares of stock of any class or other rights;

    (c)    there is a voluntary or involuntary dissolution, liquidation or winding-up of the Company; or

    (d)    in case of any Reorganization;

then, and in any one or more of such cases, the Company will give to the Holder at least 20 days' prior written notice of the date on which the books of the Company will close or a record will be taken for such dividend, distribution or offer of subscription rights, or for determining rights to vote with respect to such dissolution, liquidation or winding-up or Reorganization and, in the case of such dissolution, liquidation or winding-up or Reorganization, at least 20 days' prior written notice of the date when the same will take place. Such notice in accordance with the foregoing clause will also specify, in the case of any such dividend, distribution or offer of subscriptions rights, the date on which the holders of the Shares will be entitled thereto, and such notice in accordance with the foregoing will also specify the date on which the holders of the Shares will be entitled to exchange the Shares for securities or other property deliverable upon such dissolution, liquidation or winding-up or Reorganization, as the case may be. Each such written notice will be given by first class registered mail, postage prepaid, addressed to the Holder at the address of such Holder, as shown on the books of the Company.

C-4

In accordance with this certificate, the Company will make adjustments as it considers necessary and equitable acting in good faith. If at any time a dispute arises with respect to adjustments provided for herein, such dispute will be conclusively determined by the auditors of the Company or if they are unable or unwilling to act, by such other firm of independent chartered accountants as may be selected by the directors of the Company and any such determination, absent manifest error, will be binding upon the Company, the Holder and shareholders of the Company. The Company will provide such auditors or accountants with access to all necessary records of the Company and fees payable to such accountants or auditors will be paid by the Company.

To the extent that this Warrant confers the right to purchase a fraction of a Share, such right may be exercised in respect of such fraction only in combination with another Warrant or other Warrants which in the aggregate entitle the Holder to purchase a whole number of Shares. No fractional Shares will be issued or consideration given in lieu thereof.

The Holder may, at any time prior to the Expiry Time, upon surrender hereof to the Company and upon payment of such applicable transfer charges as may be required by the Company from time to time, exchange this Warrant for other Warrants entitling the Holder to subscribe in the aggregate for the same number of Shares as are purchasable under this Warrant at the time of such exchange.

The terms and holding of this Warrant do not constitute the Holder to be a shareholder of the Company or entitle the Holder to any right or interest with respect thereto except as herein expressly provided.

The Company will reserve and set aside sufficient shares in its authorized capital to issue the Shares which may be issued from time to time on exercise of the Warrant.

Any notice to be given hereunder to the Holder will be given in writing and either sent by telecopier, delivered or mailed by prepaid post to the Holder at the address indicated on the Warrant, or at such other address as the Holder may hereafter designate by notice in writing. If such notice is sent by telecopier or is delivered, it will be deemed to have been given at the time of delivery; if such notice is sent by mail, it will be deemed to have been given 48 hours following the date of mailing thereof. In the event of a mail strike or disruption in postal service at or prior to the time a notice is deemed to have been received by mail, such notice will be delivered or sent by telecopier.

This Warrant and the Shares underlying this Warrant have not been and will not be registered under the United States Securities Act or 1933, as amended (the "**U.S. Securities Act**") and applicable state securities laws and the Company has no current intention to effect such registration.  Warrants may only be exercised within the United States or by or on behalf of a U.S. Person (as defined in Regulation S of the U.S. Securities Act), or a person within the United States and the Shares issued upon exercise of Warrants may be delivered to an address in the United States only if the Warrants and the Shares are registered under the U.S. Securities Act and applicable state securities laws or such exercise is made in accordance with an exemption from the registration requirements of the U.S. Securities Act and applicable state securities laws, such

exemption to be evidenced by such certificates and other evidence reasonably satisfactory to the Company and the Company shall be entitled to rely upon such confirmation.

This Warrant will be governed by and construed in accordance with the laws of the Province of Ontario.

Time will be of the essence hereof.

