**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO.: 9:13-cv-80923-KLR**

TODD STANAFORD a/k/a JERALD TODD
STANAFORD, on behalf of himself and all
others similarly situated,

      Plaintiff,

vs.                                    Oral Argument Requested

ROBERT DONALD BRUCE GENOVESE,
WILLIAM TAFURI, GEOFFREY BROWNE,
BG CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC. LIBERTY
SILVER CORPORATION AND OUTLOOK
INVESTMENTS, INC.,

      Defendants.

**MEMORANDUM IN SUPPORT OF MOTION**
**TO DISMISS BY ROBERT GENOVESE,**
**BG CAPITAL GROUP LTD, LOOK BACK INVESTMENTS,**
**INC. AND OUTLOOK INVESTMENTS, INC.**

Thomas O. Gorman
Chimera N. Thompson
Dorsey & Whitney LLP
1801 K Street, N. W., Suite 750
Washington, D. C.  20006
Telephone:  202-442-3000
Fax: 202-442-3199
Gorman.tom@dorsey.com
thompson.chimera@dorsey.com

Date:  October 6, 2014

# TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................................................1

II.    Background ................................................................................................................4

III.    The Complaint ..........................................................................................................7

IV.    Argument…................................................................................................................8

        A.    The Elements of a Section 10(b) claim ...........................................................9

        B.    Standard of Review...........................................................................................9

        C.    The claimed pump-and-dump scheme is not plausible…................................9

                1.    The elements of a pump-and-dump scheme ........................................10

                2.    Rule 8(a) requires the complaint be plausible ....................................10

                        a)    Only well-pleaded facts considered, not unsupported conclusions..........11

                        b)    The scheme here fails the plausibility test ...................................15

        D.    Plaintiffs have not pleaded facts establishing reliance on a U.S. exchange ................17

        E.    The Complaint impermissibly lumps all of the defendants together, failing to plead specific facts as to each defendant ...................................................................20

        F.    Plaintiffs have failed to plead specific facts demonstrating that Mr. Genovese, BG Capital, Look Back or Outlook made false statements...................................................24

                1.    Outlook and Look Back:  No false statement ...................................24

                2.    Robert Genovese:  No false statement ................................................24

                3.    BG Capital:  No false statement .......................................................27

                4.    Lumping all claims against all defendants together still results in dismissal because the additional claims are not supported by the specific facts required by Rule 9(b) and Exchange Act Section 21D ...................................................29

        G.    Plaintiffs have failed to plead facts establishing a strong inference of scienter..........32

        H.    Plaintiffs have failed to plead facts establishing loss causation ...................................36

I.      **Introduction**

Robert Genovese, through Outlook Investments Inc. ("Outlook") and Look Back

Investments, Inc. ("Look Back"), affiliates of hedge fund, BG Capital Group LTD ("BG Capital"),

is a long-term investor in Liberty Silver Corporation ("Liberty" or "Liberty Silver"), a proven silver

mining company headquartered in Toronto, Ontario.  Since at least early 2011, Outlook and Look

Back have invested in Liberty through both a $3.6 million 2011 private placement of unregistered

securities and open market purchases of shares, disclosed at the time on the SEC website.

Liberty Silver, since 2010, has implemented a long-term development program for its silver

and mineral properties.  The firm recruited a team of highly experienced, prominent Canadian

business executives to implement its development plan.  The plan has been funded through a series

of private placements, selling packages of restricted securities to investors such as Outlook.

In November 2012, Liberty planned to continue raising development capital with another

private placement of securities.  It was an opportune time since the price of silver was up

significantly, increasing the value of its assets and shares.  A temporary trading suspension by the

Securities and Exchange Commission ("SEC") and the Ontario Securities Commission ("OSC")

engendered by questions regarding the increasing interest in, and trading of, its securities halted the

plan – Liberty is not a U.S. reporting company so stock holders are not required to file disclosure

reports such as a Schedule 13D if 5% or more of the stock is acquired.  Nevertheless, Liberty

continued with its development plan with a $1 million loan from BG Capital.

In contrast with these undisputed facts, Plaintiffs claim the defendants collectively engaged

in a market manipulation scheme just prior to the planned November capital raise – a plan that

would have destroyed the value of Liberty's securities.  Its predicate – not the detailed facts required

by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act

("PSLRA") – but a series of fact devoid, contradictory claims drawn largely from an unsigned

internet post and confidential witnesses who do not claim to have first-hand knowledge for their key assertions. Threading conclusions through the Third Amended Consolidated Class Action Complaint ("Complaint") – really the fourth attempt at a complaint – such as "pump-and-dump," "nominees," and "forced down people's throats," plaintiffs attempt to portray a complex market manipulation scheme.

Their effort fails. Tellingly absent from the Complaint are the specific facts necessary to build an exchange based market manipulation scheme such as: facts showing coordinated, matched orders and wash sales by defendants as a group to boost the share price to artificial heights; facts establishing a coordinated fraudulent advertising campaign to dupe investors to buy at false prices; facts demonstrating that the exchange price for Liberty shares was artificial; and facts establishing a coordinating dumping of Liberty shares by the defendants to reap manipulation profits.

Tellingly absent are the detailed facts necessary to plead an Exchange Act Section 10(b) and Rule 10(b)5 cause of action for fraud.[1] Plaintiffs fail to plead, for example, facts establishing materially false statements by Mr. Genovese, BG Capital, Look Back, Outlook or any defendant. Substituted are claims such as an assertion that a BG Capital press release voluntarily announcing an interest in Liberty is false because it suggested the share acquisition was recent – a point flatly refuted by the plain text of the release; and a claim that a Liberty tender offer was a sham, supported only by the unsurprising opposition statements of the target's management who would have been fired if the deal closed. These are not the building blocks of a fraud claim.[2]

Equally problematic for plaintiffs is their failure to plead detailed facts establishing the critical element of reliance. While this fourth attempt at a complaint claims to rely on the fraud-on-

---

[1] *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341 (2005) (defining elements of a claim).

[2] *See Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1238 (11th Cir. 2008) (discussing requirements to plead a securities fraud claim).

the-market theory, it wholly fails to detail facts establishing that the purchases were made on a U.S. exchange that is efficient – even the named plaintiffs do not state that their shares were acquired on such an exchange.[3]  No facts are pleaded demonstrating that, when the Complaint is considered as a whole, there is a strong, cogent inference that Mr. Genovese, BG Capital, Look Back, Outlook and each defendant acted with scienter – that is, either intent to deceive or severe recklessness.[4]  And, no facts are pleaded establishing that the truth about the claimed manipulation emerged after the price drop to establish loss causation.[5]

These critical facts are absent for good reason – there was no manipulation.  Not only does the Complaint lack the factual specificity required to plead a securities fraud claim under FRCP 8(a) and 9(b) and the PSLRA, it is inherently inconsistent, flatly contradicted by Outlook's trading, and economically irrational.  Contradictory because it claims plaintiffs planned a November securities sale but just before that ran a manipulation scheme that would destroy the value of those securities.  Contradicted because Outlook sold stock during the claimed pump, when it should have bought, and Outlook bought during the claimed dump, when it should have sold to get manipulation profits.  Economically irrational because the so-called scheme would destroy the significant share holdings of each defendant.  In the end, plaintiffs have failed to plead a claim for relief in accordance with FRCP 9(b) and the PSLRA, or even Rule 8(a) – they have posited an implausible scheme, an illusion.[6]  The Complaint should be dismissed.

---

[3]  *See Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 269-70 (2010) (purchase/sale must be on U.S. exchange); *Basic v. Levinson,* 465 U.S. 224, 246-47 (1988) (must establish that stock traded in an efficient market to invoke fraud-on-the-market presumption).

[4]  *See Tellabs, Inv. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007) (complaint as a whole must support strong inference of scienter).

[5]  *See Dura,* 544 U.S. at 342-43.

[6]  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 564-66 (2007).

## II.     Background

Liberty Silver was formed as a mineral exploration company in 2007.  The company acquired interests in the Trinity Project, a tract of mining property in Nevada, which had previously produced about 6.5 million ounces of silver [App. 445-572 [Technical Report]], under an earn-out agreement, executed on March 29, 2010.  It required that the Company invest $5 million in exploration on the property over a period of six years and obtain a bankable feasibility study by March 29, 2017.  Liberty's shares were quoted in the U.S. through the over-the-counter bulletin board or OTC BB.[7]

In 2010, Liberty revamped its management, recruiting a blue chip management team with deep mining, management and financial expertise (Cmplt. Par. 104).  Liberty also began raising the capital necessary to develop Trinity by monetizing its securities.  Beginning in July 2011, and continuing through October 2012, the company raised over $5.3 million through private sales of unregistered securities to firms such as Outlook, which invested $3.6 million.  App. 237, 260 [LS 2012 Form 10-K, Item 15, No. 10.12]; App. 574-613 [LS 2011 Form 8-K].  Liberty also moved forward with its development plans:

- **Technical Report:**  On December 21, 2011, the company filed the Technical Report with the OSC, disclosing a comprehensive description of Trinity and the mineral properties.

---

[7]  App. 265-266 [2013 LS Form 10-K at 3-4].  The facts in this section are taken from documents cited in, or relied upon, but not attached to, the Complaint, as well as filings made with the SEC and/or OSC unless otherwise noted.  The documents are included in an appendix filed under separate cover and cited as "App." with a bracketed description of each document for ease of reference.  On a motion to dismiss, the Court can consider materials cited in the complaint, as well as those of which it can take judicial notice, such as regulatory filings. *Tellabs*, 551 U.S. at 322; *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 631 n.5 (11th Cir. 2010) (trial court may take judicial notice of relevant SEC filings in matters involving allegations of violations of securities laws); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (deal documents central to complaint considered); *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002) (taking judicial notice of AP article); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (taking judicial notice of SEC filings); *Hubbard v. BankAtlantic Cancorp, Inc.*, 625 F. Supp. 2d 1267, 1279-80 (S.D. Fla. 2008) (taking judicial notice of SEC filings and other documents incorporated into the complaint); *Malin v. Ivax Corp.*, 17 F. Supp. 2d 1345, 1351-52 (S.D. Fla. 1998) (considering financial documents filed with the SEC in ruling on Defendants' motion to dismiss).

App. 445-572 [Technical Report].

- **TSX listing:**  The firm obtained a listing for its shares on the Toronto Stock Exchange ("TSX").  App. 83-86 [LS release, Dec. 21, 2011].

- **New drilling program:**  On January 25, 2012, a new drilling program was announced. App. 87-88 [LS release, Jan. 25, 2012].

- **Survey results:**  In May 2012, the firm announced the results of surveys it conducted on the properties, noting it had been "successful in locating significant new drilling targets," and that "[a] possible northern extension of the Trinity silver deposit [was] hypothesized based upon the gravity survey."  App. 89-91[LS release, May 22, 2012].

- **Drilling results:**  In July, Liberty disclosed the successful results from the first phase of the drilling program, noting it had drilled "eighteen vertical drill holes . . ." in addition to the 395 holes previously drilled.  The new holes "identifie[d] significant grade silver mineralization outside the NI 43-101 [App. 445-572 [Technical Report]] resource zone and increase[d] confidence in the Trinity Silver Project."  App. 92-99 [LS release, July 9, 2012].

