**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO.: 9:13-cv-80923-KLR**

TODD STANAFORD a/k/a JERALD TODD
STANAFORD, on behalf of himself and all
others similarly situated,

      Plaintiff,

vs.

ROBERT DONALD BRUCE GENOVESE,
WILLIAM TAFURI, GEOFFREY BROWNE,
BG CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC. LIBERTY
SILVER CORPORATION AND OUTLOOK
INVESTMENTS, INC.,

      Defendants.

**APPENDIX TO MOTION TO DISMISS**
**BY ROBERT DONALD BRUCE GENOVESE,**
**BG CAPITAL GROUP LTD, LOOK BACK**
**INVESTMENTS, INC. AND**
**OUTLOOK INVESTMENTS, INC.**

**PART I**

Thomas O. Gorman
Dorsey & Whitney LLP
1801 K Street, N. W., Suite 750
Washington, D. C.  20006
Telephone:  202-442-3000
Fax:  202-442-3199
Email: gorman.tom@dorsey.com

Date:  October 6, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 9:13-cv-80923-KLR

TODD STANAFORD a/k/a JERALD TODD
STANAFORD, on behalf of himself and all
others similarly situated,

      Plaintiff,

vs.

ROBERT DONALD BRUCE GENOVESE,
WILLIAM TAFURI, GEOFFREY BROWNE,
BG CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC. LIBERTY
SILVER CORPORATION AND OUTLOOK
INVESTMENTS, INC.,

      Defendants.

**DECLARATION OF CHIMERA THOMPSON IN SUPPORT OF MOTION
TO DISMISS BY ROBERT GENOVESE,
BG CAPITAL GROUP LTD, LOOK BACK INVESTMENTS,
INC. AND OUTLOOK INVESTMENTS, INC.**

I, Chimera Thompson, hereby declare as follows:

1.      I am a member of the Bar of the State of New York with the law firm of Dorsey &

Whitney LLP, 1801 K Street, N.W., Suite 750, Washington, D.C.  20006.

2.      This Firm represents Robert Genovese, BG Capital Group Ltd., Look Back

Investments, Inc. and Outlook Investments, Inc.

3.      I make this Declaration on my personal knowledge in support of Robert Genovese,

BG Capital Group Ltd, Look Back Investments, Inc. and Outlook Investments, Inc.'s Motion to

Dismiss.

4.      Attached hereto as App0001 is a true and correct copy of the SEC Order of Suspension of Trading obtained from the Securities Exchange Commission ("SEC's") website, www.sec.gov., *In the Matter of:  Liberty Silver Corp.*, SEC File No. 500-1 (Issued Oct. 5, 2012).

5.      Attached hereto as App0002-18 is a true and correct copy of the SEC Order obtained from the SEC's website, www.sec.gov., *In the Matter of:  John Thomas Capital Management Group LLC, et al.*, SEC File No. 3-15244 (Issued Mar. 22, 2013).

6.      Attached hereto as App0019-20 is a true and correct copy of the Opinion and Order, obtained from the Ontario Securities Commission ("OSC's") website, www.sedar.com, *In the Matter of The Securities Act, R.S.O. 1990, c. S.5 as amended and In the Matter of Liberty Silver Corp.* (Issued Oct. 12, 2012).

7.      Attached hereto as App0021-46 is a true and correct copy of the Federal Court Opinion and Order issued on September 23, 2014, in *Salvani v. ADVFN PLC, 13-cv-7082,* obtained from the Southern District of New York's website https://ecf.nysd.uscourts.gov/cgi-bin/ShowIndex.pl

8.      Attached hereto as App0047-77 is a true and correct copy of the Amended Complaint filed on August 5, 2014 in *SEC v. Galas, 14-cv-5621, W. D. WA. ,* obtained from SEC's website, http://www.sec.gov/litigation/complaints/2014/comp-pr2014-159.pdf

9.      Attached hereto as App0078-80 is a true and correct copy of the August 28, 2012, BG Capital News Release obtained from the Company.

10.     Attached hereto as App0081-82 is a true and correct copy of the September 27, 2012, BG Capital News Release obtained from the Company.

11.     Attached hereto as App0083-86 is a true and correct copy of the December 21, 2011, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

12.     Attached hereto as App0087-88 is a true and correct copy of the January 25, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

13.     Attached hereto as App0089-91 is a true and correct copy of the May 22, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

14.     Attached hereto as App0092-99 is a true and correct copy of the July 9, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

15.     Attached hereto as App0100-102 is a true and correct copy of the July 16, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

16.     Attached hereto as App0103-105 is a true and correct copy of the July 24, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com..

17.     Attached hereto as App0106-109 is a true and correct copy of the July 26, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

18.     Attached hereto as App0110-111 is a true and correct copy of the August 8, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

19.     Attached hereto as App0112-115 is a true and correct copy of the August 21, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

20.     Attached hereto as App0116-118 is a true and correct copy of the October 16, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

21.     Attached hereto as App0119-1251 is a true and correct copy of the October 19, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

22.     Attached hereto as App0126-129 is a true and correct copy of the January 7, 2013, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

23.     Attached hereto as App0130-132 is a true and correct copy of the February 28, 2013, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

24.     Attached hereto as App0133-135 is a true and correct copy of the March 21, 2013, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

25.     Attached hereto as App0136-139 is a true and correct copy of the October 4, 2013, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

26.     Attached hereto as App0140-145 is a true and correct copy of the July 31, 2012, Sennen News Release obtained from the OSC's website, www.sedar.com.

27.     Attached hereto as App0146-198 is a true and correct copy of the December 21, 2011, Liberty Silver Form 10-K obtained from the website: www.sec.gov.

28.     Attached hereto as App0199-262 is a true and correct copy of the June 30, 2012, Liberty Silver Form 10-K obtained from the website: www.sec.gov.

29.     Attached hereto as App0263-332 is a true and correct copy of the June 30, 2013, Liberty Silver Form 10-K obtained from the website: www.sec.gov.

30.     Attached hereto as App0333-335 is a true and correct copy of the July 7, 2010, SEC article entitled *"BAZI® Completes $500,000 Financing, Capping a $2.0 Million Capital Raise and Announces John Thomas Financial as its Exclusive Investment Bank,"*

*http://www.sec.gov/Archives/edgar/data/1134765/000113476510000008/ex99-07082010_100755.htm.*

31.     Attached hereto as App0336-337 is a true and correct copy of the May 16, 2012, article entitled *"John Thomas Financial Raises $33 Million for Private Shares of Facebook in Secondary Market",* Market Wired, *http://finance.yahoo.com/news/john-thomas-financial-raises-33-140500244.html.*

32.     Attached hereto as App0338-339 is a true and correct copy of the January 18, 2011, article entitled  *"John Thomas Financial CEO Thomas Belesis Reveals His Plans for Expansion in an Exclusive Interview with CNBC,"* Market Wired, *http://www.marketwired.com/press-release/john-thomas-financial-ceo-thomas-belesis-reveals-his-plans-expansion-exclusive-interview-1381679.htm* .

33.     Attached hereto as App0340-341 is a true and correct copy of the June 3, 2011, article entitled *"John Thomas Financial Chief Economist Says Investors Should Maintain a Bullish Posture,"* Business Wire, *http://www.businesswire.com/news/home/20110603005502/en/John-Thomas-Financial-Chief-Economist-Investors-Maintain.*

34.     Attached hereto as App0342-343 is a true and correct copy of the February 29, 2012, article entitled *"John Thomas Financial Releases 2012 Economic Outlook,"* Greek USA Reporter, *http://usa.greekreporter.com/2012/02/29/john-thomas-financial-releases-2012-economic-outlook/.*

35.     Attached hereto as App0344 is a true and correct copy of the website entitled *John Thomas,* Linkedin.com, *https://www.linkedin.com/company/john-thomas-financial.*

36.     Attached hereto as App0345-347 is a true and correct copy of the July 20, 2011, article entitled *"John Thomas Financial Raises $40 Million in Private Equity Placement for Kadmon I,"* Businesswire.com, *http://www.businesswire.com/news/home/20110720005330/en/John-Thomas-Financial-Raises-40-Million-Private* .

37.     Attached hereto as App0348-349 is a true and correct copy of the September 10, 2012, article entitled *"John Thomas Financial Forms Highline Research Advisors to Provide Institutional Investment Banking Services for Healthcare Companies"* Market Wired, *http://www.marketwired.com/press-release/john-thomas-financial-forms-highline-research-advisors-provide-institutional-investment-1699483.htm.*

38.     Attached hereto as App0350-354 is a true and correct copy of the December 13, 2012, article entitled  *"Latitude Global Has Engaged John Thomas Financial as its Investment Banking Firm,"* Globenewswire.com, *http://globenewswire.com/news-release/2012/12/13/511340/10015578/en/Latitude-Global-Has-Engaged-John-Thomas-Financial-as-Its-Investment-Banking-Firm.html.*

39.     Attached hereto as App0355-357 is a true and correct copy of the January 29, 2010, article entitled *"New Embattled Minority:  Wall Street Brokers,"* The New York Times, *http://www.nytimes.com/2010/01/28/nyregion/28bankers.html?_r=0.*

40.     Attached hereto as App0358-373 is a true and correct copy of the Anonymous Post Sold on the Internet regarding LBSV and Bobby Genovese, http://www.mediafire.com/view/?t63tft59qjrb3pb.

41.     Attached hereto as App0374-383 is a true and correct copy of the agenda to the Cambridge House Agenda – The Silver Summit 10th Anniversary obtained from the website: http://cambridgehouse.com/event/10/the-silver-summit-10th-anniversary/agenda.

42.     Attached hereto as App0384-398 is a true and correct copy of the agenda to the Cambridge House Agenda – 2012 Toronto Resource Investment Conference obtained from the website:  http://cambridgehouse.com/event/9/toronto-resource-investment-conference-2012/agenda.

43.     Attached hereto as App0399-404 is a true and correct copy of the list of exhibitors from the Cambridge House 2012 Toronto Resource Investment Conference obtained from the website:  http://cambridgehouse.com/event/9/toronto-resource-investment-conference-2012/exhibitors.

44.     Attached hereto as App0405-407 is a true and correct copy of the October 22, 2013, article entitled *"Icahn Cashes in on Netflix for $825M Profit, Still has 4.5% Stake,"* Forbes, *http://www.forbes.com/sites/steveschaefer/2013/10/22/carl-icahn-cashes-in-on-netflix-cuts-stake-to-take-profits/.*

45.     Attached hereto as App0408-421 is a true and correct copy of the Winter 2000, article entitled *"Investor Relations, Liquidity, and Stock Prices,"* published in the Journal of Applied Corporate Finance.

46.     Attached hereto as App0422-435 is a true and correct copy of the LBSV Historical Stock Prices obtained from Bloomberg.

47.     Attached hereto as App0436 is a true and correct copy of the London Fix Historical Silver Prices, http://www.kitco.com/scripts/hist_charts/yearly_graphs.plx.

48.     Attached hereto as App0437-444 is a true and correct copy of the November 16, 2011, OSC Stock Chart, obtained from the OSC's website, www.sedar.com.

49.     Attached hereto as App0445-572 is a true and correct copy of the December 1, 2011, Liberty Silver Technical Report:  Mine Development Associates Technical Report on the Trinity Project, obtained from the OSC's website, www.sedar.com.

50.     Attached hereto as App0573 is a true and correct copy of the SEC Release "Pump & Dumps" and Market Manipulations obtained at obtained from the SEC's website, www.sec.gov., http://www.sec.gov/answers/pumpdump.htm.\.

51.     Attached hereto as App0574-576 is a true and correct copy of Liberty Silver Form 8-K dated November 10, 2011, obtained from the SEC's website, www.sec.gov., http://www.sec.gov/Archives/edgar/data/1407583/000113705011000352/libertysilver_8kitem101priva.htm.

52.     Attached hereto as App0577-613 is a true and correct copy of Liberty Silver Exhibit 10-2 Subscription Agreement, obtained from the SEC's website, www.sec.gov., http://www.sec.gov/Archives/edgar/data/1407583/000113705011000352/exhibit1012subscriptionagree.htm.

I certify under penalty of perjury that the foregoing is true and correct.


DATED:  October 6, 2014                          */s/ **Chimera Thompson***
                                                 Chimera Thompson
                                                 Dorsey & Whitney LLP
                                                 1801 K Street, N. W., Suite 750
                                                 Washington, D. C.  20006
                                                 Telephone:  202-442-3000
                                                 Fax:  202-442-3199
                                                 Email:Thompson.chimera@dorsey.com

# **TABLE OF CONTENTS**

**PLEADINGS/ORDERS:**                                                                                    **Page**

*In the Matter of:  Liberty Silver Corp.*, SEC File No. 500-1 Order of Suspension
of Trading (Issued October 5, 2012) .............................................................................. APP0001

*In the Matter of:  John Thomas Capital Management Group LLC, et al.,* SEC
File No. 3-15244 Order (Issued March 22, 2013) ........................................APP0002-18

*In the Matter of The Securities Act, R.S.O. 1990, c. S.5 as amended and In the Matter of
Liberty Silver Corp.*, Ontario Securities Commission Temporary Order ..................APP0019-20

*Salvani v. ADVFN PLC*, 13-cv-7082, S.D.N.Y Opinion and Order (Issued
September 23, 2014) ........................................................................APP0021-46

*SEC v. Galas*, 14-cv-5621, W. D. WA Amended Complaint (Filed
August 5, 2014) .................................................................................APP0047-77

**NEWS RELEASES:**

BG Capital News Release dated August 28, 2012...............................................APP078-80

BG Capital News Release dated September 27, 2012 ...........................................APP081-82

Liberty Silver News Release dated December 21, 2011 ........................................APP083-86

Liberty Silver News Release dated January 25, 2012 ...........................................APP087-88

Liberty Silver News Release dated May 22, 2012................................................APP089-91

Liberty Silver News Release dated July 9, 2012..................................................APP092-99

Liberty Silver News Release dated July 16, 2012...............................................APP0100-102

Liberty Silver News Release dated July 24, 2012...............................................APP0103-105

Liberty Silver News Release dated July 26, 2012...............................................APP0106-109

Liberty Silver News Release dated August 8, 2012..............................................APP0110-111

Liberty Silver News Release dated August 21, 2012............................................APP0112-115

Liberty Silver News Release dated October 16, 2012............................................APP0116-118

Liberty Silver News Release dated October 19, 2012............................................APP0119-125

Liberty Silver News Release dated January 7, 2013 ............................................APP0126-129

Liberty Silver News Release dated February 28, 2013.................................................................APP0130-132

Liberty Silver News Release dated March 21, 2013.................................................................APP0133-135

Liberty Silver News Release dated October 4, 2013.................................................................APP0136-139

Sennen News Release dated July 31, 2012 .................................................................APP0140-145

**FINANCIAL DOCUMENTS:**

Liberty Silver Form 10-K dated December 21, 2011 .................................................................APP0146-198

Liberty Silver Form 10-K dated June 30, 2012.................................................................APP0199-262

Liberty Silver Form 10-K dated June 30, 2013.................................................................APP0263-332

**INFORMATION PERTAINING TO JOHN THOMAS:**

"BAZI® Completes $500,000 Financing, Capping a $2.0 Million Capital Raise and Announces John Thomas Financial as its Exclusive Investment Bank" (July 7, 2010) http://www.sec.gov/Archives/edgar/data/1134765/000113476510000008/ex99-07082010_100755.htm .................................................................APP0333-335

"John Thomas Financial Raises $33 Million for Private Shares of Facebook in Secondary Market", Market Wired, (May 16, 2012) http://finance.yahoo.com/news/john-thomas-financial-raises-33-140500244.html.................................................................APP0336-337

 "John Thomas Financial CEO Thomas Belesis Reveals His Plans for Expansion in an Exclusive Interview with CNBC," Market Wired (January 18, 2011) http://www.marketwired.com/press-release/john-thomas-financial-ceo-thomas-belesis-reveals-his-plans-expansion-exclusive-interview-1381679.htm .................................................................APP0338-339

"John Thomas Financial Chief Economist Says Investors Should Maintain a Bullish Posture," Business Wire, June 3, 2011 http://www.businesswire.com/news/home/20110603005502/en/John-Thomas-Financial-Chief-Economist-Investors-Maintain.................................................................APP0340-341

"John Thomas Financial Releases 2012 Economic Outlook," Greek USA Reporter (February 29, 2012) http://usa.greekreporter.com/2012/02/29/john-thomas-financial-releases-2012-economic-outlook/ .................................................................APP0342-343

John Thomas, Linkedin.com https://www.linkedin.com/company/john-thomas-financial.................................................. APP0344

"John Thomas Financial Raises $40 Million in Private Equity Placement for Kadmon I," Businesswire.com (July 20, 2011) http://www.businesswire.com/news/home/20110720005330/en/John-Thomas-Financial-Raises-40-Million-Private.................................................................APP0345-347

"John Thomas Financial Forms Highline Research Advisors to Provide Institutional Investment Banking Services for Healthcare Companies" Market Wired (September 10, 2012) http://www.marketwired.com/press-release/john-thomas-financial-forms-highline-research-advisors-provide-institutional-investment-1699483.htm ...................................................................APP0348-349

"Latitude Global Has Engaged John Thomas Financial as its Investment Banking Firm," Globenewswire.com (December 13, 2012) http://globenewswire.com/news-release/2012/12/13/511340/10015578/en/Latitude-Global-Has-Engaged-John-Thomas-Financial-as-Its-Investment-Banking-Firm.html ...........................................................................APP0350-354

"New Embattled Minority:  Wall Street Brokers," The New York Times (January 28, 2010) http://www.nytimes.com/2010/01/28/nyregion/28bankers.html?_r=0 ........................APP0355-357

**MISCELLANEOUS:**

Anonymous Post Sold on the Internet regarding LBSV and Bobby Genovese ...............APP0358-373

Cambridge House Agenda – The Silver Summit 10th Anniversary .....................................APP0374-383

Cambridge House Agenda – Toronto Resource Investment Conference .........................APP0384-398

Cambridge House – List of Exhibitors ....................................................................................APP0399-404

"Icahn Cashes in on Netflix for $825M Profit, Still has 4.5% Stake, Forbes (October 22, 2013) http://www.forbes.com/sites/steveschaefer/2013/10/22/carl-icahn-cashes-in-on-netflix-cuts-stake-to-take-profits/...................................................................................................................APP0405-407

"Investor Relations, Liquidity, and Stock Prices," Journal of Applied Corporate Finance (Winter 2000) .............................................................................................................APP0408-421

LBSV Historical Stock Prices.....................................................................................................APP0422-435

London Fix Historical Silver Prices ............................................................................................ APP0436

OSC Stock Chart dated November 15, 2011.............................................................................APP0437-444

Liberty Silver Technical Report:  Mine Development Associates Technical Report on the Trinity Project, dated December 1, 2011............................................................................APP0445-571

SEC Release "Pump & Dumps" and Market Manipulations........................................................ APP0573

Liberty Silver Form 8-K dated November 10, 2011.................................................................APP0574-576

Liberty Silver Exhibit 10-2 Subscription Agreement................................................................APP0577-614

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**October 5, 2012**

_____

**IN THE MATTER OF**                               :
                                                   :
                                                   :
**Liberty Silver Corp.**           :           **ORDER OF SUSPENSION**
                                   :           **OF TRADING**
                                   :
                                   :
**File No. 500-1**                 :
_____

      It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of Liberty Silver Corp. ("Liberty Silver") because of questions concerning publicly available information about Liberty Silver, the control of its stock, its market price, and trading in the stock.  Liberty Silver is a Nevada corporation based in Toronto, Ontario, Canada; it is quoted on the OTCBB under the symbol LBSV.

      The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

      THEREFORE, IT IS ORDERED, pursuant to Section 12(k) of the Securities Exchange Act of 1934, that trading in the securities of the above-listed company is suspended for the period from 9:30 a.m. EDT, on October 5, 2012 through 11:59 p.m. EDT, on October 18, 2012.

      By the Commission.

                    Kevin M. O'Neill
                    Deputy Secretary

**APP 0001**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 9396 / March 22, 2013

SECURITIES EXCHANGE ACT OF 1934
Release No. 69208 / March 22, 2013

INVESTMENT ADVISERS ACT OF 1940
Release No. 3571 / March 22, 2013

INVESTMENT COMPANY ACT OF 1940
Release No. 30435 / March 22, 2013

ADMINISTRATIVE PROCEEDING
File No. 3-15255

| | |
|---|---|
| In the Matter of | : ORDER INSTITUTING |
| | : ADMINISTRATIVE AND CEASE- |
| JOHN THOMAS CAPITAL MANAGEMENT | : AND-DESIST PROCEEDINGS |
| GROUP LLC, d/b/a PATRIOT28 LLC, | : PURSUANT TO SECTION 8A OF |
| | : THE SECURITIES ACT OF 1933, |
| GEORGE R. JARKESY JR., | : SECTIONS 15(b)(4), 15(b)(6) AND 21C |
| | : OF THE SECURITIES EXCHANGE |
| JOHN THOMAS FINANCIAL, INC., and | : ACT OF 1934, SECTIONS 203(e), 203(f), |
| | : AND 203(k) OF THE INVESTMENT |
| ANASTASIOS "TOMMY' BELESIS, | : ADVISERS ACT OF 1940 AND |
| | : SECTION 9(b) OF THE |
| Respondents. | : INVESTMENT COMPANY ACT |
| | : OF 1940 AND NOTICE OF HEARING |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Sections 15(b)(4), 15(b)(6) and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against John Thomas Capital Management Group LLC, d/b/a Patriot28 LLC ("JTCM"), George R. Jarkesy Jr. ("Jarkesy"), John Thomas Financial, Inc. ("JTF") and Anastasios "Tommy" Belesis ("Belesis") (collectively "Respondents").

## II.

After an investigation, the Division of Enforcement alleges that:

A.   **SUMMARY**

1.    This case concerns fraudulent conduct by Jarkesy, the manager of two hedge funds formerly known as the John Thomas Bridge and Opportunity Fund LP I ("Fund I") and John Thomas Bridge and Opportunity Fund LP II ("Fund II," collectively the "Funds"), and the Funds' adviser, formerly known as JTCM.  As alleged herein, Jarkesy also elevated the interests of Respondents JTF and Belesis over those of the Funds by steering millions of dollars in bloated fees to the broker-dealer.

2.    Jarkesy and JTCM launched Fund I in 2007 and Fund II in 2009.  Since September 2011, the Funds have been known as Patriot Bridge and Opportunity Fund LP I and LP II and the adviser has been known as Patriot28 LLC.[1]

3.    The Funds invest in three asset classes:  bridge loans to start-up companies; equity investments principally in microcap companies; and life settlement policies.  The Funds' assets under management peaked at approximately $30 million at the end of 2011.

4.    Among other things, Jarkesy and JTCM:

   a.    recorded arbitrary valuations without any reasonable basis for certain of the Funds' largest holdings, thus causing the Funds' performance figures to be false and misleading and their own compensation to be falsely inflated;

   b.    marketed the Funds on the basis of false representations about, among other things, the identities of their auditor and prime broker; and

   c.    breached their fiduciary duty of full and fair disclosure to the Funds by failing to disclose their repeated favoring of the pecuniary interests of Belesis, the chief executive officer of JTF, and JTF, which served as the Funds' placement agent.

5.    While they shared the same brand name, JTCM (the adviser) purported to be wholly independent of JTF (the placement agent).

6.    Notwithstanding representations that he was "responsible for all of the investment decisions" of the Funds, Jarkesy capitulated to Belesis' aggressive demands regarding certain investment decisions.  JTCM's purported independence from JTF was a

---

[1]   This Order Instituting Proceedings will refer to the Funds and the adviser by the names they used at their inception.

**APP 0003**

sham designed to enrich Belesis at the expense of the Funds, and to insulate him from future accusations of wrongdoing.

7.      In addition to capitulating to Belesis' demands regarding certain Fund activities, Jarkesy and JTCM abandoned their fiduciary duty to the Funds by negotiating arrangements whereby borrowing companies would divert large fees to JTF and Belesis using proceeds received from the Funds. For example, in connection with certain bridge loans made by Fund I, Belesis (acting through JTF) received hundreds of thousands of dollars in "fees" for providing little or no services.

8.      Jarkesy and JTCM placed the interests of Belesis and JTF above the interests of the Funds, thereby violating the fiduciary duty that they owed to the Funds. For example, after being berated by Belesis for not delivering enough fees, Jarkesy promised him in an email in late 2009, *"We will never retreat we will never surrender and we will always try to get you as much [fees] as possible, Everytime [sic] without exception!"*

## B.   <u>RESPONDENTS</u>

9.      Respondent JTCM is an unregistered investment adviser that serves as the general partner of two hedge funds, John Thomas Bridge and Opportunity Fund LP I and John Thomas Bridge and Opportunity Fund LP II. It is based in Houston, Texas.

10.      Respondent Jarkesy, age 38, of Tomball, Texas, is the manager of JTCM. In that capacity, Jarkesy purportedly controls all operations and activities of JTCM and the Funds. Jarkesy is a frequent media commentator, a radio talk show host, and the founder of the National Eagles and Angels Association, an organization designed to introduce investors to start-up companies in need of financing.

11.      Respondent Belesis, age 38, of New York, New York, is the founder and chief executive officer of JTF, which is based in New York. Until late 2011, JTF was the primary placement agent for the Funds, and was one of several broker-dealers that executed equity trade orders for the Funds. Belesis and Jarkesy became acquainted in 2003.

12.      Respondent JTF is a broker-dealer registered with the Commission and a member of the Financial Industry Regulatory Authority ("FINRA"). Approximately 125 registered representatives are associated with the firm. JTF is wholly owned by ATB Holding Company LLC, which is controlled by Belesis. JTF offers brokerage and investment services, investment banking services and private wealth management.

## C.   <u>FRAUD ON THE FUNDS</u>

### <u>Background</u>

13.      Jarkesy created JTCM as an unregistered investment adviser in 2007 to serve as the adviser to Fund I. The venture grew from Jarkesy's prior successes with bridge loan financings.

3

**APP 0004**

14.     In 2009, Jarkesy and JTCM formed a twin fund: Fund II. With the termination of Fund I scheduled for 2012, Fund II was formed in order to hold certain longer-term investments, including life settlement policies that had not matured. Initially, Fund II was structured to solicit foreign investors but when none bought shares, JTCM opened Fund II to domestic investors.

15.     Jarkesy and JTCM purport to invest the Funds in three asset classes: (i) equity investments, including shares of stock, options and warrants, mostly in speculative microcap companies that are either not traded publicly or thinly-traded over the counter; (ii) bridge loans to public and non-public growth-stage companies; and (iii) life settlement policies. Although only Fund I is invested in life settlement policies, Fund II is invested in Fund I.

16.     The Funds' limited partnership agreements ("LPAs") with shareholders provide that publicly traded securities will be valued at market price, dealer-supplied prices or by pricing models, but that Jarkesy may exercise his discretion in adjusting the values of both public and non-public holdings. The LPAs also provide that Jarkesy, as manager, has the discretion to value the Funds' non-publicly traded holdings as he "may reasonably determine." The Annual Financial Statements JTCM provided to investors, which included the independent auditors' report, stated that JTCM "records its investments at fair value" and had adopted Financial Accounting Standard 157 for purposes of valuation of the Funds' holdings, although JTCM has no records of its pricing analysis to support its valuation.

17.     Jarkesy, as the manager of JTCM, was solely responsible for ensuring that the values assigned to the Funds' investments were consistent with representations in the LPAs.

18.     The Funds' former administrator calculated the Funds' monthly net asset value based on valuation data provided by JTCM and Jarkesy. The administrator explicitly defined itself as a "scorekeeper" that did not independently analyze or verify the valuation data it was provided.

19.     The Funds' former independent auditor expressly limited the scope of its valuation work to verifying that the Funds had correctly recorded the price of publicly traded securities; the auditor did not verify the valuation Jarkesy and JTCM assigned to non-publicly traded holdings. In practice, Jarkesy often invoked his discretion in order to misprice certain of the Funds' holdings.

20.     Each Fund has a lock-up period. Fund I's lock-up period was five years and was scheduled to expire in September 2012, when the Fund was to terminate. At that time, Jarkesy and JTCM were expected to distribute its assets in cash and/or in kind, although distribution was incomplete by the end of December 2012. Fund II's lock-up period is four years and Fund II is scheduled to terminate no later than 2019. With Jarkesy's consent and

**APP 0005**

at his discretion, and provided they pay a penalty fee, investors can redeem their shares before the respective lock-up periods expire.

21.     JTF had several roles relating to the Funds, although JTF and JTCM purported to be wholly independent.  JTF served as the primary placement agent for solicitation of investments in the Funds; it served as the investment bank for some of the companies that received bridge loans from the Funds; and it acted as the broker for many of the Funds' equity trades.  To date, JTF has received millions of dollars in fees related to the Funds.

22.     At the end of 2011, Jarkesy valued Fund I at approximately $18 million to $20 million and Fund II at approximately $10 million. The Funds' auditor reported Fund I's "total return since inception" was twenty-four percent. Together the Funds have approximately 120 investors.

23.     Under the applicable LPAs, Jarkesy earns an incentive fee only after investors earn a nine percent return.  After that, he earns a twenty percent incentive fee on any profits above the first nine percent.  In addition, he earns a two percent management fee to cover operational costs of the Funds, including his own expenses, such as travel.  To date, JTCM has received at least $1.3 million in management fees, and Jarkesy has received at least $260,000 as an incentive fee with more than $500,000 additionally accrued for his incentive but not yet paid.

### Jarkesy's Baseless Valuation of Fund Holdings

24.     Investors in the Funds received monthly statements indicating the value of their shares and gains or losses compared with previous time periods.  Investors' monthly statements did not identify the Funds' holdings or the values of each of the Funds' positions, however the value of each investor's shares was derived from a portion of the Funds' overall values.

25.     Jarkesy and JTCM misrepresented the value of shareholders' investments in the Funds, which were based on an arbitrary and *ad hoc* methodology that differed from disclosures in the LPAs.  As alleged more fully herein, Jarkesy's and JTCM's misrepresentations included incorrect valuations of the Funds' equity positions in certain companies, incorrect valuations of the Funds' short-term notes provided to other companies, and misvaluing of at least two of the Funds' life settlement policies.

26.     JTCM's internal monthly holdings reports identified the Funds' holdings and the values of each position.  The holdings reports served as the basis for valuing investors' Fund shares, which JTCM reported to investors on monthly statements.  In addition, JTCM used the internal holdings reports to establish the Funds' performance, which was shared with existing and prospective shareholders.  Finally, the net asset values of the Funds were the basis for calculating Jarkesy's management and incentive fees, which were deducted from the Funds.

5

**APP 0006**

27.     For certain of the Funds' holdings, Jarkesy arbitrarily inflated valuations, causing his management and incentive fees, and the valuation of investors' shares, to be materially overstated.  Specific examples are provided below.

Company A:  An Invented and Inconsistent Valuation

28.     Company A was formed in April 2010 when Company C, a company in which the Funds had invested, merged with a third company.

29.     JTF and Belesis had a long-standing relationship with Company C.  JTF had raised substantial amounts of capital for the company through numerous private placements.

30.     Jarkesy and JTCM first invested the Funds in Company C in 2009, when Fund I extended a bridge loan to the company. That loan was repaid, and another one was made at the end of the year. From that point on, neither of the Funds' loans to Company C was repaid; instead, the Funds received allotments of penalty shares of Company C and then Company A after the merger. In 2010, the Funds' positions in Company A had grown disproportionately to their other holdings so that nearly a third of each Fund's assets were invested in Company A.

31.     By late 2010, the Company A position grew to a paper value of more than $8 million in Fund I, and more than $2 million in Fund II, or nearly a third of each Fund's values.

32.     In various versions of JTCM's internal monthly holdings statements for the same time period, Jarkesy's valuations of Company A's equity position were inconsistent, such as with two versions of the January 2009 holdings statement that valued the Company A position at seventy-five cents and $750,000.

33.     On JTCM's internal monthly holdings statements, Jarkesy recorded large swings in Company A's share value – ranging from more than three dollars per share in August 2010 to ten cents in December 2010 – that did not pertain to any underlying change in Company A's prospects or financial condition, and that he could not otherwise explain.

34.     In addition, Jarkesy's valuation of Company A's shares was inconsistent across versions of the monthly holdings statements for the same period.  On some versions of the same month's statement, Jarkesy listed Company A as either ten cents or one dollar per share.  For at least one month, Jarkesy listed Company A's per-share value for Fund I differently than he listed it for Fund II.

35.     The conflicting and inconsistent valuation of Company A was exacerbated in May 2011 by a typographical error made by JTCM's controller, who accidentally entered the value at two cents per share when it should have been sixty cents.  After the error, Jarkesy retained an outside consultant to confirm his valuation.

6

36.     The outside consultant, however, disregarded actual data and based its valuation on the assumption that Company A – a deeply troubled company that had never earned a single dollar – would generate $61 million in revenue in 2011.

37.     In June 2011, shortly after receiving the consultant's report, Jarkesy wrote off the Funds' investment in Company A.

38.     Jarkesy's valuations of Company A shares were arbitrary and inconsistent with Jarkesy's obligation to use his discretion to make reasonable valuation determinations as disclosed in the LPAs, and resulted in the recording of unreasonable and unsupported valuations on JTCM's monthly holdings reports.  The phony valuations on the monthly holdings lists served as the basis for valuing shareholders' individual positions in the Funds, which were reported to them on monthly statements.  Performance results for the Funds, and management and incentive fees for the adviser and manager, also were derived from the baseless and unreasonable values Jarkesy recorded on the monthly holdings lists.

Company B:  Jarkesy Hired Promoters to Boost the Share Price

39.     In 1996, Jarkesy personally invested in a publicly traded shell company (the "shell") that, after a later merger, would become Company B.  Jarkesy was chairman of the board of directors of the shell; in 2007, when he formed JTCM and the Funds, he stepped down as chairman but remained a director.

40.     Jarkesy and JTCM invested approximately $200,000 of the Funds' money in the shell in late 2009, and the Funds became the shell company's controlling shareholders.  The shell merged with a small, private oil and gas company in the summer of 2010 to form Company B, a microcap oil and gas exploration company.  The Funds owned approximately twenty-five percent of Company B's unrestricted stock after the merger, which Jarkesy valued by reference to its publicly quoted share price. At the time, public trading of Company B's shares in the over the counter market had only recently commenced and was extremely thin.

41.     Between November and December 2010, Company B's share price jumped from $1 to $4.  Accordingly, Jarkesy revalued the position on JTCM's monthly holdings reports, causing a material improvement in the Funds' performance. The beneficial spike in Company B's stock price did not, however, correlate to any disclosed corporate event.

42.     About a year later, in late 2011, Jarkesy testified under oath that the sudden increase in Company B's stock price may have been due to a bank extending a loan to the company, thereby indicating to the marketplace that Company B had upside as a company. No such bank loan was extended to Company B between November and December 2010, when its share price jumped.

43.     Jarkesy was in fact directly responsible for orchestrating the increase in Company B's share price at the end of 2010 through a promotion campaign he financed using money in Fund I's bank account.  In December 2010, he authorized at least three

7

**APP 0008**

wire transfers totaling $35,000 from Fund I's bank account to a promotional firm he selected to tout Company B and its stock.

44.     Jarkesy's transfers from Fund I to the promoter coincided with the jump in Company B's share price.  As a result, Jarkesy was able to record unreasonable and unsustainable valuations for the Funds' Company B shares at the same time he was writing down the value of the Company A holding, thus stabilizing the Funds' year-end performance.

45.     Jarkesy also manipulated the value of Company B's shares in JTCM's records in other ways.  For example, at a time when the market – and Jarkesy – valued Company B shares at $1 each, he sold 300,000 shares from Fund I to Fund II at twenty-two cents per share.  Then, after the shares had been transferred to Fund II, he re-valued them in Fund II at $1 per share.

46.     Jarkesy also recorded values for Company B's warrants held by the Funds that were inconsistent with the valuation methods disclosed in the LPAs.  Between August and December 2010, his values for the warrants ranged from twelve cents to $6.92. While a warrant's value often correlates with the value of the stock, which for Company B increased from $1 to $4 during that time period, it rarely rises higher than the value of the stock, particularly in the case of a speculative penny stock.  Jarkesy's work papers for his valuation of Company B warrants reflect that he calculated the value based on an inaccurate share price, which therefore generated warrant values inconsistent with the methods disclosed in the LPAs.

47.     Furthermore, Jarkesy's accounting for the Funds' holdings of shares of Company B are at odds with Company B's filings with the Commission.  Company B reported a reverse stock split effective in September 2010, but the Funds' holdings reports for August 2010 prematurely reflected the reverse split and thereby enabled Jarkesy to record a premature benefit from the reverse split.

Company D:  Jarkesy Also Hired Promoters to Boost Share Price

48.     Company D is a publicly traded microcap company in which Jarkesy invested both personally and on behalf of the Funds.  Until February 2012, Jarkesy was a director of Company D.

49.     Jarkesy, as a director of Company D, voted to hire three different promotional firms in early 2011 to promote the company. Jarkesy paid the promoters directly from Fund I's bank account and with cash that Fund II loaned to Company D that was earmarked for paying promoters.  In addition, the promoters were compensated with Company D shares.

50.     As with his use of Fund money to finance the Company B promotional campaign, Jarkesy's direct and indirect financing of Company D's promotion with Fund

**APP 0009**

assets was designed to boost the value of the Funds' large equity positions in Company D and maintain the Funds' overall performance.

51.　　The promotional campaigns that Jarkesy financed with Fund money had the effect of enhancing Jarkesy's own remuneration. If the promotional campaigns were successful in raising the share prices for publicly traded holdings of the Funds, such as Company D and Company B, then the Funds' valuation would increase – along with Jarkesy's compensation, which was based on the Funds' value and performance.

52.　　Jarkesy also used cash from the Funds to make several short-term bridge loans to Company D. Throughout 2010, Jarkesy valued $1.3 million of these loans at par in Fund I's portfolio. In reality, Company D – as disclosed in its 2010 Form 10-K filed with the Commission – had defaulted on those loans as of December 31, 2009. As a result, Fund I's valuation falsely reflected a par value for the loans when at best, the position would have been worth the value of whatever penalty shares the Fund expected to receive in exchange for repayment of the loans.

Life Settlement Policies: Inconsistent Values in Fund Documents

53.　　Jarkesy and JTCM purchased twelve life settlement policies in Fund I. When the first policy paid off on the death benefit in the spring of 2011, the proceeds were distributed to investors. The Funds acquired the life settlement policies, and assumed responsibility for payment of their premiums, to obtain the payouts that would occur upon the death of the individuals covered by the policies.

54.　　Jarkesy claimed – and told at least one Fund investor – that JTCM retained one of his former business associates to value the life settlement policies using a Milliman model, an industry standard valuation tool used to calculate the net present value of policies. The associate purportedly inputted life expectancies provided by third-party agencies, which he then used to generate the value of the policies. However, the Funds' former auditors' work papers indicate that it was Jarkesy, not his associate, who valued the life settlement policies using the Milliman model. Thus, investors received different information about who was responsible for the valuation of the assets meant to hedge the Funds' risky, speculative investments, undermining the reliability of what was represented to be the conservative side of the Funds.

55.　　Between February and March 2010, JTCM's internal documents showed that the values of two of the life settlement policies more than doubled, one rising from $900,000 to nearly $2.6 million and the other increasing from $526,000 to $1.4 million. In calculation tables JTCM purportedly used to value the policies, however, no such increase was indicated. The internal documents, which are inconsistent with the calculation tables, were the basis of monthly statements that were sent to investors.

56.　　Jarkesy has explained that the two life settlement policies were revalued based on a suggestion from the Funds' former auditor. However, the auditor's suggestions would have changed the values by approximately three percent, while Jarkesy's baseless

9

**APP 0010**

changes resulted in increasing the two policies by 167 percent and 184 percent, respectively, thereby increasing the Funds' overall asset value by nearly twelve percent. Management fees payable to JTCM and Jarkesy, and Jarkesy's incentive fees, were correspondingly increased as a percentage of the overall asset value of the Funds.

## JTCM's Sales Materials Contain Misrepresentations

57.     Jarkesy controlled all aspects of the creation of JTCM's marketing materials. JTCM's and Jarkesy's marketing materials for the Funds contained material misrepresentations about the Funds' performance, allocation of assets, and service providers – including prime broker and auditor – that Jarkesy included to create an appearance of legitimacy.

58.     Jarkesy materially exaggerated aspects of JTCM's operations in sales and marketing materials, including that:

    a.    JTCM engaged in "detailed legal and technical due diligence" before investing Fund assets when, in fact, such diligence consisted merely of cursory analysis conducted by Jarkesy, for example, his seeking free advice from academic or industry experts and investors in the Funds;

    b.    JTCM employed many expert consultants when, in fact, Jarkesy had yet to hire his only in-house analyst at the time the literature was prepared;

    c.    as manager, Jarkesy had more than 10 years of experience, "both years as a professional as well as years in the firm;"

    d.    estimated annual returns of Fund I would be thirty percent;  and

    e.    no investment would exceed five percent of either Fund's value when, in fact, at least one investment (Company A and its predecessor company, Company C) exceeded a third of the value of each Fund in 2010.

### The Funds' Auditor was not KPMG

59.     Investor updates and other marketing materials created by Jarkesy and JTCM between 2008 and 2010 identified KPMG LLP, among others, as the auditor of Fund I.  Other marketing materials also identified KPMG as auditor for both Fund I and Fund II.  Belesis and JTF marketed Fund I and Fund II to potential investors with the understanding that KPMG was the auditor of both Funds.

60.     KPMG never audited Fund I.

**APP 0011**

61.     KPMG also never audited Fund II.  In 2009, Fund II was created as a vehicle for foreign investors and JTCM and Jarkesy retained KPMG's Cayman Island office for audit work.  When no foreigners invested in Fund II, the Fund was opened to American investors and KPMG resigned without having done any substantive audit work.

62.     One set of JTCM marketing materials for Fund I dated June 1, 2007, identified Malone & Bailey, P.C., now known as MaloneBailey LLP, as the auditor. MaloneBailey never audited either of JTCM's Funds.

63.     Contrary to much of Jarkesy's and JTCM's marketing materials, neither KPMG nor MaloneBailey ever audited the Funds.  The actual auditor of the Funds was a small Houston-based firm that resigned from the engagement in 2011.

The Funds' Prime Broker was not Deutsche Bank

64.     Jarkesy's and JTCM's marketing materials for the Funds identified Deutsche Bank, among others, as the Funds' prime broker.  Deutsche Bank, however, never had a prime brokerage agreement with JTCM, and requested that the designation "prime broker" be removed from the private placement memorandum ("PPM") for Fund II, which had an inactive retail account at Deutsche Bank for six months in 2009.

65.     After Deutsche Bank requested that the false designation of "prime broker" be removed from Fund II's PPM, JTCM and Jarkesy continued to falsely identify it as the Funds' prime broker in other marketing materials.

The Undisclosed Role of Belesis and JTF in Fund Operations

66.     JTCM – acting through Jarkesy, its manager – represented that it was solely responsible for managing the Funds.  The only disclosed connection between JTF and JTCM was JTF's role as placement agent and potential broker-dealer for the Funds' securities transactions.  There was no disclosure – or even suggestion – that JTF or Belesis would become involved in JTCM's and the Funds' investment activities.

67.     To underscore the independence of JTCM and JTF, JTCM's website included a disclaimer indicating that other than using JTF as a placement agent, JTCM had no business relationship with JTF.

68.     Belesis was aware of the disclaimer distancing JTCM from JTF because he used it as a model in an unrelated business venture.

69.     In reality, Belesis frequently sought to intervene in the Funds' business decisions.  As leverage, Belesis conveyed to Jarkesy – often in a profane and belligerent manner – that the millions of dollars invested into the Funds by JTF customers required Jarkesy to follow Belesis' instructions.

11

**APP 0012**

70.     In light of his improper meddling in the Funds' business, Belesis separately indicated to registered representatives at JTF that the independence of JTCM and JTF on paper would be a helpful fact in the event anything improper happened with respect to the Funds.

71.     For example, Belesis – sometimes, but not always, in collaboration with Jarkesy – periodically guided how the Funds' money would be invested in Company A. Company A's chief executive officer requested that Belesis allocate Fund money to pay operating costs, including rent, payroll and payments to Company A's service providers. The Funds' bank records show debits to pay certain Company A expenses.

72.     In some cases, Belesis' decisions regarding Company A, one of the Funds' largest holdings, overrode the decisions of Company A's corporate officers, who implored him to handle company affairs differently.  As one example, Company A officers were displeased with Belesis' choice of chief financial officer for the company, who they thought required too high a salary.

73.     As another example, Company A's officer complained that Belesis prematurely completed a stock purchase agreement that they had wanted to revise. However, Company A's officers had no choice but to accept Belesis' decisions about their company because of Belesis' influence over when, how and if money would flow to Company A from the Funds, the company's main source of capital.

74.     Belesis also supplanted Jarkesy as the decision maker for JTCM in connection with certain of the Funds' investments in Company B.  Indeed, Belesis' role was clear when the Funds extended a bridge loan to Company B and the proceeds were delayed in arriving at the company.  The company president and chief executive officer addressed Belesis – not Jarkesy, the supposed exclusive manager of the Funds – about the delay, and Belesis reassured him, *"You will have it, smoke a nice cigar."*

75.     Numerous emails reflect Jarkesy's subservience to Belesis and efforts to please him by offering him benefits from the Funds' investment activities, including cash, fees and securities.

<u>The Undisclosed Business Relationship between JTCM and JTF</u>

76.     In addition to the undisclosed influence Belesis exerted over the Funds' operations, JTCM and Jarkesy, despite publicly professing their independence from JTF, were in fact actively seeking to generate revenue for JTF and Belesis.  For example, in March 2009, a JTCM employee wrote to Belesis:

> George [Jarkesy] and I have worked hard over the past month creating a backlog of potential clients for JTF and JTCM....We now have two or three that could be JTF clients in a matter of weeks with tens of thousands of dollars in monthly fees not to mention [another business transaction] already in the bag....

12

**APP 0013**

> The failure of your staff to execute payment on our contract has put a stop to our progress. . . . I still have high hopes for the potential of this liaison between JTF, JTCM … and myself.  Based upon your email below I estimate that you feel same.   George, I know is optimistic of the potential that this relationship holds….

77.     In March 2009, the director of a company that JTCM and Jarkesy had steered to JTF asked to meet with Belesis before paying for JTF's services.  In response, Belesis erupted at Jarkesy:  "*GEORGE WHAT KIND OF BULL[…]T IS THIS*".

78.     Jarkesy's reply indicates his allegiance to Belesis:  "*I just told him to send the stock and money, sign the document or get lost*," he wrote. "*I think this will get done today. Nobody gets access to Tommy [Belesis] until they make us money!!!!!*"

<u>Jarkesy and JTCM Diverted the Funds' Money to Enrich Belesis and JTF</u>

79.     In breach of his fiduciary duty to the Funds, Jarkesy, through his role at JTCM, actively negotiated fees on behalf of JTF and Belesis in connection with the Funds' activities, to the detriment of the Funds.

80.     Jarkesy used his role as manager of the Funds to enrich Belesis and JTF, and kept an appreciative Belesis apprised of his efforts.  For example, Jarkesy giddily wrote to Belesis in March 2010: "*[W]e are all going to make so much f[…]ing money this year, the clients of John Thomas are going to have a banner year….Write yourself a check and get ready to cash it $45 million.*" Belesis replied, "*Sounds great buddy, look forward to it…. Lol [laughing out loud],*" to which Jarkesy responded, "*Your [sic] going to not stop laughing when you are liquidating everyones [sic] stock.*"

81.     On another occasion, after Belesis complained that Jarkesy was not securing sufficient fees for JTF in February 2009, Jarkesy responded that "*we will always try to get you as much as possible, Everytime [sic] without exception!*"

82.     Overall, Jarkesy's allegiance to Belesis and JTF cost the Funds significant sums of money, directly or indirectly, for placement fees, loans to small companies that then used the money to pay fees to JTF, and for unearned bridge loan fees JTF received for doing no work.

<u>Fund Money Was Routed to JTF for Unearned Bridge Loan Fees</u>

83.     The Funds extended short-term bridge loans to small, usually private companies.  In exchange for the loans, the Funds received interest on the amount of the loan and what Jarkesy called an "equity kicker" of stock, options or warrants in the company.

84.     JTF and Belesis occasionally introduced Jarkesy and JTCM to candidates for bridge loans.  For its involvement, JTF earned a fee of approximately thirteen percent of

13

**APP 0014**

each bridge loan the Funds made. Jarkesy and JTCM made no effort to negotiate a lower fee for JTF.

85.     The Funds typically extended bridge loans to struggling, cash-poor ventures. Every dollar provided in the loan was essential to the borrowers' future prospects and, therefore, the Funds' investment in the borrowing companies and chances of ultimately being repaid. Jarkesy, however, often abandoned his fiduciary duties to the Funds and affirmatively negotiated arrangements whereby the borrowers would divert large fees to JTF using proceeds received from the Funds.

86.     Jarkesy abandoned his fiduciary duties to the Funds and negotiated arrangements whereby the borrowing companies -- in which the Funds were invested and from which the Funds sought repayment – would divert large fees to JTF using proceeds received from the Funds. Thus, Jarkesy, in his capacity as manager of the Funds, when negotiating bridge loans between the Funds and the borrowing companies, placed the interests of Belesis and JTF above the interests of JTCM's clients, the Funds, and assumed responsibility for negotiating on behalf of Belesis and JTF. As examples:

    a.     In March 2009, Jarkesy offered Belesis increasingly favorable fees on a bridge loan the Funds were extending to Company A, and also offered him commissions and warrants without Belesis requesting such benefits.

    b.     In February 2010, Jarkesy drafted a $130,000 commission for JTF in a term sheet for a $1 million bridge loan to a company that expressly informed him that it did not want to commit to long-term financing with JTF.

    c.     In May 2009, Jarkesy structured a transaction between the Funds and Company D specifically so that JTF and Belesis could be "the hero," as Jarkesy wrote in an email, and earn commissions and fees.

87.     Belesis and JTF were willing recipients of the Funds' generosity provided by Jarkesy and JTCM, but it was Jarkesy who was responsible for negotiating their fees from the Funds' bridge loans.

88.     So beholden was Jarkesy to Belesis and JTF that in some instances, Jarkesy negotiated and procured a fee for them even though they had not referred the borrower to the Funds for financing and had done, at most, minimal work relating to the loan. For example:

    a.     Jarkesy was a director of Company D and introduced the company to the Funds for a bridge loan and to JTF for long-term financing. When the Funds extended a bridge loan in October 2008, JTF received a full fee for having done merely negligible work relating to the loan.

**APP 0015**

      b.      Jarkesy was a director of Company B and brought the company to JTF for investment banking work in the summer of 2010.  When the Funds extended a bridge loan to Company B, JTF received a fee on the loan despite having done only minor work on the loan or the referral.

89.      Between 2008 and 2010, JTF was paid a total of $488,750 in fees from four bridge loans, including at least two for which it did nearly inconsequential work.  JTF's fees came from the borrowing company, which paid the fees upon receipt of the bridge loan money from the Funds, thereby immediately diminishing the loans the Funds made by the amount of the fees Jarkesy arranged for JTF.

90.      In addition to the bridge loan fees, Jarkesy and JTCM paid JTF more than $741,000 in brokerage commissions from the Funds' securities trades, and nearly $2.5 million in placement fees for selling shares of the Funds.

## D.    VIOLATIONS

1.      As a result of the conduct described above, JTCM and Jarkesy willfully violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities.

2.      As a result of the conduct described above, JTCM and Jarkesy willfully aided, abetted and caused the Funds' violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities.

3.      As a result of the conduct described above, JTCM and Jarkesy willfully violated Sections 206(1), 206(2) and 206(4) of the Advisers Act, which prohibit fraudulent conduct by an investment adviser, and Rule 206(4)-8 thereunder, which prohibits making any untrue statement of a material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading to any investor or prospective investor in a pooled investment vehicle or otherwise engaging in any act, practice, or course of business that is fraudulent, deceptive or manipulative with respect to any investor or prospective investor in a pooled investment vehicle.

4.      As a result of the conduct described above, JTF and Belesis willfully aided, abetted and caused JTCM's and Jarkesy's violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, which prohibit fraudulent conduct by an investment adviser, and Rule 206(4)-8 thereunder, which prohibits making any untrue statement of a material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading to any investor or prospective

15

**APP 0016**

investor in a pooled investment vehicle or otherwise engaging in any act, practice, or course of business that is fraudulent, deceptive or manipulative with respect to any investor or prospective investor in a pooled investment vehicle.

## III.

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative and cease-and-desist proceedings be instituted to determine:

A.      Whether the allegations set forth in Section II hereof are true and, in connection therewith, to afford Respondents an opportunity to establish any defenses to such allegations;

B.      What, if any, remedial action is appropriate in the public interest against Respondents pursuant to Sections 15(b)(4) and 15(b)(6) of the Exchange Act including, but not limited to, disgorgement and civil penalties pursuant to Section 21B of the Exchange Act;

C.      What, if any, remedial action is appropriate in the public interest against Respondents JTCM and Jarkesy pursuant to Section 203(f) of the Advisers Act including, but not limited to, disgorgement pursuant to Section 203(j), civil penalties pursuant to Section 203(i) and censure pursuant to Section 203(e) of the Advisers Act;

D.      What, if any, remedial action is appropriate in the public interest against Respondents JTCM, Jarkesy, JTF and Belesis pursuant to Section 9(b) of the Investment Company Act including, but not limited to, disgorgement pursuant to Section 9(e) and civil penalties pursuant to Section 9(d) of the Investment Company Act; and

E.      Whether, pursuant to Section 8A of the Securities Act, Section 21C of the Exchange Act, and Section 203(k) of the Advisers Act, Respondents should be ordered to cease and desist from committing or causing violations and any future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1), 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, whether Respondent Jarkesy should be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act if the conduct of that Respondent demonstrates unfitness to serve as an officer or director of any such issuer, whether Respondents should be ordered to pay a civil penalty pursuant to Section 8A(g) of the Securities Act, Section 21B(a) of the Exchange Act, Section 203(i) of the Advisers Act, and Section 9(d) of the Investment Company Act, and whether Respondents should be ordered to pay disgorgement pursuant to Section 8A(e) of the Securities Act, Sections 21B(e) and 21C(e) of the Exchange Act, Section 203(j) of the Advisers Act, and Section 9(e) of the Investment Company Act.

**APP 0017**

## IV.

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondents shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondents fail to file the directed answer, or fail to appear at a hearing after being duly notified, the Respondents may be deemed in default and the proceedings may be determined against them upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondents personally or by certified mail.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.

Elizabeth M. Murphy
Secretary

**APP 0018**



| | | | |
|---|---|---|---|
| Ontario Securities Commission | Commission des valeurs mobilières de l'Ontario | P.O. Box 55, 19th Floor 20 Queen Street West Toronto ON M5H 3S8 | CP 55, 19e étage 20, rue queen ouest Toronto ON M5H 3S8 |

---

**IN THE MATTER OF THE *SECURITIES ACT*,**
**R.S.O. 1990, c. S.5, AS AMENDED**

**- AND -**

**IN THE MATTER OF LIBERTY SILVER CORP.**

**TEMPORARY ORDER**
**(Subsections 127(1), 127(5) & 127(10))**

**WHEREAS** on October 5, 2012, the United States Securities and Exchange Commission (the "SEC") ordered, pursuant to Section 12(k) of the *Securities Exchange Act of 1934*, that trading in the securities of Liberty Silver Corp. ("Liberty Silver") is suspended for the period from 9:30 a.m. EDT, on October 5, 2012 through 11:59 p.m. EDT, on October 18, 2012 (the "SEC Order");

**AND WHEREAS** Liberty Silver is subject to an order made by the SEC, which is a securities regulatory authority in the United States of America, that imposes sanctions, conditions, restrictions or requirements on Liberty Silver within the meaning of paragraph 4 of subsection 127(10) of the *Securities Act*, R.S.O. 1990, c. S.5, as amended (the "Act");

**AND WHEREAS** the securities of Liberty Silver are traded on the Toronto Stock Exchange;

**AND WHEREAS** a hearing was held on October 12, 2012, pursuant to a Notice of Hearing issued on October 11, 2012;

**AND WHEREAS** counsel to Liberty Silver was given notice of the intention of Staff of the Ontario Securities Commission (the "Commission") to seek this order, counsel to Liberty Silver did attend the hearing, and this order is unopposed;

**APP 0019**

**AND WHEREAS** the Commission is authorized to make public interest orders under subsections 127(1) and 127(10) of the Act;

**AND WHEREAS** the Commission is of the opinion that the time required to conclude a hearing could be prejudicial to the public interest as set out in subsection 127(5) of the Act;

**AND WHEREAS** the Commission considered the submissions and material provided by Staff counsel and counsel to Liberty Silver and is of the opinion that it is in the public interest to make this order, pursuant to subsections 127(1) and 127(10) of the Act;

**IT IS ORDERED** pursuant to Rule 1.6(2) of the *Ontario Securities Commission Rules of Procedure* that the time for service is abridged;

**IT IS FURTHER ORDERED** pursuant to paragraph 2 of subsection 127(1) of the Act that trading in the securities of Liberty Silver shall cease, with the exception of the issuance from treasury of securities of Liberty Silver; and

**IT IS FURTHER ORDERED** that this order shall take effect immediately and shall expire at 11:59 p.m. on October 18, 2012, or at such earlier time as the SEC Order is lifted.

Dated at Toronto this 12th day of October, 2012.


*"Edward P. Kerwin"*                          *"James D. Carnwath"*
_____          _____
Edward P. Kerwin                              James D. Carnwath

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JOSEPH M. SALVANI and JFS INVESTMENTS,    :
INC.,                                      :
                                           :
                    Plaintiffs,            :
                                           :
        - against -                        :            **OPINION AND ORDER**
                                           :            13 Civ. 7082 (ER)
ADVFN PLC, a company incorporated under the :
laws of the United Kingdom,                :
INVESTORSHUB.COM, INC., and JOHN DOE,      :
known herein as "brkylnrusso,"             :
                                           :
                    Defendants.            :
----------------------------------------------------------------x

Ramos, D.J.:

   This case arises out of allegedly defamatory statements made on an online message board that caters to members of the securities industry. Plaintiffs Joseph M. Salvani and JFS Investments (together, "Plaintiffs") allege that Defendant John Doe ("Doe") made untrue statements regarding Plaintiffs' business on Defendant InvestorsHub.com, Inc.'s ("InvestorsHub") website. Defendant Doe allegedly accused Salvani of orchestrating a pump and dump scheme by artificially inflating certain stocks and selling them in order to profit at the inflated prices. According to Plaintiffs, this post damaged Plaintiffs' business and caused stock held by them to decline.

   Plaintiffs bring suit against Defendant Doe, InvestorsHub, and ADVFN PLC ("ADVFN"), the company that controls InvestorsHub. On October 4, 2013, Plaintiffs filed their original complaint, alleging federal question jurisdiction but bringing claims only under state law. Doc. 1. Plaintiffs filed the Amended Complaint on December 10, 2013, adding claims

under Sections 10(b)[1] and 9(a)(4) of the Securities Exchange Act of 1934 ("Exchange Act") and two additional state law claims not included in the original complaint. Doc. 7. On February 18, 2014, Plaintiffs filed the Second Amended Complaint ("SAC"), alleging the two federal securities law claims as well as the following six claims under state law: (i) defamation; (ii) libel; (iii) tortious interference with contract; (iv) aiding and abetting; (v) intentional infliction of emotional distress; and (vi) a permanent injunction for the removal of the allegedly defamatory post.

Presently before the Court is Defendant InvestorsHub's motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. Doc. 18. Defendant contends that Plaintiffs' Exchange Act claims are not colorable and that there is therefore no basis for this Court's jurisdiction. For the reasons discussed below, Defendant's motion to dismiss pursuant to Rule 12(b)(1) is DENIED, however, the Court dismisses the SAC *sua sponte* pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[2]

---

[1] The claim under Section 10(b) of the Securities Exchange Act is also brought under Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), which was promulgated under Section 10(b). For the purposes of the instant decision, the Court will refer to the claim as arising under Section 10(b).

[2] Defendant ADVFN and Defendant Doe have not yet been served. However, because Plaintiffs' claims against those defendants suffer from the same deficiencies as against InvestorsHub, the Court will treat the instant motion as if it were brought on behalf of all defendants. *Cf. Hamilton v. Broomfield*, No. 95 Civ. 3241 (MBM), 1998 WL 17697, at *1n.1 (S.D.N.Y. Jan. 20, 1998) (dismissing claims against unserved defendant because they were identical to claims against defendant who filed the motion to dismiss); *Johnson v. New York City*, No. 12 Civ. 4379 (KBF), 2013 WL 950870, at *3 (S.D.N.Y. Mar. 7, 2013), *aff'd*, 551 F. App'x 14 (2d Cir. 2014) (dismissing claims *sua sponte* against defendant who had not been served); *Virtual Dates, Inc. v. Afternic.com, Inc.*, No. 01 Civ. 4023 (LAK), 2001 WL 1646451, at *2 (S.D.N.Y. Dec. 20, 2001) (dismissing complaint against defendant who had not been served because the complaint was deficient against this defendant for "precisely the same" reasons).

## I. Factual Background

The following facts are based on the allegations in the Second Amended Complaint, which the Court accepts as true for purposes of the instant motion. *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 607 (S.D.N.Y. 2007).

Salvani has worked as an investment advisor through his company JFS Investments Inc. for over 25 years. SAC ¶ 20. Until September 5, 2013, Salvani was party to a written consulting agreement with CodeSmart Holdings, Inc. (stock symbol "ITEN"),[3] whereby Salvani advised CodeSmart in its dealings with institutions and retail investors. *Id.* ¶ 22. Salvani received cash and CodeSmart securities under the contract. *Id.* ¶ 23. The value of the contract was in excess of $3 million. *Id.* at ¶ 22.

InvestorsHub is a content provider operating under the control of ADVFN. *Id.* ¶ 28. ADVFN generates revenues from InvestorsHub through the solicitation of paid memberships throughout the United States. *Id.* ¶ 29. Membership consists of approximately 250,000 accounts, including traders and other securities professionals. *Id.* InvestorsHub provides a forum for members to post messages seeking public review and comment. *Id.* According to InvestorsHub, the site is intended as a "forum for serious investors to gather and share market insights in a dynamic environment using an advanced discussion platform." *Id.*

Only subscription members of InvestorsHub who have accepted the website's "Terms of Service" may post on its message boards. *Id.* ¶ 31. The Terms of Service require that members refrain from uploading, sharing, posting, or otherwise distributing or facilitating distribution of any content that is, *inter alia*, "unlawful, threatening, abusive, harassing, defamatory, libelous, vulgar, hateful, deceptive, fraudulent, invasive of another's privacy, [or] tortious . . . ." *Id.* ¶ 32.

---

[3] CodeSmart trades in the Over-the-Counter Bulletin Board market. SAC ¶ 54.

However, InvestorsHub is not obligated by its Terms of Service to remove any content that does not comply with the Terms or other rules of conduct for the site, or that is "otherwise harmful, objectionable, or inaccurate, or clearly detracts from the value of the community, as determined in [its] sole judgment . . . ." *Id.* ¶ 33. InvestorsHub is aware of policy violations by members but does not disclaim the accuracy of such posts or otherwise advise the public that the posts are not "adopted" by the site. *Id.* ¶ 35. Instead, InvestorsHub claims that it is "not responsible for any failure or delay in removing such Content," and only removes content if it chooses to do so. *Id.* ¶ 36.

InvestorsHub uses moderators to screen posts in order to remove what it decides to be offensive conduct. *Id.* ¶ 63. InvestorsHub's User and Moderator Handbook states that the moderators "promote the civil exchange of on-topic dialog that complies with the iHub's Terms of Service" and "help foster an environment that promotes and encourages posting of ALL opinions and information about companies, regardless of the bullish or bearish sentiment of the posts, and to be the site's first line of defense in ensuring [it] remain[s] free of spam, vulgarity, and personal attacks." *Id.* ¶¶ 64, 65 (emphasis omitted). There are more than 17,000 active boards on the InvestorsHub site, of which approximately 6,800 have at least one moderator. *Id.* ¶¶ 67-68. Over 4,300 InvestorsHub members volunteer as moderators on one or more boards. *Id.* ¶ 68.

According to the SAC, InvestorsHub has encouraged, developed, and created a "lawless no-man's land" through the adoption of content-specific banners, such as "Most Shady OTC/PK CEO's (CROOK)," "Fighting the Crooked CEO[s] and /or the MM's that HELP THEM," "Crooks, Frauds, Liars, and Banksters," and "Crooked's Den of Self Actualization." *Id.* ¶ 70. These banners intentionally invite comment, and, according to Plaintiffs, are intended to "expose

the targeted individuals to hatred, contempt, ridicule and obloquy." *Id.* ¶¶ 61, 70. The banners are published without disclaimers. *Id.* ¶ 61. According to Plaintiffs, all InvestorsHub members are on notice that the provider is under no obligation to remove posts—no matter the content— and agree that the site will be immune from liability. *Id.* ¶ 71.

The alleged unlawfulness of the InvestorsHub posts has increased user activity, which has encouraged national financial institutions to advertise on the site. *Id.* ¶ 74. These advertisements increase awareness about InvestorsHub and generate additional income for the site. *Id.*

### The Post by brklynrusso

On September 5, 2013, Defendant Doe (operating under the InvestorsHub screenname "brklynrusso") posted the following message to a forum entitled "CodeSmart Holdings, Inc. (ITEN)":[4]

> salvani was a former broker barred from the financial industry. He now gets "consulting" jobs with OTC bulliten board co's that have no other means to raise money so he goes out w/ his cronies(brokers he knows)that promote the stock. How he gets paid? The brokers are given restricted stock which they subsequently sell he gets paid off with cash in a bag. The stock usually collapses w/ little value once they have exited. Just google Joe Salvani:
>
> http://www.forbes.com/forbes/1998/0504/6109174s1.html he works with this group out on LI and a broker Daniel welsh or walsh from garden state securities who also get stock in all of salvanis deals. they get stock as an advisor for pretty much doing nothing….its a total joke and im shocked the sec hasn't knocked on their door yet.
>
> as for ITEM, 35k rev losing 2mil ayr w/ a 50mil mkt cap….you tell me if this is a real px at 4? pump n dump at its best

SAC ¶ 38 (emphasis omitted).

---

[4] The Court has reproduced Doe's post from the Second Amended Complaint without alteration.

Defendant Doe was, and may still be, a paying member of InvestorsHub and an investor in CodeSmart. *Id.* ¶ 39. Plaintiffs allege that Doe posted the comments with the intention of injuring Plaintiff Salvani and manipulating CodeSmart's stock price, and that Doe knew that his post would be published by InvestorsHub and read by traders and other securities professionals. *Id.* ¶¶ 39, 40. InvestorsHub disseminated Doe's post without disclaimer, and with the knowledge that it would be read by traders and other securities professionals to have this effect. *Id.* ¶ 41.

Plaintiffs assert that Doe's statements were known to be false when made. *Id.* ¶ 43. First, Salvani has not been barred by the financial industry, and there are no orders or judgments against Salvani or JFS Investments issued by the U.S. Securities and Exchange Commission, the Financial Industry Regulatory Authority, or any court of competent jurisdiction. *Id.* ¶¶ 52, 53. Second, Salvani is not involved in a pump and dump scheme involving "brokers he knows." *Id.* ¶ 54. Salvani is not, and has never claimed to be, a broker. *Id.* ¶ 55. He did not participate in any of the illegal activity alleged in Doe's post. *Id.*

Doe's post has appeared on InvestorsHub since September 5, 2013, and rapidly spread across Wall Street through media and subscriber-based news services. *Id.* ¶¶ 42, 56.

On September 5, 2013, Salvani discovered Doe's post and made a written demand to InvestorsHub for its removal. *Id.* ¶ 57. Salvani informed the site that the comments were unlawful and defamatory. *Id.* On September 9, 2013, David Lawrence, InvestorsHub's webmaster, responded to Salvani's demand, refusing to remove the post

and citing InvestorsHub's right "not to make value judgments on the veracity" of its

members' comments.  *Id.* ¶ 58.

As a result of Doe's post, Salvani alleges that the good reputation he has enjoyed

during his 25-year career, both generally and in the financial community at large, has

been damaged.  *Id.* ¶¶ 20, 24.  Doe's post has also had a direct effect on JFS Investments'

ability to participate and perform under the contract with CodeSmart, as well as on other

contracts.  *Id.* ¶ 76.

On August 30, 2013, shortly before the publication of Doe's statements,

CodeSmart stock "began to trade in unanticipated and unexplained volumes experiencing

trading at losses and evincing signs of stock manipulation."  *Id.* ¶ 46.  On August 30,

2013, the stock traded at $4.60 per share.  *Id.* ¶ 47.  The stock then declined from a price

of $3.97 per share on September 6, 2013 to $3.05 on September 10, 2013.  *Id.*  The stock

price continued to decline, reaching $2.13 per share on September 20, 2013, and $1.82 on

November 12, 2013.  *Id.* ¶ 48.  According to Plaintiffs, these stock declines were caused

by Doe's comments.  *Id.* ¶ 49.

Salvani traded his shares at some point during this period of decline.  *Id.*

## II.  Discussion

Defendant brings the instant motion under Rule 12(b)(1) of the Federal Rules of Civil

Procedure for lack of subject matter jurisdiction.  Rule 12(b)(1) requires that an action be

dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or

constitutional power to adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject

matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that

jurisdiction exists.  *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008),

*aff'd*, 561 U.S. 247 (2010) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, evidence outside of the pleadings, such as affidavits, may be considered by the court to resolve the disputed jurisdictional fact issues.  *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true, but does not draw inferences from the complaint favorable to the plaintiff.  *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004), *cert. denied*, 544 U.S. 968 (2005) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998)).

Unlike a dismissal under Rule 12(b)(6), a dismissal under Rule 12(b)(1) is not reflective of the merits of an action.  *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 470 (S.D.N.Y. 2004), *aff'd*, 166 F. App'x 559 (2d Cir. 2006) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).  As the Second Circuit has noted, "in cases where the asserted basis for subject matter jurisdiction is also an element of the plaintiff's allegedly federal cause of action, we ask only whether—on its face—the complaint is drawn so as to seek recovery under federal law or the Constitution."  *Nowak*, 81 F.3d at 1189.  Indeed, in such cases, "the claim should not be dismissed for want of jurisdiction except when it 'appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'"  *AVC Nederland B.V. v. Atrium Inv. P'ship*, 740 F.2d 148, 152-53 (2d Cir. 1984) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)); *see also Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("No doubt if it should appear that the plaintiff was not really relying upon [a federal statute] for his alleged rights, or if the claim of right were

frivolous, the case might be dismissed.").  The question on a Rule 12(b)(1) motion "is whether the federal . . . claim [is] so insubstantial, implausible, . . . or otherwise completely devoid of merit as not to involve a federal controversy."  *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993), *cert. denied*, 513 U.S. 822 (1994).

Here, Defendant InvestorsHub argues that Plaintiffs' Exchange Act claims are not colorable and that the Court therefore lacks subject matter jurisdiction over them.  Def. Mem. L. 4.  Specifically, Defendant contends that Plaintiffs have failed to plead two necessary elements of a claim under Section 10(b) of the Exchange Act:  reliance and loss causation.  *Id.* at 5.  Defendant further argues that the claim under Section 9(a)(4) of the Act necessarily fails because Plaintiffs have failed to plead a colorable 10(b) claim.  *Id.* at 11.  Moreover, according to Defendant, Plaintiff has also failed to allege that a defendant sold or offered to sell CodeSmart securities, as required by Section 9(a)(4).  *Id.*

On a motion to dismiss for lack of subject matter jurisdiction, the Court must simply consider whether the federal claims are wholly insubstantial and frivolous.  *See AVC Nederland*, 740 F.2d at 153.  Plaintiffs here have grounded their allegations in the elements of their federal causes of action, Sections 10(b) and 9(a)(4) of the Act, SAC ¶¶ 77-84.[5]  For example, Plaintiffs

---

[5] To succeed on a claim under Section 10(b), a plaintiff must adequately plead (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 347-48 (S.D.N.Y. 2011).  Section 9(a)(4) similarly prohibits the use of a false or misleading statement in connection with the purchase or sale of a security and has "parallel requirements" to Section 10(b).  *Panfil v. ACC Corp.*, 768 F. Supp. 54, 59 (W.D.N.Y. 1991), *aff'd*, 952 F.2d 394 (2d Cir. 1991).  In *OpenGate Capital Group LLC v. Thermo Fisher Scientific Inc.*, No. 13-1475-GMS, 2014 WL 3367675, at *9 (D. Del. Jul. 8, 2014), the court noted the "little judicial interpretation of the pleading requirements of Section 9" and concluded that the following elements are required for a Section 9(a)(4) claim:  (1) a material misrepresentation; (2) scienter; (3) intent to induce reliance; (4) reliance upon the misrepresentation; and (5) the plaintiff's act in detrimental reliance on the misrepresentation.

have tracked the language of the Act in crafting the allegations in the SAC. Specifically, with respect to the Section 10(b) claim, Plaintiffs contend that:

> brklynrusso, and Investorshub.com by engaging in the conduct described above, directly or indirectly, by use of and the means and/or instrumentality of interstate commerce, and the wire facilities, the facilities of the national securities exchange network, in connection with the purchase and/or sale of securities:
>
> (a) with scienter, employed [] devices, schemes, or artifices to defraud,
>
> (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

*Id.* ¶ 78; *see* Rule 10b-5. Plaintiffs similarly apply the language of the Act in their Section 9(a)(4) allegations:

> By engaging in the conduct described above, brklynrusso, directly or indirectly, by the use of the wires and means or instrumentality of interstate commerce, and the facility of national securities exchange, or for any member of a national securities exchange, engaged in selling or offering for sale or purchasing or offering to purchase the ITEN securities owned by Salvani, made, regarding said security registered on a national securities exchange, did for the purpose of inducing the purchase or sale of ITEN securities, made statements which were at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, and which he knew or had reasonable grounds to believe were so false or misleading and intended to manipulate the market price and ownership interest of Salvani.

SAC ¶ 82; *see* Section 9(a)(4).

Furthermore, Plaintiffs assert a theory of liability that comes within the ambit of the Exchange Act claims. First, the SAC is premised on allegations that Defendants made or published false and misleading statements relating to CodeSmart. Plaintiffs claim that Defendant Doe made the statements with scienter, knowing that they were false and misleading and would cause injury to Plaintiffs. The SAC further alleges that these false statements caused the price of

CodeSmart stock to drop, which resulted in losses to Plaintiffs. Accordingly, whether or not

Plaintiffs can ultimately prevail on their federal causes of action, the Exchange Act claims are

"drawn so as to seek recovery under federal law." *Nowak*, 81 F.3d at 1189.

In the face of similar allegations, courts have consistently rejected challenges to federal

securities claims under 12(b)(1). *See, e.g.*, *AVC Nederland*, 740 F.2d at 152 ("There is no

occasion to consider, on this motion under [Rule] 12(b)(1), defendants' argument that the interest

in Atrium that was offered by AVC was not a 'security' within § 3(a)(10) of the Securities

Exchange Act and that the district court lacked subject-matter jurisdiction on that account");

*Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999) ("[T]he main

issue arising from the pleadings is whether the Pace interests and the Weyland Eagle interests are

'securities' under federal securities laws. . . . To the extent [the] Complaint raises [this]

question[], it is neither 'plainly insubstantial' nor does it fail to present any issue worthy of

adjudication."); *S.E.C. v. Norton*, No. 95 Civ. 4451 (SHS), 1997 WL 611556, at *2 (S.D.N.Y.

Oct. 3, 1997) (denying Rule 12(b)(1) motion and proceeding to determine Rule 12(b)(6) motion

because the issue of whether the complaint failed to allege an offer or sale of a security involved

"elements [that were] integral to plaintiff's ability to state a claim" for securities fraud); *see also*

*Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. 1981) ("We have already specifically held that

the definition of the term 'security' in the context of a suit based on the federal securities laws

may reach the merits of the case and thereby limit the court's discretion to dismiss for lack of

subject matter jurisdiction."); *VT Investors v. R & D Funding Corp.*, 733 F. Supp. 823, 825, 827

(D.N.J. 1990) (analyzing an amended complaint that "alleged inapplicable sections of the

securities laws, misperceived many of the security laws and failed to properly allege the

jurisdiction of the Court" in the context of the Rule 12(b)(6) motion because "legal insufficiency

is not the standard applicable to a motion to dismiss for lack of subject matter jurisdiction"); *cf.*

*Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *1

n.5, *8 (S.D.N.Y. Nov. 19, 2013) (declining to review complaint containing RICO claim under

Rule 12(b)(1) because the claim was "not 'so insubstantial, implausible, or otherwise completely

devoid of merit as not to involve a federal controversy'" and instead dismissing claim under Rule

12(b)(6) because the plaintiffs failed to allege any predicate act or pattern of racketeering activity

(quoting *IUE AFL-CIO Pension Fund*, 9 F.3d at 1056)).

     The allegations here are brought under specific provisions of the Exchange Act, and

Plaintiffs have articulated a theory that is arguably cognizable under Rule 10b-5 and Section

9(a)(4). Accordingly, the Court cannot find that these allegations are not colorable.

     Defendant's motion to dismiss for lack of subject matter jurisdiction is DENIED.

### Dismissal for Failure to State a Claim

     The Second Circuit has made clear that a court may dismiss an action *sua sponte* for

failure to state a claim "so long as the plaintiff is given notice of the grounds for dismissal and an

opportunity to be heard." *Wisoff v. City of Schenectady*, --- F. App'x ----, 2014 WL 2219186, at

*1 n.2 (2d Cir. May 30, 2014) (dismissing a claim against the City of Schenectady for failure to

state a claim where the City moved to dismiss under Rule 12(b)(1), not 12(b)(6)). Here, while

Defendant has challenged the SAC on the basis of subject matter jurisdiction, its argument is

largely premised on the failure of the SAC to state a claim. *See* Def. Mem. L. 5-10. Likewise,

Plaintiffs have responded on the merits. Indeed, in their opposition, Plaintiffs set forth and apply

the standards for *both* Rule 12(b)(1) and Rule 12(b)(6). *See* Pls. Opp. Mem. L. 5, 6.[6] Thus,

---

[6] As Plaintiffs themselves state in opposition to the instant motion:

Plaintiffs were on notice that the SAC could be examined on the merits and responded accordingly.  Therefore, the Court will consider whether to dismiss the action for failure to state a claim.  *Cf. Wisoff*, 2014 WL 2219186, at *1 n.2 (noting that the plaintiff "had the required notice and opportunity to be heard" because the defendant's motion "was entirely premised on [the plaintiff's] failure to allege the existence of a municipal policy, practice, or custom that caused the alleged violation of his constitutional rights"); *see also First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 580, 81 (S.D.N.Y. 2002), *aff'd*, 385 F.3d 159 (2d Cir. 2004) (finding that plaintiffs had "ample notice and availed themselves of the opportunity" to litigate the merits of the federal claims where they devoted a significant portion of their papers to Rule 9(b) and 12(b)(6) arguments, "apparently assuming that the Court would adjudicate these questions despite [defendant's] failure to move for dismissal").

*Rule 12(b)(6) Motions to Dismiss:  General Legal Standard*

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch*, 699 F.3d at 145; *see also, e.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).  However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient

---

In applying the forgoing legal principles the review in this case turns on whether the merits of the claim as guided by Fed. R. Civ. P.  12(b)6 applications and whether Plaintiffs' SAC states a cause of action under the 10(b) and 10b-5, and not whether the Court has the subject matter jurisdiction over the [case] with the Court accepting the claims of the complaint as true and giving all reasonable inferences to Plaintiffs.

Pls. Opp. Mem. L. 7.

factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

*Heightened Pleading Standard under Rule 9(b) and the PSLRA*

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'" (quoting Fed. R. Civ. P. 9(b))).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v.*

*Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)). Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, No. 13 Civ. 4596 (KBF), 2014 WL 1569500, at *9 (S.D.N.Y. Apr. 18, 2014) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

### Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b) (1934), while SEC Rule 10b–5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or to omit[s] to state a material fact ... in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).

To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *Dura Pharms.*, 544 U.S. at 341–42; *see also, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *Kalnit*, 264 F.3d at 138.

### 1. Reliance

Defendant argues that the SAC must be dismissed because Plaintiffs have not pleaded and cannot plead reliance. Def. Mem. L. 7. There are two ways in which a plaintiff may plead reliance in connection with a claim under Rule 10b-5. First, the plaintiff may allege that he "directly relied on defendants' misrepresentations." *In re AES Corp. Sec. Litig.*, 849 F. Supp. 907, 909 (S.D.N.Y. 1994). A plaintiff can demonstrate direct reliance "by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2181 (2011). Second, the plaintiff "may allege that [he] relied on the integrity of the market, i.e., the 'fraud on the market' theory." *In re AES Corp. Sec. Litig.*, 849 F. Supp. at 909-10 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988)). "The fraud on the market theory is based on the premise that 'an investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.'" *Id.* at 910 (quoting *Basic*, 485 U.S. at 247).

Plaintiffs contend that they have successfully pleaded reliance through the fraud on the market theory. Pls. Opp. Mem. L. 11. Plaintiffs' theory fails for two reasons. First, it fails because they cannot claim that *they* relied on the integrity of the market. Their entire case is

based on the falsity of Doe's statements, and that, because the statements related to them, they knew the statements to be false. *See* SAC ¶¶ 10, 43, 46, 51, 88. Because Plaintiffs acknowledge that they themselves did not rely on the false statements, they argue that it was "other investors" who were caused to sell their shares. Pls. Opp. Mem. L. 14. Despite claiming that this theory of reliance is "universally accepted by the courts," *id.*, they cite not one court in support of this novel application of the reliance requirement. Indeed, the case law is to the contrary. *See Tiberius Capital, LLC v. PetroSearch Energy Corp.*, No. 09 Civ. 10270 (GBD), 2011 WL 1334839, at *6 (S.D.N.Y. Mar. 31, 2011), *aff'd*, 485 F. App'x 490 (2d Cir. 2012) (stating that plaintiff could not establish reliance through the fraud on the market presumption because it "affirmatively disbelieved" defendants' misrepresentations at the time it sold its shares).

Second, Plaintiffs' theory of reliance fails because they do not allege that the Over-the-Counter Bulletin Board ("OTCBB") is an efficient market.[7] To rely on the fraud on the market doctrine, a plaintiff must plead that the market in which he purchased his shares was efficient. *See In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 306 (S.D.N.Y. 2009) ("[W]here a plaintiff does not plead that the market in which he purchased his shares was efficient, he cannot rely on the 'fraud-on-the-market presumption' of reliance, and must specifically allege [direct] reliance."); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 (S.D.N.Y. 2005) ("To obtain the benefit of this presumption, plaintiffs first must allege that the relevant market was open and developed or, in other words, efficient."); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 650-51 (S.D.N.Y. 2012) (stating that plaintiff must

---

[7] The Over-the-Counter Bulletin Board is an electronic trading service operated by the Financial Industry Regulatory Authority that transmits real-time information of over-the-counter securities. *See Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 485 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012); *H-Quotient, Inc. v. Knight Trading Grp.*, No. 03 Civ. 5889 (DAB), 2005 WL 323750, at *1 (S.D.N.Y. Feb. 9, 2005).

allege reliance on an assumption of an efficient market free of manipulation in order to state a claim for market manipulation through the fraud on the market doctrine).

In particular, Plaintiffs rely on *S.E.C. v. Ficeto*, 839 F. Supp. 2d 1101 (C.D. Cal. 2011), for the argument that the fraud on the market theory of reliance should apply to CodeSmart, an OTCBB stock. In *Ficeto*, the court stated that "the Supreme Court [in *Morrison*][8] did not purport to overturn the universally accepted principle that § 10(b) applies with equal force to market manipulation on national exchanges and the domestic over-the-counter market." *Id.* at 1112. Despite this broad statement, however, the court in *Ficeto* intended this principle to apply only to the question of whether Section 10(b) extends to foreign defendants who purchase or sell securities on the domestic over the counter markets. *Id.* Indeed, as Defendant notes, the court in *Ficeto* does not even mention reliance. Def. Reply Mem. L. 3 n.1.[9]

[8] In *Morrison*, the Court held, *inter alia*, that Section 10(b) does not provide a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges. 561 U.S. at 247.

[9] Plaintiffs' reliance on *Ficeto* is unavailing because this court has previously concluded that the fraud on the market doctrine does not apply to OTCBB stocks. In *Alki Partners*, the court stated that a Section 10(b) claim relating to an OTCBB stock's losses "must fail" because the plaintiffs could not claim reliance on an assumption of an efficient market free of manipulation. 769 F. Supp. 2d at 493. The court noted that "while 'the NASDAQ is recognized as maintaining an efficient market . . . the Court is unaware of any court holding that the OTCBB . . . meet[s] this same standard.'" *Id.* (quoting *Burke v. China Aviation Oil (Sing.) Corp.*, 421 F. Supp. 2d 649, 653 (S.D.N.Y. 2005)); *see also In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 138 (D.N.J. 1984) ("The trading on the over-the-counter market may not constitute an 'active and substantial' market necessary to apply the fraud-on-the-market theory."); *Epstein v. Am. Reserve Corp.*, No. 79 C 4767, 1988 WL 40500, at *5 (N.D. Ill. Apr. 21, 1988) ("Although the issue was not briefed, we believe that the over-the-counter market is incapable of meeting the Supreme Court test [from *Basic*]" (citing *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. at 138)); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (concluding that "the presumption of market efficiency, which would support an application of the fraud on the market theory, does not apply [to the OTCBB stock at issue]").

However, courts in this Circuit have often found the question of whether a market is efficient to be a question of fact and therefore not meant to be answered on a motion to dismiss. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 297 (S.D.N.Y. 2008) (stating that the question of whether relevant markets were efficient is a question of fact to be resolved at trial); *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992) (per curiam) ("Whether in fact Laser Arms (whose stock was traded in the over-the-counter market) traded in an efficient market is a question of fact. Therefore, resolution of that issue must await

The SAC does not allege that the OTCBB market for CodeSmart stock was open and efficient.  Accordingly, Plaintiffs have failed to properly plead reliance under the fraud on the market doctrine.

### 2. *Loss Causation*

Defendant further argues that the SAC should be dismissed because Plaintiffs have not pleaded, and cannot plead, loss causation.  "Loss causation is the requirement that a plaintiff allege that the 'defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.'"  *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 305 (quoting *Dura Pharms.*, 544 U.S. at 346).  The burden of loss causation rests on the plaintiff, and requires that the plaintiff show that the misstatements were the reason the transaction turned out to be a losing one.  15 U.S.C. § 78u-4(b)(4)); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995).  "To plead loss causation, the complaint[] must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005).  The Second Circuit has "repeatedly analogized" the concept of loss causation to proximate cause, as loss causation requires that the damages suffered by a plaintiff be a foreseeable consequence of any misrepresentation or material omission.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  "A loss is foreseeable if it is 'within the zone of risk *concealed* by

presentation of further proof at trial.").  Accordingly, the Court will not grant Defendant's motion to dismiss on the basis that the OTCBB cannot meet the standard for an efficient market as a matter of law.

the misrepresentations and omissions alleged by the disappointed investor.'"  *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 685 (S.D.N.Y. 2012) (quoting *Lentell*, 396 F.3d at 173).  In other words, to establish loss causation, there must be an allegation that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  *Lentell*, 396 F.3d at 173; *see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (stating that loss causation requires the plaintiff allege that the *subject* of the fraudulent or omission was the cause of the actual loss suffered); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 189 (2d Cir. 2001) (recognizing that loss causation is satisfied by allegations that the defendant "disguised the very risk to which [the plaintiff] fell victim").

The Second Circuit has explained loss causation as follows:

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

*Castellano*, 257 F.3d at 188 (quoting *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 235 (2d Cir. 2000) (Winter, J., dissenting)); *cf. Suez Equity Investors*, 250 F.3d at 93, 98 (finding loss causation properly pleaded through investors' allegations that the defendant company provided them with report that omitted negative information about the company's founder, principal executive, and controlling shareholder, and that it was "entirely foreseeable" at the time of the misrepresentation that the company would fail as a result of the founder's lack of skill); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 364 (S.D.N.Y. 2011) (stating that losses from misappropriation of investment funds in Bernard Madoff's Ponzi scheme were "plainly within

the zone of risk" concealed by investment advisor firm's failure to advise its clients that it would not perform due diligence on the clients' investments).

"Loss causation 'is typically shown by the reaction of the market to a corrective disclosure which reveals a prior misleading statement,'[10] but 'may also be shown by the materialization of risk method, whereby a concealed risk . . . comes to light in a series of revealing events that negatively affect stock price over time.'" *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 292 (S.D.N.Y. 2011) (quoting *In re Vivendi Universal, S.A., Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011) (internal quotation marks omitted)); *see also Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007), *cert. denied*, 552 U.S. 1097 (2008) ("A concealed risk can lead to a decline in stock price either because a corrective disclosure reveals the falsity of the misrepresentations or omissions, or because the risk which was concealed materializes and causes the price decline.").

Plaintiffs do not rely on the corrective disclosure theory, and concede that there was no corrective action taken with respect to the misstatement at issue. Pls. Opp. Mem. L. 15. According to Plaintiffs, Defendants intentionally developed and published defamatory statements on InvestorsHub, causing other investors to sell their CodeSmart shares "thereby plunging the price of the stock and causing the loss to the Plaintiffs." *Id.* Plaintiffs contend that loss causation is satisfied here because the loss here was foreseeable and the misrepresentation was

---

[10] In order to plead that "the market reacted negatively to a corrective disclosure," the corrective disclosure in question must "reveal to the market the falsity of the prior recommendations." *Lentell*, 396 F.3d at 175, 175 n.4. "Under this method, a plaintiff must tie his loss to the dissipation of an inflated (or deflated) price upon a disclosing event that reveals the false information to the market." *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 751 (S.D.N.Y. 2011).

Plaintiffs' entire lawsuit here is based on the premise that Defendant Doe disseminated a false rumor about Plaintiff Salvani that caused the price of CodeSmart stock to experience a steep decline. According to Plaintiffs' theory then, it was a false statement—and not a corrective disclosure—that caused CodeSmart's stock price to drop.

"within a zone of risk concealed." *Id.*[11]  Accordingly, in order for Plaintiffs to satisfy the Second Circuit's loss causation requirement, they must do so through the materialization of risk theory.[12]

In order to successfully plead loss causation under the materialization of risk method, the "new information" revealed must have been "previously concealed and fall within the 'zone of risk' concealed so that the events were foreseeable consequences of the fraud." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d at 555 (internal citation omitted).[13]  The materialization of risk theory thus requires a direct connection between the risk that is hidden from investors and the subsequent loss suffered by those investors.  For example, in *Parmalat*, the court found that plaintiffs successfully pleaded loss causation under the materialization of risk method by alleging that auditors misrepresented the accuracy and completeness of Parmalat's financial statements when, in fact, they significantly understated the company's debt and overstated its revenue and net assets.  375 F. Supp. 2d at 306.  The court found Parmalat's "massive undisclosed debt" to be a concealed risk which subsequently materialized when the company suffered a liquidity crisis and became unable to pay bonds as they came due.  *Id.* at

---

[11] In particular, Plaintiffs argue that "the banner heading and content specific boards [on InvestorsHub] are within the zone of risk created where the statements were material and were the proximate cause of the Plaintiffs' loss." Pls. Opp. Mem. L. 15-16.

[12] *See, e.g.*, *Stratte-McClure v. Morgan Stanley*, No. 09 Civ. 2017 (DAB), 2013 WL 297954, at *10 (S.D.N.Y. Jan. 18, 2013) (stating that a plaintiff may establish loss causation through either a corrective disclosure or a materialization of a concealed risk); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (same).

[13] *See also In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010) (observing that where courts have found loss causation to be satisfied through the materialization of a risk, the materializations that led to losses "were sudden and caused the stock value to plummet abruptly").

307. After Parmalat announced that it would have to delay repayment on certain bonds, the price of Parmalat stock dropped sharply. *Id.*[14]

By contrast, in *Lentell*, the court affirmed the dismissal of a Rule 10b-5 claim based on the plaintiffs' failure to plead loss causation under a materialization of risk theory. 396 F.3d at 175. There, the plaintiffs alleged that a brokerage and its analyst issued false and misleading reports recommending that investors purchase stock of companies even though the defendants did not believe the purchases to be good investments. *Id.* at 164. The court ruled that the plaintiffs did not satisfy loss causation under the materialization of risk approach because there was no allegation that the brokerage misstated or omitted the risks that ultimately led to the plaintiffs' losses. *Id.* at 175 ("There is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's 'buy' and 'accumulate' recommendations and no allegation that Merrill misstated or omitted the risks that did lead to the loss. This is fatal under Second Circuit precedent.").

Here, Plaintiffs have not identified a concealed risk that proximately caused a decline in the value of the stock when revealed. Instead, Plaintiffs claim that it was the false statement itself--not a risk previously concealed or a subsequent revealing event--that led to the decline in CodeSmart's stock price. Accordingly, Plaintiffs have failed to plead loss causation under the materialization of risk theory.

---

[14] *Cf. Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *17 (S.D.N.Y. Sept. 10, 2012) (finding loss causation adequately pleaded through materialization of risk theory where an investment management fund's coverage report revealed apparent discrepancies in defendant company's filings with United States and Chinese regulatory authorities, causing an 18% decline in defendant's stock price on date of report's release); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 624 (S.D.N.Y. 2008) (ruling that plaintiff successfully pleaded loss causation against investment fund that stated in, *inter alia*, an offering memorandum its goal of achieving a targeted $200 million capitalization and portfolio diversification; the concealed risk that the investment fund was undercapitalized and unable to follow through on its investment strategy materialized through fund partner's letter and fund's financial statement disclosing that it had begun operations with only $40,750,000).

For the reasons stated above, Plaintiffs have not sufficiently pleaded reliance or loss causation.  The SAC therefore fails to state a claim under Section 10(b).

### Section 9(a)(4)

As noted above, Section 9(a)(4) closely parallels Section 10(b).  *See Panfil*, 768 F. Supp. at 59.  Section 9(a)(4) makes it unlawful for any person selling or offering for sale or purchasing or offering to purchase a security:

> to make, regarding any security registered on a national securities exchange, [or] any security not so registered, . . . for the purpose of inducing the purchase or sale of such security, . . . which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading.

15 U.S.C. § 78i(a)(4).  A claim under Section 9(a)(4) "requires a (1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1161-62 (5th Cir. 1982) (foonotes omitted), *vacated on other grounds*, 460 U.S. 1007 (1983), *on remand*, 718 F.2d 725, 728 (5th Cir. 1983); *see also OpenGate Capital Group LLC v. Thermo Fisher Scientific Inc.*, No. 13-1475-GMS, 2014 WL 3367675, at *9 (D. Del. Jul. 8, 2014) (finding, based on the "persuasive guidance from district courts in this Circuit and other Circuit courts," that Section 9(a)(4) requires a plaintiff plead the following elements: (1) the defendant's material misrepresentation; (2) scienter; (3) intent to induce reliance; (4) the plaintiff's reliance; and the (5) plaintiff's act in detrimental reliance).  And at least one court in this Circuit has noted that Section 9(a)(4) creates a higher burden of proof than Section 10(b).  *See Panfil*, 768 F. Supp. at 59 (quoting *Chemetron*, 682 F.2d at 1162).

Because the Court has already concluded that Plaintiffs failed to plead reliance under either the direct reliance approach or the fraud on the market approach, Plaintiffs' Section 9(a)(4) claim necessarily fails. *Cf. Panfil*, 768 F. Supp. at 59 ("Given the parallel requirements of these statutes, plaintiff's failure to show the omission of a material fact under rule 10b-5 . . . also defeats his claims under § 9(a)(4)."). Accordingly, Plaintiffs' claim under Section 9(a)(4) must be dismissed.

### *Supplemental Jurisdiction Under 28 U.S.C. § 1367*

Plaintiffs' remaining claims are common law tort claims. Where, as here, all federal law claims are eliminated before trial, the "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction over any remaining state law claims. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having dismissed Plaintiffs' sole federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. 28 U.S.C. § 1367(c)(3).

Therefore, Plaintiffs' defamation, libel, tortious interference with contract, aiding and abetting, intentional infliction of emotional distress, and permanent injunction claims are DISMISSED without prejudice.[15]

---

[15] Because the Court has otherwise dismissed Plaintiffs' claims, it need not consider Defendant's argument that InvestorsHub is immune from liability under the Communications Decency Act. *See* Def. Mem. L. 4 n.3.

### III. Conclusion

For the reasons set forth above, Defendant's motion to dismiss pursuant to Rule 12(b)(1)

is DENIED, and the Court dismisses the Second Amended Complaint *sua sponte* pursuant to

Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The Clerk of the

Court is respectfully directed to terminate the motion, Doc. 18, and close the case.

SO ORDERED.

Dated:    September 23, 2014
           New York, New York

 

Edgardo Ramos, U.S.D.J.

26

**APP 0046**

1
2
3
4
5
6
7
8
9
10                    **UNITED STATES DISTRICT COURT**
11               **WESTERN DISTRICT OF WASHINGTON**
12                              **AT TACOMA**
13     ────────────────────────────────────
14                                                 :
15     **SECURITIES AND EXCHANGE COMMISSION,**      :
16                                                 :
17                     *Plaintiff,*                 :
18                                                 :
19              v.                                  :      **No. 14-cv-5621**
20                                                 :
21     **MIKHAIL GALAS, ALEXANDER HAWATMEH,**       :      **AMENDED**
22     **CHRISTOPHER MWROCA, and TOVY PUSTOVIT,**   :      **COMPLAINT**
23                                                 :
24                 *Defendants, and*                :
25                                                 :
26     **NADIA HAWATMEH,**                          :
27                                                 :
28                *Relief Defendant.*               :
29     ────────────────────────────────────        :
30
31
32

33          Plaintiff Securities and Exchange Commission (the "Commission") for its complaint

34     against Mikhail Galas ("Galas"), Alexander Hawatmeh ("A. Hawatmeh"), Christopher Mrowca,

35     ("Mrowca"), and Tovy Pustovit ("Pustovit"), as defendants (collectively, "Defendants"), and

36     Nadia Hawatmeh ("N. Hawatmeh") as relief defendant ("Relief Defendant"), alleges as follows:

37

*SEC v. Galas et al.*, No. 14-cv-5621          1       Securities and Exchange Commission
Amended Complaint                                      Brookfield Place, 200 Vesey Street, Suite 400
                                                       New York, NY 10281-1022
                                                       (212) 336-0174

1                                    **SUMMARY OF ALLEGATIONS**

2          1.       This emergency action is brought to stop an ongoing market manipulation and

3   pump-and-dump scheme.  The Defendants – Mikhail Galas, Alexander Hawatmeh , Christopher

4   Mrowca and Tovy Pustovit – acting in concert, engaged in manipulative trading techniques such

5   as wash trading and matched orders in order to artificially inflate the stock prices of numerous

6   thinly-traded microcap companies, including ISM International, Inc. ("ISML"), Allied Products,

7   Corp. ("ADPC"), Aden Solutions, Inc. ("ADSU"); GrowLife, Inc. ("PHOT"); Hemp, Inc.

8   ("HEMP"); and Riverdale Oil and Gas Corporation ("RVDO").

9          2.       The Defendants' manipulative trading created the illusion of an active market in

10  these stocks, which caused the stock price to artificially increase.  Defendants coordinated their

11  sales of ISML, ADPC, ADSU, PHOT, HEMP and RVDO with aggressive promotions of the

12  stocks over the Internet and via social media.    Defendants had prior knowledge that these

13  promotions would take place and in some cases promoted these stocks themselves using webs

14  sites they controlled and blast e-mails, and timed their stock sales to benefit from the artificially

15  high price and demand.

16         3.       After accumulating large positions, Defendants sold their shares in these

17  companies.  Defendants' trading in ISML, ADPC, ADSU, PHOT, HEMP and RVDO generated

18  profits for the Defendants of over $2.5 million.

19         4.       In each promotion, potential investors were urged to buy the target stock and told

20  that the price of the stock would rise substantially.  These assertions were misleading because

21  two of the target companies (ADPC and ADSU) had no business operations and there was no

---

*SEC v. Galas et al.*, No. 14-cv-5621          2          Securities and Exchange Commission
Amended Complaint                                          Brookfield Place, 200 Vesey Street, Suite 400
                                                           New York, NY 10281-1022
                                                           (212) 336-0174

1   news concerning the other companies that would provide any basis for a significant increase in

2   the price of its stock.

3           5.      Following the stock promotions, the price of the manipulated stocks collapsed,

4   resulting in losses to investors who had purchased the ISML, ADPC, ADSU, PHOT, HEMP or

5   RVDO shares sold by Defendants during the promotions.

6           6.      Upon information and belief, A. Hawatmeh controlled accounts in the name of N.

7   Hawatmeh and used those accounts to trade in ADPC, ADSU and RVDO, generating profits of

8   approximately $35,000 in N. Hawatmeh's accounts.

9                                   **VIOLATIONS**

10          7.      By virtue of the conduct alleged herein, Defendants, directly or indirectly, singly

11  or in concert, have engaged and, unless restrained and enjoined will continue to engage in acts,

12  practices, schemes and courses of business that constitute violations of Section 17(a)(1) and (3)

13  of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)(1) and (3)] and Sections

14  9(a)(1) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§

15  78i(a) and 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R.§ 240.10b-5(a) and (c)].

16                          **JURISDICTION AND VENUE**

17          8.      The Commission brings this action pursuant to the authority conferred upon it by

18  Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange

19  Act [15 U.S.C. § 78u(d)(1)].

*SEC v. Galas et al.*, No. 14-cv-5621          3       Securities and Exchange Commission
Amended Complaint                                       Brookfield Place, 200 Vesey Street, Suite 400
                                                        New York, NY 10281-1022
                                                        (212) 336-0174

**APP 0049**

9.      The Commission seeks an emergency order: (a) restraining and enjoining Defendants from further violations; (b) freezing Defendants' and Relief Defendant's assets; (c) prohibiting Defendants from destroying documents; (d) ordering Defendants and Relief Defendants to provide a verified accounting; (e) ordering Defendants to repatriate funds held overseas, and (f) authorizing the Commission to conduct expedited discovery.

10.      The Commission seeks a final judgment: (a) permanently enjoining Defendants from engaging in the acts, practices and courses of business alleged against them herein; (b) ordering Defendants and Relief Defendant to disgorge any ill-gotten gains and to pay prejudgment interest thereon, jointly and severally; (c) prohibiting Defendants, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)], from participating in any offering of a penny stock; and (d) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

11.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

12.      Venue lies in the Western District of Washington pursuant to Section 22 (a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Certain of these transactions, acts, practices, and courses of business occurred in the Western District of Washington.  For example,

*SEC v. Galas et al.*, No. 14-cv-5621          4          Securities and Exchange Commission
Amended Complaint                                            Brookfield Place, 200 Vesey Street, Suite 400
                                                             New York, NY 10281-1022
                                                             (212) 336-0174

**APP 0050**

1   A. Hawatmeh, who formerly lived in Vancouver, Washington, and Galas, a resident of

2   Vancouver, Washington, placed some of the orders alleged in this Complaint while resident in

3   the Western District of Washington.

4       13.   Assignment to the Tacoma Division is appropriate pursuant to Local Rule 3(d)(1)

5   because a substantial part of the events that gave rise to the claims alleged herein occurred in

6   Clark County.

7                              **DEFENDANTS AND RELIEF DEFENDANT**

8       14.   Defendant Galas, age 25, lives in Vancouver, Washington.  Galas has traded in

9   over 300 different low-cost, microcap stocks through his accounts at E*Trade Financial Group

10   ("E*Trade") and Fidelity Brokerage Services LLC ("Fidelity").

11      15.   Defendant A. Hawatmeh, age 24, is a resident of Lincoln City, Oregon and a

12   former resident of Vancouver, Washington.  A. Hawatmeh is a member of Worthmore

13   Investments LLC, which owns a stock promotion website, stockhaven.com. In 2013 and 2014,

14   A. Hawatmeh traded in over 100 different microcap stocks in three different accounts at E*Trade

15   and TD Ameritrade, Inc. ("TD Ameritrade").  A. Hawatmeh also maintains an account at the

16   Housing Bank for Trade and Finance in Jordan.  On June 12 and 13, 2013, A. Hawatmeh's father

17   received wire transfers totaling $90,000.  On June 27, 2013, A. Hawatmeh's father transferred

18   $90,000 to A. Hawatmeh's brokerage account at E*Trade, and the next day A. Hawatmeh began

19   accumulating shares of ADSU and ADPC.  In the past several years, A. Hawatmeh transferred

20   about $60,000 to Mrwoca.

21      16.   Defendant Mrowca, age 25, is a former resident of Boulder, Colorado.  He

22   currently lives in Bradenton, Florida.  Mrowca is a stock promoter and operates through an entity

*SEC v. Galas et al.*, No. 14-cv-5621          5          Securities and Exchange Commission
Amended Complaint                                         Brookfield Place, 200 Vesey Street, Suite 400
                                                          New York, NY 10281-1022
                                                          (212) 336-0174

1    called Money Runners Group LLC, which has an affiliated stock promotion web site called

2    MoneyRunnersGroup.com.  In 2013 and 2014, Mrowca traded in over 150 different low-cost,

3    over-the-counter stocks in three accounts at E*TRADE.

4         17.    Defendant Pustovit, age 20, is a resident of Vancouver, Washington.  Pustovit was

5    the registered owner of a stock promotion website called "Explosive Alerts" from August 2012,

6    when the site was created, until August 2013. In 2013 and 2014, Pustovit traded in over 50

7    different low-cost, over-the-counter stocks in four accounts at E*TRADE and Scottrade

8    Financial Inc. ("Scottrade").  In 2013 and 2014, Pustovit traded in over 50 different low-cost,

9    over-the-counter stocks in four accounts at E*TRADE and Scottrade.

10        18.    Relief Defendant N. Hawatmeh, age 50, is a resident of Hernando, Florida.  . In

11   2013 and 2014, N. Hawatmeh's accounts traded in over 20 different low-cost, over-the-counter

12   stocks in four accounts at E*TRADE and Charles Schwab & Co, ("Schwab").  Based on

13   analyses of Internet protocols, it appears that all or some of the trading in N. Hawatmeh's

14   accounts may have been conducted by A. Hawatmeh, Mrowca, or Pustovit.

15                              **RELATED ENTITIES**

16        19.    ISML is a Delaware corporation based in Clearwater, Florida.  The company

17   claims to specialize "in innovation, technology and manufacturing organic products."  The

18   company lists its products as "organic nail polish and nail polish remover, security bra, green

19   energy products, Flea market, [and] movie production."  ISML securities are not registered with

20   the Commission, and ISML common stock is quoted on OTC Link.

*SEC v. Galas et al.*, No. 14-cv-5621          6          Securities and Exchange Commission
Amended Complaint                                        Brookfield Place, 200 Vesey Street, Suite 400
                                                         New York, NY 10281-1022
                                                         (212) 336-0174

**APP 0052**

1    20.    ADPC is a Delaware corporation that had its principal place of business in

2    Chicago, Illinois. ADPC was a manufacturer of agricultural and industrial equipment that filed

3    for reorganization under Chapter 11 of the Bankruptcy Code in October 2000. On November 24,

4    2003, ADPC filed a Form 15 to terminate the registration of its common stock pursuant to

5    Exchange Act Rule 12g-4. ADPC's last periodic filing with the Commission was its Form 10Q

6    for the quarter ended June 30, 2000. On February 3, 2014, the Commission entered an order

7    temporarily suspending trading in ADPC securities pursuant to Section 12(k) of the Exchange

8    Act. Prior to the trading suspension, ADPC common stock was quoted on OTC Link. During all

9    times relevant to this action, ADPC had no business operations.

10    21.    ADSU is a Nevada corporation that had its principal place of business in Toronto,

11    Canada. In filings with the Commission, the company purported to be a development stage

12    company focused on "providing travel packages and concierge services to corporate entities and

13    individuals in the United States and Canada." ADSU's last periodic filing with the Commission

14    was its Form10-Q for the quarter ended September 30, 2011. ADSU's Nevada corporate

15    registration expired in December 2011. On December 6, 2013, the Commission temporarily

16    suspended trading in ADSU securities. ADSU's stock was registered pursuant to Section 12(g)

17    of the Exchange Act until March 21, 2014, when the Commission revoked the registration of

18    ADSU's securities pursuant to Section 12(j) of the Exchange Act. Prior to the trading

19    suspension, ADSU was quoted on OTC Link. During all times relevant to this action, ADSU

20    had no business operations.

21    22.    PHOT is a Delaware corporation based in Woodland Hills, California. In filings

22    with the Commission, the company purports that it is in the oil recovery business and that it has

*SEC v. Galas et al.*, No. 14-cv-5621         7         Securities and Exchange Commission
Amended Complaint                                        Brookfield Place, 200 Vesey Street, Suite 400
                                                         New York, NY 10281-1022
                                                         (212) 336-0174

**APP 0053**

1    set up a subsidiary company, Legalizedpot.us, to manage growers of legalized marijuana and

2    hemp in various states.  PHOT stock is registered under Section 12(g) of the Exchange Act and is

3    quoted on OTC Link.  On April 10, 2014, the Commission issued an order temporarily

4    suspending trading in PHOT securities pursuant to Section 12(k) of the Exchange Act.

5         23.     HEMP is a Colorado corporation based in Las Vegas, Nevada.  In an information

6    statement posted on the OTC Markets web site, the company purports to be in the business of

7    providing lawful products and services to the medical marijuana industry and to provide over-

8    the-counter health products made from industrial hemp.  HEMP stock is not registered with the

9    Commission and is quoted on OTC Link.

10        24.     RVDO is a Nevada corporation based in Austin, Texas.  RVDO is in the business

11   of acquiring partial interests in oil and gas production.  RVDO securities are not registered with

12   the Commission, and RVDO common stock is quoted on OTC Link.

13                                              **FACTS**

14   **Trading in ISML**

15        25.     Prior to the promotion of ISML that began on April 20, 2012, A. Hawatmeh

16   engaged in coordinated trading with Mrowca, Galas and others to accumulate a large position in

17   ISML and to increase the price and volume of ISML in advance of the promotion.

18        26.     A. Hawatmeh began buying ISML on December 15, 2011.  By April 10, 2012, A.

19   Hawatmeh had accumulated approximately 2.6 million shares of ISML common stock through

20   market purchases at prices ranging from $.0097 to $.09 per share.

*SEC v. Galas et al.*, No. 14-cv-5621        8        Securities and Exchange Commission
Amended Complaint                                    Brookfield Place, 200 Vesey Street, Suite 400
                                                     New York, NY 10281-1022
                                                     (212) 336-0174

1  27. A. Hawatmeh's trades in ISML common stock from December 15, 2011 through

2 April 10, 2012 constituted approximately 85% of the total trading volume of ISML common

3 stock during that period.

4  28. From January 18, 2012 to February 10, 2012, Galas acquired 70,000 shares of

5 ISML common stock at prices ranging from $.03 to $.043, which he sold on February 28 for $.07

6 per share.

7  29. From December 15, 2011 through April 10, 2012, the price of ISML rose from

8 less than a penny per share to a high of over $.09 per share.

9  30. From April 11, 2012 through April 19, 2012, A. Hawatmeh was a net seller of

10 ISML, while Galas and Mrowca were net buyers of ISML.

11  31. From April 11, 2012 through April 19, 2012, A. Hawatmeh sold 1.88 million

12 shares of ISML at prices ranging from $.055 to $.12 per share, and purchased approximately

13 280,000 shares at prices ranging from $.04 to $.0951 per share.  A. Hawatmeh's trades during

14 this period constituted approximately 65% of the total trading volume of ISML common stock.

15  32. From April 11, 2012 through April 16, 2012, while A. Hawatmeh was selling

16 ISML, Galas accumulated 170,000 shares of ISML at prices ranging from $.06 to $.07 per share.

17 Between April 11, 2012 and April 19, 2012, Galas was a net buyer of 85,000 shares.

18  33. From April 13, 2012 through April 18, 2012, Mrowca bought and sold 125,000

19 shares of ISML. By close of trading on April 18, 2012, Mrowca owned no shares of ISML.

20  34. A. Hawatmeh, Mrowca, and Galas engaged together in various forms of

21 manipulative trading in ISML common stock, both before and during the promotion of ISML.

*SEC v. Galas et al.*, No. 14-cv-5621   9   Securities and Exchange Commission
Amended Complaint           Brookfield Place, 200 Vesey Street, Suite 400
                 New York, NY 10281-1022
                 (212) 336-0174

**APP 0055**

1      35.    For example, on April 13, 2012, April 16, 2012, April 19, 2012 and April 20,

2    2012, A. Hawatmeh, Mrowca, and Galas entered "matched orders" and "wash trades" of ISML.

3    Some of the orders were matched with orders entered by a third party, identified herein as

4    "Trader A."

5      36.    "Matched orders" occur when a person, for the purpose of creating a false or

6    misleading appearance of active trading in a security, enters an order to buy or sell that security

7    with the knowledge that a substantially similar order has been or will be placed to trade the

8    security.

9      37.    "Wash trades" occur when a security is traded between two accounts with no

10    change in beneficial ownership for the purpose of creating a false or misleading appearance of

11    active trading in the security.

12      38.    A. Hawatmeh entered matched orders for ISML knowing that matching orders

13    had been placed or would be placed in the account of Mrowca, Galas or Trader A.

14      39.    A. Hawatmeh entered matched orders for ISML with the intention of creating a

15    false or misleading appearance of active trading in ISML common stock or a false and

16    misleading appearance with respect to the market for ISML common stock.

17      40.    Mrowca entered matched orders for ISML knowing that matching orders had

18    been placed or would be placed in the account of A. Hawatmeh or Trader A.

19      41.    Mrowca entered matched orders and wash trades for ISML with the intention of

20    creating a false or misleading appearance of active trading in ISML common stock or a false and

21    misleading appearance with respect to the market for ISML common stock.

*SEC v. Galas et al.*, No. 14-cv-5621     10     Securities and Exchange Commission
Amended Complaint                       Brookfield Place, 200 Vesey Street, Suite 400
                                   New York, NY 10281-1022
                                   (212) 336-0174

**APP 0056**

1   42. Galas entered matched orders for ISML knowing that matching orders had been

2 placed or would be placed by A. Hawatmeh.

3   43. Galas entered matched orders and wash trades for ISML with the intention of

4 creating a false or misleading appearance of active trading in ISML common stock or a false and

5 misleading appearance with respect to the market for ISML common stock.

6   44. A. Hawatmeh's, Mrowca's and Galas's matched orders and wash trades affected

7 the market price and volume of ISML stock.

8   45. Beginning on April 20, 2012, ISML was the subject of an Internet promotional

9 campaign by Mrowca's stock promotion entity, Money Runners Group LLC, and other

10 promoters.  ISML was also promoted by Mrowca on the Investors Hub web site under the user

11 name "HotStockAce."  The promotions urged investors to buy ISML and claimed that ISML

12 would trade at $.20 per share, although there was no news at the company justifying the

13 prediction or the buy recommendation.

14   46. A. Hawatmeh, Mrowca and Galas had prior knowledge of the ISML promotion

15 and its timing.

16   47. On April 20, 2012, A. Hawatmeh sold 995,000 shares of ISML at prices ranging

17 from $.124 to $.20 per share.

18   48. On April 20, 2012, Galas sold 85,000 shares of ISML at prices ranging from

19 $.129 to $.20 per share.

20   49. A. Hawatmeh's sales of ISML stock from April 12, 2012 through April 20, 2012

21 generated gross profits of approximately $223,000.

*SEC v. Galas et al.*, No. 14-cv-5621   11  Securities and Exchange Commission
Amended Complaint         Brookfield Place, 200 Vesey Street, Suite 400
               New York, NY 10281-1022
               (212) 336-0174

1       50.    Galas's sales of ISML stock through April 20, 2012 generated gross profits of

2   approximately $15,000.

3       51.    Following the promotion of ISML, the price and volume of ISML stock collapsed.

4   The trading volume of ISML stock on April 20, 2012 was almost 5 million shares with a high

5   price of $.22 per share.  By May 20, 2012, the price had declined to $.03 per share and the

6   trading volume was only 33,200 shares.

7   **Trading in ADPC**

8       52.    From June 14, 2013 through the early morning of July 2, 2013, over 2.9 million

9   shares of ADPC common stock was accumulated in A. Hawatmeh's, N. Hawatmeh's and

10   Pustovit's accounts through market purchases at prices ranging from $.0018 to $.03 per share.

11       53.    The ADPC trades in N. Hawatmeh's account were controlled by A. Hawatmeh.

12       54.    The ADPC trades in A. Hawatmeh's, N. Hawatmeh's and Pustovit's accounts

13   from June 14, 2013 through July 1, 2013 constituted over 90% of the total trading volume of

14   ADPC common stock during that period.

15       55.    The price of ADPC common stock rose from $.008 per share on June 14, 2013, to

16   $.025 per share on July 1, 2013.

17       56.    From June 19, 2013 to July 1, 2013, matched orders for ADPC common stock

18   were entered in the accounts of A. Hawatmeh, N. Hawatmeh and Pustovit.

19       57.    On July 1, 2013, Pustovit engaged in two wash trades of ADPC common stock.

*SEC v. Galas et al.*, No. 14-cv-5621    12    Securities and Exchange Commission
Amended Complaint                  Brookfield Place, 200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0174

**APP 0058**

1    58.    A. Hawatmeh entered matched orders for ADPC (including orders in the N.

2  Hawatmeh account) knowing that matching orders had been placed or would be placed in the

3  account of N. Hawatmeh or Pustovit.

4    59.    Pustovit entered matched orders for ADPC knowing that matching orders had

5  been placed or would be placed by in the account of A. Hawatmeh or N. Hawatmeh.

6    60.    A. Hawatmeh and Pustovit entered the matched orders for ADPC (including

7  orders in the N. Hawatmeh account) with the intention of creating a false or misleading

8  appearance of active trading in ADPC common stock or a false and misleading appearance with

9  respect to the market for ADPC common stock.

10    61.    On July 1, 2013, Pustovit sold ADPC common stock in an account at one broker-

11  dealer, identified herein as "B-D 1" and at the same time bought an equal amount of ADPC

12  common stock in an account in his name at another broker-dealer, identified herein as "B-D 2."

13  These transactions did not result in a change in the beneficial ownership of the ADPC stock

14  being traded.

15    62.    Pustovit effected these wash trades with the intention of creating a false or

16  misleading appearance of active trading in ADPC common stock or a false and misleading

17  appearance with respect to the market for ADPC common stock.

18    63.    The Defendants matched orders and wash trades of ADPC stock affected the price

19  and volume of ADPC stock. These orders accounted for trading volume of over 4.1 million

20  shares of ADPC common stock, approximately 50% of the total volume during the period from

21  June 19, 2013 to July 1, 2013.

*SEC v. Galas et al.*, No. 14-cv-5621          13          Securities and Exchange Commission
Amended Complaint                                           Brookfield Place, 200 Vesey Street, Suite 400
                                                            New York, NY 10281-1022
                                                            (212) 336-0174

1   64.   Starting on the morning of July 2, 2013, there was an e-mail and Internet

2   promotion of ADPC stock by a stock promoter using the name "Explosive Alerts."

3   65.   Pustovit was the registered owner of the Explosive Alerts website at this time.

4   66.   At or around 10 AM eastern time on July 2, 2013, Explosive Alerts broadcast the

5   following spam e-mail:

6   **ADPC buy Alert!**

7   **Alerting ADPC here at .0255**

8   **We strongly believe ADPC could see .08+ today!**

9   **By the time you finish reading this email ADPC will probably have rose 5% or**
10   **maybe even 10% so stop wasting your time and go make some damn money!**

11
12   67.   Explosive Alert's price rise prediction was baseless, since ADPC had no business

13   operations at the time of the promotion.

14   68.   Between 10:00 AM and 10:40 AM eastern time on July 2, 2013, A. Hawatmeh

15   sold 2,720,000 shares of ADPC common stock in his account at E*TRADE at prices ranging

16   from $.025 to $.071 per share.

17   69.   A. Hawatmeh and Pustovit had prior knowledge of the ADPC promotion and its

18   timing.

19   70.   A. Hawatmeh's sales of ADPC from June 14, 2013 through July 2, 2013

20   generated gross profits of approximately $53,970.

21   71.   Pustovit's sales of ADPC from June 14, 2013 through July 2, 2013 generated

22   profits of approximately $42,200.

*SEC v. Galas et al.*, No. 14-cv-5621       14       Securities and Exchange Commission
Amended Complaint                                   Brookfield Place, 200 Vesey Street, Suite 400
                                                    New York, NY 10281-1022
                                                    (212) 336-0174

1    72.    Following the promotion of ADPC, the price and volume of ADPC stock

2    collapsed.  The trading volume of ADPC stock on July 2, 2014 was over 9.8 million shares with

3    a high price of $.08 per share.  By July 12, 2013, the price had declined to $.0031 per share and

4    the trading volume was only 35,500 shares.

5    **Trading in ADSU**

6    73.    From June 28, 2013 through November 5, 2013, over 6.6 million shares of ADSU

7    common stock was accumulated in A. Hawatmeh's and N. Hawatmeh's accounts through market

8    purchases at prices ranging from $.0032 to $.048 per share.

9    74.    The trading in ADSU common stock in N. Hawatmeh's account was controlled

10    by A. Hawatmeh.

11    75.    From June 28, 2013 through July 22, 2013, A. Hawatmeh's and N. Hawatmeh's

12    accounts purchased a total of 3,960,000 shares of ADSU common stock in market trades at

13    prices ranging from $.0032 to $.018 per share.  These trades constituted over 90% of the total

14    trading volume of ADSU common stock during that period.

15    76.    On July 2, 2013, the A. Hawatmeh and N. Hawatmeh accounts entered matched

16    orders for 10,000 shares of ADSU common stock that were executed at $.07.

17    77.    ADSU's price rose from $.009 per share on June 28, 2013 to $.0181 per share on

18    July 22, 2013.

19    78.    On August 23, 2013, the A. Hawatmeh and N. Hawatmeh accounts entered

20    matched orders by which the entire 2,850,000 shares of ADSU common stock  in N.

21    Hawatmeh's account was sold to A. Hawatmeh at $.09 per share.

*SEC v. Galas et al.*, No. 14-cv-5621          15          Securities and Exchange Commission
Amended Complaint                                          Brookfield Place, 200 Vesey Street, Suite 400
                                                           New York, NY 10281-1022
                                                           (212) 336-0174

**APP 0061**

1      79.     Following the matched orders on August 23, 2013, and through November 5,

2   2013, A. Hawatmeh purchased an additional 2,905,950 shares of ADSU common stock in

3   market trades at prices ranging from $.005 per share to $.0481 per share.

4      80.     Trading in A. Hawatmeh's and N. Hawatmeh's accounts from August 23, 2013

5   through November 5, 2013, including the matched orders, constituted over 90% of the total

6   trading volume in ADSU during this period. By November 5, 2013, A. Hawatmeh's account

7   held over 6.6 million shares of ADSU.

8      81.     A. Hawatmeh entered matched orders for ADSU (including orders entered in the

9   N. Hawatmeh account) knowing that matching orders had been placed or would be placed in the

10   A. Hawatmeh or N. Hawatmeh account.

11      82.     A. Hawatmeh entered matched orders with the intention of creating a false or

12   misleading appearance of active trading in ADSU common stock or a false and misleading

13   appearance with respect to the market for ADSU common stock.

14      83.     The matched orders in A. Hawatmeh's and N. Hawatmeh's accounts affected the

15   market price and volume of ADSU stock. For example, the 2,850,000 share matched order on

16   August 23, 2013 accounted for 93% of the market volume on that day.

17      84.     On November 7 and November 8, 2013, there was an aggressive promotion of

18   ADSU over the Internet and social media claiming that ADSU would trade at $2 per share. This

19   assertion was baseless since ADSU had no business operations at the time of the promotion.

20      85.     On November 7 and November 8, 2013, A. Hawatmeh sold his entire 6.6 million

21   share position in ADSU at prices ranging from $.045 to $.24 per share.

22      86.     A. Hawatmeh had prior knowledge of the ADSU promotion and its timing.

*SEC v. Galas et al.*, No. 14-cv-5621      16      Securities and Exchange Commission
Amended Complaint                             Brookfield Place, 200 Vesey Street, Suite 400
                                                           New York, NY 10281-1022
                                                             (212) 336-0174

1    87.    A. Hawatmeh's sales of ADSU stock from June 28, 2013 through November 08,

2  2013 generated gross profits of approximately $425,000.

3    88.    On November 8, 2013, B-D 1, through which A. Hawatmeh traded ADSU, froze

4  A. Hawatmeh's account.  At the time of the freeze, the account contained positions in numerous

5  microcap stocks and approximately $486,000 in cash.

6    89.    The trading volume for ADSU common stock on November 7 and 8, 2013 was

7  4,121,053 shares and 11,897,090 shares, respectively.  The price of ADSU common stock

8  peaked on November 7, at $.24 per share.  By December 4, 2013, the daily volume of ADSU

9  common stock had declined to approximately 186,000 shares and the price had declined to $.01

10  per share.

11  **Trading in PHOT**

12    90.    From January 9 to January 14, 2014, there was an Internet promotion of PHOT as

13  part of a broader promotion of several marijuana-related stocks.

14    91.    During that promotion, Mrowca and Galas traded approximately 6.4 million

15  shares of PHOT common stock, and during and leading up to the promotion engaged in

16  manipulative trading designed to increase the price and volume of PHOT common stock.

17    92.    From January 2, 2014 through January 14, 2014, Mrowca engaged in wash trades

18  of PHOT common stock and also engaged in matched orders of PHOT common stock with

19  Galas.

20    93.    Mrowca used "limit orders" to execute his wash trades of PHOT common stock.

*SEC v. Galas et al.*, No. 14-cv-5621        17       Securities and Exchange Commission
Amended Complaint                                    Brookfield Place, 200 Vesey Street, Suite 400
                                                     New York, NY 10281-1022
                                                     (212) 336-0174

**APP 0063**

94.     A "limit order" is an order to a broker to buy or sell a security that sets a particular price, the "limit price," at which the broker is authorized to execute the transaction.

95.     For each wash trade of PHOT common stock, Mrowca entered a limit order to sell that had a lower limit price than the corresponding limit order to buy.  The purpose of Mrowca's sell low/buy high strategy was to increase the stock price.

96.     Mrowca entered matched orders for PHOT common stock knowing that matching orders had been placed or would be placed by Galas.

97.     Galas entered matched orders for PHOT common stock knowing that matching orders had been placed or would be placed by Mrowca.

98.     Mrowca entered matched orders and wash trades for PHOT common stock with the intention of creating a false or misleading appearance of active trading in PHOT common stock or a false and misleading appearance with respect to the market for PHOT common stock.

99.     Galas entered matched orders for PHOT common stock with the intention of creating a false or misleading appearance of active trading in PHOT common stock or a false and misleading appearance with respect to the market for PHOT common stock.

100.    From January 2, 2014 to January 9, 2014, while the manipulative trading was taking place, the price of PHOT increased 196% from $.1575 per share to a high of $.467 per share.

101.    By January 14, 2014, Mrowca and Galas had liquidated their PHOT holdings, generating gross profits of approximately $54,700 for Mrowca and $3,200 for Galas.

*SEC v. Galas et al.*, No. 14-cv-5621          18          Securities and Exchange Commission
Amended Complaint                                          Brookfield Place, 200 Vesey Street, Suite 400
                                                          New York, NY 10281-1022
                                                          (212) 336-0174

1      102.     From March 6, 2014 through March 18, 2014, Mrowca promoted PHOT through

2    Money Runners Group, LLC and its related website, MoneyRunnersGroup.com.  The promotion

3    touted the marijuana industry, and predicted that PHOT's stock price would nearly double.

4      103.     During that promotion, A. Hawatmeh, Mrowca and Galas engaged in

5    manipulative trading designed to increase the price and volume of PHOT common stock and

6    they then sold their stock.

7      104.     On March 6, 2014, shares of PHOT opened at $.3865 per share. During the

8    promotion, from March 6, 2014 to March 18, 2014, PHOT's daily average market volume

9    increased to over 60 million shares per day and PHOT traded as high as $.7777 per share.  This

10   was a 101% price increase from March 6, 2014.

11     105.     From March 6 to March 18, 2014, Mrowca, Galas, and A. Hawatmeh collectively

12   traded approximately 17 million shares of PHOT.

13     106.     During the period March 6, 2014 through March 17, 2014, Mrowca engaged in

14   wash trades, and in matched orders with Galas and A. Hawatmeh.

15     107.     Mrowca entered matched orders for PHOT knowing that matching orders had

16   been placed or would be placed by Galas or A. Hawatmeh.

17     108.     Galas entered matched orders for PHOT knowing that matching orders had been

18   placed or would be placed by Mrowca.

19     109.     A. Hawatmeh entered matched orders for PHOT knowing that matching orders

20   had been placed or would be placed by Mrowca.

*SEC v. Galas et al.*, No. 14-cv-5621          19      Securities and Exchange Commission
Amended Complaint                                       Brookfield Place, 200 Vesey Street, Suite 400
                                                        New York, NY 10281-1022
                                                        (212) 336-0174

110. Mrowca entered the matched orders and wash trades for PHOT with the intention of creating a false or misleading appearance of active trading in PHOT common stock or a false and misleading appearance with respect to the market for PHOT common stock.

111. Galas entered the matched orders for PHOT with the intention of creating a false or misleading appearance of active trading in PHOT common stock or a false and misleading appearance with respect to the market for PHOT common stock.

112. A. Hawatmeh entered the matched order for PHOT with the intention of creating a false or misleading appearance of active trading in PHOT common stock or a false and misleading appearance with respect to the market for PHOT common stock.

113. A. Hawatmeh's, Mrowca's and Galas's matched orders and wash trades affected the market price and volume of PHOT stock.

114. By March 18, 2014, Mrowca, Galas and A. Hawatmeh had sold the positions in PHOT stock each of them had built up since January 14, 2014.

115. From December 16, 2014 through March 2014, trading in PHOT common stock in Mrowca's accounts generated gross profits of approximately $111,000; trading in PHOT common stock in Galas' account generated gross profits of approximately $6,000; and trading in PHOT common stock in A. Hawatmeh's account generated a gross loss of approximately $17,000.

116. On April 10, 2014, the Commission suspended trading in PHOT securities.

**Trading in HEMP**

117. A. Hawatmeh, Galas and Mrowca began accumulating HEMP common stock through market purchases on January 23, 2014. Between January 23, 2014 and February 12,

*SEC v. Galas et al.*, No. 14-cv-5621   20   Securities and Exchange Commission
Amended Complaint                           Brookfield Place, 200 Vesey Street, Suite 400
                                            New York, NY 10281-1022
                                            (212) 336-0174

**APP 0066**

1    2014, A. Hawatmeh, Galas, and Mrowca bought and sold approximately 41.7 million shares of

2    HEMP common stock.

3          118.    During the period from January 24 through February 12, 2014, HEMP was

4    actively promoted on the Internet.

5          119.    For example, on February 6, 2014, one Internet tout claimed that HEMP could

6    reach "a REAL Possible Gain of OVER 2900%."

7          120.    During the promotion, A. Hawatmeh, Mrowca and Galas engaged in manipulative

8    wash trades and matched orders of HEMP common stock.

9          121.    The total trading volume for HEMP common stock in the A. Hawatmeh, Mrowca,

10   and Galas accounts during this period was approximately 83 million shares.

11         122.    Mrowca engaged in wash trades of HEMP common stock using two accounts in

12   his name at B-D 1 (the "Mrowca #1" and "Mrowca #2" accounts).

13         123.    For each wash trade of HEMP common stock, Mrowca entered a limit order to

14   sell that had a lower limit price than the corresponding limit order to buy.  The purpose of

15   Mrowca's sell low/buy high strategy was to increase the stock price.

16         124.    Mrowca also engaged in matched orders of HEMP common stock with Galas, A.

17   Hawatmeh, and a third party identified herein as "Trader B."

18         125.    From January 24, 2014 through February 12, 2014, while these manipulative

19   trades were taking place, HEMP's stock price increased by 573%.

20         126.    Mrowca entered matched orders for HEMP common stock knowing that matching

21   orders had been placed or would be placed by Galas or A. Hawatmeh.

*SEC v. Galas et al.*, No. 14-cv-5621          21          Securities and Exchange Commission
Amended Complaint                                         Brookfield Place, 200 Vesey Street, Suite 400
                                                          New York, NY 10281-1022
                                                          (212) 336-0174

**APP 0067**

1      127.    Galas entered matched orders for HEMP common stock knowing that matching

2    orders had been placed or would be placed by Mrowca.

3      128.    A. Hawatmeh entered matched orders for HEMP common stock knowing that

4    matching orders had been placed or would be placed by Mrowca.

5      129.    Mrowca entered the matched orders and wash trades for HEMP common stock

6    with the intention of creating a false or misleading appearance of active trading in HEMP

7    common stock or a false and misleading appearance with respect to the market for HEMP

8    common stock.

9      130.    Galas entered the matched orders for HEMP common stock with the intention of

10    creating a false or misleading appearance of active trading in HEMP common stock or a false

11    and misleading appearance with respect to the market for HEMP common stock.

12      131.    A. Hawatmeh entered the matched order for HEMP common stock with the

13    intention of creating a false or misleading appearance of active trading in HEMP common stock

14    or a false and misleading appearance with respect to the market for HEMP common stock.

15      132.    A. Hawatmeh's, Mrowca's and Galas's matched orders and wash trades affected

16    the market price and volume of HEMP common stock.

17      133.    The price and volume of HEMP has collapsed since February 12, 2014.  On June

18    24, 2014, the volume was approximately 7.4 million shares and the closing price was $.0590 per

19    share.

20      134.    During the period of the manipulative trading, from January 24 through February

21    12, 2014, sales of HEMP common stock in the Mrowca account generated gross profits of

22    approximately $106,000; sales of HEMP common stock in the A. Hawatmeh account generated

*SEC v. Galas et al.*, No. 14-cv-5621      22      Securities and Exchange Commission
Amended Complaint                       Brookfield Place, 200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0174

**APP 0068**

1    gross profits of approximately $229,000; and sales of HEMP common stock in the Galas account

2    generated gross profits of approximately $12,500.

3    **Trading in RVDO**

4    135.    From February 7, 2014 through March 4, 2014, A. Hawatmeh's and N.

5    Hawatmeh's accounts accumulated a total of approximately 3.3 million shares of RVDO

6    common stock through market purchases at prices ranging from $.01 to $.102 per share.

7    136.    A. Hawatmeh controlled the RVDO trading in N. Hawatmeh's account.

8    137.    The RVDO trades in A. Hawatmeh's and N. Hawatmeh's accounts constituted

9    over 50% of the market volume for RVDO common stock during the period from February 7,

10   2014 through March 4, 2014.  The price of RVDO common stock rose from an opening price of

11   $.01 per share on February 7, 2014 to a closing price of $.06 on March 4, 2014.

12   138.    From February 7, 2014 through February 28, 2014, A. Hawatmeh entered at least

13   20 matched orders for RVDO common stock in his account or N. Hawatmeh's account.  These

14   orders were matched with orders entered by third parties identified herein as Trader C, Trader D,

15   Trader E, and Trader F.

16   139.    A. Hawatmeh entered matched orders for RVDO common stock knowing that

17   matching orders had been placed or would be placed by Trader C, Trader D, Trader E or Trader

18   F.

19   140.    A. Hawatmeh entered matched orders for RVDO common stock with the

20   intention of creating a false or misleading appearance of active trading in RVDO common stock

21   or a false and misleading appearance with respect to the market for RVDO common stock.

*SEC v. Galas et al.*, No. 14-cv-5621          23          Securities and Exchange Commission
Amended Complaint                                         Brookfield Place, 200 Vesey Street, Suite 400
                                                          New York, NY 10281-1022
                                                          (212) 336-0174

1    141.    The matched orders of RVDO in A. Hawatmeh's and N. Hawatmeh's accounts

2    affected the price and volume of RVDO stock.  The matched orders started at a price of $.0162

3    per share on February 7, 2014, and increased in price to $.07 per share on February 28, 2014,

4    hitting a high of $.075 per share on February 10, 2014.

5    142.    On March 5, 2014, there was a promotion of RVDO over the Internet claiming

6    that RVDO would trade at $2 per share.  The closing price of RVDO on March 4, 2014 was $.06

7    per share.  This claim was misleading because there was no business development at RVDO that

8    would justify such a rise in price.

9    143.    A. Hawatmeh had prior knowledge of the RVDO promotion and its timing.

10    144.    Between 9:30 AM and 09:52 AM Eastern Time on March 5, 2014, A. Hawatmeh

11    sold approximately 3.23 million shares of RVDO common stock at prices ranging from $.28 per

12    share to $.90 per share.

13    145.    A. Hawatmeh's average selling price per share on March 5, 2014 was

14    approximately $.4375 per share, almost an eightfold increase over his average purchase price per

15    share.

16    146.    A. Hawatmeh's gross profits from trading RVDO between February 7, 2014 and

17    March 5, 2014 were over $1.23 million.

18    147.    N. Hawatmeh's account sold 95,500 shares of RVDO on March 5, 2014 for gross

19    profits of over $35,800.

20    148.    On March 5, 2014, RVDO closed at $.635 per share. Thereafter, the price dropped

21    sharply.  On March 6, 2014, RVDO closed at $.18 per share.


*SEC v. Galas et al.*, No. 14-cv-5621          24          Securities and Exchange Commission
Amended Complaint                                             Brookfield Place, 200 Vesey Street, Suite 400
                                                                      New York, NY 10281-1022
                                                                      (212) 336-0174


**APP 0070**

1      149.    On March 5, 2014 and March 7, 2014, A. Hawatmeh used $738,000 of the

2    proceeds from his sales of RVDO to purchase precious metals from a refinery based in Oregon.

3                      **FIRST CLAIM FOR RELIEF**

4             **Violations of Section 17(a) of the Securities Act**

5                      (All Defendants)

6      150.    The Commission realleges and incorporates paragraphs 1 through 149 by

7    reference as if fully set forth herein.

8      151.    Shares of common stock of ISML, ADPC, ADSU, PHOT, HEMP and RVDO are

9    securities within the meaning of Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)] and

10    Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

11      152.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of

12    securities, by the use of the means or instruments of transportation or communication in

13    interstate commerce, or by use of the mails, (a) have employed, are employing, or are about to

14    employ, devices, schemes, or artifices to defraud; (b) have made untrue statements of material

15    fact, or have omitted to state material facts necessary in order to make statements made, in light

16    of the circumstances under which they were made, not misleading; and/or (c) have engaged, are

17    engaging, or are about to engage in transactions, practices, or courses of business which operate,

18    operated, or would operate as a fraud or deceit upon the purchasers of securities.

19      153.    By reason of the foregoing, Defendants, singly or in concert, directly or

20    indirectly, have violated, or are violating, and unless enjoined will again violate, Section 17(a)(1)

21    and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

*SEC v. Galas et al.*, No. 14-cv-5621    25    Securities and Exchange Commission
Amended Complaint                    Brookfield Place, 200 Vesey Street, Suite 400
                                        New York, NY 10281-1022
                                        (212) 336-0174

1        **SECOND CLAIM FOR RELIEF**

2        **Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

3                                  (All Defendants)

4        154.    The Commission realleges and incorporates paragraphs 1 through 153 by

5    reference as if fully set forth herein.

6        155.    Defendants, directly or indirectly, singly or in concert, by use of the means or

7    instruments of transportation or communication in, or the means or instrumentalities of, interstate

8    commerce or by the use of the mails, in connection with the purchase or sale of securities,

9    knowingly or recklessly: a) employed, are employing or are about to employ devices, schemes

10   and artifices to defraud; b) have obtained, are obtaining or are about to obtain money and

11   property by means of untrue statements of material fact or omissions to state material facts

12   necessary in order to make the statements made, in light of the circumstances under which they

13   were made, not misleading; and/or c) have engaged, are engaging or are about to engage in

14   transactions, practices or courses of business which have operated, operate or will operate as a

15   fraud and deceit upon investors.

16       156.    By reason of the activities herein described, Defendants, singly or in concert,

17   directly or indirectly, have violated, are violating, and unless restrained and enjoined will again

18   violate Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 (a) and (c) [17

19   C.F.R. §240.10b-5(a) and (c)] promulgated thereunder.

20

21

*SEC v. Galas et al.*, No. 14-cv-5621        26      Securities and Exchange Commission
Amended Complaint                                     Brookfield Place, 200 Vesey Street, Suite 400
                                                      New York, NY 10281-1022
                                                      (212) 336-0174

**APP 0072**

**THIRD CLAIM FOR RELIEF**

**Violations of Section 9(a) of the Exchange Act**

(All Defendants)

157.   The Commission realleges and incorporates paragraphs 1 through 156 by reference as if fully set forth herein.

158.   Defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, knowingly or recklessly, and for the purpose of creating a false or misleading appearance of active trading in securities or a false or misleading appearance with respect to the market for such securities, (a) have effected, are effecting, or are about to effect, transactions in such securities which involved no change in the beneficial ownership thereof, or (b) have entered, are entering, or are about to enter an order or orders for the purchase of such securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such securities, had been or would be entered by or for themselves or different parties, or (c) have entered, are entering, or are about to enter an order or orders for the sale of such securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such securities had been or would be entered by or for themselves or different parties.

159.   By reason of the foregoing, Defendants have violated, are violating, and unless restrained and enjoined, will again violate Section 9(a)(1) of the Exchange Act [15 U.S.C. §78i(a)(1)].

*SEC v. Galas et al.*, No. 14-cv-5621          27          Securities and Exchange Commission
Amended Complaint                                          Brookfield Place, 200 Vesey Street, Suite 400
                                                          New York, NY 10281-1022
                                                          (212) 336-0174

**APP 0073**

**FOURTH CLAIM FOR RELIEF**

**(Relief Defendant)**

160.    The Commission realleges and incorporates paragraphs 1 through 159 by reference as if fully set forth herein.

161.    N. Hawatmeh received, directly or indirectly, without consideration, funds which are the proceeds of the unlawful activities alleged herein and to which she has no legitimate claim.

162.    N. Hawatmeh obtained the funds as part of and in furtherance of the securities violations alleged herein and under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and accordingly, N. Hawatmeh has been unjustly enriched by ill-gotten gains.

163.    By reason of the foregoing, N. Hawatmeh should disgorge her ill-gotten gains, plus pre-judgment interest.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests the Court to grant the following relief:

**I.**

An Order temporarily restraining and preliminarily enjoining Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 9(a) and 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

*SEC v. Galas et al.*, No. 14-cv-5621        28        Securities and Exchange Commission
Amended Complaint                                            Brookfield Place, 200 Vesey Street, Suite 400
                                                                          New York, NY 10281-1022
                                                                          (212) 336-0174

**APP 0074**

1          **II.**

2          An Order freezing Defendants' and Relief Defendant's assets;

3          **III.**

4          An Order permanently restraining and enjoining Defendants and any person or entity

5     acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise

6     interfering with the access of the Commission to, relevant documents, books and records;

7          **IV.**

8          An Order requiring Defendants and Relief Defendant each to provide a verified

9     accounting;

10         **V.**

11         An Order requiring Defendants to repatriate funds held overseas;

12         **VI.**

13         An order authorizing the Commission to conduct expedited discovery;

14         **VII.**

15         A Final Judgment finding that Defendants each violated the securities laws and rules

16    promulgated thereunder as alleged against them herein.

17

*SEC v. Galas et al.*, No. 14-cv-5621          29          Securities and Exchange Commission
Amended Complaint                                           Brookfield Place, 200 Vesey Street, Suite 400
                                                            New York, NY 10281-1022
                                                            (212) 336-0174

1                                              **VIII.**

2          A Final Judgment permanently restraining and enjoining Defendants from violating

3   Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 9(a) and 10(b) of the Exchange

4   Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5];

5                                              **IX.**

6          A Final Judgment ordering Defendants jointly and severally to disgorge their ill-gotten

7   gains, if any, plus prejudgment interest;

8                                              **X.**

9          A Final Judgment ordering N. Hawatmeh to disgorge her ill-gotten gains, if any, plus

10  prejudgment interest;

11                                             **XI.**

12         A Final Judgment prohibiting Defendants, pursuant to Section 20(g)(1) of the Securities

13  Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. §

14  78u(d)(6)(A)], from participating in an offering of penny stock;

15                                             **XII.**

16         A Final Judgment ordering Defendants to pay civil money penalties pursuant to Section

17  20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

18  U.S.C. § 78u(d)(3)]; and

19

*SEC v. Galas et al.*, No. 14-cv-5621          30        Securities and Exchange Commission
Amended Complaint                                         Brookfield Place, 200 Vesey Street, Suite 400
                                                          New York, NY 10281-1022
                                                          (212) 336-0174

1                                   **XIII.**

2              Granting such other relief as this Court may deem just and proper.

3       Dated:  August 5, 2014                      Respectfully submitted,
4
5
6
7                                          By:     **/s David Stoelting**
8
9                                          ANDREW M. CALAMARI
10                                             CalamariA@sec.gov
11                                         AMELIA A. COTTRELL
12                                             CottrellA@sec.gov
13                                         MICHAEL D. PALEY
14                                             PaleyM@sec.gov
15                                         DAVID STOELTING
16                                             (Conditionally Admitted Pursuant to
17                                             LCR 83.1(c)(2))
18                                             StoeltingD@sec.gov
19                                         ERIC M. SCHMIDT
20                                             Schmidte@sec.gov
21                                         MONA AKHTAR
22                                             AkhtarM@sec.gov
23                                         TEJAL SHAH
24                                             ShahT@sec.gov
25
26                                         Attorneys for Plaintiff
27                                         SECURITIES AND EXCHANGE
28                                         COMMISSION
29                                         Brookfield Place
30                                         200 Vesey Street, Suite 400
31                                         New York, NY 10281
32                                         Telephone: (212) 336-0174
33                                         Facsimile:  (212) 336-1324


*SEC v. Galas et al.*, No. 14-cv-5621        31        Securities and Exchange Commission
Amended Complaint                                       Brookfield Place, 200 Vesey Street, Suite 400
                                                        New York, NY 10281-1022
                                                        (212) 336-0174

**APP 0077**

BG Capital Group Taps into Liberty Silver Corp. Amidst forecast of 'silver... -- PLANTATION, ...    Page 1 of 3

Case 9:13-cv-80923-KLR    Document 106-1    Entered on FLSD Docket 10/07/2014    Page 90 of 274





# BG Capital Group Taps into Liberty Silver Corp. Amidst forecast of "silver rush"

PLANTATION, Fla., Aug. 28, 2012 /PRNewswire-iReach/ -- BG Capital Group, a venture capital and private equity firm with offices in South Florida, has announced an interest and investment in Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV), an advanced stage junior silver mining company with potential resources of 120m silver equivalent ounces.

"We are confident that this newly discovered deposit located in the United States will yield a substantial supply of silver," said Bobby Genovese, CEO of BG Capital Group.  "We anticipate a growing increase in the value of silver and prospect of this project given the limited supply in areas that can be safely mined."

The revival of this US supply source is good news for investors - and the national economy - as this project has the potential to not only provide a safe location to produce – but it is also expected to create more jobs.  Today, silver production comes primarily from other countries that face challenges including violence and localized uprisings that have put mining to halts.

Liberty currently oversees approximately 24 million inferred ounces of silver equivalent resources located 23 miles from the renowned Coeur Rochester silver mine, known as the "Trinity" project, with an opportunity to become a low-cost, large-scale operation given the existing open pit mine on the property that produced 5m silver ounces in the late 1980s.

Historical drilling and production data, recent surveys and drilling results, as well as BG Capital's independent research reveals the property has potential resources of approximately 120m silver equivalent ounces between the Trinity property and the adjacent Hi Ho silver property of which Liberty recently entered into a mineral rights agreement with.

Liberty Silver Corp is an advanced stage junior mining company focused on developing its flagship property - the Trinity Silver Project - comprised of 10,600 acres including 5,700 acres of fee land and 240 unpatented mining claims.  The Trinity property, previously mined and operated by US Borax, produced 5 million ounces of silver from 1.1 million tons of ore from its open pit oxide resource from 1987 to 1989; mining ceased when sulfide mineralization was encountered in the bottom of the pit and metal prices were too low to support mining the sulfide resource.

The Trinity Silver Project is located 25 miles northwest of Lovelock, Nevada (Pershing County) and shares its geographical location with major gold and silver producers including one of the largest

**APP 0078**

BG Capital Group Taps into Liberty Silver Corp. Amidst forecast of 'silver... -- PLANTATION, ...    Page 2 of 3

Case 9:13-cv-80923-KLR    Document 106-1    Entered on FLSD Docket 10/07/2014    Page 91 of 274

silver mines in the United States, the Coeur Rochester silver mine, which produced 125 million ounces of silver from 1986 to 2010 and has an estimated 120 million silver ounces in reserves. The Company holds the right to earn a 70% interest in the Trinity Project from Renaissance Gold (TSXV: REN).

BG Capital Group is a venture capital and private equity firm that offers more than 20 years of investor relations experience, in-depth marketing and financial management.  For more information, visit www.bgcapitalgroup.com.

**Media Contact:** Stephanie Moore Profile Marketing & Public Relations, 5613061944, smoore@profilemarkpr.com

News distributed by PR Newswire iReach: https://ireach.prnewswire.com

SOURCE BG Capital Group

---

More by this Source
.

BG Polo & Equestrian Center Signs Deal with Max Secunda to Launch Vero Beach Polo School School
Sep 15, 2014, 10:50 ET

.

Genovese Pledges $10,000 To Muskoka Steamship & Historical Society Restoration Campaign
Sep 10, 2014, 08:48 ET

.

BG Capital Group's What's Up Media Group Launches State-of-the-Art Media Studio in Ocala, FL
Sep 03, 2014, 09:12 ET

View all news by BG Capital Group

---

Featured Video

---

Journalists and Bloggers



Visit **PR Newswire for Journalists** for releases, photos, ProfNet experts, and customized feeds just for Media.

**APP 0079**

BG Capital Group Taps into Liberty Silver Corp. Amidst forecast of 'silver... -- PLANTATION, ...    Page 3 of 3

Case 9:13-cv-80923-KLR   Document 106-1   Entered on FLSD Docket 10/07/2014   Page 92 of 274

**Find this article at:**
http://www.prnewswire.com/news-releases/bg-capital-group-taps-into-liberty-silver-corp-amidst-forecast-of-silver-rush-167718355.html

☐ Check the box to include the list of links referenced in the article.

**APP 0080**

Fool.com ▼    The World's Greatest Investing Community    Welcome!    Premium Advice ▼    Help   Join Now   or   Login

**The Motley Fool**
To Educate, Amuse & Enrich™

Search

| Home | My Fool | How To Invest | **Investing Commentary** | CAPS Community | Retirement | Boards | Fool Store |

Basics | ETFs | Options | Small-Cap | Dividends & Income | High Growth | Value | Mutual Funds | International

# Liberty Silver Doubles in Value and Trades over $20 Million Shares in September

By BusinessWire | More Articles
September 27, 2012 | Comments (0)

**Liberty Silver Doubles in Value and Trades over $20 Million Shares in September**

PLANTATION, Fla.--(BUSINESS WIRE)-- Renowned and respected investment advisor and founder of Midas Letter (www.midasletter.com), a subscriber-driven private investment strategy newsletter, James West, has recently reported his overview of the Trinity Silver Project, a Liberty Silver Corp. (TSX: LSL) (OTCBB: LBSV) endeavor.

The Trinity Silver Project is located 25 miles northwest of Lovelock, Nevada (Pershing County) and shares its geographical location with major gold and silver producers including one of the largest silver mines in the United States, the Rochester silver mine owned by Coeur d'Alene Mines Corporation, which produced 125 million ounces of silver from 1986 to 2010 and has an estimated 120 million silver ounces in reserves.

As reported by West at www.midasletter.com, "In the month of September so far, the company has traded over 20 million shares and doubled in value. Silver itself has traded in a similar trajectory, increasing in value by 35% since mid-summer, and outperforming gold smartly. The most respected and experienced traders in precious metals fully expect the ratio of how many ounces of silver it takes to buy one ounce of gold to head towards 16:1 from its current level of over 50:1. That would imply a silver value of $110 per ounce."

"If Liberty Silver shares continue to trade at such a high beta to the silver futures price, the premium being awarded Liberty Silver could be substantial," adds West.

Liberty Silver Corp is an advanced stage junior silver mining company focused on developing its flagship property – the Trinity Silver Project – comprised of 10,600 acres including 5,700 acres of fee land and 240 unpatented mining claims. The Trinity property, previously mined and operated by US Borax, produced 5 million ounces of silver from 1.1 million tons of ore from its open pit oxide resource from 1987 to 1989; mining ceased when sulfide mineralization was encountered in the bottom of the pit and metal prices were too low to support mining the sulfide resource.

Historical drilling and production data, recent surveys and drilling results, as well as independent research reveals the property has potential resources of approximately 120m silver equivalent ounces between the Trinity property and the adjacent Hi Ho silver property of which Liberty recently entered into a mineral rights agreement with.

West cites Liberty Silver's "caliber of management and board of directors" as a key to the project's success with leadership from Geoffrey Brown, Chairman & CEO, former head of private equity at Merrill Lynch Canada; Bill Tafuri, President, bringing 40 years of diverse mining and exploration experience with such companies as Getty Mining Co., Kennecott Corp. and Santa Fe Pacific Gold Corp.; Paul Haggis, an icon in Canadian business circles as

Chairman of Canadian Pacific Railway Ltd, C.E.Bancorp Inc., a Canadian merchant bank and alternative asset manager and Alberta Enterprise Corporation, a venture capital fund overseeing $100 million for early-stage ventures; and the backing of legendary entrepreneur Bobby Genovese, Chairman of BG Capital Group (a venture capital and private equity firm based in Barbados with offices throughout North America with assets of more than $200 million) as one of the biggest shareholders of Liberty Silver Corp. For more information on BG Capital Group visit www.bgcpapitalgroup.com.

James West is the portfolio advisor to the Midas Letter Opportunity Fund and an investment advisor to institutional investors and high net worth family offices with expertise in investing in commodities, real estate and energy, and providing access to early stage opportunities to public companies who explore for and produce such commodities. He has spent more than 20 years working in capacities such as corporate finance advisor, corporate development officer, investor relations officer, media relations and business development officer for companies involved in mining, oil and gas, alternative fuels, healthcare, internet technology, transportation, manufacturing, and housing construction. His website, www.midasletter.com, receives more than 30,000 unique visits per month.

BG Capital

Joanne Polin, 561-350-8784

or

Hillary Reynolds, 954-815-1186

**KEYWORDS:**   United States  North America  Florida

**INDUSTRY KEYWORDS:**

*Try any of our Foolish newsletter services free for 30 days. We Fools may not all hold the same opinions, but we all believe that considering a diverse range of insights makes us better investors. The Motley Fool has a disclosure policy.*

### The Next Industry To Crumble...

Imagine owning Amazon.com (up over an insane 4,000% since 2001) when Internet sales rendered big-box retailers obsolete...

Or Apple (up over a mindboggling 6,000% since 2004) when smartphones made landlines irrelevant.

Now an industry 99% of us use daily is set to implode... And 3 established companies are perfectly positioned to take advantage of this game-changing economic shift. That's why I urge you to click below to find out which industry is going the way of the dinosaur... and how YOU can take advantage.

Click to see the stunning presentation.



## Liberty Silver Closes U.S. $4.6 Million Non-Brokered Private Placement Funding

*--Funds will initiate exploration and development program at the Trinity Project—*

*--Company's shares to be listed on the TSX--*

RENO, NV— December 21, 2011 - Liberty Silver Corp. (OTCBB:LBSV) ("**Liberty Silver**" or the "**Company**") is pleased to announce that it has closed a U.S. $4.6 million non-brokered private placement funding (the "**Funding**") to support the continued  exploration and development of its Trinity silver project in Nevada, and for general corporate and working capital purposes. In conjunction with the Funding, the Company has received conditional approval from the Toronto Stock Exchange (the "**TSX**") to list its shares for trading under the symbol "LSL". The Company's shares are expected to begin trading on December 22, 2011.

The Trinity silver project is an example of Liberty Silver's effort to implement a mitigated risk development strategy. The first step in this process was to locate a property in an area which the Company considers to be a mining safe political jurisdiction.  Other areas of risk addressed include building a management team which it believes will be able to ensure good corporate governance and astute on-the-ground decisions; previous proven minability of the property inclusive of permits, metallurgy, access, and environmental issues; a National Instrument 43-101 mineral resource estimate technical report (the "**43-101 Report**") (focused primarily on the existing pit area  and based on historic drilling data); historic data and recent geophysical surveys confirming eight exploration targets and two extensions from the original mine (not included in the 43-101 Report); and an ability to potentially mine quickly should uncertain market conditions warrant alternate means of financing the further development of the property.  The Liberty Silver mitigated risk approach is dedicated to bringing unique mining opportunities to the market.

**The Trinity Property**

Liberty's 9,960 acre Trinity property is located in what the Company believes to be a mining friendly Nevada district and includes a former producing mine that represents approximately one percent of the geographic extent of the project. Since completing the work that forms the basis for the 43-101 Report, the Company has undertaken a review of historic data and recent geophysical data gathered on the property and has identified six additional silver exploration targets and two gold targets, all of which are independent of the inferred resource defined in the 43-101 Report.  Interpretation of the geologic data and past drilling data indicates that the Trinity property may contain additional drilling targets which have not yet been identified. In addition, there are extensions to the southeast and southwest of the known resource that have been drilled extensively (but not sufficient to prepare a resource estimate

**APP 0083**

under National Instrument 43-101 requirements) that are not included in the exploration targets discussed above.

"We are very pleased with the progress on the Trinity property," stated Bill Tafuri, President and COO of Liberty Silver. "Our 43-101 Report indicates a property of merit that contains a defined silver resource, which could be expanded through further drilling. Our team has identified and confirmed multiple silver and gold targets not discussed in the 43-101 Report.  With the funding in place, we expect to initiate additional geochemical and geophysical surveys in conjunction with an aggressive drilling campaign targeting both high priority exploration targets, and the extensions from the original pit. Given our geographical location, the quality of historical data, and our geological interpretations, we anticipate the planned programs could expand the current resources and help to define the potential for a  profitable mine."

**The Funding**

The U.S. $4,563,750 Funding consisted of the sale of 2,627,500 units (the "**Units**") and 6,500,000 "Subscription Receipts" which have been converted into 6,500,000 Units for an aggregate of 9,127,500 Units sold at U.S. $0.50 per Unit.  Each Unit consists of one common share of the Company and one common share purchase warrant (a "**Warrant**").  Each whole Warrant entitles the holder to acquire one common share at a price of U.S. $0.65 for a period of two years following the date of listing.  The common shares, Warrants and common shares underlying the Warrants (collectively, the "**Securities**") are subject to a hold periods as follows:

a)    under Canadian law, the Securities are subject to a hold period equal to the later of four months and one day after the later of (i) closing,  and (ii) the date on which Liberty becomes a reporting issuer in Canada; and

b)    under U.S. law, the Securities are subject to customary resale restrictions for "restricted securities" under the United States Securities Act of 1933.

The Company has granted to certain holders of the Securities certain U.S. registration rights pursuant to which the Company has agreed to register the Securities for resale in the United States.  If the registration statement does not become effective on or before May 31, 2012, each holder of the Securities shall receive one additional common share for each ten (10) Units held by the investor pursuant to the offering.  In such event, the Company will be obligated to issue a total of 860,750 additional shares.

The Funding supersedes the previously announced Private Placement of Special Warrants announced on June 17, 2011.

**APP 0084**

**About Liberty Silver Corp.**

Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America. The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base. The Trinity silver project, located in Pershing County, Nevada is the Company's flagship project. Liberty Silver has the right to earn a 70 percent interest in the Trinity property from Renaissance Gold Inc. subject to certain obligations.

The 43-101 Report was prepared by Paul D. Hartley, Geologist, and Michael M. Gustin, P.Geo., of Mine Development Associates of Reno, Nevada, and Daniel W. Kappes, P.Eng., of Kappes, Cassiday & Associates of Reno under the title, "Technical Report on the Trinity Project – Pershing County, Nevada". The 43-101 Report is dated December 1, 2011 with an effective date of August 9, 2011, and is filed on www.sedar.com. The report was prepared for the Company and Renaissance Gold Inc., the optionor of the Trinity silver project. Messrs. Paul D. Hartley, Michael M. Gustin, and Daniel W. Kappes are independent consultants to both the Company and Renaissance Gold Inc.; Messrs. Gustin and Kappes are "qualified persons" under National Instrument 43-101. Messrs. Michael M. Gustin and Daniel W. Kappes have reviewed, verified and compiled the technical disclosures in this press release that are derived from the 43-101 Report. Other technical information contained in this press release has been reviewed by H. Richard Klatt, P.Geo., Chief Geologist for the Company and a "qualified person" under National Instrument 43-101.

For additional information
Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com
www.libertysilvercorp.com

*This press release is not an offer to sell or a solicitation of an offer to buy securities, nor shall there be any sales of the securities in any jurisdiction in which such offer, solicitation, or sale would be unlawful.*

*Forward-Looking Statements*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project*

**APP 0085**

*development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*



## Liberty Silver Initiates Drilling Program on its Trinity Project

Toronto ON— January 25, 2012 - Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("**Liberty Silver**" or the "**Company**") is pleased to announce that it has initiated its drilling program on the Trinity Silver property in Nevada.  The Company has retained Boart Longyear as the contract driller for a drilling program that is planned for up to 7,000 meters.

The Trinity property contains a former producing open pit silver mine, the Trinity Mine, which was operated by US Borax and produced approximately 5 million ounces of silver from 1.1 million tons of oxide ore grading 6 ounces per ton silver ("oz/ton") using heap leach technology before it was shut down in 1989 due to depressed silver prices, and never reopened.  Liberty has assay data from over 400 historic drill holes, included in which are data from over 100 drill holes outside the Trinity mine resource area.  This information has been integrated with historic geophysical surveys and a recently completed magnetotelluric survey into a GIS database.  The aggregated data has been utilized to identify high priority targets and formulate the Company's drill plan.

The Company is focusing the first phase of drilling on extensions from the original pit to confirm the continuity of mineralization identified by historic drilling and to further define the extent of the resource. The extensions are identified in the Company's NI43-101 Technical Report, but not included in the resource calculation. Previous drill holes revealed silver, lead, and zinc mineralization at depths of up to 150 meters and that the deposit is still open at depth.

During the course of the first phase of drilling, Liberty expects to initiate geophysical surveys on three of the six identified silver targets. All three targets encountered mineralization in previous drilling with mineralization continuing to the end of the hole.  Data from the geophysics will be used to further focus the drilling on each target.

"We are excited to get our drilling program underway and better understand the significant resource potential contained in the Trinity property," stated Bill Tafuri, President and COO of Liberty. "The historic data and new geophysical surveys on the Trinity property will enable us to be more effective with our drilling, mitigate drilling risk and allow us to better control costs."

**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America. The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base. The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project. Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. pursuant to the terms of an Earn-In

**APP 0087**

Agreement with Renaissance Gold Inc.'s predecessor in interest AuEx, Inc.  AuEx, Inc. acquired its rights to the Trinity property from Newmont Mining USA Limited and the Company is indirectly subject to the rights and obligations of AuEx Inc. under its agreement with Newmont Mining USA Limited.

For additional information:
Manish Z. Kshatriya, Executive VP & CFO
Telephone: (888) 749-4916
Email: mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com

www.libertysilvercorp.com

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release.  No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*



## LIBERTY SILVER ANNOUNCES COMPLETION OF SUCCESSFUL GEOPHYSICAL PROGRAM AT TRINITY PROPERTY

*PROGRAM CONFIRMS POTENTIAL TO EXPAND CURRENT RESOURCE AND IDENTIFIES SIGNIFICANT EXPLORATION TARGETS*

Toronto, ON – May 22, 2012: Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("Liberty Silver" or the "Company") is pleased to announce the successful completion of its 2012 geophysical program at the Trinity Project, located in Pershing County, Nevada.  The Gravity and Induced Polarization (IP) surveys were successful in locating significant new drilling targets concealed by alluvial cover and in delineating the structural fabric of the district.  The geophysics program was designed and interpreted by Jim Wright of J.L. Wright Geophysics.  All the new data and the substantial amount of historic data relating to past operations at the Trinity Project have been input into a GIS database which will be used to further define future drilling and development of the current resource and multiple exploration targets.

Under the direction of Mr. Wright, Magee Geophysical Services of Reno, Nevada conducted the gravity survey consisting of 532 stations covering approximately 26 square kilometers.  The survey delineated the shallow eastern edge of the Sage Valley basin.  High-angle structures of two primary orientations offset the Tertiary volcanic-pre-Tertiary sediment package into a complex series of steps resulting in structurally defined basins.  Most notable is a graben filled with volcanic rocks which hosts the Trinity silver deposit that is underlain by a chargeability anomaly.  A second major chargeability anomaly south of the Trinity pit is located in the same graben.

A possible northern extension of the Trinity silver deposit is hypothesized based upon the gravity survey.  Historic IP data, acquired in 1983 (the "Historic IP"), indicates a possible northern continuation over this area as well.  Historic airborne magnetic results coupled with the gravity and new IP also suggest a continuation of the known mineralization to the southwest along the Trinity fault.  The gravity and Historic IP data, coupled with several other data sets, indicate that several target areas exist, including two possible target areas along the strike extensions to the known silver mineralization, and several other untested chargeability anomalies similar to that of the Trinity silver deposit.

Based upon the gravity and historic geophysical results, eleven (11) IP lines (35 line kilometers) were completed by Zonge Geoscience to enhance the level of detail of the chargeability anomalies detected in the Historic IP survey.  All eleven lines detected chargeability responses

consistent with that survey.  Most notable is a strong chargeability zone located approximately 500 meters ("m") south of the known Trinity silver deposit and is defined by four IP lines from the new IP survey.  The strike length of this anomaly is greater than 600m and is still open to the north and south and ranges from 500m to 700m in width in an east west direction. Furthermore, the graben interpreted from the gravity survey is further supported by the new IP results, thus increasing the thickness of the favorable host rock package.  U.S. Borax ("USB"), the former operator at Trinity, drilled three holes into this zone in the mid-1980s and all three holes intersected considerable silver mineralization but due to low silver prices, further delineation of the silver mineralization was not carried out.  The USB drill holes also stopped short of testing the chargeability anomaly found by the new survey.  The three holes (S-21, S-70, and S-132) encountered silver mineralization ranging from 2.0 grams/tonne in an interval of 1.5m to 43 grams/tonne in an interval of 1.5m but were not drilled to conform to National Instrument (NI) 43-101 standards and, while significant, are considered as non-compliant historic data only.

Bill Tafuri, President and COO, said, "The results of these surveys are very encouraging and they demonstrate the potential for extending the known resource under the covered areas.  They also have defined specific targets to drill under the covered areas making our exploration program much more focused and cost effective".

Liberty Silver is currently completing its initial drilling program on the Trinity Property.  Assayed results from the program are expected to be released in the near term.

Tim Percival, MA, CPG, of Reno, Nevada, a consultant for Liberty Silver, has reviewed the technical data in this press release and he is a Qualified Person as defined by NI 43-101.

**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America.  A skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects lead the Company.  The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base.  The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project.  Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. ("Renaissance") pursuant to the terms of an Earn-In Agreement.  Renaissance acquired its rights to the Trinity property from Newmont Mining USA Limited and the Company is indirectly subject to the rights and obligations of Renaissance under its agreement with Newmont Mining USA Limited.

For additional information:

Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com

Manish Z. Kshatriya, Executive VP & CFO
Telephone: (888) 749-4916
Email: mkshatriya@libertysilvercorp.com

www.libertysilvercorp.com

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*

**APP 0091**

**LIBERTY SILVER CORP. SUCCESSFULLY COMPLETES FIRST PHASE OF 2012 DRILLING PROGRAM**

*Program identifies significant silver mineralization outside the NI 43-101 resource zone and increases confidence in the Trinity Silver Project*

Toronto, ON – July 9, 2012: Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("Liberty Silver or the "Company") is pleased to announce results of the first phase of its 2012 drilling program in the Trinity silver mining district in Pershing County, Nevada.  Drilling was directed to the exploration of selected areas adjacent to the resource zone identified in the Company's 2011 NI 43-1012 technical report (the "Resource Area"), as well as confirmation of that resource.

Highlights

- Hole A12-17, located southeast of the Trinity open pit and Resource Area, intersected significant silver mineralization in the oxide zone with individual 5 ft-thick samples ranging up to 15 ounce per ton ("opt") silver
- 16 of 18 vertical holes intercepted sample intervals greater than 1 opt silver with grades as high as 15 opt silver
- Confirmation holes drilled inside Resource Area contained intervals up to 4.3 opt silver
- Drilling indicates potential for two new extensions from the existing Resource Area
- Based on assays from 413 historical[1] and current drill holes, spanning over approximately 1 square mile, the average grade is 0.7 opt silver

Bill Tafuri, President and COO, said, "We are extremely pleased with the results from phase one of our 2012 drilling program. Trinity is a large, high quality asset that provides us with a relatively low-risk opportunity to expand the known Resource, and also has high quality exploration targets. We are very excited about the potential revealed by the first phase of drilling."

**APP 0092**

PROGRAM HIGHLIGHTS

Eighteen vertical drill holes were completed to depths of up to 1,500 feet in rhyolite and underlying metasedimentry host rocks by reverse circulation for a total of [20,030] feet.  Drilling tested parts of five (5) geographic domains in the vicinity of the southern end the Trinity open pit mine and the 43-101 Resource Area.  Sixteen holes intercepted sample intervals greater than 1 opt silver ("Ag") with grades as high as 15 opt Ag. Sulfide zone samples contain up to 1.7 % lead ("Pb") and 1.6 % zinc ("Zn").  A map of the location of the drill holes can be found on the Company's website at: www.libertysilvercorp.com

In addition to 18 holes drilled during phase 1 of the 2012 drilling program, approximately 395 holes were drilled during the period from 1982-2007, mainly by US Borax.  While approximately 50 of these holes are widely spaced throughout the approximate 13 square-mile area of interest, the large majority are located within an approximate one square mile area centered on the Trinity open pit silver mine.  Based on historical[1] and current assays, all holes contain anomalous silver throughout.  The non-43-101-compliant average grade for all 413 holes is 0.70 opt Ag.

The following Table summarizes the oxide mineralization encountered in the drilling:

| Domain | Hole | From | To | Interval | Interval | Ag | Ag |
|--------|------|------|-----|----------|----------|-----|-----|
|        | Name | (feet) | (feet) | (feet) | (meters) | opt | g/t |
| D1 | A12-8 | | | | 0.0 | none | |
| D1 | A12-9 | | | | 0.0 | none | |
| D1 | A12-10 | 125.0 | 150.0 | 25 | 7.6 | 0.57 | 17.73 |
| | | | | | | | |
| D2 | A12-1 | | | | | none | |
| D2 | A12-2 | 80.0 | 90.0 | 10 | 3.0 | 1.02 | 31.72 |
| D2 | A12-3 | 105.0 | 115.0 | 10 | 3.0 | 0.76 | 23.64 |
| D2 | A12-6 | | | | 0.0 | none | |
| | | | | | | | |
| D3 | A12-4 | 30.0 | 95.0 | 65 | 19.8 | 1.15 | 35.77 |
| | inc | 60.0 | 90.0 | 30 | 9.1 | 1.45 | 45.10 |
| | inc | 75.0 | 90.0 | 15 | 4.6 | 1.86 | 57.85 |
| | | 110.0 | 120.0 | 10 | 3.0 | 0.87 | 27.06 |
| D3 | A12-5 | 10.0 | 95.0 | 85 | 25.9 | 0.99 | 30.79 |
| | inc | 70.0 | 95.0 | 25 | 7.6 | 1.46 | 45.41 |
| Domain | Hole | From | To | Interval | Interval | Ag | Ag |

| Number | Name | (feet) | (feet) | (feet) | (meters) | opt | g/t |
|---|---|---|---|---|---|---|---|
| D4 | A12-7 | 10.0 | 85.0 | 75 | 22.9 | 0.82 | 25.50 |
| | inc | 60.0 | 75.0 | 15 | 4.6 | 1.13 | 35.14 |
| D4 | A12-11 | 10.0 | 65.0 | 55 | 16.8 | 1.12 | 34.83 |
| | inc | 10.0 | 45.0 | 35 | 10.7 | 1.38 | 42.92 |
| | | 140.0 | 150.0 | 10 | 3.0 | 0.62 | 19.28 |
| D4 | A12-12 | 15.0 | 45.0 | 30 | 9.1 | 0.63 | 19.59 |
| | | 60.0 | 85.0 | 25 | 7.6 | 0.71 | 22.08 |
| | | 125.0 | 145.0 | 20 | 6.1 | 0.9 | 27.99 |
| | inc | 125.0 | 135.0 | 10 | 3.0 | 1.22 | 37.94 |
| D4 | A12-17 | 10.0 | 50.0 | 40 | 12.2 | 1.96 | 60.96 |
| | inc | 10.0 | 30.0 | 20 | 6.1 | 3.27 | 101.70 |
| | | 100.0 | 115.0 | 15 | 4.6 | 0.93 | 28.92 |
| | | 130.0 | 165.0 | 35 | 10.7 | 4.37 | 135.91 |
| | **inc** | **145.0** | **165.0** | **20** | **6.1** | **7.05** | **219.26** |
| | **inc** | **150.0** | **155.0** | **5** | **1.5** | **9.9** | **308.00** |
| | **inc** | **155.0** | **160.0** | **5** | **1.5** | **15.66** | **487.00** |
| D4 | A12-18 | 15.0 | 30.0 | 15 | 4.6 | 0.56 | 17.42 |
| | | 80.0 | 95.0 | 15 | 4.6 | 0.78 | 24.26 |
| | | | | | | | |
| D5 | A12-13 | 20.0 | 140.0 | 120 | 36.6 | 0.69 | 21.46 |
| | inc | 110.0 | 120.0 | 10 | 3.0 | 1.14 | 35.45 |
| D5 | A12-14 | 15.0 | 75.0 | 60 | 18.3 | 0.71 | 22.08 |
| | inc | 15.0 | 25.0 | 10 | 3.0 | 1.26 | 39.19 |
| | | 110.0 | 130.0 | 20 | 6.1 | 0.79 | 24.57 |
| | | 155.0 | 205.0 | 50 | 15.2 | 0.75 | 23.33 |
| D5 | A12-15 | 20.0 | 45.0 | 25 | 7.6 | 0.9 | 27.99 |
| | inc | 30.0 | 45.0 | 15 | 4.6 | 1.07 | 33.28 |
| | | 140.0 | 165.0 | 25 | 7.6 | 0.57 | 17.73 |
| D5 | A12-16 | 85.0 | 95.0 | 10 | 3.0 | 0.54 | 16.79 |
| | | 155.0 | 165.0 | 10 | 3.0 | 0.69 | 21.46 |

**APP 0094**

The Following Table summarizes the deeper sulfide mineralization as well as base metals of interest:

| Domain Number | Hole Name | From (feet) | To (feet) | Interval (feet) | Interval (meters) | Ag opt | Ag g/t | Pb % | Zn % | Cu % |
|---|---|---|---|---|---|---|---|---|---|---|
| D1 | A12-8 | 620 | 635 | 15 | 4.57 | 1.35 | 41.99 | 0.03 | 0.04 | - |
| D1 | A12-9 | 630 | 640 | 10 | 3.05 | 1.1 | 34.21 | 0.08 | 0.06 | - |
| D1 | A12-10 | 640 | 655 | 15 | 4.57 | 4.48 | 139.33 | 0.11 | 0.10 | - |
|  | inc | 640 | 645 | 5 | 1.52 | 11.9 | 370.00 | 0.28 | 0.23 | 0.01 |
|  |  |  |  |  |  |  |  |  |  |  |
| D2 | A12-1 | 520 | 565 | 45 | 13.72 | 1.04 | 32.34 | 0.05 | 0.04 | - |
|  |  | 575 | 585 | 10 | 3.05 | 1.76 | 54.74 | 0.13 | 0.12 | - |
|  |  | 790 | 800 | 10 | 3.05 | 0.64 | 19.90 | 0.02 | 0.02 | - |
|  |  | 1000 | 1010 | 10 | 3.05 | 3.18 | 98.90 | 0.03 | 0.04 | - |
|  |  | 1010 | 1045 | 35 | 10.67 | 1.07 | 33.28 | 0.01 | 0.02 | - |
| D2 | A12-2 | 475 | 490 | 15 | 4.57 | 0.76 | 23.64 | 0.04 | 0.03 | - |
|  |  | 635 | 645 | 10 | 3.05 | 0.71 | 22.08 | 0.02 | 0.03 | - |
| D2 | A12-3 | 205 | 225 | 20 | 6.10 | 0.58 | 18.04 | 0.02 | 0.05 | - |
|  |  | 420 | 450 | 30 | 9.15 | 1.31 | 40.74 | 0.10 | 0.08 | - |
|  | inc | 425 | 435 | 10 | 3.05 | 2.05 | 63.76 | 0.20 | 0.15 | - |
| D2 | A12-6 | 695 | 715 | 20 | 6.10 | 1.56 | 48.52 | 0.12 | 0.08 | - |
|  | inc | 705 | 715 | 10 | 3.05 | 2.68 | 83.35 | 0.21 | 0.13 | - |
|  |  | 745 | 760 | 15 | 4.57 | 1.49 | 46.34 | 0.08 | 0.08 | - |
|  |  |  |  |  |  |  |  |  |  |  |
| D3 | A12-4 | 155 | 165 | 10 | 3.05 | 1.24 | 38.56 | 0.06 | 0.11 | - |
|  |  | 180 | 190 | 10 | 3.05 | 0.74 | 23.01 | 0.06 | 0.11 | - |
|  |  | 205 | 240 | 35 | 10.67 | 1.78 | 55.36 | 0.09 | 0.10 | - |
|  |  | 295 | 305 | 10 | 3.05 | 0.74 | 23.01 | 0.10 | 0.13 | - |
|  |  | 310 | 330 | 20 | 6.10 | 1.2 | 37.32 | 0.15 | 0.20 | - |
|  | inc | 310 | 320 | 10 | 3.05 | 1.8 | 55.98 | 0.18 | 0.29 | - |
|  |  | 345 | 400 | 55 | 16.77 | 1.57 | 48.83 | 0.17 | 0.15 | - |
|  |  | 410 | 435 | 25 | 7.62 | 0.72 | 22.39 | 0.25 | 0.20 | - |
|  | inc | 435 | 445 | 10 | 3.05 | 1.64 | 51.00 | 0.11 | 0.10 | - |
|  |  | 555 | 570 | 15 | 4.57 | 1.7 | 52.87 | 0.14 | 0.10 | - |
| D3 | A12-5 | 95 | 120 | 25 | 7.62 | 1.68 | 52.25 | 0.08 | 0.15 | - |
| Domain | Hole | From | To | Interval | Interval | Ag | Ag | Pb | Zn | Cu |

| Number | Name | (feet) | (feet) | (feet) | (meters) | opt | g/t | % | % | % |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 225 | 240 | 15 | 4.57 | 0.53 | 16.48 | 0.14 | 0.19 | - |
|  |  | 280 | 305 | 25 | 7.62 | 0.6 | 18.66 | 0.43 | 0.33 | 0.01 |
|  |  | 545 | 565 | 20 | 6.10 | 0.63 | 19.59 | 0.77 | 1.00 | 0.02 |
|  |  | 640 | 650 | 10 | 3.05 | 0.55 | 17.11 | 0.51 | 0.41 | 0.01 |
|  |  |  |  |  |  |  |  |  |  |  |
| D4 | A12-7 | 515 | 545 | 30 | 9.15 | 0.73 | 22.70 | 0.83 | 0.75 | 0.02 |
|  |  | 745 | 775 | 30 | 9.15 | 0.61 | 18.97 | 0.83 | 0.66 | 0.03 |
|  |  | 785 | 795 | 10 | 3.05 | 1 | 31.10 | 0.34 | 0.29 | 0.01 |
| D4 | A12-11 | 505 | 515 | 10 | 3.05 | 0.94 | 29.23 | 1.30 | 0.65 | - |
| D4 | A12-12 |  |  |  | 0.00 | none |  |  |  |  |
| D4 | A12-17 | 165 | 180 | 15 | 4.57 | 1 | 31.10 | 0.33 | 0.26 | 0.01 |
| D4 | A12-18 |  |  |  | 0.00 | none |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| D5 | A12-13 | 300 | 315 | 15 | 4.57 | 4.16 | 129.38 | 0.10 | 0.08 | - |
|  |  | 440 | 460 | 20 | 6.10 | 1.15 | 35.77 | 0.11 | 0.11 | - |
|  |  | 485 | 495 | 10 | 3.05 | 0.59 | 18.35 | 0.30 | 0.26 | - |
|  |  | 510 | 540 | 30 | 9.15 | 0.98 | 30.48 | 0.53 | 0.32 | - |
|  |  | 980 | 990 | 10 | 3.05 | 1.41 | 43.85 | 0.12 | 0.18 | - |
| D5 | A12-14 | 365 | 380 | 15 | 4.57 | 0.77 | 23.95 | 0.37 | 0.31 | - |
| D5 | A12-15 | 305 | 315 | 10 | 3.05 | 0.54 | 16.79 | 0.41 | 0.34 | - |
|  |  | 365 | 375 | 10 | 3.05 | 0.96 | 29.86 | 0.18 | 0.06 | - |
|  |  | 390 | 450 | 60 | 18.29 | 1.06 | 32.97 | 0.16 | 0.09 | - |
|  |  | 760 | 780 | 20 | 6.10 | 0.69 | 21.46 | 0.44 | 0.49 | 0.01 |
| D5 | A12-16 | 165 | 180 | 15 | 4.57 | 0.78 | 24.26 | 0.06 | 0.09 | - |
|  |  | 405 | 415 | 10 | 3.05 | 0.62 | 19.28 | 0.04 | 0.03 | - |
|  |  | 495 | 505 | 10 | 3.05 | 0.68 | 21.15 | 0.23 | 0.18 | - |

Notes:

Ag grades are calculated using 0.5 opt cut off and minimum 10 ft reporting thickness.

All holes are exterior to the geographical area of the MDA NI 43-101 resource except holes A12-4 and -5.

inc. = including

 The three holes drilled in **Domain 1**, penetrated to depths of 1,040 to 1,120 ft and contain weakly anomalous Ag throughout.  Very thin horizons of Ag at 1.2 to 5.1 opt Ag are found spatially associated with speculated fault zones at 635 to 700 ft depths.

**Domain 2** (Holes A12-1, -2, -3 and -6) is located immediately southwest of the south end of the Trinity pit.  Holes A12-1 and A12-6 host no oxide Ag above 0.5 opt but do contain sulfide Ag averaging 0.90 opt and 0.95 opt Ag, respectively with grades improving at

depth.  A12-2 contains 1.0 opt oxide Ag at a depth of 80 to 90 ft while A12-3 contains 0.77 opt oxide Ag from 105-115 ft deep.

**Domain 3** includes holes **A12-4** and **A12-5,** which were drilled to confirm grade within the Resource Area, in the area south of the south end of the Trinity open pit mine.  Hole A12-4 exhibits up to 4.3 opt Ag and averages 0.39 opt Ag from surface to 1,275 ft depth, 0.65 opt Ag from surface to 675 ft depth in rhyolite terrain, and 0.77 opt Ag from surface to 120 ft depth in the oxide zone including 1.2 opt Ag at 30-95 ft depth.  Hole A12-5 exhibits up to 2.9 opt Ag and averages 0.23 opt Ag from surface to 1,500 ft depth, 0.49 opt Ag from surface to 490 ft depth in rhyolite terrain, 0.91 opt Ag from surface to 95 ft depth in the oxide zone including 1.2 opt Ag at 30-95 ft depth.

Drilling results in **Domain 4** (Holes **A12-7, -11, -12, -17, and -18** drilled along and outside the east side of the Resource Area.) indicate a potential new extension from the original pit and Resource Area.  Hole **A12-17**, intersected significant silver mineralization in the oxide zone with individual 5 ft-thick samples ranging up to 15 opt Ag.  Samples at 145 to 170 ft depth average 5.9 opt Ag and the entire oxide zone at 0 to 165 ft depth averages 1.6 opt Ag.  The rhyolite host rock at surface to 665 ft depth averages 0.55 opt Ag.  In the reduced zone below 165 ft. and down to 665 ft. depth Pb + Zn range up to 1% and 0.5 %, respectively, and average 0.5% Pb and Zn with 0.19 opt Ag.  Holes **A12-11** and **A12-7**, situated up to 250 ft south of A12-17 demonstrate grades of up to 2.1 and 1.4 opt Ag, respectively.

The holes drilled in **Domain 5 (**Holes A12-13, -14, -15, -16) are step outs from the south end of the Trinity open pit mine and sited on the east and south borders of the Resource Area.  Similar to Domain 4, results in Domain 5 also indicate a potential new extension. Hole **A12-13** exhibits scattered strong silver throughout, including 10 opt Ag at 305 ft depth and 2.7 opt silver at 985 ft depth.  The rhyolite host rock at surface to 475 ft depth averages 0.48 opt silver including 0.73 opt oxide silver at 25 to 120 ft depth. Pb+Zn average 0.65% with 0.74 opt silver at 485 to 540 ft depth in metasediments below Ag-bearing rhyolite terrane.  Hole **A12-14** exhibits individual sample grades of up to 1.9 opt silver in the oxide zone where it averages 0.60 opt silver from the surface to 165 ft depth.  The entire oxide zone at surface to 230 ft depth averages 0.55 opt silver. Pb+Zn average 0.65 % with 0.74 opt silver at 485 to 540 ft depth at the bottom of rhyolite terrane.

"In addition to the strong results provided by our phase 1 program, we have identified multiple exploration targets through the vast amount of historic drilling and our recently completed geophysics program. We have diligently analyzed and inputted all the historic and new data into a comprehensive GIS database and are constructing 3D models to further define the multiple opportunities the Trinity property contains," concluded Mr. Tafuri.

**Quality Assurance / Quality Control**

All drill hole samples were analyzed using ICP-MS by American Assay Laboratories, Reno, Nevada. Analytical precision and accuracy were monitored by Minerals Exploration and Environmental Quality, Reno, Nevada, including the use of certified reference materials (standards), blank samples, and duplicate samples. A senior Liberty Silver geologist supervised drill hole sample collection by the driller, Boart Longyear, Elko, Nevada, at the drill site and chain of custody throughout the program was unbroken. Drill hole deviation surveys were done by IDS, Elko, Nevada.

Tim Percival, MA, AIPG, of Reno, Nevada, a consultant to Liberty Silver has reviewed the technical data in this press release and is a Qualified Person as defined by NI 43-101.

*Notes:*
 1- The historic drilling that was used in calculating this average was undertaken in accordance with standards at the time, but was not supervised by a qualified person in accordance with current NI43-101 standards. These results are reported here for reference only and should not be relied upon.

**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America. The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base. The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project. Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. ("Renaissance") pursuant to the terms of an Earn-In Agreement.

**APP 0098**

For additional information:

Manish Z. Kshatriya, Executive VP & CFO
Telephone: (888) 749-4916
Email: mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com

www.libertysilvercorp.com

*Cautionary Statements*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release.  No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release and in filings made with Securities Regulators. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*



## LIBERTY SILVER ANNOUNCES
## OFFER FOR SENNEN RESOURCES

*Offer Represents a 47.3% Premium on Sennen's Recent Trading Price*

*Sennen's Cash Reserves Will Help Advance Liberty Silver's Mining Project and Value-Building Consolidation Strategy*

**Toronto - July 16, 2012 –** Liberty Silver Corp. (TSX: LSL; OTCBB: LBSV) today announced an offer to acquire all the outstanding common shares of Sennen Resources Ltd.  (TSXV: SN), a junior mineral exploration company.

Under the offer, Sennen shareholders will receive 0.28 of a Liberty Silver common share for each Sennen common share, being an implied offer price per Sennen common share of $0.20. The offer represents a premium of 47.3% to the 20-day volume weighted average trading price ended July 13, 2012, being $0.135. This is also larger in comparison to the average take-over bid premium paid for mining companies listed on the Toronto Stock Exchange and TSX Venture Exchange over the past 12 months of 34.8%. The offer is valued at $13.36 million.

According to Liberty Silver's estimates, the acquisition of Sennen and its financial resources at the offer price is comparable to Liberty Silver completing a private placement of its common shares at approximately $0.71.

**Benefits of the offer to Sennen shareholders:**

- The offer price represents a significant premium above Sennen's current trading price.
- Liberty Silver has an experienced management team and independent board of directors.
- Sennen shareholders are expected to benefit from Liberty Silver's accretive and low-risk acquisition and consolidation strategy.
- Sennen shareholders will receive more liquid Liberty Silver common shares, which trade on the TSX main board.
- Sennen shareholders will share in the future success of Liberty Silver's Trinity Silver Project in mining-friendly Pershing County, Nevada.
- Liberty Silver adheres to a strict discipline of risk mitigation. It aims to find and develop mineral exploration properties that provide the best opportunity for success with the least amount of risk. The success of this strategy has already been proven with the Trinity Silver Project. In contrast, Sennen has a recent history that includes acquiring projects, spending significant amounts of money on the projects, and subsequently withdrawing.

For full details of these benefits, go to the "Question-and-Answer" section of Liberty Silver's take-over-bid circular, filed today on SEDAR at www.sedar.com.

**APP 0100**

"Sennen represents a great opportunity for Liberty Silver at a time of growing consolidation in the global mining industry", Geoff Browne, Liberty Silver's chief executive officer, said. "Depressed valuations for junior mining companies alongside healthy precious metal prices have created an environment ideal for mergers and acquisitions activity."

Mr. Browne added: "Liberty Silver is well-placed to take advantage of these opportunities using our mitigated-risk approach to project evaluation and development. We are confident that the combination of Sennen's cash resources and Liberty Silver's skilled management team and proven risk-mitigation strategy will enable us to advance our promising Trinity Silver project in Nevada and to identify other low-risk projects."

The offer will be made by way of formal take-over-bid circular to be mailed to Sennen shareholders and will be subject to various conditions, including receipt of all required regulatory approvals and not less than 66⅔% of the Sennen common shares being deposited under the offer and not withdrawn. Further details concerning the offer will be included in the formal offer and take-over-bid circular.

If the transaction is completed, Liberty Silver intends to replace the board and management of Sennen and Sennen's common shares will be delisted from the TSX Venture Exchange.

Liberty Silver has an experienced board of directors comprised of sophisticated and highly-accomplished individuals. Their collective experience and expertise sets Liberty Silver apart from its peers. The eight-member board includes Paul Haggis, one of Canada's most prominent and respected business leaders. Mr. Haggis was recently named chairman of Canadian Pacific Railway Ltd. Mr. Browne, Liberty Silver's chairman and CEO, has over 35 years of experience in the financial services industry in Canada, the U.S. and the U.K.

"From an investor's perspective, one critical difference between the management teams of Liberty Silver and Sennen is their personal stakes in their respective companies", Mr. Browne said. "Our board and management collectively own approximately 30% of Liberty's outstanding common shares, while Sennen's board and management appear to collectively hold less than 8% of their company's equity."

Sennen's principal asset is its cash reserves, and it also has an option on the 10,000-acre Hope Bay Oro gold property in Nunavut, Canada. Sennen is currently funding the property as part of an option agreement with North Arrow Minerals Inc., under which Sennen would earn a 60% interest by financing a $5 million exploration program over five years.

Hope Bay Oro adjoins the Doris North mine property owned by Hope Bay Mining Ltd., a wholly-owned subsidiary of Newmont Mining Corporation. Newmont recently incurred a significant write-down on the project and placed it on care and maintenance after evaluating its economic feasibility.

Mr. Browne said: "Given recent developments pertaining to other higher profile projects in the area, we will carefully review the Hope Bay Oro project using our mitigated-risk approach to determine whether the project fits our business plan."

**About Liberty Silver**
Liberty Silver Corp. is focused on exploring and developing mineral properties in North America. The company is committed to creating value for its shareholders by advancing its projects using its mitigated risk approach to production, developing new resources on its existing properties, and acquiring new properties with potential to expand their resource base. The Trinity Silver property in Pershing County, Nevada is the company's flagship project. Liberty Silver has the right to earn a joint venture interest in

the 10,476 acre Trinity property from Renaissance Gold Inc. For more information, go to www.libertysilvercorp.com.

Byron Capital Markets Ltd. is acting as financial advisor to Liberty Silver and dealer manager in respect of the proposed take-over offer. Borden Ladner Gervais LLP is acting as Liberty Silver's legal counsel.

**Contact:**
Bernard Simon
Vice-President, Kingsdale Communications Inc.
416-867-2304
bsimon@kingsdalecommunications.com

This press release does not constitute an offer to buy or an invitation to sell, or the solicitation of an offer to buy or invitation to sell, any securities of Liberty Silver or Sennen. Such an offer may only be made pursuant to an offer and take-over bid circular filed with the securities regulatory authorities in Canada and pursuant to registration or qualification under the securities laws of any other such jurisdiction. Investors may obtain a free copy of the offer and take-over bid circular, when they become available and other documents filed by Liberty Silver with the Canadian provincial securities regulators on SEDAR at www.sedar.com, and with the SEC at the SEC's website at www.sec.gov. The offer and take-over bid circular and these other documents may also be obtained for free, once they have been mailed, on Liberty Silver's website. Free copies of any such documents could also be obtained by directing a request to Liberty Silver at Suite 2330, 181 Bay Street, Toronto, Ontario, Canada, M5J 2T3.

*The Depositary and Information Agent for the Offer is:*



**Kingsdale Shareholder Services Inc.**
**The Exchange Tower**
**130 King Street West, Suite 2950, P.O. Box 361**
**Toronto, Ontario M5X 1E2**
**North American Toll Free Phone: 1-866-581-0512**
**Facsimile: 416-867-2271**
**Toll-Free Facsimile: 1-866-545-5580**
**Outside North America, Banks and Brokers Call Collect: 416-867-2272**
**E-mail: contactus@kingsdaleshareholder.com**



# LIBERTY SILVER STARTS PLANNING FOR PRODUCTION
# AT TRINITY SILVER

Toronto, ON – July 24, 2012:  Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV, "Liberty Silver" or the "Company") has engaged an independent consultancy, SRK Consulting (U.S.), Inc., of Reno, Nevada, to undertake a scoping study for silver production at Liberty Silver's Trinity Silver property.

"We remain guided by our disciplined mitigated-risk approach," said Geoffrey Browne, Liberty Silver's Chairman and CEO. "Even though we have identified multiple exploration targets at Trinity, our board of directors and management are keenly aware of current challenging conditions for junior mining companies in global capital markets. We are thus evaluating various options, including the prudency of immediately proceeding with production planning and execution."

Liberty Silver completed and filed a NI 43-101 technical report on the Trinity mining district silver project in December 2011. The report identified an inferred resource that the Company expects to upgrade in the near term.  As part of the first phase 2012 drilling program (*See press releases January 25, and July 9, 2012*), two drill holes, of a planned twelve-hole program, successfully began confirming the grade and thickness of the resource.  Other holes identified strong new silver mineralization outside the current NI 43-101 inferred resource.

The scoping study by SRK Consulting will include the following:

- Investigating the feasibility of mining and heap-leaching the oxide silver resource defined by the NI 43-101 technical report, heap leaching an estimated 400,000 ton stockpile mined by the previous operator, and reprocessing the 1.1 million tons of material stacked on the decommissioned leach pad by U.S. Borax. The amount of material in stockpile and on the historic leach pad were not considered in the NI 43-101 resource, they are not NI 43-101 compliant estimates, and are included only for information;

- A timeline to begin leaching, inclusive of permitting and construction; and

- A preliminary projection of capital costs, cash flow, cash costs, capital payback and present value.

Liberty Silver has also retained JBR Environmental of Reno, Nevada, to begin the permitting process for mine development.  JBR has done all of the environmental work for Liberty Silver on the project to date.

Liberty Silver is currently planning the second phase of the Trinity 2012 drill program at locations adjacent to and removed from the resource area as well as confirmation drilling within the resource area.

**About Liberty Silver Corp.**

Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America.  The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base.  The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project.  Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. pursuant to the terms of an Earn-In Agreement.

**For additional information:**

Manish Z. Kshatriya, Executive VP & CFO
Telephone: (888) 749-4916
Email: mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com

www.libertysilvercorp.com

*Cautionary Statements*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release.  No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and*

**APP 0104**

*other matters discussed in this news release and in filings made with securities regulators. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*

**LIBERTY SILVER CORP. OPEN LETTER TO SENNEN SHAREHOLDERS**

Toronto, ON – July 26, 2012: Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) issued an open letter to the Sennen Resources Ltd. shareholders regarding the Company's offer to acquire Sennen. The letter follows.

Dear Sennen Shareholder –

**We at Liberty are focused on concluding a friendly deal with Sennen that is in the best interest of both Sennen and Liberty shareholders. I'd like to tell you why.**

**The rationale for a combination of our two companies could not be more compelling at this time.** As you are no doubt aware, the capital markets have been very challenging. This is especially true for junior mining companies.  Some believe that these difficulties are a part of the normal business cycle and that the junior mining public markets will return to their former health in due course.  We are less sure.

Since the mid 1990's, the number of publicly-traded junior mining companies has expanded from the hundreds to the thousands.  As a result of this huge increase:

- The junior mining sector has become overcrowded and inefficient. Most companies are small and short of cash, commitment or talent.
- With few exceptions, capital markets have been frozen for junior mining companies since mid-2011 and there is no thaw on the horizon.

In Liberty's view, the junior mining sector is going through a fundamental transformation.

Consolidation will result in fewer junior miners, each with a multitude of projects guided by the highest quality talent in every aspect of their business, including: governance, risk assessment, capital markets, regulatory requirements, communications, finance, geology, drilling, engineering, quality control, consultants, permitting, environmental, and assaying.

**APP 0106**

Junior mining companies that rely on traditional financings from the high risk/reward venture markets as a way to drive from exploration to production will be severely challenged. Many will not survive.

**The bottom line is that only a small number of high-quality miners with a disciplined approach to risk will benefit from the consolidation.  Liberty falls into this category.**
- We have assembled a high-caliber board and management team.  The management team is devoted solely to Liberty endeavors.
- We undertake a thorough fatal-flaw analysis prior to any investment.
- We adhere strictly to a mitigated-risk strategy as evidenced by our Trinity property in Nevada.
- Trinity is a former operating silver mine and has a NI 43-101 compliant technical report that has been thoroughly vetted for flaws regarding mining operations and other potential problems by management and independent third parties.
- Trinity has substantial potential resource upside (see *Completion of Geophysics press release of May 22, 2012* and *First Phase Drilling press release of July 9, 2012*).
- Trinity has substantial exploration potential (see *Completion of Geophysics press release of May 22, 2012* and our July 2012 corporate presentation on our website, www.libertysilvercorp.com).
- Trinity is being prepared for potential near-term production (see *Planning for Production press release of July 24, 2012*).
- Our track record speaks for itself: we have hit our benchmarks as promised, on time, through a very difficult period for junior mining companies.

I invite you to look closely at our team's resumes on our website. Their experience and capabilities cover a broad spectrum that will allow us the <u>means</u> and <u>credibility</u> to fulfill our mandate.

We have crafted our offer to provide numerous benefits to Sennen shareholders:
- The offer price represents a 47% premium on Sennen's recent trading price.
- Liberty has an experienced management team and independent board of directors.
- As outlined above, Sennen shareholders are expected to benefit from Liberty's accretive and low-risk acquisition and consolidation strategy.
- Sennen shareholders will receive more liquid Liberty Silver common shares, which trade on the TSX main board.
- Sennen shareholders will share in the future success of the Trinity project and in the application of our risk-mitigation strategy.

(Full details of these benefits can be found in the "Question-and-Answer" section of our take-over-bid circular, filed at www.sedar.com and available on our website).

**APP 0107**

Continuous communication, transparency, and full time commitment are Liberty's fundamental promises to its shareholders.  With that in mind, please check out our website where you will find the detailed circular outlining the proposed transaction, relevant press releases, and our corporate presentation.

For all these reasons, I am confident that the combination of Liberty and Sennen will build value, bringing substantial benefits to both sets of shareholders.
Thank you for taking the time to read this letter. I look forward to an outcome that will do us all proud.

Sincerely,

*Geoff Browne*

Geoff Browne

**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America.  The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base.  The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project.  Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. pursuant to the terms of an Earn-In Agreement.

For additional information:

Manish Z. Kshatriya, Executive VP & CFO
Telephone: (888) 749-4916
Email: mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com

www.libertysilvercorp.com

*Cautionary Statements*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release.  No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release and in filings made with Securities Regulators. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*



# Liberty Silver Expands Trinity Land Package with Acquisition of Hi Ho Silver Property

Toronto, ON - August 8, 2012 - Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("Liberty Silver" or the "Company") is pleased to announce that it has entered into a binding agreement (the "Agreement") with Primus Resources, L.C. ("Primus") to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada (the "Hi Ho Properties"). The Hi Ho Properties are the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. ("Renaissance") on the Trinity land package.

Under the terms of the Agreement, Liberty Silver will provide cash consideration of US$150,000 and issue 3,000,000 common shares of Liberty Silver stock to Primus. In addition, Primus will be granted a 2% net smelter royalty ("NSR") on future production from the Hi Ho Properties. The total consideration for the acquisition of the Hi Ho Properties will be applied to Liberty Silver's expenditure commitment under its earn-in agreement with Renaissance, upon acceptance by Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Properties payment, Liberty will have contributed in excess of 85% of its required US$5 million expenditure commitment to earn its 70% interest in the project. Pursuant to the terms of its earn-in agreement with Renaissance, the Company has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study in the following year.

"We are extremely pleased to reach an agreement that will result in our mineral claims being included with Liberty Silver's land package at the Trinity Silver property. We have closely monitored their progress to date on the property and we agree with their approach for its development, which we feel has enormous upside potential. Their on the ground mining team is very strong and has a great understanding of the existing resource and the multiple drilling targets independent of the resource zone", said Jim Marin, President of Primus Resources, L.C.

"The Hi Ho Properties are an important addition to our future development plans at Trinity," stated Geoff Browne, Chairman and CEO of Liberty. "Historic data, combined with current modeling indicates that the Trinity deposit extends into the Hi Ho Properties, significantly increasing our current resource potential and the projected economics for bringing Trinity back into production."

The Agreement is subject to regulatory approval and customary closing conditions.

**About Liberty Silver Corp.**

Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America. The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base. The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project. Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. pursuant to the terms of an earn in agreement.

**For Additional Information**E
Kevin O'Connor, Investor Relations
(416) 962-3300
ko@spinnakercmi.com

Manish Z. Kshatriya, Executive VP & CFO
(888) 749-4916
mkshatriya@libertysilvercorp.com

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release and in filings made with Securities Regulators. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.



# LIBERTY SILVER EXTENDS OFFER
# FOR SENNEN RESOURCES

**Toronto, ON – August 21, 2012**: Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) announced today that it is extending its offer for all the issued and outstanding common shares of Sennen Resources Ltd. (TSXV: SN) until 9 p.m. Toronto time on Monday, September 10, 2012.

"We remain confident that tendering to our offer represents the best value for Sennen shareholders rather than maintaining Sennen's *status quo*", Geoff Browne, Liberty Silver's chairman and chief executive officer said. "Sennen's board formed a special committee and hired financial and legal advisers more than a month ago to examine our offer.  The special committee has yet to come up with a superior – or indeed, any – alternative proposal."

Under Liberty Silver's offer, Sennen shareholders will receive 0.28 of a Liberty Silver common share for each Sennen common share. The exchange ratio, at the time the offer was made, represented an implied price of $0.20 per Sennen share.

The offer represents a premium of 47.3% to the 20-day volume weighted average trading price ended July 13, 2012, being $0.135. This is also higher than the 34.8% average take-over bid premium paid for mining companies listed on the Toronto Stock Exchange and TSX Venture Exchange over the past 12 months. The offer is valued at approximately $13.36 million, an amount that is expected to exceed Sennen's net cash reserves when the proposed transaction closes.

Mr. Browne added: "The combination of Sennen's cash resources and Liberty Silver's skilled management team and prudent risk-mitigation strategy will enable us to advance the Trinity Silver project, as well as identify other low-risk opportunities to the benefit of shareholders of both our companies.

"With the recent acquisition of the Hi Ho properties, we have met yet another milestone. As promised, we have added significant upside to our established resource, moved very close to fulfilling our earn-in requirements, and further de-risked the project. We are now planning the best path towards re-starting production."

Other benefits of Liberty Silver's offer include:

- An implied price of $0.20 per Sennen common share, which is well above the prevailing market price of Sennen shares since Liberty Silver announced its offer. Given this premium, Sennen shareholders are advised to carefully consider the possible consequences of rejecting Liberty Silver's offer.  Sennen shares rose from $0.11 on July 9 to $0.18 on July 16, the day Liberty Silver announced its offer.

- Sennen shareholders will receive more liquid shares that trade on the TSX main board. During the one-year period prior to the announcement of Liberty Silver's offer, 14.99 million Liberty Silver shares changed hands in public markets, far above the 1.92 million Sennen shares traded during the same period.

- Sennen shareholders will have the opportunity to participate in the Trinity Silver project at an early stage of its development and thereby participate in future growth.

- Sennen shareholders will participate in Liberty Silver's strategy of acquiring risk-mitigated properties and other accretive assets to create a leading precious-metals mining company with a diversified portfolio of production and development assets.

**Setting the Record Straight**

Liberty Silver also wishes to correct misleading allegations contained in a press release issued by Sennen on August 20, 2012.

- The sole compensation of the independent directors recruited by Mr. Browne to create Liberty Silver's high-calibre board is a grant of 300,000 Liberty Silver options each, at a strike price of $0.75. The directors receive no cash compensation.  Any common shares they may have purchased have been acquired either as part of a Liberty Silver private placement or in the open market.

  "Our directors have significant skin in the game, a clear indication of their confidence in Liberty Silver's business strategy and in Trinity Silver's bright prospects", Mr. Browne said.

- Sennen's statements on Liberty Silver's value do not reflect the significant progress made at the Trinity Silver project, including positive drilling results, the recent NI 43-101 resource disclosure report, and the acquisition of the Hi Ho claims.

  "It is telling that Sennen has not contacted  Liberty Silver, let alone reviewed the latest data which we would willingly share as part of a friendly process ", Mr. Browne added.

**About Liberty Silver**

Liberty Silver Corp. is focused on exploring and developing mineral properties in North America. The company is committed to creating value for its shareholders by advancing its projects using its mitigated risk approach to production, developing new resources on its existing properties, and acquiring new properties with potential to expand their resource base. The Trinity Silver property in Pershing County, Nevada is the company's flagship project. Liberty Silver has the right to earn a joint

venture interest in the 10,576 acre Trinity property from Renaissance Gold Inc. For more information, go to www.libertysilvercorp.com.

Byron Capital Markets Ltd. is acting as financial advisor to Liberty Silver and dealer manager in respect of the proposed take-over offer. Borden Ladner Gervais LLP is acting as Liberty Silver's Canadian legal counsel.

***The depositary and information agent for the offer is:***

**Kingsdale Shareholder Services Inc.**

The Exchange Tower

130 King Street West, Suite 2950, P.O. Box 361

Toronto, Ontario M5X 1E2

North American Toll Free Phone: 1-866-581-0512

Facsimile: 416-867-2271

Toll-Free Facsimile: 1-866-545-5580

Outside North America, Banks and Brokers Call Collect: 416-867-2272

**E-mail: contactus@kingsdaleshareholder.com**

For additional information:

Manish Z. Kshatriya, Executive VP & CFO
(888) 749-4916
mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
(416) 962-3300
ko@spinnakercmi.com

Bernard Simon, Vice-President – Kingsdale Communications
(416) 867-2304
bsimon@kingsdalecommunications.com

www.libertysilvercorp.com

*Cautionary Statements*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements*

**APP 0114**

*are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release and in filings made with securities regulators. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*

-----------------------------------------



## LIBERTY SILVER CLOSES ACQUISITION OF HI HO PROPERTY TO EXPAND TRINITY LAND PACKAGE

**Toronto, ON — October 16, 2012:** Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("Liberty Silver" or the "Company") is pleased to announce that it has completed its transaction with Primus Resources, L.C. and a second property owner (collectively, "Primus") to acquire approximately 100 acres located adjacent to the former Trinity Mine on the Company's Trinity property in Nevada (the "Hi Ho Property"). The Hi Ho Property was the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. ("Renaissance") on the Trinity land package.

"We are extremely pleased to have completed the transaction with Primus and appreciate their continued confidence," stated Geoff Browne, Chairman and CEO of Liberty.

The Hi Ho Property completes the land package controlled by Liberty Silver and Renaissance. The joint venture comprises over 10,500 acres of contiguous land in an historic Nevada mining district, which includes the Trinity Mine and several other exploration targets. US Borax operated the Trinity Mine from 1988 to 1989, where it produced over 5 million ounces of silver. Operations at the mine were suspended when silver prices declined to less than $5/oz in the late 1980's. Based upon the drilling results available to the Company from the US Borax drill programs on the Hi Ho Property, it is expected that the inclusion of the Hi Ho Property has the potential to substantially increase the estimated silver resource in the Trinity Mine pit area (please see the Company's December 2011 NI 43 101 resource estimate). The Company is also currently evaluating the internal data in conjunction with its recent drilling and geophysical data to determine future drilling targets. The data will be used to update the Company's current NI 43-101 report and will be utilized as part of the previously announced scoping study, which is being completed in connection with the Company's proposal to put the Trinity Mine back into production.

Richard Bedell, President and CEO of Renaissance comments, "The addition of the Hi Ho Property completes the Trinity land package and significantly increases the size of the potential resource given its close proximity to the existing pit and the historic drilling and assay data that Liberty has analyzed. We are extremely pleased with the progress that Liberty has made on the exploration and development of Trinity. Their approach has been professional, and we are very comfortable with their entire team and the assessment of the property's potential. Trinity is one of the marquee properties in our portfolio and we remain very confident in Liberty's ability to advance the project.  We are fully supportive of Liberty Silver's management and its technical team."

In closing the Hi Ho Property transaction, Liberty Silver paid cash consideration of US$250,000 plus transaction expenses, issued 2,583,333 Liberty Silver common shares (the "Liberty Silver Shares") to Primus at a deemed value of US$1,860,000 (US$0.72 per share), and also granted

Primus a 2% net smelter royalty on future production from the Hi Ho Property. In addition, pursuant to a registration rights agreement between Liberty Silver and Primus, Liberty Silver will pay Primus additional consideration as follows:

- if a registration statement is declared effective by the United States Securities Exchange Commission in respect of the Liberty Silver Shares by March 1, 2013, Liberty Silver will issue an additional 277,778 Liberty Silver common shares to Primus, thereby increasing the total aggregate number of shares issued to 2,861,111 shares at a deemed value of US$2,060,000  (US$0.72 per share); or

- if a registration statement is not declared effective by the United States Securities Exchange Commission in respect of the Liberty Silver Shares by March 1, 2013, Liberty Silver will pay Primus US$200,000. As well, if the five-day weighted average trading price of Liberty Silver's common shares on the Toronto Stock Exchange as of March 1, 2013 (the "Market Price") exceeds US$0.72 per share, Liberty Silver will issue an additional number of Liberty Silver common shares to Primus equal to (a) 277,778 less (b) US$200,000 divided by the Market Price.

"We have closely monitored the progress that Liberty Silver has made since they began operations at Trinity last year," stated Jim Marin of Primus. "They have a strong on the ground team, excellent board and management, supported by first class engineering and permitting consultants. We are very excited to be part of the project and look forward to their future success."

"Liberty Silver is very pleased to have the vendors as significant shareholders and appreciate their recognition of the future potential of the combined properties," added Mr. Browne.

The total consideration for the acquisition of the Hi Ho Property is being applied to Liberty Silver's expenditure commitment under its earn-in agreement with Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Property payment, Liberty Silver has contributed in excess of 85% of its required US$5,000,000 expenditure commitment to earn a 70% interest in the Trinity project. Pursuant to the terms of its earn-in agreement with Renaissance, Liberty Silver has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study the following year.

"We continue to achieve each milestone set forth by our team," concluded Mr. Browne. "This acquisition not only has the potential to increase our current resource and the potential economics to bring the Trinity Mine back into production, but also moves us very close to meeting our earn-in requirements. Although the past week has been challenging for the Company, the board and management of Liberty Silver remain fully committed to its future. Importantly and as previously stated, investors are reminded that they should only rely on official statements and releases issued by the Company for information regarding its activities."

**About Liberty Silver Corp.**

Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America. Liberty Silver is led by a skilled, experienced management team and board of directors with significant experience managing exploration, development and mining projects. Liberty Silver is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and acquiring new properties that have the potential to increase their resource base. The Trinity silver project, located in Pershing County, Nevada, is Liberty Silver's flagship project.

Liberty Silver has the right to earn a joint venture interest in the 10,579 acres Trinity property pursuant to the terms of an earn-in agreement with Renaissance Gold Inc.

Information on the Company is available on the Company's website www.libertysilvercorp.com, or in the SEDAR and EDGAR databases.

**For Additional Information**
Kevin O'Connor, Investor Relations
(416) 962-3300
ko@spinnakercmi.com

Manish Z. Kshatriya, Executive VP & CFO
(888) 749-4916
mkshatriya@libertysilvercorp.com

*Cautionary Statements*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this News Release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to Liberty Silver and Liberty Silver provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that Liberty Silver's future plans, objectives or goals, including words to the effect that Liberty Silver or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of Liberty Silver's mineral properties, and Liberty Silver's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with Liberty Silver's activities; and other matters discussed in this News Release and in filings made with securities regulators. This list is not exhaustive of the factors that may affect any of Liberty Silver's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on Liberty Silver's forward-looking statements. Liberty Silver does not undertake to update any forward-looking statement that may be made from time to time by Liberty Silver or on its behalf, except in accordance with applicable securities laws.*



## LIBERTY SILVER SHARES TO RESUME TRADING ON TSX

**Toronto, ON — October 19, 2012:** Liberty Silver Corp. (TSX: LSL) ("Liberty Silver" or the "Company") announced today that the cease trade orders imposed by the Securities and Exchange Commission and the Ontario Securities Commission have expired. Trading in its shares on the TSX in Canada will resume on Monday, October 22, 2012. For the present, the Company's stock will not immediately be listed, traded or quoted on any of the OTC Markets. The Company is taking steps to meet requirements necessary to permit its stock to resume trading on the OTCBB. The Company's stock may be traded in the US on the "grey market" or through US broker dealers who have access to the TSX.

The Company advises the investment community that it has never provided any form of compensation to a newsletter writer or anyone else for investment research or to recommend investment in the Company's shares. The Company also advises that it has no contractual or other relationship with Mr. Robert Genovese, BG Capital Group or any other company owned or controlled by Mr. Genovese (the "Genovese Companies") other than a subscription to a private placement in November 2011 by a company controlled by Mr. Genovese. The Company has engaged Spinnaker Capital Markets Inc. and Navigator Ltd. to provide investor relations services for the Company. The Company also confirms that Spinnaker Capital Markets Inc. and Navigator Ltd. do not have, and have never had, a contractual or other relationship with any of Mr. Genovese and the Genovese Companies. In addition, the Company confirms that Mr. Genovese has never had the right to nominate, and has not nominated, an appointee to the Board of Directors of the Company, and the officers and directors of the Company have not had, and have never had, a business relationship with Mr. Genovese concerning the Company.

The Company wishes to advise the investment community that all official information regarding the Company must be derived solely from disclosure documents filed on www.sedar.com, www.sec.gov and the Company's website (www.libertysilvercorp.com).

"Liberty is pleased to have the trading suspension concluded promptly. Without exception, the Board and management of Liberty take their regulatory responsibilities very seriously and will continue their commitment to full cooperation and transparency with regulators and the market", said Geoff Browne, Chairman and CEO of Liberty Silver.

**Trinity Silver Project Disclosure**

As a result of a review by staff of the Ontario Securities Commission, we are providing the following information regarding the Trinity Silver Project to clarify our disclosure.

*Overview of the Trinity Silver Project*

Liberty is focused on exploring and advancing mineral properties located in North America.  The Trinity Silver Project, located in Pershing County, Nevada is the Company's flagship project.  The Trinity Silver Project is approximately 10,500 acres in size and includes a former producing mine that represents approximately one percent of the geographic extent of the project.   Liberty Silver has the right to earn a 70 percent interest in the Trinity Silver Project from Renaissance Gold Inc. ("Renaissance") subject to certain obligations.

The Trinity Silver Project does not contain a mineral reserve and is not currently in production.  Any decision to place the Trinity Silver Project into production requires the support of a feasibility study prepared in accordance with National Instrument 43-101.  At this time the Company has engaged consultants to prepare a scoping study, also known as a preliminary economic assessment, but a scoping-level study does not have sufficient detail or costing estimates to support a prudent production decision.  Accordingly, any decision to commence production on the Liberty Silver Project is neither imminent nor assured, and investors cannot assume that the Liberty Silver Project hosts an economic mine at this time.

*Trinity Silver Project NI 43-101 Report*

A National Instrument 43-101 Report on the Trinity Silver Project was prepared by Paul D. Hartley, Geologist, and Michael M. Gustin, P.Geo., of Mine Development Associates of Reno, Nevada, and Daniel W. Kappes, P.Eng., of Kappes, Cassiday & Associates of Reno under the title, "Technical Report on the Trinity Project – Pershing County, Nevada". The National Instrument 43-101 Report is dated December 1, 2011 with an effective date of August 9, 2011, and is filed on www.sedar.com.  The report was prepared for the Company and Renaissance, the optionor of the Trinity Silver Project.  Messrs. Paul D. Hartley, Michael M. Gustin, and Daniel W. Kappes are independent consultants to both the Company and Renaissance.  Messrs. Gustin and Kappes are "qualified persons" under National Instrument 43-101.  The following is a summary of the resource estimate for the Trinity Silver Project provided in the technical report. Please note, based on the reasonable cut-off grade, discussed below, the current inferred resource contains 11.64 Moz Ag. Any other mineral resource estimates, reconstructed estimates, Company estimates, exploration targets, historical stockpile or leach pad estimates, should not be relied upon.

**Trinity Inferred Mineral Oxide Resources**

| Cutoff (oz Ag/ton) | Inferred Oxide Resources | | |
|---|---|---|---|
| | Tons | oz Ag/ton | oz Ag contained |
| 0.30 | 12,019,000 | 0.54 | 6,490,000 |
| 0.40 | 5,506,000 | 0.78 | 4,295,000 |
| 0.50 | 2,863,000 | 1.1 | 3,149,000 |
| **0.65** | **1,901,000** | **1.37** | **2,605,000** |
| 1.00 | 1,019,000 | 1.87 | 1,906,000 |

| 2.00 | 203,000 | 4.08 | 828,000 |
|---|---|---|---|

**Trinity Inferred Mineral Sulphide Resources**

| Cutoff (oz/ton Ag equiv) | Inferred Sulfide Resources | | | | | |
|---|---|---|---|---|---|---|
| | Tons | oz Ag/ton | % Pb | % Zn | oz Ag | |
| 1.00 | 8,408,000 | 1.27 | 0.23% | 0.43% | 10,691,000 | |
| 1.20 | 6,113,000 | 1.56 | 0.25% | 0.43% | 9,539,000 | |
| **1.30** | **5,336,000** | **1.69** | **0.25%** | **0.43%** | **9,036,000** | |
| 1.50 | 4,119,000 | 1.97 | 0.26% | 0.42% | 8,100,000 | |
| 2.00 | 2,288,000 | 2.70 | 0.30% | 0.37% | 6,170,000 | |
| 3.00 | 902,000 | 4.14 | 0.32% | 0.33% | 3,731,000 | |

The oxide resources are listed using a cutoff grade of 0.65 oz Ag/t. This cutoff grade was chosen to capture mineralization potentially available to open pit extraction and heap leach processing, and it was derived using a $17 per ounce silver price (three-year average) and a 75% heap leach recovery factor. For the sulphide mineralization, a 1.3 oz/ton Ag-equivalent cutoff grade, chosen to reflect potential open-pit mining, milling, and production of concentrates by flotation. The cutoff assumes 90% recovery by flotation of the silver, lead, and zinc, and metal prices of $17 per ounce for silver and $0.80 per pound for both lead and zinc.

The inferred resource is based upon assay results from a historic database of 306 drill holes as well as processing and recovery data from the historic operation and metallurgical testing. A total of 40 cross sections spaced at 100ft intervals across the deposit were used for the modeling of the Trinity mineral domains.  The technical report noted that some of the assay results from different assay laboratories were inconsistent, but such data was viewed as sufficiently reliable for the purposes of inferred resource estimates. Subsequent to the technical report, drilling conducted by the Company in 2012, see below, provided assay results that support the inferred resource estimate.

Silver mineralization at Trinity occurs as oxidized and unoxidized sulfides in veinlets, as fracture controlled mineralization, and as disseminated zones of tabular mineralization primarily within Tertiary rhyolite porphyry, aphanitic rhyolite, and volcaniclastic rocks.

In addition to the inferred resource defined in the National Instrument 43-101 compliant technical report, the Trinity project has potential mineralized extensions to the north, southwest and at depth below the current pit, that have been drilled previously. These extensions are outside the defined National Instrument 43-101 Report resource area but have the potential to significantly expand the size and scope of the project. The next phase of the project will include a drilling program to attempt to bring these extensions into National Instrument 43-101 compliance.

*2012 Geophysical Program*

**APP 0121**

In May 2012, Liberty completed a geophysical program at the Trinity Silver Project, located in Pershing County, Nevada. The Gravity and Induced Polarization (IP) surveys were successful in locating significant new drilling targets concealed by alluvial cover and in delineating the structural fabric of the district. The geophysics program was designed and interpreted by Jim Wright of J.L. Wright Geophysics. All the new data and the substantial amount of historic data relating to past operations at the Trinity Project have been input into a GIS database which will be used to further define future drilling and development of the current inferred resource and multiple exploration targets.

A possible northern extension of the Trinity silver deposit is hypothesized based upon the gravity survey. Historic IP data, acquired in 1983 (the "Historic IP"), indicates a possible northern continuation over this area as well. Historic airborne magnetic results coupled with the gravity and new IP also suggest a continuation of the known mineralization to the southwest along the Trinity fault. The gravity and Historic IP data, coupled with several other data sets, indicate that several target areas exist, including two possible target areas along the strike extensions to the known silver mineralization, and several other untested chargeability anomalies similar to that of the Trinity silver deposit.

*2012 Resource Area Drilling Program*

In May 2012, Liberty completed a drilling program in the resource area of the Trinity Silver Project consisting of 18 reverse circulation drill holes.  Drilling was directed to the exploration of selected areas adjacent to the inferred resource zone identified in the Company's 2011 National Instrument 43-101 technical report (the "Resource Area"), as well as confirmation of that resource.

- Hole A12-17, located southeast of the Trinity open pit and Resource Area, intersected significant silver mineralization in the oxide zone with individual 5 ft- thick samples ranging between 1.96 and 15.66 ounce per ton ("opt") silver
- 16 of 18 vertical holes intercepted sample intervals greater than 1 opt silver with grades ranging between 0.56 and 15.66 opt silver
- Confirmation holes drilled inside Resource Area contained intervals consistent with the inferred resource
- Drilling indicates potential for two new extensions from the existing Resource Area

Eighteen vertical drill holes were completed to depths of up to 1,500 feet in rhyolite and underlying metasedimentry host rocks by reverse circulation for a total of approximately 20,000 feet. Drilling tested parts of five (5) geographic domains in the vicinity of the southern end the Trinity open pit mine and the National Instrument 43-101 Resource Area. Sixteen holes intercepted sample intervals greater than 1 opt silver ("Ag") with grades ranging from 0.56 to 15.66 opt Ag. Sulfide zone samples contain ranging from 0.01  to 1.7 % lead ("Pb") and 0.01 to 1.6 % zinc ("Zn").

In addition to 18 holes drilled during the 2012 drilling program, approximately 395 holes were drilled during the period from 1982-2007, mainly by US Borax. While approximately 50 of these holes are widely spaced throughout the approximate 13 square-mile area of interest, the large majority are located within an approximate one square mile area centered on the Trinity open pit silver mine. Based on historical and current assays, all holes contain anomalous silver throughout.  Any previous disclosure by the Company related to the approximate grade based on this drilling should not be relied upon.

**APP 0122**

*Acquisition of Hi Ho Silver Property*

In October 2012, Liberty completed the acquisition of approximately 100 acres located adjacent to the former Trinity Mine on the Company's Trinity Silver Project (the "Hi Ho Property"). The Hi Ho Property was the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance on the Trinity land package.

The Hi Ho Property completes the land package controlled by Liberty Silver and Renaissance. The joint venture comprises over 10,500 acres of contiguous land in an historic Nevada mining district, which includes the Trinity Mine and several other exploration targets. US Borax operated the Trinity Mine from 1988 to 1989, where it produced over 5 million ounces of silver. Operations at the mine were suspended when silver prices declined to less than $5/oz in the late 1980's. Based upon the drilling results available to the Company from the US Borax drill programs on the Hi Ho Property, the inclusion of the Hi Ho Property has the potential to increase the mineral resources available to the Company.  The Company is also currently evaluating the internal data in conjunction with its recent drilling and geophysical data to determine future drilling targets. The data will be used to update the Company's current National Instrument 43-101 report.

In closing the Hi Ho Property transaction, Liberty Silver paid cash consideration of US$250,000 plus transaction expenses, issued 2,583,333 Liberty Silver common shares (the "Liberty Silver Shares") to the vendors at a deemed value of US$1,860,000 (US$0.72 per share), and also granted the vendors a 2% net smelter royalty on future production from the Hi Ho Property. In addition, pursuant to a registration rights agreement between Liberty Silver and the vendors, Liberty Silver will pay the vendors additional consideration as follows:

- if a registration statement is declared effective by the United States Securities Exchange Commission in respect of the Liberty Silver Shares by March 1, 2013, Liberty Silver will issue an additional 277,778 Liberty Silver common shares to the vendors, thereby increasing the total aggregate number of shares issued to 2,861,111 shares at a deemed value of US$2,060,000  (US$0.72 per share); or

- if a registration statement is not declared effective by the United States Securities Exchange Commission in respect of the Liberty Silver Shares by March 1, 2013, Liberty Silver will pay the vendors US$200,000. As well, if the five-day weighted average trading price of Liberty Silver's common shares on the Toronto Stock Exchange as of March 1, 2013 (the "Market Price") exceeds US$0.72 per share, Liberty Silver will issue an additional number of Liberty Silver common shares to the vendors equal to (a) 277,778 less (b) US$200,000 divided by the Market Price.

The total consideration for the acquisition of the Hi Ho Property is being applied to Liberty Silver's expenditure commitment under its earn-in agreement with Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Property payment, Liberty Silver has contributed in excess of 85% of its required US$5,000,000 expenditure commitment to earn a 70% interest in the Trinity project. Pursuant to the terms of its earn-in agreement with Renaissance, Liberty Silver has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study the following year.

Quality Assurance/Quality Control

**APP 0123**

Liberty Silver uses comprehensive, industry standard QA/QC protocols for diamond drilling, core recovery, handling, sampling, shipping and assaying. All drill hole samples were analyzed using ICP-MS by American Assay Laboratories, Reno, Nevada. Analytical precision and accuracy were monitored by Minerals Exploration and Environmental Quality, Reno, Nevada, including the use of certified reference materials (standards), blank samples, and duplicate samples. A senior Liberty Silver geologist supervised drill hole sample collection by the driller, Boart Longyear, Elko, Nevada, at the drill site and chain of custody throughout the program was unbroken. Drill hole deviation surveys were done by IDS, Elko, Nevada.

Tim Percival, MA, CPG, of Reno, Nevada, a consultant to Liberty has reviewed the technical data in this press release and is a Qualified Person as defined by National Instrument 43-101.

**About Liberty Silver Corp.**

Liberty Silver Corp. is focused on exploring and advancing mineral properties located in North America. Liberty Silver is led by a skilled, experienced management team and board of directors with significant experience managing exploration, development and mining projects. Liberty Silver is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to developing new resources on its current properties, and acquiring new properties that have the potential to increase their resource base. The Trinity Silver Project, located in Pershing County, Nevada, is Liberty Silver's flagship project. Liberty Silver has the right to earn a joint venture interest in the 10,579 acres Trinity property pursuant to the terms of an earn-in agreement with Renaissance Gold Inc.

Information on the Company is available on the Company's website www.libertysilvercorp.com, or in the SEDAR and EDGAR databases.

**For Additional Information**
Kevin O'Connor, Investor Relations
(416) 962-3300
ko@spinnakercmi.com

Manish Z. Kshatriya, Executive VP & CFO
(888) 749-4916
mkshatriya@libertysilvercorp.com

*Cautionary Statements*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this News Release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to Liberty Silver and Liberty Silver provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that Liberty Silver's future plans, objectives or goals, including words to the effect that Liberty Silver or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of Liberty Silver's mineral properties, and Liberty Silver's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and*

**APP 0124**

*conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with Liberty Silver's activities; and other matters discussed in this News Release and in filings made with securities regulators. This list is not exhaustive of the factors that may affect any of Liberty Silver's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on Liberty Silver's forward-looking statements. Liberty Silver does not undertake to update any forward-looking statement that may be made from time to time by Liberty Silver or on its behalf, except in accordance with applicable securities laws.*



# Liberty Silver Announces Updated Resource Estimate Identifying Increase in Silver Resource Estimate at Trinity Project, Nevada

Toronto, ON – January 7, 2013.  Liberty Silver Corp. (TSX: LSL) (the "Company") is pleased to announce that its updated National Instrument 43-101 compliant resource estimate (the "2012 NI 43-101 Compliant Resource Estimate") identifies a significant increase in the inferred silver resource estimate at its Trinity Silver Project ("Trinity").  In the 2012 NI 43-101 Compliant Resource Estimate the inferred oxide silver resource estimate increased 131%, to 7.3 million ounces, and the inferred sulfide silver-equivalent resource estimate increased 132%, to 28.8 million ounces, when compared to the resource estimate reported by the National Instrument 43-101 technical report dated December 1, 2011 (the "2011 NI 43-101") filed on www.sedar.com.  The total inferred silver equivalent resource currently stands at 36.1 million ounces.

These increases are primarily attributable to the recent acquisition of the Primus lands (the "Hi Ho Silver Property") that lies immediately adjacent to the east of the Company's existing land holdings and the increase in silver prices that occurred between the 2011 NI 43-101 Technical Report and this update.  Mineralization on the Hi Ho Silver Property had been identified by historic drilling but could not be reported by the Company until the acquisition was completed.  Acquisition of the Hi Ho Silver Property was reported in Company press releases dated August 8, 2012 and October 16, 2012.

The Trinity Silver Project is located 25 miles north of Lovelock, Nevada, in the Trinity mining district, Pershing County, Nevada.  The 2012 NI 43-101 Compliant Resource Estimate was prepared on behalf of the Company by SRK Consulting (U.S) Inc. ("SRK"), Reno, Nevada.  The new mineral resource is reported in Tables 1a and 1b below for oxide and sulfide silver, respectively.

**Table 1a.  Mineral Resource Statement of the Trinity Oxide Silver Deposit, SRK Consulting (U.S.) Inc, December 18, 2012**

| Cutoff Ag oz/ton | Resource Category | Tons (Millions) | Silver Grade | Contained Metal |
|---|---|---|---|---|
| | | | oz/ton | Silver (oz) |
| 0.5 | Inferred | 6.43 | 1.134 | 7,287,369 |

**Table 1b.  Mineral Resource Statement of the Trinity Silver-Lead-Zinc Sulfide Deposit, SRK Consulting (U.S.) Inc, December 18, 2012**

| Cutoff AgEq. oz/ton | Resource Category | Tons (Millions) | Silver Grade | Lead Grade | Zinc Grade | Equivalent Silver Grade | Contained Metal | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | oz/ton | % | % | oz/ton | Silver (oz) | Lead (lbs) | Zinc (lbs) | AgEq (oz) |
| 0.8 | Inferred | 19.79 | 1.07 | 0.217 | 0.354 | 1.46 | 21,164,650 | 85,956,657 | 140,253,403 | 28,836,759 |

Assumptions applied by SRK:

· Mineral Resources are not Mineral Reserves and do not have demonstrated economic viability;

· There is no certainty that all or any part of the Mineral Resources estimated will be converted into Mineral Reserves estimate;

**APP 0126**



· Oxide and sulfide resources are stated as contained within a single potentially economic mineable open pit using a 0.5 oz/ton Ag

cutoff grade for oxide and a 0.8 oz/ton silver equivalent (Ag Eq.) cutoff grade for sulfide;

· Resources stated in Table 1a and 1b are the oxide and sulfide components of the total Trinity Deposit inferred resource,

which is 36,124,128 oz of contained silver equivalent;

· Pit optimization is based on assumed silver, lead, and zinc prices of US$31.08/oz, US$0.94/lb, US$0.88 respectively;

. Silver equivalent is based on three-year trailing silver, lead, and zinc prices of US$28.41/oz, US$1.02/lb, and US$0.96/lb, respectively;

· A tonnage factor of 13.7 cubic feet per ton was used for oxide;

· A tonnage factor of 13.3 cubic feet per ton was used for sulfide;

· Oxide metallurgical recovery of 68.6% for silver was applied with an ore mining and processing cost of US$7.05/ton;

· Sulfide metallurgical recoveries of 85.5% for silver, 85.4% for lead, and 82.8% for zinc were applied

with an ore mining and processing cost of US$10.55/ton;

· A 4% Net Smelter Return (NSR) royalty associated with the project was applied in metal value calculations;

· A pit slope of 50° was used based on historic performance of the existing Trinity Pit;

· Mineral resource tonnage and contained metal have been rounded to reflect the accuracy of the estimate and numbers may not add due to rounding.

The mineral resource was estimated using inverse distance squared weighting with grade limiting and geostatistics applied to silver, lead, and zinc independently. A total of 296 conventional rotary and reverse circulation drill holes were used in the resource model, most of which are historic drilling from U.S. Borax (the previous operator) in the 1980s. The resource has been classified as inferred due to the use of substantial historic data which will require additional confirmation drilling in order to upgrade the resource from inferred to indicated

Geoff Browne, President and CEO of Liberty Silver, stated: "The updated NI 43-101 Resource Estimate is focused on the current pit area, the newly acquired Primus lands (Hi Ho Silver Property) adjacent to the existing pit, and the results of our 2012 drilling program. The results have exceeded our expectations. It is worth noting that we have further exploration potential in the immediate pit area. All of this is before consideration of the potential of the additional exploration targets that have been identified by current as well as past geophysics, as well as a number of widely scattered, mineralized, historic drill holes."

Recent project developments

In July, 2012 the Company announced completion of a reverse circulation drilling program at Trinity (see news release on July 9, 2012). Eighteen holes were completed to depths of up to 1,500 ft for a total of 19,950 ft. Drilling tested parts of five geographic domains at the south end of the Trinity open pit mine and south tongue of the 2011 NI 43-101 resource zone. Sixteen of the 18 holes drilled intercepted 5-ft thick sample intervals ranging from less than 0.1 to greater than 1 oz/ton silver with individual intervals containing as much as 15 oz/ton silver.

On October 15, 2012, the Company consummated acquisition of the 100-acre Hi Ho Silver Property at Trinity (see news releases on Aug. 8, 2012 and October 16, 2012) from Primus Resources. The Hi Ho Silver Property is located adjacent to the resource area identified in the 2011 NI 43-101 and was the sole remaining open ground



within the approximate 10,940-acre joint venture area of interest.  Eighty-nine drill holes completed in the 1980s on the Hi Ho Silver Property were used for resource modeling of silver, lead, and zinc mineralization.

<u>Qualified Person review</u>
Jay Pennington is the SRK-Qualified Person, as defined by NI 43-101, responsible for the current resource estimation.  Mr. Pennington is a certified professional geologist as recognized by the American Institute of Professional Geologists and has over 27 years of experience in mineral exploration and resource geology.

This release has been reviewed for accuracy by Tim Percival, CPG, Reno, Nevada, consultant to the Company, who is a Qualified Person as defined in NI 43-101 Standards of Disclosure for Mineral Projects.

A copy of the Company's complete NI 43-101 report as prepared by SRK will be available on the SEDAR website (www.sedar.com) and the Company website (www.libertysilvercorp.com) within 45 days of this news release.

**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and advancing mineral properties located in North America.  Liberty Silver is led by a skilled, experienced management team and board of directors with significant experience managing exploration, development, and mining projects.  Liberty Silver is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to developing new resources on its current properties, and acquiring new properties that have the potential to increase their resource base.  The Trinity Silver Project, located in Pershing County, Nevada, is Liberty Silver's flagship project.  Liberty Silver has the right to earn a joint venture interest in the 10,940 acres Trinity property pursuant to the terms of an earn-in agreement with Renaissance Gold Inc.

Information about the Company is available on its website, www.libertysilvercorp.com, or in the SEDAR and EDGAR databases.

For additional information:
Manish Z. Kshatriya, Executive VP & CFO
(888) 749-4916
mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
(416) 962-3300
ko@spinnakercmi.com

## Cautionary Statements

*Cautionary Note to U.S. Investors concerning estimates of Resources: This news release uses the terms "Measured, Indicated, and Inferred Resources."  The Company advises U.S. investors that while these terms are recognized and required by Canadian regulations, the SEC does not recognize the terms.  U.S. investors are cautioned not to assume that any part or all of Measured or Indicated Mineral Resources will ever be converted into Reserves.  Inferred Resources have a great amount of uncertainty as to their existence, and great uncertainty as to their economic and legal feasibility.  It cannot be assumed that all or any part of an Inferred Mineral Resource will ever be upgraded to a higher category.  Under Canadian rules, estimates of Inferred Mineral Resources may not form the basis of feasibility or*



*pre-feasibility studies, except in rare cases.  U.S. investors are cautioned not to assume that any part or all of a measured, indicated, or inferred resource exists, or is economically or legally minable.*

*Mineral resources that are not mineral reserves do not have demonstrated economic viability.  Mineral resource estimates do not account for mineability, selectivity, mining loss and dilution.  The assessment in the 43-101 report is preliminary in nature, includes inferred mineral resources that are considered too speculative geologically to have economic considerations applied to them that would enable them to be categorized as mineral reserves and there is no certainty that these inferred mineral resources will be converted to the measured and indicated categories through further drilling, or into mineral reserves, once economic considerations are applied.*

*Due to the uncertainty that may be attached to Inferred Mineral Resources, it cannot be assumed that all or any part of an Inferred Mineral Resource will be upgraded to an Indicated or Measured Mineral Resource as a result of continued exploration. Confidence in the estimate is insufficient to allow the meaningful application of technical and economic parameters or to enable an evaluation of economic viability worthy of public disclosure. Inferred Mineral Resources must be excluded from estimates forming the basis of feasibility or other economic studies.*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this News Release.  No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*Certain statements in this press release are forward-looking and involve a number of risks and uncertainties.  Such forward-looking statements are within the meaning of that term in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended.*  The forward looking statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors made in public disclosures and filings by the Company should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.

**APP 0129**



# Liberty Silver Provides Update on Technical Report and Clarifies Disclosure

Toronto, ON – February 28, 2013.  Liberty Silver Corp. (TSX: LSL) ("Liberty Silver" or the "Company") announces that it has submitted to staff of the Ontario Securities Commission ("OSC") its technical report to support the updated resource estimate announced on January 7, 2013 with respect to its Trinity Silver Project.  As a result of a review by staff of the OSC, the Company is providing the following update and clarification, regarding its disclosure on the Trinity Silver Project.

The report prepared by SRK Consulting (US) Inc. ("SRK") and submitted by the Company to staff of the OSC, built upon a previous resource estimate contained in the National Instrument 43-101 ("NI 43-101") technical report dated December 1, 2011 and filed on SEDAR (www.sedar.com). The December 2011 inferred resource estimate utilized historic results from over 400 drill holes on the property, the data from which have been included in a GIS database. During 2012, the Company drilled 18 RC holes near the main Trinity Silver deposit area which assisted in validating the December 2011 inferred resource estimate. The new technical report prepared by SRK, and submitted to staff of the OSC, includes the results of Liberty Silver's 2012 RC drilling program and the unverified historical drilling on the Hi Ho Property, which is located immediately adjacent to the historical open pit area.  The Hi Ho Property and the Company's 2012 drilling results were not included in the December 2011 technical report.

The staff of the OSC expressed concerns with the uncertainty related to the mid-1980's historical drilling from the Hi Ho Property acquired in 2012. It has been determined that additional confirmatory drilling, which was identified and recommended in the new technical report, be completed to verify the historical drilling prior to preparing an updated resource estimate. As a result, the new technical report will not be filed by the Company on SEDAR.

The Company is evaluating an appropriate confirmatory drilling program to support the use of historical results in an updated resource estimate to be prepared in accordance with NI 43-101.  The Company has engaged SRK, the Company's independent engineering firm and one of the largest global firms of its kind, to prepare an updated resource estimate when the confirmatory drilling program is completed.  There can be no assurance that any confirmatory drilling will be successful or that any results of confirmatory drilling will support an updated NI 43-101 resource estimate for the Trinity Silver Project.

Accordingly, the Company retracts the announcement of an updated resource estimate made on January 7, 2013 and cautions investors that no reliance should be made on this resource estimate disclosure. Please refer to the December 1, 2011 technical report for the inferred resource estimate on the Trinity Silver Project.

This release has been reviewed by Tim Percival, CPG, Reno, Nevada, consultant to the Company and a Qualified Person as defined in NI 43-101.



**About Liberty Silver Corp.**

Liberty Silver Corp. is focused on exploring and advancing mineral properties located in North America. Liberty Silver is led by a skilled, experienced management team and board of directors with significant experience managing exploration, development, and mining projects. Liberty Silver is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to developing new resources on its current properties, and acquiring new properties that have the potential to increase their resource base. The Trinity Silver Project, located in Pershing County, Nevada, is Liberty Silver's flagship project. Liberty Silver has the right to earn a joint venture interest in the 10,940 acres Trinity property pursuant to the terms of an earn-in agreement with Renaissance Gold Inc.

Information about the Company is available on its website, www.libertysilvercorp.com, or in the SEDAR and EDGAR databases.

For additional information:
Manish Z. Kshatriya, Executive VP & CFO
(888) 749-4916
mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
(416) 962-3300
ko@spinnakercmi.com

## Cautionary Statements

*Cautionary Note to U.S. Investors concerning estimates of Resources: This news release uses any one or more of the terms "Measured, Indicated, and Inferred Resources." The Company advises U.S. investors that while these terms are recognized and required by Canadian regulations, the SEC does not recognize the terms. U.S. investors are cautioned not to assume that any part or all of Measured or Indicated Mineral Resources will ever be converted into Reserves. Inferred Resources have a great amount of uncertainty as to their existence, and great uncertainty as to their economic and legal feasibility. It cannot be assumed that all or any part of an Inferred Mineral Resource will ever be upgraded to a higher category. Under Canadian rules, estimates of Inferred Mineral Resources may not form the basis of feasibility or pre-feasibility studies, except in rare cases. U.S. investors are cautioned not to assume that any part or all of a measured, indicated, or inferred resource exists, or is economically or legally minable.*

*Mineral resources that are not mineral reserves do not have demonstrated economic viability. Mineral resource estimates do not account for mineability, selectivity, mining loss and dilution. The assessment in the 43-101 report is preliminary in nature, includes inferred mineral resources that are considered too speculative geologically to have economic considerations applied to them that would enable them to be categorized as mineral reserves and there is no certainty that these inferred mineral resources will be converted to the measured and indicated categories through further drilling, or into mineral reserves, once economic considerations are applied.*

*Due to the uncertainty that may be attached to Inferred Mineral Resources, it cannot be assumed that all or any part of an Inferred Mineral Resource will be upgraded to an Indicated or Measured Mineral Resource as a result of continued exploration. Confidence in the estimate is insufficient to allow the meaningful application of technical and economic parameters or to enable an evaluation of*



*economic viability worthy of public disclosure. Inferred Mineral Resources must be excluded from estimates forming the basis of feasibility or other economic studies.*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this News Release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*Certain statements in this press release are forward-looking and involve a number of risks and uncertainties. Such forward-looking statements are within the meaning of that term in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. The forward-looking statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors made in public disclosures and filings by the Company should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*



## Liberty Silver Announces Effectiveness of S-1 Registration Statement and Issuance of Shares to Complete Hi Ho Property Acquisition

Toronto, ON – March 21, 2013.  Liberty Silver Corp. (TSX: LSL) ("Liberty" or the "Company") is pleased to announce that the Company's Registration Statement on Form ("S-1"), which was filed with the United States Securities and Exchange Commission ("SEC") in accordance with a Registration Rights Agreement entered into, pursuant to a Purchase Agreement to acquire the Hi Ho Property from Primus Resources, L.C. and a second property owner (collectively, "Primus"), was declared  effective on March 1, 2013.

Following the declaration of effectiveness, pursuant to the terms of the Registration Rights Agreement, the Company has issued a total of 277,778 common shares to Primus, satisfying the remaining consideration paid for the acquisition of the Hi Ho Property, which is located immediately adjacent to the existing Trinity Mine on the Company's flagship Trinity Silver property in Nevada.  The shares were issued at a deemed value of USD $0.72 per share (USD $200,000) (*press release – October 16, 2012*).  The Company intends to drill on the newly acquired Hi Ho Property to confirm the mineralization.  The Hi Ho Property is not included in the Company's current resource estimates.

The Company also announces that it has engaged SRK Consulting (U.S) Inc., Reno, Nevada, to assist the Company in outlining the second phase drill program, which will be designed to further delineate and potentially update the current resource estimates.

"We are extremely pleased to have Liberty's S-1 declared effective by the SEC.  To have our S-1 filed, reviewed and declared effective, is a significant step forward," stated Geoff Browne, President and CEO of Liberty.  "As previously disclosed, the Hi Ho Property is a key part of our future at Trinity and we look forward to continuing our efforts in the exploration and development of this valuable project."

**About Liberty Silver Corp.**

Liberty Silver Corp. is focused on exploring and advancing mineral properties located in North America.  Liberty Silver is led by a skilled, experienced management team and board of directors with significant experience managing exploration, development, and mining projects.  Liberty Silver is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to developing new resources on its current properties, and acquiring new properties that have the potential to increase their resource base.  The Trinity Silver Project, located in Pershing County, Nevada, is Liberty Silver's flagship project.  Liberty Silver has the right to earn a joint venture interest in the 10,940 acres Trinity property pursuant to the terms of an earn-in agreement with Renaissance Exploration Inc.

Information about the Company is available on its website, www.libertysilvercorp.com, or in the SEDAR and EDGAR databases.

**APP 0133**



For additional information:
Manish Z. Kshatriya, Executive VP & CFO
(888) 749-4916
mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
(416) 962-3300
ko@spinnakercmi.com

## Cautionary Statements

*Cautionary Note to U.S. Investors concerning estimates of Resources: This news release uses any one or more of the terms "Measured, Indicated, and Inferred Resources." The Company advises U.S. investors that while these terms are recognized and required by Canadian regulations, the SEC does not recognize the terms. U.S. investors are cautioned not to assume that any part or all of Measured or Indicated Mineral Resources will ever be converted into Reserves. Inferred Resources have a great amount of uncertainty as to their existence, and great uncertainty as to their economic and legal feasibility. It cannot be assumed that all or any part of an Inferred Mineral Resource will ever be upgraded to a higher category. Under Canadian rules, estimates of Inferred Mineral Resources may not form the basis of feasibility or pre-feasibility studies, except in rare cases. U.S. investors are cautioned not to assume that any part or all of a measured, indicated, or inferred resource exists, or is economically or legally minable.*

*Mineral resources that are not mineral reserves do not have demonstrated economic viability. Mineral resource estimates do not account for mineability, selectivity, mining loss and dilution. The assessment in the 43-101 report is preliminary in nature, includes inferred mineral resources that are considered too speculative geologically to have economic considerations applied to them that would enable them to be categorized as mineral reserves and there is no certainty that these inferred mineral resources will be converted to the measured and indicated categories through further drilling, or into mineral reserves, once economic considerations are applied.*

*Due to the uncertainty that may be attached to Inferred Mineral Resources, it cannot be assumed that all or any part of an Inferred Mineral Resource will be upgraded to an Indicated or Measured Mineral Resource as a result of continued exploration. Confidence in the estimate is insufficient to allow the meaningful application of technical and economic parameters or to enable an evaluation of economic viability worthy of public disclosure. Inferred Mineral Resources must be excluded from estimates forming the basis of feasibility or other economic studies.*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this News Release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*Certain statements in this press release are forward-looking and involve a number of risks and uncertainties. Such forward-looking statements are within the meaning of that term in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. The forward-looking statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-*

**APP 0134**



looking statements. These and other factors made in public disclosures and filings by the Company should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.



### Liberty Silver Enters into Letter of Intent for U.S. $1.0 Million Loan

*Retains Andrew Malim as Consultant to Accelerate Development of Trinity*

October 4, 2013 - Toronto, Ontario. Liberty Silver Corp. (TSX: LSL) ("Liberty" or the "Company") has entered into a non-binding letter of intent with BG Capital Group Inc. for a total of U.S. $1.0 million debt financing (the "**Loan**") subject to a number of conditions, including due diligence, definitive documentation and approval of the Toronto Stock Exchange (the "**Exchange**"). The Loan provides for an immediate advance of U.S. $50,000 with U.S. $200,000 to be advanced at closing and execution and delivery of definitive documentation, U.S. $250,000 at the end of the first quarter following the closing date, and two further advances of U.S. $250,000 at the end of each of the next two following quarters.

The Loan will support continued exploration of the Company's Trinity Project in Pershing County, Nevada, and afford it the time to secure longer term financing for the Project. The Trinity Project, situated on the western flank of the Trinity Mountains, is a former producing open pit mine that lies within a geographic region containing gold, silver, and base metal deposits. A dozen past and present silver and gold-silver production sites are located 20 to 25 miles east of the Trinity district in the Humboldt Range, including one of the largest silver mines in the U.S. Liberty has the right to earn a 70% joint venture interest in the 10,020 acres Trinity property, which includes the Hi Ho Silver property acquired by Liberty in 2012, pursuant to the terms of an earn-in agreement with Renaissance Gold Inc. subject to the  completion of a feasibility study by March 29, 2016. Since filing its NI 43-101compliant technical report in December of 2011 (the "technical report"), the Company has continued to review the very large database of historic geochemical, geological, and geophysical information and integrate it with new geophysical and geological data generated through drilling and geophysical programs executed during 2011 and 2012.  This work is being compiled into a GIS database, which will be used to further define future drilling and development of the current resource and exploration targets.  The Company has identified multiple silver exploration targets, all of which are independent of the inferred resource defined in the technical report.  The technical report evaluated only the previously well-drilled ground closely adjacent to and within the open pit mine area.

The Company is also pleased to announce that Andrew Malim has been retained to assist Liberty in the formation and execution of a plan to advance the development and future funding of the Trinity Project. Mr. Malim will report directly to the Liberty Board.

Mr. Malim is an experienced corporate finance executive and entrepreneur with over 35 years dedicated to the financing and management of mining and technical companies. He has a strong working knowledge of geology and geologic structures and has been associated with a number of significant mining discoveries including the Blackdome Mine and SNIP high-grade underground gold mining discoveries in British Columbia,

**APP 0136**

copper-leach properties in Arizona, several copper properties in Africa, gold exploration in North and South America and diamond exploration in the USSR and Africa.

"We are very pleased to be in a position to further advance the Trinity project," stated Tim Unwin, Chairman of Liberty. "The funding, and the addition of Andrew and his wealth of industry experience and knowledge, is a significant step forward and we look forward to getting back to the business of developing this exciting project. On behalf of the board and management of Liberty, I would like to welcome Andrew to the Liberty team."

The terms of the Loan are as follows:

- a total loan amount of U.S. $1.0 million with U.S. $50,000 advanced immediately, U.S. $200,000 to be advanced at closing and U.S. $250,000 at the end of the first quarter following the closing date, and two further advances of U.S. $250,000 at the end of each of the next two following quarters;

- an immediate advance of U.S. $50,000. The immediate advance is evidenced by an unsecured promissory note bearing interest at 11% per annum. The unsecured promissory note will be superseded at the time when definitive documentation is entered into and the outstanding amount thereunder will be included as part of the Loan indebtedness;

- outstanding principal shall bear interest at 11% per annum with an increase by 5% per annum during any period an event of default is continuing;

- the Loan will be secured by a charge on all of the assets of the Company;

- due and payable one year following the Closing Date with an option by the Company to extend the maturity date by six months with interest at 15% per annum to accrue on the outstanding principal during the period of the extension;

- at the request of Liberty and subject to Exchange approval, if Liberty completes an arm's length financing of $500,000 or more at a price of not less than $0.50 per common share, the outstanding principal and interest shall be converted into equity of Liberty on the same terms and conditions of the financing; and

- proceeds to be applied to metallurgical work, environmental permitting, other related exploration expenses, land taxes and working capital.

The lender pursuant to the Loan is BG Capital Group Inc. ("BG Capital"). The negotiations with BG Capital were conducted on an arm's length basis. BG Capital, and its related parties, own 8,609,853 common shares of Liberty and 6,500,000 common share purchase warrants, with each whole warrant entitling the holder to acquire one common share for U.S. $0.65 until December 31, 2013 (the "Warrants"). As a condition

of the Loan, BG Capital will agree to the termination of the Warrants for no further consideration. Other than pursuant to the Loan, the Company does not have any contractual or other relationship with BG Capital.

Investors are cautioned that there can be no assurance that the Loan will be completed or, if it is completed, that it will be on the terms as disclosed herein. Liberty will announce the status of the Loan including, if and when definitive loan documentation is entered into, in further press releases.

As BG Capital owns more than 10% of the issued and outstanding shares of Liberty, BG Capital is a "related party" of the Company and the Loan constitutes a "related party transaction" as such terms are defined by Multilateral Instrument 61-101- *Protection of Minority Security Holders in Special Transactions* ("MI 61-101"), requiring the Company, in the absence of exemptions, to obtain a formal valuation for, and minority shareholder approval of, the "related party transaction". Liberty is relying on the exemptions from the formal valuation and minority approval requirements of MI 61-101 pursuant to which a formal valuation and minority approval are not required in the event that the issuer is in serious financial difficulty and the transaction is designed to improve the financial condition of the issuer. The board of directors, all of whom are independent of BG Capital and its affiliates, have determined acting in good faith that in the circumstances of Liberty, the terms of the Loan are reasonable and Liberty is eligible for these formal valuation and minority approval exemptions from MI 61-101.


**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and advancing mineral properties located in North America. Liberty Silver is led by a skilled, experienced management team and board of directors with significant experience managing exploration, development, and mining projects. Liberty Silver is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to developing new resources on its current properties, and acquiring new properties that have the potential to increase their resource base. The Trinity Silver Project, located in Pershing County, Nevada, is Liberty Silver's flagship project. Liberty Silver has the right to earn a joint venture interest in the 10,020 acres Trinity property pursuant to the terms of an earn-in agreement with Renaissance Gold Inc.

Information about the Company is available on its website, www.libertysilvercorp.com, or in the SEDAR and EDGAR databases.

For additional information:
Manish Z. Kshatriya, Executive VP & CFO
(888) 749-4916
mkshatriya@libertysilvercorp.com

## Cautionary Statements

*Cautionary Note to U.S. Investors concerning estimates of Resources: This news release uses the terms "Measured, Indicated, and Inferred Resources."  The Company advises U.S. investors that while these terms are recognized and required by Canadian regulations, the SEC does not recognize the terms.  U.S. investors are cautioned not to assume that any part or all of Measured or Indicated Mineral Resources will ever be converted into Reserves.  Inferred Resources have a great amount of uncertainty as to their existence, and great uncertainty as to their economic and legal feasibility.  It cannot be assumed that all or any part of an Inferred Mineral Resource will ever be upgraded to a higher category.  Under Canadian rules, estimates of Inferred Mineral Resources may not form the basis of feasibility or pre-feasibility studies, except in rare cases.  U.S. investors are cautioned not to assume that any part or all of a measured, indicated, or inferred resource exists, or is economically or legally minable.*

*Mineral resources that are not mineral reserves do not have demonstrated economic viability.  Mineral resource estimates do not account for mineability, selectivity, mining loss and dilution.  The assessment in the 43-101 report is preliminary in nature, includes inferred mineral resources that are considered too speculative geologically to have economic considerations applied to them that would enable them to be categorized as mineral reserves and there is no certainty that these inferred mineral resources will be converted to the measured and indicated categories through further drilling, or into mineral reserves, once economic considerations are applied.*

*Due to the uncertainty that may be attached to Inferred Mineral Resources, it cannot be assumed that all or any part of an Inferred Mineral Resource will be upgraded to an Indicated or Measured Mineral Resource as a result of continued exploration. Confidence in the estimate is insufficient to allow the meaningful application of technical and economic parameters or to enable an evaluation of economic viability worthy of public disclosure. Inferred Mineral Resources must be excluded from estimates forming the basis of feasibility or other economic studies.*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this News Release.  No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*Certain statements in this press release are forward-looking and involve a number of risks and uncertainties.  Such forward-looking statements are within the meaning of that term in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended.  The forward looking statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors made in public disclosures and filings by the Company should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*

**SENNEN RESOURCES LTD.**
#408 – 837 West Hastings Street
Vancouver, BC, Canada V6C 3N6
Tel: 604-685-6851 Fax: 604-685-6493
www.sennenresources.com

**NEWS RELEASE**

**SENNEN BOARD RECOMMENDS SHAREHOLDERS
REJECT LIBERTY'S HOSTILE OFFER**

*Vancouver, British Columbia* – July 31, 2012  - Sennen Resources Ltd (TSXV:SN) ("**Sennen**" or the "**Company**") notes Liberty Silver Corp.'s ("**Liberty**") offer  issued on July 16, 2012 (the "**Liberty Offer**").  The Board of Directors of Sennen has carefully reviewed and considered the Liberty Offer and their **UNANIMOUS** recommendation to Sennen Shareholders is to **REJECT** the Liberty Offer and **NOT TENDER** their Sennen Shares, and that any Sennen Shareholder who has tendered their Sennen Shares to the Liberty Offer should formally **WITHDRAW** those Sennen Shares.

In unanimously concluding that the Liberty Offer is inadequate and not in the best interests of Sennen Shareholders, the Board of Directors, upon the recommendation of a Special Committee of the Board, and with a written opinion from Jennings Capital Inc. ("**Jennings**"), and in consultation with technical consultants, identified a number of negative aspects of the Liberty Offer as being most relevant, including the following:

**Sennen is Better Positioned to Maximize the Value to Sennen Shareholders.**

- In the current market and investment climate the most important asset a junior company could have is cash. Sennen has $13.5 million and no debt, and this is of significantly greater value than any merger arrangement that grants Sennen Shareholders effectively a 13% interest in an unproven mineral prospect in a company with very little cash.

- Sennen's business strategy is to identify mineral resource properties for acquisition, exploration, development and production or sale, and it has been successful with this strategy. The Board believes Sennen can continue being successful utilizing Sennen's current cash reserves, in a market where cash has become a lot more valuable, than participating in an early stage, high risk exploration endeavour.

- Sennen's management and Board of Directors combined have over 125 years of relevant experience in the mining and mineral exploration industry.  With $13.5 million cash and no debt, the Company is now in a perfect situation to take advantage of the solvency crisis that many junior exploration companies find themselves in.

- The Board believes that Sennen Shareholders will receive greater value by permitting Sennen to execute its business plan and strategies than by exchanging their Sennen

**APP 0140**

Shares for an approximate 18.8% stake in Liberty that would effectively convert to only a 13% interest in the Trinity Silver Project, or significantly less after dilution, if Liberty can retain its interest in it.

**Liberty is Unable to Raise Cash.**

- The only asset which Liberty covets is Sennen's $13.5 million in cash. Liberty has indicated that they require Sennen's cash because they are unable to source capital from sophisticated investors or in any other manner.

**Sennen Shareholders Would Be Contributing Substantially More Than They Would Receive.**

- The Liberty Circular indicates that Sennen Shareholders would receive an 18.8% equity interest in Liberty. In contrast, Sennen Shareholders will contribute over 84% of the pro forma cash assets and over 82% of the pro forma assets. The 18.8% equity interest being offered to Sennen Shareholders is insufficient compensation for Sennen's contribution to the pro forma assets and cash of the combined company as proposed by Liberty.

- Readers are referred to the Directors' Circular of Sennen which will be filed SEDAR for a schematic of the respective contributions of Sennen and Liberty.

**Liberty's Trinity Silver Project is of Unknown Value and of No Interest to Sennen**

- Liberty only has the right to earn a 70% interest in Trinity by spending $5,000,000 and completing a bankable feasibility. Newmont retains a 'back-in' right, or will receive a 5% NSR on all mineral production, and it is uncertain whether additional royalties apply to the property.

- The discrepancies in assay values and the lack of QA/QC programs for the majority of the data as detailed in the Trinity technical report is of concern, and in that technical report, the authors acknowledge that they are …*"concerned about the accuracy of the USBRC analyses..that represent 82% of the values used in the Inferred resource estimation."*

- Liberty does not own certain very important claims located in the middle of the Trinity area that cut off the mineralized zone to the east.

- The inferred mineral resource in the oxide zone at Trinity is only 1.9M tons at 1.37oz/ton silver for contained ounces of silver of 2.6M, with no metallurgical and/or mine planning data for input into a bankable feasibility level study.

- Liberty has stated that *"Trinity is being prepared for potential near-term production"*, which appears premature based on an inferred resource with no supporting metallurgical, environmental and engineering information to provide for technical and economic evaluation having been communicated to the market. This contradicts Liberty's repeatedly quoted *"risk-mitigation"* and/or alternatively its *"mitigated-risk"* strategy.

**APP 0141**

- Trinity appears to represent a high risk venture requiring significant expenditures on exploration, engineering and environmental work, as well as a permitting process of an unknown period that would involve the BLM, the Nevada Department of Conservation and Natural Resources, as well as various other stakeholders.

- Sennen Shareholders would be incurring significant technical and financial risk in participating in what amounts to a  13% net interest in Trinity based on Liberty only being entitled to acquire a 70% interest in the project, which net interest would most likely be reduced as a result of future financing requirements.

**Liberty has Limited Operating History; Sennen has a Track Record of Success.**

- Liberty claims to have a "*seasoned management team and accomplished independent board of directors*" and a "*proven track record*".  In reality, Liberty's only successes to date have been limited to acquiring an 'earn-in' on an exploration stage mineral property and completing a very modest capital raising.

- The Liberty Board and management team appear to have a limited track record in the junior mining sector and Liberty finds itself in a difficult financial predicament.

- Sennen has a proven Board of Directors and management team with a track record of successfully acquiring, financing, developing and operating, or selling, mineral resource properties. This has placed Sennen, with its strong treasury, in an excellent position to take advantage of current market weakness.

- Sennen's management team and Board have successfully raised over $1 billion for junior to mid-level mineral exploration, development and production stage companies, in varying market conditions and the Board believes that current management will continue to be successful in the future.

**Liberty has Issued 68,400,000 Shares at an Effective Price of Less than $0.01.**

- Sennen notes that Liberty issued 68,400,000 shares, representing over 85% of the Liberty Shares, at prices between $0.00005 and $0.0025 per share (between one two hundredth of one cent and one quarter of one cent per share) taking into consideration the 20-for-1 split of Liberty shares in February 2010. If Sennen Shareholders accept the Liberty Offer, the shares they receive will be issued at a price higher than 98% of the shares issued by Liberty, and at a premium of over 14,000% (fourteen thousand percent) to such shares.

**Management's Financial Commitment**

- Liberty refers to the high ratio of its shares held by its directors and officers (28%), relative to the ratio of Sennen Shares held by Sennen directors and officers (approximately 11%).  Given the average price paid to the treasury of Liberty of less than one cent per share, it is understandable that Sennen directors are sceptical of the financial commitment of Liberty's management. Compare this with Sennen's management who recently purchased 2 million shares in the market at a cost of approximately $0.18 per

share, clearly indicating a significantly larger financial commitment in Sennen than the management of Liberty have in their company.

- The prices at which officers and directors of Liberty acquired their Liberty Shares is not publicly available as Insider Reports filed by such directors and officers in Canada do not include this information on initial filing, and Sennen has been unable as yet to find their US insider filings. Sennen invites Liberty to disclose this information in the interests of full and fair disclosure to Sennen Shareholders.

**The Liberty Offer is Financially Inadequate**

- The Sennen Board of Directors and the Special Committee have received a written opinion dated July 30, 2012 from Jennings to the effect that the Liberty Offer is inadequate from a financial point of view to Sennen Shareholders.

**Rejection of Liberty Offer by Sennen Directors, Officers and Significant Shareholders**

- The directors and officers of Sennen who hold an aggregate of 12M Sennen Shares on a fully diluted basis have advised Sennen that they will not tender any of their Sennen Shares to the Liberty Offer.

- Subsequent to receipt of the Liberty Offer, the Company has received written confirmation from the holders of approximately 36.2M Sennen Shares, representing approximately 54% of the Sennen Shares on a fully diluted basis, who have advised the Company that they REJECT the Liberty Offer and will NOT tender their shares.

**Recommendations**

- **The Board of Directors of Sennen believes that the Liberty Offer is financially inadequate and fails to recognise the full value of Sennen's assets.**

- **The Board of Directors of Sennen unanimously recommends that Sennen Shareholders REJECT the Liberty Offer and NOT TENDER their Sennen shares.**

- **The Board of Directors of Sennen recommends that any Shareholder who has tendered their Sennen Shares to the Liberty Offer should WITHDRAW those Sennen Shares.**

Stated Ian Rozier, President and CEO of Sennen, *"We regard the Liberty shares as being significantly overpriced with respect to the value of their assets, and this offer represents significant downside risk for Sennen shareholders. It is of no interest to Sennen's Board, management, and major shareholders."*

The Board's recommendation to Sennen shareholders that they **REJECT** the Liberty Offer and **DO NOT TENDER** their Sennen Shares, as well as a more detailed discussion of the reasons for rejecting the Liberty Offer and the written opinion provided by Jennings is contained in the

**APP 0143**

Directors' Circular that will be mailed to each of Sennen's shareholders and filed with Canadian securities regulatory authorities. The Directors' Circular will be available on SEDAR at www.sedar.com.  Shareholders are advised to read the Directors' Circular carefully and in its entirety, as it contains important information regarding Sennen, Liberty and the Liberty Offer.

**How to Withdraw Tendered Sennen Shares**

To reject the Liberty Offer, you should do nothing. The Liberty Offer is open for acceptance until August 21, 2012. Shareholders who have already tendered their Sennen Shares to the Liberty Offer can withdraw them at any time before they have been taken up and accepted for payment by Liberty. Shareholders holding shares through a dealer, broker or other nominee should contact such dealer, broker or nominee to withdraw their Sennen Shares. Shareholders may also contact the information agent retained by Sennen, Georgeson Shareholder Communications Canada Inc., North America toll free at 1-888-605-8405, or call collect outside North America at 1-781-575-2182  or via email at askus@georgeson.com.

For further information contact:
Barbara Dunfield, C.F.O.
604-685-6851
Email: info@sennenresources.com

*Neither the TSX Venture Exchange (the "TSXV") nor it's Regulation Services Provider (as that term is defined in the policies of the TSXV) has reviewed, nor do they accept responsibility for the adequacy or accuracy of, this release.*

**Forward-Looking Statements**

Certain statements contained in this news release constitute "forward-looking statements" and "forward-looking information" (as defined in applicable securities legislation) and are prospective in nature. These statements refer to future events and include information concerning the Liberty Offer, the business, operations, prospects and financial performance of Sennen, the ability of Sennen to identify, acquire and successfully develop additional mineral properties, the combined company's requirement for and ability to raise future capital, the technical difficulties expected in respect of the Trinity Silver project, and market conditions for junior mining companies. These forward-looking statements can be identified by the use of words such as "anticipate", "could", "expect", "seek", "may", "likely", "intend", "will", "believe" and similar expressions or the negative thereof. These forward-looking statements reflect management's current views and are based on certain assumptions including assumptions as to future economic conditions and courses of action, as well as other factors management believes are appropriate in the circumstances. The assumptions of Sennen contained or incorporated by reference into this news release which may prove to be incorrect include, but are not limited to, (a) that Sennen will not require additional financing and other resources in the near term to execute its business plan and strategies, (b) that Sennen's current board and management composition will not change in the near future, (c) the accuracy of Liberty's documents publicly filed with securities regulatory authorities in the United States and Canada, including the Liberty's technical report for the Trinity Silver project, Liberty's financial statements and Liberty's pro forma financial statements contained in the Liberty Circular, (d) that market conditions for financing of junior mining companies will not change in the short to medium term, and (e) that there is no material undisclosed information in respect of the Trinity Silver project and Liberty. Such forward-looking statements are subject to risks and uncertainties and no assurance can be given that any of the events anticipated by such statements will occur or, if they do occur, what benefit Sennen will derive from them. A number of factors could cause actual results, performance or developments to differ materially from those expressed or implied by such forward-looking statements, including without limitation, actions taken by Liberty, actions taken by the Sennen's shareholders, risks inherent in the exploration and development of mineral properties, financing, capitalization and liquidity risks, regulatory risks, environmental risks, the risk of fluctuations

in the Canadian/U.S. dollar exchange rate, insurance risks, competitive conditions, agreements with other parties and third party reliance, employee recruitment and retention, potential conflicts of interest, reliability of financial statements, substantial volatility of share price, potential dilution of present and prospective shareholdings, the timing and amount of future exploration expenditures, capital requirements and operating costs for Sennen to implement its business plan as well as those and risks and factors disclosed in Sennen's documents filed from time to time with the securities regulatory authorities in certain provinces of Canada. Should one or more of these risks and uncertainties materialize, or should underlying assumptions prove incorrect, actual results, performance or achievements of Sennen, or industry results, may vary materially from those described in this news release.  Sennen disclaims any intention or obligation to update or revise any forward-looking statements and information, whether as a result of new information, future events or otherwise, except as required under applicable securities laws. The reader is cautioned not to place undue reliance on forward-looking statements or information.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

[ X ] **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the Fiscal Year Ended June 30, 2011

[] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

# LIBERTY SILVER CORP.

(Exact name of registrant as specified in its charter)

| **Nevada** | **333-150028** | **32-0196442** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**181 Bay Street, Suite 2330**
**Toronto ,Ontario, Canada, M5J 3T3**
(Address of principal executive offices)

Registrant's telephone number, including area code: **416-369-3978**

Securities registered under Section 12(b) of the Exchange Act:           None
Securities registered under Section 12(g) of the Exchange Act:           None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act [] Yes [ X ] No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act [ ]Yes [X ] No

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. [X] Yes [  ] No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). [X] Yes [  ] No.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not  contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [  ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and smaller reporting company" in Rule 12b-2 of the Exchange Act.

1

Large accelerated filer [ ]                                       Accelerated filer [ ]
Non-accelerated filer [ ]  (Do not check if a smaller reporting company)       Smaller reporting company [ X ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). [ ] Yes  [ X ] No

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of the last business day of the registrant's most recently completed second fiscal quarter $12,433,334.

As of September 29, 2011, the Company had 70,933,333 shares issued and outstanding.

**APP 0147**

# PART I

## ITEM 1.        BUSINESS

### Corporate History

Liberty Silver Corp. ("We", "Us", the "Company", or the "Registrant") was incorporated on February 20, 2007 under the laws of the state of Nevada under the name Lincoln Mining Corp. We were incorporated for the purpose of engaging in mineral exploration activities, and on May 24, 2007, purchased the Zone Lode mining claim located in Elko County, Nevada, for a purchase price of $10,000.  Our objective was to conduct mineral exploration activities on the Zone Lode claim to assess whether it contained economic reserves of copper, gold, silver, molybdenum or zinc.  We were not able to determine whether this property contained reserves that were economically recoverable and have ceased our attempts at developing this property.

As disclosed on a Form 8-K filed by the Company on April 5, 2010, on March 29, 2010, the Company entered into an Exploration Earn-In Agreement with AuEx, Inc. relating to the Trinity Silver property located in Pershing County, Nevada (the "Property"); a copy of the Agreement was filed as an exhibit to the Form 8-K filed by the Company on April 5, 2010 and is hereby incorporated by reference.  AuEx in turn acquired its rights to the Property from Newmont and the Company is indirectly subject to the rights and obligations of AuEx under that agreement.

The Property consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.  Under the Agreement, the Registrant may earn-in a 70% undivided interest in the Property during a 6-year period in consideration of (1) a signing payment of $25,000, which has been made, (2) an expenditure of a cumulative total of $5,000,000 in exploration and development expenses on the Property by March 29, 2016, including a minimum of $500,000 which must be expended within one year from the effective date of the Agreement, and (3) completion of a bankable feasibility study on the Property on or before the 7th anniversary date of the Agreement.   Our business operations are currently focused on efforts to develop the Property.

### Current Operations

Overview

The Registrant presently has one property, the Trinity silver mine described below. Operations at the Trinity silver mine will consist of (i) an effort to expand the known resource through drilling, (ii) permitting for operation, if deemed economically viable, (iii) metallurgical studies aimed at enhancing the recovery of the silver and by-product lead and zinc, (iv) engineering design related to potential construction of a new mine, and (v) complete feasibility studies relating to possible re-opening the historic mine. Exploration of the property will be conducted simultaneously with the mine development in order to locate additional resources.

Products

The Registrant's anticipated product will be precious and base metal-bearing concentrates and/or precious metal bullion produced from ores from mineral deposits which it hopes to discover and exploit through exploration and acquisition.

3

Property location

The Trinity silver mine is situated approximately 25 road miles north-northwest of Lovelock, Nevada, in Pershing County, Nevada, on the northwest flank of the Trinity Range, in the Trinity mining district.  It is located about 25 mi northwest of the Rochester silver mine, one of the largest silver mines in the United States.  The latitude-longitude coordinates of the mine site are 40° 23' 47" N, 118° 36' 38" W; it is situated in sections 2, 3, 4, 5, 9, 10, 11, 15, 16, and 17, Township 29 North, Range 30 East, MDB&M and sections 27, 33, and 35, Township 30 North, Range 30 East, MDB&M.

Land; Land Status; Property Rights; Licensing

The Trinity silver mine property includes located public and leased/subleased fee land consisting of the following:

(1)       240 unpatented lode mining claims, the Seka 1-6, 8-16, 61-64, 73-76, 95-112, TS 1-18, Elm 1-175 and XXX 1-6 claims, totaling approximately 4900 acres, located in sections 2, 4, 10, and 16,  Township 29 North, Range 30 East, and section 34 and 35, Township 30 North, Range 30 East.  The claims are located on public land open to mineral entry, currently valid, and subject to Bureau of Land Management regulations.

(2)       4,396.44 acres of fee land leased by Newmont Mining Corp. from Southern Pacific Land Co., and its successors, and from Santa Fe Pacific Minerals Corporation, and its successors located in sections 3, 5, 11, and 17, Township 29 North, Range 30 East, and sections 27, 33, and 35, Township 30 North, Range 30 East.

(3)       1280 acres of fee land owned by Newmont Mining Corp located in sections 9 and 15, Township 29 North, Range 30 East.

The Registrant's joint venture area of interest is currently sections 2-5, 8-11, 14-17, Township 29 North, Range 30 East, MDB&M, and sections, 26-28, 32-35, Township 30 North, Range 30 East, MDB&M.  The Registrant's rights, which apply to all of the above properties include exploration, development, and production of valuable minerals except geothermal, hydrocarbons, and sand/gravel, and also include the authority to apply for all necessary permits, licenses and other approvals from the United States of America, the State of Nevada or any other governmental or other entity having regulatory authority over any part of the Property.

Mining history

The Trinity mining district had limited, intermittent production of silver, gold, lead and zinc from 1865 to 1942.  In the early 1980s Santa Fe Pacific Gold identified and developed significant silver  and base metal mineralization on the western side of the Trinity mining district.  In 1987, an oxidized resource, with a grade of approximately 7 ounces per ton of silver, was put into production by U.S. Borax and joint venture partner Santa Fe Pacific Mining Inc., as an open-pit, cyanide-heap-leach operation.  This mine operated for approximately 2 years and, based on production records, reportedly produced 5 million ounces of silver from 1.1 million short tons of oxide ore.

Since the mine shut down in 1989 a number of explorers have examined the property by drilling and further increased the resource of sulfide silver and base metal mineralization.

Economic geology

4

The oldest rocks exposed in the Trinity mine area are Triassic to Jurassic marine sedimentary rocks which have been intruded by Cretaceous granodiorite stocks and dikes. These rocks are overlain by Miocene to Pliocene fine-grained rhyolite volcanic and volcaniclastic units which are principle hosts for silver and base metal mineralization.  Unconformably overlying these rocks are Quaternary pediment gravels.  The general mine area is dominated by high-angle, northeast-aligned Basin and Range faulting accompanied by secondary north- to northwest-aligned fault sets.

The Miocene to Pliocene rocks were invaded by hydrothermal solution which deposited metal sulfides as fine disseminations, veinlets and breccia fillings and altered the rock by silicification, sericitization, and argillization.  The sulfides include silver-bearing freibergite and pyrargyrite, sphalerite, galena, pyrite, arsenopyrite, chalcopyrite, pyrrhotite, and stannite. Over time the nearest-surface mineralization oxidized and was that mined by U.S. Borax.

The unmined, underlying sulfide mineralization, as defined by extensive drilling, covers an area of over 3000 ft by 4000 ft.  The mineralization is still open along strike and at depth.

Infrastructure

The Trinity silver deposit is situated in western Nevada, a locale which is host to many metal mines, mining equipment companies, drilling companies, mining and metallurgical consulting expertise, and experienced mining personnel.  Its location is accessible by all-weather road through an area of very sparse population.

Government Regulation and Approval

The following permits will be necessary to put the mine into production.

| Permit/notification | Agency |
|---|---|
| - Mine registry | Nevada Division of Minerals |
| - Mine Opening notification | State Inspector of Mines |
| - Solid Waste Landfill | Nevada Bureau of Waste Management |
| - Hazardous Waste Management Permit | Nevada Bureau of Waste Management |
| - General Storm Water Permit | Nevada Bureau of Pollution Control |
| - Hazardous material Permit | State Fire Marshal |
| - Fire and Life Safety | State Fire Marshal |
| - Explosives Permit | Bureau of Alcohol, Tobacco, Firearms |
| - Notification of Commencement of Operations | Mine Safety and Health Administration |
| - Radio License | Federal Communications Commission |

Environmental Issues

The historic mining and reclamation by U.S. Borax was done in compliance with all permits. The mine has been officially closed and reclaimed and there are no legacy issues. The permitting process on the historic mine did not identify any threatened or endangered species.  Pershing County is a mining friendly county with several ongoing mining operations. The following environmental permits are necessary:

▪ Permit for Reclamation
▪ Water Pollution Control Permit

5

**APP 0150**

- Air Quality Operating Permit
- Industrial Artificial pond permit
- Water Rights

The Registrant is currently soliciting bids for the programs necessary to obtain these permits. The cost, timing, and work schedules are not yet available.

<u>Competition</u>

We compete with other mining and exploration companies in connection with the acquisition of mining claims and leases on silver and other precious metals prospects and in connection with the recruitment and retention of qualified employees.  Many of these companies are much larger than we are, have greater financial resources and have been in the mining business much longer than we have.  As such, these competitors may be in a better position through size, finances and experience to acquire suitable exploration properties.  We may not be able to compete against these companies in acquiring new properties and/or qualified people to work on our current Property, or any other properties we may acquire in the future.

Given the size of the world market for precious metals such as silver and gold relative to the number of individual producers and consumers, we believe that no single company has sufficient market influence to significantly affect the price or supply of previous metals such as silver and gold in the world market.

<u>Employees</u>

The Registrant currently has two full-time employees, William Tafuri, the President and Chief Operating Officer, H. Richard Klatt, the vice president of exploration, and two consultants.

**Reports to Security Holders**

We file reports with the SEC under section 15d of the Securities Exchange Act of 1934.  The reports will be filed electronically.  You may read copies of any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, D.C. 20549.  You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330.  The SEC also maintains an Internet site that will contain copies of the reports we file electronically.  The address for the SEC Internet site is http://www.sec.gov.

**ITEM 1A.      RISK FACTORS**

AN INVESTMENT IN OUR COMMON STOCK IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. YOU SHOULD CAREFULLY CONSIDER THE FOLLOWING RISK FACTORS IN EVALUATING OUR BUSINESS BEFORE PURCHASING ANY OF OUR SHARES OF COMMON STOCK. NO PURCHASE OF OUR COMMON STOCK SHOULD BE MADE BY ANY PERSON WHO IS NOT IN A POSITION TO LOSE THE ENTIRE AMOUNT OF HIS INVESTMENT. THE ORDER OF THE FOLLOWING RISK FACTORS IS PRESENTED ARBITRARILY. YOU SHOULD NOT CONCLUDE THE SIGNIFICANCE OF A RISK FACTOR BECAUSE OF THE ORDER OF PRESENTATION.  OUR BUSINESS AND OPERATIONS COULD BE SERIOUSLY HARMED AS A RESULT OF THESE RISKS.

**<u>Risks Related to Our Business</u>**

***Our property is in the exploration and development stage. There is substantial risk that no commercially***

6

*exploitable minerals will be found and that funds we expend on exploration and development will be lost. If we do not discover any mineral resource in a commercially exploitable quantity, our business could fail.*

Exploration for minerals is a speculative venture involving substantial risk.  New mineral exploration companies encounter difficulties, and there is a high rate of failure of such enterprises.  The expenditures we may make in the exploration of the mineral concessions may not result in the discovery of commercial quantities of ore. The likelihood of success must be considered in light of the problems, expenses, difficulties, complications and delays encountered in connection with the exploration of the mineral properties that we plan to undertake. These potential problems include, but are not limited to, unanticipated problems relating to exploration, additional costs and expenses that may exceed current estimates, unusual or unexpected mineral formations, and other geological conditions.  If we find mineral reserves which we decide to extract, of which there is no guarantee, we may face additional problems, expenses, difficulties and complications which make mining the ore unprofitable. If we encounter any or all of these unanticipated problems, we may be unable to successfully put our Property into production.

*Because we may never earn revenues from our operations, our business may fail and cause  investors to lose their entire investment in our company.*

We have no history of revenues from operations. We have yet to generate positive earnings and there can be no assurance that we will ever operate profitably. Our company has a limited operating history and is in the exploration and development stage. The success of our company is significantly dependent on the uncertain events of the discovery and exploitation of mineral reserves on our properties or selling the rights to exploit those mineral reserves. If our business plan is not successful and we are not able to operate profitably, then our stock may become worthless and investors may lose all of their investment in our company. Prior to completion of our exploration stage, we anticipate that we will incur increased operating expenses without realizing any revenues. We therefore expect to incur significant losses into the foreseeable future. We recognize that if we are unable to generate significant revenues from the exploration of our mineral claims in the future, we will not be able to earn profits or continue operations. There is no history upon which to base any assumption as to the likelihood that we will prove successful, and we can provide no assurance that we will generate any revenues or ever achieve profitability. If we are unsuccessful in addressing these risks, our business will fail and investors may lose all of their investment in our company.

*Mineral operations are subject to applicable law and government regulation. Even if we discover a mineral resource in a commercially exploitable quantity, these laws and regulations could restrict or prohibit the exploitation of that mineral resource. If we cannot exploit any mineral resource that we might discover on our properties, our business may fail.*

Both mineral exploration and extraction require permits from various federal, state, and local governmental authorities and are governed by laws and regulations, including those with respect to prospecting, mine development, mineral production, transport, export, taxation, labor standards, occupational health, waste disposal, toxic substances, land use, environmental protection, mine safety and other matters. There can be no assurance that we will be able to obtain or maintain any of the permits required for the continued exploration of our mineral properties or for the construction and operation of a mine on our properties at economically viable costs. If we cannot accomplish these objectives, our business could fail.  We believe that we are in compliance with all material laws and regulations that currently apply to our activities but there can be no assurance that we can continue to remain in compliance. Current laws and regulations could be amended and we might not be able to comply with them, as amended. Further, there can be no assurance that we will be able to obtain or maintain all permits necessary for our future operations, or that we will be able to obtain them on reasonable terms. To the extent such approvals are required and are not obtained, we

7

may be delayed or prohibited from proceeding with planned exploration or development of our mineral properties.

***Our success is dependent on retaining key personnel and on hiring and retaining additional personnel. If we fail to retain our key personnel, we may have to cease operations.***

Our ability to continue to explore and develop our mineral concessions, if warranted, is, in large part, dependent upon our ability to attract and maintain qualified key personnel. There is competition for such personnel, and there can be no assurance that we will be able to attract and retain them. We may not be able to find qualified geologists and mining engineers on a timely basis or at all to pursue our business plan. Furthermore, if we are able to find qualified employees, the cost to hire them may be too great because there may be other companies that pay at a higher rate than we are able to pay.  Our progress now and in the future will depend on the efforts of key management figures, such as William Tafuri, our President and Chief Operating Officer, and on our ability to hire additional key personnel as needed in the future to continue to explore and develop our mineral concessions and pursue our business plan.  The loss of current key personnel or our inability to hire additional key personnel in the future could have a material adverse effect on our business and could require us to cease operations or to cause our business to fail.

***As we undertake exploration of our mineral claims, we will be subject to compliance with government regulation that may increase the anticipated cost of our exploration program.***

There are several governmental regulations that materially restrict mineral exploration. We will be subject to the federal regulations (environmental, Bureau of Land Management) and the laws of the State of Nevada as we carry out our exploration program. We may be required to obtain additional work permits, post bonds and perform remediation work for any physical disturbance to the land in order to comply with these laws. While our planned exploration program budgets for regulatory compliance, there is a risk that new regulations could increase our costs of doing business and prevent us from carrying out our exploration program.

***We will need additional financing to execute our business plan, which additional financing may not be available on reasonable terms or at all.***

Our current working capital is not sufficient to fund our planned operations and exploration activities for the next year.  Our operating budget for the next twelve months is currently approximately $1.68 million and we have a working capital deficit $551,303 at June 30, 2011.  Accordingly, we will require additional working capital to sustain our planned business operations and to carry out our planned exploration activities. We do not currently have any commitments to provide such funds, and there is no assurance that we will be able to obtain the required financing when needed to sustain our operations.  In addition, if we do discover mineral resources in commercially exploitable quantities on our current property, or on any other property we may acquire in the future, we will be required to expend substantial sums of money to establish the extent of the resource, develop processes to extract it and develop extraction and processing facilities and infrastructure. Although we may derive substantial benefits from the discovery of a major deposit, if we cannot raise the necessary capital to exploit such a deposit, our business may fail.

***Mineral exploration and development is subject to extraordinary operating risks. We do not currently insure against these risks. In the event of a cave-in or similar occurrence, our liability may exceed our resources, which would have an adverse impact on our company.***

Mineral exploration, development and production involve many risks. Our operations will be subject to all the hazards and risks inherent in the exploration for mineral resources and, if we discover a mineral

8

**APP 0153**

resource in commercially exploitable quantity, our operations could be subject to all of the hazards and risks inherent in the development and production of resources, including liability for pollution, cave-ins or similar hazards against which we cannot insure or against which we may elect not to insure. Any such event could result in work stoppages and damage to property, including damage to the environment. As we do not have any current exploration, development or production activities, we do not currently maintain insurance coverage against these operating hazards. The payment of any liabilities that arise from any such occurrence would have a material adverse impact on our company.

***Silver prices are highly volatile. If a profitable market does not exist, we may have to cease operations.***

Silver prices have been highly volatile, and are affected by numerous international economic and political factors over which we have no control.  Our company's long-term success is highly dependent upon the price of silver, as the economic feasibility of any ore body discovered on our current property, or on other properties we may acquire in the future, would, in large part, be determined by the prevailing market price of silver. If a profitable market does not exist, we may have to cease operations.

***The silver exploration and mining industry is highly competitive.***

The silver industry is highly competitive, and we are required to compete with other corporations that may have greater resources than ours. Such corporations could outbid us for potential projects or produce minerals at lower costs which would have a negative effect on our operations.

### Risks Relating to the Common Stock

***The Company's common stock is currently approved for trading on the OTC Bulletin Board, but the Company cannot ensure that a liquid trading market for its shares will be sustained.***

The Company's common stock is currently approved for quotation on the OTC Bulletin Board under the symbol LBSV.OB.   The Company cannot ensure that any level of trading activity will be sustained or that, if sustained, that it constitutes a liquid trading market which allows persons who purchase the Company's common stock to promptly liquidate their investment at any time. Persons who purchase the Company's common stock may have difficulty liquidating their investment because of the lack of a market or the difficulty in maintaining a market for such shares.

***Potential future sales under Rule 144 may depress the market price for the common stock.***

In general, under Rule 144, a person who has satisfied a minimum holding period of between 6 months and one-year and any other applicable requirements of Rule 144, may thereafter sell such shares publicly. The possible future sale of our shares by the Company's existing shareholders, pursuant to and in accordance with the provisions of Rule 144, may have a depressive effect on the price of our common stock in the over-the-counter market.

***The Company's common stock is currently deemed a "penny stock", which may make it more difficult for investors to sell their shares.***

The Company's common stock is currently subject to the "penny stock" rules adopted under section 15(g) of the Exchange Act.  The penny stock rules apply generally to companies whose common stock is not listed on a national securities exchange and trades at less than $5.00 per share.  These rules require, among other things, that brokers who trade penny stock to persons other than "established customers" complete

9

certain documentation, make suitability inquiries of investors and provide investors with certain information concerning trading in the security, including a risk disclosure document and quote information under certain circumstances. Many brokers have decided not to trade penny stocks because of the requirements of the penny stock rules and, as a result, the number of broker-dealers willing to act as market makers in such securities is limited. As long as the Company's shares continue to remain subject to the penny stock rules, it could have an adverse effect on the market for the Company's shares, and investors could find it more difficult to dispose of the Company's shares.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not Applicable.

## ITEM 2.        PROPERTIES.

Property location

The Registrant has a month to month rental agreement for office space at 181 Bay Street, Suite 2330,Toronto ,Ontario, Canada, M5J 3T3. The telephone number is: 416-369-3978. The monthly base rent is CDN $4,007 (approximately US $4,000).

The Trinity silver mine is situated approximately 25 road miles north-northwest of Lovelock, Nevada, in Pershing County, Nevada, on the northwest flank of the Trinity Range, in the Trinity mining district. It is located about 25 mi northwest of the Rochester silver mine, one of the largest silver mines in the United States. The latitude-longitude coordinates of the mine site are $40^\circ$ 23' 47" N, $118^\circ$ 36' 38" W; it is situated in sections 2, 3, 4, 5, 9, 10, 11, 15, 16, and 17, Township 29 North, Range 30 East, MDB&M and sections 26-28, 33, and 35, Township 30 North, Range 30 East, MDB&M.

Land; Land Status; Property Rights; Licensing

The Trinity silver mine property includes located public and leased/subleased fee land consisting of the following:

(1)       240 unpatented lode mining claims, the Seka 1-6, 8-16, 61-64, 73-76, 95-112, TS 1-18 claims, Elm1-18, and XXX 1-6 totaling approximately 4900 acres, located in sections 2, 4, 10, and 16,  Township 29 North, Range 30 East, and section 34 and 35, Township 30 North, Range 30 East. The claims are located on public land open to mineral entry, currently valid, and subject to Bureau of Land Management regulations.

(2)       4,396.44 acres of fee land leased by Newmont Mining Corp. from Southern Pacific Land Co., and its successors, and from Santa Fe Pacific Minerals Corporation, and its successors located in sections 3, 5, 11, and 17, Township 29 North, Range 30 East, and sections 27, 33, and 35, Township 30 North, Range 30 East.

(3) 1280 acres of fee land owned by Newmont Mining Corp located in sections 9 and 15, Township 29 North, Range 30 East.

The Registrant's joint venture area of interest is currently sections 2-5, 8-11, 14-17, Township 29 North, Range 30 East, MDB&M, and sections, 26-28, 32-35, Township 30 North, Range 30 East, MDB&M. The Registrant's rights, which apply to all of the above properties include exploration, development, and production of valuable minerals except geothermal, hydrocarbons, and sand/gravel, and also include the

10

**APP 0155**

authority to apply for all necessary permits, licenses and other approvals from the United States of America, the State of Nevada or any other governmental or other entity having regulatory authority over any part of the Property.

The following Map identifies the location of the Trinity Silver Mine located in Pershing County Nevada:

11



Mining history

The Trinity mining district had limited, intermittent production of silver, gold, lead and zinc from 1865 to 1942.  In the early 1980s Santa Fe Pacific Gold identified and developed significant silver  and base metal mineralization on the western side of the Trinity mining district.  In 1987, an oxidized resource, with a

12

grade of approximately 7 ounces per ton of silver, was put into production by U.S. Borax and joint venture partner Santa Fe Pacific Mining Inc., as an open-pit, cyanide-heap-leach operation.  This mine operated for approximately 2 years and, based on production records, reportedly produced 5 million ounces of silver from 1.1 million short tons of oxide ore.

Since the mine shut down in 1989 a number of explorers have examined the property by drilling and further increased the resource of sulfide silver and base metal mineralization.

### ITEM 3.        LEGAL PROCEEDINGS.

Neither the Company nor its property is the subject of any pending legal proceedings, and no such proceeding is known to be contemplated by any governmental authority. We are not aware of any legal proceedings in which any director, officer or affiliate of the Company, any owner of record or beneficially of more than 5% of any class of our voting securities, or any associate of any such director, officer, affiliate or security holder of the Company, is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries.

### ITEM 4.        (REMOVED AND RESERVED)

### PART II
### {tc \l 0 "00000000000000000000000000000003PART II"}
### ITEM 5.        MARKET  FOR  REGISTRANT'S  COMMON  EQUITY,  RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

**Market Information.**

The Company's shares are approved for trading on the OTC Bulletin Board under the symbol LBSV.OB.  The following table sets forth the Company's high and low closing prices for the Company's common stock as reported on the OTCBB for the periods indicated.

| Fiscal Year Ending June 30, 2011 | High | | Low | |
|---|---|---|---|---|
| First Quarter | $ | 0.61 | $ | 0.30 |
| Second Quarter | | 0.63 | | 0.17 |
| Third Quarter | | 0.63 | | 0.19 |
| Fourth Quarter | | 0.64 | | 0.30 |

| Fiscal Year Ending June 30, 2010 | High | | Low | |
|---|---|---|---|---|
| First Quarter | $ | 0.00 | $ | 0.00 |
| Second Quarter | $ | 0.00 | $ | 0.00 |
| Third Quarter | $ | 0.00 | $ | 0.00 |
| Fourth Quarter | $ | 1.29 | $ | .37 |

The prices presented are bid prices which represent prices between broker-dealers and do not include retail mark-ups and mark-downs or any commission to the dealer. The prices may not reflect actual transactions.

As of September 29, 2011, there were 70,933,333 shares of common stock issued and outstanding held by approximately 16 stockholders of record of the Company's common stock.

13

**APP 0158**

There have been no cash dividends declared or paid on the shares of common stock, and management does not anticipate payment of dividends in the foreseeable future.

## ITEM 6.        SELECTED FINANCIAL DATA.

Not Applicable.

## ITEM 7.        MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION.

### SPECIAL NOTE OF CAUTION REGARDING FORWARD-LOOKING STATEMENTS

CERTAIN STATEMENTS IN THIS REPORT, INCLUDING STATEMENTS IN THE FOLLOWING DISCUSSION, ARE WHAT ARE KNOWN AS "FORWARD LOOKING STATEMENTS", WHICH ARE BASICALLY STATEMENTS ABOUT THE FUTURE. FOR THAT REASON, THESE STATEMENTS INVOLVE RISK AND UNCERTAINTY SINCE NO ONE CAN ACCURATELY PREDICT THE FUTURE. WORDS SUCH AS "PLANS," "INTENDS," "WILL," "HOPES," "SEEKS," "ANTICIPATES," "EXPECTS "AND THE LIKE OFTEN IDENTIFY SUCH FORWARD LOOKING STATEMENTS, BUT ARE NOT THE ONLY INDICATION THAT A STATEMENT IS A FORWARD LOOKING STATEMENT. SUCH FORWARD LOOKING STATEMENTS INCLUDE STATEMENTS CONCERNING OUR PLANS AND OBJECTIVES WITH RESPECT TO THE PRESENT AND FUTURE OPERATIONS OF THE COMPANY, AND STATEMENTS WHICH EXPRESS OR IMPLY THAT SUCH PRESENT AND FUTURE OPERATIONS WILL OR MAY PRODUCE REVENUES, INCOME OR PROFITS. NUMEROUS FACTORS AND FUTURE EVENTS COULD CAUSE THE COMPANY TO CHANGE SUCH PLANS AND OBJECTIVES OR FAIL TO SUCCESSFULLY IMPLEMENT SUCH PLANS OR ACHIEVE SUCH OBJECTIVES, OR CAUSE SUCH PRESENT AND FUTURE OPERATIONS TO FAIL TO PRODUCE REVENUES, INCOME OR PROFITS. THEREFORE, THE READER IS ADVISED THAT THE FOLLOWING DISCUSSION SHOULD BE CONSIDERED IN LIGHT OF THE DISCUSSION OF RISKS AND OTHER FACTORS CONTAINED IN THIS REPORT ON FORM 10-K AND IN THE COMPANY'S OTHER FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION. NO STATEMENTS CONTAINED IN THE FOLLOWING DISCUSSION SHOULD BE CONSTRUED AS A GUARANTEE OR ASSURANCE OF FUTURE PERFORMANCE OR FUTURE RESULTS.

### Background and Overview

We were incorporated for the purpose of engaging in mineral exploration activities, and on May 24, 2007, purchased the Zone Lode mining claim located in Elko County, Nevada, for a purchase price of $10,000. Our objective was to conduct mineral exploration activities on the Zone Lode claim to assess whether it contained economic reserves of copper, gold, silver, molybdenum or zinc.  We were not able to determine whether this property contained reserves that were economically recoverable and have ceased our attempts at developing this property.  As disclosed above, on March 29, 2010, we entered into an Exploration Earn-In Agreement relating to the Trinity Silver property located in Pershing County, Nevada and now intend to engage in efforts to develop the Property.

Our plan of operation for the fiscal year ending June 30, 2011 is to conduct mineral exploration activities at the Trinity silver mine. Operations at the Trinity silver mine will consist of (i) an effort to expand the known resource through drilling, (ii) permitting for operation, if deemed economically viable, (iii) metallurgical

14

studies aimed at enhancing the recovery of the silver and by-product lead and zinc, (iv) engineering design related to potential construction of a new mine, and (v) complete feasibility studies relating to possible re-opening the historic mine. Exploration of the property will be conducted simultaneously with the mine development in order to locate additional resources.

**Results of Operations**

The following discussion and analysis provides information that we believe is relevant to an assessment and understanding of our results of operation and financial condition for the fiscal year ended June 30, 2011 as compared to the fiscal year ended June 30, 2010.

*Comparison of the fiscal years ended June 30, 2011 and 2010*

There were no revenues generated during the fiscal years ended, June 30, 2011 or 2010.

Total expenses increased 79% during the year ended June 30, 2011 compared to 2010. The 79% increase is primarily due to exploration expense, valuation of warrants associated with financing, legal and accounting, consulting and operation and administration expense. We expect total expenses to be approximately 100% higher during the 2012 fiscal year, primarily as a result of exploration and development and operation and administration expense.

**Liquidity and Capital Resources**

*Total Current Assets and Liabilities*

As of June 30, 2011, our audited balance sheet reflects that the Company had current assets of $27,017, total assets of $124,528, current liabilities of $578,320 and a deficit accumulated in the exploration stage of $2,337,733.

Management has established an estimated operating budget for the fiscal year commencing July 1, 2011, which includes total estimated expenses of $1,682,453 for the period. The estimated budget is as follows:

|  |  | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|---|
| **43-101** | $ |  |  |  |  |  |
| **Drilling** | $ |  | 326,667 | 326,666 | 226,667 | 880,000 |
| **Metallurgy** | $ |  |  |  |  |  |
| **Engineering** | $ |  |  |  |  |  |
| **Permitting** | $ | 2,200 | 10,000 | 25,640 |  | 37,840 |
| **Geophysics** | $ | 36,000 | 150,000 |  |  | 186,000 |
| **Socio-economic** | $ |  |  |  |  |  |
| **Feasibility** | $ |  |  |  |  |  |
| **Listing TSX** | $ |  | 75,000 | 25,000 |  | 100,000 |
| **Staff/OH** | $ | 144,001 | 106,000 | 88,000 | 56,500 | 394,501 |
| **Consultants** | $ | 84,112 |  |  |  | 84,112 |
| **Acquisition/Contingency** | $ |  |  |  |  |  |
| **Total** | $ | 266,313 | 667,667 | 465,306 | 283,167 | 1,682,453 |

On May 6, 2010, the Company completed a private placement offering of a total of 1,333,334 Units

15

(consisting of one share of common stock and one warrant to purchase an additional share of common stock), from which it received gross offering proceeds of $1,000,000. Such funds are intended to be used to pay ongoing expenses of the Company as reflected in the operating budget, but are not sufficient to pay all estimated operating expenses. Accordingly, the Company will be required either to raise additional working or to cut its operating budget.

Management currently believes that the Company will be able to raise additional working capital needed to meet its current budget, and that the best option for doing so will be through the private placement offering and sale of equity securities. However, the Company does not currently have any commitments to provide working capital and there is no assurance that the required working capital will be available, or will be available on terms acceptable to the Company.

Subsequent to the fiscal year ended June 30, 2011, on September 8, 2011, the Company, concluded a private placement offering, pursuant to which the Company raised a total of Cdn$660,000 through the sale of 1,200,000 Units at a purchase price of Cdn$0.55 per Unit. Each Unit consists of one common share in the capital of the Company (each, a "Share") and one half of one Share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of $0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions. For the above share issuances, the shares were not registered under the Securities Act of 1933 (the "Securities Act") in reliance upon the exemptions from registration contained in Regulation S of the Securities Act.

*Cash Flow*

During the fiscal year ended June 30, 2011 cash was primarily used to fund operations. We had a net increase in cash used in operating activities during the fiscal year ended June 30, 2011 as compared to June 30, 2010. See below for additional discussion and analysis of cash flow.

| | For the years ended June 30, | | | |
|---|---|---|---|---|
| | 2011 | | 2010 | |
| Net cash provided by (used in) operating activities | $ | (785,254) | $ | (236,959) |
| Net cash used in investing activities | | (72,511) | | (25,000) |
| Net cash provided by financing activities | | 150,000 | | 985,900 |
| Net Change in Cash | $ | (707,765) | $ | 723,941 |

During the year ended June 30, 2011, net cash used in operating activities was $785,254, compared to net cash used in operating activities of $236,959 during the year ended June 30, 2010. This increase in net cash used in operating is due to exploration expense, legal and accounting, consulting and operation and administration expense.

As discussed herein we realized a net loss from operations of $1,464,253 during the year ended June 30, 2011, compared to $818,876 during the year ended June 30, 2010. This was due to exploration expense,

16

valuation of warrants associated with financing, legal and accounting, consulting and operation and administration expense.

During the year ended June 30, 2011, net cash provided by financing activities of $150,000 from proceeds from notes payable from related party, compared to $985,900 which was proceeds from $1,000,000 common stock issuance and repayment of note payable to related party for $14,100 for the year ended June 30, 2010. The increase in net cash used was due to operating expenses increased.

**Off-Balance Sheet Arrangements**

The Company has no off-balance sheet arrangements and has not entered into any transaction involving unconsolidated limited purpose entities.

**ITEM 7A.       QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not Applicable.

**ITEM 8.       FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

The financial statements of the Company required by Article 8 of Regulation S-X are attached to this report.

17

**LIBERTY SILVER CORP.**
**AUDITED FINANCIAL STATEMENTS**
**FOR THE FISCAL YEAR ENDED JUNE 30, 2011 and 2010**

|  | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm | 19 |
| Balance Sheets | 20 |
| Statements of Operations And Comprehensive Income | 21 |
| Statements of Stockholders Equity | 22-23 |
| Statements of Cash Flows | 24-25 |
| Notes to Consolidated Financial Statements | 26-38 |

18

**APP 0163**

# MORRILL & ASSOCIATES, LLC
## CERTIFIED PUBLIC ACCOUNTANTS
### 563 WEST 500 SOUTH, SUITE 425
### BOUNTIFUL, UTAH 84010
### 801-546-9068 PHONE; 801-546-8211 FAX

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders
Liberty Silver Corp.
(An Exploration Stage Company)
Manahattan, CA

We have audited the accompanying balance sheets of Liberty Silver Corp. (an exploration stage company) as of June 30, 2011 and 2010 and the related statements of operations, stockholders' equity (deficit) and cash flows for the years ended June 30, 2011 and 2010 and from inception on February 20, 2007 through June 30, 2011. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Liberty Silver Corp. (an exploration stage company) as of June 30, 2011 and 2010 and the results of its operations and cash flows for the years ended June 30, 2011 and 2010 and from inception on February 20, 2007 through June 30, 2011 in conformity with generally accepted accounting principles in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. The Company has suffered recurring losses and has no operations which raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are described in Note 8. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*/s/ Morrill & Associates*

Morrill & Associates
Bountiful, Utah 84010
October 12, 2011

19

**APP 0164**

# MORRILL & ASSOCIATES, LLC

CERTIFIED PUBLIC ACCOUNTANTS

563 WEST 500 SOUTH, SUITE 425

BOUNTIFUL, UTAH 84010

801-546-9068 PHONE; 801-546-8211 FAX

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Balance Sheets**

<u>ASSETS</u>

|  |  | June 30, 2011 |  | June 30, 2010 |
|---|---|---|---|---|
| Current Assets |  |  |  |  |
| Cash and cash equivalents | $ | 16,723 | $ | 724,488 |
| Prepaid |  | 10,294 |  | 18,941 |
| Deposits |  | - |  | 850 |
| Total current assets |  | 27,017 |  | 744,279 |
| Property and Equipment |  |  |  |  |
| Mining interests (notes 2 and 4) |  | 97,511 |  | 25,000 |
| Total property and equipment |  | 97,511 |  | 25,000 |
| Total assets | $ | 124,528 | $ | 769,279 |

<u>LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)</u>

|  |  | June 30, 2011 |  | June 30, 2010 |
|---|---|---|---|---|
| Current Liabilities |  |  |  |  |
| Accounts payable | $ | 60,924 | $ | 5,982 |
| Accrued expense |  | 367,396 |  | 79,586 |
| Related party payable (note 5) |  | 150,000 |  | - |
| Total current liabilities |  | 578,320 |  | 85,568 |
| Total liabilities |  | 578,320 |  | 85,568 |
| Commitments and contingencies |  | - |  | - |
| Stockholders' Equity (Deficit) |  |  |  |  |
| Capital stock, $.001 par value, 200,000,000 shares authorized; 69,733,334 shares issued and outstanding |  | 69,734 |  | 69,734 |
| Additional paid-in capital |  | 1,814,207 |  | 1,487,457 |
| Deficit, accumulated during the exploration stage |  | (2,337,733) |  | (873,480) |
| Total stockholders' equity (deficit) |  | (453,792) |  | 683,711 |
| Total liabilities and stockholders' equity | $ | 124,528 | $ | 769,279 |

The accompany notes are an integral part of these financial statements.

**APP 0166**

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Operations**

| | For the Year Ended June 30, 2011 | For the Year Ended June 30, 2010 | Cumulative During the Exploration Stage February 20, 2007 (inception) to June 30, 2011 |
|---|---|---|---|
| Revenue | $ - | $ - | $ - |
| Operating expenses | | | |
| Consulting | 582,572 | 95,914 | 682,127 |
| Impairment of mining interest | - | - | 11,800 |
| Exploration | 126,841 | 91,100 | 217,941 |
| Legal and accounting | 138,840 | 23,535 | 186,706 |
| Financing costs associated with valuation of warrants | 40,000 | 522,191 | 562,191 |
| Stock compensation | 286,750 | - | 286,750 |
| Operation and administration | 288,755 | 86,136 | 390,017 |
| Total operating expenses | 1,463,758 | 818,876 | 2,337,532 |
| Income (loss) from operations | (1,463,758) | (818,876) | (2,337,532) |
| Other income (expense) | | | |
| Interest income | 882 | 339 | 1,221 |
| Interest expense | (189) | (45) | (234) |
| Total other income (expense) | 693 | 294 | 987 |
| Loss before income tax | (1,463,065) | (818,582) | (2,336,545) |
| Provision for income taxes | - | - | - |
| Net loss | (1,463,065) | (818,582) | (2,336,545) |
| Foreign currency adjustment | (1,188) | - | (1,188) |
| Comprehensive loss | $ (1,464,253) | $ (818,582) | $ (2,337,733) |
| Loss per common share – basic and fully diluted | $ (0.02) | $ (0.01) | |
| Weighted average common shares | 69,733,334 | 69,733,334 | |

The accompany notes are an integral part of these financial statements.

22

**APP 0167**

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Stockholders' Equity (Deficit)**
**For the period February 20, 2007 (inception) through June 30, 2011**

| | Common Stock | | | Deficit Accumulated During Exploration Stage | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | Additional Paid in Capital | | |
| Balance, February 20, 2007 (inception) | - | $ - | $ - | $ - | $ - |
| Shares issued for cash at $0.001 per share | 80,000,000 | 80,000 | (76,000) | - | 4,000 |
| Shares issued for cash at $0.01 per share | 20,000,000 | 20,000 | (10,000) | - | 10,000 |
| Shares issued for cash at $0.05 per share | 8,400,000 | 8,400 | 12,600 | - | 21,000 |
| Net loss for the period ending June 30, 2007 | - | - | - | (1,128) | (1,128) |
| Balance, June 30, 2007 | 108,400,000 | 108,400 | (73,400) | (1,128) | 33,872 |
| Net loss for the period ending June 30, 2008 | - | - | - | (22,248) | (22,248) |
| Balance, June 30, 2008 | 108,400,000 | 108,400 | (73,400) | (23,376) | 11,624 |
| Net loss for the period ending June 30, 2009 | - | - | - | (31,522) | (31,522) |
| Balance, June 30, 2009 | 108,400,000 | $ 108,400 | $ (73,400) | $ (54,898) | $ (19,898) |

The accompany notes are an integral part of these financial statements.

23

**APP 0168**

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Stockholders' Equity (Deficit)**
**For the period February 20, 2007 (inception) through June 30, 2010**

| | Common Stock | | | Deficit Accumulated During Exploration Stage | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | Additional Paid in Capital | | |
| Balance, June 30, 2009 | 108,400,000 | $ 108,400 | $ (73,400) | $ (54,898) | $ (19,898) |
| Shares issued for cash at $0.75 per share | 1,333,334 | 1,334 | 998,666 | - | 1,000,000 |
| Share cancellation | (40,000,000) | (40,000) | 40,000 | - | - |
| Valuation of stock warrants | - | - | 522,191 | - | 522,191 |
| Net loss for the period ending June 30, 2010 | - | - | - | (818,582) | (818,582) |
| Balance, June 30, 2010 | 69,733,334 | $ 69,734 | $ 1,487,457 | $ (873,480) | $ 683,711 |
| Valuation of stock options | - | - | 286,750 | - | 286,750 |
| Valuation of stock warrants | - | - | 40,000 | - | 40,000 |
| Net loss for the period ending June 30, 2011 | - | - | - | (1,464,253) | (1,464,253) |
| Balance, June 30, 2011 | 69,733,334 | 69,734 | 1,814,207 | (2,337,733) | (453,792) |

The accompany notes are an integral part of these financial statements.

24

**APP 0169**

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
Statements of Cash Flows

| | Year ended June 30, 2011 | Year ended June 30, 2010 | Accumulated from February 20, 2007 (inception) through June 30, 2011 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Comprehensive loss | $ (1,464,253) | $ (818,582) | $ (2,337,733) |
| Adjustment to reconcile net loss to net cash used in operating activities | | | |
| Valuation of warrants associated with financing | 40,000 | 522,191 | 562,191 |
| Valuation from stock option issuance | 286,750 | - | 286,750 |
| Changes in operating assets and liabilities: | | | |
| Increase (decrease) prepaid | 8,648 | (18,941) | (10,294) |
| Increase deposit | 850 | (850) | - |
| Increase in accounts payable | 54,941 | (363) | 60,924 |
| Increase in accrued expenses | 287,810 | 79,586 | 367,396 |
| Net cash used in operating activities | (785,254) | (236,959) | (1,070,766) |
| Cash flows from investing activities | | | |
| Cash paid for mining interest | (72,511) | (25,000) | (97,511) |
| Net cash used in investing activities | (72,511) | (25,000) | (97,511) |
| Cash flows from financing activities | | | |
| Payments on related party payable | - | (14,100) | - |
| Note Payable to related party | 150,000 | - | 150,000 |
| Proceeds from issuance of common stock | - | 1,000,000 | 1,035,000 |
| Net cash provided by financing activities | 150,000 | 985,900 | 1,185,000 |
| Increase (Decrease) in cash and cash equivalents | (707,765) | 723,941 | 16,723 |
| Cash and cash equivalents, beginning of year | 724,488 | 547 | - |
| Cash and cash equivalents, end of year | $ 16,723 | $ 724,488 | $ 16,723 |

The accompany notes are an integral part of these financial statements.

APP 0170

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
Statements of Cash Flows (continued)

| | Year ended June 30, 2011 | Year ended June 30, 2010 | Accumulated from February 20, 2007 (inception) through June 30, 2011 |
|---|---|---|---|
| Supplement Disclosures: | | | |
| Cash paid for interest | $ - | $ - | $ - |
| Cash paid for income tax | $ - | $ - | $ - |

The accompany notes are an integral part of these financial statements.

## Liberty Silver Corp
Notes to the Financial Statement
June 30, 2011 and 2010

**Note 1 – Nature and Continuance of Operations**

The Company was incorporated in the State of Nevada on February 20, 2007. The Company is considered an exploration stage company since its formation, and the Company has not yet realized any revenues from its planned operations. The Company is primarily focused on the exploration, acquisition and development of mining and mineral properties. Upon the location of commercially minable reserves, the Company plans to prepare for mineral extraction and enter the development stage.

On May 24, 2007, the Company had acquired a mineral property located in Elko County, within the state of Nevada. The Company was not able to determine whether this property contains reserves that are economically recoverable. The Company has ceased their attempts at developing this property.

On February 11, 2010, the Company amended its articles of incorporation. The articles of incorporation were amended for the purposes of (1) changing the name of the registrant to Liberty Silver Corp, and (2) increasing the authorized shares of the Company from 75,000,000 shares of $0.001 par value common stock to 200,000,000 shares of $0.001 par value common stock.

On March 29, 2010, the Company entered into an Exploration Earn-In Agreement (the "Agreement") with AuEx Ventures, Inc., a Nevada corporation.

The Agreement relates to the Trinity Silver property (the "Property") located in Pershing County, Nevada which consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.

The Company is reviewing other potential acquisitions in the resource and non-resource sectors. While the Company is in the process of completing due diligence reviews of several opportunities, there is no guarantee that we will be able to reach any agreement to acquire such assets.

**Note 2 - Significant Accounting Policies**

The following is a summary of significant account policies used in the preparation of these financial statements.

### a. Basis of presentation

The financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America applicable to exploration stage enterprises, and are expressed in U.S. dollars. The Company's fiscal year end is June 30.

### b. Cash and cash equivalents

Cash and cash equivalents include highly liquid investments with original maturities of three months or less.

### c. Mineral rights, property and acquisition costs

The Company has been in the exploration stage since its formation on February 20, 2007 and has not yet

27

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

realized any revenues from its planned operations. It is primarily engaged in the acquisition and exploration of mining properties.

The Company capitalizes acquisition and option costs of mineral rights as tangible assets. Upon commencement of commercial production, the mineral rights will be amortized using the unit-of-production method over the life of the mineral rights. If the Company does not continue with exploration after the completion of the feasibility study, the mineral rights will be expensed at that time.

The costs of acquiring mining properties are capitalized upon acquisition. Mine development costs incurred to develop and expand the capacity of mines, or to develop mine areas in advance of production are also capitalized once proven and probable reserves exist and the property is a commercially mineable property. Costs incurred to maintain current exploration or to maintain assets on a standby basis are charged to operations.  Costs of abandoned projects are charged to operations upon abandonment.  The Company evaluates the carrying value of capitalized mining costs and related property and equipment costs, to determine if these costs are in excess of their recoverable amount whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable.  Evaluation of the carrying value of capitalized costs and any related property and equipment costs are based upon expected future cash flows and/or estimated salvage value in accordance with Accounting Standards Codification (ASC) 360-10-35-15, *Impairment or Disposal of Long-Lived Assets*.

### d. Property and equipment

Property and equipment is stated at cost less accumulated depreciation. Depreciation is provided principally on the straight-line method over the estimated useful lives of the assets, which are generally 3 to 39 years. The cost of repairs and maintenance is charged to expense as incurred. Expenditures for property betterments and renewals are capitalized. Upon sale or other disposition of a depreciable asset, cost and accumulated depreciation are removed from the accounts and any gain or loss is reflected in other income (expense).

The Company periodically evaluates whether events and circumstances have occurred that may warrant revision of the estimated useful lives of property and equipment or whether the remaining balance of property and equipment should be evaluated for possible impairment. If events and circumstances warrant evaluation, the Company uses an estimate of the related undiscounted cash flows over the remaining life of the property and equipment in measuring their recoverability. The Company does not currently own any depreciable assets.

### e. Impairment of long-lived assets

The Company reviews and evaluates long-lived assets for impairment when events or changes in circumstances indicate the related carrying amounts may not be recoverable. The assets are subject to impairment consideration under ASC 360-10-35-17, *Measurement of an Impairment Loss*, if events or circumstances indicate that their carrying amount might not be recoverable. As of June 30, 2011, exploration progress is on target with the Company's exploration and evaluation plan and no events or circumstances have happened to indicate that the related carrying values of the properties may not be recoverable. When the Company determines that an impairment analysis should be done, the analysis will be performed using the rules of FASB ASC 930-360-35, *Asset Impairment*, and 360-10-15-3 through 15-5, *Impairment or Disposal of Long-Lived Assets*.

28

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

Various factors could impact our ability to achieve forecasted production schedules. Additionally, commodity prices, capital expenditure requirements and reclamation costs could differ from the assumptions the Company may use in cash flow models used to assess impairment. The ability to achieve the estimated quantities of recoverable minerals from exploration stage mineral interests involves further risks in addition to those factors applicable to mineral interests where proven and probable reserves have been identified, due to the lower level of confidence that the identified mineralized material can ultimately be mined economically.

Material changes to any of these factors or assumptions discussed above could result in future impairment charges to operations.

### f. Fair Value of Financial instruments

The Company adopted FASB ASC 820-10-50, "*Fair Value Measurements*. This guidance defines fair value, establishes a three-level valuation hierarchy for disclosures of fair value measurement and enhances disclosure requirements for fair value measures. The three levels are defined as follows:

> Level 1 inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.

> Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

> Level 3 inputs to valuation methodology are unobservable and significant to the fair measurement.

The carrying amounts reported in the balance sheet for the cash and cash equivalents, and current liabilities each qualify as financial instruments and are a reasonable estimate of fair value because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

### g. Environmental expenditures

The operations of the Company have been, and may in the future, be affected from time to time, in varying degrees, by changes in environmental regulations, including those for future reclamation and site restoration costs. Both the likelihood of new regulations and their overall effect upon the Company vary greatly and are not predictable. The Company's policy is to meet or, if possible, surpass standards set by relevant legislation, by application of technically proven and economically feasible measures.

Environmental expenditures that relate to ongoing environmental and reclamation programs are charged against earnings as incurred or capitalized and amortized depending on their future economic benefits. Estimated future reclamation and site restoration costs, when the ultimate liability is reasonably determinable, are charged against earnings over the estimated remaining life of the related business operation, net of expected recoveries. No costs have been, or may never be recognized by the Company for environmental expeditions.

29

**APP 0174**

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

**h. Income taxes**

The Financial Accounting Standards Board (FASB) has issued FASB ASC 740-10 (Prior authoritative literature: Financial Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - An Interpretation of FASB Statement No. 109 (FIN 48)). FASB ASC 740-10 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with prior literature FASB Statement No. 109, Accounting for Income Taxes. This standard requires a company to determine whether it is more likely than not that a tax position will be sustained upon examination based upon the technical merits of the position. If the more-likely-than- not threshold is met, a company must measure the tax position to determine the amount to recognize in the financial statements. As a result of the implementation of this standard, the Company performed a review of its material tax positions in accordance with recognition and measurement standards established by FASB ASC 740-10.

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

**i. Basic and diluted net loss per share**

The Company computes net loss per share of common stock in accordance with ASC 260, Earnings per Share ("ASC 260"). Under the provisions of ASC 260, basic net income (loss) per share is computed using the weighted average number of common shares outstanding during the period. Diluted net loss per share is computed using the weighted average number of common shares and, if dilutive, potential common shares outstanding during the period. Potential common shares consist of the incremental common shares issuable upon the exercise of stock options and warrants and the conversion of convertible promissory notes. Stock options of 6,500,000 at June 30, 2011 and warrants in the amount of 1,333,339 at June 30, 2010 and 1,633,334 at June 30, 2011were considered in the calculation but not included due to anti-dilution. The dilutive effect of these instruments is reflected in diluted earnings per share by application of the treasury stock method.

The Company's calculation of basic and diluted loss per share is as follows:

|  | | For the Years Ended | | |
| --- | --- | --- | --- | --- |
|  |  | June 30, 2011 |  | June 30, 2010 |
| Basic Earnings per share: |  |  |  |  |
| Income (Loss) (numerator) | $ | (1,464,253) | $ | (818,582) |
| Shares (denominator) |  | 69,733,334 |  | 69,733,334 |
| Per Share Amount | $ | (0.02) | $ | (0.01) |

30

**APP 0175**

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

| | | For the Years Ended | | |
| --- | --- | --- | --- | --- |
| | | June 30, 2011 | | June 30, 2010 |
| Fully Diluted Earnings per share: | | | | |
| Income (Loss) (numerator) | $ | (1,464,253) | $ | (818,582) |
| Shares (denominator) | | 69,733,334 | | 104,892,694 |
| Per Share Amount | $ | (0.02) | $ | (0.01) |

**j. Stock-Based compensation**

In December 2004, FASB issued FASB ASC 718 (Prior authoritative literature: SFAS No. 123R, *"Share-Based Payment")*. FASB ASC 718 establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. FASB ASC 718 focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. FASB ASC 718 requires that the compensation cost relating to share-based payment transactions be recognized in the financial statements. That cost will be measured based on the fair value of the equity or liability instruments issued.

**k. Use of estimates and assumptions**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. In these financial statements, assets, liabilities and earnings involve extensive reliance on management's estimates. Actual results could differ from those estimates. The Company's periodic filing with the Securities and Exchange Commission ("SEC") include, where applicable, disclosures of estimates, assumptions, uncertainties, and market that could affect the financial statements and future operations of the Company.

**l. Concentrations of credit risk**

The Company's financial instruments that are exposed to concentrations of credit risk primarily consist of its cash and related party payables. The Company places its cash and cash equivalents with financial institutions of high credit worthiness. At times, its cash equivalents with a particular financial institution may exceed any applicable government insurance limits. The Company's management also routinely assesses the financial strength and credit worthiness of any parties to which it extends funds and as such, it believes that any associated credit risk exposures are limited.

**m. Risks and uncertainties**

The Company operates in the resource exploration industry that is subject to significant risks and uncertainties, including financial, operational, and other risks associated with operating a resource exploration business, including the potential risk of business failure.

31

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

### n. Foreign currency translation

Comprehensive income is the total of (i) net income plus (ii) all other changes in net assets arising from non-owner sources, which are referred to as other comprehensive income. The company has presented a single statement of comprehensive income. An analysis of changes in components of accumulated other comprehensive income is presented below the total net income or loss on the income statement.

**Note 3 – New Technical Pronouncements**

Recent accounting standards - From time to time, new accounting pronouncements are issued by the FASB (Financial Accounting Standards Board) that are adopted by the Company as of the specified effective date. Unless otherwise discussed, management believes that the impact of recently issued standards did not or will not have a material impact on the Company's consolidated financial statements upon adoption.

Effective July 1, 2009, the FASB Accounting Standards Codification (ASC) (Topic 105, "Generally Accepted Accounting Principles"), became the single source for authoritative nongovernmental U.S. generally accepted accounting principles. Rules and interpretive releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants. The ASC does not change US GAAP but is intended to simplify user access to all authoritative U.S. GAAP by providing all the authoritative literature related to a particular topic in one place. Effective September 15, 2009, all public filings of the Company will reference the ASC as the sole source of authoritative literature.

In February 2010, the FASB issued ASU 2010-09, *Subsequent Events (Topic 855), Amendment to Certain Recognition and Disclosure Requirements*, to remove the requirement for SEC filers to disclose the date through which an entity has evaluated subsequent events. This change removes potential conflicts with current SEC guidance and clarifies the intended scope of the reissuance disclosure provisions. The update was effective upon its date of issuance, February 24, 2010, and the Company has adopted the amendments accordingly. As the update only pertained to disclosures, it had no impact on the Company's financial position, results of operations, or cash flows upon adoption.

In January 2010, the FASB issued ASU 2010-06, *Improving Disclosures About Fair Value Measurements*, which requires reporting entities to make new disclosures about recurring or nonrecurring fair value measurements including significant transfers into and out of Level 1 and Level 2 fair value measurements and information on purchases, sales, issuances, and settlements on a gross basis in the reconciliation of Level 3 fair value measurements. ASU 2010-6 is effective for annual reporting periods beginning after December 15, 2009, except for Level 3 reconciliation disclosures which are effective for annual periods beginning after December 15, 2010. The Company does not have any assets or liabilities classified as Level 3. The Company has adopted the Level 1 and Level 2 amendments accordingly. As the update only pertained to disclosures, it had no impact on the Company's financial position, results of operations, or cash flows upon adoption.

In March 2010, the FASB issued Accounting Standards Update ("ASU") No. 2010-11, which is included in the Codification under ASC 815, "Derivatives and Hedging" ("ASC 815"). This update clarifies the type of embedded credit derivative that is exempt from embedded derivative bifurcation requirements. Only an embedded credit derivative that is related to the subordination of one financial instrument to another qualifies for the exemption. This guidance is effective for interim and annual

32

**APP 0177**

## Liberty Silver Corp
Notes to the Financial Statement
June 30, 2011 and 2010

reporting periods beginning January 1, 2010. The adoption of ASU 2010-11 did not have a material impact on the Company's consolidated financial statements.

### Note 4 - Mineral Property

Pursuant to a mineral property purchase agreement dated May 24, 2007, the Company acquired a 100% undivided right, title and interest in a mineral claim, located in Section 8 of T35N, R36E Mount Diablo Base Meridian in Elko County, within the state of Nevada for a cash payment of $10,000. The Company must annually renew the lease on the land with the state for $1,800 and has not done renewed as fiscal year end, June 30, 2010. The lease has expired.

Since the Company has not established the commercial feasibility of the mineral claim, the acquisition costs have been capitalized. The Company has not depleted the mineral claims as no proven reserves have been found. The Company will not be able to keep the mineral claim in good standing due to lack of funding. The Company allowed the mineral claim to lapse at the end of June 2009. At June 30, 2009, the Company determined that there was little, or no, possibility of the company generating revenues related to the mining interests. This, coupled with the lapse of the mineral claims lease was determined to be an impairment of the asset. As such, the Company's management determined to fully impair the mining interests, which was a charge to the Company's statements of operations in the amount of $11,800.

On March 29, 2010, the Company entered into an Exploration Earn-In Agreement (the "Agreement") with AuEx Ventures, Inc., a Nevada corporation. The Agreement relates to the Trinity Silver property (the "Property") located in Pershing County, Nevada which consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.

Under the Agreement, the Company may earn-in a 70% undivided interest in the Property during a 6-year period in consideration of (1) a signing payment of $25,000, which has been made and has been capitalized, (2) an expenditure of a cumulative total of $5,000,000 in exploration and development expenses on the Property by March 29, 2016, and (3) completion of a bankable feasibility study on the Property on or before the 7th anniversary date of the Agreement.

The Company has begun financing to be in compliance with terms of the agreement. No actual mining has begun at this point.

### Note 5 – Related Party Payable

Effective April 1, 2011, Liberty Silver Corp. (the "Company") borrowed a total of $150,000 pursuant to the terms and conditions of promissory notes (individually referred to as a "Note" and collectively referred to as the "Notes") entered into with six of the Company's directors. Each Note is for $25,000 and is required to be repaid by the Company on the earlier of one year, or when the Company raises a minimum of $2,000,000 through equity investments. The Notes are interest free for the first six months following the date of the Note and then bear interest at a rate of 8% per annum thereafter. In conjunction with the entry into the Notes, in lieu of the holders charging the Company interest on the outstanding principal of the Notes for the initial six months, the Company issued each holder a warrant entitling the holder to purchase up to a total of 50,000 shares of the Company's common stock at price of $0.55 per share for a period of three (3) years following the date of the Note.

APP 0178

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

**Note 6 - Capital Stock and Warrants**

**Authorized**

The total authorized capital is 200,000,000 common shares with a par value of $0.001 per common share.

**Issued and outstanding**

In April 2007 the Company issued 4,000,000 and 1,000,000 shares of our common stock for cash at $0.001 and $0.01 per share, respectively.

In May 2007 the Company issued 420,000 shares of our common stock for cash at $0.05 per share.

In February 2010, the board of directors authorized a 20-for-1 forward stock split of the Company's currently issued and outstanding common stock. Prior to approval of the forward split the Company had a total of 5,420,000 issued and outstanding shares of $0.001 par value common stock. On the effective date of the forward split, the Company has a total of 108,400,000 issued and outstanding shares of $0.001 par value common stock. The stock split has been retroactively applied to all prior equity transactions.

In May 2010 the Company issued 1,333,334 shares of our common stock for cash at $0.75 per share. One warrant was received per each share purchased. The warrants expire in two years on May 6, 2012 and the investor can exercise their right to purchase more shares at a $1.25 per share. The warrants vest upon grant.

In May 2010, the president surrendered 40,000,000 of his common stock to the company.

At the year ended June 30, 2011 and 2010, the Company had 69,733,334 shares of the common stock issued and outstanding.

**Stock warrants**

In May 2010, the Company commenced a private stock offering, whereby it authorized the issuance of 1,333,334 units consisting of one share of its common stock and one common stock purchase warrant for a total raise of $1,000,000. The common stock purchase warrants are exercisable at $1.25 per share and carrying a two year exercise period. The offering was closed as of May 26, 2010. All 1,333,334 units were issued and $1,000,000 in cash was received.

The amount of warrant expense related to this offering for the year ending June 30, 2010 was $522,191. The expense was calculated using the Black-Scholes pricing model.

In April 2011, the Company borrowed $150,000 from related parties. In conjunction with each $25,000 note, the Company issued a warrant to purchase 50,000 share of the Company's common stock at $0.55 per share for a three year term, commencement on the date of the note. The total number of warrants for purchase is 300,000 shares.

The amount of warrant expense related to this related party payable for the year ending June 30, 2011 was $40,000. The expense was calculated using the Black-Scholes pricing model.

34

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

The following table summarizes information about warrants as of June 30, 2011:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, July 1, 2009 | - | $ | - |
| Warrants granted | 1,333,334 | | 1.25 |
| Warrants expired | - | | - |
| Warrants cancelled | - | | - |
| Outstanding, June 30, 2010 | 1,333,334 | $ | 1.25 |
| Exercisable, June 30, 2010 | 1,333,334 | $ | 1.25 |
| | | | |
| Outstanding, July 1, 2010 | 1,333,334 | | 1.25 |
| Warrants granted | 300,000 | | 0.55 |
| Warrants exercised | - | | - |
| Warrants cancelled | - | | - |
| Outstanding, June 30, 2011 | 1,633,334 | $ | 1.12 |
| Exercisable, June 30, 2011 | 1,633,334 | $ | 1.12 |

The following table summarizes information about stock warrants granted to employees, advisors, investors and board members at June 30, 2011:

| Warrants Outstanding | | | | Warrants Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life   (in years) | Number of Warrants | Weighted Average Exercise Price |
| $   1.25 | 1,333,334 | $   1.25 | .85 | 1,333,334 | $   1.25 |
| $   0.55 | 300,000 | $   0.55 | 2.75 | 300,000 | $   0.55 |

As of June 30, 2011, the aggregate intrinsic value of the warrants outstanding and exercisable was $0 and $0, respectively.  The weighted-average grant-date fair value of warrants granted for the year ended June 30, 2011 was $1.12.  The total fair value of shares vested during 2011 was 1,633,334 of warrants at fair market value on June 30, 2011.

**Stock options**

In October 2010, the Company granted to Geoff Browne, Chief Executive Officer, 3,000,000 stock options of the Company's common stock to be purchased at $0.75 per share for a 5 year term. In addition, the

35

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

Company granted the directors, Paul Haggis, Timothy Unwin, John Barrington, and George Kent, each 300,000 stock options, for a total of 1,200,000 of the Company's common stock to be purchased at $0.75 per share for a 5 year term.

In December 2010, the Company granted director W Thomas Hodgson 300,000 stock options the Company's common stock to be purchased at $0.75 per share for a 5 year term.

In April 2011, the Company granted incentive stock options of 800,000 shares Bill Tafuri, officer; 600,000 shares to Dick Klatt, consultant; 500,000 shares John Barrington, consultant; and 100,000 shares Kevin O'Connor, consultant. All these stock options are at $0.75 per share for a 5 year term.

The amount of stock option compensation expense for the year ending June 30, 2011 was $286,750. The expense was calculated using the Black-Scholes pricing model.

The following table summarizes information about options as of June 30, 2011:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, July 1, 2010 | - | $ | - |
| Options granted | 6,500,000 | | .75 |
| Options expired | - | | - |
| Options cancelled | - | | - |
| Outstanding, June 30, 2011 | 6,500,000 | $ | .75 |
| Exercisable, June 30, 2011 | 6,500,000 | $ | .75 |

The following table summarizes information about stock warrants granted to employees, advisors, investors and board members at June 30, 2011:

| Stock Options Outstanding | | | | Stock Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life    (in years) | Number of Options | Weighted Average Exercise Price |
| $    0.75 | 6,500,000 | $    0.75 | 4.19 | 6,500,000 | $    0.75 |

As of June 30, 2011, the aggregate intrinsic value of the stock options outstanding and exercisable was $0.  The weighted-average grant-date fair value of stock options granted for the year ended June 30, 2011 was $0.75.  The total fair value of shares vested during 2011 was 6,500,000 of stock options at fair market value on June 30, 2011.

36

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

**Note 7 - Income Taxes**

The Financial Accounting Standards Board (FASB) has issued FASB ASC 740-10 (Prior authoritative literature: Financial Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - An Interpretation of FASB Statement No. 109 (FIN 48)). FASB ASC 740-10 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with prior literature FASB Statement No. 109, Accounting for Income Taxes. This standard requires a company to determine whether it is more likely than not that a tax position will be sustained will be sustained upon examination based upon the technical merits of the position. If the more-likely-than- not threshold is met, a company must measure the tax position to determine the amount to recognize in the financial statements. As a result of the implementation of this standard, the Company performed a review of its material tax positions in accordance with recognition and measurement standards established by FASB ASC 740-10.

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

As of June 30, 2011, the Company had no accrued interest and penalties related to uncertain tax positions. The income tax provision differs from the amount of income tax determined by applying the U.S. federal and state income tax rates of 34% to pretax income from continuing operations for the years ended June 30, 2011 and 2010 due to the following:

Deferred tax assets and the valuation account are as follows:

|  |  | For the Years Ended June 30, | | |
|---|---|---|---|---|
|  |  | 2011 |  | 2010 |
| **Deferred tax asset:** |  |  |  |  |
| Net operating loss carryforward | $ | 794,829 | $ | 296,983 |
| Valuation allowance |  | (794,829) |  | (296,983) |
| Total | $ | - | $ | - |

The components of income tax expense are as follows:

|  |  | For the Years Ended June 30, | | |
|---|---|---|---|---|
|  |  | 2011 |  | 2010 |
| Current Federal tax | $ | - | $ | - |
| Current State tax |  | - |  | - |

37

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

| | | | | |
|---|---|---:|---|---:|
| Change in NOL benefit | | 497,846 | | 278,318 |
| Change in valuation allowance | | (497,846) | | (278,318) |
| Total | $ | - | $ | - |

The potential income tax benefit of these losses has been offset by a full valuation allowance.

As at June 30, 2011 and 2010, the Company has an unused net operating loss carry-forward balance of $2,337,733 and $873,480 that is available to offset future taxable income. This unused net operating loss carry-forward balance begins to expire in 2028.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | | | | |
|---|---|---:|---|---:|
| | | **Years Ended June 30,** | | |
| | | **2011** | | **2010** |
| Beginning balance | $ | - | $ | - |
| Additions based on tax positions related to current year | | - | | - |
| Additions for tax positions of prior years | | - | | - |
| Reductions for tax positions of prior years | | - | | - |
| Reductions in benefit due to income tax expense | | - | | - |
| Ending balance | $ | - | $ | - |

At June 30, 2011 and 2010, the Company had no unrecognized tax benefits that, if recognized, would affect the effective tax rate.

The Company did not have any tax positions for which it is reasonably possible that the total amount of unrecognized tax benefits will significantly increase or decrease within the next 12 months.

As of June 30, 2011 and 2010, the Company had no accrued interest or penalties related to uncertain tax positions.

The tax years that remain subject to examination by major taxing jurisdictions are those for the years ended June 30, 2011, 2010 and 2009.

**Note 8 – Going Concern**

These financial statements have been prepared on a going concern basis. The Company has incurred losses since inception resulting in an accumulated deficit of $2,337,733 and further losses are anticipated in the development of its business. This raises substantial doubt about the Company's ability to continue as a going concern. Its ability to continue as a going concern is dependent upon the ability of the Company to generate profitable operations in the future and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due.

Management has plans to seek additional capital through a private placement and public offering of its common stock. These financial statements do not include any adjustments relating to the recoverability and

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2011 and 2010

classification of recorded assets, or the amounts of and classification of liabilities that might be necessary in the event the Company cannot continue in existence.

The ability of the Company to emerge from the exploration stage is dependent upon, among other things, obtaining additional financing to continue operations, explore and develop the mineral properties and the discovery, development, and sale of reserves.

These factors, among others raise substantial doubt about the Company's ability to continue as a going concern. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Note 9 – Subsequent events**

Subsequent to the fiscal year ended June 30, 2011, on September 8, 2011, the Company, concluded a private placement offering, pursuant to which the Company raised a total of Cdn$660,000 through the sale of 1,200,000 Units at a purchase price of Cdn$0.55 per Unit.  Each Unit consists of one common share in the capital of the Company (each, a "Share") and one half of one Share purchase warrant (each whole such warrant, a "Warrant").  Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of $0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.  For the above share issuances, the shares were not registered under the Securities Act of 1933 (the "Securities Act") in reliance upon the exemptions from registration contained in Regulation S of the Securities Act.

Liberty Silver Corp has evaluated subsequent events for the period June 30, 2011 through the date the financial statements were issued, and concluded, aside from the foregoing, there were no other events or transactions occurring during this period that required recognition or disclosure in its financial statements.

**APP 0184**

**ITEM 9.      CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

As disclosed on Form 8-K filed with the SEC on February 4, 2011, the Company changed accountants.  We have not had any disagreements with our accountants required to be disclosed pursuant to Item 304 of Regulation S-K.

**ITEM 9A.   CONTROLS AND PROCEDURES.**

**Disclosure Controls and Procedures**

The Securities and Exchange Commission defines the term "disclosure controls and procedures" to mean a company's controls and other procedures of an issuer that are designed to ensure that information required to be disclosed in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.  The Company maintains such a system of controls and procedures in an effort to ensure that all information which it is required to disclose in the reports it files under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified under the SEC's rules and forms and that information required to be disclosed is accumulated and communicated to principal executive and principal financial officers to allow timely decisions regarding disclosure.

As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures.  Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are designed to provide reasonable assurance of achieving the objectives of timely alerting them to material information required to be included in our periodic SEC reports and of ensuring that such information is recorded, processed, summarized and reported with the time periods specified.  Our chief executive officer and chief financial officer also concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report to provide reasonable assurance of the achievement of these objectives.

**Internal Control Over Financial Reporting**

The management of the Company is responsible for the preparation of the financial statements and related financial information appearing in this Annual Report on Form 10-K. The financial statements and notes have been prepared in conformity with accounting principles generally accepted in the United States of America. The management of the Company also is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. A company's internal control over financial reporting is defined as a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit

40

preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Management, including the Chief Executive Officer and Chief Financial Officer, does not expect that the Company's disclosure controls and internal controls will prevent all error and all fraud. Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable, not absolute, assurance that the objectives of the control system are met and may not prevent or detect misstatements. Further, over time control may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate.

With the participation of the Chief Executive Officer and Chief Financial Officer, our management evaluated the effectiveness of the Company's internal control over financial reporting as of June 30, 2011 based upon the framework in Internal Control –Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, our management has concluded that, as of June 30, 2011, the Company's internal control over financial reporting was not effective.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report is not subject to attestation by the Company's registered public accounting firm.

There was no change in the Company's internal control over financial reporting during the last fiscal quarter, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

## ITEM 9B.    OTHER INFORMATION.

None.

## PART III
{tc \l 0 "0000000000000000000000000000003PART III"}
## ITEM 10.         DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE.

### Directors and Executive Officers

The following table sets forth the our directors, executive officers, promoters and control persons, their ages, and all offices and positions held within the Company as of June 30, 2011.  Directors are elected for a period of one year and thereafter serve until their successor is duly elected by the stockholders and qualified.  Officers and other employees serve at the will of the board of directors.

| Name | Age | Present Position With the Company | Director Since |
|---|---|---|---|
| Geoffe Browne | 58 | Chief Executive Officer, Director | October 2010 |
| John Pulos | 45 | Chief Financial Officer, Director | February 2007 |
| Bill Tafuri | 70 | Chief Operating Officer, Director | October 2010 |
| John Barrington | 66 | Director | October 2010 |
| George Kent | 81 | Director | October 2010 |
| Paul Haggis | 59 | Director | October 2010 |

41

| Tim Unwin | 68 | Director | October 2010 |
| Tom Hodgson | 58 | Director | December 2010 |
| Dick Klatt | 75 | Vice President of Exploration | October 2010 |

**Biographical Information**

Geoffe Browne. Mr. Browne has over 30 years of experience in the financial services industry in Canada, the U.S and London, England.  He was head of private equity for Merrill Lynch Canada and he is a founder and Managing Partner of MWI & Partners, a private equity firm. Prior to founding MWI, Mr. Browne was a senior executive with Canadian Imperial Bank of Commerce and CIBC Wood Gundy Inc. for over 20 years.  The last position he held at CIBC was Chief of Staff for CIBC World Markets. Mr. Browne is active on numerous other corporate and not-for-profit Boards, and is one of three independent members of the Investment Review Committee of UBS Global Asset Management (Canada) Co. Mr. Browne is holds a B.A. in economics from the University of Western Ontario.

John Pulos.  Mr. Pulos has been involved in the real estate market for the past 20 years.  Focus has been on development, investment and obtaining land entitlements all over United States and Canada.  Current deals have included a purchase and resale of a 12 building portfolio of retail space as well as numerous acquisitions of undervalued residential projects in the southern California market.  Mr. Pulos obtained his Bachelor of Arts in Political Science from the University of Washington and a Masters of Science in Real Estate Finance at New York University.

Bill Tafuri. Mr. Tafuri has a Ph.D. in geology and over 35 years of diverse mining and exploration experience in precious and base metals. He has worked for a number of major international mining companies and has held management positions in both domestic and foreign locations for Getty Mining Co., Santa Fe Pacific Gold Corp., and Kinross Gold Corp. He has extensive consulting experience, both domestic and foreign. He has extensive exploration and mine development experience in the USA, Central Asia, and Russia. Since 2004 he has acted as the Exploration Vice President of Centrasia Mining Corp. acquiring properties and conducting exploration for base and precious metals in Central Asia. Mr. Tafuri received his B.S. and M.S. degrees in geology at the University of Nevada-Reno and his Ph.D. in geology at the University of Utah.

Paul Haggis. Mr. Haggis has had a career in structuring, organizing various business enterprises, including being the President and CEO of OMERS one of Canada's largest pension plans which under his leadership grew to more than $48 Billion dollars in assets from 2004 until 2007. Currently Mr. Haggis is Chairman of the Alberta Enterprise Corporation a venture capital fund which expects to have $300 million dollars for first stage ventures. He is also an active director of Canadian Tire Bank, Chair of the Audit Committee of Advantage Energy of Calgary, Director and Audit Committee Chair of Prime Restaurants Inc., and is a Trustee and Chair of the Finance Committee of the Royal Ontario Museum. In Addition Paul has overseen and is actively engaged in the investment program at ICBC as Chair of the Investment Committee.

Timothy Unwin. Mr. Unwin is a partner Emeritus at Blake, Cassels & Graydon LLP in Toronto. He has worked as a corporate and securities lawyer. Previously, Mr. Unwin was the U.S. Managing Partner at Blakes, working out of its New York office and was also the Office Managing Partner at the Blakes office in London, England. Mr. Unwin is a graduate of the director's education program at the Institute of Corporate Directors at the Rotman School of Management, University of Toronto and is an institute certified director (ICD.D). Mr. Unwin is a member and immediate past Chairman of the board of directors of the Toronto Community Foundation and is a former trustee of Charter Real Estate Investment Trust.

John Barrington.  Mr. Barrington worked in the mining industry at such projects as the Opemiska Mine in

42

Chapais Que and the Lorraine mine in Belleterre Que. Mr. Barrington also worked at TransCanada Pipelines and the Ontario Ministry of Transportation and Communications, where he was head of the Financial Planning Unit. Subsequently Mr. Barrington was one of the founders of the Uxmal Communications partnership, and among many other investments and acquisitions in Canada and the U.S. bought, turned around and later sold Comac which at the time was Canada's third largest consumer magazine company.

George Kent. Mr. Kent has been engaged in worldwide exploration, mining, financing and education for decades, having spent significant periods of time with major and minor public companies and five years with the United Nations. Mr. Kent has been chief geologist or manager on numerous projects around the world and is currently President of George R. Kent & Associates Ltd. which is engaged in geological and mining consulting worldwide, assisting in public company formation, directorships, management and public relations.

W. Thomas Hodgson. In addition to serving as a director of the Registrant, Mr. Hodgson is currently Senior Partner and Chairman of Greenbrook Capital Partners Inc., a financial advisory firm, and until May 2011, acted as a consultant and advisor to the Chairman Magna International group, one of the world's largest automotive companies, having a particular specialization in sourcing venture investment opportunities for the company.  Mr. Hodgson has over twenty years experience in capital markets research, corporate advisory matters and consulting.  He is currently a director of Helix Biopharma Corp. and Lithium Americas Corp., has been a board member of MI Developments Inc., and was Director, President and Chief Executive Officer of Magna Entertainment Corp. from March 2005 to March 2006.  From November 2002 to March 2005, Mr. Hodgson was President of Strategic Analysis Corporation.  Prior to that, Mr. Hodgson held senior positions with Canadian financial institutions and U.K. companies, including Canadian Imperial Bank of Commerce, Canada Permanent Trust Co. Central Guaranty Trust, where he served as President and Chief Executive Officer, Marathon Asset Management Inc., where he served as President, and GlobalNetFinancial.com, where he served as Chief Operating Officer and then as President and Chief Executive Officer.  Mr. Hodgson holds an MBA from Queen's University, Kingston, Ontario.

H  Richard 'Dick' Klatt. Mr. Klatt currently serves as vice president of exploration for the Company.  Mr. Klatt has over 40 years of diverse mining and exploration experience in precious and base metals.  He has worked for a number of major mining companies.  From 2007 through 2009 he served as contract exploration manager of Yellowcake Mining, Inc., Las Vegas Nevada, during which time he organized and oversaw exploration drilling for uranium in the Uravan mineral belt, Colorado.  From 2006 through 2007 he worked as a consulting minerals exploration geologist during which time he: (i) completed an economic geology review of the La Sal uranium district for Superior Uranium, Moab, Utah; (ii) completed extensive lithology-logging for base and precious metals for a drill program at the south rim of the Bingham copper mine, Utah, for Grand Central Silver Mines, Carrollton, Texas; (iii) directed a 2,100 feet diamond drilling program for gold and cobalt in the Belt-Percell basin, eastern Idaho, for Salmon River Resources, Vancouver, British Columbia, Canada; (iv) completed a 6,000 feet diamond drilling program for zinc in western Utah for Franconia Minerals Corp., Spokane, Washington; and (v) Directed a 6,000 m rotary drilling program for uranium in western Colorado for U.S. Energy,  Riverton, Wyoming.  From 2004 through 2005, he worked as a consulting minerals exploration geologist for Kennecott Exploration Company located in Salt Lake City, Utah.  During this time he also oversaw initial development drilling for vein-hosted base metals in the Zacatecas district, Zacatecas, Mexico, for Capstone Gold, Vancouver, British Columbia, Canada.  Mr. Klatt received his B.S. degree in geology at the University of Illinois, Urbana, Illinois.

**Family Relationships**

43

**APP 0188**

There are no family relationships between any of the current directors or officers of the Company.

**Involvement in Certain Legal Proceedings**

To the best of its knowledge, the Company's directors and executive officers were not involved in any legal proceedings during the last ten years as described in Item 401(f) of Regulation S-K.

**Directorships**

None of the Company's executive officers or directors is a director of any company with a class of equity securities registered pursuant to Section 12 of the Securities exchange Act of 1934 (the "Exchange Act") or subject to the requirements of the Exchange Act or any company registered as an investment company under the Investment Company Act of 1940.

**Code of Ethics**

Our board of directors has adopted a code of ethics that will apply to its principal executive officer, principal financial officer and principal accounting officer or controller and to persons performing similar functions. The code of ethics is designed to deter wrongdoing and to promote honest and ethical conduct, full, fair, accurate, timely and understandable disclosure, compliance with applicable laws, rules and regulations, prompt internal reporting of violations of the code and accountability for adherence to the code. We will provide a copy of our code of ethics, without charge, to any person upon receipt of written request for such delivered to our corporate headquarters. All such requests should be sent care of Liberty Silver Corp, Attn: Corporate Secretary, 181 Bay Street, Suite 2330, Toronto, Ontario, Canada, M5J3T3.

**ITEM 11.        EXECUTIVE COMPENSATION.**

**Summary Compensation Table**

The following table sets forth, for the years indicated, all compensation paid, distributed or accrued for services, including salary and bonus amounts, rendered in all capacities by the Company's principal executive officer, chief financial officer and all other executive officers; the information contained below represents compensation paid to the Company's officers for their work related to the Company.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Award(s) ($) | Option Award(s) ($) | Non-Equity Incentive Plan Compensation (#) | Non-qualified Deferred Compensation Earnings ($) | All other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Geoff Browne CEO | 2011 | 166,667 | -- | -- | -- | -- | 99,999 | 16,670 | 131,669 |
| | 2010 | -- | -- | -- | 1,050,000(2) | -- | -- | 50,004 | 50,004 |
| Bill Tafuri, President, COO | 2011 | 120,000 | -- | -- | 224,000(2) | -- | 50,000 | 20,000 | 70,000 |
| | 2010 | -- | -- | -- | -- | -- | -- | 70,000 | 70,000 |
| John Pulos, CFO | 2011 | -- | -- | -- | -- | -- | -- | -- | -- |
| | 2010 | -- | -- | -- | -- | -- | -- | -- | -- |
| Dick Klatt(1) | 2011 | 93,600 | -- | -- | 168,000(2) | -- | -- | -- | -- |
| | 2010 | -- | -- | -- | -- | -- | -- | -- | -- |

(1) Dick Klatt serves as the vice president of exploration of the Company.
(2) Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a discussion please refer to Note 6 in the Notes to the Financial Statements herein.

44

**Grant of Plan Based Awards**

The following table provides a summary of equity awards granted to our executive officers during the fiscal year ended June 30, 2011.

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stocks or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | |
| Geoff Browne | October 18, 2010 | -- | -- | -- | -- | -- | -- | | 3,000,000 | .75 | 1,050,000(1) |
| William Tafuri | April 19, 2011 | -- | -- | -- | -- | -- | -- | | 800,000 | .75 | 224,000(1) |
| John Pulos | -- | -- | -- | -- | -- | -- | -- | | -- | -- | -- |
| Dick Klatt | April 19, 2011 | -- | -- | -- | -- | -- | -- | | 600,000 | .75 | 168,000(1) |

(1) Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a discussion please refer to Note 6 in the Notes to the Financial Statements herein.

**Outstanding Stock Options Awards At Fiscal Year End.**

The following table provides a summary of equity awards outstanding at June 30, 2011, for each of our named executive officers.

| Name | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Geoff Browne | 3,000,000 | -- | -- | .75 | October 18, 2015 | -- | -- | -- | -- |
| William Tafuri | 266,664 | 533,336 | -- | .75 | April 19, 2016 | -- | -- | -- | -- |
| Dick Klatt | 200,000 | 400,000 | -- | .75 | April 19, 2016 | -- | -- | -- | -- |

There were no options or other derivative securities exercised in fiscal 2011 by our named executive officers.  In addition, there were no shares acquired by our named executive officers upon the vesting of restricted stock.

**Long-Term Incentive Plans**

We do not have any long-term incentive plans, pension plans, or similar compensatory plans for our directors or executive officers.

APP 0190

**Change of Control Agreements**

We are not party to any change of control agreements with any of our directors or executive officers.

**Employment Agreement**

On October 18, 2010, the Board of Directors of the Company, engaged Geoff Browne to serve as the Chief Executive Officer of the Company, and appointed Mr. Browne to serve as a director of the Company to fill an existing vacancy on the Board. In conjunction with the Company's engagement of Mr. Browne, on October 18, 2010, the Company entered into an employment agreement (the "Employment Agreement") with Mr. Browne for an unfixed term, pursuant to which the Company agreed to employ Mr. Browne as the Chief Executive Officer of the Company. Pursuant to the terms of the Employment Agreement, Mr. Browne is paid an annual salary of $200,000, as well as an annual discretionary performance bonus for his services rendered as the Chief Executive Officer; the amount of the performance bonus is at the discretion of the Company's Board of Directors. The Employment Agreement may be terminated by Mr. Browne upon thirty (30) days notice, or by the Company pursuant to enumerated circumstances set forth in the Employment Agreement. In conjunction with the entry into the Employment Agreement, the Company granted Mr. Browne stock options to acquire up to 3,000,000 shares of restricted common stock of the Company at a price of $.75 per share pursuant to the terms of a Stock Option Agreement which was attached to the Employment Agreement as Exhibit A. The foregoing description of the Employment Agreement and Stock Option Agreement is qualified in its entirety by reference to the Employment Agreement and the accompanying Stock Option Agreement which were filed as Exhibit 10.3 to Form 8-K filed with the Securities and Exchange Commission on October 19, 2010 and is hereby incorporated by reference.

**Equity Compensation Plan Information**

As disclosed on Form 8-K filed with the Securities and Exchange Commission on May 3, 2011, on April 19, 2011, subject to shareholder approval, the Board of Directors of Liberty Silver Corp. (the "Company") approved the adoption of the Liberty Silver Corp. Incentive Share Plan (the "Plan") under which common shares of the Company's common stock have been reserved for purposes of possible future issuance of incentive stock options, non-qualified stock options, and stock grants to employees, directors and certain key individuals. Under the Plan, the maximum number of common shares reserved for issuance shall not exceed 10% of the common shares of the Company outstanding from time to time. The purpose of the Plan shall be to advance the interests of the Company by encouraging equity participation in the Company through the acquisition of common shares of the Company. In order to maintain flexibility in the award of stock benefits, the Plan constitutes a single plan, but is composed of two parts. The first part is the Share Option Plan which provides grants of both incentive stock options under Section 422A of the Internal Revenue Code of 1986, as amended, and nonqualified stock options. The second part is the Share Bonus Plan which provides grants of shares of Company common stock. The foregoing description of the Plan is qualified in its entirety by reference to the Liberty Silver Corp. Incentive Share Plan which was filed as Exhibit 10.9 to Form 8-K filed with the Securities and Exchange Commission on May 3, 2011 and is hereby incorporated by reference.

<u>**Director Compensation**</u>

The general policy of the Board is that compensation for independent directors should be equity-based compensation. Additionally, we reimburse our directors for reasonable expenses incurred during the course of their performance. We have no long-term incentive or medical reimbursement plans. The Company does not pay employee directors for Board service in addition to their regular employee

46

compensation.  The Board determines the amount of director compensation.

| Director | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) (1) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Geoff Browne | -- | -- | -- | -- | -- | -- | -- |
| William Tafuri | -- | -- | -- | -- | -- | -- | -- |
| John Pulos | -- | -- | -- | -- | -- | -- | -- |
| John Barrington | 70,500(2) | --- | $ 90,000(1) | --- | --- | --- | $ 90,000 |
| George Kent | -- | --- | $ 93,000(1) | --- | --- | --- | $ 93,000 |
| Timothy Unwin | -- | --- | $ 93,000(1) | --- | --- | --- | $ 93,000 |
| Paul Haggis | -- | --- | $ 93,000(1) | --- | --- | --- | $ 93,000 |
| W. Thomas Hodgson | -- | --- | $ 42,000(1) | --- | --- | --- | $ 42,000 |

(1)     Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a discussion please refer to Note 6 in the Notes to the Financial Statements herein.

(2)     This figure represents fees paid to John Barrington for consulting services rendered to the Company, not in his capacity as a director.

## ITEM 12.     SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table sets forth as of September 29, 2011, the name and the number of shares of our common stock, par value $0.001 per share, held of record or beneficially by each person who held of record, or was known by us to own beneficially, more than 5% of the issued and outstanding shares of our common stock, and the name and shareholdings of each director and of all executive officers and directors as a group.

| Title and Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of class{tc "Percent of Class"} |
|---|---|---|---|
| Common | Geoff Browne(1) 181 Bay Street, Suite 2330 Toronto,Ontario, Canada, M5J3T3 | 2,000,000 | 2.9% |
| Common | William Tafuri(1) 675 Sierra Rose Drive, Suite 112 Reno, NV  89511 | 2,000,000 | 2.9% |
| Common | John Pulos(1) 675 Sierra Rose Drive, Suite 112 Reno, NV  89511 | 10,000,000 | 14.3% |

47

**APP 0192**

| Common | John Barrington(1)<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J3T3 | 1,000,000 | 1.4% |
| Common | George Kent(1)<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J3T3 | 1,000,000 | 1.4% |
| Common | Timothy Unwin(1)<br>181 Bay Street, Suite 2330<br>Toronto ,Ontario, Canada, M5J3T3 | 1,000,000 | 1.4% |
| Common | Paul Haggis(1)<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J3T3 | 1,000,000 | 1.4% |
| Common | W. Thomas Hodgson(1)<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J3T3 | 1,000,000 | 1.4% |
| Common | H. Richard Klatt(1)<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J3T3 | 1,000,000 | 1.4% |
| Common | All Directors and Executive Officers as a Group ( 9 in number) | 20,000,000 | 20,000,000 |

(1) Director or Officer of Company

## ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

### Certain Relationships and Related Transactions

{tc   \l 0  "00000000000000000000000000000005ITEM  12.   CERTAIN  RELATIONSHIPS  AND RELATED TRANSACTIONS"}

As disclosed on Form 8-K filed with the SEC on May 3, 2011, effective April 1, 2011, the Company borrowed a total of $150,000 pursuant to the terms and conditions of promissory notes (individually referred to as a "Note" and collectively referred to as the "Notes") entered into with six of the Company's directors.  Each Note was for $25,000 and is required to be repaid by the Company on the earlier of one year, or when the Company raises a minimum of $2,000,000 through equity investments.   The Notes are interest free for the first six months following the date of the Note and then bear interest at a rate of 8% per annum thereafter.   In conjunction with the entry into the Notes, in lieu of the holders charging the Company interest on the outstanding principal of the Notes for the initial six months, the Company issued each holder a warrant entitling the holder to purchase up to a total of 50,000 shares of the Company's common stock at price of $0.55 per share for a period of three (3) years following the date of the Note.

Aside from the foregoing, there were no material transactions, or series of similar transactions, during our Company's last fiscal year, or any currently proposed transactions, or series of similar transactions, to which our Company was or is to be a party, in which the amount involved exceeded the lesser of $120,000 or one percent of the average of the small business issuer's total assets at year-end for the last three completed fiscal years and in which any director, executive officer or any security holder who is known to us to own of record or beneficially more than five percent of any class of our common stock, or any member of the immediate family of any of the foregoing persons, had an interest.

### Director Independence

48

The NASDAQ Stock Market has instituted director independence guidelines that have been adopted by the Securities & Exchange Commission.  These guidelines provide that a director is deemed "independent" only if the board of directors affirmatively determines that the director has no relationship with the company which, in the board's opinion, would interfere with the director's exercise of independent judgment in carrying out his or her responsibilities.  Significant stock ownership will not, by itself, preclude a board finding of independence.

For NASDAQ Stock Market listed companies, the director independence rules list six types of disqualifying relationships that preclude an independence filing.  The Company's board of directors may not find independent a director who:

1.      is an employee of the company or any parent or subsidiary of the company;

2.      accepts, or who has a family member who accepts, more than $60,000 per year in payments from the company or any parent or subsidiary of the company other than (a) payments from board or committee services; (b) payments arising solely from investments in the company's securities; (c) compensation paid to a family member who is a non-executive employee of the company' (d) benefits under a tax qualified retirement plan or non-discretionary compensation; or (e) loans to directors and executive officers permitted under Section 13(k) of the Exchange Act;

3.      is a family member of an individual who is employed as an executive officer by the company or any parent or subsidiary of the company;

4.      is, or has a family member who is, a partner in, or a controlling shareholder or an executive officer of, any organization to which the company made, or from which the company received, payments for property or services that exceed 5% of the recipient's consolidated gross revenues for that year, or $200,000, whichever is more, other than (a) payments arising solely from investments in the company's securities or (b) payments under non-discretionary charitable contribution matching programs;

5.      is employed, or who has a family member who is employed, as an executive officer of another company whose compensation committee includes any executive officer of the listed company; or

6.      is, or has a family member who is, a current partner of the company's outside auditor, or was a partner or employee of the company's outside auditor who worked on the company's audit.

Based upon the foregoing criteria, our Board of Directors has determined that Geoff Browne, Bill Tafuri and John Pulos, John Barrington are not independent directors under these rules as they is also employed as officers or consultants of the Company.

## ITEM 14.        PRINCIPAL ACCOUNTING FEES AND SERVICES

### Audit Fees

(1)      Morrill & Associates served as the Company's independent registered public accounting firm for the years ended June 30, 2011 and 2010, and is expected to serve in that capacity for the current year. Principal accounting fees for professional services rendered for the Company by Morrill & Associates for the year ended June 30, 2011 and 2010, are summarized as follows:

|       | 2011 |        | 2010 |        |
|-------|------|--------|------|--------|
| Audit | $    | 23,000 | $    | 11,213 |

49

**APP 0194**

| | | | | | |
|---|---|---|---|---|---|
| Audit related | $ | 0 | $ | 0 |
| Tax | $ | 0 | $ | 0 |
| All other | $ | 0 | $ | 0 |
| Total | $ | 23,000 | $ | 11,213 |

**Audit Related Fees**

(2)      Audit fees were for professional services rendered in connection with our annual financial statement audits and quarterly reviews of financial statements for filing with the Securities and Exchange Commission.

**Tax Fees**

(3)      Tax fees related to services for tax compliance and consulting.

**All Other Fees**

 (4)      Other fees were for EDGAR filing services provided to the Company.

**Audit Committee's Pre-approval Policies and Procedures**

(5)      At our regularly scheduled and special meetings, our board of directors, in lieu of an established audit committee, considers and pre-approves any audit and non-audit services to be performed by our independent registered public accounting firm. The board of directors has the authority to grant pre-approvals of non-audit services.

**PART IV**

**ITEM 15.        EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

(a)      Exhibits.

3.1      Articles of Incorporation (incorporated by reference from exhibit to Form S-1 filed with the Securities and Exchange Commission on April 1, 2008).

3.1      Articles of Amendment (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on February 12, 2008).

3.2      Bylaws (incorporated by reference from exhibit to Form S-1 filed with the Securities and Exchange Commission on April 1, 2008).

3.2      Amended Bylaws (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 25, 2010).

10.1      Mineral Property Purchase Agreement corporation (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on April 1, 2008).

50

**APP 0195**

10.2     Exploration Earn-In Agreement dated March 29, 2010, by and between Liberty Silver Corp, a Nevada corporation, and AuEx Ventures, Inc., a Nevada corporation (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on April 5, 2010).

10.3     Employment Agreement and accompanying Stock Option Agreement, dated October 18, 2010, by and between Liberty Silver Corp. and Geoff Browne (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 19, 2010).

10.4     Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and Paul Haggis (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.5     Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and Timothy Unwin (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.6     Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and John Barrington (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.7     Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and George Kent (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.8     Stock Option Agreement dated December 6, 2010 by and between Liberty Silver Corp. and W. Thomas Hodgson (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on December 6, 2010).

10.9     Liberty Silver Corp. Incentive Share Plan (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 3, 2011).

10.10    Liberty Silver Corp. Incentive Stock Option Agreement dated April 19, 2011 between Liberty Silver Corp. and Bill Tafuri (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 5, 2011).

10.11    Liberty Silver Corp. Non-Qualified Stock Option Agreement dated April 19, 2011 between Liberty Silver Corp. and John Barrington ((incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 5, 2011).

31.1     Certifications pursuant to Rule 13a-14(a) or 15d-14(a) under the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

31.2     Certifications pursuant to Rule 13a-14(a) or 15d-14(a) under the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

51

32.1    Certifications pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

32.2    Certifications pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

101     SCH XBRL Schema Document.*

101     CAL XBRL Taxonomy Extension Calculation Linkbase Document.*

101     LAB XBRL Taxonomy Extension Label Linkbase Document.*

101     PRE XBRL Taxonomy Extension Presentation Linkbase Document.*

101     DEF XBRL Taxonomy Extension Definition Linkbase Document.*


* Filed Herewith

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.


By: /s/ John Pulos
        John Pulos, Chief Financial Officer

Date:  October 13, 2011

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

By: /s/ Geoff Browne
        Geoff Browne, Director

Date:  October 13, 2011


By: /s/ Bill Tafuri
        Bill Tafuri, Director

Date:  October 13, 2011

By: /s/ John Pulos
        John Pulos, Director

Date:  October 13, 2011

52

APP 0197

By: /s/ John Barrington
      John Barrington, Director

Date:  October 13, 2011

By: /s/ Tom Hodgson
      Tom Hodgson, Director

Date:  October 13, 2011

**APP 0198**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

[ X ] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the Fiscal Year Ended June 30, 2012

[] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

# LIBERTY SILVER CORP.

(Exact name of registrant as specified in its charter)

| Nevada | 333-150028 | 32-0196442 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**181 Bay Street, Suite 2330**
**Toronto, Ontario, Canada, M5J 2T3**
(Address of principal executive offices)

Registrant's telephone number, including area code: **888-749-4916**

Securities registered under Section 12(b) of the Exchange Act:         None
Securities registered under Section 12(g) of the Exchange Act:         None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act [] Yes [ X ] No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the [ ]Yes [ X ] No

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. [X] Yes [ ] No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). [X] Yes [ ] No.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and smaller reporting company" in Rule 12b-2 of the Exchange Act.

APP 0199

Large accelerated filer [ ]                                           Accelerated filer [ ]
Non-accelerated filer [ ]  (Do not check if a smaller reporting company)     Smaller reporting company [ X ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). [ ] Yes  [X ] No

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of the last business day of the registrant's most recently completed second fiscal quarter $58,408,817.

As of September 28, 2012, the Company had 80,710,834 shares issued and outstanding.

2

**APP 0200**

## PART I

**ITEM 1.**          **BUSINESS**

### The Corporation

Liberty Silver Corp. ("Liberty Silver", the "Company", or the "Registrant") was incorporated on February 20, 2007 under the laws of the state of Nevada under the name Lincoln Mining Corp.  Pursuant to a Certificate of Amendment dated February 11, 2010, the Company changed its name to Liberty Silver Corp.  The Company's registered office is located at 1802 N. Carson Street, Suite 212, Carson City Nevada 89701, and its head office is located at 181 Bay Street, Suite 2330, P.O. Box 848, Toronto, Ontario, Canada, M5J 2T3, and the telephone number is 888-749-4916.

### Current Operations

Overview

The Company was incorporated for the purpose of engaging in mineral exploration activities, and on May 24, 2007, purchased the Zone Lode mining claim located in Elko County, Nevada, for a purchase price of $10,000.  The objective was to conduct mineral exploration activities on the Zone Lode claim to assess whether it contained economic reserves of copper, gold, silver, molybdenum or zinc.  The Company was not able to determine whether this property contained reserves that were economically recoverable and as a result, ceased to explore this property.  The Company's current business operations are focused on exploring and developing the Trinity Silver property located in Pershing County, Nevada (the "Trinity Project").

The Company acquired its interest in the Trinity Project through an Exploration Earn-In Agreement (the "Earn-In Agreement"), discussed below in Item 2 - Properties.  On March 29, 2010, the Company entered into the Earn-In Agreement relating to the Trinity Project with AuEx, Inc., a Nevada company providing the Company with a right to earn a 70% undivided interest in rights of AuEx, Inc. in the Trinity Project (the "70% Interest"); as discussed below, the 70% Interest is subject to the rights and obligations of AuEx, Inc. and its successors and assigns under a Minerals Lease and Sublease between AuEx, Inc. and Newmont Mining USA Limited.  AuEx, Inc. is beneficially owned by another Nevada company AuEx Ventures, Inc. AuEx, Inc. held an exclusive interest in the Trinity Project by way of a Minerals Lease and Sublease with Newmont Mining USA Limited, a Delaware corporation who owns or leases the various unpatented mining claims and portions of private land comprising the Trinity Project; the Minerals Lease and Sublease is discussed below. As part of a restructuring transaction by AuEx Ventures, Inc., another Nevada company Renaissance Gold Inc. ("Renaissance") was spun out, and on July 1, 2010 AuEx, Inc. assigned all of its interest in the Trinity Project and the Earn-In Agreement to Renaissance, who currently holds a 100% leasehold interest in the Trinity Project pursuant to the Minerals Lease and Sublease.  The Company's rights in the Trinity Project are derived from and based upon the rights of Renaissance through the Minerals Lease and Sublease.  The Minerals Lease and Sublease grants to Newmont, a right of first offer on any transfer of AuEx, Inc.'s interests in the Trinity Project to any non-affiliate of AuEx, Inc., and also gives Newmont a right to either enter into a joint venture agreement covering the Trinity Project and any other real property interests that AuEx, Inc. holds or acquires within the Trinity Project, or receive a royalty on all mineral production from such properties.

The Trinity Project consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.  Under the Earn-In Agreement, the Company may earn-in the 70% Interest in the rights of Renaissance in the Trinity Project during a 6-year period in consideration of (1) a

3

signing payment of $25,000, (2) an expenditure of a cumulative total of $5,000,000 in exploration and development expenses on the Trinity Project by March 29, 2016, including a minimum of $500,000 which must be expended within one year from the effective date of the Agreement, and (3) completion of a bankable feasibility study on the Trinity Project on or before the 7th anniversary date of the Agreement. Item (1) has been completed by the Company, and the Company is current with item (2).

The Company's business operations are currently focused on efforts to develop the Trinity Project. The Company foresees future operations at the Trinity Project consisting of (i) an effort to expand the known resource through drilling, (ii) permitting for operation, if deemed economically viable, (iii) metallurgical studies aimed at enhancing the recovery of the silver and by-product lead and zinc, and (iv) engineering design related to potential construction of a new mine. Exploration of the property will be conducted simultaneously with the mine development in order to locate additional resources.

Products

The Company's anticipated product will be precious and base metal-bearing concentrates and/or precious metal bullion produced from ores from mineral deposits which it hopes to discover and exploit through exploration and acquisition.   The Company anticipates such products will be silver, lead and zinc.

Trinity Project Location

The Trinity Project is located along the west flank of the Trinity Range in Pershing County, Nevada, about 25 miles by road northwest of Lovelock, NV, the county seat. The Trinity Project consists of approximately 10,600 acres, which includes 248 unpatented lode mining claims and portions of nine sections of private land.  The specific location of the Trinity Project is discussed in more detail the Item 2 entitled "Properties" herein.

Infrastructure

The Trinity Project is situated in western Nevada, a locale that is host to many metal mines, mining equipment companies, drilling companies, mining and metallurgical consulting expertise, and experienced mining personnel.  Its location is accessible by all-weather road through an area of very sparse population.

Government Regulation and Approval

The following permits will be necessary to put the Trinity Project into production.

| Permit/notification | Agency |
|---|---|
| - Mine registry | Nevada Division of Minerals |
| - Mine Opening notification | State Inspector of Mines |
| - Solid Waste Landfill | Nevada Bureau of Waste Management |
| - Hazardous Waste Management Permit | Nevada Bureau of Waste Management |
| - General Storm Water Permit | Nevada Bureau of Pollution Control |
| - Hazardous material Permit | State Fire Marshal |
| - Fire and Life Safety | State Fire Marshal |
| - Explosives Permit | Bureau of Alcohol, Tobacco, Firearms |
| - Notification of Commencement of Operations | Mine Safety and Health Administration |
| - Radio License | Federal Communications Commission |

4

**APP 0202**

Environmental Regulations

Current exploration activities and any future mining operations, if any, are subject to extensive laws and regulations governing the protection of the environment, waste disposal, worker safety, mine construction, and protection of endangered and protected species. The Company has incurred, and expects to incur in the future, significant expenditures to comply with such laws and regulations. Future changes in applicable laws, regulations and permits or changes in their enforcement or regulatory interpretation could have an adverse impact on the Company's financial condition or results of operations. In the event of a mineral discovery, and if management decides to proceed with production, the costs and delays associated with compliance with these laws and regulations could stop the Company from proceeding with a project or the operation or further improvement of a mine or increase the costs of improvement or production.

The Company expects the following environmental permits will be necessary for any anticipated operations:

- Permit for Reclamation
- Water Pollution Control Permit
- Air Quality Operating Permit
- Industrial Artificial pond permit
- Water Rights

The Company anticipates that it will begin soliciting bids for the programs necessary to obtain these permits in due course. The cost, timing, and work schedules are not yet available.

Competition

The Company competes with other mining and exploration companies in connection with the acquisition of mining claims and leases on silver and other precious metals prospects and in connection with the recruitment and retention of qualified employees. Many of these companies are much larger than Liberty Silver, have greater financial resources and have been in the mining business for much longer. As such, these competitors may be in a better position through size, finances and experience to acquire suitable exploration properties. Liberty Silver may not be able to compete against these companies in acquiring new properties and/or qualified people to work on the current Trinity Project, or any other properties that may be acquired in the future.

Given the size of the world market for precious metals such as silver and gold relative to the number of individual producers and consumers, management believes that no single company has sufficient market influence to significantly affect the price or supply of precious metals such as silver and gold in the world market.

Employees

The Company currently has six full-time employees, Geoff Browne, the Chief Executive Officer and Chairman of the Board of Directors, Manish Z. Kshatriya, the Chief Financial Officer and Executive Vice President, William Tafuri, the President and Chief Operating Officer, H. Richard Klatt, the Vice President of Exploration, and two additional employees.

5

**APP 0203**

**Reports to Security Holders**

The Company files reports with the SEC under section 15d of the Securities Exchange Act of 1934. The reports will be filed electronically. You may read copies of any materials filed with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet site that will contain copies of the reports that are filed electronically. The address for the SEC Internet site is http://www.sec.gov.

## ITEM 1A.      RISK FACTORS

Not Applicable.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not Applicable.

## ITEM 2.      PROPERTIES.

### Office Space

The Registrant has a lease agreement for office space at 181 Bay Street, Suite 2330, Toronto, Ontario, Canada, M5J 2T3. The telephone number is: 647-749-4916. The monthly base rent is CDN $4,007 (approximately US $4,000). The term of the lease is for fifty-four months and terminates on April 28, 2016.

The Registrant has a lease agreement for a field office at 808 Packer Way, Sparks, NV 89431. The phone number there is: 775-352-9375. The monthly base rent is USD $ 2,477.25 plus Common Area Reimbursement of USD $ 370 and Property Tax of USD $250. The term of the lease is for twelve months and terminates on January 31, 2013.

### Trinity Project

**Trinity Project Location**

The Trinity Project is situated approximately 25 road miles north-northwest of Lovelock, Nevada, in Pershing County, Nevada, on the northwest flank of the Trinity Range, in the Trinity mining district. The latitude-longitude coordinates of the mine site are 40° 23' 47" N, 118° 36' 38" W; the mine is located SE ¼, Section 9, Township 29 North, Range 30 East, MDB&M.

The Trinity Project includes public and leased/subleased fee land consisting of the following:

(1)      248 unpatented lode mining claims, the Seka 1-6, 8-16, 61-64, 73-76, 95-112, TS 1-18 claims, Elm1-183, and XXX 1-6 totaling approximately 5000 acres, located in sections 2, 4, 10, 16, and 21, Township 29 North, Range 30 East, and section 26, 28, 34 and 35, Township 30 North, Range 30 East MDB&M. The claims are located on public land open to mineral entry, currently valid, and subject to Bureau of Land Management regulations.

(2)      Approximately 4,396 acres of fee land leased by Newmont Mining Corp. from Southern Pacific Land Co., and its successors, and from Santa Fe Pacific Minerals Corporation, and its successors located

6

in sections 3, 5, 11, and 17, Township 29 North, Range 30 East, and sections 27, 33, and 35, Township 30 North, Range 30 East MDB&M.

(3)      Approximately 1,280 acres of fee land owned by Newmont Mining Corp. located in sections 9 and 15, Township 29 North, Range 30 East, MDB&M.

The Company's joint venture area of interest is currently sections 2-5, 8-11, 14-17, Township 29 North, Range 30 East, MDB&M, and sections, 26-28, 32-35, Township 30 North, Range 30 East, MDB&M. The Company's rights, which apply to all of the above properties include exploration, development, and production of valuable minerals except geothermal, hydrocarbons, and sand/gravel, and also include the authority to apply for all necessary permits, licenses and other approvals from the United States of America, the State of Nevada or any other governmental or other entity having regulatory authority over any part of the Trinity Project.

The following Maps identify the location of the Trinity Silver Mine located in Pershing County Nevada:



8



MAP* SHOWING LOCATION OF THE TRINITY SILVER
OPEN PIT MINE, PERSHING COUNTY, NEVADA

Trinity Silver mine

*Nevada State road map base, 1998

H.R. Klatt
3-17-11

9

**Trinity Project Agreements**

The Company acquired its interest in the Trinity Project through an Exploration Earn-In Agreement, discussed below.  On March 29, 2010, the Company entered into the Earn-In Agreement relating to the Trinity Project with AuEx, Inc., a Nevada company beneficially owned by another Nevada company AuEx Ventures, Inc. AuEx, Inc. held an exclusive interest in the Trinity Project by way of a Minerals Lease and Sublease with Newmont Mining USA Limited, a Delaware corporation who owns or leases the various unpatented mining claims and portions of private land comprising the Trinity Project; the Minerals Lease and Sublease is discussed below. As part of a restructuring transaction by AuEx Ventures, Inc., another Nevada company Renaissance Gold Inc. ("Renaissance") was spun out, and on July 1, 2010 AuEx, Inc. assigned all of its interest in the Trinity Project and the Earn-In Agreement to Renaissance, who currently holds a 100% leasehold interest in the Trinity Project pursuant to the Minerals Lease and Sublease.  The Company's rights in the Trinity Project are derived from and based upon the rights of Renaissance through the Minerals Lease and Sublease.

**Lease and Sublease Agreement**

Renaissance's rights in the Trinity Project are derived through a Minerals Lease and Sublease dated July 29, 2005 (the "Lease") by and between Newmont Mining USA Limited, a Delaware corporation ("Newmont") and AuEx, Inc., a Nevada corporation.

<u>Consideration</u>

The Lease was granted to Renaissance for the following consideration:

    a)    Renaissance agreed to pay Newmont a claim fee reimbursement of $10,955 concurrently with the execution of the Lease  (this amount was paid);

    b)    Renaissance is required to expend a total of $2,000,000 in ascertaining the existence, location, quantity, quality or commercial value of a deposit of minerals within the Trinity Project on or before the seventh anniversary of the Lease;

    c)    Prior to the commencement of any commercial production, Renaissance shall supply Newmont with a feasibility study with respect to the Trinity Project.

<u>Joint Venture / Royalty</u>

The Lease gives Newmont a right to either enter into a joint venture with Renaissance covering the Trinity Project and any other real property interests that Renaissance holds or acquires within the Trinity Project, or receive a royalty on all mineral production from such properties.

*Joint Venture:*  The Lease contemplates the following schedule with respect to Newmont's rights to enter into a joint venture with Renaissance:

    a)     Before Renaissance spends $5 million and provides a feasibility study, Newmont can elect at any time to enter into a joint venture in which event Newmont would be required to pay all future joint venture expenses up to 250% of the expenditures made by Renaissance as of the date of Newmont's election to enter into the joint venture.

    b)    Upon Renaissance spending $5 million, but before the feasibility study, Renaissance shall deliver written notice to Newmont containing a summary of the expenditures made by Renaissance on the Trinity Project.  Newmont may thereafter elect to enter into a joint venture by notifying Renaissance in writing of such election within 60 days of Newmont's receipt of Renaissance's initial notice.  Under the joint venture, Newmont would be required

10

**APP 0208**

to pay all future joint venture expenses up to 250% of the expenditures made by Renaissance as of the date of Newmont's election to enter into the joint venture.

c) After Renaissance spending $5 million, but before the feasibility study, at any time after the expiration of the 60 day period identified in section b above, Newmont can elect to enter into a joint venture in which event Newmont would be required to pay Renaissance 50% of the expenditures made in the Trinity Project up to the date of Newmont's election to participate in a joint venture, and all future joint venture expenses up to 200% of such expenditures.

d) At any time within 60 days after Renaissance's delivery of feasibility study, Newmont can elect to enter into a joint venture at which time Newmont would be required to pay Renaissance 200% of expenditures made by Renaissance as of the date of Newmont's election to enter into the joint venture. Additionally, Renaissance can elect to have Newmont finance Renaissance's share of the joint venture expenses until the Trinity Project is put into commercial production. Following the commencement of commercial production, Newmont shall be entitled to recover such paid expenses with interest at the London Interbank Offering Rate. If Newmont fails to elect to participate in the Joint Venture within 60 days following the delivery of the feasibility study, Newmont's right to participate in a joint venture shall terminate.

Should Newmont elect to participate in a joint venture with Renaissance, pursuant to the Lease, Newmont will serve as the manager of the joint venture and own 51% of the joint venture with an option to acquire an additional 14% for additional payments to Renaissance (for a total participating interest of 65%).

*Royalty:* In the event Newmont does not elect to participate in a joint venture, then Newmont shall have the right to receive a royalty on all mineral production from the Trinity Project. Pursuant to the Lease, if Newmont elects to not participate in the joint venture, then Renaissance shall pay to Newmont $1 million and the Lease shall terminate and Newmont shall transfer title to all property comprising the Trinity Project to Renaissance, and thereafter receive a royalty payment of up to 5% of the net smelter returns generated from the properties comprising the Trinity Project. The Company is current in respect of the consideration requirements of the Earn-In Agreement.

Buyout Option

The Lease provides Renaissance with a buyout option pursuant to which Renaissance holds the right to purchase Newmont's rights in the Trinity Project through the payment of $1 million to Newmont. In the event Renaissance elects the buyout option, Newmont would transfer title to the Trinity Project to Renaissance through quitclaim deed while retaining certain rights in the Trinity Project; such rights may include some form of joint venture or a royalty interest.

**Ownership Interest – Earn-In Agreement**

As noted above, the rights to the Trinity Project are held 100% by Renaissance, pursuant to an assignment of such rights from AuEx, Inc. The Company entered into the Earn-In Agreement providing the Company with a right to earn a 70% undivided interest in rights of Renaissance in the Trinity Project (the "70% Interest"), as set out below. The following is intended to be a summary of some of the material terms of the Earn-In Agreement, and is subject to, and qualified in its entirety, by the full text of the Earn-In Agreement

Consideration

The exclusive right to acquire the 70% Interest in the rights of Renaissance in the Trinity Project was granted to the Company for the following consideration:

11

**APP 0209**

a) The Company agreed to pay $25,000 upon execution of the Earn-In Agreement (this amount was paid);

b) In order to obtain the 70% Interest in the Trinity Project, the Company is required to (i) produce a bankable feasibility study by March 29, 2017 and (ii) to expend a minimum of $5,000,000 in exploration on the Trinity Project as follows: $500,000 in the first year; $1,000,000 in the second year; $1,000,000 in the third year; $1,000,000 in the fourth year; $1,000,000 in the fifth year; and $500,000 in the sixth year.

Any excess expenditure in any year shall be carried forward and applied to the subsequent year's expenditure requirement, and the Company may accelerate the expenditures at its discretion. If the Company elects not to meet the minimum expenditure obligation during any year but wishes to maintain the Earn-In Agreement in full force and effect, or if it is subsequently determined that the minimum amount was not expended in any given year, the Company shall pay the amount of any deficiency to Renaissance.  The Company is current in respect of the consideration requirements of the Earn-In Agreement.

Work Program

The Company shall be the operator and shall have full control over the content of work programs and annual expenditure amounts during the earn-in period, including having the authority to apply for all necessary permits, licenses and other approvals from the U.S., the State of Nevada or any other governmental or other entity having regulatory authority over any part of the Trinity Project.

Joint Venture

Upon the Company having acquired the 70% Interest in the Trinity Project by satisfying the minimum expenditure amounts and producing a bankable feasibility study, the Company and Renaissance shall enter into a formal joint venture agreement, and the Company will be the operator of the joint venture.

At such time as the Company earns the 70% Interest in the Trinity Project, the parties will thereafter participate in expenditures on the Trinity Project in accordance with their respective interests therein, or have their interest diluted in accordance with a straight-line dilution formula, as set forth in the joint venture agreement.

If through dilution the interest of a party is reduced to less than 10%, then that party's participating interest shall automatically be converted to a 3% net smelter returns royalty interest. Should third party claims be acquired with royalties within the area of interest, the 3% royalty described above would be reduced by the amount of such royalty but not below 1%. This reduction does not apply to the royalty described under the heading "Royalty upon Termination of Interest" below.

Royalty upon Termination of Interest

If the Company elects to terminate its right to earn interest in the Trinity Project prior to completing a bankable feasibility study by March 29, 2017, but has expended at least $3,000,000, the Company shall be entitled to a 4% net smelter return royalty capped at twice its expenditure on the Trinity Project.

Termination

The Company may in its sole discretion terminate the Earn-In Agreement at any time by giving not less than 30 days prior written notice to that effect to Renaissance. Upon expiry of the 30-day notice period,

12

the Earn-In Agreement will be of no further force and effect. Upon such termination, the Company shall have no further obligation to incur expenses on or for the benefit of the Trinity Project and shall have no further obligations or liabilities to Renaissance under the Earn-In Agreement or with respect to the Trinity Project (including without limitation liability for lost profits or consequential damages as a result of an election by the Company to terminate the agreement), other than (a) as set forth below, and (b) to reclaim (in accordance with applicable law) any disturbances of the Trinity Project made by the Company.

At any time the Company may, at its option, terminate its interest in some but less than all of the claims comprising the Trinity Project by written notice to Renaissance, provided that if such notice (or notice of termination of the Earn-In Agreement in its entirety) is received by Renaissance after June 30th of any year, the Company shall remain obligated to pay the claim maintenance fees (and make all filings and recordings required in connection therewith) for those claims to which such termination applies for the upcoming assessment year. To the extent the Company terminates its interest in some but less than all of the claims, the Earn-In Agreement shall remain in full force and effect with respect to the remaining claims.

In the event the Company is in default in the observance or performance of any of the Company's covenants, agreements or obligations under the Earn-In Agreement, Renaissance may give written notice of such alleged default specifying the details of same. The Company shall have 30 days following receipt of said notice within which to remedy any such default described therein, or to diligently commence action in good faith to remedy such default. If the Company does not cure or diligently commence to cure such default by the end of the applicable 30-day period, then Renaissance shall have the right to terminate the Earn-In Agreement by providing 30 days advance written notice to the Company.

<u>Confidentiality</u>

All data and information coming into possession of Renaissance or the Company by virtue of the Earn-In Agreement with respect to the business or operations of the other party, or the Trinity Project generally, shall be kept confidential and shall not be disclosed to any person not a party hereto without the prior written consent of the other party, except: (a) as required by law, rule, regulation or policy of any stock exchange or securities commission having jurisdiction over a party; (b) as may be required by a party in the prosecution or defense of a lawsuit or other legal or administrative proceedings; (c) as required by a financial institution in connection with a request for financing relating to development or mining activities; or (d) as may be required in connection with a proposed conveyance to a third party of an interest in the Trinity Project or the Earn-In Agreement, provided such third party agrees in writing in a manner enforceable by the other party to abide by all of the applicable confidentiality provisions of the Earn-In Agreement with respect to such data and information.

To the extent either party intends to disclose data or information via press release or other similar format as may be required, the disclosing party shall provide the other party with not less than five business days notice of the text of the proposed disclosure, and the other party shall have the right to comment on the same.

**Trinity Project Technical Report**

In the process of compiling and synthesizing information on the Trinity Project, on February 15, 2011, the Company completed an independently verified mineral resource estimate on the Trinity Project (the "Trinity Project Technical Report"); the report was publicly released by the Company on March 2, 2011. The Technical Report for the Trinity mine project was prepared in accordance with the Canadian Securities Administrators' National Instrument 43-101 ("NI 43-101") by Mine Development Associates of Reno, Nevada.  The Trinity Project Technical Report may be viewed under the Company's profile on

13

the Securities and Exchange Commission's website at www.SEC.gov.

**Mining history**

The following disclosure regarding the mining history of the Trinity Project has been derived from information contained in the Trinity Project Technical Report.

The Trinity Project lies in the Trinity mining district, which had limited production of silver, lead, zinc, and gold from 1864 through 1942, primarily from the east side of the Trinity Range. In the vicinity of the Trinity project, which is located on the west side of the range, there was historic prospecting with unrecorded but presumed minor silver production.

Minor exploration activity took place in the vicinity of the Trinity project in the 1950s, and in the 1960s Phelps Dodge Corporation completed trenching, IP surveying, and limited drilling in the area.

U. S. Borax and Chemical Corp. ("Borax") became interested in what is now the Trinity project in 1982 on the basis of reconnaissance geochemical sampling that indicated the presence of anomalous lead and silver in the Willow Canyon area. By 1984, Borax had acquired a property position and had entered into a joint venture with Southern Pacific Land Company (later Santa Fe Pacific Mining, Inc. ("SFPM") and still later Newmont Mining Corp. ("Newmont")), in which Borax was the operator. From 1982 to 1986, Borax and its joint-venture partner explored the property and developed the Trinity mine. Borax operated the open pit heap-leaching mine, through a mining contractor, on behalf of the joint venture from September 3, 1987 to August 29, 1988, with leaching continuing into 1989. During this period, the mine produced about five million ounces of silver from about 1.1 million tons of oxidized ore grading six ounces of silver per ton. Borax drilled and conducted extensive metallurgical testing on the sulfide mineralization, but metal prices at the time were too low to support mining of this material.

In 1984-1985, 1987-1989, and 1990, SFPM conducted exploration and drilling on their property in the vicinity of the joint-venture lands. In 1991, SFPM acquired sole interest in the joint-venture lands, including Borax's claims, and conducted further exploration through 1992. SFPM's 1990-1992 exploration work concentrated on down-dip and lateral extensions of mineralization underlying the oxide pit and the sulfide mineralization, as well as extensions of mineralization outside the immediate mine area.

There was no exploration on the Trinity property from 1993 to 2005. In August 2005, Renaissance leased the property from Newmont, who had acquired SFPM's Nevada holdings. Under an earn-in agreement with Piedmont Mining Company, Renaissance explored the property from September 2005 through July 2009, including limited drilling in 2006 and 2007 that encountered high-grade silver values below and adjacent to the open pit.

Liberty Silver entered into an Earn-In Agreement with Renaissance in March, 2010. To date, Liberty Silver has conducted extensive data compilation and has completed a magnetotelluric geophysical survey of the project. The database of technical data for the property, developed since 1982, includes the results of soil and rock surveys, geophysical surveys, geologic mapping, lithology logging and multi-element analyses for about 400 drill holes, and metallurgical work, as well as data derived from the previous production of heap-leach silver.

**Geology and Mineralization of Trinity Project**

The following disclosure regarding the Geology and Mineralization of the Trinity Project has been derived from information contained in the Trinity Project Technical Report.

The Trinity Project lies on the western flank of the Trinity Range, one of the generally north-trending ranges formed during Tertiary extension of the Basin and Range Province.

Within the Trinity Range, the basement rocks are comprised of the Middle Triassic to Early Jurassic near-shore deltaic deposits of the Auld Lang Syne Group, which are represented by phyllite, argillite, quartzite, and dirty limestone at the Trinity project. The best-represented pre-Cenozoic deformation in this portion of the Trinity Range is the Jurassic and Cretaceous Nevadan Orogeny, which resulted in low-grade regional metamorphism, variably directed folding, and thrust faulting. A Cretaceous intrusive episode culminated the Nevadan Orogeny and is exemplified by a Cretaceous granodiorite stock just northeast of the Trinity project.

Tertiary volcanic and sedimentary rocks and Quaternary sediments are abundant in the Trinity project area. There is a thin Tertiary rhyolite sequence along the central north-south axis of the property that includes the resource area. These volcanic rocks overlie the Mesozoic phyllite and argillite, exposed to the east, but are separated by an argillite breccia that is closely associated with faulting. The rhyolite includes interbedded rhyolitic flows, welded tuffs, air-fall tuffs, epiclastic tuffs, and lacustrine deposits. Several rhyolite domes, dikes, and sills have also been identified on the property, some of which may be related to mineralization. Early Tertiary north- to northwest-trending faults are present in the Trinity project area, as are younger north- to northeast-trending normal faults. Late Tertiary and/or Quaternary bench and channel gravel deposits and Quaternary alluvium and outwash unconformably overly the rhyolites and cover the western part of the property.

Rhyolite porphyry, aphanitic rhyolite, and volcaniclastic rocks are the principal host rocks for mineralization in the Trinity mine area. Silicification and quartz-adularia-sericite alteration are associated with the mineralization. Tertiary rhyolitic tuffs and flows were extensively altered and form a halo extending 1.6 miles beyond the main mineralized area. This alteration affected the Auld Lang Syne Group only locally along faults and breccia zones.

Mineralization at the Trinity project is controlled by a northeast-trending zone of normal faults. Silver, lead, and zinc mineralization occurs in fractures and bedding planes in Tertiary rhyolite in the hanging-wall block of the fault zone. Although mineralization continues downward into the underlying Triassic rocks, it is more tightly constrained to fractures that host higher-grade vein mineralization. The original Trinity silver deposit can generally be divided into two parts: a sulfide zone below the current pit and to the northeast, and an overlying oxide zone. Borax's mining in the late 1980s focused on a portion of the oxide zone.

Mineralization occurs as oxidized and unoxidized sulfides in veinlets, as fracture-controlled mineralization, and as disseminations within the host rocks, including breccia matrix. Sulfide mineralization consists mainly of pyrite, sphalerite, galena, marcasite, and minor arsenopyrite with various silver minerals, including tetrahedrite-freibergite, pyrargyrite, minor argentite, and rare native silver, with traces of gold, pyrrhotite, stannite, and chalcopyrite. Low-grade lead and zinc have the potential to add value as byproducts.

**Index of Geologic Terms**

| TERM | DEFINITION |
| --- | --- |
| Adularia | A variety of transparent or translucent orthoclase. |
| Air-fall tuffs | Ash exploded out of a volcano, which falls through the air and settles in beds, called **tuffs** when consolidated. |

| Alluvium | Loose, unconsolidated (not cemented together into a solid rock) soil or sediments |
| --- | --- |
| Aphanitic | Igneous rock in which the grain or crystalline structure is too fine to be seen by the unaided eye |
| Argillite | A fine-grained sedimentary rock composed predominantly of indurated muds and oozes. |
| Argillization | The replacement or alteration of feldspars to form clay minerals. |
| Arsenopyrite | The most prevalent mineral containing the element arsenic. |
| Breccia | A rock composed of broken fragments of minerals or rock cemented together by a fine-grained matrix, which can be either similar to or different from the composition of the fragments. |
| Cenozoic | The current and most recent geological era and covers the period from 65.5 million years ago to the present |
| Chalcopyrite | A major ore mineral containing copper, iron, and sulfur. |
| Cretaceous | A geologic period from 145 to 65 million years ago. |
| Deltaic | Pertaining to, or like a delta. |
| Dikes | A type of sheet intrusion referring to any geologic body that cuts discordantly across rock structures. |
| Domes | A roughly circular mound-shaped protrusion resulting from the slow extrusion of viscous lava from a volcano. |
| Epiclastic | Formed at the surface of the earth by consolidation of fragments of preexisting rocks. |
| Freibergite | A complex sulfosalt mineral of silver, copper, iron, antimony, arsenic, and sulfur. |
| Galena | The natural mineral form of lead sulfide. |
| Grandiorite | A visibly crystalline plutonic rock composed chiefly of sodic plagioclase, alkali feldspar, quartz, and subordinate dark-colored minerals. |
| Hydrothermal | Relating to or produced by hot water, especially water heated underground by the Earth's internal heat. |
| Jurassic | The geologic period that extends from about 200 to 145 million years ago. |
| Lacustrine | Of or relating to lakes. |
| Metal Sulfides | A group of minerals containing both metals and sulfur. |
| Mesozoic | A geologic era that extends from 251 to 65 million years ago |
| Mineral | A mineral is a naturally occurring solid chemical substance having characteristic chemical composition, highly ordered atomic structure, and specific |
| Mineralization | The act or process of mineralizing. |
| Miocene | A geological epoch that extends from about 23.8 to 5.3 million years ago. |
| Nevadan Orogeny | A major mountain building event that took place along the western edge of ancient North America between the mid to late Jurassic. |
| Ore | Mineralized material that can be mined and processed at a positive cash flow. |
| Orthoclase | A variety of feldspar, essentially potassium aluminum silicate, which forms igneous rock. |
| Oxidized | A process whereby the sulfur in a mineral has been removed and replaced by oxygen. |
| Phyllite, | A type of foliated metamorphic rock primarily composed of quartz, muscovite mica, and chlorite |
| Pliocene | The geologic epoch that extends from about 5.3 million to 1.8 million years ago. |
| Porphyry | A variety of igneous rock consisting of large-grained crystals suspended in a fine grained matrix |
| Pyrargyrite | A sulfosalt mineral consisting of silver, arsenic, and sulfur. |
| Pyrite | A very common sulfide mineral consisting of iron and sulfur found in a wide variety of geological occurrences. Commonly known as "Fools Gold" |
| Pyrrhotite | An unusual iron sulfide mineral with a variable iron content. |
| Quartzite | A hard metamorphic rock which was originally sandstone |
| Rhyolite | A fine-grained volcanic rock, similar to granite in composition |
| Sercitization | A hydrothermal or metamorphic process involving the introduction of, alteration to, or replacement by white, fine-grained potassium mica. |
| Silicification | A hydrothermal or metamorphic process involving the introduction of, alteration to, or replacement by silica. |
| Sills | A tabular sheet intrusion that has intruded between older layers of sedimentary rock, beds of volcanic lava or tuff. |
| Sphalerite | A mineral containing zinc and sulfur. |
| Stannite | A mineral containing copper, iron, tin, and sulfur. |
| Sulfides | Sulfide minerals are a class of minerals containing sulfur with sulfide ($S^{2-}$) as the major anion. |

16

| | |
|---|---|
| Tetrahedrite | A sulfosalt mineral containing copper, antimony, and sulfur. |
| Triassic | A geologic period that extends from about 251 to 200 million years ago. |
| Volcanic | A rock formed from magma erupted from a volcano. |
| Volcaniclastic | Volcanic material which been transported and reworked through mechanical action, such as by wind or water. |
| Welded tuffs | Rock composed of compacted volcanic ejected materials. |

**Subsequent Event**

On August 8, 2012, Liberty Silver entered into a conditional letter agreement with Primus Resources, L.C. to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada (the "Hi Ho Properties"). The Hi Ho Properties are the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. on the Trinity land package. Under the terms of the Agreement, Liberty Silver will provide cash consideration of US$150,000 and issue 3,000,000 common shares of Liberty Silver stock to Primus. In addition, Primus will be granted a 2% net smelter royalty ("NSR") on future production from the Hi Ho Properties. The total consideration for the acquisition of the Hi Ho Properties will be applied to Liberty Silver's expenditure commitment under its Earn-In Agreement with Renaissance, upon acceptance by Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Properties payment, Liberty Silver will have contributed in excess of 85% of its required US$5 million expenditure commitment to earn its 70% interest in the project. Pursuant to the terms of its Earn-In Agreement with Renaissance, the Company has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study in the following year.

**ITEM 3.      LEGAL PROCEEDINGS.**

Neither the Company nor its property is the subject of any pending legal proceedings, and no such proceeding is known to be contemplated by any governmental authority. The Company is not aware of any legal proceedings in which any director, officer or affiliate of the Company, any owner of record or beneficially of more than 5% of any class of our voting securities, or any associate of any such director, officer, affiliate or security holder of the Company, is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries.

**ITEM 4.      MINE SAFETY DISCLOSURES.**

The recently enacted Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Act") requires the operators of mines to include in each periodic report filed with the Securities and Exchange Commission certain specified disclosures regarding the Company's history of mine safety. The Company is currently in the exploration phase and does not operate mines at any of its properties, and as such is not subject to disclosure requirements regarding mine safety that were imposed by the Act.

# PART II

**ITEM 5.      MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

**Market Information.**

The Company's common stock is quoted on the Toronto Stock Exchange under the Symbol "LSL", and on the OTC Bulletin Board under the Symbol "LBSV.OB".

17

**APP 0215**

The quotations set forth below reflect inter-dealer prices, without retail mark-up, markdown or commission and may not represent actual transactions.

The high and low closing prices of our common stock on the Toronto Stock Exchange and the OTC Bulletin Board for the periods indicated below are as follows:

| PERIOD | TSX | | | | OTCBB | | | |
|---|---|---|---|---|---|---|---|---|
| | HIGH BID CAD$ | | LOW BID CAD$ | | HIGH BID US$ | | LOW BID US$ | |
| April 1, 2012 through June 30, 2012 | $ 0.95 | $ | 0.41 | $ | 0.85 | $ | 0.47 | |
| January 1, 2012 through March 31, 2012 | $ 1.04 | $ | 0.75 | $ | 1.03 | $ | 0.60 | |
| October 1, 2011 through December 31, 2011 (1) | $ 1.09 | $ | 0.72 | $ | 1.11 | $ | 0.50 | |
| July 1, 2011 through September 30, 2011 | $ N/A | $ | N/A | $ | 0.80 | $ | 0.47 | |
| April 1, 2011 through June 30, 2011 | $ N/A | $ | N/A | $ | 0.64 | $ | 0.30 | |
| January 1, 2011 through March 31, 2011 | N/A | | N/A | $ | 0.63 | $ | 0.19 | |
| October 1, 2010 through December 31, 2010 | N/A | | N/A | $ | 0.64 | $ | 0.17 | |
| July 1, 2010 through September 30, 2010 | N/A | | N/A | $ | 0.61 | $ | 0.30 | |

(1)   Common stock commenced trading on the TSX on December 22, 2011.

As of September 25, 2012, there were 80,710,834 shares of common stock issued and outstanding held by approximately 29 registered stockholders of record of the Company's common stock.

There have been no cash dividends declared or paid on the shares of common stock, and management does not anticipate payment of dividends in the foreseeable future.

ITEM 6.          SELECTED FINANCIAL DATA.

Not Applicable.

ITEM 7.          MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION.

SPECIAL NOTE OF CAUTION REGARDING FORWARD-LOOKING STATEMENTS

CERTAIN STATEMENTS IN THIS REPORT, INCLUDING STATEMENTS IN THE FOLLOWING DISCUSSION, ARE WHAT ARE KNOWN AS "FORWARD LOOKING STATEMENTS", WHICH ARE BASICALLY STATEMENTS ABOUT THE FUTURE. FOR THAT REASON, THESE STATEMENTS INVOLVE RISK AND UNCERTAINTY SINCE NO ONE CAN ACCURATELY PREDICT THE FUTURE. WORDS SUCH AS "PLANS," "INTENDS," "WILL," "HOPES," "SEEKS," "ANTICIPATES," "EXPECTS "AND THE LIKE OFTEN IDENTIFY SUCH FORWARD LOOKING STATEMENTS, BUT ARE NOT THE ONLY INDICATION THAT A STATEMENT IS A FORWARD LOOKING STATEMENT. SUCH FORWARD LOOKING STATEMENTS INCLUDE STATEMENTS CONCERNING OUR PLANS AND OBJECTIVES WITH RESPECT TO THE PRESENT AND FUTURE OPERATIONS OF THE COMPANY, AND STATEMENTS WHICH EXPRESS OR IMPLY THAT SUCH PRESENT AND FUTURE OPERATIONS WILL OR MAY PRODUCE REVENUES, INCOME OR PROFITS. NUMEROUS FACTORS AND FUTURE EVENTS COULD CAUSE THE COMPANY TO CHANGE SUCH PLANS AND OBJECTIVES OR FAIL TO SUCCESSFULLY IMPLEMENT SUCH PLANS OR ACHIEVE SUCH OBJECTIVES, OR CAUSE SUCH PRESENT AND FUTURE OPERATIONS TO FAIL TO PRODUCE REVENUES, INCOME OR PROFITS.

THEREFORE, THE READER IS ADVISED THAT THE FOLLOWING DISCUSSION SHOULD BE CONSIDERED IN LIGHT OF THE DISCUSSION OF RISKS AND OTHER FACTORS CONTAINED IN THIS REPORT ON FORM 10-K AND IN THE COMPANY'S OTHER FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION. NO STATEMENTS CONTAINED IN THE FOLLOWING DISCUSSION SHOULD BE CONSTRUED AS A GUARANTEE OR ASSURANCE OF FUTURE PERFORMANCE OR FUTURE RESULTS.

**Background and Overview**

The Company was incorporated for the purpose of engaging in mineral exploration activities. On March 29, 2010, the Company entered into an Exploration Earn-In Agreement relating to the Trinity Project located in Pershing County, Nevada and now intends to engage in efforts to develop the Trinity Project. The plan of operation for the fiscal year ending June 30, 2013 is to conduct mineral exploration activities and production planning at the Trinity Silver property. Operations at the Trinity Project will consist of (i) an effort to expand the known resource through drilling, (ii) permitting for operation, if deemed economically viable, (iii) metallurgical studies aimed at enhancing the recovery of the silver and by-product lead and zinc, and (iv) engineering design related to potential construction of a new mine. Exploration of the property will be conducted simultaneously with the mine development in order to locate additional resources.

**Results of Operations**

The following discussion and analysis provides information that we believe is relevant to an assessment and understanding of our results of operation and financial condition for the fiscal year ended June 30, 2012 as compared to the fiscal year ended June 30, 2011. Unless otherwise stated, all figures herein are expressed in U.S. dollars.

***Comparison of the fiscal years ended June 30, 2012 and 2011***

Revenue

During the fiscal years ended June 30, 2012 and June 30, 2011, the Company generated no revenue.

Expenses

During the fiscal year ended June 30, 2012, the Company reported total operating expenses of $5,681,977 as compared to $1,463,758 during the fiscal year ended June 30, 2012, an increase of $4,218,219 or approximately 288%. The increase in operating expenses is primarily due to increases in stock compensation, financing cost associated with valuation of warrants, exploration, legal and accounting expense and operation and administration. The increases in these expenses are primarily attributable to the Company's effort to finance, explore and develop the Trinity Silver property located in Pershing County, Nevada.

Comprehensive Loss

The Company had a comprehensive loss of $5,689,256 for the fiscal year ended June 30, 2012, as compared to a comprehensive loss of $1,464,253 for the fiscal year ended June 30, 2012, a change of $4,225,003 or approximately 289%. The change in comprehensive loss was primarily due to an increase in operating expenses, which was minimally offset by the gain from foreign exchange during the fiscal year ended June 30, 2012.

19

**Liquidity and Capital Resources**

Management currently believes that the Company has sufficient working capital needed to meet its current fiscal obligations.  In order to continue to meet its fiscal obligations beyond the next twelve months, management has plans to pursue various financing alternatives including, but not limited to, merger and acquisition activity, raising capital through the capital markets and debt financing.

On November 10, 2011, the Company entered into a Subscription Agreement (the "Subscription Agreement") with Look Back Investments, Inc. ("Investor"), pursuant to which an investor acquired Subscription Receipts ("Subscription Receipts") for U.S. $0.50 per Subscription Receipt for gross proceeds of U.S. $3,250,000; the gross proceeds of U.S. $3,250,000 (the "Escrow Proceeds") were held in escrow pursuant to the terms of the Subscription Receipt.  Each Subscription Receipt entitled the investor to receive one unit (a "Unit") from the Company without payment of any additional consideration upon conditional approval by the Toronto Stock Exchange for the listing of the common shares of the Company.  Each Unit consists of one share of common stock of the Company and one common stock purchase warrant (a "Warrant"); each Warrant is exercisable at a price of US $0.65 per share at any time until 5:00 p.m. (Toronto time) on December 31, 2013.  On December 19, 2011, each Subscription Receipt was automatically converted for no additional consideration, into one Unit of the Company as a result of the Company's receipt of notice that its common stock was accepted for trading on the Toronto Stock Exchange under the trading symbol, "LSL", effective as of December 22, 2011.  On December 19, 2011, the Escrow Proceeds were delivered to the Company from the escrow agent.  As a result of the foregoing private placement transaction, the Company currently has the necessary working capital needed to meet its current budget.

Additionally, on December 19, 2011, the Company completed a private placement offering, pursuant to which the Company raised a total of US $1,313,750 through the sale of 2,627,500 Units at a purchase price of US $0.50 per Unit; there were no underwriting discounts or commissions paid.  Each Unit consisted of one share of common stock of the Company and one common stock purchase warrant (a "Warrant").  Each whole Warrant entitles the holder to acquire one share of common stock at a price of US $0.65 for a period of two years following the date of the closing of the financing.

*Current Assets and Total Assets*

As of June 30, 2012, the Company audited balance sheet reflects that the Company had: i) total current assets of $1,796,779, as compared to total current assets of $27,017 at June 30, 2011, an increase of $1,769,762, or approximately 6,511%; and ii) total assets of $1,956,416, as compared to total assets of $124,528 at June 30, 2011, an increase of 1,831,888 or approximately 1,471%.  The increase in total current assets and total assets was primarily attributable to the proceeds raised from the Company's issuance of common stock.

*Total Current Liabilities and Liabilities*

As of June 30, 2012, the audited balance sheets reflect that the Company had total current liabilities and total liabilities of $167,948, as compared to total current liabilities and total liabilities of $578,320 at June 30, 2011, a decrease of $410,372 or approximately 71%. This decrease was due to a decrease in accrued liabilities and related party payable, partially offset by an increase in accounts payable

*Cash Flow*

During the fiscal year ended June 30, 2012 cash was primarily used to fund operations. We had a net increase in cash used in operating activities during the fiscal year ended June 30, 2012 as compared to

**APP 0218**

June 30, 2011.  See below for additional discussion and analysis of cash flow.

|  | For the years ended June 30, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | $ | $ |
| Net cash provided by (used in) operating activities | (3,155,094) | (785,254) |
| Net cash used in investing activities | (66,340) | (72,511) |
| Net cash provided by financing activities | 4,899,625 | 150,000 |
| Net Change in Cash | 1,678,191 | (707,765) |

During the year ended June 30, 2012, net cash used in operating activities was $3,155,094, compared to net cash used in operating activities of $785,254 during the year ended June 30, 2011.  The increase in net cash used in operating activities is primarily due to an increase in: exploration expense; operation and administration expense; and, legal and accounting expense.  The increase in these expenses was partially offset by a small decrease in consulting expense.

During the year ended June 30, 2012, net cash used in investing activities was $66,340, comprised of $34,732 paid for the purchase of furniture and equipment and $31,608 paid to acquire mining interests.  During the year ended June 30, 2011, net cash used in investing activities was $72,511, all of which was paid to acquire mining interests.

During the year ended June 30, 2012, net cash provided by financing activities was $4,899,625.  The net amount was comprised of $5,252,388 from the proceeds of the issuance of common stock, partially offset by $202,763 of costs associated with the issuance of the common stock, and $150,000 used to repay related party notes.  During the year ended June 30, 2011, net cash provided by financing activities was $150,000, which represented proceeds from related party notes.

**Subsequent Events**

On August 8, 2012, Liberty Silver entered into a conditional letter agreement with Primus Resources, L.C. to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada (the "Hi Ho Properties"). The Hi Ho Properties are the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. on the Trinity land package. Under the terms of the Agreement, Liberty Silver will provide cash consideration of US$150,000 and issue 3,000,000 common shares of Liberty Silver stock to Primus. In addition, Primus will be granted a 2% net smelter royalty ("NSR") on future production from the Hi Ho Properties. The total consideration for the acquisition of the Hi Ho Properties will be applied to Liberty Silver's expenditure commitment under its Earn-In Agreement with Renaissance, upon acceptance by Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Properties payment, Liberty Silver will have contributed in excess of 85% of its required US$5 million expenditure commitment to earn its 70% interest in the project. Pursuant to the terms of its Earn-In Agreement with Renaissance, the Company has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study in the following year.

As disclosed on Form CB filed with the Securities and Exchange Commission on July 17, 2012, on July 16, 2012 Liberty Silver commenced an offer (the "Offer") to purchase all of the issued and outstanding common shares of Sennen Resources Ltd. ("Sennen"). The Offer was open for acceptance by

Sennen shareholders until 11:59 P.M. on Monday September 10, 2012. The Offer was not accepted by the requisite number of Sennen shareholders, therefore the Offer was terminated on September 11, 2012 at 12:00 A.M.

**Off-Balance Sheet Arrangements**

The Company has no off-balance sheet arrangements and has not entered into any transaction involving unconsolidated limited purpose entities.

**ITEM 7A.      QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not Applicable.

**ITEM 8.      FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

The financial statements of the Company required by Article 8 of Regulation S-X are attached to this report

**LIBERTY SILVER CORP.**
**AUDITED FINANCIAL STATEMENTS**
**FOR THE FISCAL YEARS ENDED JUNE 30, 2012 and 2011**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 23 |
| Balance Sheets | 24 |
| Statements of Operations And Comprehensive Income | 25 |
| Statements of Stockholders Equity | 26-28 |
| Statements of Cash Flows | 29-30 |
| Notes to Consolidated Financial Statements | 31-47 |

**APP 0220**

# Morrill & Associates, LLC
## Certified Public Accountants
1448 North 2000 West, Suite 3
Clinton, Utah 84015
801-820-6233 Phone; 801-820-6628 Fax

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders
Liberty Silver Corp. (An Exploration Stage Company)
Manahattan, CA

We have audited the accompanying balance sheets of Liberty Silver Corp. (an exploration stage company) as of June 30, 2012 and 2011 and the related statements of operations, stockholders' equity (deficit) and cash flows for the years ended June 30, 2012 and 2011 and from inception on February 20, 2007 through June 30, 2012. These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting.  Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting.  Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Liberty Silver Corp. (an exploration stage company) as of June 30, 2012 and 2011 and the results of its operations and cash flows for the years ended June 30, 2012 and 2011 and from inception on February 20, 2007 through June 30, 2012 in conformity with generally accepted accounting principles in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.  The Company has suffered recurring losses and has no operations, which raise substantial doubt about its ability to continue as a going concern.  Management's plans in regard to these matters are described in Note 9. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*/s/ Morrill & Associates*

Morrill & Associates
Clinton, Utah 84015
September 25, 2012

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Balance Sheets**

<u>ASSETS</u>

|  |  | June 30, 2012 |  | June 30, 2011 |
|---|---|---|---|---|
| Current Assets |  |  |  |  |
| Cash and cash equivalents | $ | 1,694,914 | $ | 16,723 |
| Accounts receivable |  | - |  | - |
| Deposit |  | 10,906 |  | - |
| Other |  | 34,335 |  | - |
| Prepaid |  | 56,624 |  | 10,294 |
| Total current assets |  | 1,796,779 |  | 27,017 |
| Property and Equipment |  |  |  |  |
| Furniture and office equipment |  | 34,732 |  | - |
| Accumulated depreciation |  | (4,214) |  | - |
| Mining interests |  | 129,119 |  | 97,511 |
| Total property and equipment |  | 159,637 |  | 97,511 |
| Total assets | $ | 1,956,416 | $ | 124,528 |

<u>LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)</u>

|  |  | June 30, 2012 |  | June 30, 2011 |
|---|---|---|---|---|
| Current Liabilities |  |  |  |  |
| Accounts payable | $ | 96,323 | $ | 60,924 |
| Accrued liabilities |  | 71,625 |  | 367,396 |
| Related party payable |  | - |  | 150,000 |
| Total current liabilities |  | 167,948 |  | 578,320 |
| Total liabilities |  | 167,948 |  | 578,320 |
| Commitments and contingencies (note 7) |  | - |  | - |
| Stockholders' Equity (Deficit) |  |  |  |  |
| Capital stock, $.001 par value, |  |  |  |  |
| 200,000,000 shares authorized; |  |  |  |  |
| 80,710,834 and 69,733,334 shares issued and outstanding, |  |  |  |  |
| respectively |  | 80,711 |  | 69,734 |
| Additional paid-in-capital |  | 9,937,509 |  | 1,814,207 |
| Issue costs |  | (202,763) |  | - |
| Deficit accumulated during the exploration stage |  | (8,026,989) |  | (2,337,733) |
| Total stockholders' equity (deficit) |  | 1,788,468 |  | (453,792) |
| Total liabilities and stockholders' equity (deficit) | $ | 1,956,416 | $ | 124,528 |

The accompanying notes are an integral part of these financial statements.

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Operations**

| | | | Cumulative During the Exploration Stage February 20, 2007 (inception) to June 30, |
|---|---|---|---|
| | For Year Ended June 30, | | |
| | 2012 | 2011 | 2012 |
| Revenue | $ - | $ - | $ - |
| Operating expenses | | | |
| Financing costs associated with valuation of warrants | 1,826,160 | 40,000 | 2,388,351 |
| Consulting | 416,338 | 582,572 | 1,098,465 |
| Exploration | 1,273,491 | 126,841 | 1,491,433 |
| Operation and administration | 1,311,615 | 288,755 | 1,701,631 |
| Stock compensation | 639,731 | 286,750 | 926,482 |
| Legal and accounting | 214,642 | 138,840 | 401,348 |
| Impairment of mining interests | - | - | 11,800 |
| Total operating expenses | 5,681,977 | 1,463,758 | 8,019,510 |
| Income (loss) from operations | (5,681,977) | (1,463,758) | (8,019,510) |
| Other income (expense) | | | |
| Interest income | - | 882 | 1,220 |
| Interest expense | (169) | (189) | (403) |
| Total other income (expense) | (169) | 693 | 817 |
| Loss before income tax | (5,682,146) | (1,463,065) | (8,018,693) |
| Provision for income taxes | - | - | - |
| Net loss | (5,682,146) | (1,463,065) | (8,018,693) |
| Gain (loss) foreign exchange | (7,110) | (1,188) | (8,296) |
| Comprehensive loss | $ (5,689,256) | $ (1,464,253) | $ (8,026,989) |
| Loss per common share – basic and fully diluted | $ (0.08) | $ (0.02) | |
| Weighted average common shares | 75,705,683 | 69,733,334 | |

The accompanying notes are an integral part of these financial statements.

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Stockholders' Equity (Deficit)**
**For the period February 20, 2007 (inception) through June 30, 2012**

| | Common Stock | | Additional Paid in Capital | Issued Cost | Deficit Accumulated During Exploration Stage | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance, February 20, 2007 (inception) | $ - | $ - | $ - | $ - | $ - | $ - |
| *Shares for cash:* | | | | | | |
| Shares issued at $0.001 per share | 80,000,000 | 80,000 | (76,000) | - | - | 4,000 |
| Shares issued at $0.01 per share | 20,000,000 | 20,000 | (10,000) | - | - | 10,000 |
| Shares issued at $0.05 per share | 8,400,000 | 8,400 | 12,600 | - | - | 21,000 |
| Net loss for the period ending June 30, 2007 | - | - | - | - | (1,128) | (1,128) |
| Balance, June 30, 2007 | 108,400,000 | 108,400 | (73,400) | - | (1,128) | 33,872 |
| Net loss for the period ending June 30, 2008 | - | - | - | - | (22,248) | (22,248) |
| Balance, June 30, 2008 | 108,400,000 | 108,400 | (73,400) | - | (23,376) | 11,624 |
| Net loss for the period ending June 30, 2009 | - | - | - | - | (31,522) | (31,522) |

APP 0224

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Stockholders' Equity (Deficit)**
**For the period February 20, 2007 (inception) through June 30, 2012**

| | Common Stock | | Additional Paid in Capital | | Issued Cost | | Deficit Accumulated During Exploration Stage | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | | |
| Balance, June 30, 2009 | 108,400,000 | $ 108,400 | $ (73,400) | $ | - | $ | (54,898) | $ | (19,898) |
| *Shares for cash:* | | | | | | | | | |
| Shares issued at $0.75 per share | 1,333,334 | 1,334 | 998,666 | | - | | - | | 1,000,000 |
| Share cancellation | (40,000,000) | (40,000) | 40,000 | | - | | - | | - |
| Valuation of stock warrants | - | - | 522,191 | | - | | - | | 522,191 |
| Net loss for the period ending June 30, 2010 | - | - | - | | - | | (818,582) | | (818,582) |
| Balance, June 30, 2010 | 69,733,334 | $ 69,734 | $ 1,487,457 | $ | - | $ | (873,480) | $ | 683,711 |
| Valuation of stock options | - | - | 286,750 | | - | | - | | 286,750 |
| Valuation of stock warrants | - | - | 40,000 | | - | | - | | 40,000 |
| Net loss for the period ending June 30, 2011 | - | - | - | | - | | (1,464,253) | | (1,464,253) |

**Liberty Silver Corp.**
**(An Exploration Stage Company)**

The accompanying notes are an integral part of these financial statements.

27

**Statements of Stockholders' Equity (Deficit)**
**For the period February 20, 2007 (inception) through June 30, 2012**

| | Common Stock | | Additional Paid in Capital | Issued Cost | Deficit Accumulated During Exploration Stage | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance, June 30, 2011 | 69,733,334 | 69,734 | 1,814,207 | - | (2,337,733) | (453,792) |
| Valuation of stock options | - | - | 639,731 | - | - | 639,731 |
| Valuation of stock warrants | - | - | 1,826,160 | - | - | 1,826,160 |
| *Shares for cash:* | | | | | | |
| Shares issued at $0.57 per share (1) | 200,000 | 200 | 116,291 | - | - | 116,491 |
| Shares issued at $0.57 per share  (1) | 1,000,000 | 1,000 | 571,148 | - | - | 572,148 |
| Shares issued at $0.50 per share | 6,500,000 | 6,500 | 3,243,500 | - | - | 3,250,000 |
| Shares issued at $0.50 per share | 2,627,500 | 2,627 | 1,311,122 | - | - | 1,313,749 |
| *Shares for non-cash:(2)* | | | | | | |
| Shares issued at $0.64 per share (2) | 650,000 | 650 | 415,350 | - | - | 416,000 |
| Net loss for the period ending June 30, 2012 | - | - | - | (202,763) | (5,689,256) | (5,892,019) |
| Balance, June 30, 2012 | 80,710,834 | 80,711 | 9,937,509 | (202,763) | (8,026,989) | 1,788,468 |

(1) Shares purchase for $0.55 CDN and was converted to $0.57 USD
(2) Shares issued to satisfy contractual obligation pursuant to a registration rights agreement

The accompanying notes are an integral part of these financial statements.

APP 0226

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
**Statements of Cash Flows**

| | For Year Ended June 30, | | Cumulative During the Exploration Stage February 20, 2007 (inception) to June 30, |
|---|---|---|---|
| Cash flows from operating activities | 2012 | 2011 | 2012 |
| Comprehensive loss | $          (5,689,256) | $   (1,464,253) | $          (8,026,989) |
| Adjustments to reconcile net (loss) to net cash used in operating activities | | | |
| Valuation of warrants associated with financing | 1,826,160 | 40,000 | 2,388,351 |
| Valuation of stock option issuance | 639,731 | 286,750 | 926,481 |
| Shares issued to settle contractual obligation | 416,000 | - | 416,000 |
| Depreciation expense | 4,214 | - | 4,214 |
| Changes in operating assets and liabilities: | | | |
| (Increase) decrease in prepaid expenses | (46,330) | 8,648 | (56,624) |
| (Increase) decrease in deposit | (10,906) | 850 | (10,906) |
| Increase in other assets | (34,335) | - | (34,335) |
| Increase in accounts payable | 35,399 | 54,941 | 96,323 |
| Increase (decrease) in accrued expenses | (295,771) | 287,810 | 71,625 |
| Net cash used in operating activities | (3,155,094) | (785,254) | (4,225,860) |
| Cash flows from investing activities | | | |
| Cash used for furniture and equipment | (34,732) | - | (34,732) |
| Cash paid for mining interests | (31,608) | (72,511) | (129,119) |
| Net cash used in investing activities | (66,340) | (72,511) | (163,851) |
| Cash flows from financing activities | | | |
| Proceeds from related party note | - | 150,000 | 150,000 |
| Payments on related party note | (150,000) | - | (150,000) |
| Proceeds from issuance of common stock | 5,252,388 | - | 6,287,388 |
| Issue costs | (202,763) | - | (202,763) |
| Net cash provided by financing activities | 4,899,625 | 150,000 | 6,084,625 |
| Increase (decrease) in cash and cash equivalents | 1,678,191 | (707,765) | 1,694,914 |
| Cash and cash equivalents, beginning of period | 16,723 | 724,488 | - |
| Cash and cash equivalents, end of period | $           1,694,914 | $      16,723 | $           1,694,914 |

The accompanying notes are an integral part of these financial statements.

**Liberty Silver Corp.**
**(An Exploration Stage Company)**
Statements of Cash Flows (continued)

| | Year ended June 30, 2012 | | Year ended June 30, 2011 | | Accumulated from February 20, 2007 (inception) through June 30, 2012 |
|---|---|---|---|---|---|
| Supplement Disclosures: | | | | | |
| Cash paid for interest | $ | 169 | $ | 189 | $ 403 |
| Cash paid for income tax | $ | - | $ | - | - |

The accompanying notes are an integral part of these financial statements.

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

## Note 1 – Nature and Continuance of Operations

The Company was incorporated in the State of Nevada on February 20, 2007. The Company is considered an exploration stage company since its formation, and the Company has not yet realized any revenues from its planned operations. The Company is primarily focused on the exploration, acquisition and development of mining and mineral properties.  Upon the location of commercially minable reserves, the Company plans to prepare for mineral extraction and enter the development stage.

On May 24, 2007, the Company had acquired a mineral property located in Elko County, within the state of Nevada. The Company was not able to determine whether this property contained reserves that were economically recoverable. The Company has ceased their attempts at developing this property.

On February 11, 2010, the Company amended its articles of incorporation. The articles of incorporation were amended for the purposes of (1) changing the name of the registrant to Liberty Silver Corp, and (2) increasing the authorized shares of the Company from 75,000,000 shares of $0.001 par value common stock to 200,000,000 shares of $0.001 par value common stock.

On March 29, 2010, the Company entered into an Exploration Earn-In Agreement (the "Agreement") with AuEx Ventures, Inc., a Nevada corporation.

The Agreement relates to the Trinity Silver property (the "Property") located in Pershing County, Nevada, which consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.

The Company is reviewing other potential acquisitions in the resource and non-resource sectors. While the Company is in the process of completing due diligence reviews of several opportunities, there is no guarantee that we will be able to reach any agreement to acquire such assets.

## Note 2 - Significant Accounting Policies

The following is a summary of significant account policies used in the preparation of these financial statements.

### a. Basis of presentation

The financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America applicable to exploration stage enterprises, and, unless otherwise stated, are expressed in U.S. dollars. The Company's fiscal year end is June 30.

### b. Cash and cash equivalents

Cash and cash equivalents include highly liquid investments with original maturities of three months or less.

### c. Mineral rights, property and acquisition costs

The Company has been in the exploration stage since its formation on February 20, 2007 and has not yet realized any revenues from its planned operations. It is primarily engaged in the acquisition and

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

exploration of mining properties.

The Company capitalizes acquisition and option costs of mineral rights as tangible assets. Upon commencement of commercial production, the mineral rights will be amortized using the unit-of-production method over the life of the mineral rights. If the Company does not continue with exploration after the completion of the feasibility study, the mineral rights will be expensed at that time.

The costs of acquiring mining properties are capitalized upon acquisition. Mine development costs incurred to develop and expand the capacity of mines, or to develop mine areas in advance of production are also capitalized once proven and probable reserves exist and the property is a commercially mineable property. Costs incurred to maintain current exploration or to maintain assets on a standby basis are charged to operations. Costs of abandoned projects are charged to operations upon abandonment. The Company evaluates the carrying value of capitalized mining costs and related property and equipment costs, to determine if these costs are in excess of their recoverable amount whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable. Evaluation of the carrying value of capitalized costs and any related property and equipment costs are based upon expected future cash flows and/or estimated salvage value in accordance with Accounting Standards Codification (ASC) 360-10-35-15, *Impairment or Disposal of Long-Lived Assets*.

### d. Property and equipment

Property and equipment is stated at cost less accumulated depreciation. Depreciation is provided principally on the straight-line method over the estimated useful lives of the assets, which are generally 3 to 39 years. The cost of repairs and maintenance is charged to expense as incurred. Expenditures for property betterments and renewals are capitalized. Upon sale or other disposition of a depreciable asset, cost and accumulated depreciation are removed from the accounts and any gain or loss is reflected in other income (expense).

The Company periodically evaluates whether events and circumstances have occurred that may warrant revision of the estimated useful lives of property and equipment or whether the remaining balance of property and equipment should be evaluated for possible impairment. If events and circumstances warrant evaluation, the Company uses an estimate of the related undiscounted cash flows over the remaining life of the property and equipment in measuring their recoverability. The Company currently owns furniture and office equipment as its depreciable assets.

### e. Impairment of long-lived assets

The Company reviews and evaluates long-lived assets for impairment when events or changes in circumstances indicate the related carrying amounts may not be recoverable. The assets are subject to impairment consideration under ASC 360-10-35-17, *Measurement of an Impairment Loss*, if events or circumstances indicate that their carrying amount might not be recoverable. As of June 30, 2012, exploration progress is on schedule with the Company's exploration and evaluation plan and no events or circumstances have happened to indicate that the related carrying values of the properties may not be recoverable. When the Company determines that an impairment analysis should be done, the analysis will be performed using the rules of FASB ASC 930-360-35, *Asset Impairment*, and 360-10-15-3 through 15-5, *Impairment or Disposal of Long-Lived Assets*.

Various factors could impact the Company's ability to achieve forecasted production schedules.

32

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

Additionally, commodity prices, capital expenditure requirements and reclamation costs could differ from the assumptions the Company may use in cash flow models used to assess impairment. The ability to achieve the estimated quantities of recoverable minerals from exploration stage mineral interests involves further risks in addition to those factors applicable to mineral interests where proven and probable reserves have been identified, due to the lower level of confidence that the identified mineralized material can ultimately be mined economically.

Material changes to any of these factors or assumptions discussed above could result in future impairment charges to operations.

### f. Fair Value of Financial instruments

The Company adopted FASB ASC 820-10-50, "*Fair Value Measurements*. This guidance defines fair value, establishes a three-level valuation hierarchy for disclosures of fair value measurement and enhances disclosure requirements for fair value measures. The three levels are defined as follows:

· Level 1 inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.

· Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

· Level 3 inputs to valuation methodology are unobservable and significant to the fair measurement.

The carrying amounts reported in the balance sheet for the cash and cash equivalents, and current liabilities each qualify as financial instruments and are a reasonable estimate of fair value because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest.

### g. Environmental expenditures

The operations of the Company have been, and may in the future, be affected from time to time, in varying degrees, by changes in environmental regulations, including those for future reclamation and site restoration costs. Both the likelihood of new regulations and their overall effect upon the Company vary greatly and are not predictable. The Company's policy is to meet or, if possible, surpass standards set by relevant legislation, by application of technically proven and economically feasible measures.

Environmental expenditures that relate to ongoing environmental and reclamation programs are charged against earnings as incurred or capitalized and amortized depending on their future economic benefits. Estimated future reclamation and site restoration costs, when the ultimate liability is reasonably determinable, are charged against earnings over the estimated remaining life of the related business operation, net of expected recoveries. No costs have been, or may never be recognized by the Company for environmental expenditures.

### h. Income taxes

33

**APP 0231**

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

The Financial Accounting Standards Board (FASB) has issued FASB ASC 740-10 (Prior authoritative literature: Financial Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - An Interpretation of FASB Statement No. 109 (FIN 48)). FASB ASC 740-10 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with prior literature FASB Statement No. 109, Accounting for Income Taxes. This standard requires a company to determine whether it is more likely than not that a tax position will be sustained upon examination based upon the technical merits of the position. If the more-likely-than-not threshold is met, a company must measure the tax position to determine the amount to recognize in the financial statements. As a result of the implementation of this standard, the Company performed a review of its material tax positions in accordance with recognition and measurement standards established by FASB ASC 740-10.

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

### i. Basic and diluted net loss per share

The Company computes net loss per share of common stock in accordance with ASC 260, Earnings per Share ("ASC 260"). Under the provisions of ASC 260, basic net income (loss) per share is computed using the weighted average number of common shares outstanding during the period. Diluted net loss per share is computed using the weighted average number of common shares and, if dilutive, potential common shares outstanding during the period. Potential common shares consist of the incremental common shares issuable upon the exercise of stock options and warrants and the conversion of convertible promissory notes. Stock options of 6,950,000 as of June 30, 2012 and warrants in the amount of 10,027,500 as of June 30, 2012 were considered in the calculation but not included due to anti-dilution. The dilutive effect of these instruments is reflected in diluted earnings per share by application of the treasury stock method.

The Company's calculation of basic and diluted loss per share is as follows:

|  |  | For the Years Ended | | |
| --- | --- | --- | --- | --- |
|  |  | June 30, 2012 |  | June 30, 2011 |
| Basic Earnings per share: |  |  |  |  |
| Income (Loss) (numerator) | $ | (5,689,256) | $ | (1,464,253) |
| Shares (denominator) |  | 75,705,683 |  | 69,733,334 |
| Per Share Amount | $ | (0.08) | $ | (0.02) |

34

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

| | | For the Years Ended | |
| --- | --- | --- | --- |
| | | June 30, 2012 | June 30, 2011 |
| Fully Diluted Earnings per share: | | | |
| Income (Loss) (numerator) | $ | (5,689,256) $ | (1,464,253) |
| Shares (denominator) | | 75,705,683 | 69,733,334 |
| Per Share Amount | $ | (0.08) $ | (0.02) |

### j. Stock-Based compensation

In December 2004, FASB issued FASB ASC 718 (Prior authoritative literature: SFAS No. 123R, *"Share-Based Payment")*. FASB ASC 718 establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. FASB ASC 718 focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. FASB ASC 718 requires that the compensation cost relating to share-based payment transactions be recognized in the financial statements. That cost will be measured based on the fair value of the equity or liability instruments issued.

### k. Use of estimates and assumptions

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. In these financial statements, assets, liabilities and earnings involve extensive reliance on management's estimates. Actual results could differ from those estimates. The Company's periodic filing with the Securities and Exchange Commission ("SEC") include, where applicable, disclosures of estimates, assumptions, uncertainties, and market that could affect the financial statements and future operations of the Company.

### l. Concentrations of credit risk

The Company's financial instruments that are exposed to concentrations of credit risk primarily consist of its cash and related party payables. The Company places its cash and cash equivalents with financial institutions of high credit worthiness. At times, its cash equivalents with a particular financial institution may exceed any applicable government insurance limits. The Company's management also routinely assesses the financial strength and credit worthiness of any parties to which it extends funds and as such, it believes that any associated credit risk exposures are limited.

### m. Risks and uncertainties

35

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

The Company operates in the resource exploration industry that is subject to significant risks and uncertainties, including financial, operational, and other risks associated with operating a resource exploration business, including the potential risk of business failure.

**n. Foreign currency translation**

Comprehensive income is the total of (i) net income plus (ii) all other changes in net assets arising from non-owner sources, which are referred to as other comprehensive income. The Company has presented a single statement of comprehensive income. An analysis of changes in components of accumulated other comprehensive income is presented below the total net income or loss on the income statement.

**Note 3 – New Technical Pronouncements**

The Company has reviewed accounting pronouncements issued during the past two years and has assessed the adoption of any that are applicable to the Company.  Management has determined that none had a material impact on the financial position, results of operations, or cash flows for the fiscal years ended June 30, 2012 and 2011.

**Note 4 - Mineral Property**

Pursuant to a mineral property purchase agreement dated May 24, 2007, the Company acquired a 100% undivided right, title and interest in a mineral claim, located in Section 8 of T35N, R36E Mount Diablo Base Meridian in Elko County, within the state of Nevada for a cash payment of $10,000. The Company must annually renew the lease on the land with the state for $1,800 and has not renewed the lease as of fiscal year end, June 30, 2010. The lease has expired.

Since the Company had not established the commercial feasibility of the mineral claim, the acquisition costs had been capitalized. The Company has not depleted the mineral claims as no proven reserves have been found. The Company was not able to keep the mineral claim in good standing due to lack of funding. The Company allowed the mineral claim to lapse at the end of June 2009. At June 30, 2009, the Company determined that there was little, or no, possibility of the company generating revenues related to the mining interests. This, coupled with the lapse of the mineral claims lease, was determined to be an impairment of the asset. As such, the Company's management determined to fully impair the mining interests, which was a charged to the Company's statements of operations in the amount of $11,800.

On March 29, 2010, the Company entered into an Exploration Earn-In Agreement (the "Agreement") with AuEx Ventures, Inc., a Nevada corporation. The Agreement relates to the Trinity Silver property (the "Property") located in Pershing County, Nevada, which consists of a total of approximately 10,600 acres, including 5,700 acres of fee land and 240 unpatented mining claims.

Under the Agreement, the Company may earn-in a 70% undivided interest in the Property during a 6-year period in consideration of (1) a signing payment of $25,000, which has been made and has been capitalized, (2) an expenditure of a cumulative total of $5,000,000 in exploration and development expenses on the Property by March 29, 2016, and (3) completion of a bankable feasibility study on the Property on or before the 7th anniversary date of the Agreement.

The Company has completed, and continues to pursue, financing opportunities to be in compliance with

36

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

terms of the Earn-In Agreement. There has been no mining of resources to date.

Subsequent to the fiscal year ended June 30, 2012, as discussed in Note 10 herein, on August 8, 2012, the Company entered into a conditional letter agreement with Primus Resources, L.C. to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the Company's Trinity property in Nevada.

**Note 5 - Capital Stock and Warrants**

    **Authorized**

The total authorized capital is 200,000,000 common shares with a par value of $0.001 per common share.

    **Issued and outstanding**

In April 2007 the Company issued 4,000,000 and 1,000,000 shares of our common stock for cash at $0.001 and $0.01 per share, respectively.

In May 2007 the Company issued 420,000 shares of our common stock for cash at $0.05 per share.

In February 2010, the board of directors authorized a 20-for-1 forward stock split of the Company's currently issued and outstanding common stock. Prior to approval of the forward split the Company had a total of 5,420,000 issued and outstanding shares of $0.001 par value common stock. On the effective date of the forward split, the Company has a total of 108,400,000 issued and outstanding shares of $0.001 par value common stock. The stock split has been retroactively applied to all prior equity transactions.

In May 2010, the Company issued 1,333,334 units ("Units") for cash at US $0.75 per Unit. Each Unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at a price of $1.25 per share at any time during the 24 months following the date of closing of the private placement offering.

In May 2010, a director of the Company surrendered 40,000,000 of his common stock to the company.

On July 27, 2011, the Company issued 200,000 units ("Units") for cash at CDN $0.55 (US $0.58) per Unit. Each Unit consisted of one common share and one half of one common share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of CDN$0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.

On August 4, 2011, the Company issued 1,000,000 units ("Units") for cash at CDN $0.55 (US $0.57) per Unit. Each Unit consisted of one common share and one half of one common share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of CDN$0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.

On November 10, 2011, Liberty Silver issued 6,500,000 subscription receipts to an investor (the

37

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

"Subscription Receipts") pursuant to a private placement at a price of US$ 0.50 per Subscription Receipt for gross proceeds of US $3,250,000; there were no underwriting discounts or commissions paid.  On December 19, 2011, each Subscription Receipt was automatically converted for no additional consideration, into one unit of the Company (a "Unit") as a result of the Company's receipt of notice that its common stock was accepted for trading on the Toronto Stock Exchange under the trading symbol, "LSL", effective as of December 22, 2011.  Each Unit is comprised of one common share and one common share purchase one warrant ("Warrant"). Each Warrant is exercisable at a price of US $0.65 per share at any time until 5:00 p.m. (Toronto time) on December 31, 2013.  In conjunction with the issuance of Subscription Receipts, the Company entered into a Registration Rights Agreement (the "Registration Rights Agreement") with the investor, pursuant to which the Company agreed, following the conditional approval by the Toronto Stock Exchange, to file a registration statement on Form S-1 with the Securities and Exchange Commission which registers the common stock and common stock underlying the Warrants acquired by the investor for resale.  If the registration statement did not become effective on or before six months from the date of conditional approval by the Toronto Stock Exchange for the listing of the common stock of the Company, the investor would receive an additional common share for each ten (10) common shares.  On May 31, 2012, the Company issued 650,000 common shares in satisfaction of this contractual obligation, the value for which of $416,000 was determined by the closing market price of $0.64 per share on the date of issuance.

On December 19, 2011, Liberty Silver completed a private placement offering, pursuant to which the Company raised a total of US $1,313,750 through the sale of 2,627,500 units ("Units") at a purchase price of US $0.50 per Unit; there were no underwriting discounts or commissions paid.  Each Unit consists of one common share and one common share purchase warrant (a "Warrant").  Each Warrant entitles the holder to acquire one common share at a price of US $0.65 for a period of two years following the date of the closing of the financing. The Units were not registered under the Securities Act of 1933 (the "Securities Act") in reliance upon the exemptions from registration contained in Section 4(2) and Regulation D thereunder, and Regulation S of the Securities Act.

As of June 30, 2012, the Company had 80,710,834 shares of the common stock issued and outstanding.

### Stock warrants

In May 2010, the Company commenced a private stock offering, whereby it authorized the issuance of 1,333,334 units consisting of one share of its common stock and one common stock purchase warrant for a total raise of $1,000,000. The common stock purchase warrants are exercisable at $1.25 per share and carrying a two-year exercise period. The offering was closed as of May 26, 2010. All 1,333,334 units were issued and $1,000,000 in cash was received.

The amount of warrant expense related to this offering for the year ending June 30, 2010 was $522,191. The expense was calculated using the Black-Scholes pricing model.

In April 2011, the Company borrowed $150,000 from related parties. In conjunction with each $25,000 note, the Company issued a warrant to purchase 50,000 share of the Company's common stock at $0.55 per share for a three-year term, commencing on the date of the note. The total number of warrants for purchase is 300,000 shares.

The amount of warrant expense related to this related party payable for the year ending June 30, 2012 was $370,075 and was 40,000 for the year ending June 30, 2011. The expense was calculated using the

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

Black-Scholes pricing model.

On July 27, 2011, the Company issued 200,000 units ("Units") for cash at CDN $0.55 (US $0.58) per Unit. Each Unit consisted of one common share and one half of one common share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of CDN$0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.

On August 4, 2011, the Company issued 1,000,000 units ("Units") for cash at CDN $0.55 (US $0.57) per Unit. Each Unit consisted of one common share and one half of one common share purchase warrant (each whole such warrant, a "Warrant"). Each Warrant entitles the holder thereof to acquire one common share of the Company (a "Warrant Share") at a price of CDN$0.75 until the date which is 60 months following the closing date of the private placement offering (the "Warrant Term"), provided, however, that the Company may accelerate the Warrant Term under certain conditions.

On November 10, 2011, Liberty Silver issued 6,500,000 subscription receipts to an investor (the "Subscription Receipts") pursuant to a private placement at a price of US$ 0.50 per Subscription Receipt for gross proceeds of US $3,250,000; there were no underwriting discounts or commissions paid. On December 19, 2011, each Subscription Receipt was automatically converted for no additional consideration, into one unit of the Company (a "Unit") as a result of the Company's receipt of notice that its common stock was accepted for trading on the Toronto Stock Exchange under the trading symbol, "LSL", effective as of December 22, 2011. Each Unit is comprised of one common share and one common share purchase one warrant ("Warrant"). Each Warrant is exercisable at a price of US $0.65 per share at any time until 5:00 p.m. (Toronto time) on December 31, 2013. In conjunction with the issuance of Subscription Receipts, the Company entered into a Registration Rights Agreement (the "Registration Rights Agreement") with the investor, pursuant to which the Company has agreed, following the conditional approval by the Toronto Stock Exchange, to file a registration statement on Form S-1 with the Securities and Exchange Commission which registers the common stock and common stock underlying the Warrants acquired by the Investor for resale. If the registration statement does not become effective on or before six months from the date of conditional approval by the Toronto Stock Exchange for the listing of the common stock of the Company, Investor shall receive an additional common share and Warrant for, respectively, each ten (10) common shares.

On December 19, 2011, Liberty Silver completed a private placement offering, pursuant to which the Company raised a total of US $1,313,750 through the sale of 2,627,500 units ("Units") at a purchase price of US $0.50 per Unit; there were no underwriting discounts or commissions paid. Each Unit consists of one common share and one common share purchase warrant (a "Warrant"). Each Warrant entitles the holder to acquire one common share at a price of US $0.65 for a period of two years following the date of the closing of the financing. The Units were not registered under the Securities Act of 1933 (the "Securities Act") in reliance upon the exemptions from registration contained in Section 4(2) and Regulation D thereunder, and Regulation S of the Securities Act.

The amount of warrant expense related to these investments for the year ending June 30, 2012 was $1,826,160. The expense was calculated using the Black-Scholes pricing model.

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

The fair value of warrants was established at the date of grant using the Black-Scholes valuation model with the following underlying assumptions:

1) Risk free interest rate:
   2012:   0.24% - 1.51%
   2011:   1.31%

2) Dividend yield:
   2012 & 2011:   0%

3) Volatility:
   2012:   102.90% - 113.77%
   2011:   200%

4) Weighted average remaining life:
   2012:   1.63 years
   2011:   2.75 years

The following table summarizes information about warrants as of June 30, 2012:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, July 1, 2009 | - | $ | - |
| Warrants granted | 1,333,334 | | 1.25 |
| Warrants expired | - | | - |
| | | | |
| Outstanding, June 30, 2010 | 1,333,334 | $ | 1.25 |
| Exercisable, June 30, 2010 | 1,333,334 | $ | 1.25 |

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, July 1, 2010 | 1,333,334 | | 1.25 |
| Warrants granted | 300,000 | | 0.55 |
| Warrants exercised | - | | - |
| | | | |
| Outstanding, June 30, 2011 | 1,633,334 | $ | 1.12 |
| Exercisable, June 30, 2011 | 1,633,334 | $ | 1.12 |
| | | | |
| Outstanding, July 1, 2011 | 1,633,334 | | 1.12 |
| Warrants granted | 9,727,500 | | 0.66 |
| Warrants exercised | - | | - |
| Warrants expired | 1,333,334 | | 1.25 |
| Outstanding, June 30, 2012 | 10,027,500 | $ | 0.65 |

40

**APP 0238**

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

| | | | |
|---|---|---|---|
| Exercisable, June 30, 2012 | 10,027,500 | $ | 0.65 |

The following table summarizes information about stock warrants granted to employees, advisors, investors and board members at June 30, 2012:

| | Warrants Outstanding | | | | Warrants Exercisable | |
|---|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | | Number of Warrants | Weighted Average Exercise Price |
| $ 0.55 | 300,000 | $ 0.55 | 1.75 | | 300,000 | $ 0.55 |
| $ 0.75 (1) | 600,000 | $ 0.75 (1) | 4.08 | | 600,000 | $ 0.75(1) |
| $ 0.65 | 9,127,500 | $ 0.65 | 1.47 | | 9,127,500 | $ 0.65 |

(1)  Figure expressed in $CDN

As of June 30, 2012, the aggregate weighted-average intrinsic value of the warrants outstanding and exercisable was $1,604,400. The weighted-average grant-date fair value of warrants outstanding as of June 30, 2012 was $0.65.

### Stock options

In October 2010, the Company granted to Geoff Browne, Chief Executive Officer, 3,000,000 stock options of the Company's common stock to be purchased at $0.75 per share for a 5 year term, all of which are vested. In addition, the Company granted the directors, Paul Haggis, Timothy Unwin, John Barrington, and George Kent, each 300,000 stock options, for a total of 1,200,000, to purchase the Company's common stock at $0.75 per share for a 5 year term, all of which are vested.

In December 2010, the Company granted director W. Thomas Hodgson 300,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term, all of which are vested.

In April 2011, the Company granted consultant Kevin O'Connor 100,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term, all of which are vested.

In April 2011, the Company granted director and employee John Barrington 500,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term, all of which have vested.

In April 2011, the Company granted director and officer Bill Tafuri 800,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term.  Pursuant to the terms of the option

41

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

agreement, entered into between Mr. Tafuri and the Company, a total of 266,664 options vested immediately upon the grant of the options; the remaining 533,336 options vest over a two year period.  The vesting of the remaining 533,336 options may be accelerated in the event the Company achieves certain milestones with respect to its mining operations.

In April 2011, the Company granted employee Dick Klatt 600,000 stock options to purchase the Company's common stock at $0.75 per share for a 5 year term.  Pursuant to the terms of the option agreement, entered into between Mr. Klatt and the Company, a total of 200,000 options vested immediately upon the grant of the options; the remaining 400,000 options vest over a two year period.  The vesting of the remaining 400,000 options may be accelerated in the event the Company achieves certain milestones with respect to its mining operations.

In January 2012, the Company granted non-qualified stock options of 450,000 shares at an exercise price of $1.00 per share for a 5 year term to Manish Z. Kshatriya, Chief financial Officer and Executive Vice President. Pursuant to the terms of the option agreement, entered into between Mr. Kshatriya and the Company, a total of 150,000 options vest six months from the grant date, 150,000 options will vest 18 months following the grant date, and the remaining 150,000 options vest 30 months following the grant date of the options.

The amount of stock option compensation expense for the year ending June 30, 2011 was $639,731. The expense was calculated using the Black-Scholes pricing model.

The fair value of stock options was established at the date of grant using the Black-Scholes valuation model with the following underlying assumptions:

1)  Risk free interest rate:
    2012:   0.79% - 2.09%
    2011:   1.14% - 2.09%

2)  Dividend yield:
    2012 & 2011:   0%

3)  Volatility:
    2012:   95.11% - 164.27%
    2011:   127.32% - 164.27%

4)  Weighted average remaining life:
    2012:   3.59 years
    2011:   4.52 years

The following table summarizes information about options as of June 30, 2012:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, July 1, 2010 | - | $ | - |
| Options granted | 6,500,000 | | .75 |

42

**APP 0240**

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

|  |  |  |  |
|---|---:|---|---:|
| Options expired | - |  | - |
| Options cancelled | - |  | - |
| Outstanding, June 30, 2011 | 6,500,000 | $ | - |
| Exercisable, June 30, 2011 | 6,500,000 | $ | - |
|  |  |  |  |
| Outstanding, July 1, 2011 | 6,500,000 | $ | .75 |
| Options granted | 450,000 |  | 1.00 |
| Options expired | - |  | - |
| Options cancelled | - |  | - |
| Outstanding, June 30, 2012 | 6,950,000 | $ | 0.88 |
| Exercisable, June 30, 2012 | 6,500,000 | $ | 0.75 |

The following table summarizes information about stock warrants granted to employees, advisors, investors and board members at June 30, 2012:

| Stock Options Outstanding | | | | Stock Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life   (in years) | Number of Options | Weighted Average Exercise Price |
| $   0.75 | 6,500,000 | $   0.75 | 3.52 | 6,500,000 | $   0.75 |
| $   1.00 | 450,000 | $   1.00 | 4.55 | 450,000 | $   1.00 |

As of June 30, 2012, the aggregate intrinsic value of the stock options outstanding and exercisable was $0. The weighted-average grant-date fair value of stock options granted for the year ended June 30, 2012 was $0.88.

**Note 6 – Related Party Payable**

Effective April 1, 2011, the Company borrowed a total of $150,000 pursuant to the terms and conditions of promissory notes (individually referred to as a "Note" and collectively referred to as the "Notes") entered into with six of the Company's directors. Each Note was for $25,000 and was required to be repaid by the Company on the earlier of one year, or when the Company raised a minimum of $2,000,000 through equity investments. The Notes were interest free for the first six months following the date of the Note and then bore interest at a rate of 8% per annum thereafter. In conjunction with the entry into the Notes, in lieu of the holders charging the Company interest on the outstanding principal of the Notes for the initial six months, the Company issued each holder a warrant entitling the holder to purchase up to a total of 50,000 shares of the Company's common stock at a price of $0.55 per share for a period of three (3) years following the date of the Note. The Notes were repaid during the year at the time of the Company's equity financing during the year.

43

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

## Note 7 – Commitments and Contingencies

Effective November 1, 2011, the Company entered into a sub-lease agreement for the lease of premises in Toronto, Ontario, Canada, for a term of 54 months.  The Company has its head office at these premises, which is approximately 1,400 square feet.  The annual base rent commitment for the Toronto head office space is CAD $48,094.

Effective February 8, 2012, the Company entered into a lease agreement for the lease of premises in Sparks, Nevada, USA, for a term of 12 months.  The Company has its field office at these premises, which is approximately 5,500 square feet.  The annual base rent commitment for the Sparks field office space is USD $27,972.

As at June 30, 2012, the Company had a commitment, for the above noted leases, of USD $196,123 remaining.

The following table outlines the remaining lease commitment at the end of the next five fiscal years based on the leases that are currently entered into by the Company:

| Year | Total Lease Commitment |
|---|---|
| 2012 | $196,123 |
| 2013 | $132,900 |
| 2014 | $85,994 |
| 2015 | $39,088 |
| 2016 and thereafter | $0 |

Additionally, in the normal course of operations, certain contingencies may arise relating to legal actions undertaken against the Company. In the opinion of management, the outcome of such potential legal actions will not have a material adverse effect on the Company's results of operations, liquidity, or its financial position.

## Note 8 - Income Taxes

The Financial Accounting Standards Board (FASB) has issued FASB ASC 740-10 (Prior authoritative literature: Financial Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - An Interpretation of FASB Statement No. 109 (FIN 48)).  FASB ASC 740-10 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with prior literature FASB Statement No. 109, Accounting for Income Taxes.  This standard requires a company to determine whether it is more likely than not that a tax position will be sustained upon examination based upon the technical merits of the position.  If the more-likely-than-not threshold is met, a company must measure the tax position to determine the amount to recognize in the financial statements.  As a result of the implementation of this standard, the Company performed a review of its material tax positions in accordance with recognition and measurement standards established by FASB ASC 740-10.

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carry forwards and deferred tax liabilities are recognized for taxable temporary differences.  Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis.  Deferred tax assets are reduced

44

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized.  Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

As of June 30, 2012, the Company had no accrued interest and penalties related to uncertain tax positions. The income tax provision differs from the amount of income tax determined by applying the U.S. federal and state income tax rates of 34% to pretax income from continuing operations for the years ended June 30, 2012 and 2011 due to the following:

Deferred tax assets and the valuation account are as follows:

| | | For the Years Ended June 30, | | |
|---|---|---|---|---|
| | | 2012 | | 2011 |
| Deferred tax asset: | | | | |
| Net operating loss carry forward | $ | 2,729,176 | $ | 794,829 |
| Valuation allowance | | (2,729,176) | | (794,829) |
| Total | $ | - | $ | - |

The components of income tax expense are as follows:

| | | For the Years Ended June 30, | | |
|---|---|---|---|---|
| | | 2012 | | 2011 |
| Current Federal tax | $ | - | $ | - |
| Current State tax | | - | | - |
| Change in NOL benefit | | 1,934,347 | | 497,846 |
| Change in valuation allowance | | (1,934,347) | | (497,846) |
| Total | $ | - | $ | - |

The potential income tax benefit of these losses has been offset by a full valuation allowance.

As of June 30, 2012 and 2011, the Company has an unused net operating loss carry-forward balance of $2,729,176 and $794,829 that is available to offset future taxable income. This unused net operating loss carry-forward balance begins to expire in 2029.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | | Years Ended June 30, | | |
|---|---|---|---|---|
| | | 2012 | | 2011 |
| Beginning balance | $ | - | $ | - |

45

**APP 0243**

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

| | | |
|---|---|---|
| Additions based on tax positions related to current year | - | - |
| Additions for tax positions of prior years | - | - |
| Reductions for tax positions of prior years | - | - |
| Reductions in benefit due to income tax expense | - | - |
| Ending balance | $               - | $               - |

At June 30, 2012 and 2011, the Company had no unrecognized tax benefits that, if recognized, would affect the effective tax rate.

The Company did not have any tax positions for which it is reasonably possible that the total amount of unrecognized tax benefits will significantly increase or decrease within the next 12 months.

As of June 30, 2012 and 2011, the Company had no accrued interest or penalties related to uncertain tax positions.

The tax years that remain subject to examination by major taxing jurisdictions are those for the years ended June 30, 2012, 2011, 2010 and 2009.

## Note 9 – Going Concern

These financial statements have been prepared on a going concern basis. The Company has incurred losses since inception resulting in an accumulated deficit of $8,026,990 and further losses are anticipated in the development of its business. This raises substantial doubt about the Company's ability to continue as a going concern. Its ability to continue as a going concern is dependent upon the ability of the Company to generate profitable operations in the future and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due.

Management has plans to pursue various financing alternatives including, but not limited to, merger and acquisition activity, raising capital through the capital markets and debt financing. These financial statements do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts of and classification of liabilities that might be necessary in the event the Company cannot continue in existence.

The ability of the Company to emerge from the exploration stage is dependent upon, among other things, obtaining additional financing to continue operations, explore and develop the mineral properties and the discovery, development, and sale of reserves.

These factors, among others raise substantial doubt about the Company's ability to continue as a going concern. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

## Note 10 – Subsequent events

On August 8, 2012, Liberty Silver entered into a conditional letter agreement with Primus Resources, L.C. to acquire approximately 100 acres located adjacent to the former Trinity Silver mine on the

46

**Liberty Silver Corp**
Notes to the Financial Statement
June 30, 2012 and 2011

Company's Trinity property in Nevada (the "Hi Ho Properties"). The Hi Ho Properties are the only acreage not controlled by Liberty Silver or its joint venture partner Renaissance Gold Inc. on the Trinity land package. Under the terms of the Agreement, Liberty Silver will provide cash consideration of US$150,000 and issue 3,000,000 common shares of Liberty Silver stock to Primus. In addition, Primus will be granted a 2% net smelter royalty ("NSR") on future production from the Hi Ho Properties. The total consideration for the acquisition of the Hi Ho Properties will be applied to Liberty Silver's expenditure commitment under its Earn-In Agreement with Renaissance, upon acceptance by Renaissance, pursuant to the applicable area of interest provisions. With the addition of the Hi Ho Properties payment, Liberty Silver will have contributed in excess of 85% of its required US$5 million expenditure commitment to earn its 70% interest in the project. Pursuant to the terms of its Earn-In Agreement with Renaissance, the Company has until March 29, 2016 to incur the balance of its expenditure commitment and, in addition, produce a bankable feasibility study in the following year.

As disclosed on Form CB filed with the Securities and Exchange Commission on July 17, 2012, on July 16, 2012 Liberty Silver commenced an offer (the "Offer") to purchase all of the issued and outstanding common shares of Sennen Resources Ltd. ("Sennen"). The Offer was open for acceptance by Sennen shareholders until 11:59 P.M. on Monday September 10, 2012. The Offer was not accepted by the requisite number of Sennen shareholders, therefore the Offer was terminated on September 11, 2012 at 12:00 A.M.

Liberty Silver Corp has evaluated subsequent events for the period ended June 30, 2012 through the date the financial statements were issued, and concluded, aside from the foregoing, that there were no other events or transactions occurring during this period that required recognition or disclosure in its financial statements.

**ITEM 9.     CHANGES   IN   AND   DISAGREEMENTS   WITH   ACCOUNTANTS   ON ACCOUNTING AND FINANCIAL DISCLOSURE**

As disclosed on Form 8-K filed with the SEC on February 4, 2011, the Company changed its accountants. The Company has had no disagreements with its accountants, which would be required to be disclosed pursuant to Item 304 of Regulation S-K.

**ITEM 9A.   CONTROLS AND PROCEDURES.**

**Disclosure Controls and Procedures**

The Securities and Exchange Commission defines the term "disclosure controls and procedures" to mean a company's controls and other procedures of an issuer that are designed to ensure that information required to be disclosed in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.  The Company maintains such a system of controls and procedures in an effort to ensure that all information which it is required to disclose in the reports it files under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified under the SEC's rules and forms and that information required to be disclosed is accumulated and communicated to principal executive and principal financial officers to allow timely decisions regarding disclosure.

As of the end of the period covered by this report, The Company carried out an evaluation, under the supervision and with the participation of the chief executive officer and the chief financial officer, of the effectiveness of the design and operation of disclosure controls and procedures.  Based on this evaluation, the chief executive officer and chief financial officer concluded that disclosure controls and procedures are designed to provide reasonable assurance of achieving the objectives of alerting them on a timely basis to material information required to be included in periodic SEC reports and of ensuring that such information is recorded, processed, summarized and reported within the time periods specified.  The Company's chief executive officer and chief financial officer also concluded that disclosure controls and procedures were effective as of the end of the period covered by this report to provide reasonable assurance of the achievement of these objectives.

**Internal Control Over Financial Reporting**

The management of the Company is responsible for the preparation of the financial statements and related financial information appearing in this Annual Report on Form 10-K. The financial statements and notes have been prepared in conformity with accounting principles generally accepted in the United States of America. The management of the Company also is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. A company's internal control over financial reporting is defined as a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded

48

**APP 0246**

as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Management, including the Chief Executive Officer and Chief Financial Officer, does not expect that the Company's disclosure controls and internal controls will prevent all error and all fraud. Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable, not absolute, assurance that the objectives of the control system are met and may not prevent or detect misstatements. Further, over time, control may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate.

With the participation of the Chief Executive Officer and Chief Financial Officer, the Company's management evaluated the effectiveness of the Company's internal control over financial reporting as of June 30, 2012 based upon the framework in Internal Control –Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, management has concluded that, as of June 30, 2012, the Company's internal control over financial reporting was effective.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report is not subject to attestation by the Company's registered public accounting firm.

There was no change in the Company's internal control over financial reporting during the last fiscal quarter, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

## ITEM 9B.    OTHER INFORMATION.

None.

# PART III

## ITEM 10.        DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE.

### Directors and Executive Officers

The following table sets forth the our directors, executive officers, promoters and control persons, their ages, and all offices and positions held within the Company as of June 30, 2012.  Directors are elected for a period of one year and thereafter serve until their successor is duly elected by the stockholders and qualified.  Officers and other employees serve at the will of the board of directors.

| Name | Age | Present Position With the Company | Since |
| --- | --- | --- | --- |
| R. Geoffrey Browne | 58 | Chief Executive Officer, Chairman | October 2010 |
| Manish Z. Kshatriya | 39 | Chief Financial Officer, Executive VP | January 2012 |
| Bill Tafuri | 71 | President, Chief Operating Officer, Director | October 2010 |
| John Pulos | 46 | Director | February 2007 |
| John Barrington | 67 | Director | October 2010 |
| George Kent | 82 | Director | October 2010 |

49

**APP 0247**

| Paul Haggis | 60 | Director | October 2010 |
| Tim Unwin | 69 | Director | October 2010 |
| Tom Hodgson | 59 | Director | December 2010 |
| Dick Klatt | 76 | Vice President of Exploration | October 2010 |

**Biographical Information**

*Geoff Browne*.  Mr. Browne currently serves as our Chief Executive Officer and a Director of the Company.  Mr. Browne has over 30 years of experience in the financial services industry in Canada, the U.S. and London, England.  In addition to his work with the Company, since July 1996 Mr. Browne has served as the Managing Partner of MWI & Partners, a private equity firm located in Ontario, Canada.  As the managing partner of MWI & Partners, Mr. Browne is responsible for making investments for the company.  Prior to founding MWI & Partners, Inc., from September 1976 to June 1996 Mr. Browne was a senior executive with Canadian Imperial Bank of Commerce and CIBC Wood Gundy Inc.  The last position he held at CIBC was Chief of Staff for CIBC World Markets.  Mr. Browne is active on numerous other corporate and not-for-profit Boards, and is one of three independent members of the Investment Review Committee of UBS Global Asset Management (Canada) Co. Mr. Browne is holds a B.A. in economics from the University of Western Ontario.

*Manish Z. Kshatriya*.  Mr. Kshatriya has over 14 years of progressive experience in corporate finance, accounting, taxation and auditing obtained in public accounting practice and industry. From January 2006 until October 2011, Mr. Kshatriya worked for Augen Capital Corp., a Toronto based, Canadian listed mining merchant bank where he served as both the Director of Finance, and most recently the Chief Financial Officer.  As the Director of Finance and Chief Financial Officer, Mr. Kshatriya was responsible for the management and oversight of all financial matters for Augen Capital Corp.  Mr. Kshatriya is a Chartered Accountant and a member of the Institute of Chartered Accountants of Ontario. He is also a Certified Public Accountant in the United States and a member of the Colorado State Board of Accountancy.

*William Tafuri*.  Mr. Tafuri currently serves as our President, Chief Operating Officer, and as a Director of the Company.  Mr. Tafuri has a Ph.D. in geology and over 35 years of diverse mining and exploration experience in precious and base metals. Mr. Tafuri has worked for a number of major international mining companies and has held management positions in both domestic and foreign locations for Getty Mining Co., Santa Fe Pacific Gold Corp., and Kinross Gold Corp. He has extensive consulting experience, both domestic and foreign. He has extensive exploration and mine development experience in the USA, Central Asia, and Russia. From March 2010to the present Mr. Tafuri has been the President and COO of the Company.  As March of 2010 Mr. Tafuri was responsible for managing the operations of the Company.  From January 2007 to December 2009, Mr. Tafuri was the President of Yellowcake Mining Company, which was located in Vancouver, B.C., Canada, and was in the business of mining.  As of January 2007, Mr. Tafuri was responsible for the acquisition and exploration of uranium properties in Wyoming and Colorado.  From June 2004 to November 2006 Mr. Tafuri was the Vice President of Centrasia Mining Company, which was located in Vancouver, B.C., Canada and was in the business of mining.  As of June 2004, Mr. Tafuri was responsible for the acquisition and exploration of mining properties in Central Asia.  Mr. Tafuri received his B.S. and M.S. degrees in geology at the University of Nevada-Reno and his Ph.D. in geology at the University of Utah.

*John Pulos*.  Mr. Pulos currently serves as a member of the Board of Directors.  Mr. Pulos has been involved in the real estate market for the past 20 years with a focus on development, investment and obtaining land entitlements throughout the United States and Canada as well as investing in many private and public companies.  From February 2007 to present Mr. Pulos has been a director and officer of Liberty Silver.  In May 2010 Mr. Pulos became CFO and Vice President of Liberty Silver and duties

50

**APP 0248**

included all filings, accounts payable and help in running the day-to-day operations of Liberty.   In January 2012, Mr. Pulos stepped down as CFO and Vice President but remains on the Board of Directors. Mr. Pulos obtained his Bachelor of Arts in Political Science from the University of Washington and a Masters of Science in Real Estate Finance at New York University.

*Paul Haggis* Mr. Haggis currently serves as a Director of the Company.  In addition to his work as a Director of the Company, from March 2008 to the present, Mr. Haggis has served as the Chairman of the Alberta Enterprise Corporation, a venture capital fund that focuses on first stage ventures.   As the Chairman of the Alberta Enterprise Corporation, Mr. Haggis is responsible for overseeing management and approving, with the board, fund investments and company policy. Additionally, currently Mr. Haggis is also an active director of Canadian Tire Bank, Chair of the Audit Committee of Advantage Energy of Calgary, Chairman of CA Bancorp, Toronto, and is an Honorary Trustee and of the Royal Ontario Museum.  In Addition Paul has overseen and is actively engaged in the investment program at ICBC as advisor the Investment Committee.  He was Chair of the Investment Committee of the Board until December 31st 2011.   From Sept 2003 until May 2007, Mr. Haggis served as the President and CEO of OMERS, one of Canada's largest pension plans.  As the President and CEO, Mr. Haggis was responsible for overseeing all of the business operations of OMERS. During Mr. Haggis' leadership, OMERS assets grew to more than $48 Billion dollars in assets with value added of 2.6 billion dollars.

*Timothy Unwin*.  Mr. Unwin currently serves as a Director of the Company.  In addition to his work for the Company, Mr. Unwin is also the Chairman of the board of Evoke Neurosciences Inc., a private U.S based company specializing in neurological testing and reporting, and from December 2008 to the present, Mr. Unwin has been a partner emeritus at Blake, Cassels & Graydon LLP in Toronto. Additionally, from February 2009 to the present, Mr. Unwin has served as a director and member of the Audit Committee of C.A. Bancorp Inc.  From March 2004 until his retirement as an active partner in December 2008, Mr. Unwin worked as the managing partner of the New York Office of Blake, Cassels & Graydon LLP.   As the managing partner, Mr. Unwin oversaw the management of the law firm and worked as a corporate and securities lawyer.  Prior to working as the managing partner of the New York Office of Blake, Cassels & Graydon LLP, Mr. Unwin was also the office managing partner at Blake's office in London, England.  Mr. Unwin is a graduate of the director's education program at the Institute of Corporate Directors at the Rotman School of Management, University of Toronto and is an institute certified director (ICD.D).

*John Barrington*.  Mr. Barrington currently serves as a consultant to the Company and as a Director of the Company. From January 1, 2007 to December 31, 2012, Mr. Barrington was the President & CEO of Uxmal Communications Ltd., which is located in Toronto, Canada and is a holding company in the communications, media and marketing business.  As January 2007 Mr. Barrington was responsible for strategy and executive functions at Uxmal Communications Ltd.  Additionally, prior to his work for Uxmal Communications Ltd., Mr. Barrington worked in the mining industry at such projects as the Opimiska Mine in Chapais Que and the Lorraine mine in Belleterre Que. Mr. Barrington also worked at TransCanada Pipelines and the Ontario Ministry of Transportation and Communications, where he was head of the Financial Planning Unit. Subsequently Mr. Barrington was one of the founders of the Uxmal Communications partnership, and among many other investments and acquisitions in Canada and the U.S. bought, turned around and later sold Comac, which at the time was Canada's third largest consumer magazine company.  Mr. Barrington holds a bachelor of engineering science degree from the University of Western Ontario.

*George Kent*. Mr. Kent currently serves as a Director of the Company.  As a Professional Engineer in geology he has been engaged in worldwide exploration, mining, financing and education for decades, having spent eight years with Watts Griffis and McOuat Limited and significant periods of time employed with major and minor public companies, Noranda, Dresser Industries, Conwest Exploration, nine years as

51

a full professor at the University of Toronto in Geo-Engineering and Arts and Science faculties, and five years as Exploration Geologist and finally as Officer in Charge with the United Nations of an all mineral survey over 120,000 sq kms in Ethiopia. In addition to his work for the Company, from October, 2011 to the present, Mr. Kent has served as the President of George R. Kent & Associates Ltd since 1980 which firm is engaged in geological and mining consulting across Canada in Ecuador, Bolivia, India, and in some other countries, assisting in public company formation, directorships Santa Maria Mines Ltd and Canadax Mines Ltd 1980 - 1985. He was a founder, CEO, and director of Duration Mines Limited from 1980 - 1985; of Glimmer Resources Inc. from 1986 - 2004 both successful mining, oil and gas producing companies. He was a co-founder (2001) and still serves as Vice President Corporate Development, CFO, and director of Taranis Resources Inc. Mr. Kent belongs to four investment groups, is a member of the Geological Discussion Group, and is a Life Member of the Canadian Institute of Mining and Metallurgy and of the Prospectors and Developers Association. He is very active in mining circles.

*W. Thomas Hodgson*. In addition to serving as a director of the Company, Mr. Hodgson is also Executive Chairman of Lithium Americas Corp., a TSX-listed mineral exploration company, and Senior Partner and Chairman of Greenbrook Capital Partners Inc., a financial advisory firm, and until May 2011, acted as a consultant and advisor to the Chairman Magna International Inc., one of the world's largest automotive companies, having a particular specialization in sourcing venture investment opportunities for the company. Mr. Hodgson has over twenty years' experience in capital markets research, corporate advisory matters and consulting. He is currently a director of Helix Biopharma Corp. and Lithium Americas Corp., has been a board member of MI Developments Inc., and was Director, President and Chief Executive Officer of Magna Entertainment Corp. from March 2005 to March 2006. From November 2002 to March 2005, Mr. Hodgson was President of Strategic Analysis Corporation. Prior to that, Mr. Hodgson held senior positions with Canadian financial institutions and U.K. companies, including Canadian Imperial Bank of Commerce, Canada Permanent Trust Co. Central Guaranty Trust, where he served as President and Chief Executive Officer, Marathon Asset Management Inc., where he served as President, and GlobalNetFinancial.com, where he served as Chief Operating Officer and then as President and Chief Executive Officer. Mr. Hodgson holds an MBA from Queen's University, Kingston, Ontario.

*H. Richard 'Dick' Klatt*. Mr. Klatt currently serves as vice president of exploration for the Company. Mr. Klatt has over 40 years of diverse mining and exploration experience in precious and base metals. He has worked for a number of major mining companies. From 2007 through 2009 he served as contract exploration manager of Yellowcake Mining, Inc., Las Vegas Nevada, during which time he organized and oversaw exploration drilling for uranium in the Uravan mineral belt, Colorado. From 2006 through 2007 he worked as a consulting minerals exploration geologist during which time he: (i) completed an economic geology review of the La Sal uranium district for Superior Uranium, Moab, Utah; (ii) completed extensive lithology-logging for base and precious metals for a drill program at the south rim of the Bingham copper mine, Utah, for Grand Central Silver Mines, Carrollton, Texas; (iii) directed a 2,100 feet diamond drilling program for gold and cobalt in the Belt-Percell basin, eastern Idaho, for Salmon River Resources, Vancouver, British Columbia, Canada; (iv) completed a 6,000 feet diamond drilling program for zinc in western Utah for Franconia Minerals Corp., Spokane, Washington; and (v) Directed a 6,000 m rotary drilling program for uranium in western Colorado for U.S. Energy, Riverton, Wyoming. From 2004 through 2005, he worked as a consulting minerals exploration geologist for Kennecott Exploration Company located in Salt Lake City, Utah. During this time he also oversaw initial development drilling for vein-hosted base metals in the Zacatecas district, Zacatecas, Mexico, for Capstone Gold, Vancouver, British Columbia, Canada. Mr. Klatt received his B.S. degree in geology at the University of Illinois, Urbana, Illinois.

**Family Relationships**

There are no family relationships between any of the current directors or officers of the Company.

52

**APP 0250**

**Involvement in Certain Legal Proceedings**

To the best of its knowledge, the Company's directors and executive officers were not involved in any legal proceedings during the last ten years as described in Item 401(f) of Regulation S-K.

**Directorships**

None of the Company's executive officers or directors is a director of any company with a class of equity securities registered pursuant to Section 12 of the Securities exchange Act of 1934 (the "Exchange Act") or subject to the requirements of the Exchange Act or any company registered as an investment company under the Investment Company Act of 1940.

**Code of Ethics**

Our board of directors has adopted a code of ethics that will apply to its principal executive officer, principal financial officer and principal accounting officer or controller and to persons performing similar functions. The code of ethics is designed to deter wrongdoing and to promote honest and ethical conduct, full, fair, accurate, timely and understandable disclosure, compliance with applicable laws, rules and regulations, prompt internal reporting of violations of the code and accountability for adherence to the code.  We will provide a copy of our code of ethics, without charge, to any person upon receipt of written request for such delivered to our corporate headquarters.  All such requests should be sent care of Liberty Silver Corp, Attn: Corporate Secretary, 181 Bay Street, Suite 2330, Toronto, Ontario, Canada, M5J 2T3.  The Company's Code of Business Conduct and Ethics has also posted on our website at, www.libertysilvercorp.com.

**ITEM 11.     EXECUTIVE COMPENSATION.**

**Summary Compensation Table**

The following table sets forth, for the years indicated, all compensation paid, distributed or accrued for services, including salary and bonus amounts, rendered in all capacities by the Company's principal executive officer, chief financial officer and all other executive officers; the information contained below represents compensation paid to the Company's officers for their work related to the Company.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Award(s) ($) | Option Award(s) ($) | Non-Equity Incentive Plan Compensation (#) | Non-qualified Deferred Compensation Earnings ($) | All other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Geoff Browne CEO | 2012 | 200,004 | -- | -- | -- | -- | -- | -- | 200,004 |
|  | 2011 | 166,673 | -- | -- | 1,468,451 (2) | -- | -- | -- | 1,635,124 |
| Bill Tafuri, President, COO | 2012 | 120,000 | -- | -- | -- | -- | -- | -- | 120,000 |
|  | 2011 | 120,000 | -- | -- | 292,251 (2) | -- | -- | -- | 412,251 |
|  | 2010 | 30,000 | -- | -- | -- | -- | -- | -- | 30,000 |
| Manish Z. Kshatriya CFO | 2012 | 60,357 | -- | -- | 296,133 (2) | -- | -- | -- | 356,490 |
| Dick Klatt (1) | 2012 | 96,000 | -- | -- | -- | -- | -- | -- | 96,000 |
|  | 2011 | 93,600 | -- | -- | 219,188 (2) | -- | -- | -- | 312,788 |
|  | 2010 | 20,000 | -- | -- | -- | -- | -- | -- | 20,000 |
| John Pulos CFO (3) | 2011 | -- | -- | -- | -- | -- | -- | -- | -- |
|  | 2010 | -- | -- | -- | -- | -- | -- | -- | -- |

(1) Dick Klatt serves as the vice president of exploration of the Company.
(2) Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a discussion please refer to Note 6 in the Notes to the Financial Statements herein.
(3) John Pulos resigned as the Chief Financial Officer of the Company on January 16, 2012.

**Grant of Plan Based Awards**

The following table provides a summary of equity awards granted to the Company's executive officers during the fiscal year ended June 30, 2012.

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stocks or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) |  |  |  |  |
| Geoff Browne | October 18, 2010 | -- | -- | -- | -- | -- | -- | -- | 3,000,000 | .75 | 1,468,451(1) |
| William Tafuri | April 19, 2011 | -- | -- | -- | -- | -- | -- | -- | 800,000 | .75 | 292,251(1) |
| Manish Kshatriya | January 16, 2012 | -- | -- | -- | -- | -- | -- | -- | 450,000 | 1.00 | 296,133 (1) |

54

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Dick Klatt | April 19, 2011 | -- | -- | -- | -- | -- | -- | -- | 600,000 | .75 | 219,188(1) |
| John Pulos | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |

(1) Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a discussion please refer to Note 4 in the Notes to the Financial Statements herein.

**Outstanding Stock Options Awards At Fiscal Year End**

The following table provides a summary of equity awards outstanding at June 30, 2012, for each of our named executive officers.

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Geoff Browne | 3,000,000 | -- | -- | .75 | October 18, 2015 | -- | -- | -- | -- |
| William Tafuri | 266,664 | 533,336 | -- | .75 | April 19, 2016 | -- | -- | -- | -- |
| Dick Klatt | 200,000 | 400,000 | -- | .75 | April 19, 2016 | -- | -- | -- | -- |
| Manish Kshatriya | 150,00 | 300,00 | -- | 1.00 | July 16, 2019 | -- | -- | -- | -- |

There were no options or other derivative securities exercised in fiscal 2012 by our named executive officers.  In addition, there were no shares acquired by our named executive officers upon the vesting of restricted stock.

**Long-Term Incentive Plans**

We do not have any long-term incentive plans, pension plans, or similar compensatory plans for our directors or executive officers.

**Change of Control Agreements**

We are not party to any change of control agreements with any of our directors or executive officers.

**Employment Agreement; Employment Arrangement**

Geoff Browne currently serves as the Chief Executive Officer and Executive Vice President of the Company.  Pursuant to an agreement dated October 18, 2010, (the "Agreement") Mr. Browne is paid an annual salary of $200,000, as well as an annual discretionary performance bonus for his services rendered as the Chief Executive Officer; the amount of the performance bonus is at the discretion of the Company's Board of Directors.  In conjunction with the entry into the Agreement, the Company granted Mr. Browne stock options to acquire up to 3,000,000 shares of restricted common stock of the Company

at a price of $.75 per share.

Manish Z. Kshatriya currently serves as the Chief Financial Officer of the Company. Pursuant to an arrangement with the Company, in consideration of his services to the Company, Mr. Kshatriya's is paid $2,500 per week. Additionally, in January of 2012 he was granted stock options to purchase up to a total of 450,000 shares the Company's common stock at an exercise price of $1.00 per share. The options are subject to the following vesting schedule: (i) 150,000 options vest six months after January 16, 2012; (ii) 150,000 options vest one and a half years after January 16, 2012; and (iii) 150,000 options vest two and one half years after January 16, 2012.

Bill Tafuri currently serves as the Chief Operating Officer of the Company. Pursuant to an arrangement with the Company, in consideration of Mr. Tafuri's services to the Company, Mr. Tafuri is paid $120,000 annually. Additionally, in April 2011, Mr. Tafuri was granted stock options to purchase 800,000 shares of the Company's common stock at $0.75 per share for a 5-year term. Pursuant to the terms of the option agreement, entered into between Mr. Tafuri and the Company, a total of 266,664 options vested immediately upon the grant of the options; the remaining 533,336 options vest over a two-year period. The vesting of the remaining 533,336 options may be accelerated in the event the Company achieves certain milestones with respect to its mining operations.

Dick Klatt currently serves as the Vice President of Exploration of the Company. Pursuant to an arrangement with the Company, in consideration of Mr. Klatt's services to the Company, Mr. Klatt is paid $96,000 annually. Additionally, in April 2011, Mr. Klatt was granted stock options to purchase 600,000 shares of the Company's common stock at $0.75 per share for a 5-year term. Pursuant to the terms of the option agreement, entered into between Mr. Klatt and the Company, a total of 200,000 options vested immediately upon the grant of the options; the remaining 400,000 options vest over a two-year period. The vesting of the remaining 400,000 options may be accelerated in the event the Company achieves certain milestones with respect to its mining operations

**Equity Compensation Plan Information**

As disclosed on Form 8-K filed with the Securities and Exchange Commission on May 3, 2011, on April 19, 2011, subject to shareholder approval, the Board of Directors of the Company approved the adoption of the Liberty Silver Corp. Incentive Share Plan (the "Plan") under which common shares of the Company's common stock have been reserved for purposes of possible future issuance of incentive stock options, non-qualified stock options, and stock grants to employees, directors and certain key individuals. Under the Plan, the maximum number of common shares reserved for issuance shall not exceed 10% of the common shares of the Company outstanding from time to time. The purpose of the Plan shall be to advance the interests of the Company by encouraging equity participation in the Company through the acquisition of common shares of the Company. In order to maintain flexibility in the award of stock benefits, the Plan constitutes a single plan, but is composed of two parts. The first part is the Share Option Plan which provides grants of both incentive stock options under Section 422A of the Internal Revenue Code of 1986, as amended, and nonqualified stock options. The second part is the Share Bonus Plan which provides grants of shares of Company common stock. The foregoing description of the Plan is qualified in its entirety by reference to the Liberty Silver Corp. Incentive Share Plan which was filed as Exhibit 10.9 to Form 8-K filed with the Securities and Exchange Commission on May 3, 2011 and is hereby incorporated by reference.

**Director Compensation**

The general policy of the Board is that compensation for independent directors should be equity-based

compensation.  Additionally, the Company reimburses directors for reasonable expenses incurred during the course of their performance. There are no long-term incentive or medical reimbursement plans.  The Company does not pay directors, who are part of management, for Board service in addition to their regular employee compensation.  The Board, through its compensation committee, determines the amount of director compensation. The following table provides a summary of compensation paid to directors during the fiscal year ended June 30, 2012.

| Director | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) (1) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Geoff Browne (3) | -- | -- | -- | -- | -- | -- | -- |
| William Tafuri (3) | -- | -- | -- | -- | -- | -- | -- |
| John Pulos (3) | -- | -- | -- | -- | -- | -- | -- |
| John Barrington | 120,000(2) | --- | --- | --- | --- | --- | 120,000 |
| George Kent | -- | --- | --- | --- | --- | --- | --- |
| Timothy Unwin | -- | --- | --- | --- | --- | -- | --- |
| Paul Haggis | -- | --- | --- | --- | --- | --- | --- |
| W. Thomas Hodgson | -- | --- | --- | --- | --- | --- | --- |

(1)     Option awards reflect the aggregate grant date fair value computed using the Black-Scholes model; for a discussion please refer to Note 6 in the Notes to the Financial Statements herein.

(2)     This figure represents fees paid to John Barrington for consulting services rendered to the Company, not in his capacity as a director.

(3)     Refer to the summary compensation table in Item 11 executive compensation.

**APP 0255**

**ITEM 12.        SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**Equity Compensation Plan**

The following table gives information about our Equity Compensation Plan as of June 30, 2012:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants | Weighted average exercise price of outstanding options, warrants | Number of securities remaining available for future issuances under equity compensation plans (excluding securities reflected in column) (a) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | - | - | - |
| Equity compensation plans not approved by security holders | 6,950,000 | $0.88 | 1,121,083 |
| Total | 6,950,000 | $0.88 | 1,121,083 |

**Security Ownership of Certain Beneficial Owners**

The following table sets forth as of September 25, 2012, the name and the number of shares of the Company's common stock, par value $0.001 per share, held of record or beneficially by each person who held of record, or was known by the Company to own beneficially, more than 5% of the issued and outstanding shares of common stock, and the name and shareholdings of each director and of all executive officers and directors as a group.

| Title and Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of class |
|---|---|---|---|
| Common | Geoff Browne [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 2,550,000 | 3.2% |
| Common | Manish Z. Kshatriya [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 0 | 0% |
| Common | William Tafuri [1]<br>675 Sierra Rose Drive, Suite 112<br>Reno, NV  89511 | 2,110,000 | 2.6% |

58

**APP 0256**

| | | | |
|---|---|---|---|
| Common | John Pulos [1]<br>675 Sierra Rose Drive, Suite 112<br>Reno, NV  89511 | 10,000,000 | 12.4% |
| Common | John Barrington [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,000,000 | 1.2% |
| Common | George Kent [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,050,000 | 1.3% |
| Common | Timothy Unwin [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,050,000 | 1.3% |
| Common | Paul Haggis [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,250,000 | 1.5% |
| Common | W. Thomas Hodgson [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,100,000 | 1.4% |
| Common | H. Richard Klatt [1]<br>181 Bay Street, Suite 2330<br>Toronto, Ontario, Canada, M5J2T3 | 1,000,000 | 1.2% |
| Common | All Directors and Executive Officers as a Group (9 in number) | 21,110,000 | 26.1% |

(1) Director or Officer of Company

## ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

### Certain Relationships and Related Transactions

Effective April 1, 2011, the Company borrowed a total of $150,000 pursuant to the terms and conditions of promissory notes (individually referred to as a "Note" and collectively referred to as the "Notes") entered into with six of the Company's directors.  Each Note was for $25,000 and is required to be repaid by the Company on the earlier of one year, or when the Company raises a minimum of $2,000,000 through equity investments.   The Notes are interest free for the first six months following the date of the Note and then bear interest at a rate of 8% per annum thereafter.   In conjunction with the entry into the Notes, in lieu of the holders charging the Company interest on the outstanding principal of the Notes for the initial six months, the Company issued each holder a warrant entitling the holder to purchase up to a total of 50,000 shares of the Company's common stock at price of $0.55 per share for a period of three (3) years following the date of the Note.  The Notes were repaid through the issuance of shares of common stock in the Company on December 19, 2011.

Aside from the foregoing, there were no material transactions, or series of similar transactions, during our Company's last fiscal year, or any currently proposed transactions, or series of similar transactions, to which our Company was or is to be a party, in which the amount involved exceeded the lesser of $120,000 or one percent of the average of the small business issuer's total assets at year-end for the last three completed fiscal years and in which any director, executive officer or any security holder who is known to us to own of record or beneficially more than five percent of any class of our common stock, or any member of the immediate family of any of the foregoing persons, had an interest.

**Director Independence**

The Company's common stock is currently traded on the OTCBB, and as such, is not subject to the rules of any national securities exchange which requires that a majority of a listed company's directors and specified committees of its board of directors meet independence standards prescribed by such rules. For the purpose of preparing the disclosures in this Form 10-K with respect to director independence, the Company has used the definition of "independent director" within the meaning of National Instrument 52-110 – Audit Committees adopted by the Canadian Securities Administration and as set forth in the Marketplace Rules of the NASDAQ, which defines an "independent director" generally as being a person, other than an executive officer or employee of the company or any other individual having a relationship which, in the opinion of the company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

Consistent with these standards, the Company's board of directors has determined that W. Thomas Hodgson, Timothy Unwin, Paul Haggis, and George Kent are "independent".

## ITEM 14.        PRINCIPAL ACCOUNTING FEES AND SERVICES

**Audit Fees**

(1)      Morrill & Associates served as the Company's independent registered public accounting firm for the years ended June 30, 2012 and 2011, and is expected to serve in that capacity for the current year. Principal accounting fees for professional services rendered for the Company by Morrill & Associates for the year ended June 30, 2012 and 2011, are summarized as follows:

|  | | 2012 | | 2011 |
|---|---|---|---|---|
| Audit | $ | 15,000 | $ | 23,000 |
| Audit related | $ | 0 | $ | 0 |
| Tax | $ | 0 | $ | 0 |
| All other | $ | 0 | $ | 0 |
| Total | $ | 15,000 | $ | 23,000 |

**Audit Related Fees**

(2)      Morrill & Associates did not bill the Company any amounts for assurance and related services that were related to its audit or review of the Company's financial statements during the fiscal years ended 2012 and 2011.

**Tax Fees**

(3)      The aggregate fees billed by Morrill & Associates for tax compliance, advice and planning were $0.00 for the fiscal years ended June 30, 2012 and 2011.

**All Other Fees**

(4)      Morrill & Associates did not bill the Company for any products and services other than the foregoing during the fiscal years ended 2012 and 2011.

APP 0258

**Audit Committee's Pre-approval Policies and Procedures**

(5)     At the Company's regularly scheduled and special meetings, the audit committee considers and pre-approves any audit and non-audit services to be performed by the Company's independent registered public accounting firm. The audit committee has the authority to grant pre-approvals of non-audit services.

## PART IV

## ITEM 15.     EXHIBITS, FINANCIAL STATEMENT SCHEDULES.

**(a)(1)(2) Financial Statements and Financial Statement Schedule.**

The financial statements and financial statement schedules identified in Item 8 are filed as part of this annual report.

**(a)(3) Exhibits.**

The exhibits required by this item are set forth on the Exhibit Index below.

3.1     Articles of Incorporation (incorporated by reference from exhibit to Form S-1 filed with the Securities and Exchange Commission on April 1, 2008).

3.1     Articles of Amendment (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on February 12, 2008).

3.2     Bylaws (incorporated by reference from exhibit to Form S-1 filed with the Securities and Exchange Commission on April 1, 2008).

3.2     Amended Bylaws (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 25, 2010).

10.1     Mineral Property Purchase Agreement corporation (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on April 1, 2008).

10.2     Exploration Earn-In Agreement dated March 29, 2010, by and between Liberty Silver Corp, a Nevada corporation, and AuEx Ventures, Inc., a Nevada corporation (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on April 5, 2010).

10.3     Employment Agreement and accompanying Stock Option Agreement dated October 18, 2010, by and between Liberty Silver Corp. and Geoff Browne (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 19, 2010).

10.4     Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and Paul Haggis (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

APP 0259

10.5    Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and Timothy Unwin (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.6    Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and John Barrington (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.7    Stock Option Agreement dated October 26, 2010 by and between Liberty Silver Corp. and George Kent (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on October 27, 2010).

10.8    Stock Option Agreement dated December 6, 2010 by and between Liberty Silver Corp. and W. Thomas Hodgson (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on December 6, 2010).

10.9    Liberty Silver Corp. Incentive Share Plan (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 3, 2011).

10.10    Liberty Silver Corp. Incentive Stock Option Agreement dated April 19, 2011 between Liberty Silver Corp. and Bill Tafuri (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 5, 2011).

10.11    Liberty Silver Corp. Non-Qualified Stock Option Agreement dated April 19, 2011 between Liberty Silver Corp. and John Barrington (incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on May 5, 2011).

10.12    Subscription Agreement dated November 10, 2011(incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on November 10, 2011).

10.13    Subscription Receipt and Escrow Agreement dated November 10, 2011(incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on November 10, 2011).

10.14    Registration Rights Agreement dated November 10, 2011(incorporated by reference from exhibit to Form 8-K filed with the Securities and Exchange Commission on November 10, 2011).

31.1    Certifications pursuant to Rule 13a-14(a) or 15d-14(a) under the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

31.2    Certifications pursuant to Rule 13a-14(a) or 15d-14(a) under the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

32.1    Certifications pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

| 32.2 | Certifications pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |
|---|---|
| 101 | SCH XBRL Schema Document.* |
| 101 | INS XBRL Instance Document* |
| 101 | CAL XBRL Taxonomy Extension Calculation Linkbase Document.* |
| 101 | LAB XBRL Taxonomy Extension Label Linkbase Document.* |
| 101 | PRE XBRL Taxonomy Extension Presentation Linkbase Document.* |
| 101 | DEF XBRL Taxonomy Extension Definition Linkbase Document.* |

* Filed Herewith

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.


By: /s/ Manish Z. Kshatriya
      Manish Z. Kshatriya, Chief Financial Officer

Date:  September 28, 2012

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.


By: /s/ R. Geoffrey Browne
      R. Geoffrey Browne, Director

Date:  September 28, 2012


By: /s/ Thomas Hodgson
      Thomas Hodgson, Director

Date:  September 28, 2012


By: /s/ Timothy Unwin
      Timothy Unwin, Director

Date:  September 28, 2012

**APP 0261**

By: /s/ Paul Haggis
      Paul Haggis, Director

Date:  September 28, 2012

By: /s/ John Pulos
      John Pulos, Director

Date:  September 28, 2012

**APP 0262**