# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

### CASE NO.: 9:13-cv-80923-KLR

TODD STANAFORD a/k/a JERALD TODD
STANAFORD, on behalf of himself and all
others similarly situated,

     Plaintiff,

vs.

ROBERT DONALD BRUCE GENOVESE,
WILLIAM TAFURI, GEOFFREY BROWNE,
BG CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC. LIBERTY
SILVER CORPORATION AND OUTLOOK
INVESTMENTS, INC.,

     Defendants.

## APPENDIX TO MOTION TO DISMISS
## BY ROBERT DONALD BRUCE GENOVESE,
## BG CAPITAL GROUP LTD, LOOK BACK
## INVESTMENTS, INC. AND
## OUTLOOK INVESTMENTS, INC.

### PART IV

Thomas O. Gorman
Dorsey & Whitney LLP
1801 K Street, N. W., Suite 750
Washington, D. C.  20006
Telephone:  202-442-3000
Fax:  202-442-3199
Email: gorman.tom@dorsey.com

Date:  October 6, 2014

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

### CASE NO.: 9:13-cv-80923-KLR

TODD STANAFORD a/k/a JERALD TODD
STANAFORD, on behalf of himself and all
others similarly situated,

      Plaintiff,

vs.

ROBERT DONALD BRUCE GENOVESE,
WILLIAM TAFURI, GEOFFREY BROWNE,
BG CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC. LIBERTY
SILVER CORPORATION AND OUTLOOK
INVESTMENTS, INC.,

      Defendants.

## DECLARATION OF CHIMERA THOMPSON IN SUPPORT OF MOTION TO DISMISS BY ROBERT GENOVESE, BG CAPITAL GROUP LTD, LOOK BACK INVESTMENTS, INC. AND OUTLOOK INVESTMENTS, INC.

I, Chimera Thompson, hereby declare as follows:

1.     I am a member of the Bar of the State of New York with the law firm of Dorsey & Whitney LLP, 1801 K Street, N.W., Suite 750, Washington, D.C.  20006.

2.     This Firm represents Robert Genovese, BG Capital Group Ltd., Look Back Investments, Inc. and Outlook Investments, Inc.

3.     I make this Declaration on my personal knowledge in support of Robert Genovese, BG Capital Group Ltd, Look Back Investments, Inc. and Outlook Investments, Inc.'s Motion to Dismiss.

4.      Attached hereto as App0001 is a true and correct copy of the SEC Order of Suspension of Trading obtained from the Securities Exchange Commission ("SEC's") website, www.sec.gov., *In the Matter of:  Liberty Silver Corp.*, SEC File No. 500-1 (Issued Oct. 5, 2012).

5.      Attached hereto as App0002-18 is a true and correct copy of the SEC Order obtained from the SEC's website, www.sec.gov., *In the Matter of:  John Thomas Capital Management Group LLC, et al.*, SEC File No. 3-15244 (Issued Mar. 22, 2013).

6.      Attached hereto as App0019-20 is a true and correct copy of the Opinion and Order, obtained from the Ontario Securities Commission ("OSC's") website, www.sedar.com, *In the Matter of The Securities Act, R.S.O. 1990, c. S.5 as amended and In the Matter of Liberty Silver Corp.* (Issued Oct. 12, 2012).

7.      Attached hereto as App0021-46 is a true and correct copy of the Federal Court Opinion and Order issued on September 23, 2014, in *Salvani v. ADVFN PLC, 13-cv-7082,* obtained from the Southern District of New York's website https://ecf.nysd.uscourts.gov/cgi-bin/ShowIndex.pl

8.      Attached hereto as App0047-77 is a true and correct copy of the Amended Complaint filed on August 5, 2014 in *SEC v. Galas, 14-cv-5621, W. D. WA. ,* obtained from SEC's website, http://www.sec.gov/litigation/complaints/2014/comp-pr2014-159.pdf

9.      Attached hereto as App0078-80 is a true and correct copy of the August 28, 2012, BG Capital News Release obtained from the Company.

10.     Attached hereto as App0081-82 is a true and correct copy of the September 27, 2012, BG Capital News Release obtained from the Company.

11.     Attached hereto as App0083-86 is a true and correct copy of the December 21, 2011, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

2

12. Attached hereto as App0087-88 is a true and correct copy of the January 25, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

13. Attached hereto as App0089-91 is a true and correct copy of the May 22, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

14. Attached hereto as App0092-99 is a true and correct copy of the July 9, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

15. Attached hereto as App0100-102 is a true and correct copy of the July 16, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

16. Attached hereto as App0103-105 is a true and correct copy of the July 24, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com..

17. Attached hereto as App0106-109 is a true and correct copy of the July 26, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

18. Attached hereto as App0110-111 is a true and correct copy of the August 8, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

19. Attached hereto as App0112-115 is a true and correct copy of the August 21, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

20. Attached hereto as App0116-118 is a true and correct copy of the October 16, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

21. Attached hereto as App0119-1251 is a true and correct copy of the October 19, 2012, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

22. Attached hereto as App0126-129 is a true and correct copy of the January 7, 2013, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

23. Attached hereto as App0130-132 is a true and correct copy of the February 28, 2013, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

24.     Attached hereto as App0133-135 is a true and correct copy of the March 21, 2013, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

25.     Attached hereto as App0136-139 is a true and correct copy of the October 4, 2013, Liberty Silver News Release obtained from the OSC's website, www.sedar.com.

26.     Attached hereto as App0140-145 is a true and correct copy of the July 31, 2012, Sennen News Release obtained from the OSC's website, www.sedar.com.

27.     Attached hereto as App0146-198 is a true and correct copy of the December 21, 2011, Liberty Silver Form 10-K obtained from the website:  www.sec.gov.

28.     Attached hereto as App0199-262 is a true and correct copy of the June 30, 2012, Liberty Silver Form 10-K obtained from the website:  www.sec.gov.

29.     Attached hereto as App0263-332 is a true and correct copy of the June 30, 2013, Liberty Silver Form 10-K obtained from the website:  www.sec.gov.

30.     Attached hereto as App0333-335 is a true and correct copy of the July 7, 2010, SEC article entitled *"BAZI® Completes $500,000 Financing, Capping a $2.0 Million Capital Raise and Announces John Thomas Financial as its Exclusive Investment Bank,"* http://www.sec.gov/Archives/edgar/data/1134765/000113476510000008/ex-99-07082010_100755.htm.

31.     Attached hereto as App0336-337 is a true and correct copy of the May 16, 2012, article entitled *"John Thomas Financial Raises $33 Million for Private Shares of Facebook in Secondary Market"*, Market Wired, http://finance.yahoo.com/news/john-thomas-financial-raises-33-140500244.html.

32.     Attached hereto as App0338-339 is a true and correct copy of the January 18, 2011, article entitled *"John Thomas Financial CEO Thomas Belesis Reveals His Plans for Expansion in an Exclusive Interview with CNBC,"* Market Wired, http://www.marketwired.com/press-release/john-thomas-financial-ceo-thomas-belesis-reveals-his-plans-expansion-exclusive-interview-1381679.htm .

33.     Attached hereto as App0340-341 is a true and correct copy of the June 3, 2011, article entitled *"John Thomas Financial Chief Economist Says Investors Should Maintain a Bullish Posture,"* Business Wire, *http://www.businesswire.com/news/home/20110603005502/en/John-Thomas-Financial-Chief-Economist-Investors-Maintain.*

34.     Attached hereto as App0342-343 is a true and correct copy of the February 29, 2012, article entitled *"John Thomas Financial Releases 2012 Economic Outlook,"* Greek USA Reporter, *http://usa.greekreporter.com/2012/02/29/john-thomas-financial-releases-2012-economic-outlook/.*

35.     Attached hereto as App0344 is a true and correct copy of the website entitled *John Thomas,* Linkedin.com, *https://www.linkedin.com/company/john-thomas-financial.*

36.     Attached hereto as App0345-347 is a true and correct copy of the July 20, 2011, article entitled *"John Thomas Financial Raises $40 Million in Private Equity Placement for Kadmon I,"* Businesswire.com, *http://www.businesswire.com/news/home/20110720005330/en/John-Thomas-Financial-Raises-40-Million-Private* .

37.     Attached hereto as App0348-349 is a true and correct copy of the September 10, 2012, article entitled *"John Thomas Financial Forms Highline Research Advisors to Provide Institutional Investment Banking Services for Healthcare Companies"* Market Wired, *http://www.marketwired.com/press-release/john-thomas-financial-forms-highline-research-advisors-provide-institutional-investment-1699483.htm.*

38.     Attached hereto as App0350-354 is a true and correct copy of the December 13, 2012, article entitled  *"Latitude Global Has Engaged John Thomas Financial as its Investment Banking Firm,"* Globenewswire.com, *http://globenewswire.com/news-release/2012/12/13/511340/10015578/en/Latitude-Global-Has-Engaged-John-Thomas-Financial-as-Its-Investment-Banking-Firm.html.*

39.     Attached hereto as App0355-357 is a true and correct copy of the January 29, 2010, article entitled *"New Embattled Minority: Wall Street Brokers,"* The New York Times, http://www.nytimes.com/2010/01/28/nyregion/28bankers.html?_r=0.

40.     Attached hereto as App0358-373 is a true and correct copy of the Anonymous Post Sold on the Internet regarding LBSV and Bobby Genovese, http://www.mediafire.com/view/?t63tft59qjrb3pb.

41.     Attached hereto as App0374-383 is a true and correct copy of the agenda to the Cambridge House Agenda – The Silver Summit 10th Anniversary obtained from the website: http://cambridgehouse.com/event/10/the-silver-summit-10th-anniversary/agenda.

42.     Attached hereto as App0384-398 is a true and correct copy of the agenda to the Cambridge House Agenda – 2012 Toronto Resource Investment Conference obtained from the website: http://cambridgehouse.com/event/9/toronto-resource-investment-conference-2012/agenda.

43.     Attached hereto as App0399-404 is a true and correct copy of the list of exhibitors from the Cambridge House 2012 Toronto Resource Investment Conference obtained from the website: http://cambridgehouse.com/event/9/toronto-resource-investment-conference-2012/exhibitors.

44.     Attached hereto as App0405-407 is a true and correct copy of the October 22, 2013, article entitled *"Icahn Cashes in on Netflix for $825M Profit, Still has 4.5% Stake,"* Forbes, http://www.forbes.com/sites/steveschaefer/2013/10/22/carl-icahn-cashes-in-on-netflix-cuts-stake-to-take-profits/.

45.     Attached hereto as App0408-421 is a true and correct copy of the Winter 2000, article entitled *"Investor Relations, Liquidity, and Stock Prices,"* published in the Journal of Applied Corporate Finance.

46.     Attached hereto as App0422-435 is a true and correct copy of the LBSV Historical Stock Prices obtained from Bloomberg.

47.     Attached hereto as App0436 is a true and correct copy of the London Fix Historical Silver Prices, http://www.kitco.com/scripts/hist_charts/yearly_graphs.plx.

48.     Attached hereto as App0437-444 is a true and correct copy of the November 16, 2011, OSC Stock Chart, obtained from the OSC's website, www.sedar.com.

49.     Attached hereto as App0445-572 is a true and correct copy of the December 1, 2011, Liberty Silver Technical Report:  Mine Development Associates Technical Report on the Trinity Project, obtained from the OSC's website, www.sedar.com.

50.     Attached hereto as App0573 is a true and correct copy of the SEC Release "Pump & Dumps" and Market Manipulations obtained at obtained from the SEC's website, www.sec.gov., http://www.sec.gov/answers/pumpdump.htm.\.

51.     Attached hereto as App0574-576 is a true and correct copy of Liberty Silver Form 8-K dated November 10, 2011, obtained from the SEC's website, www.sec.gov., http://www.sec.gov/Archives/edgar/data/1407583/000113705011000352/libertysilver_8kitem101 priva.htm.

52.     Attached hereto as App0577-613 is a true and correct copy of Liberty Silver Exhibit 10-2 Subscription Agreement, obtained from the SEC's website, www.sec.gov., http://www.sec.gov/Archives/edgar/data/1407583/000113705011000352/exhibit1012subscriptio nagree.htm.

7

I certify under penalty of perjury that the foregoing is true and correct.

DATED:  October 6, 2014

*/s/ Chimera Thompson*
Chimera Thompson
Dorsey & Whitney LLP
1801 K Street, N. W., Suite 750
Washington, D. C.  20006
Telephone:  202-442-3000
Fax:  202-442-3199
Email:Thompson.chimera@dorsey.com

# TABLE OF CONTENTS

**PLEADINGS/ORDERS:**                                                                                              **Page**

*In the Matter of:  Liberty Silver Corp.*, SEC File No. 500-1 Order of Suspension
   of Trading (Issued October 5, 2012)..................................................................................APP0001

*In the Matter of:  John Thomas Capital Management Group LLC, et al.*, SEC
   File No. 3-15244 Order (Issued March 22, 2013) ...................................................APP0002-18

*In the Matter of The Securities Act, R.S.O. 1990, c. S.5 as amended and In the Matter of
   Liberty Silver Corp.*, Ontario Securities Commission Temporary Order...................APP0019-20

*Salvani v. ADVFN PLC*, 13-cv-7082, S.D.N.Y Opinion and Order (Issued
   September 23, 2014) ...............................................................................................APP0021-46

*SEC v. Galas*, 14-cv-5621, W. D. WA Amended Complaint (Filed
   August 5, 2014).....................................................................................................APP0047-77

**NEWS RELEASES:**

BG Capital News Release dated August 28, 2012 ........................................................APP078-80

BG Capital News Release dated September 27, 2012 ...................................................APP081-82

Liberty Silver News Release dated December 21, 2011................................................APP083-86

Liberty Silver News Release dated January 25, 2012...................................................APP087-88

Liberty Silver News Release dated May 22, 2012.........................................................APP089-91

Liberty Silver News Release dated July 9, 2012............................................................APP092-99

Liberty Silver News Release dated July 16, 2012.........................................................APP0100-102

Liberty Silver News Release dated July 24, 2012 ........................................................APP0103-105

Liberty Silver News Release dated July 26, 2012 ........................................................APP0106-109

Liberty Silver News Release dated August 8, 2012.......................................................APP0110-111

Liberty Silver News Release dated August 21, 2012.....................................................APP0112-115

Liberty Silver News Release dated October 16, 2012...................................................APP0116-118

Liberty Silver News Release dated October 19, 2012...................................................APP0119-125

Liberty Silver News Release dated January 7, 2013 .....................................................APP0126-129

Liberty Silver News Release dated February 28, 2013 ............................................................APP0130-132

Liberty Silver News Release dated March 21, 2013................................................................APP0133-135

Liberty Silver News Release dated October 4, 2013 .............................................................APP0136-139

Sennen News Release dated July 31, 2012 ...............................................................................APP0140-145

## FINANCIAL DOCUMENTS:

Liberty Silver Form 10-K dated December 21, 2011................................................................APP0146-198

Liberty Silver Form 10-K dated June 30, 2012 .......................................................................APP0199-262

Liberty Silver Form 10-K dated June 30, 2013 .......................................................................APP0263-332

## INFORMATION PERTAINING TO JOHN THOMAS:

"BAZI® Completes $500,000 Financing, Capping a $2.0 Million Capital Raise and Announces John Thomas Financial as its Exclusive Investment Bank" (July 7, 2010) http://www.sec.gov/Archives/edgar/data/1134765/000113476510000008/ex99-07082010_100755.htm ...............................................................................................................................................APP0333-335

"John Thomas Financial Raises $33 Million for Private Shares of Facebook in Secondary Market", Market Wired, (May 16, 2012) http://finance.yahoo.com/news/john-thomas-financial-raises-33-140500244.html..........................................................................................................................APP0336-337

"John Thomas Financial CEO Thomas Belesis Reveals His Plans for Expansion in an Exclusive Interview with CNBC," Market Wired (January 18, 2011) http://www.marketwired.com/press-release/john-thomas-financial-ceo-thomas-belesis-reveals-his-plans-expansion-exclusive-interview-1381679.htm ..........................................................................................................................APP0338-339

"John Thomas Financial Chief Economist Says Investors Should Maintain a Bullish Posture," Business Wire, June 3, 2011) http://www.businesswire.com/news/home/20110603005502/en/John-Thomas-Financial-Chief-Economist-Investors-Maintain.................................................................APP0340-341

"John Thomas Financial Releases 2012 Economic Outlook," Greek USA Reporter (February 29, 2012) http://usa.greekreporter.com/2012/02/29/john-thomas-financial-releases-2012-economic-outlook/ ...............................................................................................................................................APP0342-343

John Thomas, Linkedin.com https://www.linkedin.com/company/john-thomas-financial ...................................................APP0344

"John Thomas Financial Raises $40 Million in Private Equity Placement for Kadmon I," Businesswire.com (July 20, 2011) http://www.businesswire.com/news/home/20110720005330/en/John-Thomas-Financial-Raises-40-Million-Private..........................................................................................................................APP0345-347

"John Thomas Financial Forms Highline Research Advisors to Provide Institutional Investment Banking Services for Healthcare Companies" Market Wired (September 10, 2012) http://www.marketwired.com/press-release/john-thomas-financial-forms-highline-research-advisors-provide-institutional-investment-1699483.htm ...................................................................APP0348-349

"Latitude Global Has Engaged John Thomas Financial as its Investment Banking Firm," Globenewswire.com (December 13, 2012) http://globenewswire.com/news-release/2012/12/13/511340/10015578/en/Latitude-Global-Has-Engaged-John-Thomas-Financial-as-Its-Investment-Banking-Firm.html ...........................................................APP0350-354

"New Embattled Minority:  Wall Street Brokers," The New York Times (January 28, 2010) http://www.nytimes.com/2010/01/28/nyregion/28bankers.html?_r=0 .........................APP0355-357

## MISCELLANEOUS:

Anonymous Post Sold on the Internet regarding LBSV and Bobby Genovese ...............APP0358-373

Cambridge House Agenda – The Silver Summit 10th Anniversary .......................................APP0374-383

Cambridge House Agenda – Toronto Resource Investment Conference ..........................APP0384-398

Cambridge House – List of Exhibitors ...............................................................................APP0399-404

"Icahn Cashes in on Netflix for $825M Profit, Still has 4.5% Stake, Forbes (October 22, 2013) http://www.forbes.com/sites/steveschaefer/2013/10/22/carl-icahn-cashes-in-on-netflix-cuts-stake-to-take-profits/.......................................................................................................APP0405-407

"Investor Relations, Liquidity, and Stock Prices," Journal of Applied Corporate Finance (Winter 2000).......................................................................................................APP0408-421

LBSV Historical Stock Prices ..............................................................................................APP0422-435

London Fix Historical Silver Prices .....................................................................................APP0436

OSC Stock Chart dated November 15, 2011 .......................................................................APP0437-444

Liberty Silver Technical Report:  Mine Development Associates Technical Report on the Trinity Project, dated December 1, 2011.......................................................................APP0445-571

SEC Release "Pump & Dumps" and Market Manipulations.........................................APP0573

Liberty Silver Form 8-K dated November 10, 2011 ...........................................................APP0574-576

Liberty Silver Exhibit 10-2 Subscription Agreement .........................................................APP0577-614

*Technical Report on the Trinity Project*
*Pershing County, Nevada* | *Page 66*

These checks samples are at the low end of zinc values but are consistently lower than the USBRC analyses by 5% to 10%.

### 12.2.12 CMS vs. USBRC Checks on Zinc - 1985

There were 52 duplicate pulps submitted to CMS for zinc analyses to compare against original USBRC analyses. The original and check analyses were by AA. The digestion method for the AA analyses is not known. The type of check sample submitted is not known. The samples are from rotary percussion S-series holes drilled in 1983. Figure 12.12 is a graph that shows the difference.

**Figure 12.12 CMS Checks Relative to Original USBRC Analyses for Zinc – 1985**



Descriptive statistics of the paired data for the 52 samples are summarized in Table 12.12.

*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

**APP 0516**

*Technical Report on the Trinity Project*
*Pershing County, Nevada*

*Page 67*

### Table 12.12 CMS Checks Relative to Original USBRC Analyses for Zinc – 1985

| All Pairs | Mean | Original | Duplicate | Diff. | Rel. Diff. | A.V. Rel. Diff. |
|---|---|---|---|---|---|---|
| Count | 52 | 52 | 52 | | 52 | 52 |
| Mean | 2691.740 | 2657.423 | 2726.058 | 3% | 0% | 6% |
| Median | 1975.000 | 2060.000 | 1885.000 | | | |
| Std. Dev. | 3069.692 | 2973.946 | 3171.374 | | | |
| CV | 1.140 | 1.119 | 1.163 | | | |
| Min. | 160.000 | 160.000 | 160.000 | 0% | -28% | 0% |
| Max. | 15200.000 | 14800.000 | 15600.000 | 5% | 26% | 28% |

| Mean ≥1000 ppm Zn | Mean | Original | Duplicate | Diff. | Rel. Diff. | A.V. Rel. Diff. |
|---|---|---|---|---|---|---|
| Count | 35 | 35 | 35 | | 35 | 35 |
| Mean | 3821.071 | 3771.429 | 3870.714 | 3% | 0% | 8% |
| Median | 2820.000 | 2690.000 | 2800.000 | | | |
| Std. Dev. | 3178.028 | 3056.184 | 3307.838 | | | |
| CV | 0.832 | 0.810 | 0.855 | | | |
| Min. | 1127.500 | 1080.000 | 1130.000 | 5% | -28% | 0% |
| Max. | 15200.000 | 14800.000 | 15600.000 | 5% | 26% | 28% |

The CMS checks are lower by 8% in the 0.13% to 0.27% Zn range and then trend upward and cross over the mean above 0.28% zinc.

### 12.2.13 AAL vs. AAL Pulp Checks on Zinc from RC Samples

The AAL set of checks includes 173 duplicate pulp analyses from the 2006/2007 Renaissance drilling and were reported on the same analytical reports. Zinc analyses were completed using inductively coupled plasma ("ICP") analytical techniques with a four-acid digestion of sample pulps in 2006 and two-acid sample digestion in 2007. Figure 12.13 is a graph that shows the difference.

.

*Mine Development Associates*
*December 2, 2011*

U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
*Print date: 12/2/11 12:44 p.m.*

**APP 0517**

*Technical Report on the Trinity Project*
*Pershing County, Nevada*

*Page 68*

**Figure 12.13 AAL Checks on Pulps Relative to Original AAL Analyses for Zinc – 2007**



Descriptive statistics of the paired data for the 173 samples are summarized in Table 12.13.

**Table 12.13 AAL Checks on Pulps from RC and Core Samples Relative to Original AAL Analyses for Zinc – 2006**

| All Pairs | Mean | Original | Duplicate | Diff. | Rel. Diff. | A.V. Rel. Diff. |
|---|---|---|---|---|---|---|
| Count | 173 | 173 | 173 | | 173 | 173 |
| Mean | 1344.862 | 1341.971 | 1347.754 | 0% | 1% | 10% |
| Median | 408.000 | 421.000 | 407.000 | | | |
| Std. Dev. | 2380.521 | 2373.744 | 2401.872 | | | |
| CV | 1.770 | 1.769 | 1.782 | | | |
| Min. | 31.450 | 31.000 | 31.900 | 3% | -81% | 0% |
| Max. | 15900.000 | 16600.000 | 15200.000 | -8% | 45% | 81% |

| Mean >1000 ppm Zn | Mean | Original | Duplicate | Diff. | Rel. Diff. | A.V. Rel. Diff. |
|---|---|---|---|---|---|---|
| Count | 55 | 55 | 55 | | 55 | 55 |
| Mean | 3567.364 | 3557.273 | 3577.455 | 1% | 0% | 9% |
| Median | 2375.000 | 2370.000 | 2370.000 | | | |
| Std. Dev. | 3246.390 | 3237.702 | 3288.579 | | | |
| CV | 0.910 | 0.910 | 0.919 | | | |
| Min. | 1015.000 | 960.000 | 1030.000 | 7% | -81% | 1% |
| Max. | 15900.000 | 16600.000 | 15200.000 | -8% | 38% | 81% |

The results for these checks are similar for the silver and lead checks at AAL. There is variation in results, but no consistent bias.

*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

**APP 0518**

## 12.3    Summary Statement on Data Verification

MDA is concerned about the accuracy of the USBRC analyses for silver, lead, and zinc. The USBRC analyses represent 82% of the values used in the Inferred resource estimation (Section 14.0) and the USBRC silver, lead, and zinc values are consistently higher when compared to CMS, Hunter and Bondar Clegg checks (the only exception is the CMS lead analyses which are 10% higher than the USBRC analyses).    This is especially true for the 0.5 to 2.0 oz/ton range for silver, and the 0.02 to 1.0% range for lead and zinc. The average grades reported in Section 17 for the Inferred resources are within these grade ranges.

Because the 0.5 to 2.0 oz Ag/ton range is critical for this deposit, it must be determined if the USBRC analyses are reliable for silver, lead and zinc before the resources can be classified higher than the Inferred category. Since the pulps are no longer available, twinning of some of the holes from the early Borax drilling is required. Twelve drill-hole locations have been identified outside, but in the vicinity of, the existing open pit that would twin USBRC-analyzed holes and might provide a statistically viable data set. Additional holes may be required after the first phase of twinning.

## 12.4    Assay Database Audit

The majority of the 1982 through 1992 drill-hole analytical data and collar information was entered into a digital database by Renaissance prior to 2007. Approximately 10% of the silver values were checked by MDA against original lab reports and entries were accurate. However, several discrepancies for the lead and zinc values required that all lead and zinc values be checked against the lab reports. The information from the 2006 and 2007 drilling was in digital form and was imported by MDA into the project database.

*Technical Report on the Trinity Project*
*Pershing County, Nevada*                                                                 *Page 70*

## 13.0   MINERAL PROCESSING AND METALLURGICAL TESTING

### 13.1   Historical Testing and Mineral Processing

In discussing possible processing costs and processes prior to mining at Trinity, Ganderup (1986) provided the following discussion of projected recoveries:

*"Oxide leach extractions are estimated to be 93%* [for silver] *based on an average of more than 40 intervals from 10 holes. Surface oxide results which yielded lower extractions were excluded because they represent only a very minor portion of the reserves.*

*Flotation recovery of silver from sulfide ore is estimated to be 92% at a weight concentration ratio of 10:1. Leach extraction from the sulfide concentrate following a 48 hour atmospheric pre-aeration at 85°C is optimistically estimated to be 87%. However, this leach extraction requires a potentially difficult solid-liquid separation between the pre-aeration and leach stages and there are some indications of minor silver losses to the pre-aeration liquor.*

*It is estimated that an additional silver loss of roughly 1% can be expected in the 4-stage CCD* [countercurrent decantation] *circuit. Therefore the overall silver recovery is estimated to be 92% for oxide ore and 79% for sulfide ore."*

Whateley, *et al.* (2006) provided the following summary of mineral processing:

- The oxide mineralization is amenable to direct leaching resulting in a 94 to 97% silver recovery.
- Oxide material recoveries of silver by flotation were low at 50 to 60%.
- Sulfide mineralization required fine grinding to give a 78 to 84% silver recovery; cyanide consumption was high.
- Flotation tests on sulfide material liberated 90 to 95% of the silver and 90% of the lead and zinc, providing that the pH values of the collectors, which suppress Fe and As, were high.
- Following production of the oxide deposit, it was estimated that 75% of the silver in the oxide material was recovered by heap leaching.

