UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 9:13-cv-80923-KLR

TODD STANAFORD a/k/a JERALD TODD
STANAFORD, on behalf of himself and all
others similarly situated,

       Plaintiff,

vs.

ROBERT DONALD BRUCE GENOVESE,
WILLIAM TAFURI, GEOFFREY BROWNE,
BG CAPITAL GROUP LTD, LOOK BACK
INVESTMENTS, INC. LIBERTY SILVER
CORPORATION AND OUTLOOK
INVESTMENTS, INC.,

       Defendant.
_____/

**MOTION TO POSTPONE DECISION ON CERTIFYING A
SETTLEMENT CLASS UNTIL AFTER PLAINTIFFS' MOTION FOR
CLASS CERTIFICATON IS RESOLVED BY ROBERT GENOVESE, BG
CAPITAL GROUP LTD., LOOK BACK INVESTMENTS, INC., AND
OUTLOOK INVESTMENTS, INC.**

| | |
|---|---|
| Eduardo Palmer | Thomas O. Gorman |
| Eduardo Palmer P.A. | DORSEY & WHITNEY LLP |
| 255 Aragon Avenue, Second Floor | 1801 K Street, N. W., Suite 750 |
| Coral Gables, FL 33134 | Washington, D. C. 20006 |
| Telephone: (305) 476-1100 | Telephone: 202-442-3000 |
| Fax: (305) 476-1300 | Fax: 202-442-3199 |
| ep@epalmerlaw.com | gorman.tom@dorsey.com |

July 13, 2015

Defendants Robert Genovese, BG Capital Group, Ltd. ("BG Capital"), Look Back Investments, Inc. ("Look Back") and Outlook Investments, Inc. ("Outlook") (collectively the "BG Capital Defendants") respectfully request that the Court postpone any decision regarding the certification of a settlement class as part of the proposed settlement between Plaintiffs and Defendants Liberty Silver Corporation, William Tafuri and Geoffrey Browne (collectively "Liberty Silver Defendants") until after the Court has heard and resolved Plaintiffs' Motion for Class Certification, briefing for which will be completed by July 27, 2015, for the reasons detailed below. In seeking this order the BG Capital Defendants are not requesting a delay of the hearing on the settlement, scheduled for July 16, 2015.

## BACKGROUND

**A.    The Complaint**

Plaintiffs' Third Amended Consolidated Class Action Complaint [ECF No. 88] ("Complaint") posits a stock price drop claim resulting from the October 5, 2012 announcement by the Securities and Exchange Commission ("SEC") instituting a ten day trading halt and commencing an investigation because of a lack of information in the market place regarding the company and those trading its shares. Cmplt. ¶ 117. Following the reinstitution of trading the share price, which had been at $1.55 on October 4, dropped but then rebounded despite the fact that Liberty Silver never took the steps to restart trading on the OTC BB, leaving the U.S. shares and their price to languish in the gray market.[1]

The share price of Liberty Silver began to rise in August 2012 and continued through October 4, 2012. The price rise was fueled, according to plaintiffs, by a series of false statements made by various defendants that began in July 2012. Plaintiffs claim it was aided by: Liberty Silver securities transactions by the BG Capital defendants – first sales and then

---

[1] *See* BG Capital Defendants' Motion to Dismiss at 7 [ECF No. 61].

2

purchases; newsletter writers supposedly affiliated with Mr. Genovese; and transactions effected through New York broker John Thomas Financial, Inc. ("JTF") which began in late August 2012 without the necessary due diligence. Plaintiffs claim those transactions were the result of a scheme in which Mr. Genovese and/or BG Capital extended a sham loan to the then chairman of that brokerage firm which was never to be repaid – a bribe – and not due diligence regarding the merit of the investment itself. Cmplt. at ¶¶ 115-116. Collectively Plaintiffs refer to these allegations as a "pump-and-dump" scheme. *Id.* at ¶ 2. Plaintiffs purport to represent a class of Liberty Silver shareholders who acquired shares through the OTC BB from February 10, 2010 to October 5, 2012. *Id*. at ¶ 1.

