**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No.: 13-CV-80923-RYSKAMP/HOPKINS

TODD STANAFORD a/k/a JERALD TODD
STNAFORD, on behalf of himself and all
others similarly situated,

    Plaintiffs,

v.

ROBERT DONALD BRUCE GENOVESE, et al,

    Defendants.

_____/

## ORDER DENYING MOTION FOR CLASS CERTIFICATION [DE 144]

**THIS CAUSE** comes before the Court on Plaintiffs' motion for class certification **[DE 144]**, filed on May 21, 2015.  Defendants responded in opposition **[DE 163]** on July 13, 2015.  Plaintiffs replied in support **[DE 183]** on August 14, 2015.  The Court held a hearing **[DE 287]** on the motion for class certification on February 26, 2016.  This matter is now ripe for adjudication.

**I.**    **Background**

This case involves claims of a "pump-and-dump" scheme, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5.  Plaintiffs allege that Defendants manipulated the common stock of Liberty Silver Corporation ("Liberty Silver"), a silver mining company.  Plaintiffs contend that Defendants purchased millions of shares of Liberty Silver stock, "pumped" the price of the stock by

1

publically issuing materially false or misleading statements through corrupt third-party promoters, and then "dumped" the stock by selling the shares at an artificially inflated price, which yielded millions in profit.

Plaintiffs move the Court pursuant to Federal Rule Civil Procedure 23 for an order certifying this action as a class action. In support of the motion, Plaintiffs submit the expert report of Candace L. Preston ("Preston"). Plaintiffs argue that they meet the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a). Furthermore, Plaintiffs argue that they meet the requirements of Rule 23(b)(3) because "reliance is presumed in cases involving non-disclosures or omissions, such as this one, as recognized by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972); and Plaintiffs are entitled to rely on the fraud-on-the-market presumption of reliance recognized by the Supreme Court in *Basic Inc v. Levinson*, 485 U.S. 224, 231 (1988)." **[DE 144]**.

Plaintiffs contend that "either of these theories relieves Plaintiffs and prospective class members of the burden of providing reliance individually." *Id.* For example, Plaintiffs claim that, even if they have not demonstrated their entitlement to the *Affiliated Ute* presumption, they may still rely on the presumption of reliance that applies under *Basic*—the fraud-on-the-market theory. Specifically, Plaintiffs argue that "the fundamental premise of *Basic* is that, in well-developed securities markets, a misrepresentation of material fact is incorporated into the price of a stock." **[DE 144]**. Such markets are known as "efficient markets." *Id.* Therefore, Plaintiffs argue that they are entitled to a presumption of reliance because the Liberty Silver stock traded on an efficient market. *Id.* To support the efficiency of the market for Liberty Silver stock, Plaintiffs submit the Preston Report.

Defendants oppose class certification.  Defendants argue that, to establish a section 10(b) fraud claim, reliance on the claimed fraudulent statements must be established.  **[DE 163]**. Defendants contend that Plaintiffs two alternate theories to avoid providing the reliance elements fail.  For example, Defendants turn first to Plaintiffs' second theory, arguing that the Preston Report does not indicate that the security traded in an efficient market.  To support Defendants' claim that the Liberty Silver shares traded in an inefficient market, Defendants submit the analysis of Professor Gregg Jarrell ("Jarrell Report").  **[DE 163]**

Defendants further contend that Plaintiffs' effort to avoid admitting proof of reliance by invoking *Affiliated Ute* fails.  Defendants claim that a "prerequisite to use and avoid proof of its omission theory" requires a "fiduciary-like duty," which Plaintiffs have failed to mention.  *Id.*

## II.  Discussion

Federal Rule of Civil Procedure 23 (b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. (b)(3).[1]

---

[1] The Court notes that, in addition to Rule 23(b)(3), subsection (a) sets forth certain prerequisites for class actions.  For example, Rule 23(a) requires the following:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

3

Because reliance is an element of Plaintiffs' claim, Plaintiffs must establish that common questions predominate regarding the element of reliance. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (stating that reliance upon the misrepresentation or omission is an element of a claim under section 10(b) and Rule 10b-5). To do so, Plaintiffs argue for a presumption of reliance by arguing two separate theories. The Court addresses Plaintiffs' first theory under *Affiliated Ute* and *Kirkpatrick*, and then turns to Plaintiffs' second theory under *Basic*. For the reasons that follow, the Court finds that, under both of Plaintiffs' theories, Plaintiffs' request for class certification fails.