IN WITNESS WHEREOF the Company has caused this Warrant to be signed by its duly authorized officer as of the 10th day of November, 2011.

**LIBERTY SILVER CORP.**

By:   /s/Geoffrey Browne

       Authorized Signatory

Countersigned by Capital Transfer Agency Inc.
Registrar and Transfer Agent:

By: /s/ Chris Goodale

    Authorized Signatory

C-6

SUBSCRIPTION FORM


TO:    **LIBERTY SILVER CORP.**
        390 Bay Street, Suite 806
        Toronto, ON  M5H 2Y2


_____, the holder of the within Share Purchase Warrant, does hereby subscribe for _____ Shares according to the conditions thereof and herewith makes payment in the amount of US$_____ as the purchase price in full for the said number of Shares at the price of US$0.75 per Share until the Expiry Time.


_____ hereby directs that the Shares hereby subscribed for be issued and delivered as follows:

| Name(s) in full | Address | Number of Shares |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |

The undersigned represents, warrants and certifies as follows (one (only) of the following must be checked):

☐     A      The undersigned holder (i) at the time of exercise of the Warrant Certificate is not in the United States; (ii) at the time of exercise of the Warrant Certificate is not a "U.S. person" (as defined in Regulation S under the United States Securities Act of 1933, as amended (the "**U.S. Securities Act**")) and is not exercising the Warrant Certificate for the account or benefit of a person in the United States or a U.S. person; (iii) did not execute or deliver this exercise form in the United States; and (iv) has in all other aspects complied with the terms of Regulation S under the U.S. Securities Act.

☐     B      The undersigned holder (i) purchased the Warrants in an offering of unit subscription receipts of Liberty Silver Corp. comprised of Common Shares, Warrants and Rights to acquire Common Shares, for its own account or the account of another "accredited investor" (as defined in Rule 501(a) of Regulation D under the U.S. Securities Act) ("**Accredited Investor**"); (ii) is exercising the Warrants solely for its own account or for the account of such other Accredited Investor; and (iii) each of it and such other person, if any, was an Accredited Investor on the date the Warrants were acquired and is an Accredited Investor on the date of exercise of the Warrants.

☐     C      The undersigned is delivering a written opinion of United States legal counsel or evidence satisfactory to Liberty Silver Corp. to the effect that the Warrants and the Common Shares to be delivered upon exercise hereof have been registered under the U.S. Securities Act.

☐    D      The undersigned holder has delivered to Liberty Silver Corp. a written opinion of counsel of recognized standing in form and substance satisfactory to Liberty Silver Corp. to the effect that an exemption from the registration requirements of the U.S. Securities Act and applicable state laws is available for the issue of the Common Shares issuable upon exercise of the Warrants.

**Note:** The undersigned holder understands that unless Box A or C above is checked, the certificate representing the Common Shares will bear a legend restricting transfer without registration under the U.S. Securities Act and applicable state securities laws unless an exemption from registration is available.  Certificates representing Common Shares will not be registered or delivered to an address in the United States unless Box B, C or D above is checked. If Box C or D is checked, any opinion tendered must be in form and substance satisfactory to Liberty Silver Corp.. Holders planning to deliver an opinion of counsel in connection with the exercise of Warrants should contact Liberty Silver Corp. in advance to determine whether any opinions to be tendered will be acceptable to Liberty Silver Corp.

DATED this _____ day of _____, _____.

_____
Authorized Signatory

_____
Mailing Address

_____

_____

C-8

## ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the accompanying Warrant and all rights evidenced thereby and does irrevocably constitute and appoint _____, attorney, to transfer said Warrant on the books of the corporation named therein.

Dated: _____        Signature      _____

                                Address        _____

                                               _____

## PARTIAL ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the right to purchase _____ shares of common stock evidenced by the accompanying Warrant together with all rights therein, and does irrevocably constitute and appoint _____, attorney, to transfer that part of said Warrant on the books of the corporation named therein.