- **Tender offer:**  On July 16, 2012, Liberty announced a tender offer for Canadian junior mineral exploration company, Sennen Resources Ltd. ("Sennen").  App. 100-102 [LS release, July 16, 2012].  Sennen's principal asset was about $14 million in cash.  App. 140-145 [Sennen opposition].  Sennen shareholders would be paid a significant premium to market in Liberty shares and gain the expertise and experience of Liberty's board which had skin in the game, holding about 30% of the outstanding company stock.  The Liberty board would have replaced that of Sennen.  App. 101 [LS release, July 16, 2012].  The bid was unsuccessful.

- **Drilling results:**  On a July 24, 2012 the firm announced the second phase of the "Trinity 2012 drilling program," disclosing that SRK Consulting., Inc. ("SRK"), a highly respected consulting firm, had been retained to:  1) investigate the feasibility of "mining and heap-laching the oxide silver resource defined by . . ." the Technical Report; 2) develop a timeline to begin leaching; and 3) provide a preliminary projection of capital costs.  In addition, the company retained JBR Environmental to begin the permitting process for mine development.  App. 103-105 [LS release, July 24, 2012].

- **Acquired Hi Ho properties:**  On August 8, 2014, Liberty announced an agreement to acquire the Hi Ho Silver Property, a 100 acre tract adjacent to Trinity and "the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. ("Renaissance") on the Trinity land package."  App. 110 [LS release, Aug. 8, 2012].  The transaction was funded largely with Liberty Silver stock and the "total consideration . . . [was] applied to Liberty Silver's expenditure commitment under its earn-in agreement with Renaissance . . . [which resulted in Liberty having] contributed in excess of 85% of its required US$5 million expenditure commitment to earn its 70% interest in the [Trinity] project."  App. 110 [LS release, Aug. 8, 2012].

In September, just weeks ahead of Liberty's planned November capital raise, the price of silver

was climbing significantly, adding to the value of Liberty's assets and securities and drawing new investors to the firm.[8]  In August, and even the first part of September, its share price had remained largely flat.  App. 422-435 [Share Price].  Outlook had been selling shares since late August, although it still had substantial holdings.  *See* App. 437-444 [share holdings]; App. 405-407 [article: not unusual for large shareholder to sell part of stake].  Later in the month, the share price started to mimic the increasing price of silver.  *See* App. 436 [Silver Prices].

Mr. Genovese, previously contacted by longtime acquaintance Avi Mirman, then head of investment banking at Wall Street brokerage, John Thomas Financial ("JTF") (Cmplt. Par. 55),[9] held meetings at the firm, at times with Liberty executives, to promote the company.  (Cmplt. Par. 55, 60, 68).  He also participated in a conference and dinner with Liberty executives, again to promote the firm (Cmplt. Par. 71).  That dinner and conference probably took place during the Toronto Resource Investor Conference sponsored by Liberty and other firms on September 27 and 28, 2012.[10]  The September meetings followed an August 28, 2012, BG Capital press release, which

---

[8]  *See* App. 436 [Silver Prices] is a chart depicting the price of silver during the period taken from www.kitco.com.  App. 422-435 [Share Price] is the share price of Liberty Silver as quoted on the OTC BB during the same period, taken from Bloomberg.  The Court may take judicial notice of such market statistics.  *See La Grasta v. First Union Sec.*, 358 F.3d 840, 842 (11th Cir. 2004) (stock prices are not subject to reasonable dispute, and are proper subject for judicial notice); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (taking judicial notice of stock prices in considering motion to dismiss § 10(b) claim); *Waterford Twp. Gen. Emp. Ret. Sys. v. SunTrust Banks, Inc.*, 2010 U.S. Dist. LEXIS 85755, at *15 n.1 (N.D. Ga. Aug. 19, 2010) (same); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) (same).

[9]  At the time, JTF was a reputable Wall Street brokerage house.  Its founder frequently appeared on CNBC as a commentator and was in the feature film, "Wall Street, Money Never Sleeps."  App. 333-357 is a series of articles about the firm cited only as background.  Later, as the Complaint notes, the firm encountered regulatory difficulties with the SEC and FINRA (Cmplt. Par. 54 n.3, Par. 56 n.5).  *In the Matter of John Thomas Capital Mgmt. Group LLC, et al.,* Adm. Proc. File No. 3-15255 (Filed March 22, 2013); *see also* Press Release:  FINRA Files Complaint Charging John Thomas Financial, CEO (April 15, 2013), *available at* http://www.finra.org/newsroom/newsreleases/2013/p241455.

[10]  Cambridge House, the sponsor of the conference, has a website at www.cambridgehouse.com.  These conferences are opportunities for firms to attract investors.  A similar conference was the

voluntarily disclosed that the firm had an interest in Liberty.  At the end of the month, BG Capital published a second release discussing Liberty and its projects.  App. 78-80 [BG Capital release, Aug. 28, 2012]; App. 81-82 [BG Capital release, Sept. 27, 2012].

As the price of silver continued to climb, the well-known Goldstocktraders blog published "Why Are the Silver Miners Outperforming?", which commented favorably on Liberty.  (Cmplt. Par. 103).  When the Toronto conference concluded, one attendee, author James West, published an article favorably analyzing Liberty in terms of the increasing price of silver (Cmplt. Par. 104).

In late September, Outlook sold a block of 6.6 million shares to JTF clients, according to plaintiffs (Cmplt. Par. 74), apparently off-exchange.  The firm then began purchasing Liberty shares at increasing market prices.  In the wake of the rising share price and increasing trading activity, the SEC and OSC temporarily halted trading on October 6, 2012.  App. 1, 19-20 [SEC order/OSC order].  The Liberty share price crashed.  Later in October, trading resumed in the U.S. in the grey market and on the TSX in Canada.  App. 119 [LS release, Oct. 19, 2014].  The company, nevertheless, continued with its development plans, although it was unable to do the planned November capital raise.  The next year, BG Capital loaned the firm $1 million.  App. 136 [LS release, Oct. 4, 2013].  Look Back and Outlook continue to be substantial shareholders.

## III.    The Complaint

Plaintiffs' Complaint alleges securities fraud in violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder using a fraud-on-the-market theory.  A second claim, derivative of the first, is based on control person liability under Exchange Act Section 20(a).

The Complaint centers on an alleged pump-and-dump stock exchange manipulation scheme, which is claimed to have occurred from February 10, 2010 through October 5, 2012 (Cmplt. Par. 2).

---

annual Silver Summit held on October 25, 2012 in Wallace, Idaho.  App. 374-383 [Toronto conference; Silver Summit].  These materials are attached only for background.

The supporting allegations are based largely on an anonymous post sold on the internet (Cmplt. Par. 19-40)[11] and seven confidential witnesses.  It asserts seven key claims (Cmplt. Par. 116); App. 358-373 [internet post]:

- **Exaggerated resources:**  The defendants exaggerated the resources of Liberty Silver;

- **Ploy tender offer:**  The Sennen tender offer was a "ploy;"

- **Not independent:**  Defendant BG Capital issued press releases in conjunction with Goldstocktraders blog and publisher, James West, in a manner which appeared that each release was independent when it was not;

- **Baseless promotions:**  "Defendants offered wholly self-serving and largely baseless promotions of Liberty Silver;"

- **Trading statistics:**  Defendants "pointed to the increased trading volume and increased stock price as emergent market responses when they were the results of JTF's unethical sales tactics and/or were sells effectuated by Genovese and his many proxies;"

- **Concealed 5% holdings:**  The defendants concealed the number of shares controlled by Mr. Genovese by ignoring SEC requirements to file disclosure documents about them; and

- **JTF boiler room:**  The defendants manipulated the share price of Liberty through JTF.

The Complaint does not plead detailed facts about manipulative exchange trading by Mr. Genovese, BG Capital, Look Back, Outlook or any defendant.  The scheme ended, according to the Complaint, with the trading halt by the SEC and the OSC (Cmplt. Par. 139).  The truth emerged about the claimed pump-and-dump manipulation, according to plaintiffs, from the trading halt and a series of news articles that fail to discuss a manipulation.

## IV.   Argument

### The Complaint Fails to Present a Plausible Claim or Plead Specific Facts Supporting the Elements of a Section 10(b) Claim and Should Be Dismissed.

Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failing to state a claim upon which relief can be granted for five reasons:  1) the scheme is not plausible; 2) plaintiffs fail to establish reliance on an efficient U.S. exchange; 3) the

---

[11]  A copy of the internet post is attached hereto at App. 358-373.

complaint fails to plead specific facts establishing a false statement; 4) the complaint fails to establish a strong inference of scienter; and 5) the complaint fails to establish loss causation.

**A.      The Elements of a Section 10(b) claim**

The Complaint attempts to allege a cause of action under Exchange Act Section 10(b) and Rule 10(b)-5 for securities fraud.[12]  Accordingly, plaintiffs have the burden of pleading facts to establish six key elements:  1) a material misrepresentation or omission; 2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.[13]

**B.      Standard of Review**

On a motion to dismiss under Rule 12(b)(6), the well pleaded allegations of the complaint must be assumed to be true.  Assumptions, conclusions and unsupported allegations must be disregarded.  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("conclusory statements, do not suffice"); *Twombly,* 550 U.S. at 555; *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." ).  Any allegations that fail to comport with the requirements of FRCP 8(a) and 9(b) and the heightened pleading requirements of Exchange Act § 21D must be disregarded.  *See Findwhat,* 658 F.3d at 1299.

**C.      The claimed pump-and-dump scheme is not plausible**

Plaintiffs' complaint centers on a claimed pump-and-dump scheme (Cmplt. Par. 2).  The scheme  was supposedly conducted by the defendants as a group, with BG Capital and Liberty making false statements attributed to each defendant (Cmplt. Par. 115, 116), and implemented

---

[12]  Plaintiffs also allege an Exchange Act Section 20(a) claim, which is derivative of the Section 10(b) claim.  If the Section 10(b) claim fails, the Section 20(a) claim also fails.  *Mizzaro v. Home Depot,* 544 F.3d 1230, 1237 (11th Cir. 2008).

[13]  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 128 S.Ct. 761, 768 (2008); *Dura,* 544 U.S. at 341; *Findwhat Inv. Group v. Findwhat.com,* 658 F.3d 1282, 1295 (11th Cir. 2011).

through JTF (Cmplt. Par. 116).  The claim fails the Rule 8(a) plausibility test since it is flatly contradicted by admissions in the Complaint and the securities transactions of Outlook, and since it is economically irrational.