The following subsections describe specific metallurgical testing programs undertaken in 1983 to 1987, prior to production from the Trinity mine.

### 13.1.1  1983 U. S. Borax Research Corp. and Hazen Research Inc.

In March-April 1983, USBRC conducted preliminary metallurgical testing on three predominantly sulfide samples and one oxidized sample of rotary drill cuttings, including cyanide leach and froth flotation testing (Smith, 1983). Silver recovery following grinding and rougher/scavenger froth flotation procedures was about 90%, with a maximum of 93% and a minimum of 72%. Cyanide leaching resulted in silver recovery of about 50%, with a high of 65% and a low of 24%; reagent consumption was high.

*Mine Development Associates*
*December 2, 2011*

U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
*Print date: 12/2/11 12:44 p.m.*

**APP 0520**

*Technical Report on the Trinity Project*
*Pershing County, Nevada*                                                      *Page 71*

Later in 1983, Hazen Research, Inc. ("Hazen") reviewed the prior test results from USBRC and proceeded with preliminary testing and a mineralogical examination of the Trinity silver mineralization (Gathje, 1983). Hazen's test work used a sample composite prepared by Borax from rotary drill holes S-8 and S-13. The following is a summary of their conclusions:

- Bulk sulfide flotation achieved silver recoveries of 90 to 95% into a bulk concentrate assaying about 20 oz silver/ton and containing about 15-20% by weight of the feed. Corresponding lead and zinc recoveries ranged from the high 80s to low 90s percent. A typical cleaner concentrate contained 77% of the contained arsenic and assayed 1.90% arsenic.

- Selective sulfide flotation achieved a silver recovery of 84.6% into a single-stage cleaner concentrate assaying 156.8 oz silver/ton and containing 2.07% by weight of the feed. This concentrate, assaying 0.60% arsenic and containing approximately 8% of the arsenic in the feed, demonstrated the possibility of producing concentrates low in arsenic.

- Cyanide leach tests, using 2 to 10g NaCN/liter and grinds from 77 to 92% passing 270 mesh, demonstrated slow kinetics for silver dissolution. In all cases, the data show the need for leach times of at least 72 to 96 hours. At 96 hours, the cyanidation of whole ore gave silver dissolutions of 78 to 84%. The cyanidation of a bulk flotation concentrate, after regrinding, achieved a silver dissolution of 82.4% after 96 hours. Cyanide consumptions were high, presumably due to interactions between the sulfides and cyanide.

### 13.1.2  1983-1984 U. S. Borax Research Corp.

Following the preliminary metallurgical work showing that flotation was feasible, whereas direct cyanidation of the ore was very slow with high cyanide consumption (described in Section 13.1.1), USBRC evaluated a wider selection of rotary drill-hole composite samples with four objectives: depressing arsenic, iron, and zinc; analyzing rougher and cleaner concentrates to produce a concentrate acceptable to a smelter; investigating ways to make cyanidation feasible; and evaluating gravity separation (Woods and Smith, 1984). All of the samples contained a high amount of fines (rotary drill cuttings). Composites were developed from holes S-1, S-3, S-4, S-8, S-13, S-26, S-30, S-42, and S-45. The following is a summary of their conclusions:

- Screen fractionation and analyses showed increased silver assay with decreasing particle size down to 325 mesh; the minus 325 mesh fraction had a normal silver content. Even the coarsest fraction could not be discarded without serious silver losses.

- A bulk sample of oxidized surface rock gave Bond work index values of 7.5 kilowatt hours per short ton ("kwh/st") (ball mill) and 5.5 kwh/st (rod mill). Due to a lack of core, no work index data could be obtained on the sulfide ore.

- Flotation of oxidized ore, representing about 20% of the deposit, gave 50-60% recovery of silver, even with use of a sulfidizer. However, this ore was amenable to direct cyanide leaching, providing 94-97% recovery of silver with moderate cyanide consumption.

- Bulk flotation of sulfide ore using a strong collector gave silver recoveries of 87-96%. Lead and zinc recoveries generally also are high, followed by arsenic and iron. Maintaining a high pH (11) during bulk flotation substantially lowered the arsenic, zinc, and iron recoveries with only a

*Mine Development Associates*
*December 2, 2011*

U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
Print date: 12/2/11 12:44 p.m.

**APP 0521**

slight effect on silver recovery. Changing to more selective collectors (Aero 325 and the Minerecs) gave much lower arsenic recovery, while silver recovery dropped to the 76-89% range.

- Two stages of cleaning can give 87% recovery of silver, with a second increment of arsenic and iron depression (pH 11). Regrinding of the intermediate rougher concentrate is beneficial.

- Cyanidation of sulfide ore directly is not practicable due to very slow leach rate, poor ultimate silver recovery, and high cyanide consumption. Finer grinding and higher initial cyanide concentration increased the leaching rate but pushed the cyanide consumption even higher.

- Pre-aeration of bulk concentrates oxidizes iron minerals, and subsequent cyanide leaching gives greatly improved results. Addition of soda ash to maintain a pH near 10 during the oxidation is beneficial.

- Heavy media sink-float experiments were not encouraging.

### 13.1.3 1984-1985 U. S. Borax Research Corp.

From February 1984 through December 1985, USBRC undertook extensive metallurgical testing of the Trinity oxide and sulfide ores (Ganderup and Woods, 1986). In contrast to the 1983 USBRC and Hazen studies that primarily involved rotary cuttings (Section 1.1.1), this work studied core samples from holes SC-1 through SC-5 (only ore zones running 1.5 oz silver/ton and higher were composited). This work included a study of mineralogy and determination of ore specific gravity; gravity separation; rod and ball mill grinding studies; flotation; analysis of cyanidation *vs.* depth; and column leaching. They also studied agglomeration, percolation, acid extraction, oxidation-reduction potential, and Merrill-Crowe silver recovery. The following are some of their conclusions:

- Rod mill and ball mill grindability tests on five sulfide core composites yielded moderate work indices, averaging 10 kwh/st; rod mill testing of four oxide composites yielded an average work index of 8.7 kwh/st.

- For five sulfide core composites, in general, silver recovery and the total weight of the flotation concentrate both increased at finer grinds; the ideal grind was around 60-65% minus 200 mesh, at finer grinds minimal improvement was seen in silver recovery.

- At a grind of 60% minus 200 mesh, the core composites averaged 93.2% recovery of silver to a concentrate containing 10.7% of the initial feed weight.

- In contrast to earlier results on rotary cuttings, three of the five sulfide core composites yielded poor rejection of arsenic (15-35%) under high pH conditions (pH 11).

- Specific gravity determinations were made on core samples taken at 50ft intervals within each hole. The mineral specific gravity (without voids) for rhyolite tuff averaged 2.61, intrusive rhyolite averaged 2.65, and argillite averaged 2.66. The rock specific gravities showed more variance for the rhyolites and averaged 2.10 for the tuff, 2.24 for the intrusive rhyolites, and 2.56 for the argillite.

- Tabling tests on ground core showed that sufficient grinding to relieve gangue locking gave unacceptable silver losses to slimes.

**APP 0522**

- Column leaching of agglomerated oxide material showed that at depth, oxide should be amenable to heap leaching, but surface oxide would require finer grinding and give lower recovery.

- Cyanidation as a function of depth for two rotary and two core holes showed a sharp break in silver recovery between oxide and sulfide material, also suggesting that direct cyanidation of upper sulfide material would not be feasible.

- Column-leach recoveries were low, and cyanide consumption was high on agglomerated sulfide material; air oxidation at ambient temperature prior to cyanidation gave only marginal improvement.

- Mineralized material from RC drill hole SR-5 was floated to produce rougher concentrate for oxidation/cyanidation studies.  Recovery of 93.6% of the silver was achieved in a concentrate with 12.2% of the initial feed weight; rejection of arsenic and iron was good.

### 13.1.4   1986–1987 Kappes, Cassiday & Associates

In late 1986, Kappes, Cassiday & Associates ("KCA") received five (5) core samples from the Trinity, Nevada property (SC-6 through SC-10).  The core samples were assayed (gold and silver) and split to form two composites (upper and lower).  These composites were utilized for head assay, bottle roll leach, NaCN/pH optimization, agglomeration and column leach test work.  (Dix, 1987)

Results for the (SC-6 through SC-10) composites indicated:

- Column leach tests on agglomerated material (minus 3/4 inch) indicated an average silver recovery of 84% based on 67 days of leaching and an average calculated head of 6.86 oz silver/ton.  Chemical consumption averaged 2.18 pounds of NaCN and 0.23 pounds of hydrated lime per ton or ore.

- Bottle roll leach tests on pulverized material (minus 100 mesh) indicated an average silver recovery of 94% in 24 hours of leaching, based on an average calculated head of 7.16 oz silver/ton.  Chemical consumption averaged 1.14 pounds of NaCN and 1.10 pounds of hydrated lime per ton of ore.

In late 1987, KCA conducted additional test work on five additional samples from the Trinity property. These samples were identified as *Mn low grade (5310', 1.3 oz/ton Ag)*, *Drain from Cell 1&2 Composite*, *Drain from Cell 3 Composite*, *Drain from Cell 4 Composite* and *Drain from Cell 5 Composite*.  The material (minus 10 mesh) was utilized for bottle roll leach tests.  Results for the bottle roll leach test work indicated silver recovery in the range of 27.3% – 52.5% based on calculated heads between 0.44 – 1.13 oz silver/ton of ore (Yernberg, 1987).

### 13.2   Metallurgical Testing by Liberty Silver Corp.

Liberty Silver Corp. has engaged Kappes, Cassiday & Associates to undertake additional testing of the Trinity, Nevada deposit.  Future laboratory studies will include additional test work completed on new samples to verify and optimize the extractive process.

## 14.0   MINERAL RESOURCE ESTIMATE

### 14.1   Introduction

Mineral resources described in this report for the Trinity project have been estimated in accordance with standards adopted by the Canadian Institute of Mining, Metallurgy and Petroleum ("CIM") in 2000, as amended on November 27, 2010, and prescribed by Canadian Securities Administrators' NI 43-101 ("NI 43-101"). The modeling and estimate of the mineral resources were done under the supervision of Michael M. Gustin, a qualified person with respect to Mineral Resource estimation under NI 43-101. Mr. Gustin is independent of Liberty Silver by the definitions and criteria set forth in NI 43-101; there is no affiliation between Mr. Gustin and Liberty Silver except that of an independent consultant/client relationship. There are no Mineral Reserves estimated for the Trinity project as of the date of this report. The Trinity resources were modeled, estimated, and classified in August through December of 2010.

Although MDA is not an expert with respect to any of the following aspects of the project, MDA is not aware of any unusual environmental, permitting, legal, title, taxation, socio-economic, marketing, or political factors that may materially affect the Trinity mineral resources as of the date of this report.

MDA classifies resources in order of increasing geological and quantitative confidence into Inferred, Indicated, and Measured categories to be in compliance with the "CIM Definition Standards - For Mineral Resources and Mineral Reserves" (2010) and therefore Canadian National Instrument 43-101. CIM mineral resource definitions are given below:

**Mineral Resource**

*Mineral Resources are sub-divided, in order of increasing geological confidence, into Inferred, Indicated and Measured categories. An Inferred Mineral Resource has a lower level of confidence than that applied to an Indicated Mineral Resource. An Indicated Mineral Resource has a higher level of confidence than an Inferred Mineral Resource but has a lower level of confidence than a Measured Mineral Resource.*

A Mineral Resource is a concentration or occurrence of diamonds, natural solid inorganic material, or natural solid fossilized organic material including base and precious metals, coal, and industrial minerals in or on the Earth's crust in such form and quantity and of such a grade or quality that it has reasonable prospects for economic extraction. The location, quantity, grade, geological characteristics and continuity of a Mineral Resource are known, estimated or interpreted from specific geological evidence and knowledge.

*The term Mineral Resource covers mineralization and natural material of intrinsic economic interest which has been identified and estimated through exploration and sampling and within which Mineral Reserves may subsequently be defined by the consideration and application of technical, economic, legal, environmental, socio-economic and governmental factors. The phrase 'reasonable prospects for economic extraction' implies a judgement by the Qualified Person in respect of the technical and economic factors likely to influence the prospect of economic extraction. A Mineral Resource is an inventory of mineralization that under*

*Mine Development Associates*
*December 2, 2011*       U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101\trinity_2011_43-101_v32.docx
*Print date: 12/2/11 12:44 p.m.*

*realistically assumed and justifiable technical and economic conditions might become economically extractable. These assumptions must be presented explicitly in both public and technical reports.*

### Inferred Mineral Resource

An 'Inferred Mineral Resource' is that part of a Mineral Resource for which quantity and grade or quality can be estimated on the basis of geological evidence and limited sampling and reasonably assumed, but not verified, geological and grade continuity. The estimate is based on limited information and sampling gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes.

*Due to the uncertainty that may be attached to Inferred Mineral Resources, it cannot be assumed that all or any part of an Inferred Mineral Resource will be upgraded to an Indicated or Measured Mineral Resource as a result of continued exploration. Confidence in the estimate is insufficient to allow the meaningful application of technical and economic parameters or to enable an evaluation of economic viability worthy of public disclosure. Inferred Mineral Resources must be excluded from estimates forming the basis of feasibility or other economic studies.*

### Indicated Mineral Resource

An 'Indicated Mineral Resource' is that part of a Mineral Resource for which quantity, grade or quality, densities, shape and physical characteristics can be estimated with a level of confidence sufficient to allow the appropriate application of technical and economic parameters, to support mine planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough for geological and grade continuity to be reasonably assumed.

*Mineralization may be classified as an Indicated Mineral Resource by the Qualified Person when the nature, quality, quantity and distribution of data are such as to allow confident interpretation of the geological framework and to reasonably assume the continuity of mineralization. The Qualified Person must recognize the importance of the Indicated Mineral Resource category to the advancement of the feasibility of the project. An Indicated Mineral Resource estimate is of sufficient quality to support a Preliminary Feasibility Study which can serve as the basis for major development decisions.*

### Measured Mineral Resource

A 'Measured Mineral Resource' is that part of a Mineral Resource for which quantity, grade or quality, densities, shape, and physical characteristics are so well established that they can be estimated with confidence sufficient to allow the appropriate application of technical and economic parameters, to support production planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches,

*Mine Development Associates*
*December 2, 2011*                    U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
                                        *Print date: 12/2/11 12:44 p.m.*

pits, workings and drill holes that are spaced closely enough to confirm both geological and grade continuity.

*Mineralization or other natural material of economic interest may be classified as a Measured Mineral Resource by the Qualified Person when the nature, quality, quantity and distribution of data are such that the tonnage and grade of the mineralization can be estimated to within close limits and that variation from the estimate would not significantly affect potential economic viability. This category requires a high level of confidence in, and understanding of, the geology and controls of the mineral deposit.*

## 14.1   Resource Modeling

### 14.1.1   Data

A model was created for estimating the silver, lead, and zinc resources at Trinity from data generated by Borax, SFPM, and Renaissance between 1982 and 2007, including geologic mapping, core, rotary percussion and RC drill data, and project topography derived from a 1988 final pit map and USGS digital elevation data.  These data were incorporated into a digital database using Nevada State Plane West Zone and the NAD27 datum.  All units are in feet.  All modeling of the Trinity resources was performed using Gemcom Surpac® mine planning software.

It is important to note that the project database includes a significant amount of data from holes drilled beyond the limits of the lands controlled by Liberty Silver.  From an estimation standpoint, these holes provide data that are critical to the estimation of the resources controlled by Liberty Silver, as modeling of the entire deposit is needed to properly estimate any subset of the mineralization.  Similarly, drill data that lies within the existing pit, which has since been mined, were also used in the modeling.  Only resources that lie within the property controlled by Liberty Silver and that lie outside of the pit limits are reported herein.

In addition, although the blast hole data from the mining during the 1980's was loaded into the drill hole database, it was not used in this resource estimation.

### 14.1.2   Deposit Geology Pertinent to Resource Modeling

There are two primary controls on mineralization at Trinity.  In the vicinity of the existing pit, mineralization is controlled by a northeast-trending normal fault zone that dips steeply to the northwest.  Mineralization dissipates in the hanging wall of the fault zone, but there is substantial continuity in the footwall to the southeast and east.  The footwall mineralization is primarily within rhyolite units, but generally follows the contact with the underlying Mesozoic meta-sedimentary rocks.  Both the rhyolites and older sedimentary rocks are offset by a series of normal faults that strike primarily to the northeast and dip steeply to the northwest.  Some of these normal faults may be cross faults that strike to the west-northwest. Although some of the mineralized zones may be offset by these normal faults, this Inferred resource study was not sufficiently detailed to model those offsets.

*Mine Development Associates*
*December 2, 2011*

U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
*Print date: 12/2/11 12:44 p.m.*

### 14.1.3  Geologic and Oxidation Modeling

MDA entered the principal rock types into the drill-hole database, but ultimately the contact between the Tertiary volcanic rocks and underlying Auld Lang Syne Group was the only significant lithologic control on mineralization that was identified on a set of cross sectional interpretations completed by MDA.  Mapped faults (Ashleman (1983) were projected from the surface and used to help interpret offsets in the Triassic/Tertiary contact.  While it is likely that there are additional lithological and local structural controls, there are many inconsistencies in the geological drill-hole logs that would need to be resolved before these could be defined accurately.  In addition, logging of alteration related to mineralization, especially silicification, was found to be very inconsistent.

The oxide/sulfide boundary was logged in many of the drill holes, and MDA used these data to model this boundary as an undulating surface.  If it was not noted in the log, the oxide/sulfide boundary was interpreted as the first consistent appearance of sulfide, even if small amounts of iron oxide staining were noted on the logs.

### 14.1.4  Density

After reviewing the available density data, Baele and Pelletier's (1989) bulk tonnage factor of $13.3 \text{ft}^3$/ton was selected for use in the modeling of both the oxide and sulfide material.

### 14.1.5  Silver, Lead, and Zinc Modeling

The Trinity mineral resources were modeled and estimated by:

1)  Statistically evaluating the drill-hole data to determine silver, lead, and zinc mineral domains;

2)  Interpreting the mineral domains in cross section at 100ft spacings;

3)  Analyzing the modeled domains geostatistically to determine estimation parameters; and

4)  Interpolating grades into a three-dimensional block model.

*Mineral Domains*.  MDA modeled the Trinity silver, lead, and zinc mineralization by interpreting mineral-domain polygons on vertical N40E-looking cross sections that span the extents of the deposit.  A mineral domain is a natural grade population of a metal that occurs in a specific geologic environment.  In order to define the mineral domains at Trinity, the natural populations were identified on quantile graphs that plot the silver, lead, and zinc grade distributions of the drill-hole assays.  This analysis led to the identification of low, medium, and high-grade populations for each metal (Table 14.1).  Ideally, each of these populations can be correlated with specific geologic characteristics that are captured in the project database to aid in the definition of the mineral domains.

### Table 14.1  Trinity Mineral Domains

| Domain | Ag_ppm | Pb_ppm | Zn_ppm |
|--------|--------|--------|--------|
| 100 | ~6 to ~25 | ~100 to ~1,000 | ~300 to ~1,500 |
| 200 | ~25 to ~650 | ~1,000 to ~6,000 | ~1,500 to ~7,000 |
| 300 | >~650 | >~6,000 | >~7,000 |

A total of 40 cross sections spaced at 100ft intervals across the deposit were used for the modeling of the Trinity mineral domains. The drill-hole traces, topographic profile, top of the Triassic sedimentary rocks, interpreted fault surfaces, and the oxide/sulfide boundary were displayed on the sections, with silver, lead, and zinc assays (colored by the grade domain population ranges defined above) and lithologic codes plotted along the drill-hole traces. These data were used as the base for MDA's interpretations of the mineral domains. Mineral-domain envelopes were interpreted on the sections to more-or-less capture assays corresponding approximately to each of the defined grade populations. Representative cross sections showing silver, lead, and zinc mineral-domain interpretations are shown in Figure 14.1, Figure 14.2, and Figure 14.3, respectively.

The mineral domains were interpreted through the volume now occupied by the open pit. The highest grade silver domain is confined to the vicinity of the open pit and extends up to 50ft below the bottom of the pit. This 650 ppm Ag domain is controlled by the northeast trending, northwest dipping fault zone. This silver domain is enclosed by a lens of the 6000 ppm lead domain. The high grade silver zone is not enclosed by a higher grade (7000 ppm) zinc zone. The 25 to 650 ppm Ag domain encloses high grade silver domain but is not nearly as controlled by the northeast fault zone. To the southeast and northeast of the pit, this silver domain flattens out. It is confined to the rhyolites but parallels the contact with the Triassic rocks.

The low grade (100 to 1000 ppm) lead domain encloses all of the silver domains and is generally steep dipping along the northeast fault zone and flat dipping to the south and northeast of the pit. There are higher grade zones south of the pit that may or may not enclose elevated silver zones (greater than 25 ppm Ag). The lead and silver zones do not appear to be affected by the oxide sulfide boundary, but the zinc is partially leached from the oxide zone and most all of the high grade (greater than 7000 ppm Zn) domains are below the oxide/sulfide surface. There are higher-grade zinc lenses along the northeast fault zone, but these are entirely below the pit.

**Figure 14.1 Cross Section 2800 Showing Silver Mineral Domains**
(Looking N40E)



*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

**Figure 14.2 Cross Section 2800 Showing LeadMineral Domains**
(Looking N40E)



**Figure 14.3 Cross Section 2800 Showing Zinc Mineral Domains**
(Looking N40E)



**APP 0531**

*Technical Report on the Trinity Project*
*Pershing County, Nevada*                                                              *Page 82*

*Assay Coding, Capping, and Compositing*. Drill-hole silver, lead, and zinc assays were coded to their domains by the sectional mineral-domain envelopes. Descriptive statistics of the coded assays are provided in Table 14.2 for silver, Table 14.3 for lead, and Table 14.4 for zinc.

**Table 14.2 Descriptive Statistics of Coded Silver Assays**

| Domain | Assays | Count | Mean | Median | Std. Dev. | CV | Minimum | Maximum |
|--------|--------|-------|------|--------|-----------|----|---------|---------|
| 100 | Ag_ppm | 8640 | 12.1 | 10.6 | 8.0 | 0.66 | 0.0 | 313.4 |
| | Ag_ppm_cap | 8640 | 12.1 | 10.6 | 6.9 | 0.57 | 0.0 | 75.0 |
| 200 | Ag_ppm | 4350 | 72.7 | 46.6 | 73.7 | 1.01 | 0.4 | 629.8 |
| | Ag_ppm_cap | 4350 | 72.7 | 46.6 | 73.3 | 1.01 | 0.4 | 550.0 |
| 300 | Ag_ppm | 132 | 801.5 | 620.0 | 524.0 | 0.65 | 16.3 | 3003.4 |
| | Ag_ppm_cap | 132 | 792.1 | 620.0 | 489.6 | 0.62 | 16.3 | 2350.0 |
| All | Ag_ppm | 13122 | 39.6 | 15.1 | 105.1 | 2.66 | 0.0 | 3003.4 |
| | Ag_ppm_cap | 13122 | 39.4 | 15.1 | 102.6 | 2.60 | 0.0 | 2350.0 |

**Table 14.3 Descriptive Statistics of Coded Lead Assays**

| Domain | Assays | Count | Mean | Median | Std. Dev. | CV | Minimum | Maximum |
|--------|--------|-------|------|--------|-----------|----|---------|---------|
| 100 | Pb_ppm | 9520 | 405.9 | 267.0 | 443.8 | 1.09 | 10.0 | 20110.0 |
| | Pb_ppm_cap | 9520 | 405.5 | 267.0 | 434.2 | 1.07 | 10.0 | 6000.0 |
| 200 | Pb_ppm | 5356 | 2055 | 1710.0 | 1364.7 | 0.66 | 11.1 | 13100.0 |
| | Pb_ppm_cap | 5356 | 2053.2 | 1710.0 | 1352.4 | 0.66 | 11.1 | 10000.0 |
| 300 | Pb_ppm | 939 | 7415.7 | 6600.0 | 4618.0 | 0.62 | 15.8 | 40100.0 |
| | Pb_ppm_cap | 939 | 7406.3 | 6600.0 | 4559.6 | 0.62 | 15.8 | 33000.0 |
| All | Pb_ppm | 15815 | 1378.6 | 599.0 | 2196.3 | 1.59 | 10.0 | 40100.0 |
| | Pb_ppm_cap | 15815 | 1377.2 | 599.0 | 2183.9 | 1.59 | 10.0 | 33000.0 |

**Table 14.4 Descriptive Statistics of Coded Zinc Assays**

| Domain | Assays | Count | Mean | Median | Std. Dev. | CV | Minimum | Maximum |
|--------|--------|-------|------|--------|-----------|----|---------|---------|
| 100 | Zn_ppm | 6119 | 675.6 | 531.0 | 541.7 | 0.80 | 17.0 | 19100.0 |
| | Zn_ppm_cap | 6119 | 672.6 | 531.0 | 486.7 | 0.70 | 17.0 | 4200.0 |
| 200 | Zn_ppm | 3197 | 2762.2 | 2300.0 | 1693.8 | 0.60 | 17.5 | 12400.0 |
| | Zn_ppm_cap | 3197 | 2690.0 | 2300.0 | 1665.2 | 0.60 | 17.5 | 9000.0 |
| 300 | Zn_ppm | 744 | 9443.5 | 8860.0 | 5295.1 | 0.60 | 400.0 | 86000.0 |
| | Zn_ppm_cap | 744 | 9343.4 | 8860.0 | 4464.4 | 0.50 | 400.0 | 27000.0 |
| All | Zn_ppm | 10060 | 1992.7 | 900.0 | 2932.4 | 1.50 | 17.0 | 86000.0 |
| | Zn_ppm_cap | 10060 | 1981.3 | 900.0 | 2795.7 | 1.40 | 17.0 | 27000.0 |

*Mine Development Associates*
*December 2, 2011*

U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
*Print date: 12/2/11 12:44 p.m.*

**APP 0532**

*Technical Report on the Trinity Project*
*Pershing County, Nevada*                                                                    *Page 83*

The process of determining assay caps began with inspection of quantile plots of the coded assays by domain to assess the mineral-domain populations and identify possible high-grade outliers that might require capping. Descriptive statistics of the coded assays by domain and visual reviews of the spatial relationships of the possible outliers and their potential impacts during grade interpolation were also considered in the process of determining appropriate assay caps. The caps are tabulated below for silver, lead, and zinc (Table 14.5, Table 14.6, and Table 14.7, respectively). The effects of the assay capping can be qualitatively evaluated by examination of the descriptive statistics of the mineral-domain assays (Table 14.2, Table 14.3, and Table 14.4).

### Table 14.5 Trinity Silver Assay Caps

| Domain | Ag_ppm Cap | Count | Number Capped | Percent of Samples |
|--------|-----------|-------|---------------|--------------------|
| 100 | 75 | 8640 | 10 | 0.12% |
| 200 | 550 | 4350 | 8 | 0.18% |
| 300 | 2350 | 132 | 2 | 1.52% |

### Table 14.6 Trinity Lead Assay Caps

| Domain | Pb_ppm Cap | Count | Number Capped | Percent of Samples |
|--------|-----------|-------|---------------|--------------------|
| 100 | 6000 | 9520 | 4 | 0.04% |
| 200 | 10000 | 5356 | 4 | 0.07% |
| 300 | 33000 | 939 | 2 | 0.21% |

### Table 14.7 Trinity Zinc Assay Caps

| Domain | Zn_ppm Cap | Count | Number Capped | Percent of Samples |
|--------|-----------|-------|---------------|--------------------|
| 100 | 4200 | 6119 | 7 | 0.11% |
| 200 | 9000 | 3197 | 19 | 0.59% |
| 300 | 27000 | 744 | 5 | 0.67% |

The capped assays were composited down-hole by domain at 10ft intervals intervals (Table 14.8, Table 14.9, and Table 14.10). In the silver analyses, about 3% of the analytical intervals were 10-foot samples, and 97% were 5-foot intervals. Approximately 80% of the analytical intervals for lead and silver represented 5 foot samples with most of the remainder 10 foot intervals.