**B.     Motions for Class Certification**

Two motions seeking class certification of the same class are pending before the Court. One is a Motion by Plaintiffs and the Liberty Silver Defendants to approve a partial settlement of this case [ECF. No. 133] ("partial settlement"). The other is Plaintiff's Motion for Class Certification as to the BG Capital defendants [ECF No. 144] ("Motion for Class Certification"). The partial settlement is set for hearing on Thursday July 16, 2015. The Motion for Class Certification is in the final stage of briefing with Plaintiffs' Reply Brief due on July 27, 2015. The resolution of each motion hinges on whether Plaintiffs' proposed class can be certified in accord with the requirements of Rule 23(b)(3), Federal Rules of Civil Procedure.

Approval of the partial settlement requires that the Court certify a settlement class as alleged in the complaint and which is identical to the one in Plaintiffs' Motion for Class Certification.[2] The parties to the settlement have stipulated that the proposed settlement class

---

[2] Plaintiffs agreed to limit the class to those who traded through the OTC BB, excluding those who traded on the TSX or outside the U.S., during the hearing on the BG Capital Defendants' Motion to Dismiss. *See, e.g., Morrison v. United Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) (holding that the reach of an Exchange Act Section 10(b) cause of action is the edge of the U.S.).

meets the requirements of Rule 23(b)(3). No evidence has been proffered to support the stipulations, other than the allegations of the Complaint.[3]

Plaintiffs' Motion for Class Certification seeks the certification of the same class on the merits. It is also based on Rule 23(b)(3), Federal Rules of Civil Procedure. In support of that Motion Plaintiffs have tendered the expert report by Candace L. Preston, CFA ("Preston Report").[4]

The BG Capital Defendants' Opposition[5] is supported by five sources of evidence, not in the complaint: 1) The expert report of former SEC Chief Economist, Professor Gregg Jarrell ("Jarrell Report");[6] 2) the declaration of Dan Guilfoile, former chief analyst at JTF detailing his analysis of Liberty Silver, prepared as part of the due diligence for any trading and the planned November 2012 capital raise to be undertaken by the broker;[7] 3) the affidavit of attorney Charles Pearlman who negotiated, and later instituted collection efforts, on a $2 million loan extended by BG Capital to the holding company of JTF for working capital in late October 2012;[8] 4) the declaration of Sandra Flores, attaching three charts ("Flores charts") she prepared summarizing documents regarding BG Capital's pre-securities offering "road show," to stimulate securities

---

[3] The "Settlement Class" is defined in Section 1(19) of the Settlement Memorandum which is attached as Exhibit 1 to the Stipulation of Settlement. That document is in turn attached as Exhibit B to the Memorandum of Law in Support of Plaintiffs' Unopposed Motion For Preliminary Approval of Partial Settlement, filed February 27, 2015 [ECF No. 133].

[4] The Preston Report is attached as Exhibit 1 to the Declaration of William B. Federman in Support of Plaintiffs' Motion for Class Certification [ECF No. 144].

[5] The BG Capital Defendants Corrected Memorandum In Opposition to Plaintiffs' Motion for Class Certification by Robert Genovese, BG Capital Group, Ltd., Look Back Investments, Inc., and Outlook Investments, Inc., dated July 1, 2015 at 5-6. The Corrected Memorandum and the related exhibits were refiled pursuant to the Court's directive on July 13, 2015. ("Opposition").

[6] The Report is attached to the Opposition.

[7] Declaration of Dan Guilfoile, former head of research for JTF ("Guilfoile Declaration"), attached to the Opposition.

[8] Affidavit of Attorney Charles Pearlman ("Pearlman Affidavit") who negotiated and documented the loan, attached to the Opposition.

4

analyst and investor interest in the firm and its stock prior to the planned November capital raise, the effort began in early August 2012 with mine site visits and continued through September and October when the firm was a sponsor at two well-known investor conferences;[9] and 5) the declaration of Stacey Vogel, authenticating the BG Capital business records summarized in the Flores charts regarding the road show paid for by BG Capital.