**1. Omission Theory and/or Common Scheme**

Plaintiffs first argue that, "[i]n cases primarily involving nondisclosures or omissions, plaintiffs may rely on the presumption of reliance recognized by the Supreme Court in *Affiliated Ute*, 406 U.S. at 153." **[DE 144]**. Under this theory, Plaintiffs primarily rely on *Affiliate Ute* and *Kirkpatrick v. J.C. Bradford & co.*, 827 F.2d 718, 724-25 (11th Cir. 1987).[2] The Court finds that Plaintiffs' reliance on such cases is misplaced.

Turning first to *Affiliated Ute*, there the Supreme Court held that '[u]nder the circumstances of [the] case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the

---

Fed. R. Civ. P. 23(a). However, because Defendants only argue that the predominance requirement of Rule 23(b)(3) has not been satisfied, the Court directs its attention to subsection (b)(3). *See* Fed. R. Civ. P. 23(b)(3).

[2] Plaintiffs further rely on a string of other cases, in the following order, *Gerrard v. A.J. Gerrard & Co.*, 285 F. Supp. 2d 1331 (S.D. Ga. Sept. 30, 2003); *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479 (S.D. Fla. 1996); *Katz v. MRT Holdings, LLC*, 2008 WL 4725284 at *5 (S.D. Fla. Oct. 24, 2008); and *Powers v. Stuart-James Co., Inc.*, 707 F. Supp. 499 (M.D. Fla. 1989), to argue that a case is considered primarily a case of omission if defendants failed to disclose their "scheme" to wronged investors and that reliance is presumed even when defendants made misrepresentations as well as omissions. The Court finds that such cases are distinguishable.

sense that a reasonable investor might have considered them important in the making of the decision." *Id.* at 153-54. The fraudulent scheme in *Affiliated Ute* centered on the sale of face-to-face securities transactions  There,  two bank employees devised a plan or scheme to acquire, for themselves and others, shares in the Ute Distribution Corp. ("UDC"), which was a firm created under federal statutes to manage the Ute Indian tribe.  The two bank employees acquired shares for less than their fair value by violating their duty to make a fair disclosure.

For example, the record showed that the two bank employees "were active in encouraging a market for the UDC stock among non-Indians." *Id.* at 152. The employees did such by soliciting and accepting standing orders from non-Indians, and, as a result, received increased deposits because of the development of the market. *Id.* The Supreme Court observed that the sellers considered the employees to be familiar with the market for the shares of stock and relied upon them when they sold their shares. *Id.* Therefore, the Supreme Court held that the Court of Appeals erred when it held there was no violation of Rule 10b-5, unless the record disclosed evidence of reliance on material fact misrepresentations  The Supreme Court found that, because the employees devised a plan and induced sellers to dispose of their shares "without disclosing to them material facts that reasonably could have been expected to influence their decisions to sell, positive proof of reliance is not a prerequisite to recovery. *Id.* at 153.