Dated: _____        Signature      _____

                                Address        _____

                                               _____

## FOR USE BY THE LIBERTY SILVER CORP. ONLY:

This Warrant No. _____ cancelled (or transferred or exchanged) this _____ day of _____, _____, shares of common stock issued therefor in the name of _____, Warrant No. _____ issued for _____ shares of common stock in the name of _____.

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "Agreement") is made and entered into as of November 10, 2011, by and among Liberty Silver Corp., a Nevada corporation (the "Company"), and the investors signatory hereto (each an "Investor" and collectively, the "Investors").

This Agreement is made pursuant to the Subscription Agreement, dated as of November 10, 2011 among the Company, the Investors and certain other parties (the "Purchase Agreement").

The Company and the Investors hereby agree as follows:

1.  **Definitions.**

    **Capitalized terms used and not otherwise defined herein that are defined in the Purchase Agreement shall have the meanings given such terms in the Purchase Agreement.** As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

    "Commission" means the Securities and Exchange Commission.

    "Effective Date" means the date that a Registration Statement is first declared effective by the Commission.

    "Effectiveness Date" means with respect to the Registration Statement required to be filed under Section 2(a), the earlier of: (i) May 31, 2012; and, (ii) the fifth Trading Day following the date on which the Company is notified by the Commission that the Registration Statement will not be reviewed or is no longer subject to further review and comments.

    "Effectiveness Period" means the period commencing on the Effective Date and terminating on the date the Registration Statement ceases to be effective in accordance with clause 2(a)(i) or (ii) of this Agreement.

    "Exchange Act" means the Securities Exchange Act of 1934, as amended.

    "Filing Date" means with respect to the Registration Statement required to be filed under Section 2(a), the thirtieth day following the Closing Date.

    "Holder" or "Holders" means the holder or holders, as the case may be, from time to time of Registrable Securities.

    "Person" means an individual, a corporation, a partnership, a syndicate, a trustee or any unincorporated organization and words importing persons are intended to have a similarly extended meaning;

    "Proceeding" means an action, claim, suit, investigation or proceeding (including, without

*1*

limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Prospectus" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"Registrable Securities" means: (i) all of the shares of Common Stock issued or issuable to the Investors pursuant to the Purchase Agreement; (ii) all shares of Common Stock issued to the Investors pursuant to Section 2(c) of this Agreement; and (iii) all shares of Common Stock issuable upon exercise of the Warrants, together with any securities issued or issuable upon any stock split, dividend or other distribution, recapitalization or similar event, or any conversion price adjustment with respect to any of the securities referenced above.

"Registration Statement" means the registration statement required to be filed in accordance with Section 2(a) and any additional registration statement(s) required to be filed under Section 2(b), including (in each case) the Prospectus, amendments and supplements to such registration statements or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statements.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 415" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Rule 424" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Securities Act" means the Securities Act of 1933, as amended.

"Shares" means the shares of Common Stock issued or issuable to the Investors pursuant to the Purchase Agreement.

"Trading Day" means (i) a day on which the Common Stock is traded or quoted on a Trading Market (other than the OTC Bulletin Board), or (ii) if the Common Stock is not listed on a Trading Market (other than the OTC Bulletin Board), a day on which the Common Stock is traded in the over the counter market, as reported by the OTC Bulletin Board, or (iii) if the Common Stock is not quoted on any Trading Market, a day on which the Common Stock is quoted in the over the counter market as reported by the Pink OTC Markets Inc. (or any similar organization or agency succeeding to its functions of reporting prices); provided, that in the event that the Common Stock is not listed or

quoted as set forth in (i), (ii) and (iii) hereof, then Trading Day shall mean a Business Day.

"Trading Market" means whichever of the Toronto Stock Exchange, or OTC Bulletin Board on which the Common Stock is listed or quoted for trading on the date in question.

"Warrants" shall mean the Warrants issued or issuable to the Investors pursuant to the Purchase Agreement.