### 1.    The elements of a pump-and-dump scheme

Pump-and-dump schemes are a form of market manipulation on an exchange and typically involve a shell company in which the manipulators have acquired control of the stock for little or no investment.  In the "pump" phase of the scheme, the manipulators drive the price of the stock up through manipulative, coordinated trading such as wash sales and matched orders.  *SEC v. Curshen,* 888 F. Supp. 2d 1299, 1301 n.3 (S.D. Fla. 2012) (pump-and-dump schemes involve pushing up share price of shell company using matched orders and wash sales), *aff'd U.S. v. Curshen,* 2014 U.S. App. LEXIS 9764, at *2 (11th Cir. May 28, 2014).  A barrage of false publicity through e-mail, websites and other media is deployed to draw investors to the stock, which is priced at an artificial level.  In the "dump" phase, the manipulators sell their shares into the rising and manipulated price.  When the manipulation is over, the stock price crashes, leaving investors with worthless stock, the firm with its reputation tattered to the extent it had one, and the manipulators with large profits from trading.[14]

### 2.    Rule 8(a) requires the complaint be plausible

To properly plead a Section 10(b) claim, plaintiffs must first meet the standards of FRCP 8(a).  That Rule requires plaintiff to prepare a complaint which details a plausible claim

---

[14] *See, e.g., U.S. v. Gordon*, 710 F.3d 1124, 1128 n.2 (10th Cir. 2013) (detailing pump-and-dump schemes which leave stock worthless); *U.S. v. Zolp,* 479 F.3d 715, 716 n.1 (9th Cir. 2007) (same); *U.S. v. Newman,* 74 Fed. App'x. 126, 127 (2d Cir. 2003) (same); *see also SEC v. Galas,* No. 14-cv-5621 (W.D. Wash. Filed Aug. 5, 2014) (SEC complaint alleging four pump-and-dump schemes built on coordinated trading and wash sales and matched orders) (attached hereto at App. 47-77).  *See generally,* SEC Investor Warning:  Pump-and Dumps and Market Manipulations, available at www.sec.gov/answers/pumpdump.htm (describing typical pump-and-dump scheme).  App. 573.

demonstrating a right to the relief sought. *Iqbal*, 556 U.S. 662; *Twombly*, 550 U.S. 544. Plausible means that the plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a violation is *plausible*, not just possible. *Id.*

In assessing plausibility, *Twombly* and *Iqbal* mandate a two-step process. First, the court must set aside all conclusions that are merely recitations of the elements of a claim or which are not supported by specific facts.[15] Second, the court must utilize its experience to assess the overall claim and determine if it plausibly sets forth a claim which, if the facts are established, would entitle the pleader to relief. This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense . . . where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief,'" it must be dismissed. *Iqbal*, 556 U.S. at 679, quoting FRCP 8(a)(2).

### a)    Only well-pleaded facts considered, not unsupported conclusions

The first step in applying *Iqbal-Twombly* is to eliminate assertions such as "knew of, condoned, and willfully and maliciously agreed," and "principal architect" and "instrumental." *Id.* at 680. Eliminated here are conclusory and unsubstantiated allegations such as: This is a "pump-and-dump" scheme (CW6, Par. 70 using "nominee assets" (Cmplt. Par. 4)); stock was "forced down people's [client's] throats" (CW6, Cmplt. Par. 70); Liberty stock was "jammed down our [JTF]

---

[15] *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (in assessing plausibility, the court's "first task is to eliminate any allegations in Plaintiffs' complaint that are merely legal conclusions.").

threats" (CW1, Cmplt. Par. 56); "Genovese regularly runs cons" (CW2, Cmplt. Par. 62); and Mr.

Genovese was "manipulating the stock" (CW6, Cmplt. Par. 76).[16]

    Likewise, items such as an unsigned for-sale internet post whose sources of information are

completely unknown[17] and the claims by CW1, 2, 6 and 7, which are unsupported conclusory claims

---

[16] Other unsupported conclusions include:  An "estimate" with no supporting facts that Mr. Genovese "sourced" 80 to 90% of Liberty stock (CW6, Cmplt. Par. 76); an estimate that JTF traded 5.6 million shares of Liberty stock supposedly based on documents that were not attached or even quoted in the Complaint and without describing the basis for or the manner in which the estimate was made (CW7, Cmplt.  Par.78); a claim that "pump-and-dump" was conducted based on "information and belief" without specifying the underlying facts (fired JTF brokers who refused to be interviewed, Cmplt. Par. 65); and an unsupported conclusion that "Defendant Genovese used Beliests and John Thomas Financial to artificially inflate the stock price. . ." (Cmplt. Par. 66); a list of conclusory bullet points summarizing plaintiffs' claims and conclusions and alleged to be "information [that] became clear" or "the truth emerged" after the trading suspension (Cmplt. Par. 120); and conclusory claims of "additional scienter allegations" (Cmplt. Par. 136-138) that are actually a summary of earlier conclusions such as "Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information they caused to be disseminated . . ." (Cmplt. Par. 136) and "Genovese has effected pump-and-dump schemes upon numerous other companies previously" (Cmplt. Par. 137) taken from the anonymous internet posting.  *See* App. 358-373 [Internet Posting].

[17] *See In re AOL, Inc. Repurchase Offer Litig.*, 966 F. Supp. 2d 307, 314 (S.D.N.Y. 2013) (rejecting allegations based on internet blog post where complaint failed to plead facts showing that blogger had first or second hand knowledge of matters in question); *Greenberg v. Cooper Cos.*, 2013 WL 2403648 (N.D. Cal. May 31, 2013) (similar); *In re Apollo Group*, 2011 U.S. Dist. LEXIS 12478, at *1 (D. Ariz. Oct. 27, 2011) ("[T]he only appreciable difference that the Court can ascertain between anonymous internet postings and confidential witness statements is that anonymous internet postings are less reliable than confidential witness statements."); *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 630-31 (S.D.N.Y. 2008) (refusing to consider allegations based on an anonymous blog post where plaintiffs failed to show why the source would have been likely to know the relevant facts); *Pittleman v. Impac Mortgage Holdings, Inc.*, 2008 WL 4809962 (C.D. Cal. Oct. 6, 2008) *aff'd on other grounds* (refusing to consider allegations based on statements made by anonymous bloggers as unreliable); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) ("Plaintiffs' reference to anonymous messages posted by unidentified and, perhaps, unidentifiable [source] cannot pass muster."); *see also In re Sunterra Corp. Sec. Litig*, 199 F. Supp. 2d 1308, 1325 (M.D. Fla. 2002) (claims based on emails from unnamed source lacked specificity and indicia of reliability necessary to satisfy PSLRA requirements); *Damian v. Montgomery County Bankshares, Inc.,* 2013 U.S. Dist. LEXIS 159771, at *17-18 (N. D. Ga. 2013) ("[P]laintiff must set forth sufficient information about the documents in the complaint to allow both the court and the defendants to understand the foundation or basis for the plaintiff's belief.") (internal citations omitted).

and are not based on first-hand knowledge, should be set aside.[18]  Where the proffered claims are contradictory or legally incorrect, they should also be set aside.[19]

Here, the claims by the confidential witnesses are contradictory, legally incorrect and not supported by facts demonstrating that the witnesses had personal knowledge of the claimed events. For example, the claim by CW1, 6 and 7 that Mr. Genovese lied about being a control person of Liberty Silver (Cmplt. Par. 56, 57, 75, 80) and the conclusion that he should have filed a Schedule 13D (Cmplt. Par. 80, fn. 9) are incorrect as a matter of law.[20]  That requirement only applies to issuers whose shares are registered under Exchange Act Section 12.  *See* Exchange Act Section 13(d).[21]

---

[18] *Mizzaro,* 544 F.3d at 1240, 1249 (weight given to confidential witness depends on facts pled which "fully describes the foundation or basis of the confidential witness's knowledge" and rejecting statement from such witness where the person did not explain the basis for the claimed knowledge); *Mogensen v. Body Cent. Corp.,* 2014 U.S. Dist. LEXIS 56747, 14 (M.D. Fla. 2014) (confidential witness must have personal knowledge); *Durham v. Whitney Info. Network, Inc.,* 2009 U.S. Dist. LEXIS 113757 at 13 (M.D. Fla. 2009) (no facts pleaded demonstrating that confidential witness employed at company had firsthand knowledge); *see also City of Livonia Employees' Retirement System, et al. v. Boeing Co., et al.,* 711 F.3d 754, 759 (7th Cir.) ("Allegations concerning . . . unnamed confidential sources of damaging information require a heavy discount.  The sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent—a gimmick for obtaining discovery costly to the defendants and maybe forcing settlement or inducing more favorable settlement terms.").

[19] *See Calhoun v. U.S.,* 2010 U.S. Dist. LEXIS 85100, at *10 (N.D. Fla. 2010) (facts not assumed to be true on motion to dismiss where they are internally inconsistent); *ASA Accugrade, Inc. v. Am. Numismatic Ass'n,* 370 F. Supp. 2d 213, 216 n.4 (D.D.C. 2005) (dismissing allegation that was "implausible on its face"); *DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 56-57 (1st Cir. 1999) (dismissing "implausible conclusory assertion").

[20] A Schedule 13D is not filed to disclose "control."  Rather, Section 13d, added to the Exchange Act as part of the 1968 Williams Act Amendments regarding take-overs, is an early warning alert for issuers of a possible take-over.  *See, e.g., GAF Corp. v. Milstein,* 453 F.2d 709, 716-717 (2d Cir. 1971), *cert. denied,* 406 U.S. 910 (1972); *CSX Corp. v. The Children's Inv. Fund Mgmt. (UK), LLP,* 502 F. Supp. 2d 511, 538-48 (S.D.N.Y. 2008), *aff'd CSX Corp. v. The Children's Inv. Fund Mgmt. (UK), LLP,* 292 Fed. App'x 133 (2d Cir. 2011).

[21] That Section provides that "Any person who, after acquiring directly or indirectly the beneficial ownership of an equity security . . . registered pursuant to section 12 of this title  . . . [and is the owner of] more than 5 per centum of such class shall, within ten days . . ." file a Schedule 13D with

Since Liberty Silver's shares are not registered under Exchange Act Section 12, the filing requirement does not apply to holders of its shares. App. 199 [2012 Form 10-K, cover].  The unreliability of these claims, and the lack of any predicate for the knowledge of the witnesses, is highlighted by CW1's claim that JTF had to refile unspecified regulatory papers after discovering the issue (Cmplt. Par. 57).  Since the obligation to file a Schedule 13D is imposed on the security purchaser under Exchange Act Section 13d and not the broker, just what, if any, papers were initially prepared at JTF and then later re-filed is unclear.  What is clear is that these witnesses made statements that make no sense and are legally incorrect.

Similarly, the claim by CW1 that no due diligence was done (Cmplt. Par. 56) regarding any possible client transactions by JTF brokers, about which the head of compliance supposedly wrote a memorandum – without attaching or even quoting the document – is flatly contradicted by CW2. That witness states that, at a meeting attended by Mr. Genovese, the JTF brokers, CW1 and CW2, Mr. Mirman represented that he conducted the necessary inquiry (Cmplt Par. 61).  *See Calhoun,* 2010 U.S. Dist. LEXIS 85100, at *10 (facts not assumed to be true on motion to dismiss where they are internally inconsistent).[22]

---

the SEC.