*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

**APP 0533**

**Table 14.8 Descriptive Statistics of Trinity Silver Composites**

| Domain | Count | Mean (Ag_ppm) | Median (Ag_ppm) | Std. Dev. | CV | Min (Ag_ppm) | Max (Ag_ppm) |
|---|---|---|---|---|---|---|---|
| 100 | 4640 | 12.19 | 10.99 | 5.98 | 0.49 | 0.66 | 75 |
| 200 | 2362 | 71.5 | 47.5 | 65.83 | 0.92 | 0.36 | 506 |
| 300 | 76 | 790.1 | 652.6 | 431.7 | 0.55 | 25.3 | 2336 |
| All | 7078 | 40.3 | 15.6 | 101.7 | 2.52 | 0.36 | 2336 |

**Table 14.9 Descriptive Statistics of Trinity Lead Composites**

| Domain | Count | Mean (Pb_ppm) | Median (Pb_ppm) | Std. Dev. | CV | Min (Pb_ppm) | Max (Pb_ppm) |
|---|---|---|---|---|---|---|---|
| 100 | 5072 | 406.9 | 279 | 399.1 | 0.98 | 13.8 | 6000 |
| 200 | 2937 | 2053.2 | 1755 | 1245.2 | 0.61 | 29.2 | 10000 |
| 300 | 507 | 7409.7 | 6890 | 3944.6 | 0.53 | 21.3 | 25400 |
| All | 8516 | 1391.6 | 622.5 | 2107.3 | 1.51 | 13.8 | 25400 |

**Table 14.10 Descriptive Statistics of Trinity Zinc Composites**

| Domain | Count | Mean (Zn_ppm) | Median (Zn_ppm) | Std. Dev. | CV | Min (Zn_ppm) | Max (Zn_ppm) |
|---|---|---|---|---|---|---|---|
| 100 | 3256 | 675.6 | 549.5 | 441.8 | 0.65 | 27.5 | 4200 |
| 200 | 1661 | 2697.5 | 2360 | 1469.6 | 0.54 | 27.1 | 8605 |
| 300 | 412 | 9391.6 | 8902.5 | 4022.9 | 0.43 | 400 | 27000 |
| All | 5329 | 1979.7 | 915 | 2736.9 | 1.38 | 27.1 | 27000 |

*Block Model Coding*.  Solids were created by extruding the 100ft spaced sectional mineral-domain polygons half way to the adjacent sections.  These solids were used to code a three-dimensional block model comprised of blocks 20 feet in width, 20 feet in length, and 15 feet in height.  The model bearing is rotated so that the "x" direction is N40°E, matching the orientation and view of the cross sections.  In order for the block model to better reflect the irregularly shaped limits of the various silver, lead, and zinc domains, as well as to explicitly model dilution, the percentage volume of each mineral domain within each block is stored (the "partial percentages"). The percentage of each block that lies below the topographic surface, as well as above and below the oxide/sulfide surface, is also stored.

*Grade Interpolation*.  A variographic study was performed using the silver, lead, and zinc composites from each mineral domain, collectively and separately, at various azimuths, dips, and lags.   The variogram in Figure 14.4 is fairly typical of the dip direction (10° dip at azimuth 310°) and strike (040° azimuth) variograms for all three metals.  The ranges varied between 30 and 60 feet.

*Mine Development Associates*
*December 2, 2011*                                          U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
                                                             Print date: 12/2/11 12:44 p.m.

*Technical Report on the Trinity Project*
*Pershing County, Nevada*                                                              *Page 85*

### Figure 14.4 Trinity Variogram



Since the average drill-hole spacing is closer to 100 feet and this is an Inferred resource estimate, only nearest neighbor and inverse distance interpolations were used to estimate grades into the block model. Table 14.11 and Table 14.12 summarize the estimation parameters.

### Table 14.11 Search Ellipse Orientations

| Estimation Domain | Major Bearing | Plunge | Tilt |
|---|---|---|---|
| | Search Ellipse Orientation | | |
| 100, 200, 300 | 040° | 0° | 10° |

### Table 14.12  Summary of Trinity Estimation Parameters

Estimation Parameters: Ag, Pb, & Zn Domains 100, 200, 300

| Estimation Pass | Search Ranges (m) | | | Comp Constraints | | | |
|---|---|---|---|---|---|---|---|
| | Major | S-Major | Minor | Min | Max | Max/hole | Min Holes |
| 1 | 120 | 120 | 40 | 1 | 18 | 3 | 1 |
| 2 | 500 | 500 | 500 | 1 | 18 | 3 | 1 |

*Mine Development Associates*
*December 2, 2011*                                   *U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
                                                              *Print date: 12/2/11 12:44 p.m.*

APP 0535

The major and semi-major axes of the search ellipses approximate the average dip directions of the silver, lead, and zinc mineralization. The first-pass search distances take into consideration drill-hole spacing. The second pass was designed to estimate grade into all blocks coded to the mineral domains that were not estimated in the first pass. Grades were interpolated using inverse distance to the third power and nearest-neighbor methods. The mineral resources reported herein were estimated by inverse-distance interpolation.

The two estimation passes were performed independently for each of the mineral domains, so that only composites coded to a particular domain were used to estimate grade into blocks coded by that domain. The estimated grades were coupled with the partial percentages of the mineral domains and un-modeled waste stored in the blocks to enable the calculation of a single weight-averaged block-diluted grade for each block.

## 14.2    Trinity Inferred Mineral Resources

The Trinity project oxidized silver mineral resources are listed in Table 14.13 using a cutoff grade of 0.65 oz Ag/ton. This cutoff was chosen to capture mineralization potentially available to open-pit extraction and heap-leach processing, and it was derived using a $17 per ounce silver price (three-year average) and a 75% heap-leach recovery factor.

### Table 14.13 Trinity Inferred Mineral Oxide Resources

| Cutoff (oz Ag/ton) | Inferred Oxide Resources | | |
|---|---|---|---|
| | Tons | oz Ag/ton | oz Ag contained |
| 0.30 | 12,019,000 | 0.54 | 6,490,000 |
| 0.40 | 5,506,000 | 0.78 | 4,295,000 |
| 0.50 | 2,863,000 | 1.1 | 3,149,000 |
| 0.65 | 1,901,000 | 1.37 | 2,605,000 |
| 1.00 | 1,019,000 | 1.87 | 1,906,000 |
| 2.00 | 203,000 | 4.08 | 828,000 |

Unoxidized silver, lead, and zinc mineral resources are listed in Table 14.14 using a silver-equivalent cutoff grade of 1.3 oz Ag/ton, chosen to reflect potential open-pit mining, milling, and production of concentrates by flotation. The cutoff assumes 90% recovery by flotation of the silver, lead, and zinc, and metal prices of $17 per ounce for silver and $0.80 per pound for both lead and zinc. The cutoff envisions potential mining by open-pit methods. Metallurgical data, summarized in Section 13.0, suggest that the expected recoveries of the three metals are similar.

*Mine Development Associates*
*December 2, 2011*                                    U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
                                                     *Print date: 12/2/11 12:44 p.m.*

### Table 14.14 Trinity Inferred Mineral Sulfide Resources

| Cutoff (oz/ton Ag equiv) | Inferred Sulfide Resource | | | | |
|---|---|---|---|---|---|
| | Tons | oz Ag/ton | % Pb | % Zn | oz Ag |
| 1.00 | 8,408,000 | 1.27 | 0.23% | 0.43% | 10,691,000 |
| 1.20 | 6,113,000 | 1.56 | 0.25% | 0.43% | 9,539,000 |
| *1.30* | *5,336,000* | *1.69* | *0.25%* | *0.43%* | *9,036,000* |
| 1.50 | 4,119,000 | 1.97 | 0.26% | 0.42% | 8,100,000 |
| 2.00 | 2,288,000 | 2.70 | 0.30% | 0.37% | 6,170,000 |
| 3.00 | 902,000 | 4.14 | 0.32% | 0.33% | 3,731,000 |

The block-diluted resources reported in Table 14.13 and Table 14.14 are tabulated at additional cutoffs in order to give grade-distribution information, as well as to provide for economic conditions other than those envisioned by the chosen resource cutoffs.  Only modeled mineralization that lies within the Liberty Silver property is reported.  The pre-mining deposit was modeled and estimated, after which the mined-out material was removed to allow for reporting of the present-day resources.

At low grades, there is a significant increase in contained silver ounces. Although silver and lead grades increase with increasing cutoffs, as expected, zinc grades actually decrease at the higher cutoffs.

The Trinity resources are classified entirely as Inferred due to: (1) the simplistic sectional modeling method; (2) suspect USBRC AA data that dominate the data used in the resource modeling; (3) lack of backup data that could be used to verify the historic conventional rotary, RC, and core drill-hole data; and (4) limited amount of density data.

The following checks of the Trinity resource model were completed:

- Cross sections showing the mineral domains, drill-hole assays, geology, topography, sample coding, and interpolated inverse-distance block grades were reviewed for reasonableness;

- A comparison against the total mineral inventory estimated by Paul Hartley in 2006 showed that this current Inferred resource is within 4% of the tonnage and 6% of the total silver ounces estimated in 2006;

- Volume checks between the extruded sections and block model domain values were essentially identical;

- A nearest-neighbor interpolation was completed for comparisons with the inverse-distance results; at a zero cutoff grade, there was a 0.23% difference in the  grade of the inverse distance and nearest neighbor estimates for silver, a 3.3% difference in lead, and 0.94% difference in the zinc;

- Population distribution plots of assays, composites, and block model grades were evaluated and found to be reasonable; and

*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

**APP 0537**



**Technical Report on the Trinity Project**
**Pershing County, Nevada**

*Page 88*

- A total of 1.01 million tons grading 5.8 oz/ton Ag modeled to lie within the existing open pit. This compares with the reported production of approximately 1.1 million tons of 6 oz/ton Ag.

Representative cross sections showing silver, lead, and zinc blocks, colored to reflect their respective mineral-domain grade ranges, are shown in Figure 14.5, Figure 14.6, and Figure 14.7, respectively.

*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

**APP 0538**

**Figure 14.5 Cross Section 2800 Showing Block Model Silver Grades**
(Looking N40E)



*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

APP 0539

**Technical Report on the Trinity Project**
**Pershing County, Nevada**

Page 90

### Figure 14.6 Cross Section 2800 Showing Block Model Lead Grades
(Looking N40E)



*Technical Report on the Trinity Project*
*Pershing County, Nevada*

*Page 91*

**Figure 14.7 Cross Section 2800 Showing Block Model Zinc Grades**
(Looking N40E)



*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

**APP 0541**

*Technical Report on the Trinity Project*
*Pershing County, Nevada*

*Page 92*

## 15.0   ADJACENT PROPERTIES

MDA is not aware of any activity on adjacent properties that is relevant to this report.

*Mine Development Associates*
*December 2, 2011*

*U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx*
*Print date: 12/2/11 12:44 p.m.*

**APP 0542**

## 16.0   OTHER RELEVANT DATA AND INFORMATION

There is no remaining infrastructure related to the 1987-1989 mining operations conducted on the property.

*Mine Development Associates*
*December 2, 2011*                     U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
                                      *Print date: 12/2/11 12:44 p.m.*

**APP 0543**

## 17.0   INTERPRETATION AND CONCLUSIONS

MDA completed a comprehensive review of Liberty project data, including the drill-hole database. The review included a field visit to the project site. Based on this review, two primary controls on the silver, lead, and zinc mineralization were identified and used to model the mineral domains. Mineralization is controlled by (1) a northeast-trending zone of normal faults, the primary one being along the axis of the pit, and (2) the contact between the underlying Triassic sedimentary rocks and overlying Tertiary rhyolitic volcanic rocks, creating a tabular, slightly northwest-dipping, zone. The bulk of this low-angle tabular zone is in the rhyolites.

Silver mineralization at Trinity occurs as oxidized and unoxidized sulfides in veinlets, as fracture-controlled mineralization, and as disseminated mineralization primarily within Tertiary rhyolite porphyry, aphanitic rhyolite, and volcaniclastic rocks.  There is an oxide zone that overlies sulfide mineralization.

Between 1982 and 1985, 273 rotary percussion and reverse-circulation holes were drilled by Borax to explore and define the Trinity mineralization. The bulk of the silver, lead, and zinc analyses were completed by Borax. A review of the QA/QC data collected between 1982 and 1985 identified a inconsistencies with the Borax results and check analyses.  The check analyses by commercial laboratories are not within acceptable ranges.  Twinning of at least some of the early drill holes is required to compare verifiable analyses with the Borax values.

The oxide portion of the Trinity silver deposit was mined by a joint venture of Borax and SFPM from September 1987 to August 1988, with leaching continuing into 1989.  During that time, the mine produced about five million ounces of silver from about 1.1 million tons of oxidized ore grading six ounces of silver per ton.  Mining ceased when sulfide mineralization was encountered.  Although metallurgical testing on the sulfide mineralization indicated there was potential to recover silver, lead, and zinc, metal prices were too low at that time to support mining of the sulfide mineralization.

Liberty Silver provided MDA with a project drill-hole database consisting of information derived from 199 rotary percussion holes, 97 reverse circulation holes, and 10 core holes.  These holes were drilled by Borax, Santa Fe Pacific Mining, and Renaissance.  MDA completed and checked the analytical portion of the database and entered a standardized general lithologic coding into the database.  The oxide and sulfide mineral resources reported herein were estimated using this database.

The resources reported herein are entirely classified as Inferred. Although grades and tons are felt to be reasonably reflective of the project data, the cross sections that controlled the estimate are 100 feet apart, and the spatial distribution of the mineralization is not sufficiently understood to allow for higher resource categorization.  In addition, there is a question about the accuracy of the US Borax analyses, which dominate the project database, that can only be addressed by twinning at least some of the 1982 to 1985 holes.

The oxide silver resources are tabulated at a cutoff grade of 0.65 oz Ag/ton. Inferred oxide resources total 1.9 million tons averaging 1.37 oz/ton Ag (2,605,000 ounces).  The Inferred sulfide resources are tabulated at a cutoff grade of 1.30 oz/ton Ag equivalent.  The sulfide resources totaled 5.3 million tons, averaging 1.69 oz/ton Ag (9,036,000 ounces), 0.25% Pb, and 0.43% Zn.

**APP 0544**



*Technical Report on the Trinity Project*
*Pershing County, Nevada*

*Page 95*

Trinity is considered to be a property of merit. There is an oxide resource that may be amenable to open pit mining and heap leaching, as well as a larger sulfide resource that may be amenable to open pit mining and the production of a concentrate by flotation. In addition, the large area of geochemically anomalous lead and zinc encountered in the drilling is suggestive of an intrusive-related system that has not been systematically explored, especially to the south of Section 9.

*Mine Development Associates*
*December 2, 2011*

U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
*Print date: 12/2/11 12:44 p.m.*

**APP 0545**

## 18.0   RECOMMENDATIONS

There are a number of questions that need to be answered in the next phase of work at Trinity to advance the project.

1) What recoveries can be expected from the lower-grade oxide silver mineralization?

   Although there is higher-grade, multi-ounce silver mineralization along the main northeast-trending fault zone beneath the pit, at the southwest end of the pit, and 600 feet to the northeast of the pit, the bulk of the silver ounces modeled by MDA are in the low-grade halo that surrounds this fault and in tabular zones to the southeast of the fault. This is true for both the remaining oxide and most of the sulfide mineralization.

   Previous cyanide-leach test work has been primarily directed towards higher-grade oxide samples. MDA believes test work on lower-grade oxide material (0.3 to 1.0 oz Ag/ton) is needed and recommends that the testing program be planned in concert with metallurgical experts. Large-diameter core drilling should be used to obtain samples for the metallurgical test work. Density measurements should also be completed on the core samples.

2) How feasible is it to produce a saleable silver/lead/zinc concentrate from the sulfide mineralization?

   The economics of mining the low-grade sulfide mineralization hinge on producing a saleable silver, lead, and zinc concentrate. Many of the same core holes that are drilled for oxide metallurgical testing should be deepened to obtain sulfide metallurgical test samples.

3) How reliable are the old USBRC silver analyses and can they be used to advance the Inferred resource into Measured and Indicated categories?

   To upgrade the Inferred resources, the reliability of the early USBRC analyses for all three metals must be addressed since more than 80% of the analyses used to estimate the resources are USBRC analyses. MDA recommends twinning 12 of the USBRC-analyzed holes, with the goal of providing a statistically viable comparative data set. Dry reverse-circulation drilling can be used for the twin program, although preferably most or all of the metallurgical core holes could also be used to twin the USBRC holes. Additional holes may be required after the initial phase of twinning, depending on the results.

4) What are the continuity and grades of silver, lead, and zinc mineralization to the south of the pit, and are there additional higher-grade zones similar to the one in the area of the pit?

   In addition to the twinning program, there are several outlying areas of mineralization that warrant further drilling. These areas are partially within the Inferred resource, but the mineralized zones are only defined by one to three holes. Some of these poorly defined zones lie in the northeast quarter of Section 16 and the southeast quarter of Section 9, all south of the pit. This drilling should also help to define the southwesterly limits of mineralization. Current drill-hole spacing is 300 to 500

feet apart in this area. Additional higher-grade oxide zones may also be present in these areas, perhaps along structures that parallel the mineralized fault along the axis of the pit.

The mineralization in the hanging wall of the fault along the axis of the pit is reasonably well defined, and therefore no additional drilling is required northwest of the pit. The down-dip extent along the pit fault mineralization holds some potential, but the deepest holes have tested the zone at a depth of 750 feet below the surface. Although drill-hole spacing at this depth is only about 400 feet, the mineralized zones are much narrower and no deep drilling is recommended in this phase.

There are inconsistencies in the 1982 through 1992 drill-hole lithologic logging. Additional work should be completed to determine if lithologies and alteration can be standardized. This might aid in further refining the controls on mineralization, in addition to better defining the contact between Tertiary volcanic rocks and Triassic sedimentary rocks and the main northeast fault.

5) What are the updated Measured, Indicated, and Inferred resources?

Following the completion of the work outlined above, the resource model should be updated.

6) What is the preliminary economic viability of these resources?

Based on the new metallurgical work and resource model, a preliminary economic assessment is recommended to determine the economic viability of this project.

Table 18.1 summarizes the above recommendations with estimated costs.

**Table 18.1  Estimated Costs of Trinity Program**

| Item | Estimated Cost |
|---|---|
| Core Drilling (PQ size) for Metallurgical Test Samples (~2500 feet) | $ 250,000 |
| RC Twin Drilling and Assaying (~6,000 feet) | 210,000 |
| RC Definition and Stepout Drilling and Assaying (~30,000 feet) | 1,045,000 |
| Density Determinations and Metallurgical Test Work | 180,000 |
| Updated Resource Modeling | 75,000 |
| Preliminary Economic Assessment | 40,000 |
| *Total* | *US $1,800,000* |

Additional exploration targets on the property are at an early stage. They are mostly geophysical and conceptual geological and geochemical targets. They were not thoroughly assessed by MDA and are not considered in any detail in this report.

*Mine Development Associates*
*December 2, 2011*                              U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
                                               *Print date: 12/2/11 12:44 p.m.*

**APP 0547**

## 19.0   REFERENCES

Anonymous, 1988, *Preliminary evaluation of silver sulfide mineral deposit, Trinity project, Pershing County, Nevada*: Internal U. S. Borax memorandum, 33 p.

Appold, M., and Muntean, J., 1993 (January), *Results of isotopic analyses from the Trinity silver mine*: Report prepared for Santa Fe Pacific Mining, Inc., 26 p.

Ashleman, J. C., 1984, *Trinity silver project 1982-1983 progress summary report*: U. S. Borax and Chemical Corporation internal report no. EX 84-10, 88 p.

Ashleman, J. C., 1987, *Trinity venture project, 1986 summary report*: U. S. Borax and Chemical Corporation internal report no. EX 87-3, 30 p.

Ashleman, J. C., 1988, *The Trinity silver deposit, Pershing County, Nevada*, in *International meeting on gold exploration; techniques, concepts and problems*: Field Trip Guide 2, Precious Metal Deposits of Northwestern Nevada, p. 18-23.

Ashleman, 1989 (May 25), *Trinity project – 1989, ore reserve calculations*: U. S. Borax interoffice correspondence, 3 p.

Baele, S. M., and Pelletier, S. C., 1989 (May 30), *Silver reserve estimation, Trinity silver project, Pershing County, Nevada*: U. S. Borax and Chemical Corporation internal report no. MD 89-1, 17 p. plus appendices.

Coolbaugh, M., 2007 (December 21), *Preliminary review of core vs. reverse circulation assays at Trinity Ag*: Internal AuEx Ventures memorandum, 2 p.

Coolbaugh, M., 2009a (May 17), *Potential byproducts of mining sulfides at Trinity Ag*: Internal AuEx Ventures memorandum, 2p.

Coolbaugh, M., 2009b (Revised May 26), *Revised progress report, grade-thickness of silver equivalents at Trinity Ag*: Internal AuEx Ventures memorandum, 2 p.

Dix, R. B., 1987 (March 28), *Trinity property core composites cyanide leach tests*: Report prepared for U. S. Borax Research by Kappes, Cassiday & Associates, 29 p.

Dyer, T. L., and Prenn, N., 2008 (April 14), *Pit optimization for the Trinity deposit*: Report prepared for AuEx Ventures by Mine Development Associates, 5 p.

Ekins, G., 2011a (January 5), *Trinity silver project title review, Seka, TS, and ELM lode claims, 9 sections of fee lands, Pershing County, Nevada*: Title Review Report 2010-22-TR prepared for Liberty Silver Corporation by G.I.S. Land Services, 16 p.

Ekins, G., 2011b (January 11), *Trinity silver project title review, Seka, TS, and ELM lode claims, 9 sections of fee lands, Pershing County, Nevada*: Title Review Report 2010-22-TR prepared for Liberty Silver Corporation by G.I.S. Land Services, 3 p.

*Mine Development Associates*
*December 2, 2011*                    U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
                                      *Print date: 12/2/11 12:44 p.m.*

**APP 0548**

Ekins, G., 2011c (August 5), *Trinity silver project title review, the "XXX" lode claims, Pershing County, Nevada*:  Title Review Report 2011-22-TRA prepared for Liberty Silver Corporation by G.I.S. Land Services.

Ganderup, K. R., 1986 (May 27), Letter regarding potential processing of Trinity silver ore from U. S. Borax Research Corp. to U. S. Borax and Chemical Corp., 7 p.

Ganderup, K. R., and Woods, W. G., 1986 (March 18), *Trinity silver metallurgy – tabling, specific gravity, grinding, and flotation of core; direct cyanidation of ore, February 1984 – December 1985*:  U. S. Borax Research Corporation report no. CR 86-1, 28 p. plus appendices.

Gathje, J. C., 1983 (July 19), *Metallurgical investigation of a Nevada silver ore*:  Report prepared by Hazen Research, Inc. for U. S. Borax Research Corp., 25 p. plus appendices.

Hartley, P., 2007 (June 5), *Summary on work completed for AuEx on the Trinity silver project, Pershing County, Nevada*:  Report prepared for AuEx Ventures by Mine Development Associates, 7p.

Hartley, P. D., Gustin, M. M., and Kappes, D. W., 2011 (February 22), *Technical report on the Trinity project, Pershing County, Nevada*:  Report prepared by Mine Development Associates for Liberty Silver Corp. and Renaissance Gold Inc., 103 p.

Hendrickson, R. E., 1985 (November 1), *Monthly report – October 1985*:  Internal Santa Fe Pacific Mining memorandum, 10 p.

John, D., and Muntean, J., 2006, *Summary of characteristics of Tertiaryi metallic mineral deposits in the Lovelock area, northwestern Nevada, in Geology and mineral resources of the Trinity, Seven Troughs, and Kamma Ranges, west-central Nevada, 2006 spring field trip guidebook*: Geological Society of Nevada Special Publication no. 42, p. 60-69.

Johnson, M. G., 1977, *Geology and mineral deposits of Pershing County, Nevada*:  Nevada Bureau of Mines and Geology Bulletin 89, 115 p.

Leonard, F. A., Baele, S. M., and Ellingsen, R. B., 1986 (September 30), *Screening evaluation, Trinity silver project, Pershing County, Nevada*:  United States Borax & Chemical Corporation Internal Report No. MD 86-3, 76 p.

Lide, C. S., 1991 (March 7), *Trinity IP data*:  Correspondence to Santa Fe Pacific Mining, Inc. from Great Basin Geophysical, Inc., 1 p. plus attachments.

Muntean, J. L., 1992 (April 29), *Summary report on the Trinity project*:  Internal Santa Fe Pacific Mining, Inc. report, 10 p. plus maps.

Nevada Bureau of Mines and Geology, 1994, *The Nevada mineral industry – 1994*:  Nevada Bureau of Mines and Geology Special Publication MI-1994, 57 p.

Ostrander, A., 1990 (August 17), *CSAMT survey interpretation and final report, Trinity prospect, Pershing County, Nevada*:  Report prepared for Santa Fe Pacific Mining, Inc., 4 p. plus attachments.

*Mine Development Associates*
*December 2, 2011*                                    U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
                                                         Print date: 12/2/11 12:44 p.m.

**APP 0549**

Reim, K. M., 1988 (August), *Preliminary evaluation of silver sulfide mineral deposit, Trinity project, Pershing County, Nevada*: U. S. Borax interoffice correspondence, 5 p. plus figures and appendix.

Reim, K. M., 1989a (March 22), *Mineral reserve stockpile, Trinity mine, Nevada*:  U. S. Borax interoffice correspondence, 3 p.

Reim, K. M., 1989b (April 19), *Revised sulfide silver mineral reserve estimate, Trinity project*: U. S. Borax interoffice correspondence, 2 p.

Reim, K. M., Ashleman, J. C., Baele, S. M., Haggerty, M. T., and Jensen, R. C., 1988 (February 26), *Review of initial ore reserve estimate versus actual and updated ore grade and tonnage estimate, Trinity silver project, Nevada*: Internal U. S. Borax memorandum, 8 p. plus attachments.

Roesch, T., 1990 (December 12), *Trinity project, Pershing County, NV*:  Internal correspondence of Santa Fe Pacific Mining, Inc., 4 p.

Santa Fe Pacific Mining, Inc., undated, *Trinity, Au Ag, available joint venture, Pershing County, NV NK-11-10-22*: Company property promotional material, 2 p.

Smith, J. A., 1983 (April 19), *Trinity project, preliminary metallurgical investigations, March-April 1983*: U. S. Borax Research Corp. report no. CR 83-6, 53 p.

Tingley, J. V., 1985, *Trinity district*, *in* A mineral inventory of the Paradise-Denio and Sonoma-Gerlach resource areas, Winnemucca district, Nevada:  Nevada Bureau of Mines and Geology Open-file Report 85-3, p. 192-194.