C.   **The conflicting evidence before the Court on Plaintiffs' Motion for Certification**

   1.   **Plaintiffs' allegations and evidence**

Plaintiffs' Motion for Class Certification is based on the allegations of the complaint and the Preston Report. In an effort to comply with the Rule 23(b)(3) requirement that common fact and legal issues predominate over individual claims, plaintiffs rely in part on the fraud-on-the-market theory as a substitute for proof of individual reliance, a key Section10(b) element.[10] That theory substitutes a rebuttable presumption that market participants relied on the integrity of the market price when the shares trade in an efficient market for proof of individual reliance.[11] Plaintiffs' claim that the market for Liberty Silver shares is efficient is based on a passage in the Preston Report stating that Liberty Silver shares "reflected publicly available information regarding the Company . . . ." Preston Report at 3. It does not specifically state that the market for those shares is efficient.

---

[9]   Declaration of Sandra Flores ("Flores Declaration") and three supporting schedules summarizing BG Capital business records, attached to the Opposition; Declaration of Stacey Vogel ("Vogel Declaration") authenticating the BG Capital business records summarized in the charts attached to the Flores Declaration, attached to the Opposition.

[10]   *Dura Pharms., Inc. v. Broudo*, 554 U.S. 336, 341-342 (2005).

[11]   *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224 (1988)(adopting a rebuttable presumption of reliance where the securities are traded in a well-developed, efficient market). *See also Halliburton Co. v. Erica P. John Fund, Inc.*,134 S. Ct. 2398 (2014)("*Halliburton   II*"). Plaintiffs also contend that proof of reliance is unnecessary based on an omission theory under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). The Preston Report did not address this theory. *See also* Opposition beginning at 12 (discussing omission theory).

The only economic analysis offered in support of the statement is an examination of two market indexes Ms. Preston identifies as comparable to Liberty Silver shares along with data on the spot price of silver. An analysis of the price movements by Ms. Preston of the two indexes and the spot price of silver compared to those of the Liberty Silver shares demonstrates that there is no correlation between the price movement of the indexes and spot price and the share price of Liberty Silver. Preston Report at 6. Since the indexes and spot price reflect available material information, the fact that the share price of Liberty Silver does not correlate with them contradicts the Report's statement that the shares reflect available information and trading. The Report does not discuss this point or mention any of the tests of efficiency typically considered by courts and the academic economic literature. There is no analysis of what impact, if any, the false statements alleged in the complaint may have had on the share price of Liberty Silver.[12]

The Preston Report also proffers a damage model for the period August 20, 2012 through October 4, 2012 centered on a chart of accounts obtained from JTF. To meet the requirement that a damage model be based on the date the truth emerged in the market, revealing the fraudulent scheme,[13] Ms. Preston adopted the allegation in the complaint, assuming that date is October 5, 2012. That same date is used to calculate the Private Securities Litigation Reform Act "PSLRA" damage cap.[14]

---

[12] *See, e.g., Halliburton II*, 134 S. Ct. at 2414 (holding that claims of price impact from alleged false statements can be rebutted by proof of a lack of price impact using an event study conducted by an economist).

[13] Exchange Act Section 21D(b)(4) requires proof of loss causation which links the claimed fraud to the alleged injury. *Dura Pharms. v. Broudo*, 544 U.S. 336, 342-43 (2005)(discussing loss causation).

[14] Exchange Act Section 21D(e)(1), 15 U.S.C. Section 78 78u-4(e)(1) requires that damages be limited to the mean price between the date the truth emerged and 90 days later. The purpose is to avoid windfall damages. Opposition beginning at 17.

Building on the Complaint's claim that the truth emerged on October 5, and assuming loss causation, Ms. Preston calculated damages by examining the expected abnormal return rate for the period. That calculation determines the average price rise over a period prior to August 20, 2012 and compares it to the one during the period considered. The difference is assumed to be the result of the false statements and scheme alleged in the complaint. It also assumes that no other factors influenced the share price during the period. Based on that model the Report calculates a damage range after considering the PSLRA damage cap. Preston Report at ¶ 32.

2. **Evidence submitted by the BG Capital defendants**

The evidence submitted by the BG Capital defendants demonstrates that plaintiffs have not met the requirements of Rule 23(b)(3) because individual issues predominate with regard to the key element of reliance. Plaintiffs have failed to establish the predicates for invoking either the *Basic* efficient market theory or the *Affiliate Ute* omission theory. First, Plaintiffs cannot use the *Basic* efficient market theory to avoid proof of individual reliance. The Jarrell Report states that Liberty Silver's shares are inefficient – not traded in an efficient market. To reach this conclusion Professor Jarrell analyzed a series of factors typically considered by courts and economists to determine whether Liberty Silver's shares reflect available information. Opposition at 8-10; Jarrell Report at 9-16; 23-29; Appendix A to Jarrell Report ("Jarrell Appendix A") at 1-34. These results are consistent with those stated in the Preston Report regarding the price movements of the two market indexes, the spot price of silver and that of Liberty Shares noted above – the shares are inefficient.