The Supreme Court focused on the scheme created by the employees.  The Court explained that the individual bank employees created a market for their personal purchases and for other sales their activities produced.  In other words, the employees personally purchased shares for their own account or for resale to an undisclosed principal at a higher price. As such, the employees had a duty to disclose such facts. *Id.* at 153. Instead, they stood mute while facilitating the sales.  Because the "sellers had the right to know that the defendants were in a

5

position to gain financially from their sales and that their shares were selling for a higher price in that market," positive proof of reliance was not required. *Id.*

Plaintiffs' reliance on *Affiliated Ute* is misplaced. The Supreme Court's holding in *Affiliated Ute* was based on the unique circumstances of the case—a failure to disclose material facts where the defendant owed a duty of disclosure. The case at bar does not satisfy this test. Assuming arguendo that Plaintiffs' case primarily concerns improper omissions,[3] Plaintiffs have failed to demonstrate that Defendants owed a specific duty of disclosure similar to the unique facts in *Affiliated Ute*. Although Plaintiffs argue that "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c) that misconduct creates an independent duty to disclose," the Court finds that a general duty not to engage in fraudulent schemes or acts (a duty not to break the law) does not entitle Plaintiffs to the *Affiliate Ute* presumption of reliance. *See, e.g.*, *Regents of the Univ. of Ca. v. Credit Suisse First Boston*, 482 F.3d 372, 384-86 (5th Cir. 2007) (finding that the district court should have declined to apply the *Affiliated Ute* presumption where the defendants lacked any **specific** duty to disclose and that a **general** duty not to engage in a fraudulent scheme does not entitle one to the *Affiliated Ute* presumption).

Next, the Court turns to *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987) (citing *Kennedy v. Tallant*, 710 F.2d 711 (11th Cir. 1983)). Plaintiffs argue that reliance is presumed under the principles established in *Kirkpatrick* where there is a common fraudulent scheme. **[DE 183]**. In *Kirkpatrick*, plaintiffs alleged that the actions of defendant brokerage

---

[3] Defendants and Plaintiffs argue at great length as to whether *Affiliated Ute* is applicable when a case is primarily based on omissions or affirmative misrepresentations. Defendants argue that, because this case involves primarily alleged misrepresentations, *Affiliated Ute* is inapplicable. On the contrary, Plaintiffs argue that a case is primarily one of omissions if Defendants failed to disclose their scheme.

firms and individuals selling and promoting interests in Petro-Lewis violated section 10 of the Securities Exchange Act of 1934 and Rule 10b-5.  *Id.* at 721.  The plaintiffs alleged that the individual brokers knowingly or recklessly participated with Petro-Lewis in disseminating materially misleading information regarding Petro-Lewis' financial condition, and the brokers continued to sell and promote shares, which were not traded on the open market, despite the brokers' awareness of Petro-Lewis' severe financial difficulties.  *Id.*

The *Kirkpatrick* plaintiffs asserted three theories of liability under which common issues of law and fact necessarily would outweigh individual issues.  The plaintiffs argued the *Affiliated Ute* presumption, the fraud-on-the-market theory, and a theory involving allegations of a common course of conduct.  The Eleventh Circuit found that the *Affiliated Ute* presumption did not apply, but found that the district court's rejection of the fraud-on-the-market theory and the common scheme theory was improper.

As background, the district court focused on deposition testimony, indicating that the "named plaintiffs relied not so much on prospectuses and other written materials as on the recommendations of their individual brokers."  *Id.*  However, the Eleventh Circuit found that the fraud-on-the-market theory applied because the plaintiffs alleged that the shares "which were not traded on the open market, could not have been marketed but for the defendants' fraud."  *Id.* at 722.  The Eleventh Circuit then reaffirmed that where "a complaint alleges that a security not traded on the open market could not have been issued but for the fraud of the defendants, class action treatment is not precluded by the possibility that some purchasers . . . might have relied on factors other than the integrity of the market."  *Id.* at  723.

Similarly, the Eleventh Circuit found that the district court improperly found that plaintiffs' 10b-5(2) claims were not suited for class treatment because the plaintiffs relied on the

7

recommendations of their individual brokers. *Id.* at 724. The Eleventh Circuit stated that, contrary to the district court's construction of the claims, the complaints alleged that the defendant brokerage firms and individual officers engaged in a common course of conduct to misrepresent the financial condition of Petro-Lewis. *Id.* "The claims essentially involve[d] allegations that the defendants 'committed the same unlawful acts in the same method against the entire class.'" *Id.* at 724 (quoting *Kennedy v. Tallant*, 710 F.2d at 717). Because each of the complaints alleged a single conspiracy and fraudulent scheme, the Eleventh Circuit found the *Kirkpatrick* case was appropriate for class action. *Id.* at 725.