**2. Registration.**

(a) On or prior to the Filing Date, the Company shall prepare and file with the Commission a Registration Statement covering the resale of all Registrable Securities to be made on a continuous basis pursuant to Rule 415, on Form S-1 (except if the Company is eligible at such time to register for resale the Registrable Securities on Form S-3, in which case such registration shall be on Form S-3), and shall contain (unless otherwise directed by the Holders) substantially the "Plan of Distribution" attached hereto as Annex A.  The Company shall cause the Registration Statement to be declared effective under the Securities Act as soon as possible but, in any event, no later than the Effectiveness Date, and shall use its reasonable best efforts to keep the Registration Statement continuously effective under the Securities Act until the date which is the earlier of (i) the first date as of which all of the Registrable Securities have been publicly sold thereunder by the Holders, or (ii) (A) the first date as of which all of the Registrable Securities may be sold by the Holders pursuant to Rule 144 without application of the requirements imposed by such Rule upon sales by affiliates, as determined by the Company and evidenced by a written opinion of its counsel to that effect delivered to each of the Holders who then hold Registrable Securities that have not been publicly sold, addressed and acceptable to the Company's transfer agent and the affected Holders, and (B) any "distribution compliance period" and "offering restrictions" (as such terms are defined in Regulation S under the Securities Act) applicable to the Registrable Securities at their time of issue shall have ceased to apply thereto (the date described in this clause 2(a)(ii), the "Termination Date").

(b) Notwithstanding any other provision of this Agreement, if the Registration Statement is not filed on or before the Filing Date, or if the Registration Statement is not declared effective by the Commission on or before the Effectiveness Date, the Company shall not be relieved of its obligation to prepare and file the Registration Statement or to cause the Registration Statement to be declared effective by the Commission, on the earliest possible date thereafter provided, however, that the requirements of this Section 2(b) shall terminate on the Termination Date.

(c) If a Registration Statement is not declared effective by the Commission on or prior to May 31, 2012, then, in addition to any other rights available to the Holders under the Purchase Agreement or under applicable law, the Company shall issue to the Holders, for no additional consideration and without any further action required by the Holder, one share of Common Stock for each ten (10) Common Shares to which they are entitled pursuant to the terms and conditions of the Purchase Agreement and the Subscription Receipts (the "Rights Shares").  The certificates representing the Rights Shares shall be delivered to the Holders as soon as reasonably practicable and in any event no later than five (5) business days following May 31, 2012.  In connection with the foregoing, the Company shall execute and deliver to its transfer agent all required treasury orders.

(d) The Company shall not be required to include the Registrable Securities of a Holder in a Registration Statement and shall not be required to pay any liquidated or other damages under Section 2(c) hereof to any Holder who fails to furnish to the Company a fully completed Selling Holder

*3*

Questionnaire at least five Trading Days prior to the Filing Date (subject to the requirements set forth in Section 3(a)).

### 3.   Registration Procedures.

In connection with the Company's registration obligations hereunder, the Company and, as applicable, Holders shall do the following:

(a)  Not less than five Trading Days prior to the filing of the Registration Statement or any related Prospectus or any amendment or supplement thereto (including any document that would be incorporated or deemed to be incorporated therein by reference), the Company shall, (i) furnish to each Holder copies of all such documents proposed to be filed, which documents (other than those incorporated or deemed to be incorporated by reference) will be subject to the review of such Holders, and (ii) cause its officers and directors, counsel and independent certified public accountants to respond to such inquiries of the Holders as shall be necessary, in the reasonable opinion of respective counsel to conduct a reasonable investigation within the meaning of the Securities Act. Each Holder agrees to furnish to the Company a completed questionnaire in the form attached to this Agreement as Annex B (a "Selling Shareholder Questionnaire") not less than five Trading Days prior to the Filing Date.