[22]  Other claims by these witnesses also lack any indicia of reliability.  The assertion by CW6, for example, regarding a $2 million loan to the holding company of JTF (Cmplt. Par. 69) that was never repaid "to his/her knowledge" (Cmplt. Par. 69), or a claimed "quid pro quo" between the owner of JTF and Mr. Genovese (Cmplt. Par. 69), have no apparent basis and are wholly unsubstantiated. Neither CW6 nor CW1 specify how they learned the claimed facts.  Transactions with the holding company would not have been within the obligations of CW6 as head of investment banking or CW1 as a compliance department employee.  In this regard, it is noteworthy that while CW6 claims to have been in meetings with Mr. Genovese, he/she neither cites Mr. Genovese as a source of information, nor claims to have spoken to anyone with the holding company or to have seen the deal documents.  Likewise, the claim of CW1 that numerous employees were discussing such an arrangement (Cmplt. Par. 56), or that a fragment of an e-mail not attached to the Complaint suggested that the loan was never intended to be repaid (Cmplt. Par. 69), fail to identify the source of the information, other than possible rumors or, at best, an unidentified conversation about a deal that may have been discussed but was never completed or concluded.  Rumors, speculation and

### b)        The scheme here fails the plausibility test

The scheme here is not plausible for three reasons:  1) Admissions in the Complaint contradict the hypothesized scheme; 2) it is completely undermined by the trading, particularly that of Outlook; and 3) it is economically irrational.

First, the scheme is contradicted by admissions in the Complaint.  Plaintiffs repeatedly admit that Liberty was planning to continue its long-term business plan by raising additional capital in November 2012 (Cmplt. Par. 73, 81,136) – and the increasing price of silver would have facilitated that.  *See* App. 436 [Silver Prices].  Rendering the stock worthless through a pump-and-dump scheme is directly contrary to those plans – no rational investor would invest in the securities of a firm whose shares were just manipulated.  The Complaint is thus inherently contradictory.

Second, the lack of facts in the Complaint about trading and the transactions of Outlook completely undermine Plaintiffs' manipulation claim.  The hallmark of a pump-and-dump scheme is the trading – coordinated manipulative market transactions to create an artificial price during the pump and massive selling by the manipulators during the dump to reap manipulation profits.  Here, there are no facts pleaded about such actions – the necessary building blocks used to create an artificial price for a pump-and-dump scheme.  *See Curshen,* 888 F. Supp. 2d at 1301 n. 3; *Zolp,* 479 F.3d at 716 n.1; *Newman,* 74 Fed. App'x. at 127.  Indeed, there are no specific facts demonstrating that the defendants or anyone else engaged in transactions that created an artificial price for Liberty shares.  The repeated claims in the Complaint that shares were forced on everyone by JTF– the brokers and their clients – focus on selling shares, not manipulative trading on an exchange, which is the claim here.

---

contradictory claims are not a substitute for the firsthand knowledge required of a confidential witness.  *Mizzaro,* 544 F.3d at 1240, 1249; *In re Theragenics Corp. Sec. Litig.,* 137 F. Supp. 2d 1339, 1345 (N. D. Ga. 2001) (plaintiff must fully describe the foundation or basis of confidential witness's knowledge).

Likewise, claims that BG Capital sold 6.5 million shares (Cmplt. Par. 74) or that Look Back was about to sell its 6.6 unregistered and restricted securities do not support plaintiffs' claims. The Complaint states that the 6.5 million shares were sold "directly to JTF clients," according to CW6 (Cmplt. Par. 74). There is no claim that the shares were sold on an exchange.

Even assuming that Outlook intended to sell its 6.6 million restricted shares, there are no facts pleaded that the transaction was to be effected on a U.S. exchange. In any event, those shares could not have been sold because they were unregistered and restricted. Absent the creation of false documents furnished to the clearing agent to remove the restrictions on the shares, they could not be sold. *See Gordon,* 710 F.3d at 1130, 1132, 1147-48 & n.26 (describing the false documents prepared for the transfer agent to effectuate removal of restrictions and clear the stock).[23] There is no allegation here regarding the creation of the necessary transfer documents.

Finally, the trading by Outlook – the only defendant to have purchased and sold Liberty shares in the late summer and fall of 2012 – flatly contradicts plaintiffs' claims. The trading records cited by Plaintiffs [(Cmplt. Par. 115 n.15); App. 437-444 [share holdings]] demonstrate that from mid-August 2012, to late September 2012, Outlook sold Liberty shares when the pump should have been going on, undercutting any effort to inflate the share price; in late September, and continuing until the trading suspension, during what should have been the dump phase, Outlook purchased Liberty shares at prices that were increasing as the price of silver rose and the value of the firm's assets went up. Trading directly against the alleged scheme negates any claim that Outlook participated in the scheme, as does the failure of every other defendant to sell shares during the claimed dump in the fall of 2012.

In essence, the claimed scheme here differs little from those in *Twombly* and *Iqbal.* In

---

[23]  *See generally* Exchange Act Rule 144 (permitting the sale of certain amounts of restricted shares of Liberty after a one year holding period beginning in November 2011).

*Twombly,* 555 U.S. at 566, the Court concluded that a claimed antitrust conspiracy was implausible because once the conclusions were stripped away, the allegations of coordinated activity were consistent with parallel conduct that is not illegal.  Likewise, in *Iqbal,* 556 U.S. at 681, the Court found the claims to be "consistent with petitioners' [assertion that defendants] purposefully designed detainees of 'high interest' because of their race, religion, or national origin.  But given more likely explanations, they do not plausibly establish this purpose."[24]  Likewise, here, the lack of trading and connections among the claimed scheme participants and Outlook's contrary trading renders the pump-and-dump claim implausible.

Finally, the claimed scheme makes no sense.  Mr. Genovese and BG Capital, through Outlook and Look Back, held millions of shares of Liberty stock at the time of the so-called scheme. The officers of Liberty held about 30% of its shares.  It defies common sense to claim that each would participate in a scheme where not only did they fail to reap manipulation profits but they also destroyed the value of their own shareholdings.  This fact alone, particularly when coupled with the inherent contradiction on which the claim is built, and Outlook's trading, fully demonstrates that the claim is not plausible and should be dismissed.

### D.    Plaintiffs have not pleaded facts establishing reliance on a U.S. exchange

To properly plead a claim under Exchange Act Section 10(b), plaintiffs must set forth facts establishing the key element of reliance, which "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury."  *Erica P. John Fund, Inc. v. Halliburton Co.,* 131

---

[24] *See also Loren Data Corp. v. GXS, Inc.,* 2012 U.S. App. LEXIS 26471, 8 (4th Cir. 2012) (conspiracy claim not plausible where inferences of conspiracy contradicted by facts pleaded); *Smith v. Striblings,* 2014 U.S. Dist. LEXIS 79750, at *3 (N.D. Ga. 2014) (contradictory and conclusory claims not sufficient under Rule 8(a) to plead a claim); *MCWhorter v. Kindercare Learning Ctrs., LLC,* 2012 U.S. Dist. LEXIS 89891, at *3 (N.D. Ga. 2012) ("Plaintiff's claim is contradicted by her own allegations . . . does not plausibly suggest a discriminatory state of mind"); *see generally, Calhoun,* 2010 U.S. Dist. LEXIS 85100, at *10 (facts not assumed to be true on motion to dismiss where they are internally inconsistent or contrary to those of which court can take judicial notice).

S.Ct. 2179, 2184 (2011) (*Halliburton I*).  In fraud-on-the market cases such as this (Cmplt. Par. 134), to establish reliance, plaintiffs are required, but have failed, to plead facts demonstrating two key elements:  1) that they purchased their shares on a U.S. exchange; and 2) that the exchange on which the purchase was made is efficient.

First, in a Section 10(b) action, the exchange on which the securities transactions took place must be in the U.S.  In *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 269-70 (2010), the Supreme Court held that a cause of action under Exchange Act Section 10(b) extends only to the water's edge of the U. S. – it has no extraterritorial reach.  Thus, for a Section 10(b) claim, the securities must be purchased or sold on U.S. exchange.  *Id.*

Here, *Morrison* requires that specific facts be pleaded demonstrating that the purchases were made on the OTC BB – not the TSX.[25]  Absent the inclusion of these specific facts, *Morrison* requires that the claim be dismissed.[26]

In this case, while plaintiffs claim that the shares of Liberty silver were traded on the TSX and through the OTC BB, they have failed to specify that each member of the potential class purchased shares on a U.S. exchange.  Indeed, even the named plaintiffs, who claim to have purchased shares, fail to specify that their purchases were made on a U.S. exchange as required by *Morrison*.[27]  The failure is fatal to the Complaint.

---

[25]  *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 67 (2d Cir. 2012) (plaintiff must plead facts to show securities transaction is in U.S.); *SEC v. Tourre,* 2012 U.S. Dist. LEXIS 165214 (S.D.N.Y. Nov 19, 2012) (same); *see also Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVCC Tur Limitada,* 645 F.3d 1307, 1310-11 (11th Cir. 2011).

[26]  *See Cornwell v. Credit Suisse Group,* 729 F. Supp. 2d 620, 625-26 (S.D.N.Y. 2010) (Section 10(b) does not cover transactions on foreign exchange); *In re Alstom SA Sec. Litg.,* 741 F. Supp. 469, 471-72 (S.D.N.Y. 2010) (same); *Sgalambo v. McKenzie,* 739 F. Supp. 2d 453, 487 (S.D.N.Y. 2010) (dismissing claims based on the purchase of Canadian Superior common stock on the TSX under *Morrison*).

[27]  *See also Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 67 (2d Cir. 2012) (plaintiff must plead facts to show securities transaction in U.S.); *SEC v. Tourre,* 2012 U.S. Dist. LEXIS 165214 (S.D.N.Y. Nov 19, 2012); *see also, Cornwell v. Credit Suisse Group,* 729 F. Supp. 2d 620, 625-26

Second, assuming that the plaintiffs purchased shares on a U.S. exchange, to invoke the fraud-on-the-market theory, they must plead facts demonstrating that the market is efficient.  The fraud-on-the-market theory, adopted by the Supreme Court in *Basic v. Levinson,* 465 U.S. 224 (1988), posits that "the market price of shares traded on well-developed markets reflects all publicly available information and, hence, any material misrepresentations."  *Basic*, 465 U.S. at 246.  In adopting this theory, the Court recognized that the typical "investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."  *Id.* at 247.  To invoke the rebuttable *Basic* presumption*,* the plaintiffs must plead facts establishing that the securities purchased by the class members were traded on a well-developed and efficient market in the U.S.  *See id.*; *Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398, 2417 (2014) (*Halliburton II*) (reaffirming *Basic* and holding that the fraud-on-the-market theory only applies if the securities are traded on an efficient market).

Here, the Complaint fails to plead specific facts demonstrating that the OTB BB is efficient within the meaning of *Basic*.  While the Complaint asserts general allegations that "Liberty Silver securities are traded in an efficient market" (Cmplt. Par.134), those conclusions are insufficient to establish efficiency or even whether the vague claim applies to the TSX or the OTC BB.  Plaintiffs cannot hedge their bets and evade their pleading obligations.  This is particularly true here, not just in view of *Morrison*, but also because there is a split of authority regarding whether the OTC markets meet the *Basic* test.  Some courts have held that, as a matter of law, they do not.  *See, e.g., Epstein v. Am. Reserve Corp.,* 1988 WL 40500, at *5 (N.D. Ill. 1988); *In re Data Access Sys. Sec. Litig.,* 103 F.R.D. 130, 138 (D.N.J. 1984).  Other courts assess the question on a case-by-case basis, evaluating the question using a series of factors.  *Binder v. Gillespie,* 184 F.3d 1059, 1064-65 (9th Cir. 1999)*; see also*

---

(S.D.N.Y. 2010) (Section 10(b) does not cover transactions on foreign exchange); *In re Alstom SA Sec. Litig.,* 741 F. Supp. 469, 471-72 (S.D.N.Y. 2010 )(same).