Trubey, D., 1990 (December 18), *Trinity project, effect of 1979 agreement on transfer of properties from U. S. Borax to SFPM*:  Internal correspondence of Santa Fe Pacific Mining, Inc., 2 p.

Trubey, D. B., 1991a (January 8), *Trinity mine project, Pershing County, Nevada*: Letter from Santa Fe Pacific Gold Corp. to U. S. Borax & Chemical Corp., 2 p.

Trubey, D. B., 1991b (February 14), *Trinity mine area*: Internal correspondence of Santa Fe Pacific Mining, Inc., 1 p.

Whateley, M. K. G., Bell, T., and Moon, C. J., 2006, *Disseminated precious metals – Trinity mine, Nevada*, *in Introduction to mineral exploration*:  Blackwell Publishing, second edition, Charles J. Moon, Michael K. G. Whateley, and Anthony M. Evans, eds., p. 386-412.

Wieduwilt, W. G., 1983 (April 13), *Induced polarization and resistivity survey, Trinity project, Pershing County, Nevada*:  Report prepared for Knox, Kaufman, Inc. by Mining Geophysical Surveys Inc., 9 p. plus attachments.

Woods, W. G., and Smith, J. A., 1984 (March 6), *Trinity/Seka silver-metallurgical studies, May 1983 – January 1984*: U. S. Borax Research Corp. report no. CR 84-2, 17 p. plus appendices.

Yernberg, W. R., 1987 (December 17), *Trinity project cyanide bottle roll test*: Report prepared for U. S. Borax by Kappes, Cassiday & Associates, 7 p.

*Technical Report on the Trinity Project*
*Pershing County, Nevada*                                                    *Page 101*

## 20.0   DATE AND SIGNATURE PAGE

Effective Date of report:                          August 9, 2011
  The data on which the contained resource estimates are based were current as of the Effective Date.


Completion Date of report:                         December 1, 2011


*"Paul D. Hartley"*                                Date Signed:
Paul D. Hartley, Geo.                              December 1, 2011


*"Michael M. Gustin"*                              Date Signed:
Michael M. Gustin, P. Geo.                         December 1, 2011


*"Daniel W. Kappes"*                               Date Signed:
Daniel W. Kappes, P. Eng.                          December 1, 2011

**APP 0551**

## 21.0   CERTIFICATE OF AUTHORS

### MICHAEL M. GUSTIN, P.GEO.

I, Michael M. Gustin, P. Geo., do hereby certify that I am currently employed as Senior Geologist by Mine Development Associates, Inc., 210 South Rock Blvd., Reno, Nevada 89502 and:

1.  I graduated with a Bachelor of Science degree in Geology from Northeastern University in 1979 and a Doctor of Philosophy degree in Economic Geology from the University of Arizona in 1990. I have worked as a geologist in the mining industry for more than 25 years.  I am a Licensed Professional Geologist in the state of Utah (#5541396-2250), a Licensed Geologist in the state of Washington (# 2297), and a member of the Society of Mining Engineers and the Geological Society of Nevada.

2.  I have read the definition of "qualified person" set out in National Instrument 43-101 ("NI 43-101") and certify that by reason of my education, affiliation with a professional association (as defined in NI 43-101), and past relevant work experience, I fulfill the requirements to be a "qualified person" for the purposes of NI 43-101.  I am independent of Liberty Silver and Renaissance, and all of their subsidiaries, as defined in Section 1.5 of NI 43-101 and in Section 1.5 of the Companion Policy to NI 43-101.

3.  I have not visited the Trinity project site.

4.  I am responsible for all sections of this report, except for Sections 1.4 and 13.0, titled, "***Technical Report on the Trinity Silver Project, Pershing County, Nevada***", dated December 1, 2011 (the "Technical Report"), subject to my reliance on other experts identified in Section 3.0.

5.  I have had no prior involvement with the property or project that is the subject of the Technical Report.

6.  As of the date of this certificate, to the best of my knowledge, information, and belief, this Technical Report contains all the scientific and technical information that is required to be disclosed to make this technical report not misleading.

7.  I have read NI 43-101 and Form 43-101F1, and the Technical Report has been prepared in compliance with that instrument and form.

8.  The Technical Report contains information relating to mineral titles, permitting, environmental issues, regulatory matters, and legal agreements.  I am not a legal, environmental or regulatory expert, and do not offer a professional opinion regarding these issues.

9.  A copy of this report is submitted as a computer readable file in Adobe Acrobat© PDF© format. The requirements of electronic filing necessitate submitting the report as an unlocked, editable file.  I accept no responsibility for any changes made to the file after it leaves my control.

Dated December 1, 2011

*signed "Michael M. Gustin"*
Michael M. Gustin

**APP 0552**

**Daniel W. Kappes, P. Eng.**

I do hereby certify that:

1. My name is Daniel W. Kappes and I am President of the firm of Kappes, Cassiday & Associates at 7950 Security Circle, Reno, Nevada USA 89506.

2. I am a Professional Mining and Metallurgical Engineer (No. 3223) in the state of Nevada, USA, registered through the Nevada State Board of Professional Engineers and Land Surveyors.

3. I am a graduate of the Colorado School of Mines (1966) and the University of Nevada, Mackay School of Mines (1972), and hold B. Sc. and M. Sc. degrees in Mining Engineering.

4. I have practiced my profession continuously since 1966.

5. I am a "Qualified Person" for the purposes of NI 43-101 by reason of my education, affiliation with a professional association as defined by NI 43-101 and past relevant work experience.

6. I am responsible for Section 1.4 and Section 13.0 of this report titled "*Technical Report on the Trinity Silver Project, Pershing County, Nevada*" dated December 1, 2011.

7. I have not visited the Trinity project.

8. Prior to my work on this report, Kappes, Cassiday & Associates performed metallurgical testing on samples from the Trinity project submitted by a prior operator.  That is the extent of my prior involvement with the Trinity project.

9. Neither I, nor any affiliated entity of mine, is at present, under agreement, arrangement, or understanding or expects to become, an insider, associate, affiliated entity or employee of Liberty Silver Corporation or Renaissance Gold Inc. or any associated or affiliated entities.

10. Neither I, nor any affiliated entity of mine own, directly or indirectly, nor expect to receive, any interest in the properties or securities of Liberty Silver Corporation, or any associated or affiliated companies.

11. A copy of this report is submitted as a computer readable file in Adobe Acrobat© PDF© format.  The requirements of electronic filing necessitate submitting the report as an unlocked, editable file.  I accept no responsibility for any changes made to the file after it leaves my control.

Signed and dated at Reno, Nevada, December 1, 2011.


*"Daniel W. Kappes"*_____


Daniel W. Kappes
President
P. Eng., B. Sc., M. Sc.
Kappes, Cassiday & Associates


**APP 0553**

**Brian W. Buck, VP**
**JBR Environmental Consultants, Inc.**
**8160 S. Highland Drive**
**Sandy, Utah 84093**

I, Brian W. Buck, P.G., C.E.M. do hereby certify that:

1.  I have been employed for the last 25 years as a Principal and Vice President of:
    JBR Environmental Consultants, Inc., 8160 S. Highland Drive, Sandy, UT, USA 84093

2.  I graduated with a Master of Science, Geological Engineering, from the University of Utah, Salt Lake City, Utah, 1976, and a Bachelor of Science, Geology, from the University of Wisconsin, Madison, Wisconsin, 1973.

3.  I am registered with the following professional associations:
    Registered Professional Geologist, State of Utah, 2003
    Certified Environmental Manager, State of Nevada, 1994
    Registered Professional Geologist, State of Wyoming, 1992
    Registered Environmental Assessor, State of California, 1989

4.  I have worked as a Geologist and Environmental Professional for a total of 34 years since 1976.

5.  I have read the definition of "qualified person" set out in National Instrument 43-101 ("NI43-101") and certify that by reason of my education, affiliation with a professional association (as defined in NI43-101) and past relevant work experience, I fulfill the requirements to be a "qualified person" for the purposes of NI43-101.

6.  I am responsible for Section 4.4 of the Technical Report titled "*Technical Report on the Trinity Silver Project, Pershing County, Nevada*" dated December 1, 2011.

7.  I have had prior involvement with the property that is the subject of the Technical Report. The nature of my prior involvement was to assist Newmont Gold Company with planning for closure of their heap leach facility at the property.

8.  I am not aware of any material fact or material change with respect to the subject matter of the Technical Report that is not reflected in the Technical Report, the omission to disclose which makes the Technical Report misleading.

9.  I am independent of the issuer applying all of the tests in Section 1.5 of NI 43-101.

10. I have read national Instrument 43-101 and Form 43-101F1, and to my knowledge, the Technical Report has been prepared in compliance with that instrument and form.

11. I consent to the filing of the Technical Report with any stock exchange and other regulatory authority and any publication by them, including electronic publication in the public company files on their websites accessible by the public, of the Technical Report.

Dated 1st day of December, 2011

*"Brian W. Buck"*
Brian W. Buck, P.G., C.E.M.

## PAUL D. HARTLEY

I, Paul D. Hartley, do hereby certify that I am currently employed as a Geologist by Mine Development Associates, Inc., 210 South Rock Blvd., Reno, Nevada 89502 and:

1. I graduated with a Bachelor of Science degree in Geology from Stanford University in 1976 and a Master of Science degree in Minerals Exploration from the Stanford University in 1976. I have worked as a geologist in the mining industry for more than 33 years. I am member of the Society of Mining Engineers and the Geological Society of Nevada.

2. I am independent of Liberty Silver Corporation and Renaissance Gold Inc. as defined in Section 1.5 of NI 43-101 and in Section 1.5 of the Companion Policy to NI 43-101.

3. I visited the Trinity project site during August 2010.

4. During 2006 and 2007, I provided an independent interpretation of the Trinity mineralization for Renaissance.

5. As of the date of this certificate, to the best of my knowledge, information, and belief, this Technical Report contains all the scientific and technical information that is required to be disclosed to make this technical report not misleading.

6. I have read NI 43-101 and Form 43-101F1, and the Technical Report has been prepared in compliance with that instrument and form.

7. The Technical Report contains information relating to mineral titles, permitting, environmental issues, regulatory matters, and legal agreements. I am not a legal, environmental or regulatory expert, and do not offer a professional opinion regarding these issues.

8. A copy of this report is submitted as a computer readable file in Adobe Acrobat© PDF© format. The requirements of electronic filing necessitate submitting the report as an unlocked, editable file. I accept no responsibility for any changes made to the file after it leaves my control.

Dated December 1, 2011

*signed "Paul D. Hartley"*

Paul D. Hartley

*Mine Development Associates*
*December 2, 2011*                    U:\Paul\liberty_silver\Trinity\Reports\Trinity_43-101_2011\trinity_2011_43-101_v32.docx
                                        *Print date: 12/2/11 12:44 p.m.*

## Liberty Silver Closes U.S. $4.6 Million Non-Brokered Private Placement Funding

*--Funds will initiate exploration and development program at the Trinity Project--*

*--Company's shares to be listed on the TSX--*

RENO, NV— December 21, 2011 - Liberty Silver Corp. (OTCBB:LBSV) ("**Liberty Silver**" or the "**Company**") is pleased to announce that it has closed a U.S. $4.6 million non-brokered private placement funding (the "**Funding**") to support the continued  exploration and development of its Trinity silver project in Nevada, and for general corporate and working capital purposes. In conjunction with the Funding, the Company has received conditional approval from the Toronto Stock Exchange (the "**TSX**") to list its shares for trading under the symbol "LSL". The Company's shares are expected to begin trading on December 22, 2011.

The Trinity silver project is an example of Liberty Silver's effort to implement a mitigated risk development strategy. The first step in this process was to locate a property in an area which the Company considers to be a mining safe political jurisdiction.  Other areas of risk addressed include building a management team which it believes will be able to ensure good corporate governance and astute on-the-ground decisions; previous proven minability of the property inclusive of permits, metallurgy, access, and environmental issues; a National Instrument 43-101 mineral resource estimate technical report (the "**43-101 Report**") (focused primarily on the existing pit area  and based on historic drilling data); historic data and recent geophysical surveys confirming eight exploration targets and two extensions from the original mine (not included in the 43-101 Report); and an ability to potentially mine quickly should uncertain market conditions warrant alternate means of financing the further development of the property.  The Liberty Silver mitigated risk approach is dedicated to bringing unique mining opportunities to the market.

**The Trinity Property**

Liberty's 9,960 acre Trinity property is located in what the Company believes to be a mining friendly Nevada district and includes a former producing mine that represents approximately one percent of the geographic extent of the project. Since completing the work that forms the basis for the 43-101 Report, the Company has undertaken a review of historic data and recent geophysical data gathered on the property and has identified six additional silver exploration targets and two gold targets, all of which are independent of the inferred resource defined in the 43-101 Report.  Interpretation of the geologic data and past drilling data indicates that the Trinity property may contain additional drilling targets which have not yet been identified. In addition, there are extensions to the southeast and southwest of the known resource that have been drilled extensively (but not sufficient to prepare a resource estimate

**APP 0556**

under National Instrument 43-101 requirements) that are not included in the exploration targets discussed above.

"We are very pleased with the progress on the Trinity property," stated Bill Tafuri, President and COO of Liberty Silver. "Our 43-101 Report indicates a property of merit that contains a defined silver resource, which could be expanded through further drilling. Our team has identified and confirmed multiple silver and gold targets not discussed in the 43-101 Report.  With the funding in place, we expect to initiate additional geochemical and geophysical surveys in conjunction with an aggressive drilling campaign targeting both high priority exploration targets, and the extensions from the original pit. Given our geographical location, the quality of historical data, and our geological interpretations, we anticipate the planned programs could expand the current resources and help to define the potential for a  profitable mine."

**The Funding**

The U.S. $4,563,750 Funding consisted of the sale of 2,627,500 units (the "**Units**") and 6,500,000 "Subscription Receipts" which have been converted into 6,500,000 Units for an aggregate of 9,127,500 Units sold at U.S. $0.50 per Unit.  Each Unit consists of one common share of the Company and one common share purchase warrant (a "**Warrant**").  Each whole Warrant entitles the holder to acquire one common share at a price of U.S. $0.65 for a period of two years following the date of listing.  The common shares, Warrants and common shares underlying the Warrants (collectively, the "**Securities**") are subject to a hold periods as follows:

a)      under Canadian law, the Securities are subject to a hold period equal to the later of four months and one day after the later of (i) closing,  and (ii) the date on which Liberty becomes a reporting issuer in Canada; and

b)      under U.S. law, the Securities are subject to customary resale restrictions for "restricted securities" under the United States Securities Act of 1933.

The Company has granted to certain holders of the Securities certain U.S. registration rights pursuant to which the Company has agreed to register the Securities for resale in the United States.  If the registration statement does not become effective on or before May 31, 2012, each holder of the Securities shall receive one additional common share for each ten (10) Units held by the investor pursuant to the offering.  In such event, the Company will be obligated to issue a total of 860,750 additional shares.

The Funding supersedes the previously announced Private Placement of Special Warrants announced on June 17, 2011.

**APP 0557**

**About Liberty Silver Corp.**

Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America. The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base. The Trinity silver project, located in Pershing County, Nevada is the Company's flagship project. Liberty Silver has the right to earn a 70 percent interest in the Trinity property from Renaissance Gold Inc. subject to certain obligations.

The 43-101 Report was prepared by Paul D. Hartley, Geologist, and Michael M. Gustin, P.Geo., of Mine Development Associates of Reno, Nevada, and Daniel W. Kappes, P.Eng., of Kappes, Cassiday & Associates of Reno under the title, "Technical Report on the Trinity Project – Pershing County, Nevada". The 43-101 Report is dated December 1, 2011 with an effective date of August 9, 2011, and is filed on www.sedar.com.  The report was prepared for the Company and Renaissance Gold Inc., the optionor of the Trinity silver project.   Messrs. Paul D. Hartley, Michael M. Gustin, and Daniel W. Kappes are independent consultants to both the Company and Renaissance Gold Inc.; Messrs. Gustin and Kappes are "qualified persons" under National Instrument 43-101.  Messrs. Michael M. Gustin and Daniel W. Kappes have reviewed, verified and compiled the technical disclosures in this press release that are derived from the 43-101 Report. Other technical information contained in this press release has been reviewed by H. Richard Klatt, P.Geo., Chief Geologist for the Company and a "qualified person" under National Instrument 43-101.

For additional information
Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com
www.libertysilvercorp.com

*This press release is not an offer to sell or a solicitation of an offer to buy securities, nor shall there be any sales of the securities in any jurisdiction in which such offer, solicitation, or sale would be unlawful.*

*Forward-Looking Statements*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project*

*development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*



## Liberty Silver Initiates Drilling Program on its Trinity Project

Toronto ON— January 25, 2012 - Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("**Liberty Silver**" or the "**Company**") is pleased to announce that it has initiated its drilling program on the Trinity Silver property in Nevada.  The Company has retained Boart Longyear as the contract driller for a drilling program that is planned for up to 7,000 meters.

The Trinity property contains a former producing open pit silver mine, the Trinity Mine, which was operated by US Borax and produced approximately 5 million ounces of silver from 1.1 million tons of oxide ore grading 6 ounces per ton silver ("oz/ton") using heap leach technology before it was shut down in 1989 due to depressed silver prices, and never reopened.  Liberty has assay data from over 400 historic drill holes, included in which are data from over 100 drill holes outside the Trinity mine resource area.  This information has been integrated with historic geophysical surveys and a recently completed magnetotelluric survey into a GIS database.  The aggregated data has been utilized to identify high priority targets and formulate the Company's drill plan.

The Company is focusing the first phase of drilling on extensions from the original pit to confirm the continuity of mineralization identified by historic drilling and to further define the extent of the resource. The extensions are identified in the Company's NI43-101 Technical Report, but not included in the resource calculation. Previous drill holes revealed silver, lead, and zinc mineralization at depths of up to 150 meters and that the deposit is still open at depth.

During the course of the first phase of drilling, Liberty expects to initiate geophysical surveys on three of the six identified silver targets. All three targets encountered mineralization in previous drilling with mineralization continuing to the end of the hole.  Data from the geophysics will be used to further focus the drilling on each target.

"We are excited to get our drilling program underway and better understand the significant resource potential contained in the Trinity property," stated Bill Tafuri, President and COO of Liberty. "The historic data and new geophysical surveys on the Trinity property will enable us to be more effective with our drilling, mitigate drilling risk and allow us to better control costs."

**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America. The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base. The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project. Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. pursuant to the terms of an Earn-In

Agreement with Renaissance Gold Inc.'s predecessor in interest AuEx, Inc.  AuEx, Inc. acquired its rights to the Trinity property from Newmont Mining USA Limited and the Company is indirectly subject to the rights and obligations of AuEx Inc. under its agreement with Newmont Mining USA Limited.


For additional information:
Manish Z. Kshatriya, Executive VP & CFO
Telephone: (888) 749-4916
Email: mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com

www.libertysilvercorp.com


*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release.  No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*



## LIBERTY SILVER ANNOUNCES COMPLETION OF SUCCESSFUL GEOPHYSICAL PROGRAM AT TRINITY PROPERTY

*PROGRAM CONFIRMS POTENTIAL TO EXPAND CURRENT RESOURCE AND IDENTIFIES SIGNIFICANT EXPLORATION TARGETS*

Toronto, ON – May 22, 2012: Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("Liberty Silver" or the "Company") is pleased to announce the successful completion of its 2012 geophysical program at the Trinity Project, located in Pershing County, Nevada. The Gravity and Induced Polarization (IP) surveys were successful in locating significant new drilling targets concealed by alluvial cover and in delineating the structural fabric of the district. The geophysics program was designed and interpreted by Jim Wright of J.L. Wright Geophysics. All the new data and the substantial amount of historic data relating to past operations at the Trinity Project have been input into a GIS database which will be used to further define future drilling and development of the current resource and multiple exploration targets.

Under the direction of Mr. Wright, Magee Geophysical Services of Reno, Nevada conducted the gravity survey consisting of 532 stations covering approximately 26 square kilometers. The survey delineated the shallow eastern edge of the Sage Valley basin. High-angle structures of two primary orientations offset the Tertiary volcanic-pre-Tertiary sediment package into a complex series of steps resulting in structurally defined basins. Most notable is a graben filled with volcanic rocks which hosts the Trinity silver deposit that is underlain by a chargeability anomaly. A second major chargeability anomaly south of the Trinity pit is located in the same graben.

A possible northern extension of the Trinity silver deposit is hypothesized based upon the gravity survey. Historic IP data, acquired in 1983 (the "Historic IP"), indicates a possible northern continuation over this area as well. Historic airborne magnetic results coupled with the gravity and new IP also suggest a continuation of the known mineralization to the southwest along the Trinity fault. The gravity and Historic IP data, coupled with several other data sets, indicate that several target areas exist, including two possible target areas along the strike extensions to the known silver mineralization, and several other untested chargeability anomalies similar to that of the Trinity silver deposit.

Based upon the gravity and historic geophysical results, eleven (11) IP lines (35 line kilometers) were completed by Zonge Geoscience to enhance the level of detail of the chargeability anomalies detected in the Historic IP survey. All eleven lines detected chargeability responses

consistent with that survey.  Most notable is a strong chargeability zone located approximately 500 meters ("m") south of the known Trinity silver deposit and is defined by four IP lines from the new IP survey.  The strike length of this anomaly is greater than 600m and is still open to the north and south and ranges from 500m to 700m in width in an east west direction. Furthermore, the graben interpreted from the gravity survey is further supported by the new IP results, thus increasing the thickness of the favorable host rock package. U.S. Borax ("USB"), the former operator at Trinity, drilled three holes into this zone in the mid-1980s and all three holes intersected considerable silver mineralization but due to low silver prices, further delineation of the silver mineralization was not carried out.  The USB drill holes also stopped short of testing the chargeability anomaly found by the new survey.  The three holes (S-21, S-70, and S-132) encountered silver mineralization ranging from 2.0 grams/tonne in an interval of 1.5m to 43 grams/tonne in an interval of 1.5m but were not drilled to conform to National Instrument (NI) 43-101 standards and, while significant, are considered as non-compliant historic data only.

Bill Tafuri, President and COO, said, "The results of these surveys are very encouraging and they demonstrate the potential for extending the known resource under the covered areas.  They also have defined specific targets to drill under the covered areas making our exploration program much more focused and cost effective".

Liberty Silver is currently completing its initial drilling program on the Trinity Property.  Assayed results from the program are expected to be released in the near term.

Tim Percival, MA, CPG, of Reno, Nevada, a consultant for Liberty Silver, has reviewed the technical data in this press release and he is a Qualified Person as defined by NI 43-101.

**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America.  A skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects lead the Company.  The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base.  The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project.  Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. ("Renaissance") pursuant to the terms of an Earn-In Agreement.  Renaissance acquired its rights to the Trinity property from Newmont Mining USA Limited and the Company is indirectly subject to the rights and obligations of Renaissance under its agreement with Newmont Mining USA Limited.

For additional information:

Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com

Manish Z. Kshatriya, Executive VP & CFO
Telephone: (888) 749-4916
Email: mkshatriya@libertysilvercorp.com

www.libertysilvercorp.com

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*



**LIBERTY SILVER CORP. SUCCESSFULLY COMPLETES FIRST PHASE OF 2012 DRILLING PROGRAM**

*Program identifies significant silver mineralization outside the NI 43-101 resource zone and increases confidence in the Trinity Silver Project*

Toronto, ON – July 9, 2012: Liberty Silver Corp. (TSX: LSL, OTCBB: LBSV) ("Liberty Silver" or the "Company") is pleased to announce results of the first phase of its 2012 drilling program in the Trinity silver mining district in Pershing County, Nevada.  Drilling was directed to the exploration of selected areas adjacent to the resource zone identified in the Company's 2011 NI 43-1012 technical report (the "Resource Area"), as well as confirmation of that resource.

Highlights
- Hole A12-17, located southeast of the Trinity open pit and Resource Area, intersected significant silver mineralization in the oxide zone with individual 5 ft-thick samples ranging up to 15 ounce per ton ("opt") silver
- 16 of 18 vertical holes intercepted sample intervals greater than 1 opt silver with grades as high as 15 opt silver
- Confirmation holes drilled inside Resource Area contained intervals up to 4.3 opt silver
- Drilling indicates potential for two new extensions from the existing Resource Area
- Based on assays from 413 historical[1] and current drill holes, spanning over approximately 1 square mile, the average grade is 0.7 opt silver

Bill Tafuri, President and COO, said, "We are extremely pleased with the results from phase one of our 2012 drilling program. Trinity is a large, high quality asset that provides us with a relatively low-risk opportunity to expand the known Resource, and also has high quality exploration targets. We are very excited about the potential revealed by the first phase of drilling."

PROGRAM HIGHLIGHTS

Eighteen vertical drill holes were completed to depths of up to 1,500 feet in rhyolite and underlying metasedimentry host rocks by reverse circulation for a total of [20,030] feet.  Drilling tested parts of five (5) geographic domains in the vicinity of the southern end the Trinity open pit mine and the 43-101 Resource Area.  Sixteen holes intercepted sample intervals greater than 1 opt silver ("Ag") with grades as high as 15 opt Ag. Sulfide zone samples contain up to 1.7 % lead ("Pb") and 1.6 % zinc ("Zn").  A map of the location of the drill holes can be found on the Company's website at: www.libertysilvercorp.com

In addition to 18 holes drilled during phase 1 of the 2012 drilling program, approximately 395 holes were drilled during the period from 1982-2007, mainly by US Borax.  While approximately 50 of these holes are widely spaced throughout the approximate 13 square-mile area of interest, the large majority are located within an approximate one square mile area centered on the Trinity open pit silver mine.  Based on historical[1] and current assays, all holes contain anomalous silver throughout.  The non-43-101-compliant average grade for all 413 holes is 0.70 opt Ag.