Second, even assuming that *Basic* can be utilized, Professor Jarrell concluded that the false statements alleged in the complaint had no material price impact by conducting a series of event studies. Opposition at 11-12; Jarrell Report at 29; Jarrell Appendix A at 32-34; *see also*

7

*Halliburton II*, 134 S. Ct. at 2414.  Thus, even if the shares traded in an efficient market, *Basic* cannot be used.

Third, Plaintiffs cannot avoid proof of reliance using an omission theory in view of the affidavit of attorney Charles Pearlman and the Declaration of Mr. Guilfoile.[15]  Based on a waiver of all applicable privileges, Mr. Pearlman states that the late October 2012 loan was made on standard commercial terms to supply JTF with working capital and was to be repaid.  It is now the subject of collection litigation.  There was no bribe.  The Guilfoile Declaration establishes the due diligence predicate for any trades through JTF.  There was no scheme.  Since neither *Basic's* efficient market theory nor *Affiliated Ute's* omission theory can be utilized by Plaintiffs, reliance must be established through the proof of individual claims – Rule 23(b)(3)'s predominance requirement cannot be met.  Opposition beginning at 10.

The evidence submitted by the BG Capital defendants also demonstrates that Plaintiffs' proposed damage model, constructed on assumptions which are contrary to law, not only fails to cover the proposed class period but results in $0 damages.  In this calculation the date the truth about the scheme is revealed to the market is critical.  The complaint and the Preston Report assumes that date is October 5, 2012, the date of the SEC announcement.  Cmplt. at ¶ 117; Preston Report at ¶¶ 24-25.  Yet Professor Jarrell's work demonstrates that the SEC release contained no new information about the firm and was thus not material to investors.  Jarrell Report at 33-34.  While the announcement did discuss a lack of information about Liberty Silver in the market place, that was already known.

---

[15] Plaintiffs claim that alleging a scheme substitutes for the *Affiliated Ute* requirement of establishing a fiduciary like duty between them and the BG Capital Defendants as the predicate for a duty to disclose.  Motion for Class Certification at 11-12.  Regardless of the propriety of that allegation, the Pearlman Affidavit refutes it.  Opposition beginning at 12.

8

Professor Jarrell's conclusion is based on extending a calculation used by Ms. Preston in her damage model beyond the October 4, 2012 cut-off date she selected to include the October 5 announcement and into late October.[16] Loss causation and the PSLRA damage cap are both tied to this date. Thus Plaintiffs' effort to construct a class tied to the wrong date is contrary to Exchange Act Sections 21D(b)(4), 21D(e)(1) and *Dura*. Opposition beginning at 17.

Perhaps more importantly, Plaintiffs' proposed damage model yields no damages. To certify a Rule 23(b)(3) class, plaintiffs must establish a class wide damage model. Opposition beginning at 17. Professor Jarrell's extension of the Preston Report damage calculation discussed above demonstrates there are no damages for the class. Opposition at 17-19; Jarrell Report at 16-30.

Finally, Plaintiffs' damage model fails to eliminate the impact of other information such as the road show on the price of Liberty Silver stock as required. Opposition at 18-19; Jarrell Report at 27-28. The Preston Report's damage model assumes that the entire price increase from August 20, 2012 through October 4, 2012 is the result of the wrongful conduct alleged in the complaint. Yet the claimed false statements had no material impact on the share price, according to Professor Jarrell. His work did, however, demonstrate that the share price reacted to trading. Appendix A to Jarrell Report at 30-34. Thus the BG Capital sponsored road show, designed to create investor and analyst interest in the stock, must also be accounted for and deducted from any claimed damages.[17] JTF customers, armed with more than adequate due diligence from

---

[16] This result is consistent with the conclusion of the Eleventh Circuit in *Myer v. Green*, 710 F. 3d 1189, 1201 (11th Cir. 2013) holding that the announcement of an SEC investigation and the resulting stock price drop does not establish that the truth about a claimed fraud emerged.