Plaintiffs in the instant case rely on *Kirkpatrick* for the proposition that a fraudulent scheme against a large number of individuals is appropriate for class action. In other words, Plaintiffs claim that the alleged pump-and-dump scheme in this case excuses proof of reliance. However, unlike *Kirkpatrick*, which involved shares not traded on the open market, and of which could not have been marketed but for the defendants' fraud, Plaintiffs in this case have not alleged that, but for the fraud, the Liberty Silver shares would not have been on the market.

### 2. Fraud-On-The-Market Presumption under *Basic*

To properly invoke the fraud-on-the-market presumption, a plaintiff must prove that the market in which the security trades is efficient, thereby reflecting available material information. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). Neither the Supreme Court nor the Eleventh Circuit has defined a specific check list for determining when a market is efficient. *See, e.g. id.* ("Market efficiency is a matter of degree and accordingly . . . a matter of proof."); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1254 (11th Cir. 2014) (stating that there is no mandatory analytical framework in analyzing market efficiency because district

courts are given the flexibility to make the fact-intensive inquiry on a case-by-case basis). Although the Eleventh Circuit in *Local* 703 stated that district courts have discretion in considering whether a market is efficient, the leading case in assessing market efficiency is *Cammer v. Bloom*, 711 F. Supp. 1264 (D. N.J. 1989).

In *Cammer*, the court explained that the central question under the fraud-on-the-market theory is whether the stock price, at the time plaintiff effected trade, reflected misinformation alleged to have been disseminated. To determine whether a market is open and efficient, the court addressed the following factors: (1) the trading volume during the class period; (2) the number of securities analysists following and reporting on a company's stock during the class period; (3) the existence of market makers; (4) whether the Company was required to file a S-3 Registration statement; and (4) a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *Id.* at 1287.

Specifically, in explaining the first *Cammer* factor, the court stated the following:

> First, plaintiffs could have alleged there existed an average weekly trading volume during the class period in excess of a certain number of shares. The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.

*Id.* at 1286.

With regards to the second *Cammer* factor, the court explained that "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period" because "[t]he existence of such analysts would imply, for example, the [] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." *Id.*

9

As to the third *Cammer* factor, the court explained that "[t] he existence of market markers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and report financial results by buying or selling stock and driving it to a changed price level." *Id.* at 1287-88.

Turning to the fourth *Cammer* factor, the court explained that Form S-3 Eligibility "is an important factor weighing in favor of a finding that a market is efficient" because "the aspect of Form S-3 requirements ensures that enough investors have in fact read the previously filed document." *Id.*

Finally, the court explained that the fifth *Cammer* factor was the "essence of an efficient market and the foundation for the fraud on the market theory." *Id.* at 1287. The court explained that "one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Id.*

The Court finds the above-stated *Cammer* factors to be highly instructive in determining whether a market is efficient, and therefore the Court applies such factors to the instant case. *See Local 703*, 762 F.3d at 1255 (noting that seven of the twelve Circuit Courts have adopted the *Cammer* factors as the mandatory analytical framework for market efficiency inquiries). Applying the *Cammer* factors to the instant case, the Court finds that the analysis of Professor Jarrell demonstrates that the shares of Liberty Silver traded in an informationally inefficient market during the class period. For example, Professor Jarrell analyzed each *Cammer* factor in determining whether a market is efficient and found that four *Cammer* factors established that the Liberty Silver shares traded on an inefficient market. Professor Jarrell further analyzed other

factors to determiner market efficiency and found that such factors weigh against a finding of market efficiency.  The Court addresses each factor below.