(b) (i) The Company shall prepare and file with the Commission such amendments, including post-effective amendments, to the Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement continuously effective as to the applicable Registrable Securities for its Effectiveness Period and prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities; (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus amendment or supplement, and as so amended or supplemented to be filed pursuant to Rule 424; (iii) respond as promptly as reasonably possible to any comments received from the Commission with respect to the Registration Statement or any amendment thereto and, as promptly as reasonably possible provide the Holders true and complete copies of all correspondence from and to the Commission relating to the Selling Holder Sections (other than to the extent the Company believes that such disclosure would result in the disclosure to the Holders of material and non-public information concerning the Company); and (iv) comply in all material respects with the provisions of the Securities Act and the Exchange Act, and the rules and regulations of the Commission thereunder, with respect to the Registration Statement and the disposition of all Registrable Securities covered by the Registration Statement.

(c) The Company shall notify the Holders as promptly as reasonably possible (and, in the case of (i)(A) below, not less than three Trading Days prior to such filing) and (if requested by any such Person) confirm such notice in writing no later than one Trading Day following the day (i)(A) when a Prospectus or any Prospectus supplement or post-effective amendment to a Registration Statement is proposed to be filed; (B) when the Commission notifies the Company whether there will be a "review" of such Registration Statement and whenever the Commission comments in writing on such Registration Statement (the Company shall provide true and complete copies of all correspondence to and from the Commission regarding the Registration Statement to each of the Holders that pertain to the Selling Holder Sections applicable to such Holder, other than to the extent the Company believes that such disclosure would result in the disclosure to the Holders of material and non-public information concerning the Company); and (C) with respect to the Registration Statement or any post-effective amendment, when the same has become effective; (ii) of any request by the Commission or any other Federal or state governmental authority for amendments or supplements to a Registration Statement or Prospectus or for additional information; (iii) of the issuance by the Commission of any

stop order suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; and (v) of the occurrence of any event or passage of time that makes the financial statements included in a Registration Statement ineligible for inclusion therein or any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to such Registration Statement, Prospectus or other documents so that in such Registration Statement or the Prospectus, as the case may be, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(d) The Company will use its reasonable best efforts to avoid the issuance of, or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment.

(e) Upon request by a Holder, the Company will promptly deliver to such Holder, without charge, as many copies of the Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Persons may reasonably request. The Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(f) Prior to any public offering of Registrable Securities, the Company will use its reasonable best efforts (i) to register or qualify or cooperate with the selling Holders in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or Blue Sky laws of the applicable jurisdictions that are required for the Holders to offer and sell the Registrable Securities and are requested by the Holders in writing, (ii) to keep each such registration or qualification (or exemption therefrom) effective during the Effectiveness Period, and (iii) to do any and all other acts or things necessary or advisable to enable the disposition in such jurisdictions of the Registrable Securities covered by the Registration Statements; provided, however, that in no event will the Company be required, in order to satisfy its obligations under this paragraph, to qualify to do business generally in any jurisdiction where it is not so qualified on the date the applicable Registration Statement is filed.

(g) The Company will cooperate with the Holders to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to the Registration Statements, which certificates shall be free of all restrictive legends, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holders may request.

(h) The Company shall, upon the occurrence of any event contemplated by Section 3(c)(v), as promptly as reasonably possible, prepare a supplement or amendment, including a post-effective amendment, to the affected Registration Statements or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(i) The Company shall provide a transfer agent and registrar for all Registrable Securities registered pursuant to such Registration Statement and a CUSIP number for all such Registrable Securities, in each case not later than the Effective Date.

(j) The Company shall cause all Registrable Securities that are required by this Agreement to be registered by a Registration Statement to be listed on each Trading Market or other securities exchange on which securities of the same class issued by the Company are then listed or if such securities are not listed, then on such Trading Market or other securities exchange on which any other securities of the Company are then traded, and enter into such customary agreements including a listing application and indemnification agreement in customary form (provided that the applicable listing requirements are satisfied).