*Salvani v. ADVFN Plc,* No. 13 Civ. 7082, at *17-19 (S.D.N.Y Opinion issued September 23, 2014) (no facts in complaint to show that OTC BB is efficient) (attached hereto at App. 21-46).

Regardless of the approach to the efficiency of the OTC BB utilized by this Court, plaintiffs have failed to properly plead a claim. If the Court adopts the *Epstein* approach, then as a matter of law, plaintiffs' Complaint must fail. If the Court adopts the *Data Access Sys.* approach, the vague, general conclusions offered by plaintiffs do not even begin to adequately address the detailed factual showing that must be made to demonstrate *Basic* efficiency. Since Plaintiffs fail to plead facts sufficient to satisfy *Morrison* and *Basic,* they have not pled the key element of reliance and the Complaint must be dismissed.[28]

**E.    The Complaint impermissibly lumps all of the defendants together, failing to plead specific facts as to each defendant**

Plaintiffs' attempt to circumvent the pleading requirements of Rule 9(b) and Exchange Act Section 21D(b)(1), as well as the limitations on a Section 10(b) claim established by the Supreme Court, with a series of vague allegations about all defendants, should be rejected. First, to plead a Section 10(b) claim for fraud, plaintiffs must comply not only with FRCP 8(a), but also with the dictates of FRCP 9(b) and Exchange Act Section 21D(b)(1). Under Rule 9(b), plaintiff must, for each false statement claimed, attribute it to the maker to provide fair notice of the facts underlying

---

[28] Plaintiffs have also cited *Affiliated Ute Citizens v. U.S.,* 406 U.S. 128 (1972), apparently as an alternative way to establish reliance. There, the Court held that in a securities fraud action where material information is not disclosed, a plaintiff need not establish reliance if the defendant had an obligation to disclose the omitted material information. In this case, plaintiffs have not pleaded specific facts demonstrating that each defendant had a duty to disclose and that such duty was breached, thereby resulting in a material omission of fact. In fact, the word "omission," based on a word search of the Complaint, appears only twice (Cmplt. Par. 86, 111) and those reference only the claims regarding the disclosure of the securities holdings of Outlook and Look Back in two SEC filings. Likewise, the word "duty," based on a word search of the complaint, occurs only twice − once in footnote 4 discussing Mr. Mirman's difficulties with FINRA, and also in paragraph 153, which is part of the standard charging language in Count II. These scattered and limited statements are not sufficient to support an *Affiliated Ute* claim.

the fraud claim.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).[29]  As the Court

held in *Bruhl v. Price WaterhouseCoopers Int'l,* 2007 U.S. Dist. LEXIS 21685, at *13 (S.D. Fla. Mar. 27,

2007):  "Rule 9(b) does not allow a complaint to merely 'lump' multiple defendants together but

require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and

inform each defendant separately of the allegations surrounding his alleged participation in the

fraud" as a matter of fair notice.[30]

Exchange Act Section 21D(b)(1), added to the Securities Exchange Act of 1934 as part of

the PSLRA, enhanced the Rule 9(b) pleading requirement.  *See Findwhat,* 658 F.3d at 1296.  The

Section has two requirements:  1) for each alleged false statement, plaintiff must plead specific facts

supporting the claim; and 2) for each claim asserted on information and belief, each specific fact

supporting the belief must be stated.  15 U.S.C. § 78u-4(b)(1)(B).  The increased standards were

designed "[a]s a check against abusive litigation by private parties," *Tellabs, Inv. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 313 (2007), in recognition of the fact that "private securities fraud actions .

. . if not adequately contained, can be employed abusively to impose substantial costs on companies

and individuals whose conduct conforms to the law."  *Id.* (citing *Merrill Lynch, Pierce, Fenner & Smith*

*Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (construing SLUSA, passed to preclude securities class actions

from evading the PSLRA by filing in state court)); *see also Blue Chip Stamps v. Manor Drug Stores*, 421

---

[29]  In *Mizzaro,* 544 F.3d at 1237, the Eleventh Circuit explained that Rule 9(b) requires that a complaint in a Section 10(b) action set forth:  1) precisely what statements were made in what documents or oral representations or what omissions were made, 2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) it, 3) the content of such statements and the manner in which they misled the plaintiff, and 4) what the defendants obtained as a consequence of the fraud.

[30]  *See Haskin v. R.J. Reynolds Tobacco Co.,* 995 F. Supp. 1437, 1439 (M.D. Fla. 1998); *see also Magluta v. Samples,* 256 F.3d 1282 (11th Cir. 2001) (calling a complaint, which lumped all defendants together, among other things, "a quintessential 'shotgun' pleading of the kind we have condemned repeatedly . . ."); *see also Atuahene v. City of Hartford,* 2001 U.S. App. LEXIS 11694 (2d Cir. 2001).

U.S. 723, 739 (1975) ("There has been widespread recognition that litigation under Rule 10b-5

presents a danger of vexatiousness different in degree and in kind from that which accompanies

litigation in general").[31]

Second, primary liability under Section 10(b) for false statements is limited to the particular

person who controlled its distribution.  *Janus Capital Group, Inc. v. First Derivative Traders,* 131 S.Ct.

2296 (2011); *Sood v. Catalyst Pharm. Partners Inc.*, 13-CV-23878-UU, 2014 WL 1245271 (S.D. Fla. Mar.

26, 2014).  In *Janus,* the Court held, in assessing liability under Exchange Act Section 10(b) for a false

statement, that only the maker of the statement, that is, the person who controlled its publication,

can be held liable.  131 S.Ct. at 2302.  This is consistent with the repeated refusal of the Supreme

Court to extend liability for false statements beyond the person who actually made the statement.

As the Court held last term:

> In *Central Bank* [*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511
> U.S. 164 (1994) (rejecting aiding and abetting)] and *Stoneridge* [(*Stoneridge Investment
> Partners, LLC v. Scientific-Atlanta, Inc.,* 128 S.Ct. 761 (2008) (declining to adopt scheme
> liability)], we declined to extend Rule 10b-5 liability to entirely new categories of
> defendants who themselves had not made any material, public misrepresentation.
> Such an extension, we explained, would have eviscerated the requirement that a
> plaintiff prove that he relied on a misrepresentation made by *the defendant.*

*Halliburton II* at 2412 (emphasis original).

Despite the requirements of Rule 9(b) and Section 12D(b)(1), and the limitations imposed by

*Janus, Central Bank, Stoneridge* and *Halliburton II,* plaintiffs' claim all defendants are liable as a group

for the alleged pump-and-dump by asserting conclusory claims in paragraphs 115 and 116 while

---

[31]  Indeed, Congress concluded that too often complaints which lack merit moved to discovery and
were used to extract unwarranted settlements from business organizations. *See, e.g.,* H.R. Conf. Rep.
No. 369, 104th Cong., 1st Sess. 31 (1995); S. Rep. No. 98, 104th Cong., 1st Sess. 8 (1995); Janet Cooper
Alexander, *Do the Merits Matter?  A Study of Settlements in securities Class Actions,* 43 Stan. L. Rev. 497,
516-17 (1991) (cited in legislative reports).  It is for this reason that the PSLRA added not just this
stringent pleading requirement as a supplement to Rule 9(b) but also a provision staying all discovery
pending the resolution of a motion to dismiss. *See* Exchange Act Section 21D(b)(3)(B), 15 U.S.C.
§ 78u-4(b)(3)(B).

trying to skirt their pleading obligations by cross-referencing each of the claims to other paragraphs which concern only Liberty or BG Capital's isolated actions.  For example the claim of:  1) **"Exaggerated resources"** by all defendants references paragraphs 97-101(claiming BG Capital promoted the Hi Ho property); 2) **"Ploy tender offer"** by all defendants references Cmplt. Par. 90-92, 95-96 (re the Liberty offer and Sennen response App. 140-145); 3) **"Not independent"** references Cmplt. Par. 103-105 (quoting from the Goldstocktraders blog and the Midas letter and a BG Capital press release App. 81-82); 4) **"Baseless promotions"** references Cmplt. Par. 98, 103-105 (quoting from another BG Capital press release and the market reports listed above); 5) **"Trading statistics"** references Cmplt. Par. 105 (quoting from a BG Capital press release); 6) **"Concealed 5% holdings"** references Cmplt. Par. 95, 106-108 regarding the failed Sennen offer and a table from a Liberty Form 10-K that does not list the holdings of Mr. Genovese); and 7) **"JTF boiler room"** has no cross reference.

These seven claims are nothing more than generalized, vague conclusions that plaintiffs claim add up to a pump-and-dump manipulation scheme conducted by all defendants as a group. Yet each is nothing but a conclusion that fails to pass muster under *Twombly-Iqbal*, let alone under the heightened pleading requirements of Rule 9(b) and the PSLRA.  *Bruhl,* 2007 U.S. Dist. LEXIS 21685 at *13 ("Rule 9(b) does not allow a complaint to merely 'lump' multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant … and inform each defendant separately of the allegations surrounding his alleged participation in the fraud."); *Cordova v. Lehman Bros.*, 526 F. Supp. 2d 1305, 1313 (S.D. Fla. 2007) (same); *Mizzaro,* 544 F.3d at 1238 (discussing PSLRA pleading standards).

The cross-references to specific allegations about either BG Capital or Liberty do not save these claims.  Claims that "all defendants" (there are seven) engaged in a scheme supported by assertions against two defendants based on their individual acts not only fails to establish a

coordinated scheme, it is inherently contradictory.  This is precisely the kind of mischief that the Supreme Court sought to halt in *Janus, Central Bank, Stoneridge* and *Halliburton II*.[32]  The Complaint – a continuous stream of unsupported conclusions in search of supporting facts – should be dismissed.

### F.   Plaintiffs have failed to plead specific facts demonstrating that Mr. Genovese, BG Capital, Look Back or Outlook made false statements

Plaintiffs' attempt to tie Mr. Genovese, BG Capital, Look Back or Outlook to the claimed pump-and-dump scheme with allegations regarding false statements fails.  There are no facts pleaded demonstrating that either Mr. Genovese, BG Capital, Look Back or Outlook participated in the claimed pump-and-dump by making false statements.

### 1.   Outlook and Look Back:  No false statement

The Complaint does not allege that Outlook made a false statement.  While Outlook did sell and buy shares, as previously discussed, those transactions flatly contradict the claimed scheme.

Similarly, the Complaint fails to allege any false statements as to Look Back.  The only action attributed to Look Back is the claimed possible sale of its private placement shares which, as previously demonstrated, was not legally possible and, in any event, would not have supported the scheme.  Accordingly, the Complaint as to Outlook and Look Back should be dismissed.