The following Table summarizes the oxide mineralization encountered in the drilling:

| Domain | Hole Name | From (feet) | To (feet) | Interval (feet) | Interval (meters) | Ag opt | Ag g/t |
|---|---|---|---|---|---|---|---|
| D1 | A12-8 | | | | 0.0 | none | |
| D1 | A12-9 | | | | 0.0 | none | |
| D1 | A12-10 | 125.0 | 150.0 | 25 | 7.6 | 0.57 | 17.73 |
| | | | | | | | |
| D2 | A12-1 | | | | | none | |
| D2 | A12-2 | 80.0 | 90.0 | 10 | 3.0 | 1.02 | 31.72 |
| D2 | A12-3 | 105.0 | 115.0 | 10 | 3.0 | 0.76 | 23.64 |
| D2 | A12-6 | | | | 0.0 | none | |
| | | | | | | | |
| D3 | A12-4 | 30.0 | 95.0 | 65 | 19.8 | 1.15 | 35.77 |
| | inc | 60.0 | 90.0 | 30 | 9.1 | 1.45 | 45.10 |
| | inc | 75.0 | 90.0 | 15 | 4.6 | 1.86 | 57.85 |
| | | 110.0 | 120.0 | 10 | 3.0 | 0.87 | 27.06 |
| D3 | A12-5 | 10.0 | 95.0 | 85 | 25.9 | 0.99 | 30.79 |
| | inc | 70.0 | 95.0 | 25 | 7.6 | 1.46 | 45.41 |
| Domain | Hole | From | To | Interval | Interval | Ag | Ag |

| Number | Name | (feet) | (feet) | (feet) | (meters) | opt | g/t |
|---|---|---|---|---|---|---|---|
| D4 | A12-7 | 10.0 | 85.0 | 75 | 22.9 | 0.82 | 25.50 |
| | inc | 60.0 | 75.0 | 15 | 4.6 | 1.13 | 35.14 |
| D4 | A12-11 | 10.0 | 65.0 | 55 | 16.8 | 1.12 | 34.83 |
| | inc | 10.0 | 45.0 | 35 | 10.7 | 1.38 | 42.92 |
| | | 140.0 | 150.0 | 10 | 3.0 | 0.62 | 19.28 |
| D4 | A12-12 | 15.0 | 45.0 | 30 | 9.1 | 0.63 | 19.59 |
| | | 60.0 | 85.0 | 25 | 7.6 | 0.71 | 22.08 |
| | | 125.0 | 145.0 | 20 | 6.1 | 0.9 | 27.99 |
| | inc | 125.0 | 135.0 | 10 | 3.0 | 1.22 | 37.94 |
| D4 | A12-17 | 10.0 | 50.0 | 40 | 12.2 | 1.96 | 60.96 |
| | inc | 10.0 | 30.0 | 20 | 6.1 | 3.27 | 101.70 |
| | | 100.0 | 115.0 | 15 | 4.6 | 0.93 | 28.92 |
| | | 130.0 | 165.0 | 35 | 10.7 | 4.37 | 135.91 |
| | **inc** | **145.0** | **165.0** | **20** | **6.1** | **7.05** | **219.26** |
| | **inc** | **150.0** | **155.0** | **5** | **1.5** | **9.9** | **308.00** |
| | **inc** | **155.0** | **160.0** | **5** | **1.5** | **15.66** | **487.00** |
| D4 | A12-18 | 15.0 | 30.0 | 15 | 4.6 | 0.56 | 17.42 |
| | | 80.0 | 95.0 | 15 | 4.6 | 0.78 | 24.26 |
| | | | | | | | |
| D5 | A12-13 | 20.0 | 140.0 | 120 | 36.6 | 0.69 | 21.46 |
| | inc | 110.0 | 120.0 | 10 | 3.0 | 1.14 | 35.45 |
| D5 | A12-14 | 15.0 | 75.0 | 60 | 18.3 | 0.71 | 22.08 |
| | inc | 15.0 | 25.0 | 10 | 3.0 | 1.26 | 39.19 |
| | | 110.0 | 130.0 | 20 | 6.1 | 0.79 | 24.57 |
| | | 155.0 | 205.0 | 50 | 15.2 | 0.75 | 23.33 |
| D5 | A12-15 | 20.0 | 45.0 | 25 | 7.6 | 0.9 | 27.99 |
| | inc | 30.0 | 45.0 | 15 | 4.6 | 1.07 | 33.28 |
| | | 140.0 | 165.0 | 25 | 7.6 | 0.57 | 17.73 |
| D5 | A12-16 | 85.0 | 95.0 | 10 | 3.0 | 0.54 | 16.79 |
| | | 155.0 | 165.0 | 10 | 3.0 | 0.69 | 21.46 |

APP 0567

The Following Table summarizes the deeper sulfide mineralization as well as base metals of interest:

| Domain Number | Hole Name | From (feet) | To (feet) | Interval (feet) | Interval (meters) | Ag opt | Ag g/t | Pb % | Zn % | Cu % |
|---|---|---|---|---|---|---|---|---|---|---|
| D1 | A12-8 | 620 | 635 | 15 | 4.57 | 1.35 | 41.99 | 0.03 | 0.04 | - |
| D1 | A12-9 | 630 | 640 | 10 | 3.05 | 1.1 | 34.21 | 0.08 | 0.06 | - |
| D1 | A12-10 | 640 | 655 | 15 | 4.57 | 4.48 | 139.33 | 0.11 | 0.10 | - |
| | inc | 640 | 645 | 5 | 1.52 | 11.9 | 370.00 | 0.28 | 0.23 | 0.01 |
| | | | | | | | | | | |
| D2 | A12-1 | 520 | 565 | 45 | 13.72 | 1.04 | 32.34 | 0.05 | 0.04 | - |
| | | 575 | 585 | 10 | 3.05 | 1.76 | 54.74 | 0.13 | 0.12 | - |
| | | 790 | 800 | 10 | 3.05 | 0.64 | 19.90 | 0.02 | 0.02 | - |
| | | 1000 | 1010 | 10 | 3.05 | 3.18 | 98.90 | 0.03 | 0.04 | - |
| | | 1010 | 1045 | 35 | 10.67 | 1.07 | 33.28 | 0.01 | 0.02 | - |
| D2 | A12-2 | 475 | 490 | 15 | 4.57 | 0.76 | 23.64 | 0.04 | 0.03 | - |
| | | 635 | 645 | 10 | 3.05 | 0.71 | 22.08 | 0.02 | 0.03 | - |
| D2 | A12-3 | 205 | 225 | 20 | 6.10 | 0.58 | 18.04 | 0.02 | 0.05 | - |
| | | 420 | 450 | 30 | 9.15 | 1.31 | 40.74 | 0.10 | 0.08 | - |
| | inc | 425 | 435 | 10 | 3.05 | 2.05 | 63.76 | 0.20 | 0.15 | - |
| D2 | A12-6 | 695 | 715 | 20 | 6.10 | 1.56 | 48.52 | 0.12 | 0.08 | - |
| | inc | 705 | 715 | 10 | 3.05 | 2.68 | 83.35 | 0.21 | 0.13 | - |
| | | 745 | 760 | 15 | 4.57 | 1.49 | 46.34 | 0.08 | 0.08 | - |
| | | | | | | | | | | |
| D3 | A12-4 | 155 | 165 | 10 | 3.05 | 1.24 | 38.56 | 0.06 | 0.11 | - |
| | | 180 | 190 | 10 | 3.05 | 0.74 | 23.01 | 0.06 | 0.11 | - |
| | | 205 | 240 | 35 | 10.67 | 1.78 | 55.36 | 0.09 | 0.10 | - |
| | | 295 | 305 | 10 | 3.05 | 0.74 | 23.01 | 0.10 | 0.13 | - |
| | | 310 | 330 | 20 | 6.10 | 1.2 | 37.32 | 0.15 | 0.20 | - |
| | inc | 310 | 320 | 10 | 3.05 | 1.8 | 55.98 | 0.18 | 0.29 | - |
| | | 345 | 400 | 55 | 16.77 | 1.57 | 48.83 | 0.17 | 0.15 | - |
| | | 410 | 435 | 25 | 7.62 | 0.72 | 22.39 | 0.25 | 0.20 | - |
| | inc | 435 | 445 | 10 | 3.05 | 1.64 | 51.00 | 0.11 | 0.10 | - |
| | | 555 | 570 | 15 | 4.57 | 1.7 | 52.87 | 0.14 | 0.10 | - |
| D3 | A12-5 | 95 | 120 | 25 | 7.62 | 1.68 | 52.25 | 0.08 | 0.15 | - |
| Domain | Hole | From | To | Interval | Interval | Ag | Ag | Pb | Zn | Cu |

| Number | Name | (feet) | (feet) | (feet) | (meters) | opt | g/t | % | % | % |
|--------|------|--------|--------|--------|----------|-----|-----|---|---|---|
|  |  | 225 | 240 | 15 | 4.57 | 0.53 | 16.48 | 0.14 | 0.19 | - |
|  |  | 280 | 305 | 25 | 7.62 | 0.6 | 18.66 | 0.43 | 0.33 | 0.01 |
|  |  | 545 | 565 | 20 | 6.10 | 0.63 | 19.59 | 0.77 | 1.00 | 0.02 |
|  |  | 640 | 650 | 10 | 3.05 | 0.55 | 17.11 | 0.51 | 0.41 | 0.01 |
|  |  |  |  |  |  |  |  |  |  |  |
| D4 | A12-7 | 515 | 545 | 30 | 9.15 | 0.73 | 22.70 | 0.83 | 0.75 | 0.02 |
|  |  | 745 | 775 | 30 | 9.15 | 0.61 | 18.97 | 0.83 | 0.66 | 0.03 |
|  |  | 785 | 795 | 10 | 3.05 | 1 | 31.10 | 0.34 | 0.29 | 0.01 |
| D4 | A12-11 | 505 | 515 | 10 | 3.05 | 0.94 | 29.23 | 1.30 | 0.65 | - |
| D4 | A12-12 |  |  |  | 0.00 | none |  |  |  |  |
| D4 | A12-17 | 165 | 180 | 15 | 4.57 | 1 | 31.10 | 0.33 | 0.26 | 0.01 |
| D4 | A12-18 |  |  |  | 0.00 | none |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| D5 | A12-13 | 300 | 315 | 15 | 4.57 | 4.16 | 129.38 | 0.10 | 0.08 | - |
|  |  | 440 | 460 | 20 | 6.10 | 1.15 | 35.77 | 0.11 | 0.11 | - |
|  |  | 485 | 495 | 10 | 3.05 | 0.59 | 18.35 | 0.30 | 0.26 | - |
|  |  | 510 | 540 | 30 | 9.15 | 0.98 | 30.48 | 0.53 | 0.32 | - |
|  |  | 980 | 990 | 10 | 3.05 | 1.41 | 43.85 | 0.12 | 0.18 | - |
| D5 | A12-14 | 365 | 380 | 15 | 4.57 | 0.77 | 23.95 | 0.37 | 0.31 | - |
| D5 | A12-15 | 305 | 315 | 10 | 3.05 | 0.54 | 16.79 | 0.41 | 0.34 | - |
|  |  | 365 | 375 | 10 | 3.05 | 0.96 | 29.86 | 0.18 | 0.06 | - |
|  |  | 390 | 450 | 60 | 18.29 | 1.06 | 32.97 | 0.16 | 0.09 | - |
|  |  | 760 | 780 | 20 | 6.10 | 0.69 | 21.46 | 0.44 | 0.49 | 0.01 |
| D5 | A12-16 | 165 | 180 | 15 | 4.57 | 0.78 | 24.26 | 0.06 | 0.09 | - |
|  |  | 405 | 415 | 10 | 3.05 | 0.62 | 19.28 | 0.04 | 0.03 | - |
|  |  | 495 | 505 | 10 | 3.05 | 0.68 | 21.15 | 0.23 | 0.18 | - |

Notes:

Ag grades are calculated using 0.5 opt cut off and minimum 10 ft reporting thickness.

All holes are exterior to the geographical area of the MDA NI 43-101 resource except holes A12-4 and -5.

inc. = including

The three holes drilled in **Domain 1**, penetrated to depths of 1,040 to 1,120 ft and contain weakly anomalous Ag throughout.  Very thin horizons of Ag at 1.2 to 5.1 opt Ag are found spatially associated with speculated fault zones at 635 to 700 ft depths.

**Domain 2** (Holes A12-1, -2, -3 and -6) is located immediately southwest of the south end of the Trinity pit.  Holes A12-1 and A12-6 host no oxide Ag above 0.5 opt but do contain sulfide Ag averaging 0.90 opt and 0.95 opt Ag, respectively with grades improving at

depth.  A12-2 contains 1.0 opt oxide Ag at a depth of 80 to 90 ft while A12-3 contains 0.77 opt oxide Ag from 105-115 ft deep.

**Domain 3** includes holes **A12-4** and **A12-5,** which were drilled to confirm grade within the Resource Area, in the area south of the south end of the Trinity open pit mine.  Hole A12-4 exhibits up to 4.3 opt Ag and averages 0.39 opt Ag from surface to 1,275 ft depth, 0.65 opt Ag from surface to 675 ft depth in rhyolite terrain, and 0.77 opt Ag from surface to 120 ft depth in the oxide zone including 1.2 opt Ag at 30-95 ft depth.  Hole A12-5 exhibits up to 2.9 opt Ag and averages 0.23 opt Ag from surface to 1,500 ft depth, 0.49 opt Ag from surface to 490 ft depth in rhyolite terrain, 0.91 opt Ag from surface to 95 ft depth in the oxide zone including 1.2 opt Ag at 30-95 ft depth.

Drilling results in **Domain 4 (Holes A12-7, -11, -12, -17, and -18** drilled along and outside the east side of the Resource Area.) indicate a potential new extension from the original pit and Resource Area.  Hole **A12-17**, intersected significant silver mineralization in the oxide zone with individual 5 ft-thick samples ranging up to 15 opt Ag.  Samples at 145 to 170 ft depth average 5.9 opt Ag and the entire oxide zone at 0 to 165 ft depth averages 1.6 opt Ag.  The rhyolite host rock at surface to 665 ft depth averages 0.55 opt Ag.  In the reduced zone below 165 ft. and down to 665 ft. depth Pb + Zn range up to 1% and 0.5 %, respectively, and average 0.5% Pb and Zn with 0.19 opt Ag.  Holes **A12-11** and **A12-7**, situated up to 250 ft south of A12-17 demonstrate grades of up to 2.1 and 1.4 opt Ag, respectively.

The holes drilled in **Domain 5** (Holes A12-13, -14, -15, -16) are step outs from the south end of the Trinity open pit mine and sited on the east and south borders of the Resource Area.  Similar to Domain 4, results in Domain 5 also indicate a potential new extension. Hole **A12-13** exhibits scattered strong silver throughout, including 10 opt Ag at 305 ft depth and 2.7 opt silver at 985 ft depth.  The rhyolite host rock at surface to 475 ft depth averages 0.48 opt silver including 0.73 opt oxide silver at 25 to 120 ft depth. Pb+Zn average 0.65% with 0.74 opt silver at 485 to 540 ft depth in metasediments below Ag-bearing rhyolite terrane.  Hole **A12-14** exhibits individual sample grades of up to 1.9 opt silver in the oxide zone where it averages 0.60 opt silver from the surface to 165 ft depth.  The entire oxide zone at surface to 230 ft depth averages 0.55 opt silver. Pb+Zn average 0.65 % with 0.74 opt silver at 485 to 540 ft depth at the bottom of rhyolite terrane.

"In addition to the strong results provided by our phase 1 program, we have identified multiple exploration targets through the vast amount of historic drilling and our recently completed geophysics program.  We have diligently analyzed and inputted all the historic and new data into a comprehensive GIS database and are constructing 3D models to further define the multiple opportunities the Trinity property contains," concluded Mr. Tafuri.

**Quality Assurance / Quality Control**

All drill hole samples were analyzed using ICP-MS by American Assay Laboratories, Reno, Nevada.  Analytical precision and accuracy were monitored by Minerals Exploration and Environmental Quality, Reno, Nevada, including the use of certified reference materials (standards), blank samples, and duplicate samples.  A senior Liberty Silver geologist supervised drill hole sample collection by the driller, Boart Longyear, Elko, Nevada, at the drill site and chain of custody throughout the program was unbroken.  Drill hole deviation surveys were done by IDS, Elko, Nevada.

Tim Percival, MA, AIPG, of Reno, Nevada, a consultant to Liberty Silver has reviewed the technical data in this press release and is a Qualified Person as defined by NI 43-101.

*Notes:*
1- The historic drilling that was used in calculating this average was undertaken in accordance with standards at the time, but was not supervised by a qualified person in accordance with current NI43-101 standards.  These results are reported here for reference only and should not be relied upon.

**About Liberty Silver Corp.**
Liberty Silver Corp. is focused on exploring and developing mineral properties located in North America.  The Company is led by a skilled, experienced, management team and board of directors with significant experience managing exploration, development and mining projects. The Company is committed to creating value for its shareholders by advancing its current projects utilizing its mitigated risk approach to production, developing new resources on its current properties, and by acquiring new properties that have the potential to increase their resource base.  The Trinity Silver project, located in Pershing County, Nevada is the Company's flagship project.  Liberty Silver has the right to earn a joint venture interest in the 10,476 acre Trinity property from Renaissance Gold Inc. ("Renaissance") pursuant to the terms of an Earn-In Agreement.

For additional information:

Manish Z. Kshatriya, Executive VP & CFO
Telephone: (888) 749-4916
Email: mkshatriya@libertysilvercorp.com

Kevin O'Connor, Investor Relations
Telephone: (416) 962-3300
Email: ko@spinnakercmi.com

www.libertysilvercorp.com

*Cautionary Statements*

*The Toronto Stock Exchange does not accept responsibility for the adequacy or accuracy of this release. No stock exchange, securities commission or other regulatory authority has approved or disapproved the information contained herein.*

*This News Release includes certain "forward-looking statements". These statements are based on information currently available to the Company and the Company provides no assurance that actual results will meet management's expectations. Forward-looking statements include estimates and statements that describe the Company's future plans, objectives or goals, including words to the effect that the Company or management expects a stated condition or result to occur. Forward-looking statements may be identified by such terms as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results relating to, among other things, results of exploration, project development, reclamation and capital costs of the Company's mineral properties, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as: changes in general economic conditions and conditions in the financial markets; changes in demand and prices for minerals; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the activities of the Company; and other matters discussed in this news release and in filings made with Securities Regulators. This list is not exhaustive of the factors that may affect any of the Company's forward-looking statements. These and other factors should be considered carefully and readers should not place undue reliance on the Company's forward-looking statements. The Company does not undertake to update any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws.*

# "Pump-and-Dumps" and Market Manipulations

"Pump-and-dump" schemes involve the touting of a company's stock (typically small, so-called "microcap" companies) through false and misleading statements to the marketplace. These false claims could be made on social media such as Facebook and Twitter, as well as on bulletin boards and chat rooms. Pump-and-dump schemes often occur on the Internet where it is common to see messages posted that urge readers to buy a stock quickly or to sell before the price goes down, or a telemarketer will call using the same sort of pitch. Often the promoters will claim to have "inside" information about an impending development or to use an "infallible" combination of economic and stock market data to pick stocks. In reality, they may be company insiders or paid promoters who stand to gain by selling their shares after the stock price is "pumped" up by the buying frenzy they create. ***Once these fraudsters "dump" their shares and stop hyping the stock, the price typically falls, and investors lose their money.***

## Additional Information

Investor Alert: Social Media and Investing – Avoiding Fraud

Internet Fraud:  How to Avoid Internet Investment Scams

The Office of Investor Education and Advocacy has provided this information as a service to investors. It is neither a legal interpretation nor a statement of SEC policy. If you have questions concerning the meaning or application of a particular law or rule, please consult with an attorney who specializes in securities law.

**APP 0573**

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C.  20549

---

### FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

---

Date of Report (Date of earliest event reported): November 10, 2011

# LIBERTY SILVER CORP.

(Exact name of registrant as specified in its charter)

| **Nevada** | **333-150028** | **32-0196442** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**181 Bay Street, Suite 2330**
**Toronto ,Ontario, Canada, M5J 3T3**
(Address of Principal Executive Office)

Registrant's telephone number, including area code: **416-369-3978**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 DFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4 (c) under the Exchange Act (17 CFR 240.13e-4(c))

## ITEM 1.01 - ENTRY INTO MATERIAL DEFINITIVE AGREEMENT

**APP 0574**

On November 10, 2011, Liberty Silver Corp., a Nevada corporation (the "Company") entered into a Subscription Agreement (the "Subscription Agreement") with Look Back Investments, Inc. ("Investor"), pursuant to which Investor acquired Subscription Receipts ("Subscription Receipts") for U.S. $0.50 per Subscription Receipt for gross proceeds of U.S. $3,250,000; the gross proceeds of U.S. $3,250,000 (the "Escrow Proceeds") are being held in escrow pursuant to the terms of the Subscription Receipt.  Each Subscription Receipt entitles the Investor to receive one unit (a "Unit") from the Company without payment of any additional consideration upon conditional approval by the Toronto Stock Exchange for the listing of the common shares of the Company (the "Escrow Release Condition").  Each Unit consists of one share of common stock of the Company and one common stock purchase warrant (a "Warrant"). Each whole Warrant entitles the holder to acquire one share of common stock at a price of U.S. $0.65 for a period of two years following the date of listing with the Toronto Stock Exchange.

If the Escrow Release Condition is not satisfied on or before 5:00 p.m. (Toronto time) on December 31, 2011, the Subscription Receipts will immediately become null and void and of no further force and effect and within five (5) business days thereafter the Escrow Proceeds will be returned to Investor by the escrow agent, Capital Transfer Agency, Inc.

In conjunction with the entry into the Subscription Agreement, the Company entered into a Registration Rights Agreement (the "Registration Rights Agreement") with Investor, pursuant to which the Company has agreed, immediately following the conditional approval by the Toronto Stock Exchange, to file a registration statement on Form S-1 with the Securities and Exchange Commission which registers the common stock and common stock underlying the Warrants acquired by the Investor for resale.  If the registration statement does not become effective on or before six months from the date of conditional approval by the Toronto Stock Exchange for the listing of the common stock of the Company, Investor shall receive an additional common share and Warrant for, respectively, each ten (10) common shares and each ten (10) Warrants held by the Investor.

The foregoing descriptions of the Subscription Agreement, Subscription Receipt, and Registration Rights Agreement are qualified in their entirety by the contents of the respective agreements which are attached as Exhibits to this Current Report.

## ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS

10.12    Subscription Agreement dated November 10, 2011

10.13    Subscription Receipt and Escrow Agreement dated November 10, 2011

10.14    Registration Rights Agreement dated November 10, 2011

2

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**APP 0575**

UNITED STATES

LIBERTY SILVER CORP.

By: /s/ Geoff Browne
      Chief Executive Officer

Date: November 10, 2011

3

**APP 0576**

TO SUBSCRIBE, EACH SUBSCRIBER MUST RETURN THE FOLLOWING (as applicable to the Subscriber):

a.   Duly completed and executed Subscription Agreement (complete cover page);
b.   Terms and Conditions of Subscription for Subscription Receipts of Liberty Silver Corp.;
c.   Duly completed and executed Schedule "B" – Exemption Form;
d.   Duly completed and executed Schedule "C" – Accredited Investor Certificate, if applicable;
e.   Duly completed and executed Schedule "D" – Certificate of U.S. Accredited Investor, if applicable;
f.   Duly completed and executed Schedule "E" – Additional, Representations, Warranties and Covenants of Subscriber Resident Outside of Canada and the United States, if applicable; and
g.   Subscription Funds by certified cheque, bank draft, money order or wire transfer (see Schedule "F" for instructions).

## SUBSCRIPTION AGREEMENT

TO:        **LIBERTY SILVER CORP. (the "Company")**

The undersigned (hereinafter referred to as the "**Subscriber**") hereby irrevocably subscribes for and agrees to purchase the number of subscription receipts of the Company (the "**Subscription Receipts**") set forth below, for the aggregate consideration set forth below (the "**Subscription Price**"), representing a subscription price of US$0.50 per Subscription Receipt. The gross proceeds (less the BG Subscriber Expense, as herein defined) shall be paid to the Escrow Agent (as herein defined) against issuance of the certificates representing the Subscription Receipts. Upon satisfaction of the Escrow Release Condition (as herein defined), each Subscription Receipt shall be automatically exchanged without any further action by the holder and for no additional consideration for one unit of the Company (each, a "**Unit**"). Each Unit shall consist of one common share in the capital of the Company (each, a "**Common Share**"), one Common Share purchase warrant (each whole warrant, a "**Warrant**"), and one right to acquire Common Shares in certain circumstances (each, a "**Right**"). Each Warrant shall entitle the holder thereof to acquire one Common Share (a "**Warrant Share**") at a price of U.S.$0.65 per Warrant Share at any time until 5:00 p.m. (Toronto time) on the date which is the earlier of 24 months following the date the Company's Common Shares are listed on Toronto Stock Exchange (the "**Exchange**") and 30 months following the date of the closing of the Offering. Each Right shall entitle the holder thereof to acquire, for no additional consideration, one-tenth (1/10) of a Common Share (each whole such Common Share, a "**Right Share**") in the event that the Registration (as herein defined) of the Securities (as herein defined) has not occurred in accordance with the terms of the Registration Rights Agreement (as herein defined). The Subscriber agrees to be bound by the terms and conditions set forth in the attached "Terms and Conditions of Subscription for Subscription Receipts of Liberty Silver Corp." including without limitation the terms, conditions, representations and warranties set forth thereunder or set out in any applicable Schedules attached thereto (the "**Terms**"), which Terms and attachments thereto together with this page form this subscription agreement (the "**Subscription Agreement**").

**THE        SUBSCRIBER: SUBSCRIBED:**

| Print name of Subscriber: |
|---|
| Look Back Investments, Inc. |
| Signature of individual Subscriber: |
| |
| Signature of authorized signatory, if Subscriber not an individual: |
| |
| Print name of authorized signatory, if applicable: Robert Genovese |
| Subscriber's address: |

**SUBSCRIPTION        RECEIPTS**

| Number of Subscription Receipts: <u>6,500,000</u> |
|---|
| Aggregate consideration:   <u>$3,250,000</u> |
| **DISCLOSED PRINCIPAL (if purchasing as agent or trustee for a disclosed principal):** |
| Name of disclosed principal: |
| Address of disclosed principal: |

**APP 0577**

Calle Euaeblo A. Morales
Suite a-A #5
El Cangrejo, Panama City, Panama

| Subscriber's email address: | Telephone number of disclosed principal: |
|---|---|

Form A

| Subscriber's telephone number: | |
|---|---|
| **REGISTRATION INSTRUCTIONS (if other than in name of Subscriber):** | **CERTIFICATE DELIVERY INSTRUCTIONS (if other than to Subscriber's address):** |
| Name: | Name: |
| Account reference, if applicable: | Account reference, if applicable: |
| Address: | Address: |

**DELIVERY:**   This Subscription Agreement should be delivered to the Company at the following address:

**LIBERTY SILVER CORP.**
c/o Peterson Law Professional Corporation
390 Bay Street, Suite 806
Toronto, ON M5H 2Y2

**ACCEPTANCE:**   The Company hereby accepts the above subscription on the Terms contained in this Subscription Agreement.