[17] *See also* The Declaration of Jay Pennington of SRK Consulting Inc. ("Pennington Declaration") and his firm's report, commissioned by Mr. Genovese at the time he began investing in Liberty Silver, demonstrating that the properties owned by the company could be very profitably operated at the then current price of silver because the ore was very close to the surface, distinguishing them from other similar properties.

Mr. Guilfoile's work and representing legitimate demand, also must be deducted from any damage calculation. Plaintiffs' failure to account for this information dooms their damage model. Opposition beginning at 17.

## ARGUMENT

**THE COURT SHOULD POSTPONE ANY DECISION ON THE CERTIFICATION OF A SETTLEMENT CLASS UNTIL THE RESOLUTION OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION IN VIEW OF THE LACK OF EVIDENCE FROM THE SETTLING PARTIES AND THE CONFLICTING EVIDENCE IN THE RECORD.**

The BG Capital Defendants request that the Court postpone any decision regarding the certification of a settlement class until after the Plaintiffs' Motion for Class Certification is resolved. The Rule 23 standard which plaintiffs must establish to secure certification on the merits must be applied with heightened scrutiny when considering the certification of a settlement class. Briefing to date on Plaintiffs' Motion for Class Certification has put before the Court evidence which, at a minimum, presents significant questions regarding the propriety of certifying Plaintiffs' proposed class. Since the proposed settlement class is identical to the proposed class on the merits, any determination regarding certification of the settlement class should await the Court's decision regarding the Motion for Class Certification.

**A.     Certifying a class for settlement requires heightened scrutiny by the Court**

To secure class certification Plaintiffs have the burden of proving compliance with the requirements of Rule 23. *See, e.g., Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011). In determining whether Plaintiffs have met their burden, the district court has the obligation to "conduct a rigorous analysis of the rule 23 prerequisites . . . ." *Vega v. T-Mobile U.S.A. Inc.*, 564 F. 3d 1256, 1266 (11th Cir. 2009) (citation omitted). This means that the securities law plaintiff must submit proof which establishes full compliance with both the Rule 23(a) requirements as well as, in this case, the Rule 23(b)(3) specifications. *See, e.g.,*

10

*Babineau v. Fed. Exp. Corp.*, 576 F. 3d 1183, 1191 (11th Cir. 2009).[18] Frequently this will require the Court to go beyond the pleadings and hold an evidentiary hearing to determine whether plaintiffs have marshalled and presented sufficient evidence to establish each of the Rule 23 requirements. *Vega*, 654 F. 3d at 1266 (going "beyond the pleadings is necessary, as the court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."); *Mills v. Foremost Ins. Co.*, 511 F. 3d 1300, 1309-10 (11th Cir. 2008)(same).

The same rigorous analysis, indeed a heightened analysis, must be undertaken when the parties seek certification of a settlement class. In *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997), the Supreme Court affirmed a ruling of the Third Circuit holding that to certify a class for settlement purposes, plaintiff must still prove each of the Rule 23 requirements as if the issue were being considered on the merits:

> On class-action prerequisites, the Court of Appeals referred to an earlier Third Circuit decision, *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation* 55 F.3d 768 (CA3), cert. denied, 516 U.S. [824] (1995) . . . which held that although a class action may be certified for settlement purposes only, Rule 23(a)'s requirements must be satisfied as if the case were going to be litigated. . . . The same rule should apply, the Third Circuit said, to class certification under Rule 23(b)(3).[19]

Indeed, as *Amchem* made clear, the "Federal courts . . . lack authority to substitute for Rule 23's certification criteria . . . ." Id. at 622. *See also* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, § 1797.2; MOORE'S FEDERAL PRACTICE 3d, § 23.161[2][b].

---

[18] The requirements for class certification applicable in this case are discussed in detail in the Opposition beginning at 5.