Turning to the first *Cammer* factor—trading volume—Professor Jarrell considered the weekly trading volume over the class period and found that the medial weekly trading volume as a percentage of shares outstanding over the class period was .3% and that the mean was .8%, which are both less than the 1% benchmark specified in *Cammer*.   **[DE 163-3]**; *See Cammer*, 711 F. Supp. at 1286 ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.") (quoting Bromberg & Lownfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

Applying the second *Cammer* factor—analyst coverage—Professor Jarrell found that "no equity research analysts provided buy/sell recommendations or quarterly EPS estimates for Liberty Silver during the Class Period." **[DE 163-3]**.  Professor Jarrell further stated that his research for "material news for Liberty Silver over the Class Period indicate[d] that there [was] no material news, stories, press releases, or SEC filings . . . on 899 of the 969 days during the Class Period." *Id.*

Regarding the third *Cammer* factor—the existence of market makers—Professor Jarrell found that Liberty Silver traded on the Over the Counter Bulletin Board ("OTBB") during the Class Period.  According to Professor Jarrell, the "*Cammer* market-maker factor originally related to over-the counter stocks that were traded  in a quote-driven system, especially markets without volume reporting." **[DE 163-3]**; *Id.* at 1293 ("For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is

11

an efficient one; five market makers would justify a more modest presumption.'") (quotation omitted). Professor Jarrell explained that "the larger the number of market makers, the greater the confidence of high liquidity . . . ." *Id.* Professor Jarrell found that the number of market makers for Liberty Silver ranged from 5 to 28, with an average of 18 during the class period.

Although there were an average of 18 market makers for Liberty Silver stock over the class period, which would suggest market efficiency, Professor Jarrell opined that "it is not clear that this *Cammer* factor carries much weight in view of the low trading volume of Liberty Silver stock." **[DE 163-3]**. Professor Jarrell further noted that, even though Liberty Silver had an average of 18 market makers, the "relatively low amount of liquidity and high trading costs for Liberty Silver's common stock over the Class Period, [] supports a finding that Liberty Silver's common stock traded in an informationally inefficient market during the Class Period." **[DE 163-3]**. The trading costs of Liberty Silver stock is discussed as a separate factor below.

Furthermore, Professor Jarrell noted that Liberty Silver discussed the company's status as a "penny stock". Professor Jarrell discussed the status of a company as a "penny stock" and its effect on the market. For example, Professor Jarrell noted the following:

> The Company's common stock is currently subject to the "penny stock" rules adopted under section 15(g) of the Exchange Act. The penny stock rules apply generally to companies whose common stock is not listed on a national securities exchange and trades at less than $5.00 per share. These rules require, among other things, that brokers who trade penny stock to persons other than "established customers" complete certain documentation, make suitability inquiries of investors and provide investors with certain information concerning trading in the security, including a risk disclosure document and quote information under certain circumstances. **Many brokers have decided not to trade penny stocks because of the requirements of the penny stock rules and, as a result, the number of broker-dealers willing to act as market makers in such securities is limited.** As long as the Company's shares continue to remain subject to the penny stock rules, it could have an adverse effect on the market for the

12

> Company's shares, and investors could find it more difficult to dispose of the Company's shares.

**[DE 163-3]**.

Turning to the fourth *Cammer* factor—Form S-3—Professor Jarrell found that "Liberty Silver did not meet the $75 million requirement for filing a Form S-3 Registration Statement during most of the Class Period . . . ." *Id.* Therefore, Professor Jarrell found that Plaintiffs failed to meet the fourth traditional *Cammer* factor to test for market efficiency. **[DE 163-3]**.