## 4.  Registration Expenses.

All fees and expenses incident to the performance of or compliance with this Agreement by the Company shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market or other securities exchange on which the Common Stock is then listed for trading, and (B) in compliance with applicable state securities or Blue Sky laws), (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) Securities Act liability insurance, if the Company desires such insurance, and (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company shall be responsible for all of its internal expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on any Trading Market or other securities exchange as required hereunder.

## 5.  Indemnification.

(a) _Indemnification by the Company_. The Company shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Holder, the officers, directors, agents, investment advisors, partners, members, shareholders and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (1) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or (2) in the case of an occurrence of an

event of the type specified in Section 3(c)(ii)-(v), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of an Advice (as hereinafter defined) or an amended or supplemented Prospectus, but only if and to the extent that following the receipt of the Advice or the amended or supplemented Prospectus the misstatement or omission giving rise to such Loss would have been corrected.

(b) <u>Indemnification by Holders</u>. Each Holder shall, severally, and not jointly or jointly and severally, indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising solely out of or based solely upon: (x) such Holder's failure to comply with the prospectus delivery requirements of the Securities Act or (y) any untrue statement of a material fact contained in any Registration Statement, any Prospectus, any form of prospectus, or in any amendment or supplement thereto, or arising out of or based upon any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading to the extent, but only to the extent that, (1) such untrue statements or omissions are based solely upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or (2) in the case of an occurrence of an event of the type specified in Section 3(c)(ii)-(v), the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of an Advice or an amended or supplemented Prospectus, but only if and to the extent that following the receipt of the Advice or the amended or supplemented Prospectus the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(c) <u>Conduct of Indemnification Proceedings</u>. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "Indemnified Party"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "Indemnifying Party") in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have proximately and materially adversely prejudiced the Indemnifying Party. An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and such counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending

Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding. All fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten Trading Days of written notice thereof to the Indemnifying Party (regardless of whether it is ultimately determined that an Indemnified Party is not entitled to indemnification hereunder; provided, that the Indemnifying Party may require such Indemnified Party to undertake to reimburse all such fees and expenses to the extent it is finally judicially determined that such Indemnified Party is not entitled to indemnification hereunder).

(d) <u>Contribution</u>. If a claim for indemnification under Section 5(a) or 5(b) is unavailable to an Indemnified Party (by reason of public policy or otherwise), then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in Section 5(c), any reasonable attorneys' or other reasonable fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section was available to such party in accordance with its terms.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 5(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.

The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

## 6. Miscellaneous.

(a) <u>Remedies</u>. In the event of a breach by the Company or by a Holder, of any of their obligations under this Agreement, each Holder or the Company, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company and each Holder agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

(b) <u>No Piggyback on Registrations</u>. Neither the Company nor any of its security holders (other than the Holders in such capacity pursuant hereto) may include securities of the Company in a Registration Statement other than the Registrable Securities, and the Company shall not, from the date of this Agreement until the expiration of the Registration Period enter into any agreement providing any such right to any of its security holders.

(c) <u>Compliance</u>. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Registrable Securities pursuant to the Registration Statement.

(d) <u>Discontinued Disposition</u>. Each Holder agrees by its acquisition of such Registrable Securities that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in Section 3(c), such Holder will forthwith discontinue disposition of such Registrable Securities under the Registration Statement until such Holder's receipt of the copies of the supplemented Prospectus and/or amended Registration Statement or until it is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(e) <u>Reserved</u>.

(f) <u>Amendments and Waivers</u>. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and the Holders of no less than a majority of the then outstanding or issuable Registrable Securities. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of at least a majority of the Registrable Securities to which such waiver or consent relates, provided, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence.

(g) <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be delivered as set forth in the Purchase Agreement.

(h) <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of each Holder. The Company may not assign its rights or obligations hereunder without the prior written consent of each Holder (which consent shall not be unreasonably withheld). Any Investor may assign any or all of its rights under this Agreement to any Person to whom such investor assigns or transfers any Shares, provided such transferee agrees in writing to be bound, with respect to the transferred Shares, by the provisions hereof that apply to the "Investors".

(i) <u>Execution and Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and, all of which taken together shall constitute one and the same Agreement. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid binding obligation of the party

executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were the original thereof.

(j) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be determined in accordance with with the provisions of the Purchase Agreement.

(n) <u>Cumulative Remedies</u>. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(o) <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(p) <u>Headings</u>. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(q) <u>Independent Nature of Investors' Obligations and Rights</u>. The obligations of each Investor under this Agreement are several, and not joint or jointly and several, with the obligations of any other Investor, and no Investor shall be responsible in any way for the performance of the obligations of any other Investor under this Agreement. Nothing contained herein or in any Transaction Document, and no action taken by any Investor pursuant thereto, shall be deemed to constitute the Investors as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Investors are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement or any other Transaction Document. Each Investor acknowledges that no other Investor will be acting as agent of such Investor in enforcing its rights under this Agreement. Each Investor shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement, and it shall not be necessary for any other Investor to be joined as an additional party in any Proceeding for such purpose. The Company acknowledges that each of the Investors has been provided with the same Registration Rights Agreement for the purpose of closing a transaction with multiple Investors and not because it was required or requested to do so by any Investor.

*************************

*10*

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**LIBERTY SILVER CORP.**

By: /s/ Geoffrey Browne_____
    Name:  Geoffrey Browne
    Title:  Chief Executive Officer

[SIGNATURE PAGE OF HOLDERS FOLLOWS]

*11*

[SIGNATURE PAGE OF HOLDERS TO LIBERTY SILVER CORP. RRA]

Name of Holder: Look Back Investments, Inc. _____
*Signature of Authorized Signatory of Holder:* /s/Robert Genovese _____
Name of Authorized Signatory: Robert Genovese_____
Title of Authorized Signatory: _____

[SIGNATURE PAGES CONTINUE]

*12*

Plan of Distribution

Each Selling Stockholder (the "Selling Stockholders") of the common stock ("Common Stock") of Liberty Silver Corp., a Nevada corporation (the "Company") and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on the Trading Market or any other stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. A Selling Stockholder may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales entered into after the effective date of the registration statement of which this prospectus is a part;

- broker-dealers may agree with the Selling Stockholders to sell a specified number of such shares at a stipulated price per share;

- a combination of any such methods of sale;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise; or

- any other method permitted pursuant to applicable law.

The Selling Stockholders may also sell shares under Rule 144 under the Securities Act of 1933, as amended (the "Securities Act"), if available, rather than under this prospectus.

Broker-dealers engaged by the Selling Stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, but, except as set forth in a supplement to this Prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with NASDR Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with NASDR IM-2440.

In connection with the sale of the Common Stock or interests therein, the Selling Stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The Selling Stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The Selling Stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of

*13*

shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

The Selling Stockholders and any broker-dealers or agents that are involved in selling the shares may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Each Selling Stockholder has informed the Company that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the Common Stock. In no event shall any broker-dealer receive fees, commissions and markups which, in the aggregate, would exceed eight percent (8%).

The Company is required to pay certain fees and expenses incurred by the Company incident to the registration of the shares. The Company has agreed to indemnify the Selling Stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

Because Selling Stockholders may be deemed to be "underwriters" within the meaning of the Securities Act, they will be subject to the prospectus delivery requirements of the Securities Act. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Securities Act may be sold under Rule 144 rather than under this prospectus. Each Selling Stockholder has advised us that they have not entered into any written or oral agreements, understandings or arrangements with any underwriter or broker-dealer regarding the sale of the resale shares. There is no underwriter or coordinating broker acting in connection with the proposed sale of the resale shares by the Selling Stockholders.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the shares may be resold by the Selling Stockholders without registration and without regard to any volume limitations by reason of Rule 144(e) under the Securities Act or any other rule of similar effect or (ii) all of the shares have been sold pursuant to the prospectus or Rule 144 under the Securities Act or any other rule of similar effect. The resale shares will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale shares may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

Under applicable rules and regulations under the Exchange Act, any person engaged in the distribution of the resale shares may not simultaneously engage in market making activities with respect to the Common Stock for the applicable restricted period, as defined in Regulation M, prior to the commencement of the distribution. In addition, the Selling Stockholders will be subject to applicable provisions of the Exchange Act and the rules and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of shares of the Common Stock by the Selling Stockholders or any other person. We will make copies of this prospectus available to the Selling Stockholders and have informed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale.

**Annex B**

## LIBERTY SILVER CORP.

### Selling Security Holder Notice and Questionnaire

The undersigned beneficial owner of common stock, par value $0.001 per share (the "Common Stock"), of Liberty Silver Corp., a Nevada corporation (the "Company"), (the "Registrable Securities") understands that the Company has filed or intends to file with the Securities and Exchange Commission (the "Commission") a registration statement on Form S-3 (the "Registration Statement") for the registration and resale under Rule 415 of the Securities Act of 1933, as amended (the "Securities Act"), of the Registrable Securities, in accordance with the terms of the Registration Rights Agreement, dated as of _____ ___, 2011 (the "Registration Rights Agreement"), among the Company and the Purchasers named therein.  A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below.  All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Registration Rights Agreement.

Certain legal consequences arise from being named as a selling security holder in the Registration Statement and the related prospectus.  Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling security holder in the Registration Statement and the related prospectus.

### NOTICE

The undersigned beneficial owner (the "Selling Security Holder") of Registrable Securities hereby elects to include the Registrable Securities owned by it and listed below in Item 3 (unless otherwise specified under such Item 3) in the Registration Statement.

*15*

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate:

## QUESTIONNAIRE

**1.**          **Name.**

      (a)          Full Legal Name of Selling Security Holder

_____

      (b)          Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Securities Listed in Item 3 below are held:

_____

      (c)          Full Legal Name of Natural Control Person (which means a natural person who directly or indirectly alone or with others has power to vote or dispose of the securities covered by the questionnaire):

_____

**2. Address for Notices to Selling Security Holder:**

_____
_____
_____
Telephone:
Fax:
Contact Person:

**3. Beneficial Ownership of Registrable Securities:**

      (a)          Type and Principal Amount of Registrable Securities beneficially owned:

_____
_____
_____

*16*

**4. Broker-Dealer Status:**

    (a)    Are you a broker-dealer?

                    Yes     No

    (b)    If "yes" to Section 4(a), did you receive your Registrable Securities as compensation for investment banking services to the Company.

                    Yes     No

Note:    If no, the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

    (c)    Are you an affiliate of a broker-dealer?

                    Yes     No

    (d)    If you are an affiliate of a broker-dealer, do you certify that you bought the Registrable Securities in the ordinary course of business, and at the time of the purchase of the Registrable Securities to be resold, you had no agreements or understandings, directly or indirectly, with any person to distribute the Registrable Securities?

                    Yes     No

Note:    If no, the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

**5. Beneficial Ownership of Other Securities of the Company Owned by the Selling Security Holder.**

*Except as set forth below in this Item 5, the undersigned is not the beneficial or registered owner of any securities of the Company other than the Registrable Securities listed above in Item 3.*

    (a)    Type and Amount of Other Securities beneficially owned by the Selling Securityholder:

_____

_____

*17*

**6. Relationships with the Company:**

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (owners of 5% of more of the equity securities of the undersigned) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

State any exceptions here:

_____

_____

The undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Registration Statement remains effective.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items 1 through 6 and the inclusion of such information in the Registration Statement and the related prospectus and any amendments or supplements thereto. The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Registration Statement and the related prospectus.

IN WITNESS WHEREOF the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated:                                              Beneficial Owner:

                                                    By:
                                                        Name:
                                                        Title:

**PLEASE FAX A COPY OF THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE, AND RETURN THE ORIGINAL BY OVERNIGHT MAIL, TO:**

*18*