### 2.   Robert Genovese:  No false statement

Plaintiffs' claims that Mr. Genovese made a false statement regarding control of Liberty shares at JTF, that he paid the authors of the Midas Report and the Goldstocktraders blog to create the false appearance of independent support for the company, and that he manipulated the price of Liberty Silver stock through JTF each fail.  Not only do plaintiffs fail to properly support the claims

---

[32]  The only time plaintiffs claim that more than one defendant participated in an event is when Mr. Genovese attended meetings at JTF with Messrs. Tafuri and Browne and with respect to the September conference.  *See* text *infra* beginning at Section F, discussing these claims.

with specific facts as required by Rule 9(b) and Exchange Act Section 21D, each is wrong.

First, Plaintiffs' claim – part of their "concealed 5% holdings claim" – that Mr. Genovese misrepresented his position in Liberty stock and evaded filing a Schedule 13D (CW6, Par. 75; CW1, Cmplt. Par. 59; CW7, Cmplt. Par. 80) is simply wrong.  As previously demonstrated, plaintiffs' supposition that Mr. Genovese was required to file a Schedule 13D is wrong as a matter of law and misinterprets the purpose of the filing as well as who has the obligation to make it.  *See Calhoun,* 2010 U.S. Dist. LEXIS 85100, at *10 (facts not assumed to be true on motion to dismiss where they are contrary to those of which court can take judicial notice).[33]

Second, Plaintiffs allegation, as part of their "not independent" claim, that Mr. Genovese paid the authors of the Midas report and the Goldstocktraders blog to make it appear that there were independent writers supporting Liberty when, in fact, there were not, is nothing more than speculation.  Specifically, in paragraph 103 as to the Goldstocktraders blog, the Complaint states "Genovese is believed . . . to have paid for the blog posting."  Paragraph 104 makes a similar allegation about the Midas Letter:  That it is "believed to have been paid by Genovese to publish false reports . . ." (Cmplt. Par. 104).

Despite the fact that Exchange Act Section 21D specifically requires that, if a statement "is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1)(B), those facts are not specified in the Complaint. Plaintiffs wholly fail to state the basis for their belief as to either publication.  Thus, the claim should be dismissed.[34]

---

[33] *See* text *supra* beginning at Section IV.B.2.a. regarding the obligation to file a Schedule 13D.

[34] While Plaintiffs have italicized certain statements in each of the newsletters suggesting they consider them to be false or misleading, no facts are specified to support these claims. *See City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l., Inc.*, 806 F. Supp. 2d 1267, 1291 (N.D. Ga.

Finally, plaintiffs' supposition that Mr. Genovese and other defendants manipulated the share price of Liberty Silver through JTF is, again, devoid of facts and simply wrong.  In an effort to support this claim, plaintiffs allege in Paragraph 116 that "Defendants manipulated the price of Liberty Silver stock by utilizing the services of JTF to aggressively pressure clients, using unethical tactics, to induce clients to purchase Liberty Silver stock, thereby creating artificial demand and artificial trading activity."  This claim, even if true, describes the operation of a boiler room, which pushes stock on investors but has nothing to do with a manipulation on an exchange which is the claim here.[35]  *Compare Berko v. SEC*, 316 F.3d 137, 138-39 (2d Cir. 1963) (boiler room) *with U.S. v. Gordon*, 710 F.3d 1124, 1128 n.2 (10th Cir. 2013) (pump-and-dump schemes).

Plaintiffs' claim is also devoid of factual support.  The who, what, when and where required by 9(b) is absent.  *Mizzaro,* 544 F.3d at 1238; *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) ("The particularity requirement of Rule 9(b) is satisfied if the complaint alleges facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."); *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (same).  The specific facts required to support a claim that Mr. Genovese directed the manipulation, on a U.S. exchange are tellingly absent.  *See FindWhat,* 658 F.3d at 1302-04 (noting that specific facts have to be pled).  And, with good reason.  There are none.  As previously demonstrated, the purchases and sales executed by Outlook were directly contrary to those necessary to support the claimed manipulation.[36]  It is telling that the Complaint wholly fails to mention those purchases and sales.  In view of the fact that

---

2011) (granting motion to dismiss 10(b) claims based, in part, on failure to sufficiently allege a materially false or misleading statement).

[35] *See* text *supra* beginning at Section IV.B.1 discussing pump-and-dump schemes.

[36] *See* text *supra* beginning at Section IV.B.2 discussing the plausibility requirement of Rule 8(a).

these securities transactions directly contradict plaintiffs' claim, and the failure to adequately plead any other claim against Mr. Genovese, the Complaint should be dismissed as to him.

### 3.    BG Capital:  No false statement

Plaintiffs' claim that BG Capital issued two false press releases – part of their "exaggerated resources" contention − also fails.  To the contrary, plaintiffs' claims are based wholly on supposition and a misconstruction of a 2013 Liberty Silver press release, not facts.

The claims center on statements in an August 28, 2012, BG Capital press release (Cmplt. Par. 98), which are largely reiterated in a September 27, 2012, release (Cmplt. Par. 105).[37]  Plaintiffs allege that the August 28 release is false and misleading because it states "Historical drilling and production data, recent surveys and drilling results, as well as BG Capital's independent research reveals the property has potential resources of approximately 120m silver equivalent ounces between the Trinity property and the adjacent Hi Ho silver property . . ."  (Cmplt. Par. 105).  There is no claim that the estimate of potential minerals is wrong or that the multiple sources of information offered to support the opinion are incorrect.

Rather, plaintiffs rely on statements from CW4 and CW5, along with a misconstruction of a 2013 Liberty press release regarding the OSC.  CW4 notes that the inferred resource estimate by Liberty "in 2012  . . . [is] twice the amount in value than was estimated in 2011. . ." and that the OSC "ordered the 2012 estimates to be retracted . . ." (Cmplt. Par. 99) or "expressed concern . . ." (Cmplt. Par. 115), depending on which paragraph is read, and that new drilling samples were needed to make the estimate (Cmplt. Par 115).  CW5 agrees that current information about Hi Ho is not adequate to do an estimate (Cmplt. Par. 101).

Neither CW4 nor CW5 contends that the BG Capital releases are false and misleading.

---

[37] Collectively, the August 28, 2012 and September 27, 2012 press releases are the "BG Capital releases."

Neither state that they have even read the releases.  Neither state that any of the multiple sources of information relied on by the firm to make the estimate is wrong.

Rather, plaintiffs seem to suggest that without additional drilling samples at Hi Ho, an estimate of the type in the BG Capital release cannot be made.  At best, this is a difference of opinion, not fraud, as demonstrated by consideration of two points.

First, in a January 7, 2013, release (App. 126-129), Liberty announced an updated resource estimate done by international consulting firm, SRK.  The increases announced were "primarily attributable to" the acquisition of the Hi Ho property, although Liberty had announced additional drilling and testing on the Trinity property. *Id.*  This is the first estimate by Liberty which included Hi Ho and is clearly the one plaintiffs mistakenly refer to as being in 2012 since there was no 2012 release.  SRK, a very reputable consulting firm, was able to make a resource estimate without new drilling samples from Hi Ho, as plaintiffs suggest.

Second, the February 28, 2013, Liberty release, which updated the January 7, 2013 release, stated in part that the SRK report had been submitted to OSC staff, and that staff "expressed concerns with the uncertainty related to the mid-1980's historical drilling from the Hi Ho Property acquired in 2012.  It has been determined that additional confirmatory drilling, which was identified and recommended in the new technical report, be completed to *verify* the historical drilling prior to preparing an updated resource estimate." App. 130-132 (emphasis added).  The OSC did not state that the SRK opinion was false and misleading because new drilling samples had not been obtained from Hi Ho, only that additional verification should be done.  If SRK can make an estimate without new samples, then clearly BG Capital can do the same – plaintiffs are wrong.  Even if plaintiffs were correct, however, that would not render the BG Capital releases false and misleading.  At best, it would highlight a difference of opinion as the necessary basis for the estimate.  *See Benda v. Per-Se Techs., Inc.*, 2005 U.S. Dist. LEXIS 13613, at *16 (N.D. Ill. June 2, 2005) (differences of opinion do

not amount to fraud): *DeMarco v. Depotech Corp.,* 149 F. Supp. 2d 1212, 1225 (S.D. Cal. 2001) (differences in opinion as to the proper statistical analysis do not, by itself, demonstrate securities fraud); *see also In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 47 (1st Cir. 2005) (in order to challenge a statement of opinion plaintiffs must plead "facts sufficient to indicate that the speaker did not actually hold the opinion expressed").[38]

> **4.     Lumping all claims against all defendants together still results in dismissal because the additional claims are not supported by the specific facts required by Rule 9(b) and Exchange Act Section 21D**

Even assuming that plaintiffs can lump all of the defendants together and attribute the specific claims relating to Liberty Silver and its executives to Mr. Genovese, BG Capital, Look Back and Outlook, the Complaint still must be dismissed since it fails to properly plead any intentional misstatements.  The Liberty claims – like the ones specifically mentioning either Mr. Genovese, BG Capital, Look Back or Outlook – are nothing but unsupported conclusions.

First, plaintiffs' claim that an August 8, 2012, Liberty Silver press release regarding its acquisition of the Hi Ho properties is false and misleading – part of plaintiffs' "overstated resources" claim – is incorrect (Cmplt. Par. 93, 115).  That release states in part that the Hi Ho properties "are an important addition to our future development plans at Trinity . . . Historic data,

---

[38] To the extent these statements may be viewed as corporate optimism or puffery, they are not actionable.  *Next Century Communs. Corp. v. Ellis*, 318 F.3d 1023, 1028-29 (11th Cir. 2003) (mere puffing does not constitute legal fraud); *Grossman v. Novell Inc., et al.*, 120 F.3d 1112, 1119-20 (10th Cir. 1997) (statements classified as "corporate optimism" or "mere puffing" not actionable because reasonable investors do not rely on them).  Likewise, to the extent they may be viewed as forward-looking, plaintiffs must plead facts demonstrating actual knowledge of the falsity of their statements when made, which they have failed to do.  15 U.S.C. § 78u-5(c)(1)(B)(ii)(II) (providing safe harbor for forward-looking statements); *Harris v. Ivax Corp.*, 182 F.3d 799, 806-07 (11th Cir. 1999) (all statements in challenged press release were forward-looking and within the PSLRA's safe harbor protection); *In re S1 Corp. Sec. Litig*, 173 F. Supp. 2d 1334, 1354-57 (N.D. Ga. 2001) (all of plaintiffs' alleged misrepresentations failed to state a claim because they were either immaterial as mere corporate optimism and vague puffing, or protected by the statutory safe harbor for forward-looking statements).

combined with current modeling indicates that the Trinity deposit extends into the Hi Ho Properties, significantly increasing our current resource potential and the projected economics for bringing Trinity back into production." (Cmplt. Par. 93, 94). A Liberty release issued the next day also references the new properties, noting that Liberty has added a "significant upside to our established resources" and moved closer to "fulfilling our earn-in requirements." (Cmplt. Par. 95).

Again, the Rule 9(b)- and Section 21D-specific facts required to support plaintiffs' fraud claims are wholly absent. Plaintiffs have not pleaded any facts to demonstrate that the properties were not a significant addition or did not add to the resources of Trinity, or to dispute the fact that the deal paid off a significant portion of the earn-in agreement. App.110-111 [LS release, Aug. 8, 2012].

Rather the only "fact" offered is the opinion of CW4 that the price was too high, a "ransom price." Since CW4 admits the properties have value – his/her firm was interested in acquiring the property (Cmplt. Par. 94) – the only question is price. A difference of opinion about price, even if significant, does not make the Liberty statements false and misleading. *Benda*, 2005 U.S. Dist. LEXIS 13613, at *16 (differences in opinion do not amount to fraud): *DeMarco,* 149 F. Supp. 2d at 1225 (same).

Second, plaintiffs' claim that Liberty Silver engaged in a "ploy" (Cmplt. Par. 90-92; 95-96; 116) by making the tender offer for Sennen Resources lacks any factual basis. In asserting this claim, plaintiffs rely on statements such as a claim that the consideration to be paid largely in Liberty stock was "unfounded, ridiculous and artificial valuation . . ." (Cmplt. Par. 90), and that "Liberty's Offer is an insult . . ." according to Sennen management (Cmplt. Par. 92). Yet it is axiomatic that conclusions such as these are not sufficient to even meet the requirements of Rule 8(a), let alone the

exacting pleading requirements of Rule 9(b) and Exchange Act Section 21D.[39]

Likewise, it is hardly surprising that Sennen's management opposed a take-over bid which would result in them being terminated.  Again, a difference of opinion, this time between Liberty's management and that of Sennen, does not provide a basis for claiming that the offer was a fraudulent ploy.  *Benda*, 2005 U.S. Dist. LEXIS 13613, at *16 (differences in opinion do not amount to fraud): *DeMarco,* 149 F. Supp. 2d at 1225 (same).  This is particularly true here in view of the detailed Liberty calculations demonstrated that Sennen's shareholders would be paid a premium to market and the clear benefits to Liberty from the deal.

Finally, plaintiffs' claim that Liberty tried to conceal the share holdings of Mr. Genovese, is, like their other claims, lacking in any factual support.  The claim is asserted in paragraphs 86 and 87 regarding the Form 10-Q for the period ended December 31, 2011 and for the Form 10-K for the fiscal year ended June 30, 2012.  As to the former, plaintiffs' claim that the "private placement by Genovese *via* Look Back Investments announced in November 2011" should have been disclosed as a related party transaction, citing SEC Regulation S-X, Rule 4-08(k)(1) (Cmplt. Par. 111-112).  While that Rule does require the disclosure of related party transactions, the type of transactions it governs are defined for SEC reporting by Regulation S-K, Item 404, not ASC 808 as plaintiffs claim.  That provision defines related parties to include officers and directors and similar persons and cross-references to Item 403, which also adds 5% shareholders.  Since Look Back did not own any shares at the time of the private placement, it would not have been a 5% shareholder at the time of the transaction.  Even assuming that the holdings of Outlook had to be aggregated with those of Look Back for purposes of Item 404, no facts are pleaded demonstrating that Liberty knew of those

---

[39] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (conclusions must be excluded in evaluating complaint); *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1290 (11th Cir. 2010) (same); *Mizzaro, Inc.,* 544 F.3d at 1238 (discussing heightened pleading standards under the PSLRA).

holdings.  And, in any event, on a Form 8-K dated November 10, 2011 and in the 2012 Form 10-K,

Liberty disclosed the Look Back private placement and attaching a set of the private placement

papers, signed by Mr. Genovese.  App. 237, 260 [Item 10.12] [LS. 2012 Form 10-K, Item 15, No.

10.12]; App. 574-613 [LS 2011 Form 8-K].  Therefore, plaintiffs' claim is deficient.

Plaintiffs' claim as to the latter is also deficient.  In paragraph 106, plaintiffs point to a table

in Liberty's Form 10-K for 2012, in which the company listed "each person who held of record, or

was known by the Company to own beneficially, more than 5% of the issued and outstanding

shares."  Plaintiffs claim, without citing supporting facts, that at the time "Defendants knew of

Genovese's interest in the Company, including the 6.5 million shares he obtained through Look

Back Investments' private placement."  (Cmplt. Par. 107).  This claim is sleight of hand.  While it is

true that "Defendants" – as a group, including Mr. Genovese, Outlook, Look Back and BG Capital

– knew how many shares each owned, there are no facts pleaded demonstrating that Liberty, the

author of the document, or Mr. Browne, who signed the form, knew those facts.  *Halliburton II* at

2412.[40]  And, as previously noted, the Look Back transaction was disclosed in two SEC filings.  *See*

App. 237, 260 [Item 10.12] [LS. 2012 Form 10-K]; App. 574-613 [LS 2011 Form 8-K].  Accordingly,

the claim is incorrect.

### G.   Plaintiffs have failed to plead facts establishing a strong inference of scienter

Exchange Act Section 21D(b)(2) requires that plaintiff "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

4(b)(2)(A).  A "strong inference" means one which is "powerful or cogent."  *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.,* 551 U.S. 308, 323 (2007); *Mizzaro*, 544 F.3d at 1240.  This requirement

---

[40]  *See* text *supra* beginning at Section IV.D, discussing the obligation to plead facts as to each
defendant.

"substantially raised the *pleading* standard for scienter." *Mizzaro,* 544 F.3d at 1238 (emphasis

original). It did not, however, change the standard for the "required state of mind," which in this

circuit is either intent to deceive, manipulate, or defraud, or severe recklessness, the latter of which is

defined as "those highly unreasonable omissions or misrepresentations that involve not merely

simple or even inexcusable negligence, but an extreme departure from the standards of ordinary

care, and that present a danger of misleading buyers or sellers which is either known to the

defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *Bryant v.*

*Avado Brands, Inc.,* 187 F.3d, 1271, 1284 (11th Cir. 1999)).

To determine if a complaint properly pleads a strong inference of scienter, *Tellabs* crafted a

three step test. First, the factual allegations of the complaint pleaded with particularity must be

accepted as true. *Tellabs,* 551 U.S. at 322-323. Second, the court must "consider the complaint in its

entirety, as well as other sources courts ordinarily examine when ruling on a Rule 12(b)(6) motion to

dismiss." *Id.* at 322. Third, "the court must take into account plausible opposing inferences . . .

The inquiry is inherently comparative . . ." *Id.* at 322-24. In making this assessment, "omissions and

ambiguities count against inferring scienter . . ." *Id.* at 326; *Mizzaro,* 544 F.3d at 1238.

Application of the *Tellabs* holistic approach here demonstrates that plaintiffs have failed to

establish a strong inference of scienter. First, under *Tellabs,* only the properly pleaded facts must be

assumed to be true. This means that the conclusions, hyperbole and unsupported claims threaded

through the complaint must be set aside.[41] Second, *Tellabs* and *Mizzaro* require that the allegations

be assessed as a whole, not individually. The "whole" here is the claimed scheme that "defendants"

collectively engaged in a "pump-and-dump" stock manipulation. Assessing scienter thus turns on a

determination that Mr. Genovese, BG Capital, Look Back, Outlook and each other defendant knew,

---

[41] *See* text *infra* beginning at Section IV.B.2.a, discussing the unsupported claims of plaintiffs which
must be set aside when assessing the allegations of the Complaint.

or was severely reckless in not knowing, that each was part of a collective, participating in one scheme to manipulate the share price of Liberty.  In making this assessment, *Tellabs* is clear that inferences from individual facts or claims are not sufficient – only those drawn from the entirety of the claim can be considered.  *Tellabs,* 551 U.S. at 322-24.  Here, considering the alleged scheme, the few meetings involving more than one defendant, and the trading, demonstrates that the Complaint, viewed as a whole, fails to present a strong inference of scienter.

**The scheme:**  The essence of plaintiffs' alleged manipulation scheme is coordinated activity among a group of claimed manipulators to create an artificial price, draw investors to the market and then dump their shares.  *U.S. v. Gordon*, 710 F.3d 1124, 1128 n.2 (10th Cir. 2013).[42]  Yet, here, the Complaint is devoid of such actions.  As previously demonstrated, there are no claims that Mr. Genovese, Outlook, Look Back and BG Capital or any of the other defendants knew, or was severely reckless in not knowing, that each was participating in a collective action or scheme.  There are no allegations or claims that each, or at least some members of the supposed scheme, engaged in manipulative trading such as matched orders, wash sales or other, similar fraudulent trading on a U.S. exchange to push the Liberty share price to artificial levels.  As *Tellabs* makes clear, the omission of these critical facts cuts against any inference of scienter.  551 U.S. at 326.

Here again, as they do throughout the Complaint, plaintiffs skirt their obligation to present these critical facts and substitute a confusing, convoluted cavalcade of conclusions laced with unsupported innuendo, keyed to the two-tiered structure of the Complaint.  In tier one – Paragraphs 115 and 116 – plaintiffs substitute conclusory claims about the defendants as a group.  In tier two, plaintiffs try to bolster the generalizations about all defendants with isolated, scattered claims about Liberty or BG Capital, but none of the other defendants.  As previously demonstrated, this

---

[42] *See* text *infra* beginning at Section IV.B.2.b, discussing the elements of such a scheme.

approach does not create the kind of coordinated, concerted activity necessary for a market manipulation scheme, just a jumble of fact-devoid claims.  In the end, these claims fail to demonstrate that Mr. Genovese, Outlook, Look Back and BG Capital knew, or were severely reckless in not knowing, that their actions and those of the other defendants were part of a massive market manipulation.[43]

   **The meetings:**  Even the few instances where Mr. Genovese and Liberty executives are alleged to have participated in events together fail to raise a strong or any inference of scienter. According to the Complaint, those meetings occurred on the visits to the JTF offices and at the conference and dinner in Canada.  Yet in the JTF meetings, Mr. Genovese and Messrs. Tafuri and Browne promoted Liberty Silver as an investment, according to the Complaint.  In paragraph 68, CW6 "explained that Genovese and Tafuri came to New York and met with JTF brokers in August 2012 and in September 2012, at which time they pitched Liberty Silver."  The conference and dinner were the same.  As CW6 stated, the conference and dinner were designed to "promote Liberty Silver."  (Cmplt. Par. 71, 3).  Stated differently, all of these meetings were designed to promote Liberty – typical branding and marketing for company representatives.  *See generally*, *Investor Relations, Liquidity and Stock Prices*, Michael J. Brennan & Claudia Tamaroski, 12 J. Applied Corporate Finance, 26 (2000) (attached hereto at App. 408-421).  Absent from the description of the JTF meetings, the conference and dinner is any allegation about stock manipulation by Mr. Genovese or any defendant.  Again, the absence of such allegations cuts against any allegation of scienter.

   **The trading:**  An analysis of the securities transactions here – or the lack of them – and their overall impact of the claimed pump-and-dump scheme negates any inference of scienter.  The essence of any such manipulation is the securities transactions by the claimed manipulators during

---

[43] Each of the specific paragraphs is discussed in detail *supra* beginning at Section IV.E.

the pump to inflate the price and the dump to reap the profits.  Here, as previously demonstrated,[44] the trading of Outlook and the lack of any trading by the other defendants directly contradict any claimed pump-and-dump scheme.

Finally, the devastating financial impact that the alleged scheme would have had on Mr. Genovese, Outlook, Look Back and BG Capital, as well as the other defendants, confirms not just the lack of scienter but of any intent to manipulate.  While lack of motive may not be wholly determinative here, when viewed in the context of the contradictory and conclusory claims in the Complaint and the trading by Outlook, it is clear that, when taken as a whole, the Complaint fails to raise a strong inference of scienter.

### H.    Plaintiffs have failed to plead facts establishing loss causation

Plaintiffs' Complaint fails to plead the facts necessary to establish the key Section 10(b) element of loss causation.  The Complaint fails to demonstrate that after the stock price crashed, facts demonstrating the truth about their claimed manipulation scheme emerged and that those events were the key cause of the price drop.

Under the PSLRA, plaintiffs must plead specific facts that establish loss causation. Exchange Act Section 21D(b)(3) provides in pertinent part that "plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  Loss causation ensures that "only losses actually attributable to a given misrepresentation are cognizable . . ."  *Meyer v. Greene,* 710 F.3d 1189, 1196 (11th Cir. 2013).

To prove this element, it is not sufficient that plaintiff demonstrate that the price of the security was inflated at the time of the purchase.  *Hubbard v. BankAtlantic Bancorp, Inc.,* 688 F.3d 725,

---

[44]  *See* text *supra* beginning at Section IV.E.1.

726 (11th Cir. 2012).  Plaintiff must plead specific facts which prove that "the defendant's

misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."

*Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346 (2005).  This means that in a fraud-on-the-market case

"the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the

security's value but also that 'the fraud-induced inflation that was baked into the plaintiff's purchase

price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.'"

*Hubbard,* 688 F.3d at 726 (11th Cir. 2012) (quoting *FindWhat,* 658 F.3d at 1311).

 Critical to establishing loss causation is the emergence of the truth – the market learns of the

fraud.  *Meyer,* 710 F.3d at 1196-97.  While the corrective disclosure need not mirror the earlier

misrepresentation, it "must at least relate back to the misrepresentation and not to some other

negative information about the company.  *Id.* at 1197.  Stated differently, "because a corrective

disclosure must reveal a previously concealed truth, it obviously must disclose new information, and

cannot be merely confirmatory."  *FindWhat,* 658 F.3d at n.28.  In essence, loss causation poses the

following question:  "even if the plaintiffs' paid an inflated price for the stock as a result of the fraud

. . . did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?"  *Id.*

at 1312.  In answering this question, it is essential that plaintiffs establish that the defendants' acts

were "substantial, meaning a significant contributing cause."  *Kinnett v. Strayer Educ., Inc.,* 2012 U.S.

Dist. LEXIS 37737, at *53 (M.D. Fla. 2012) (citing *Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1447

(11th Cir. 1997)).

 Here, although plaintiffs' claim that the "truth emerged," it is beyond dispute that the share

price dropped as a result of the trading suspensions, not from any scheme.  Likewise, plaintiffs

wholly fail to cite any new facts which emerged and established that there had been a pump-and-

dump stock manipulation on a U.S. stock exchange.  The key elements of plaintiffs' claim, according

to paragraphs 115 and 116 of the complaint, are:

- **Exaggerated resources:**  The Company's prospects and resources were exaggerated;

- **Ploy tender offer:**  The Sennen Resources tender offer was a "ploy;"

- **Not independent:**  The BG Capital press releases and the Midas Letter and the Goldstocktraders blog were presented as independent reports when they were not;

- **Baseless promotions:**  "Defendants offered wholly self-serving and largely baseless promotions of Liberty Silver;"

- **Trading statistics:**  Defendants "pointed to the increased trading volume and increased stock price as emergent market responses when they were the results of JTF's unethical sales tactics and/or were sells effectuated by Genovese and his many proxies;"

- **Concealed 5% holdings:**  Defendants falsely made it appear that "Genovese did not have an interest in the Company greater than five percent . . .;" and

- **JTF boiler room:**  "Defendants manipulated the price of Liberty Silver stock by utilizing the services of JTF to aggressively pressure client[s] . .." (Cmplt. Par. 116).

To prove loss causation, plaintiffs have to establish that these facts emerged and deflated the stock price from its artificial level.  While plaintiffs claim the "facts" listed above emerged in paragraph 120 of the Complaint, again, they present nothing but conclusions.  The detailed facts required by Rule 9(b) and Section 21D, or even those sufficient for Rule 8(a), are wholly absent.

Plaintiffs' failure to plead facts establishing that the truth emerged is highlighted by comparing the chart above with paragraphs 121-127, detailed below, which are the facts plaintiffs claim emerged as the truth:

- *Trading suspension order:*  The SEC-OSC trading suspensions in October which caused the share price for Liberty Silver to essentially crash on the TSX and the OTC BB.  The release issued by the SEC says nothing about a pump-and-dump manipulation.  Rather, it states that the suspension was instituted because of "a *lack of current and accurate information about the company concerning, among other things, the control of its stock,* its market price, and trading in the stock" (Cmplt. Par. 117);[45]

- *Oct. 12, 2012 Financial Post:*  This article largely *reiterates facts regarding the trading suspension, the failed tender* offer for Sennen, an Aug. 28, 2012 BG Capital release and information from the

---

[45]  *See Meyer,* 710 F.3d at 1200-02 (announcement of SEC investigation insufficient to reveal the truth); *Loos v. Immersion Corp.,* 2014 U.S. App. LEXIS 17813, at *22 (9th Cir. Aug.7, 2014) (same); *Durham v. Whitney Info. Network, Inc.*, 2009 U.S. Dist. LEXIS 113757, at *58-64 (M.D. Fla. Nov. 10, 2009) (same).

anonymous internet letter quoted at the beginning of the Complaint (Cmplt. Par. 121);

- *Undated Financial Post*:  This article quotes from a *2011 Technical Report* regarding the resources of Liberty Silver that had been publically available since December 2011, when Liberty filed it with the OSC (Cmplt. Par. 122);

- *Dec. 28, 2012 Financial Post:*  This article largely summarizes Liberty Silver securities transactions by BG Capital, Look Back and Outlook taken from the *SEDI* report filed by Mr. Genovese in December 2012 with the OSC (Cmplt. Par 123), listing Outlook's transactions which directly undercut any claim of manipulation;

- *Oct. 7, 2013 Financial Post*:  This article reiterates facts regarding a *loan by BG Capital to Liberty Silver in 2013* to develop the properties and was filed with the OSC on Oct. 4, 2013 (Cmplt. Par. 124), again the direct opposite of plaintiffs' claims;[46] and

- *June 22, 2014 Ocala Star Banner* (Cmplt. Par. 125):  This article *summarizes portions of the initial Complaint*.[47]

These so-called facts say nothing about any manipulation and fail to even discuss trading on a securities exchange involving Liberty Silver.  These are not the facts plaintiffs claim were the building blocks of its so-called pump-and-dump scheme.  These are not new facts emerging to show the market that a stock manipulation has occurred on a U.S. exchange and the reason for the price drop.  *Meyer*, 710 F.3d at 1197 (the facts must reveal the fraud).

The truth did emerge – there was no manipulation.  The share price of Liberty went up in the fall of 2012 in tandem with the increase in the price of silver which made the firm's assets more valuable.  The crash of that price resulted from the temporary trading suspensions imposed by the SEC and the OSC because of questions about the available information in the market place, not because of any manipulation.  Perhaps most importantly, what has emerged is a consistent pattern of

---

[46]  *See* App. 136-139 [Oct. 4, 2013 press release].

[47]  It is axiomatic that plaintiffs' initial Complaint does not provide evidence of the claims asserted therein.  *Barrie v. InterVoice Brite Inc.*, 2009 U.S. Dist. LEXIS 99253, *24-25 (N.D. Tex. Oct. 26, 2009) ("Allegations in pleadings are not evidence."); *Powell v. Idacorp, Inc.*, 2006 U.S. Dist. LEXIS 21831, at *10-11 (D. Idaho Mar. 29, 2006) (finding that plaintiff failed to plead loss causation where the complaint formed the basis for loss causation).

facts:  Liberty Silver has valuable assets the firm has sought to develop both before and after the trading suspension.  Mr. Genovese, Outlook, Look Back and BG Capital continue to support those efforts.  In the end, plaintiffs have failed not just to present facts demonstrating loss causation, but any of the elements of a Section 10(b) cause of action.

## V.      Conclusion

Absent from plaintiffs' Complaint are the critical facts necessary to plead a pump-and-dump manipulation scheme on a U.S. stock exchange.  Allegations and conclusions strung together from an unsigned internet post, confidential witnesses who contradict each other and offer no source for the key allegations they assert tied together in a tangled web do not present a cause of action for securities fraud.  What they do present is an implausible and economically irrational claim that is directly undercut by the securities transactions of Outlook.  It is just this kind of claim that spurred Congress to pass the PSLRA and bar discovery before a motion to dismiss could be heard.  It is just this kind of claim that caused the stringent pleading requirements of that Act to be crafted.  It is just the kind of claim that should be dismissed.

WHEREFORE, for the foregoing reasons, Mr. Genovese, BG Capital, Look Back and Outlook respectfully request that the Complaint be dismissed with prejudice.[48]

---

[48]  The Complaint should be dismissed with prejudice.  Plaintiffs have now amended and filed the claims here four times.  (Doc. Nos. 1, 45, 76, 88).  While one version was attached to a motion to amend (Doc. 76), which was later mooted for months, plaintiffs have repeatedly altered, changed and amended the facts in the case while adding and deleting parties.  While leave to amend may be liberally granted, after four times plaintiffs, have had more than a sufficient opportunity to present facts that state a claim.  Dismissal should be with prejudice.  *Rogers v. Nacchio*, 241 F. App'x 602, 610 (11th Cir. 2007) (affirming lower court's dismissal of complaint where further amendment would have been futile); *Pittleman v. Impac Mortgage Holdings, Inc.*, 2009 WL 648983, at *1 (Mar. 9, 2009 C.D. Cal.) (granting motion to dismiss Section 10(b) action without leave to amend where plaintiff had three chances to submit a valid complaint); *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1174 (S.D. Fla. 2004) (dismissing complaint in Section 10(b) class action with prejudice, as further amendment would have been futile because the facts alleged were legally insufficient, plaintiffs were granted leave to file a second complaint and they had significant time to carefully draft their complaints).

Date:  October 6, 2014

Respectfully submitted

By:   */s/ Thomas O. Gorman*
        Thomas O. Gorman
        Chimera N. Thompson
        Dorsey & Whitney LLP
        1801 K Street, N. W., Suite 750
        Washington, D. C.  20006
        Telephone:  202-442-3000
        Gorman.tom@dorsey.com
        Thompson.chimera@dorsey.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on October 6, 2014, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

                        */s/ Martin Raskin*
                        MARTIN R. RASKIN
                        Florida Bar No. 0315206