**Liberty Silver Corp.**

Dated:  November 10, 2011

Per:    /s/ Geoffrey Browne
     Authorized Signatory

**TERMS AND CONDITIONS OF
SUBSCRIPTION FOR SUBSCRIPTION RECEIPTS OF
LIBERTY SILVER CORP.**

1.      **Definitions** - In this Subscription Agreement:

    (a)      "***Action***" has the meaning ascribed to such term in section 10(x) hereof;

    (b)      "***Anti-Money Laundering Laws***" has the meaning ascribed to such term in section 10(x) hereof;

    (c)      "***BG Subscriber***" means BG Capital Group Ltd.;

    (d)      "***BG Subscriber's Expenses***" means the reasonable professional fees incurred by BG Subscriber in connection with its subscription for Subscription Receipts

**APP 0578**

which shall not exceed CDN$25,000 plus applicable taxes and reasonable disbursements;

(e)    "*Closing Date*" means November 9, 2011 or such earlier or later date as the Company shall determine;

(f)    "*Closing Time*" means 9:00 a.m. (Toronto time) or such earlier or later time on the Closing Date as the Company shall determine;

(g)    "*Common Shares*" mean the shares of common stock in the capital of the Company partially comprising each Unit;

(h)    "*Disclosed Beneficial Purchaser*" has the meaning ascribed to such term in section 11(f) hereof;

(i)    "*Disclosure Documents*" means all reports, schedules, forms, statements and other documents required to be filed by the Company with the Securities and Exchange Commission under the Securities laws, including the exhibits thereto and documents incorporated by reference therein, which are publicly available or otherwise posted by the Company on EDGAR during the 24 months preceding the date hereof;;

(j)    "*Environmental Laws*" has the meaning ascribed to such term in section 10(q)(i) hereof;

(k)    "*Escrow Agent*" means Capital Transfer Agency Inc.;

(l)    "*Escrow Release Condition*" has the meaning ascribed to such term in section 9(a) hereof;

(m)    "*Escrowed Funds*" has the meaning ascribed to such term in section 9(a) hereof;

(n)    "*Escrowed Proceeds*" has the meaning ascribed to such term in section 9(a) hereof;

(o)    "*Exchange*" has the meaning ascribed to such term on the face page hereof;

2

(p)    "*Exchange Confirmation*" has the meaning ascribed to such term in section 9(a) hereof;

(q)    "*Licenses*" has the meaning ascribed to such term in section 10(r) hereof;

(r)    "*Listing*" has the meaning ascribed to such term in section 8 hereof;

(s)    "*Mining Rights*" has the meaning ascribed to such term in section 10(o) hereof;

(t)    "*NI 45-106*" means National Instrument 45-106 - Prospectus and Registration Exemptions, a Canadian securities regulatory policy applicable to the Company;

(u)    "*Offering*" means the offering of Subscription Receipts;

(v)    "*Registration*" means the registration of the Securities in accordance with the U.S. Securities Act, as set out in the Registration Rights Agreement;

**APP 0579**

(w)　　*"**Registration Rights Agreement**"* means the Registration Rights Agreement, in the form set out in Schedule "G" hereto, to be entered into by the Company and each Subscriber on or before the Closing Date;

(x)　　*"**Release Deadline**"* has the meaning ascribed to such term in section 9(b) hereof;

(y)　　*"**Right**"* means the right, partially comprising each Unit, for the holder to receive, for no additional consideration, one-tenth (1/10) of a Right Share in the event that the Registration has not occurred in accordance with the terms of the Registration Rights Agreement;

(z)　　*"**Right Shares**"* mean Common Shares issuable upon conversion of the Rights in accordance with the terms of the Registration Rights Agreement;

(aa)　　"**SEC**" means the United States Securities and Exchange Commission;

(bb)　　*"**Securities**"* has the meaning ascribed to such term in section 11(a);

(cc)　　*"**Securities Laws**"* has the meaning ascribed to such term in section 10(c) hereof;

(dd)　　*"**SRA Agreement**"* has the meaning ascribed to such term in section 3 hereof;

(ee)　　*"**Subscribers**"* means the subscribers of Subscription Receipts pursuant to their executed and accepted Subscription Agreements;

(ff)　　*"**Subscription Receipt Certificate**"* has the meaning ascribed to such term in section 3 hereof;

(gg)　　*"**Taxes**"* has the meaning ascribed to such term in section 10(ff) hereof;

(hh)　　*"**Terms**"* has the meaning ascribed to such term on the face page hereof;

(ii)　　*"**U.S. Person**"* has the meaning set out in Regulation S under the U.S. Securities Act;

(jj)　　*"**U.S. Securities Act**"* means the United States Securities Act of 1933, as amended;

3

(kk)　　"**U.S. Exchange Act**" means the United States Securities and Exchange Act of 1934, as amended;

(ll)　　*"**Units**"* mean the unit of securities of the Company into which the Subscription Receipts will be automatically exchanged in the event the Escrow Release Condition is satisfied by the Release Deadline, each such unit to be comprised of one (1) Common Share, one (1) Warrant, and one (1) Right;

(mm)　　*"**Warrant Shares**"* has the meaning ascribed to such term on the face page hereof; and

(nn)　　*"**Warrants**"* has the meaning ascribed to such term on the face page hereof.

2.　　**Deliveries by Subscriber** - In connection with its subscription under this Subscription Agreement, the Subscriber agrees to deliver to the Company at the address shown on the face page hereof:

(a)　　this Subscription Agreement duly completed and executed;

**APP 0580**

(b)    a certified cheque, bank draft or money order payable to the Escrow Agent, in trust, Attention: Lisa Cripps, for the Subscription Price set out on the face page hereof, less the BG Subscriber's Expense, if the Subscriber is the BG Subscriber, or to wire transfer such Subscription Price, less the BG Subscriber's Expense, if the Subscriber is the BG Subscriber, to the Escrow Agent as set forth in the attached Schedule "F";

(c)    the attached Schedule "B" - Exemption Form, duly initialled and signed by or on behalf of the Subscriber;

(d)    if applicable, the attached Schedule "C" - Accredited Investor Certificate, duly initialled and signed by or on behalf of the Subscriber;

(e)    if applicable, the attached Schedule "D" - Certificate of U.S. Accredited Investor, duly initialled and signed by or on behalf of the Subscriber;

(f)    if applicable, the attached Schedule "E" - Additional, Representations, Warranties and Covenants of Subscriber Resident Outside of Canada and the United States; and

(g)    such other documents as may be reasonably requested by the Company.

3.    **Subscription for the Subscription Receipts** – The Subscriber hereby confirms its irrevocable subscription for and offer to purchase the Subscription Receipts from the Company, on and subject to the Terms set out in this Subscription Agreement, for the Subscription Price which is payable in the manner set out in section 2. The certificate representing the Subscription Receipts will be registered in accordance with the registration instructions set forth on the face page of this Subscription Agreement. The Subscription Receipts shall be duly and validly created and issued pursuant to the terms of the certificate representing the Subscription Receipts (the "**Subscription Receipt Certificate**") and the terms of a subscription receipt and escrow agreement (the "**SRA Agreement**") to be entered into on or before the Closing Date. The Subscription Receipt Certificate representing the Subscription Receipts will, among other things, include provisions for the appropriate adjustment in number and price upon the occurrence of certain events, including any subdivision, consolidation, or reclassification of the Company's common shares.

4

4.    **Acceptance and Rejection of Subscription by the Company** – The Subscriber acknowledges and agrees that the Company reserves the right, in its absolute discretion, to reject this subscription for Subscription Receipts, in whole or in part, at any time prior to the Closing Time. Upon the Company's acceptance of this subscription, this Subscription Agreement will constitute an agreement for the purchase by the Subscriber from the Company, and for the Company to issue and sell to the Subscriber, the number of Subscription Receipts set forth on the first page hereof at the Subscription Price and on the Terms set forth herein. The Company shall be entitled to rely on delivery of a facsimile copy of completed and executed Subscription Agreements, and acceptance by the Company of such facsimile subscriptions shall be legally effective to create a valid and binding agreement between the Subscriber and the Company in accordance with the terms hereof. If this subscription is rejected in whole, any cheques or other forms of payment delivered to the Escrow Agent or the Company representing the Subscription Price will be promptly returned to the Subscriber without interest or deduction. If this subscription is accepted only in part, a cheque representing any refund of the Subscription Price for that portion of the subscription for the Subscription Receipts which is not accepted will be promptly delivered to the Subscriber or to the Subscriber's legal counsel for delivery to the Subscribers without interest or deduction.

**APP 0581**

5. **Closing** – If the Subscriber's subscription is accepted by the Company, the purchase and sale of the Subscription Receipts shall be completed at the Closing Time on the Closing Date.

6. **Issuance of Subscription Receipt Certificates** – Upon this subscription being accepted by the Company, the Company shall, subject to the receipt of the deliveries to be made by the Subscriber pursuant to section 2 hereof and Terms set out in this Subscription Agreement, issue to the Subscriber certificates evidencing the Subscriber's ownership of the Subscription Receipts acquired by the Subscriber pursuant to the subscription for Subscription Receipts.

7. **Acknowledgment of Offering** – The Subscriber acknowledges that the Subscription Receipts subscribed for hereunder form part of a larger issuance and sale of 6,500,000 Subscription Receipts for aggregate gross proceeds of up to $3,250,000. The Subscriber acknowledges it is intended that the minimum dollar amount of Subscription Receipts will be $3,000,000.

8. **Acknowledgment of Transaction** – The Subscriber acknowledges that the Company is proceeding with a proposed listing of its Common Shares on the Exchange (the "**Listing**"). The completion and approval of the Listing by the Exchange is subject to the satisfaction of a number of conditions, including, but not limited to, the completion of the Offering and other customary listing conditions.

9. **Escrow Conditions**

    (a) Upon completion of the offer, issue and sale by the Company of the Subscription Receipts, the gross proceeds from the Offering less the BG Subscriber's Expense (the "**Escrowed Proceeds**") will be held by the Escrow Agent (or such other escrow agent as may be acceptable to the Company and the BG Subscriber), in its capacity as escrow agent thereunder and invested in an interest bearing account (the Escrowed Proceeds, together with all interest and other income earned thereon, are referred to herein as the "**Escrowed Funds**") pursuant to the SRA Agreement. The Escrowed Funds shall be released to the Company (or as it may direct), upon the receipt of written confirmation from the Exchange (the "**Exchange Confirmation**") that all conditions precedent to the Listing have been satisfied (the "**Escrow Release Condition**"). As a condition precedent to the release of the Escrowed Funds to the Company, the Chief Executive Officer and Chief Financial Officer of the Company shall certify to the Escrow Agent that the Escrow Release Condition has been satisfied, and a copy of such certification shall be provided to the BG Subscriber together with a copy of the Exchange Confirmation.

5

    (b) In the event that the Escrow Release Condition is not satisfied at or before 5:00 p.m. (EST) on December 31, 2011 (the "**Release Deadline**"), then the Subscription Receipts shall expire automatically and be of no further force and effect and the Escrowed Funds shall be returned to the Subscribers *pro rata*. To the extent the Escrowed Proceeds are not sufficient to refund the Subscribers the full amount paid for the Subscription Receipts, the Company shall be liable and responsible to repay the deficiency to the Subscribers, *pro rata*.

    (c) The Subscription Receipts shall be created and issued pursuant to the SRA Agreement and the specific attributes of the Subscription Receipts shall be as set forth thereunder. The Company shall provide a copy of the SRA Agreement to the Subscriber upon request by the Subscriber.

    (d) The Subscriber, on its own behalf and on behalf of each beneficial purchaser, if any, for whom it is contracting under this Subscription Agreement, acknowledges and agrees that the rights of the holders of the Subscription

**APP 0582**

Receipts (including, without limitation, the date of the Release Deadline) may be modified under the SRA Agreement pursuant to an extraordinary resolution approved either: (i) by holders of Subscription Receipts representing at least 66⅔% of the outstanding Subscription Receipts that attend or are represented by proxy at a duly convened meeting of holders of Subscription Receipts; or (ii) by written consent of holders of Subscription Receipts representing at least 66⅔% of the outstanding Subscription Receipts.

10.   **Representations, Warranties and Covenants of the Company** – The Company represents, warrants and covenants to the Subscriber, and acknowledges that the Subscriber is relying upon such representations, warranties and covenants in purchasing the Subscription Receipts, that:

(a)   the Company has been duly incorporated and is validly existing under the laws of the State of Nevada, has all requisite corporate power and authority and is duly qualified to carry on its business as now conducted and to own, lease or operate its properties and assets and no steps or proceedings have been taken by the Company or to the knowledge of the Company by any person, voluntary or otherwise, requiring or authorizing its dissolution or winding-up and the Company has all requisite corporate power and authority to enter into each of this Subscription Agreement, the SRA Agreement and the Registration Rights Agreement and to carry out its obligations hereunder and thereunder;

(b)   the Company has no subsidiaries;

(c)   the Company is a reporting issuer under the securities laws of the United States and is not in default of any requirement of such securities laws (the "**Securities Laws**");

(d)   each of the execution and delivery of this Subscription Agreement, the SRA Agreement and the Registration Rights Agreement and the performance by the Company of its obligations hereunder or thereunder, including the issuance of the Subscription Receipts and underlying Common Shares, Warrants, Rights and Warrant Shares, do not and will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, (whether after notice or lapse of time or both): (A) any statute, rule or regulation in effect at the date hereof applicable to the Company including, without limitation, the Securities Laws; (B) the constating documents, by-laws or resolutions of the Company which are in effect at the date hereof; (C) any mortgage, note, indenture, contract, agreement, instrument, lease or other document to which the Company is a party or by which it is bound; or (D) any judgment, decree or order binding the Company or the property or assets of the Company;

(e)   the Company is in compliance with the timely and continuous disclosure obligations under the Securities Laws and, without limiting the generality of the foregoing, there has not occurred any material adverse change, financial or otherwise, in the assets, liabilities (contingent or

6

otherwise), business, financial condition, capital or prospects of the Company since June 30, 2011, which has not been publicly disclosed on a non-confidential basis and all the statements set forth in the Disclosure Documents are true, correct, and complete in all material respects and do not contain any material misrepresentation as of the date of such statements;

**APP 0583**

(f)    except as disclosed in the Disclosure Documents or as contemplated herein, the Company has not approved, entered into any binding agreement in respect of, or has any knowledge of:

(i)    the purchase of any material property or assets or any interest therein or the sale, transfer or other disposition of any material property or assets or any interest therein currently owned, directly or indirectly, by the Company whether by asset sale, transfer of shares or otherwise;

(ii)    the change of control (by sale or transfer of shares or sale of all or substantially all of the property and assets of the Company or otherwise) of the Company; or

(iii)    a proposed or planned disposition of shares by any shareholder who owns, directly or indirectly, 10% or more of the outstanding shares of the Company;

(g)    the audited consolidated comparative financial statements of the Company as at and for the years ended June 30, 2011 and 2010, respectively have been prepared in accordance with United States generally accepted accounting principles, and present fairly in all material respects the financial position and condition of the Company, as at the dates thereof and for the periods indicated and reflect all assets, liabilities or obligations (absolute, accrued, contingent or otherwise) of the Company and the results of its operations and the changes in its financial position for the periods then ended;

(h)    no holder of outstanding shares in the capital of the Company is entitled to any pre-emptive or any similar rights to subscribe for any Common Shares or other securities of the Company and other than as disclosed in section 10(aa) hereof, no rights, warrants or options to acquire, or instruments convertible into or exchangeable for, any shares in the capital of the Company are outstanding;

(i)    no legal or governmental proceedings are pending to which the Company is a party or to which its property is subject that would result in any material adverse change in the operation, business, condition or prospects of the Company and, to the knowledge of the Company, no such proceedings have been threatened against or are contemplated with respect to the Company or with respect to its properties;

(j)    the Company is not violation in of its constating documents or in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any material contract, indenture, trust deed, mortgage, loan agreement, note, option, lease or other agreement or instrument to which it is a party or by which it or its property may be bound;

(k)    to the knowledge of the Company, no counterparty to any material obligation, agreement, covenant or condition contained in any material contract or other material instrument to which the Company is a party is in default in the performance or observance thereof, except where such default in performance would not have a material adverse effect on the Company;

(l)    any and all of the agreements and other documents and instruments pursuant to which the Company holds its property and assets (including any interest in, or right to earn an interest in, any property) are valid and subsisting agreements, documents or instruments in full force and effect, enforceable against the Company in accordance with the terms thereof, the Company is not in default of any of the material provisions of any such agreements, documents or

7

**APP 0584**

instruments nor has any such default been alleged and such properties and assets are in good standing, in all material respects, under the applicable statutes and regulations of the jurisdictions in which they are situated, all leases, licences and claims pursuant to which the Company derives its interests in such property and assets are in good standing and there has been no material default under any such lease, licence or claim. None of the properties (or any interest in, or right to earn an interest in, any property) of the Company is subject to any right of first refusal or purchase or acquisition right which is not disclosed in the Disclosure Documents;

(m)   to the knowledge of the Company, there is no agreement in force or effect which in any manner affects or will affect the voting or control of any of the securities of the Company, and there are no shareholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's shareholders;

(n)   the Company is the absolute legal and beneficial owner of, and has good and marketable title to, all of its material properties or assets as described in the Disclosure Documents, and except as disclosed in the Disclosure Documents, free of all mortgages, liens, charges, pledges, security interests, encumbrances, claims or demands whatsoever and no other property rights are necessary for the conduct of the business of the Company, as currently conducted or contemplated to be conducted by the Company, the Company does not know of any claim or the basis for any claim that might or could adversely affect the right thereof to use, transfer or otherwise exploit such property rights and, except as disclosed in the Disclosure Documents, the Company has no responsibility or obligation to pay any commission, royalty, licence fee or similar payment to any person with respect to the property rights thereof;

(o)   the Company holds either freehold title, mining leases, mining concessions, mining claims or participating interests or other conventional property or proprietary interests or rights, recognized in the jurisdiction in which a particular property is located (collectively, the "**Mining Rights**"), in respect of the ore bodies and minerals located in material properties in which the Company has an interest as set out in Schedule "H" hereto and as described in all material respects in the Disclosure Documents, under valid, subsisting and enforceable documents or recognized and enforceable agreements or instruments, sufficient to permit the Company to explore the minerals relating thereto, and all material property, options, leases or claims in which the Company has an interest or right have been validly located and recorded in accordance with all applicable laws and are valid and subsisting. The Company has all necessary surface rights, access rights and other necessary rights and interests relating to material properties in which the Company has an interest granting the Company, as applicable, the right and ability to explore for minerals, ore and metals for development purposes as are appropriate in view of the rights and interest therein of the Company, with only such exceptions as do not materially interfere with the use made by the Company of the rights or interest so held, and each of the proprietary interests or rights and each of the documents, agreements and instruments and obligations relating thereto referred to above is currently in good standing in the name of the Company. The Mining Rights in respect of the Company's material properties as disclosed in Schedule "H" hereto and in the Disclosure Documents constitute a description of all material Mining Rights held by the Company;

(p)   the Company has conducted and is conducting its business in material

**APP 0585**

compliance with all applicable laws and regulations of each jurisdiction in which it carries on business (including, without limitation, all applicable federal, state, provincial, municipal and local environmental anti-pollution and licensing laws, regulations and other lawful requirements of any governmental or regulatory body) and has not received a notice of non-compliance, or knows of, or has reasonable grounds to know of, any facts that could give rise to a notice of non-compliance with any such laws or regulations which would have a material adverse effect on the Company;

8

(q)     except to the extent that any violation or other matter referred to in this subsection does not have a material adverse effect on the Company:

(i)      the Company is not currently in violation of any applicable federal, state, provincial, municipal or local laws, regulations, orders, governmental decrees or ordinances with respect to environmental, health or safety matters (collectively, the "**Environmental Laws**");

(ii)     to the knowledge of the Company, the Company has operated its business at all times and has received, handled, used, stored, treated, shipped and disposed of all contaminants without violation of Environmental Laws;

(iii)    there have been no material spills, releases, deposits or discharges of hazardous or toxic substances, contaminants or wastes into the earth, air or into any body of water or any municipal or other sewer or drain water systems by the Company that have not been remedied;

(iv)     as a result of its operations, no orders, rulings, directions or notices have been issued and remain outstanding or to the knowledge of the Company are pending or threatened against the Company under or pursuant to any Environmental Laws;

(v)      the Company has no knowledge of, and has not received any notice of, any claim, judicial or administrative proceeding, pending or threatened against it which may materially adversely affect the Company as a whole relating to or alleging any material violation of Environmental Laws by the Company and the Company is not aware of any facts which could give rise to any such claim or judicial or administrative proceeding and the Company, to the knowledge of the Company, is not the subject of any investigation, evaluation, audit or review by any governmental authority to determine whether any material violation of Environmental Laws by it has occurred or is occurring or whether any remedial action is needed;

(vi)     to the knowledge of the Company, the Company has not failed to report to the proper governmental authority the occurrence of any event which is required to be so reported by any Environmental Law; and

(vii)    the Company holds all licences, permits and approvals required under any Environmental Laws in connection with the operation of its business as currently conducted and the ownership and use of its assets, all such licences, permits and approvals are in full force and effect, and the Company has not received any notification pursuant to any Environmental Laws that any material work, repairs, constructions or capital expenditures are required to be made by it as a condition of continued compliance with any Environmental Laws, or any licence, permit or approval issued pursuant thereto, or that any license, permit or approval referred to above is about to be reviewed, made

**APP 0586**

subject to material limitations or conditions, revoked, withdrawn or terminated;

(r)    the Company holds all requisite licences, registrations, qualifications, permits, consents and other approvals, including in respect of any Mining Rights (collectively, the "**Licenses**"), necessary for carrying on its business as currently carried on and proposed to be carried on and all such Licenses are valid and subsisting and in good standing in all material respects except where the failure to hold such licences would not have a material adverse effect on the Company, and the Company has not received any notice of proceedings relating to the revocation, adverse modification or cancellation of or any intention to revoke, adversely modify or cancel any of the Licenses;

9

(s)    the Company is the holder in good standing of all of its material licences free and clear of any encumbrances which would have a material adverse effect on the Company, and the Company has no knowledge of any claim of adverse ownership in respect thereof;

(t)    at the Closing Time, each of this Subscription Agreement, the SRA Agreement and the Subscription Receipt Certificate, the Registration Rights Agreement, and, at the applicable times, the certificates representing the Warrants and the Rights shall have been duly authorized and executed and delivered by the Company and upon such execution and delivery by the Company and the other parties thereto each shall constitute a valid and binding obligation of the Company and each shall be enforceable against the Company in accordance with its terms, except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws relating to or affecting the rights of creditors generally and except as limited by the application of equitable principles when equitable remedies are sought, and by the fact that rights to indemnity, contribution and waiver, and the ability to sever unenforceable terms, may be limited by applicable law;

(u)    Pacific Stock Transfer Company, at its principal office in the City of Las Vegas, Nevada, has been duly appointed as registrar and transfer agent in respect of the Common Shares;

(v)    Capital Transfer Agency Inc., at its principal office in the City of Toronto, Ontario, has been duly appointed agent in respect of the Subscription Receipts;

(w)    no order, ruling or determination having the effect of suspending the sale or ceasing the trading in any securities of the Company has been issued by any regulatory authority and is continuing in effect and no proceedings for that purpose have been instituted or, to the knowledge of the Company, are pending, contemplated or threatened by any regulatory authority;

(x)    there are no material actions, suits, proceedings or inquiries pending or, to the knowledge of the Company, threatened against or affecting the Company at law or in equity or before or by any federal, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality (collectively, an "**Action**") which: i) would adversely impede or prevent the consummation of the transactions contemplated by this Subscription Agreement or challenge the legality, validity or enforceability of this Subscription Agreement; or ii) could, if there were an unfavourable decision, have a material adverse effect. Neither the Company, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation

**APP 0587**

of or liability under applicable Securities Laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by any securities commission or other regulatory authorities involving the Company or any current or former director or officer of the Company. No securities commission nor any other regulatory authority has issued any order, ruling or determination having the effect of ceasing the trading or suspending the sale of the Subscription Receipts, Common Shares or any other securities of the Company and no Action has been instituted or is pending or, to the knowledge of the Company, is threatened by any securities commission or other regulatory authority;

(y)     there are no actions, suits, judgments, investigations, inquiries or proceedings of any kind whatsoever outstanding (whether or not purportedly on behalf of the Company), pending or, to the knowledge of the Company, threatened against or affecting the Company or any of its directors or officers, at law or in equity or before or by any commission, board, bureau or agency of any kind whatsoever and, to the knowledge of the Company, there is no basis therefor and the Company is not subject to any judgment, order, writ, injunction, decree, award, rule, policy or regulation of any governmental authority which, either separately or in the aggregate, may affect,

10

is material to or will materially affect the Company or would adversely affect the ability of the Company to perform its obligations under this Subscription Agreement;

(z)     the Company is not aware of any licensing or legislation, regulation, by-law or other lawful requirement of any governmental authority having lawful jurisdiction over the Company presently in force or, to its knowledge, proposed to be brought into force that the Company anticipates it will be unable to comply with or which could reasonably be expected to have a material adverse effect on the Company;

(aa)    as of October 31, 2011, the authorized capital of the Company consists of 200,000,000 Common Shares, of which 70,933,334 Common Shares are issued and outstanding as fully paid and non-assessable. The Company also has 2,233,334 warrants to subscribe for an equal number of Common Shares and 6,500,000 stock options outstanding to subscribe for an equal number of Common Shares as of October 31, 2011;

(bb)    the Company is subject to the reporting requirements of section 13(a) or 15(d) of the U.S. Exchange Act, has filed with the SEC all reports required to be filed pursuant to the U.S. Exchange Act, and such reports at the time they were filed with the SEC materially complied as to form with the requirements of the U.S. Exchange Act;

(cc)    the Company shall use commercially reasonable efforts to file with the SEC all reports required to be filed pursuant to the U.S. Exchange Act on such date as each such report is required to be filed, until such time as the Common Shares and Warrant Shares may be resold pursuant to an effective registration statement filed with the SEC or pursuant to Rule 144 under the U.S. Securities Act without regard to Rule 144(i);

(dd)    upon request to do so, the Company shall use commercially reasonable efforts

**APP 0588**

and shall take all steps to qualify the Securities for electronic deposit;

(ee)    none of the directors, officers or employees of the Company or any associate or affiliate of any of the foregoing had or has any material interest, direct or indirect, in any material transaction or any proposed material transaction with the Company which materially affects, is material to or will materially affect the Company;

(ff)    the Company owns or has the right to use under license, sub-license or otherwise all material intellectual property used by the Company in its business, including copyrights, industrial design, trademarks, trade secrets, knowhow and proprietary rights, free and clear of all encumbrances;

(gg)    the Company is in compliance with all laws respecting employment and employment practices, terms and conditions of employment, pay equity and wages, except where non-compliance with such laws could not reasonably be expected to have a material adverse effect on the Company and has not and is not engaged in any unfair labour practice;

(hh)    there has not been in the last two years and there is not currently any labour disruption or conflict which could reasonably be expected to have a material adverse effect on the Company;

(ii)    all taxes (including income tax, capital tax, payroll taxes, employer health tax, workers' compensation payments, property taxes, customs and land transfer taxes), duties, royalties, levies, imposts, assessments, deductions, charges or withholdings and all liabilities with respect thereto including any penalty and interest payable with respect thereto (collectively, "**Taxes**") due and payable by the Company have been paid except for where the failure to pay such taxes would not constitute an adverse material fact of the Company or result in an adverse material change to the Company.   All tax returns, declarations, remittances and filings required to be filed by the Company have been filed with all appropriate governmental authorities and all such

11

returns, declarations, remittances and filings are complete and accurate and no material fact or facts have been omitted therefrom which would make any of them misleading except where the failure to file such documents would not constitute an adverse material fact of the Company or result in an adverse material change to the Company.   To the knowledge of the Company, no examination of any tax return of the Company is currently in progress and there are no issues or disputes outstanding with any governmental authority respecting any Taxes that have been paid, or may be payable, by the Company except where such examinations, issues or disputes would not constitute an adverse material fact of the Company or result in an adverse material change to the Company;

(jj)    the Company has established on its books and records reserves that are adequate for the payment of all Taxes not yet due and payable and there are no liens for Taxes on the assets of the Company and, to the knowledge of the Company, there are no audits pending of the tax returns of the Company (whether federal, state, provincial, local or foreign) and there are no claims which have been or may be asserted relating to any such tax returns, which audits and claims, if determined adversely, would result in the assertion by any governmental agency of any deficiency that would result in a material adverse

**APP 0589**

effect on the Company;

(kk) except as disclosed in the Disclosure Documents, there are no material liabilities of the Company whether direct, indirect, absolute, contingent or otherwise and the Company has not made any loans to or guaranteed the obligations of any person;

(ll) except as disclosed in the Disclosure Documents, the Company is not indebted to any person in any material respect;

(mm) there are no documents required to be filed under the Securities Laws in connection with the Offering that will not have been filed as required, subject only to satisfaction of all applicable post-closing filings and/or requirements;

(nn) the minute books of the Company made available to counsel for the Underwriters in connection with its due diligence investigation of the Company for the periods from the date of incorporation to the date of examination thereof are all of the minute books of the Company and contain the constating documents of the Company from the date of incorporation and copies of all proceedings (or certified copies thereof) of the shareholders, the boards of directors and all committees of the boards of directors of the Company and there have been no other meetings, resolutions or proceedings of the shareholders, board of directors or any committees of the boards of directors of the Company not reflected in such minute books and other records, other than those which are not material in the context of the Company as of the date hereof;

(oo) all information which has been prepared by the Company relating to the Company and its business, property and liabilities and made available to the Underwriters, including all financial and operational information provided to the Underwriters was, as of the date of such information and is as of the date hereof, true and correct in all material respects, taken as a whole, and no fact or facts have been omitted therefrom which would make such information materially misleading;

(pp) the operations of the Company are and have been conducted at all times in compliance with the anti-money laundering statutes of all jurisdictions to which they are subject, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Anti-Money Laundering Laws**") and no Action by or before any governmental authority or any arbitrator involving the Company with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened;

12

(qq) the creation, sale and issuance of the Subscription Receipts, and the delivery of the Subscription Receipt Certificates representing them, will have been approved by all requisite corporate action on or before the Closing Date and, upon issue and delivery at the Closing Time, the Subscription Receipts will be validly issued and the Subscription Receipt Certificates will be validly delivered;

(rr) upon the automatic exchange of the Subscription Receipts into Units in accordance with the terms of the Subscription Receipt Certificate or the SRA Agreement, as applicable, the issuance of the Common Shares, and the creation and issuance of the Warrants and Rights, and the delivery of the certificates

**APP 0590**

representing the Common Shares, Warrants and Rights, will have been approved by all requisite corporate action on or before such automatic exchange and, upon issue and delivery, the Common Shares will be validly issued as fully paid and non-assessable, the Warrant and the Rights will be validly issued, and the certificates representing the Common Shares, Warrants and Rights will be validly delivered;

(ss)   upon valid exercise of the Warrants in accordance with the terms thereof, and in accordance with the terms of the Subscription Receipt Certificate or the SRA Agreement, as applicable, the issuance of the Warrant Shares and the delivery of the certificates representing the Warrant Shares will have been approved by all requisite corporate action on or before the automatic exchange of the Subscription Receipts and, upon issue and delivery, the Warrant Shares will be validly issued as fully paid and non-assessable, and the certificates representing the Warrant Shares will be validly delivered;

(tt)   upon valid exercise of the Rights in accordance with the terms of the Registration Rights Agreement, the issuance of the Right Shares and the delivery of the certificates representing the Right Shares will have been approved by all requisite corporate action on or before the exercise of the Rights and, upon issue and delivery, the Right Shares will be validly issued as fully paid and non-assessable, and the certificates representing the Right Shares will be validly delivered;

(uu)   the representations and warranties of the Company stated or referred to in this Subscription Agreement shall be true and correct both as of the execution of this Subscription Agreement by the Subscriber and as of the Closing Time on the Closing Date, as if repeated at such time, and shall survive the completion of the issuance of the Subscription Receipts;

(vv)   upon satisfaction of the Escrow Release Condition, the net proceeds of the Offering will be used by the Company to fund the exploration of the Mining Rights with respect to the Trinity Silver Mine Property identified in Schedule "H" and for general working capital purposes; and

(ww)   the Company will, and covenants and agrees to, use its best efforts to perform its obligations under the Registration Rights Agreement and to effect the Registration in accordance with the terms set out in the Registration Rights Agreement.

11.   **Representations, Warranties and Covenants of the Subscriber** – The Subscriber (on its own behalf and, if applicable, on behalf of each person on whose behalf the Subscriber is contracting) represents, warrants and covenants to the Company (and acknowledges that the Company and its counsel are relying thereon) that both at the date hereof and at the Closing Time (as defined below):

(a)   it has been independently advised as to restrictions with respect to trading in the Subscription Receipts and the Common Shares, Warrants and Rights issuable upon exchange of the Subscription Receipts (collectively, the "**Securities**") imposed by applicable securities laws, confirms that no representation (written or oral) has been made to it by or on behalf of the Company with respect thereto other than as set forth herein, acknowledges that it is aware of the

13

characteristics of the Securities, the risks relating to an investment therein and of the fact that it may not be able to resell the Securities except in accordance

**APP 0591**

with limited exemptions under applicable securities laws and regulatory policy until expiry of the applicable restricted period and compliance with the other requirements of applicable law; and it agrees that:

(i)      any certificates representing the Securities are to bear the following legend:

"UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY BEFORE [INSERT: THE DATE THAT IS FOUR MONTHS AND A DAY AFTER THE CLOSING DATE]";

and

(ii)     any certificates representing the Common Shares issuable upon conversion of the Subscription Receipts are to also bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE LISTED ON THE TORONTO STOCK EXCHANGE ("TSX"); HOWEVER, THE SAID SECURITIES CANNOT BE TRADED THROUGH THE FACILITIES OF TSX SINCE THEY ARE NOT FREELY TRANSFERABLE, AND CONSEQUENTLY ANY CERTIFICATE REPRESENTING SUCH SECURITIES IS NOT "GOOD DELIVERY" IN SETTLEMENT OF TRANSACTIONS ON TSX.";

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THE HOLDER HEREOF, BY PURCHASING THE SECURITIES REPRESENTED HEREBY, AGREES FOR THE BENEFIT OF LIBERTY SILVER CORP. AND ITS SUCCESSORS (THE "CORPORATION") THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE CORPORATION, (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN COMPLIANCE WITH LOCAL LAWS AND REGULATIONS, (C) WITHIN THE UNITED STATES, PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 OR RULE 144A THEREUNDER, IF APPLICABLE AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (D) WITHIN THE UNITED STATES, IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE STATE LAWS AND REGULATIONS GOVERNING THE OFFER AND SALE OF SECURITIES, AND IN THE CASE OF TRANSFERS PURSUANT TO (C) OR (D) ABOVE, THE HOLDER HEREOF HAS, PRIOR TO SUCH TRANSFER, FURNISHED TO THE CORPORATION AND THE CORPORATION'S TRANSFER AGENT AN OPINION OF COUNSEL OF RECOGNIZED STANDING IN FORM AND SUBSTANCE SATISFACTORY TO THE CORPORATION."

and the Subscriber further acknowledges that: (i) it has been advised to consult its own legal counsel in its jurisdiction of residence for full particulars of the resale restrictions applicable to it; and (ii) in the event that the Company is required by applicable securities legislation to provide written notice containing the legend set out at section 11(a)(i) to the beneficial purchaser of the Subscription Receipts, notice shall be deemed to have been given and received on the date on which it was delivered to the address of such beneficial purchaser provided on the face page hereof; and

14

**APP 0592**

(b)    it has not received or been provided with, nor has it requested, nor does it have any need to receive, any offering memorandum, any prospectus, sales or advertising literature, or any other document (other than an annual report, annual information form, interim report, information circular or any other continuous disclosure document, the content of which is prescribed by statute or regulation) describing or purporting to describe the present or proposed business and affairs of the Company which has been prepared for delivery to, and review by, prospective purchasers in order to assist them in making an investment decision in respect of the Subscription Receipts; and

(c)    it has not become aware of any advertisement in printed media of general and regular paid circulation (or other printed public media), radio, television or telecommunications or other form of advertisement (including electronic display and the internet) with respect to the distribution of the Securities; and

(d)    it understands that the Subscription Receipts are being offered for sale only on a "private placement" basis and that the sale and delivery of the Subscription Receipts is conditional upon such sale being exempt from the requirements as to the filing of a prospectus or delivery of an offering memorandum or upon the issuance of such orders, consents or approvals as may be required to permit such sale without the requirement of filing a prospectus or delivering an offering memorandum and, as a consequence (i) the Subscriber is restricted from using most of the civil remedies available under securities legislation, (ii) the Subscriber may not receive information that would otherwise be required to be provided to it under applicable securities legislation, and (iii) the Company is relieved from certain obligations that would otherwise apply under applicable securities legislation; and

(e)    unless it is purchasing under section 11(f) or (g), it is purchasing the Subscription Receipts as principal for its own account, not for the benefit of any other person, for investment only and not with a view to the resale or distribution of all or any of the Securities, it is resident in the jurisdiction set out as the "Subscriber's Residential Address" on the face page hereof; and

(f)    if it is not purchasing as principal or pursuant to section 11(g), it is duly authorized to enter into this Subscription Agreement and to execute and deliver all documentation in connection with the purchase on behalf of each beneficial purchaser, each of whom is purchasing as principal for its own account, not for the benefit of any other person, and not with a view to the resale or distribution of all or any of the Securities, it acknowledges that the Company may be required by law to disclose to certain regulatory authorities the identity of each beneficial purchaser of Subscription Receipts (the "**Disclosed Beneficial Purchaser**") for whom it may be acting, and it and each beneficial purchaser is resident in the jurisdiction set out as the "Subscriber's Residential Address"; and

(g)    it, and each person on whose behalf the Subscriber is contracting, is a resident of a jurisdiction outside of both Canada and the United States, it has concurrently executed and delivered a Representation Letter in the form attached to this Subscription Agreement as Schedule "E" and will provide such evidence of compliance with all matters described in such Representation Letter as the Company or its counsel may request; and

(h)    it acknowledges that:

(i)    no securities commission or similar regulatory authority has reviewed or passed on the merits of the Securities; and

(ii)    there is no government or other insurance covering the Securities; and

**APP 0593**

(iii)    there are risks associated with the purchase of the Subscription Receipts; and

15

(iv)    there are restrictions on the Subscriber's ability to resell the Securities and it is the responsibility of the Subscriber to find out what those restrictions are and to comply with them before selling the Securities; and

(v)    there is no market for the Securities and there is no assurance that a market will develop in the future and that no verbal or written representation has been made by or on behalf of the Company with respect thereto; and

(vi)    the Company has advised the Subscriber that the Company is relying on an exemption from the requirements to provide the Subscriber with a prospectus and to sell securities through a person or company registered to sell securities under the *Securities Act* (Ontario) and other applicable securities laws and, as a consequence of acquiring securities pursuant to this exemption, certain protections, rights and remedies provided by the *Securities Act* (Ontario) and other applicable securities laws, including statutory rights of rescission or damages, will not be available to the Subscriber; and

(vii)    the certificates representing the Securities will be endorsed with a legend stating that such securities will be subject to restrictions on resale in accordance with applicable securities legislation; and

(i)    the Subscription Receipts have not been offered to the Subscriber (or any person on whose behalf the Subscriber is contracting) in the United States, and any person making the order to purchase the Subscription Receipts and executing and delivering this Subscription Agreement was not in the United States when the order was placed and this Subscription Agreement was executed and delivered, unless such person is a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States signing on behalf of a discretionary account or similar account (other than an estate or trust) held for the benefit or account of a Disclosed Beneficial Purchaser which is a not in the United States or a U.S. Person; and

(j)    it is not a U.S. Person (as defined in Regulation S under the U.S. Securities Act, which definition includes, but is not limited to, an individual resident in the United States, an estate or trust of which any executor or administrator or trustee, respectively, is a U.S. Person and any partnership or corporation organized or incorporated under the laws of the United States) and is not purchasing and will not purchase the Subscription Receipts on behalf of, or for the account or benefit of, a person in the United States or a U.S. Person or for resale in the United States; and

(k)    it is aware that the Securities are not currently registered under the U.S. Securities Act or the securities laws of any state and that these securities may not be offered or sold in the United States without registration under the U.S. Securities Act or compliance with requirements of an exemption from registration and the applicable laws of all applicable states and acknowledges that while the Company has covenanted and agreed to file a registration statement under the U.S. Securities Act in respect of the Securities, there is no certainty as to timing or to whether the registration status will become effective; and

(l)    it undertakes and agrees that it will not offer or sell any of the Securities in the United States unless such securities are registered under the U.S. Securities Act

**APP 0594**

and the securities laws of all applicable states of the United States or an exemption from such registration requirements is available, and further that it will not resell the Securities, except in accordance with the provisions of applicable securities legislation, regulations, rules, policies and orders and stock exchange rules; and

(m)     it has not purchased the Subscription Receipts as a result of any form of directed selling efforts in the United States, as such term is defined in Regulation S under the U.S. Securities Act; and

16

(n)     it understands and acknowledges that the Company (i) is under no obligation to be or to remain a "foreign issuer", as such term is defined in the U.S. Securities Act, (ii) may not, at the time the Subscriber sells the Securities or at any other time, be a foreign issuer and that it is not currently a foreign issuer, and (iii) may engage in one or more transactions that could cause the Company not to be a foreign issuer; and

(o)     if it is not an individual, it pre-existed the offering of the Subscription Receipts and has a bona fide business purpose other than the investment in the Subscription Receipts and was not created, formed or established solely or primarily to acquire securities, or to permit purchases of securities without a prospectus, in reliance on an exemption from the prospectus requirements of applicable securities legislation; and

(p)     if it is a corporation, partnership, trust, unincorporated association or other entity, it has the legal capacity to enter into and be bound by this Subscription Agreement and further certifies that all necessary approvals of directors, trustees, fiduciaries, shareholders, partners, stakeholders, holders of voting securities or otherwise have been given and obtained; and

(q)     if it is an individual, it is of the full age of majority and is legally competent to execute this Subscription Agreement and take all action pursuant hereto; and

(r)     the entering into of this Subscription Agreement and the transactions contemplated hereby will not result in a violation of any of the terms or provisions of any law applicable to the Subscriber (or any person on whose behalf the Subscriber is contracting), or if the Subscriber (or any person on whose behalf the Subscriber is contracting) is not a natural person, any of such person's constating documents, or any agreement to which such person is a party or by which it is bound; and

(s)     this Subscription Agreement has been duly and validly authorized, executed and delivered by and constitutes a legal, valid, binding and enforceable obligation of the Subscriber; and

(t)     in the case of a subscription by it for Subscription Receipts acting as agent for a principal, it is duly authorized to execute and deliver this Subscription Agreement and all other necessary documentation in connection with such subscription on behalf of such principal and this Subscription Agreement has been duly authorized, executed and delivered by or on behalf of, and constitutes a legal, valid and binding agreement of, such principal; and

(u)     it has such knowledge and experience in financial and business affairs as to be capable of evaluating the merits and risks of its investment in the Subscription Receipts and is able to, and agrees to, bear the economic risk of loss of its

**APP 0595**

investment or, where it is not purchasing as principal, each beneficial purchaser is able to, and agrees to, bear the economic risk of loss of its investment; and

(v)      it has relied solely upon publicly available information relating to the Company and not upon any verbal or written representation as to fact or otherwise made by or on behalf of the Company; and

(w)      it acknowledges that the Company's counsel is acting as counsel to the Company and not as counsel to the Subscriber (or any person on whose behalf the Subscriber is contracting); and

(x)      if required by applicable securities legislation, regulations, rules, policies or orders or by any securities commission, stock exchange or other regulatory authority, the Subscriber will execute, deliver, file and otherwise assist the Company in filing, such reports, undertakings and other documents with respect to the issue of the Securities including, without limitation: (A) this Subscription Agreement; (B) if the Subscriber, or if applicable, the Disclosed Beneficial

17

Purchaser, is an accredited investor, a Representation Letter in the form attached as Exhibit 1 hereto; and (C) if the Subscriber, or if applicable, the Disclosed Beneficial Purchaser, is resident outside of Canada, a Representation Letter in the form attached as Exhibit 2 hereto; and

(y)      it acknowledges that the acquisition of the Common Shares issuable upon conversion of the Subscription Receipts purchased hereunder by the Subscriber (or any person on whose behalf the Subscriber is contracting) may result in the Subscriber (or any such person) becoming a "control person" in respect of the Company, as defined under applicable securities laws, and that it has been advised to consult its own legal counsel, both in its jurisdiction of residence and in Canada, for full particulars of the resale restrictions applicable to it; and

(z)      no person has made to the Subscriber (or any person on whose behalf the Subscriber is contracting) any written or oral representations (i) that any person will resell or repurchase the Securities (except in accordance with the articles of the Company or the SRA Agreement), or (ii) that any person will refund the purchase price of the Subscription Receipts, or (iii) as to the future price or value of the Securities, or (iv) as to any of the Securities being listed on any stock exchange; and

(aa)     the Subscription Price which will be advanced by the Subscriber to the Company hereunder will not represent proceeds of crime for the purposes of the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) (the "**PCMLA**") and the Subscriber acknowledges that the Company may in the future be required by law to disclose the Subscriber's name and other information relating to this Subscription Agreement and the Subscriber's subscription hereunder, on a confidential basis, pursuant to the PCMLA; and to the best of its knowledge (i) none of the subscription funds to be provided by the Subscriber (A) have been or will be derived from or related to any activity that is deemed criminal under the laws of Canada, the United States of America, or any other jurisdiction, or (B) are being tendered on behalf of a person or entity who has not been identified to the Subscriber, and (ii) it shall promptly notify the Company if the Subscriber discovers that any of such representations ceases to be true, and to provide the Company with appropriate information in connection therewith; and

## APP 0596

(bb)   the Subscriber (including any person on whose behalf the Subscriber is contracting) has been encouraged to obtain independent legal, income tax and investment advice with respect to this subscription for the Subscription Receipts and accordingly, has had the opportunity to acquire an understanding of the meanings of all terms contained herein relevant to the Subscriber (and each person on whose behalf the Subscriber is contracting) for purposes of giving representations, warranties and covenants under this Subscription Agreement; and

(cc)   the Subscriber has such knowledge of financial and business affairs or has received such advice as to be capable of evaluating the merits and risks of the Subscriber's investment in the Subscription Receipts and the Subscriber is able to bear the economic risk of the loss of the Subscriber's investment in the Subscription Receipts; and

(dd)   the Subscriber will execute, deliver, file and otherwise assist the Company in filing such reports, undertakings and other documents with respect to the issue of the Common Shares, Warrants and/or Warrant Shares as may be required by applicable securities legislation, regulations, rules, policies and orders of securities commissions, stock exchanges or other regulatory authorities applicable to the Company; and

(ee)   the Subscriber agrees to be bound by any escrow and pooling agreements that may be required by any securities commission or stock exchange or other regulatory authority having jurisdiction; and

18

(ff)   the representations and warranties of the Subscriber stated or referred to in this Subscription Agreement shall be true and correct both as of the execution of this Subscription Agreement by the Subscriber and as of the Closing Time on the Closing Date, as if repeated at such time, and shall survive the completion of the issuance of the Subscription Receipts.

12.   **Collection of Personal Information** - The Subscriber, on the Subscriber's own behalf and, if applicable, on behalf of each beneficial purchaser for whom the Subscriber is contracting hereunder, acknowledges and consents to the fact that the Company is collecting the personal information (as that term is defined under applicable private legislation, including, without imitation, the *Personal Information Protection and Electronic Documents Act* (Canada) and any other applicable similar, replacement or supplemental provincial or federal legislation or laws in effect from time to time) of the Subscriber or that of each beneficial purchaser for whom the Subscriber is contracting hereunder, for the purpose of completing this Subscription Agreement.

13.   **Consent to Use and Disclosure** - The Subscriber and, if applicable, on behalf of each beneficial purchaser for whom the Subscriber is contracting hereunder, acknowledges and consents to the company retaining such personal information for as long as permitted or required by law or business practices. The Subscriber, on its own behalf and, if applicable, on behalf of each beneficial purchaser for whom the Subscriber is contracting hereunder, further acknowledges and consents to the fact that the Company may be required by applicable securities legislation or the rules and policies of any stock exchange or the rules of the Investment Industry Regulatory Organization of Canada to provide regulatory authorities with any personal information provided by the Subscriber in this Subscription Agreement. The Subscriber represents and warrants that the Subscriber has the authority to provide the consents and acknowledgements set out in this paragraph on behalf of each beneficial purchaser for whom the Subscriber is contracting hereunder. In addition to the foregoing, the

**APP 0597**

Subscriber agrees and acknowledges that the Company may use and disclose the personal information of the Subscriber or that of each beneficial purchaser for whom the Subscriber is contracting hereunder, as follows:

    (a)    for internal use with respect to managing the relationships between and contractual obligations of the Company and the Subscriber or any beneficial purchaser for whom the Subscriber is contracting hereunder;

    (b)    for use and disclosure for income tax related purposes, including without limitation, where required by law, disclosure to the Canada Revenue Agency;

    (c)    disclosure to securities regulatory authorities with jurisdiction with respect to reports of trade and similar regulatory filings;

    (d)    disclosure to a governmental or other authority to which the disclosure is required by court order or subpoena compelling such disclosure and where there is no reasonable alternative to such disclosure;

    (e)    disclosure to professional advisers of the company in connection with the performance of their professional services; and

    (f)    for use and disclosure as otherwise required or permitted by law.

14.    **Ontario Authorization** - The Subscriber and, if applicable, on behalf of each beneficial purchaser for which the Subscriber is contracting hereunder, acknowledges that the Company may be required to file with the Ontario Securities Commission information pertaining to the Subscriber and each such beneficial purchaser relating to the purchase of the Subscription Receipts, that this information is being collected indirectly by the Ontario Securities Commission under the authority granted to it in applicable securities legislation, that this information is being

19

collected for the purposes of the administration and enforcement of the securities legislation of Ontario, and that the title, business address and business telephone number of the public official in Ontario who can answer questions about the Ontario Securities Commission's indirect collection of the information is as follows:

    Ontario Securities Commission
    Suite 1903, Box 5520 Queen Street West
    Toronto, Ontario  M5H 3S8
    Telephone: (416) 593-3682
    Facsimile: (416) 593-8252
    Public official contact regarding indirect collection of information:
    Administrative Assistant to the Director of Corporate Finance
    Telephone (416) 593-8086

and the Subscriber hereby authorizes the indirect collection of such information by the Ontario Securities Commission.

15.    **Facsimiles and Counterparts** - The Company shall be entitled to rely on a facsimile or other electronically communicated copy of an executed Subscription Agreement and acceptance by the Company of such agreement shall be legally effective to create a valid and binding agreement between the Subscriber and the Company in accordance with the Terms hereof. In addition, this Subscription Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same document.

16.    b)    **Reliance by Company and Indemnity** - The representations, warranties and

**APP 0598**

covenants of the Subscriber herein (including all schedules and certificates attached hereto) are made with the intent that they be relied upon in determining the suitability of a purchaser of Subscription Receipts and the Subscriber agrees to indemnify and hold harmless the Company and its directors, officers, employees, and advisers from and against any and all loss, liability, claim, damage and expense whatsoever including, but not limited to, any fees, costs and expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation, administrative proceeding or investigation commenced or threatened or any claim whatsoever arising out of or based upon any representation or warranty of the Subscriber contained herein or in any document furnished by the Subscriber to the Company in connection herewith being untrue in any material respect or any breach or failure by the Subscriber to comply with any covenant or agreement made by the Subscriber herein or in any document furnished by the Subscriber to the Company in connection herewith. The Subscriber undertakes to immediately notify the Company at its registered and records office, 675 Sierra Rose Drive, Ste. 112, Reno, Nevada, 89511, Attention: Geoffrey Browne, of any change in any statement or other information relating to the Subscriber set forth herein which takes place prior to the Closing Time on the Closing Date.

(b)     **Reliance by Subscriber and Indemnity** - The representations, warranties and covenants of the Company herein (including all schedules and certificates attached hereto) are made with the intent that they be relied upon in determining the suitability of the investment of the Subscription Receipts by the Subscriber, and the Company agrees to indemnify and hold harmless the Subscriber from and against any and all loss, liability, claim, damage and expense whatsoever including, but not limited to, any fees, costs and expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation, administrative proceeding or investigation commenced or threatened or any claim whatsoever arising out of or based upon any representation or warranty of the Company contained herein or in any document furnished by the Company to the

20

Subscriber in connection herewith being untrue in any material respect or any breach or failure by the Subscriber to comply with any covenant or agreement made by the Company herein or in any document furnished by the Company to the Subscriber in connection herewith.

17.     **Closing Conditions** – The obligations of the Subscriber to purchase the Subscription Receipts, to complete the transactions contemplated in this Subscription Agreement and to deliver executed Subscription Agreement and the Subscription Proceeds to the Company is subject to the following conditions for the benefit of the Subscriber, which must be fulfilled at or prior to the Closing Time, unless waived in writing by the Subscriber:

(a)     the Company delivering to the Subscriber, at the Closing Time, a certificate dated the Closing Date addressed to the Subscriber and signed by the chief executive officer and chief financial officer of the Company certifying on behalf of the Company, and not in their personal capacities, to the best of their knowledge, information and belief, after due inquiry, that:

(i)     no order, ruling or determination having the effect of suspending the sale or ceasing the trading in any securities of the Company (including the Common Shares) has been issued by any regulatory authority and is continuing in effect and no proceedings for that purposes have been instituted or are pending or,

**APP 0599**

to the knowledge of such officers contemplated or threatened by any regulatory authority;

(ii) the Company has complied with all the covenants and satisfied all the terms and conditions of this Subscription Agreement to be complied with and satisfied by the Company at or prior to the Closing Time;

(iii) the representations and warranties of the Company contained in this Subscription Agreement are true and correct as at the Closing Time, with the same force and effect as if made on and as at the Closing Time after giving effect to the transactions contemplated by this Subscription Agreement; and

(iv) the Company has made and/or obtained, on or prior to the Closing Time, all necessary filings, approvals, consents and acceptances under applicable Securities Laws, and under any applicable agreement or document to which the Company is a party or by which it is bound, required for the execution and delivery of this Subscription Agreement, the offering and sale of the Subscription Receipts (subject to completion of filings with certain regulatory authorities following the Closing Date);

(b) the Company delivering to the Subscriber at the Closing Time a certificate dated the Closing Date addressed to the Subscriber and signed by the Company certifying:

(i) the constating documents of the Company;

(ii) the resolutions of the directors of the Company relevant to the Offering; and

(iii) the incumbency and signatures of signing officers of the Company;

(c) the Subscriber having received from the Company and/or its counsel a certificate of status for the Company, dated the Closing Date or earlier if logistics so dictate;

21

(d) the Subscriber having received a certificate of the Company's registrar that certifies the number of Common Shares issued and outstanding on the date immediately prior to the Closing Date; and

(e) the Subscriber shall have received prior to the Closing Date legal opinions from solicitors for the Company dated the Closing Date in a form satisfactory to the Subscriber and its counsel, acting reasonably, with respect to the following matters:

(i) as to the incorporation and existence of the Company;

(ii) as to the power and capacity of the Company to own its property and carry on its business as currently conducted and carry out the transactions contemplated by this Subscription Agreement;

(iii) that all necessary corporate action has been taken by the Company to authorize the execution and delivery of this Subscription Agreement, the SRA Agreement and the Registration Rights Agreement, and to issue the Common Shares, Warrants and Rights issuable on the exchange of the Subscription Receipts;

(iv) as to the authorized and issued capital of the Company;

**APP 0600**

    (v)    that the Company is not a party to, bound or affected by or subject to any charter or by-law provision which is or would be violated, contravened or breached by the execution, delivery and performance by it of this Subscription Agreement or the performance by it of any of the terms thereof;

    (vi)    that this Subscription Agreement, the SRA Agreement and the Registration Rights Agreement has been duly authorized, executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company enforceable against it in accordance with its terms;

    (vii)    that the Subscription Receipts, Warrants and Rights have been duly created;

    (viii)    that the Common Shares, Warrants and Rights have been authorized and allotted for issuance;

    (ix)    that the Warrant Shares issuable on the due exercise of the Warrants and the Rights Shares issuable on the deemed exercise of the Rights have been duly allotted and reserved for issuance, and when issued in accordance with the terms of the certificates representing the Warrants and the Rights, respectively, will be issued as fully paid and non-assessable; and

    (x)    matters with respect to title to the Mineral Rights described in Schedule "H".

Each of the foregoing conditions is included for the benefit of the Subscriber and maybe waived by the Subscriber by notice in writing to the Company.

18.    **Governing Law** - This Subscription Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and the Subscriber and the Company both irrevocably attorn to the non-exclusive jurisdiction of the Courts of the Province of Ontario.

19.    **Time** - Time shall be of the essence hereof.

22

20.    **Entire Agreement** - This Subscription Agreement represents the entire agreement of the parties hereto relating to the subject matter hereof and there are no representations, warrants, covenants or other agreements relating to the subject matter hereof except as stated or referred to herein.

21.    **Subscriber's Costs** - The Subscriber acknowledges and agrees that all costs incurred by the Subscriber (including any fees and disbursements of any counsel retained by the Subscriber) relating to the purchase of the Subscription Receipts by the Subscriber shall be borne by the Subscriber with the exception of the BG Subscriber's Expenses.

22.    **Assignment** - No rights or obligations of the Subscriber hereunder may be assigned without the prior written consent of the Company.

23.    **Enurement** - The terms and provisions of this Subscription Agreement shall be binding upon and enure to the benefit of the Subscriber and the Company and their respective heirs, executors, administrators, successors and permitted assigns.

24.    **Offer Irrevocable** - The Subscriber agrees that this offer is made for valuable consideration and may not be withdrawn, cancelled, terminated or revoked by the Subscriber.

25.    **Modifications** - Neither this Subscription Agreement nor any provision hereof shall be modified, changed, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge or termination is sought.

**APP 0601**

26.   **Survival** - The covenants, representations and warranties contained herein shall survive the closing of the transactions contemplated hereby.

27.   **Currency** - In this Subscription Agreement, references to "$" or *"Cdn $"* are to United States dollars except where otherwise specified herein.

**TO ASSIST THE COMPANY IN COMPLYING WITH APPLICABLE SECURITIES LAW AND COMPLETING ANY REQUIRED REGULATORY FILINGS, THE SUBSCRIBER HAS COMPLETED THE SUBSCRIPTION AGREEMENT AND THE ATTACHED SCHEDULE "B" - EXEMPTION FORM AND IF APPLICABLE, THE ATTACHED SCHEDULE "C" – ACCREDITED INVESTOR CERTIFICATE, THE ATTACHED SCHEDULE "D" – CERTIFICATE OF U.S. INVESTOR, WHICH FORM PART OF THIS SUBSCRIPTION AGREEMENT AND THE ATTACHED SCHEDULE "E" – ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS FOR SUBSCRIBERS OUTSIDE OF CANADA AND THE UNITED STATES, WHICH FORM PART OF THIS SUBSCRIPTION AGREEMENT.**

23

**SCHEDULE "A"**

**TERM SHEET**

**LIBERTY SILVER CORP.**

**PRIVATE PLACEMENT OF SUBSCRIPTION RECEIPTS**

| | |
|---|---|
| Issuer: | Liberty Silver Corp. (the **"Company"**) |
| Offering: | Private placement (the "**Offering**") of up to 6,500,000 subscription receipts ("**Subscription Receipts**") |
| Offering Size: | Up to US$3,250,000 |
| Issue Price: | $0.50 per Subscription Receipt |
| Subscription Receipts | Each Subscription Receipt will be automatically exchanged without any further action by the holder and for no additional consideration for one unit of the Company (a "**Unit**") upon satisfaction of the Escrow Release Condition on or before the Release Deadline (as defined below). |
| Escrow Release Condition | Upon completion of the Offering, the gross proceeds from the Offering less certain expenses (the "**Escrowed Proceeds**") will be held by the Capital Transfer Agency Inc. (the "**Escrow Agent**"), in an interest bearing account pursuant to a subscription receipt and escrow agreement (the "SRA Agreement") to be entered into on or before the Closing Date (as defined below) between the Company and the Escrow Agent. |
| | The Escrowed Proceeds plus any interest accrued thereon shall be released to the Company, upon confirmation on or before 5:00 p.m. (Toronto time) on December 31, 2011 (the "**Release Deadline**") that the common shares of the Company ("**Common Shares**") have been accepted for listing on the Toronto Stock Exchange (the "**Escrow Release Condition**"). |
| Units: | Each Unit shall be comprised of one (1) Common Share, one Common Share purchase warrant (a "**Warrant**") and one right to acquire Common Shares (a "**Right**"). |
| | Each whole Warrant will entitle the holder thereof to purchase one Common Share at |

**APP 0602**

US$0.65 at any time until 5:00 on the date which is the earlier of (i) 24 months following the date the Common Shares are listed on the Toronto Stock Exchange and (ii) 30 months following the Closing Date.

Each Right shall entitle the holder thereof to receive, for no additional consideration, one-tenth (1/10) of a Common Share in the event that the registration in accordance with the U.S. Securities Act of the Subscription Receipts, and the Common Shares, Warrants and Rights issuable upon exchange thereof, together with the Common Shares issuable on the exercise of the Warrants or on the exercise of the Rights, has not occurred in accordance with a Registration Rights Agreement to be entered into by the Company and the subscribers.

| | |
|---|---|
| Use of Proceeds: | The net proceeds of the Subscription Receipts will be used for the exploration of the Trinity Silver Mine and for general working capital purposes. |
| Hold Period: | The Subscription Receipts, and the Common Shares, Warrants and Rights issuable upon exchange of the Subscription Receipts, are subject to a hold period expiring on the later of (i) six months after the Closing Date, and (ii) the date on which the Company becomes a reporting issuer. |

- 2 -

| | |
|---|---|
| Offering Jurisdictions: | The Subscription Receipts will be offered for sale by way of private placement exemptions available in all provinces of Canada (except Quebec) and in those jurisdictions outside of Canada that are agreed to by the Company and the Agent (including the United States). The Subscription Receipts will be sold to U.S. buyers on a private placement basis pursuant to an exemption from the registration requirements in Rule 144A or Regulation D of the United States Securities Act of 1933, as amended. |
| Concurrent Offering | Concurrent with the Offering, the Company is completing the sale of a minimum of 1,500,000 Units at US$0.50 per Unit for gross proceeds of US$750,000. The Units shall be issued on the same basis as the Units issued pursuant to the Offering which, for greater certainty, shall include for each Unit, one Common Share, one Warrant and one Right. |
| Closing Date: | Closing of the Offering will occur on or about November 10, 2011 (the "**Closing Date**"). |
| Finders: | This placement is non-brokered. Qualified finders will receive a commission to be determined. |

## SCHEDULE "B"

## EXEMPTION FORM

*TO BE COMPLETED BY ALL INVESTORS*

**Please complete this Exemption Form by indicating the category of exempt investor to which the Subscriber belongs and completing and signing page 3 of this Exemption Form. Initial or otherwise mark the box or line to the left of each item. Mark only one of boxes 1, 2, 3 and 4. If**

## APP 0603

box 3 or 4 is marked, mark only one sub-item under box 3 or box 4.

The Subscriber represents, warrants and covenants to the Company and acknowledges that the Company is relying thereon:

? 1. that the Subscriber is purchasing the Subscription Receipts as principal and is an accredited investor resident in Canada (**if this category is initialled, please complete the attached Schedule "C" - Accredited Investor Certificate**);

? 2. that the Subscriber is purchasing the Subscription Receipts as principal and is a U.S. Person (**if this category is initialled, please complete the attached Schedule "D" – Certificate of U.S. Accredited Investor**);

? 3. that the Subscriber is purchasing the Subscription Receipts as principal and is resident outside of Canada and the United States (**if this category is initialled, please complete the attached Schedule "E" – Additional Representations, Warranties and Covenants for Subscribers Outside of Canada and the United States**);

? 4. that the Subscriber is resident other than in Ontario or Saskatchewan, is purchasing the Subscription Receipts as principal and is:

(a) a director, executive officer or control person of the Company, or of an affiliate of the Company;

_____ (b) a spouse, parent, grandparent, brother, sister or child of a director, executive officer or control person of the Company, or of an affiliate of the Company;

_____ (c) a parent, grandparent, brother, sister or child of the spouse of a director, executive officer or control person of the Company, or of an affiliate of the Company;

_____ (d) a close personal friend of a director, executive officer or control person of the Company, or of an affiliate of the Company;

_____ (e) a close business associate of a director, executive officer or control person of the Company, or of an affiliate of the Company;

- 2 -

_____ (f) a founder of the Company or a spouse, parent, grandparent, brother, sister, child, close personal friend or close business associate of a founder of the Company;

_____ (g) a parent, grandparent, brother, sister or child of a spouse of a founder of the Company;

_____ (h) a person of which a majority of the voting securities are beneficially owned by, or a majority of the directors are, persons described in paragraphs (a) to (g); or

_____ (i) a trust or estate of which all of the beneficiaries or a majority of the trustees or executors are persons described in paragraphs (a) to (g);

?

**APP 0604**

5.   that the Subscriber is resident in Ontario, is purchasing the Subscription Receipts as principal and is:

_____   (a)   a founder of the Company;

_____   (b)   an affiliate of a founder of the Company;

_____   (c)   a spouse, parent, brother, sister, grandparent or child of an executive officer, director or founder of the Company; or

_____   (d)   a person that is a control person of the Company;

The following terms used in this Exemption Form have the following meanings:

"**close business associate**" means an individual who has had sufficient prior business dealings with a director, executive officer, founder or control person of the Company to be in a position to assess their capabilities and trustworthiness;

"**close personal friend**" of a director, executive officer, founder or control person of the Company is an individual who knows the director, executive officer, founder or control person well enough and has known them for a sufficient period of time to be in a position to assess their capabilities and trustworthiness;

"**control person**" means:

(a)   a person who holds a sufficient number of the voting rights attached to all outstanding voting securities of the Company to affect materially the control of the Company, or

(b)   each person in a combination of persons, acting in concert by virtue of an agreement, arrangement, commitment or understanding, which holds in total a sufficient number of the voting rights attached to all outstanding voting securities of the Company to affect materially the control of the Company,

and, if a person or combination of persons holds more than 20% of the voting rights attached to all outstanding voting securities of the Company, the person or combination of persons is deemed, in the absence of evidence to the contrary, to hold a sufficient number of the voting rights to affect materially the control of the Company;

- 3 -

"**executive officer**" means an individual who is:

(a)   a chair, vice-chair or president;

(b)   a vice-president in charge of a principal business unit, division or function including sales, finance or production;

(c)   an officer of the Company or any of its subsidiaries and who performs a policy-making function in respect of the Company; or

(d)   performing a policy-making function in respect of the Company;

"**founder of the Company**" means a person who

(a)   acting alone, in conjunction, or in concert with one or more persons, directly or indirectly, takes the initiative in founding, organizing or substantially reorganizing the

**APP 0605**

business of the Company; and

(b)        is actively involved in the business of the Company.

The undersigned has executed this Exemption Form as of the _____ day of _____, 2011.

If a Corporation, Partnership or Other Entity:        If an Individual:

*Name of Entity*                           *Signature*

*Type of Entity*                           *Name of Individual*

*Signature of Person Signing*

*Title of Person Signing*

**SCHEDULE "C"**

**ACCREDITED INVESTOR CERTIFICATE**

*TO BE COMPLETED <u>ONLY</u> BY ACCREDITED INVESTORS
WHO ARE RESIDENTS OF CANADA*

> **If you have marked the "accredited investor" category on the Schedule "B" - Exemption Form and you are a resident of Canada, please complete this Schedule "C" - Accredited Investor Certificate by initialling or otherwise marking the category of accredited investor to which the Subscriber belongs and completing and signing page 3 of this Accredited Investor Certificate.**

The Subscriber represents, warrants and covenants to the Company and acknowledges that the Company is relying thereon, that the Subscriber is purchasing the Subscription Receipts as principal and is:

(a)      a Canadian financial institution, or a Schedule III bank;

(b)      the Business Development Bank of Canada incorporated under the *Business Development Bank of Canada Act* (Canada);

(c)      a subsidiary of any person referred to in paragraphs (a) or (b), if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by directors of that subsidiary;

(d)      a person registered under the securities legislation of a jurisdiction of Canada as an adviser or dealer, other than a person registered solely as a limited market dealer under one or both of the *Securities Act* (Ontario) or the *Securities Act*

**APP 0606**

(Newfoundland and Labrador);

(e) an individual registered or formerly registered under the securities legislation of a jurisdiction of Canada as a representative of a person referred to in paragraph (d);

(f) the Government of Canada or a jurisdiction of Canada, or any crown Company, agency or wholly owned entity of the Government of Canada or a jurisdiction of Canada;

(g) a municipality, public board or commission in Canada and a metropolitan community, school board, the Comité de gestion de la taxe scolaire de l'île de Montréal or an intermunicipal management board in Québec;

(h) any national, federal, state, provincial, territorial or municipal government of or in any foreign jurisdiction, or any agency of that government;

(i) a pension fund that is regulated by either the Office of the Superintendent of Financial Institutions (Canada) or a pension commission or similar regulatory authority of a jurisdiction of Canada;

- 2 -

(j) an individual who, either alone or with a spouse, beneficially owns, directly or indirectly, financial assets having an aggregate realizable value that before taxes, but net of any related liabilities, exceeds $1,000,000 (exclusive of the value of the principal residence);

(k) an individual whose net income before taxes exceeded $200,000 in each of the 2 most recent calendar years or whose net income before taxes combined with that of a spouse exceeded $300,000 in each of the 2 most recent calendar years and who, in either case, reasonably expects to exceed that net income level in the current calendar year;

(l) an individual who, either alone or with a spouse, has net assets of at least $5,000,000;

(m) a person, other than an individual or investment fund, that has net assets of at least $5,000,000 as shown on its most recently prepared financial statements;

(n) an investment fund that distributes or has distributed its securities only to:

(i) a person that is or was an accredited investor at the time of the distribution;

(ii) a person that acquires or acquired securities in the circumstances referred to in sections 2.10 [*Minimum amount investment*], and 2.19 [*Additional investment in investment funds*] of NI 45-106; or

(iii) a person described in paragraph (i) or (ii) that acquires or acquired securities under section 2.18 [*Investment fund reinvestment*] of NI 45-106;

(o) an investment fund that distributes or has distributed securities under a prospectus in a jurisdiction of Canada for which the regulator or, in Québec, the securities regulatory authority, has issued a receipt;

(p) a trust company or trust Company registered or authorized to carry on business under the *Trust and Loan Companies Act* (Canada) or under comparable legislation in a

**APP 0607**

jurisdiction of Canada or a foreign jurisdiction, acting on behalf of a fully managed account managed by the trust company or trust Company, as the case may be;

(q)    a person acting on behalf of a fully managed account managed by that person, if that person:

    (i)    is registered or authorized to carry on business as an adviser or the equivalent under the securities legislation of a jurisdiction of Canada or a foreign jurisdiction; and

    (ii)    in Ontario, is purchasing a security that is not a security of an investment fund;

(r)    a registered charity under the *Income Tax Act* (Canada) that, in regard to the trade, has obtained advice from an eligibility adviser or an adviser registered under the securities legislation of the jurisdiction of the registered charity to give advice on the securities being traded;

- 3 -

(s)    an entity organized in a foreign jurisdiction that is analogous to any of the entities referred to in paragraphs (a) to (d) or paragraph (i) in form and function;

(t)    a person in respect of which all of the owners of interests, direct, indirect or beneficial, except the voting securities required by law to be owned by directors, are persons that are accredited investors;

(u)    an investment fund that is advised by a person registered as an adviser or a person that is exempt from registration as an advisor; or

(v)    a person that is recognized or designated by the securities regulatory authority or, except in Ontario and Québec, the regulator as:

    (i)    an accredited investor; or

    (ii)    an exempt purchaser in Alberta or British Columbia after NI 45-106 comes into force.

As used in this accredited Investor Certificate, the following terms have the following meanings:

"**eligibility adviser**" means a person that is registered as an investment dealer or in an equivalent category of registration under the securities legislation of the Subscriber's jurisdiction and authorized to give advice with respect to the Subscription Receipts;

"**financial assets**" means cash or securities or a contract of insurance, a deposit or an evidence of a deposit that is not a security for the purposes of securities legislation;

"**fully managed account**" means an account of a client for which a person makes the investment decisions if that person has full discretion to trade in securities for the account without requiring the client's express consent to a transaction;

"**investment fund**" means an investment fund as such term is defined in National Instrument 81-106 – Investment Fund Continuous Disclosure;

**APP 0608**

"**related liabilities**" means   (a)  liabilities  incurred  or  assumed  for  the  purpose  of  financing  the acquisition or ownership of financial assets, or (b) liabilities that are secured by financial assets; and

- 4 -

"**securities legislation**" means  securities  legislation  as  such  term  is  defined  in  National  Instrument 14-101 – Definitions.

The  undersigned  has  executed  this  Accredited  Investor  Certificate  as  of  the  _____  day  of _____, 2011.

If a Corporation, Partnership or Other Entity:          If an Individual:

*Name of Entity*                                        *Signature*

*Type of Entity*                                        *Name of Individual*

*Signature of Person Signing*

*Title of Person Signing*

## SCHEDULE "D"

## CERTIFICATE OF U.S. ACCREDITED INVESTOR

*TO BE COMPLETED <u>ONLY</u> IF THE SUBSCRIBER IS A U.S. PERSON*

**If you have marked the "accredited investor" category on the Schedule "B" - Exemption Form and you are not a resident of Canada, and you are a U.S. Person within the meaning set out in Regulation S under the U.S. *Securities Act of 1933*, please complete this Schedule "D" - Certificate of U.S. Investor by initialling or otherwise marking the category of U.S. accredited investor to which the Subscriber belongs and completing and signing page 2 of this Certificate of U.S. Accredited Investor.**

**All  prospective  U.S.  purchasers  are  advised  that  completion  of  this  Certificate  of  U.S. Accredited  Investor  is  required  in  order  to  purchase  the  Subscription  Receipts.  In  addition, supplemental  information  may  be  required  at  the  Company's  discretion  in  order  to  confirm  the Subscriber's  eligibility  to  invest  in  the  Company  as  an  "accredited  investor"  as  defined  in Rule 501(A) of Regulation D promulgated under the U.S. Securities Act of 1933, as amended**

## APP 0609

(the "U.S. Securities Act").

**In making an investment decision, Subscribers must rely on their own examination of the Company and the terms of the offering including the merits and risks involved. The securities offered have not been recommended by any federal or state securities commission or regulatory authority, nor has any such commission or authority confirmed the accuracy or determined the adequacy of the offering. Any representation to the contrary is a criminal offence.**

**Subscribers should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.**

The undersigned hereby represents and warrants that it is an "accredited investor" as defined in Rule 501(a) of Regulation D of the U.S. Securities Act, by reason of being:

_____   (a)   a natural person whose individual net worth, or joint net worth with his/her spouse, at the time of purchase exceeds U.S.$1,000,000;

_____   (b)   a natural person who had an individual income in excess of U.S.$200,000 in 2007 and 2008 or joint income with his or her spouse in excess of U.S.$300,000 in each of those years and has a reasonable expectation of reaching the same income level in 2011;

_____   (c)   a director or executive officer of the Company;

_____   (d)   a bank as defined in Section 3(a)(2) of the U.S. Securities Act;

_____   (e)   a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the U.S. Securities Act, whether acting in its individual or fiduciary capacity;

_____   (f)   a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934;

_____   (g)   an insurance company as defined in Section 2(13) of the U.S. Securities Act;

- 2 -

_____   (h)   an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act;

_____   (i)   a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958;

_____   (j)   a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, which plan has total assets in excess of U.S.$5,000,000;

_____   (k)   an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is a bank, savings and loan association, insurance company or registered investment advisor;

_____   (l)   an employee benefit plan within the meaning of ERISA which has total assets in excess of U.S.$5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

**APP 0610**

_____   (m)   a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

_____   (n)   an organization described in Section 50l(c)(3) of the Internal Revenue Code of 1986, as amended, a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

_____   (o)   a trust, with total assets in excess of U.S.$5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of an investment in the securities offered; and

_____   (p)   an entity in which each of the equity owners meets the requirements of one of the above sections.

The undersigned has executed this Certificate of U.S. Accredited Investor as of the _____ day of _____, 2011.

If a Corporation, Partnership or Other Entity:          If an Individual:


*Name of Entity*                                        *Signature*


*Type of Entity*                                        *Name of Individual*


*Signature of Person Signing*


*Title of Person Signing*


### SCHEDULE "E"

### ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS
### FOR SUBSCRIBERS OUTSIDE OF CANADA AND THE UNITED STATES

*TO BE COMPLETED ONLY IF THE SUBSCRIBER IS RESIDENT*
*OUTSIDE OF CANADA AND THE UNITED STATES*

| |
|---|
| **If you have marked the "resident outside of Canada and the United States" category on the Schedule "B" - Exemption Form, please complete this Schedule "E" – Additional Representations, Warranties and Covenants for Subscribers Outside of Canada and the United States by completing and signing page 2 of this certificate.** |

The Subscriber, on its own behalf and (if applicable) on behalf of others for whom it is contracting hereunder, further represents, warrants and covenants to and with the Company (and acknowledges that the Company is relying thereon) that it is, and (if applicable) any beneficial purchaser for whom it is contracting hereunder is, a resident of, or otherwise subject to, the securities legislation of a jurisdiction other than Canada or the United States, and:

## APP 0611

(a)   the Subscriber is, and (if applicable) any other purchaser for whom it is contracting hereunder, is:

    (i)   a purchaser that is recognized by the securities regulatory authority in the jurisdiction in which it is, and (if applicable) any other purchaser for whom it is contracting hereunder is resident or otherwise subject to the securities laws of such jurisdiction, as an exempt purchaser and is purchasing the Subscription Receipts as principal for its, or (if applicable) each such other purchaser's, own account, and not for the benefit of any other person, for investment only and not with a view to resale or distribution; or

    (ii)   a purchaser which is purchasing Subscription Receipts pursuant to an exemption from any prospectus or securities registration requirements (particulars of which are enclosed herewith) available to the Company, the Subscriber and any such other purchaser under applicable securities laws of their jurisdiction of residence or to which the Subscriber and any such other purchaser are otherwise subject to, and the Subscriber and any such other purchaser shall deliver to the Company such further particulars of the exemption and their qualification thereunder as the Company may reasonably request;

(b)   the purchase of Subscription Receipts by the Subscriber, and (if applicable) each such other purchaser, does not contravene any of the applicable securities laws in such jurisdiction and does not trigger: (i) any obligation to prepare and file a prospectus, an offering memorandum or similar document, or any other ongoing reporting requirements with respect to such purchase or otherwise; or (ii) any registration or other obligation on the part of the Company; and

- 2 -

(c)   the Subscriber, and (if applicable) any other purchaser for whom it is contracting hereunder, will not sell or otherwise dispose of any Common Shares, Warrants or Warrant Shares, Rights or Right Shares except in accordance with applicable Canadian securities laws, and if the Subscriber, or (if applicable) such beneficial purchaser, sells or otherwise disposes of any Common Shares, Warrants or Warrant Shares, Rights or Right Shares to a person other than a resident of Canada, the Subscriber, and (if applicable) such beneficial purchaser, will obtain from such purchaser representations, warranties and covenants in the same form as provided in this Schedule "E" and shall comply with such other requirements as the Company may reasonably require.

**Dated at** _____ **this** _____ **day of** _____, **2011.**

        _____
        Name of Subscriber

        By: _____

        Signature

        _____
        Title

**APP 0612**

## SCHEDULE "F"

### WIRE TRANSFER INSTRUCTIONS

Melissa Torrecampo
Business Adviser
Commerce Court Banking Center
Court Level, CCW
199 Bay St
Toronto, Ontario, M5L 1G9
Tel: (416) 304-2223
Fax: (416) 362-6518

Incoming Wire Instructions

(U.S. Funds)

| Beneficiary Bank/Address : | **CIBC/CIBC MAIN BRANCH COMMERCE COURT** |
|---|---|

| Beneficiary Name/Address : | **CAPITAL TRANSFER AGENCY INC.**<br>Capital Transfer Agency Inc.<br>105 Adelaide St.W., Suite 1101<br>Toronto, ON M5H 1P9<br>Attention:  Lisa Cripps<br>T: 416.350.5007<br>F: 416.350.5008<br>E: lcripps@capitaltransferagency.com |
|---|---|

| Beneficiary Account : | **0511013** |
|---|---|

| Swift Code : | **CIBC CATT** |
|---|---|

| Bank Number : | **//CC001000002** |
|---|---|

| Transit : | **00002** |
|---|---|

- 2 -

## SCHEDULE "F"

### FORM OF REGISTRATION RIGHTS AGREEMENT

**APP 0613**

## SCHEDULE "H"

## LIST OF MATERIAL PROPERTIES

## TRINITY SILVER MINE PROPERTY

### Property location

The Trinity silver mine property is situated approximately 25 road miles north-northwest of Lovelock, Nevada, in Pershing County, Nevada, on the northwest flank of the Trinity Range, in the Trinity mining district. It is located about 25 mi northwest of the Rochester silver mine, one of the largest silver mines in the United States. The latitude-longitude coordinates of the mine site are $40^o$ 23' 47" N, $118^o$ 36' 38" W; it is situated in sections 2, 3, 4, 5, 9, 10, 11, 15, 16, and 17, Township 29 North, Range 30 East, MDB&M and sections 27, 33, and 35, Township 30 North, Range 30 East, MDB&M.

### Land; Land Status; Property Rights; Licensing

The Trinity silver mine property includes located public and leased/subleased fee land consisting of the following:

(1)    240 unpatented lode mining claims, the Seka 1-6, 8-16, 61-64, 73-76, 95-112, TS 1-18, Elm 1-175 and XXX 1-6 claims, totaling approximately 4900 acres, located in sections 2, 4, 10, and 16, Township 29 North, Range 30 East, and section 34 and 35, Township 30 North, Range 30 East. The claims are located on public land open to mineral entry, currently valid, and subject to Bureau of Land Management regulations.

(2)    4,396.44 acres of fee land leased by Newmont Mining Corp. from Southern Pacific Land Co., and its successors, and from Santa Fe Pacific Minerals Corporation, and its successors located in sections 3, 5, 11, and 17, Township 29 North, Range 30 East, and sections 27, 33, and 35, Township 30 North, Range 30 East.

(3)    1280 acres of fee land owned by Newmont Mining Corp. located in sections 9 and 15, Township 29 North, Range 30 East.

The Corporation's joint venture area of interest is currently sections 2-5, 8-11, 14-17, Township 29 North, Range 30 East, MDB&M, and sections, 26-28, 32-35, Township 30 North, Range 30 East, MDB&M. The Corporation's rights, which apply to all of the above properties include exploration, development, and production of valuable minerals except geothermal, hydrocarbons, and sand/gravel, and also include the authority to apply for all necessary permits, licenses and other approvals from the United States of America, the State of Nevada or any other governmental or other entity having regulatory authority over any part of the Trinity silver mine property.

## APP 0614