[19] The Third Circuit held that the Rule 23 requirements must be considered "without taking into account the settlement." *Id*. at 609 (citation omitted). The *Amchem* Court concluded that: "Settlement is relevant to a class certification. . . the Court of Appeals in fact did not ignore the settlement; instead, that court honed in on settlement terms in explaining why it found the absentees' interest inadequately represented . . . . The Third Circuit's close inspection of the settlement in that regard was altogether proper." *Id*. at 619-20.

Not only is the court required to apply the same rigorous scrutiny to the question of whether a settlement class should be certified as it would when evaluating the question on the merits, but increased scrutiny is required because of the context.  As the *Amchem* Court explained:  "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.  But other specification of the Rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, *even heightened*, attention in the settlement context.  Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  *Id*. at 621 (emphasis added).  *See also Oritiz v. Fibreboard Corp.*, 527 U.S. 815, 849 (1999) ("When a district court, as here, certifies for class action settlement only, the moment of certification requires 'heightene[d] attention[,]'" quoting *Amchem*, 521 U.S. at 620).

While a court considering the question of certifying a settlement class can consider the fact that the case is settling, that fact cannot be used to dilute the dictates of Rule 23.  For example, when considering the Rule 23(b)(3) which tests whether the proposed class action is sufficiently cohesive to in fact be litigated as a class, the court cannot conclude that a common interest in a fair compromise would be sufficient.  Such an approach would impermissibly mix the requirements of Rule 23(e) regarding settlement with those of Rule 23(b)(3) – the protections of "that vital prescription would be stripped of any meaning in the settlement context." *Amchem* 521 U.S. at 623.

> **B.**     **The evidence before the Court presents significant issues regarding the certification of the class on the merits, precluding certification of a settlement class now.**

The record before the Court demonstrates that there are significant and complex issues regarding Plaintiffs' proposed class on the merits which require resolution before any class can be certified--particularly a settlement class which requires heightened scrutiny.  First, the evidence proffered by the parties to date on Plaintiffs' Motion for Certification demonstrates that there are significant dispositive questions regarding whether the proposed class can be certified. A comparison of the allegations of the Complaint relied on by Plaintiffs, as well as their expert report, to that of the BG Capital Defendants on the key Rule 23(b)(3) predominance issue of reliance and the possible application of *Basic* illustrates the point:

- *The complaint*:  Plaintiffs claim that they will rely on the fraud-on-the-market theory, that Liberty Silver shares were traded in an efficient market, were liquid and traded with moderate to heavy volume during the Class Period and the stock was covered by multiple analysts – the *Basic* efficient market presumption. Alternatively, Plaintiffs will rely on *Affiliated Ute Citizens*.  Cmplt. ¶ 134.

- *Preston Report*:  The Report states that Liberty Silver shares reflect available information and trading but does not specifically state the market is efficient.  The Report fails to cite the factors typically considered by courts and economists to evaluate efficiency.  The only economic analysis in the Report on this point involves a comparison of the price movements of two market indexes and the spot price of silver to that of Liberty Silver shares.  The analysis contradicts Ms. Preston's statement regarding Liberty Silver's shares reflecting available material information.  No explanation is offered for the contradiction.

- *Jarrell Report*:  Professor Jarrell flatly contradicts the statement in the Preston Report regarding Liberty Silver shares, concluding that they are inefficient.  After noting that the price movement analysis of the two indexes and spot silver compared to Liberty Silver shares in the Preston Report supports his conclusion, Professor Jarrell reports his findings from a series of factors typically considered by the courts and the academic, economic literature on market efficiency.  That extensive analysis demonstrates that not only is the complaint wrong in its assertion that analysts follow the stock and the market is efficient, but that Liberty Silver shares are virtually impervious to information – news releases, company SEC filings and other types of information have no material impact.  This means the shares trade in a totally inefficient market.  Even assuming that the shares did trade in an efficient market, the series of event studies conducted by Professor Jarrell demonstrated that the alleged false statements had no material price

13

impact.[20]

Similar questions are presented by a comparison of the record before the Court on the critical elements of loss causation, the PSLRA damage cap and damages, each of which goes to the question of whether plaintiffs can prove predominance as required by Rule 23(b)(3):

- ***Complaint***: The complaint claims that the truth about the claimed market manipulation scheme emerged on October 5, 2012 when the SEC announced its investigation. That press release, however, as quoted in the complaint, only indicated there were questions about the company and the trading in the market. Cmplt. ¶ 117. Nothing emerged about false statements, a bribery scheme or market manipulation.[21]

- ***Preston Report***: The Report uses the October 5, 2012, date from the complaint, to establish *Dura* loss causation, the PSLRA damage cap and construct its damage model.

- ***Jarrell Report***: The Jarrell Report tested the October 5, 2012 date to determine if the truth emerged by extending a calculation used in the Preston Report. That calculation demonstrated that the news content of the October 5, 2012 SEC release had no material price impact thus refuting the claim that on October 5 the truth emerged and negating any claim of *Dura* and Section 21D(b)(4) loss causation. It also means the PSLRA damage cap in the Preston Report is incorrectly calculated since it is based on the same assumption.[22] Accordingly, Plaintiffs' damage model results in $0 damages. The model is thus contrary to law. Opposition at 2.

Finally, even assuming Plaintiffs' damage model is viable, it is flawed since the impact of confounding information such as the BG Capital road show and the Guilfoile due diligence analysis for JTF were not considered:

---

[20] The record presents a similar conflict as to whether Plaintiffs can invoke the *Affiliated Ute* to excuse proof of reliance. The Complaint fails to identify any fiduciary like duty running between the proposed plaintiff class and the BG Capital defendants as required by that decision. Opposition beginning at 12. Assuming *arguendo* that a scheme such as the one alleged in the complaint is a substitute for such a duty as plaintiffs claim, those allegations are flatly refuted by the Pearlman Affidavit and the Guilfoile Declaration.

[21] The only additional facts added by subsequent news articles cited by the complaint are the shares purchased and sold by BG Capital as listed in an Ontario Securities Commission filing made in early December 2012. Cmplt. at ¶ 120. Buying and selling shares does not, however, reveal a manipulation to the market.

[22] The Preston Report fails to calculate any damages for that portion of the class period which began on February 10, 2010 through August 19, 2012. There is no explanation for this failure.

- ***Complaint***: The complaint assumes that the entire share-price increase for Liberty Silver from August through October 4, 2012 is attributable to the alleged false statements, and trading of the BG Capital defendants and transactions through JTF as part of the alleged scheme, creating an artificial price.

- ***Preston Report***: The Report adopts the assumption in the complaint. It assumes that the entire increase in price for Liberty Silver shares between August 20, 2012 and October 4, 2012 is attributable to the claimed wrongful actions alleged in the complaint and constituted an artificial price.

- ***Jarrell Report***: The Report states that any viable economic model for damages must consider and eliminate the effect of other or confounding information. *See also* Opposition at 18. Failing to eliminate this information invalidates the damage model.

- ***Confounding information***: The evidence, the impact of which the Preston Report failed to exclude from its damage model, includes: 1) The extensive efforts of Mr. Genovese, BG Capital and Liberty Silver to create interest in acquiring the firm's shares in advance of the planned November capital raise through the road show, detailed in the Flores and Vogel declarations and supporting documents; 2) the extensive due diligence done by JTF's Mr. Guilfoile which aided those efforts; and 3) the Pearlman Affidavit establishing there was no scheme. Plaintiffs' failure to eliminate the impact of this evidence invalidates their damage model.

The evidence before the Court thus demonstrates that there are significant questions regarding whether Plaintiffs' proposed class can in fact be certified on the merits in accord with the requirements of Rule 23.

That evidence also demonstrates that the proposed settlement class cannot be certified on the basis of the complaint and the unsupported stipulations of the parties. The barren record Plaintiffs and the Liberty Silver defendants offered the Court to support their request for certification of a settlement class does not permit the Court to fulfill its obligation to conduct the "heightened" scrutiny required by *Amchem* and *Oritiz*. *See also In re Dry Max Pampers Litigation*, 724 F. 3d 713, 721 (6th Cir. 2013) (court has heightened obligation of scrutiny when considering certification of settlement class).

More importantly, key elements of the meager support offered have been refuted. The evidence before the Court to date demonstrates that key allegations in the Complaint regarding

the efficiency of the market, the date the truth emerged, the cause of the fall 2012 price rise and the alleged scheme are wrong. The unsupported stipulations of Plaintiffs and the Liberty Silver defendants offer nothing to contradict these facts or establish the key Rule 23 elements. Stated differently, neither the Plaintiffs nor the Liberty Silver defendants have furnished the Court with sufficient evidence to comply with *Amchem* and *Oritiz*. To the contrary, the Court is being requested to approve a settlement class in the absence of evidence demonstrating compliance with Rule 23 and against the backdrop of a record which presents significant issues regarding whether the proposed class can be certified on the merits under a lesser standard of scrutiny than is required for a settlement class. To certify a settlement class on the basis proffered by Plaintiffs and the Liberty Silver Defendants would be contrary not just to Rule 23, *Amchem* and *Oritiz* but also the PSLRA which governs this action.[23] Accordingly, any decision regarding the certification of a settlement class should be postponed until the Court has had the opportunity to make a determination on Plaintiffs' Motion for Class Certification.

---

[23] The PSLRA was enacted to correct abuses in the securities class action litigation. One was the fact that far too often the suits were used to extract settlements which had no relation to the merits, only the enormous costs and strains of the litigation. *See, e.g.*, 141 *Cong. Rec*. S9320-01 (daily ed. June 28, 1995) (statement of Sen. Dodd); S. Rep. 104-98, 104th Cong., 1st Sess. 14 (1995); The "Private Securities Litigation Reform Act of 1995," H.R. Rep. 104-369, 104th Cong. 1st Sess. at 31; *see also* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 STAN. L. REV. 497, 516-17, 569 (1991) (cited in legislative reports) (noting that, in securities litigation, "the mere filing of a complaint appears to be a ticket to a guaranteed and substantial recovery. Getting the claim into the legal system, without more, sets in motion forces that ultimately compel a multi-million dollar payment. . . . The malfunctioning litigation process itself causes claims to be brought and then coerces a payment."). *See also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. at 723, 739-40 (1975) (A securities class action "complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment.").

## CONCLUSION

WHEREFORE, for the foregoing reasons, the BG Capital Defendants respectfully request that the Court postpone any determination regarding the certification of a settlement class until the completion of proceedings on plaintiffs' Certification Motion.

Dated: July 13, 2015

*/s/ Eduardo Palmer*
Eduardo Palmer P.A.
255 Aragon Avenue, 2nd Floor
Coral Gables, Florida 33134
Telephone: (305) 476-1100
E-mail: ep@epalmerlaw.com


*/s/ Thomas O. Gorman*
Thomas O. Gorman (SBN 2367407)
Dorsey & Whitney LLP
1801 K Street, N.W., Suite 750
Washington, D.C. 20006
Telephone: 202-442-3507
Fax: 202-442-3199
gorman.tom@dorsey.com

*Attorneys for Defendants Robert Donald Bruce Genovese, BG Capital Group LTD, Look Back Investments, Inc., and Outlook Investments, Inc.*

## CERTIFICATE OF COMPLIANCE OF GOOD FAITH CONFERRAL

Pursuant to Local Rule 7.1(a)(3), counsel for the BG Capital Defendants, Thomas O. Gorman, certifies that: (1) on July 13 he conferred with Plaintiffs' counsel regarding the filing of this Motion and that Plaintiffs oppose the relief requested herein; and (2) on July 13 he left a voice mail for counsel for the Liberty Silver Defendants regarding the filing of this Motion, but did not hear back from them before the filing of this Motion.

By: *s/ Thomas O. Gorman*_____
    THOMAS O. GORMAN

**CERTIFICATE OF SERVICE**

Not All Case Participants are registered for the USDC CM/ECF System
*Todd Stanaford v. Robert Donald Bruce Genovese, et al.*
*Southern District of Florida Case Number 9:13-cv-80923-KLR*

**MOTION TO POSTPONE DECISION ON CERTIFYING A SETTLEMENT CLASS UNTIL AFTER PLAINTIFFS' MOTION FOR CLASS CERTIFICATON IS RESOLVED BY ROBERT GENOVESE, BG CAPITAL GROUP LTD., LOOK BACK INVESTMENTS, INC., AND OUTLOOK INVESTMENTS, INC.**

I hereby certify that on July 13th, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Florida by using the appellate CM/ECF system.

Date: July 13, 2015

By: *s/ Eduardo Palmer*_____
     EDUARDO PALMER