Finally, as to the fifth *Cammer* factor—cause-and-effect relationship—Professor Jarrell conducted several empirical tests for Liberty Silver's stock to determine the cause and effect relationship between unexpected corporate events or financial releases and an immediate response in Liberty Silver's stock price. Professor Jarrell opined that "Liberty Silver's stock returns were not correlated with any general market or industry indexes during the Class Period . . . ." **[DE 163-3]**. Specifically, Professor Jarrell examined each of the "11 disclosures that [were] alleged in the Complaint to contain fraudulent misstatements." **[DE 163-3]**. According to an event study conducted, he found that none of the disclosures had a "corresponding, statistically-significant reaction of Liberty Silver's stock price." *Id.* Therefore, Professor Jarrell opined that "whether we examine non-fraud-related news or allegedly fraud-related news, there is no evidence whatsoever of any cause-and-effect relationship between news and Liberty Silver's stock returns." **[DE 163-3]**.

The Court notes that in addition to analyzing the traditional factors adopted by many courts following *Cammer*, Professor Jarrell further analyzed other factors considered by courts and found that such factors indicated that Liberty Silver shares did not trade in an efficient market. For example, Professor Jarrell looked at the following factors: market capitalization; public float; bid-ask spread; media coverage; and institutional ownership. *See Krogman v.*

*Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (stating that "[m]arket capitalization . . . may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations" and "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.") ; *Cheney v. Cyberguard Corp*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (stating that a significant number of news items indicates that information regarding the company may have been widely distributed, which would support a finding of efficiency); *see, e.g.*, *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 508 (S.D. Tex. 2004) (crediting plaintiff's expert's assertion that "there is a general understanding that a high level of institutional ownership in a security serves to increase the efficiency of the market.").

Here, Professor Jarrell found that the market capitalization of the equity of Liberty Silver had a median value of $44 million and the median value of the public float of Liberty Silver was approximately $32 million over the class period. Compared to NASDAQ-listed companies, Professor Jarrell opined that 78% of such listed companies had greater market capitalization than Liberty Silver. Professor Jarrell further opined that Liberty Silver's stock had virtually zero institutional ownership over the Class Period. **[DE 163-3]** ("Excluding the Defendants, only two institutional owners held any Liberty Silver shares, and their total holdings accounted for less than 1% of the shares outstanding on average over the Class Period. By comparison, 99% of the companies on the NASDAQ had a greater percentage of institutional ownership over the Class Period.").

And finally, as to the bid-ask spread, which involves the cost of trading stock, Professor Jarrell opined that Liberty Silver's bid-ask spread averaged 7.1% over the Class Period. **[DE 163-3]**. Professor Jarrell opined that "[t]his is a very high bid-ask spread that is significantly

greater than the spread for NASDAQ companies, which ha[ve] an average bid-ask spread of 1.28% . . . ." *Id.* He further found that Liberty Silver's bid-ask spread was greater than the average bid-ask spread of "89% of the NASDAQ companies over the Class Period." *Id.* Therefore, Professor Jarrell stated that "it is likely that the cost of trading would have deterred investors from transacting. **[DE 163-3]**.

After evaluating all of the *Cammer* factors and the other factors used in *Krogman*, and *Cheney*, Professor Jarrell opined, among other things, that Liberty Silver was essentially a company with low trading volume, little news coverage, no analyst coverage, and high trading costs. **[DE 163-3]**. Professor Jarrell ultimately found that the market for information for Liberty Silver's stock during the class period was not efficient.

The Court has reviewed each of the *Cammer* factors, along with several other factors stated above, and adopts Professor Jarrell's opinion that Liberty Silver shares did not trade on an informationally efficient market. Although no one factor is dispositive, the Court finds that, by collectively examining each factor, there was no cause and effect relationship between the disclosure of information and price movements of the Liberty Silvery stock. Thus, Plaintiffs are not entitled to a presumption of reliance using the fraud-on-the-market theory.

Although the Court adopts Professor Jarrell's opinion, the Court notes that it reviewed the report and testimony of Plaintiffs' expert, Ms. Candace Preston. The Court rejects Ms. Preston's conclusion, which claimed that Liberty Silver shares traded on an efficient market. The Court finds Professor Jarrell to be more credible.

### III. Conclusion

**ORDERED AND ADJUDGED** that Plaintiffs' motion for class certification **[DE 144]** is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 11 day of March 2016.

/s/ Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE